James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Proposed Counsel to the Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) ) ) Case No. 09-_____(___) |
| Debtors. | ) ) ) Joint Administration Requested |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO (A) PAY CERTAIN PREPETITION WAGES AND REIMBURSABLE EMPLOYEE EXPENSES, (B) PAY AND HONOR EMPLOYEE MEDICAL AND OTHER BENEFITS AND (C) CONTINUE EMPLOYEE BENEFITS PROGRAMS

The Reader's Digest Association, Inc. ("***Reader's Digest***") and certain of its affiliates, as

debtors and debtors in possession (collectively, the "***Debtors***"),[1] file this motion (the "***Motion***")

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home

for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "***Interim Order***"), and a final order, substantially in the form attached hereto as **Exhibit B** (the "***Final Order***"), (i) authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, commissions and other compensation, taxes, withholdings and related costs and reimbursable employee expenses, (b) pay and honor obligations relating to employee medical, insurance and other benefits programs and (c) continue their employee medical, insurance and other benefits programs on a postpetition basis, (ii) authorizing financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests related to the foregoing and (iii) scheduling a final hearing (the "***Final Hearing***") to consider entry of the Final Order. In support of the Motion, the Debtors submit the Declaration of Thomas A. Williams, Chief Financial Officer and Senior Vice President of The Reader's Digest Association, Inc., in Support of Debtors' First Day Pleadings (the "***Williams Declaration***"). In support of this Motion, the Debtors respectfully state as follows:

<u>**Jurisdiction**</u>

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

3. The statutory bases for the relief requested herein are sections 105(a), 363, 507(a)(4)-(5), 1107(a) and 1108 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule

---

Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, Inc. (3276); World Almanac Education Group, Inc. (3781); World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is: 1 Reader's Digest Road, Pleasantville, NY 10570.

K&E 14375259.

9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***").

## Introduction

4.  As described in the Williams Declaration, the Debtors and their non-debtor affiliates (collectively, the "***Company***") are a global multi-brand media and direct marketing company that markets books, magazines, home entertainment products, online networking websites and educational products. With its global headquarters located in Pleasantville, New York, the Company has over 3,000 employees worldwide, including approximately 1,500 in the United States, and achieves annual sales of approximately $2.2 billion.

5.  Despite their leading industry position, the Debtors have not been immune to the global financial crisis. The current recession has resulted in reductions in the Debtors' advertising, retail and subscription revenues, placing pressure on the Debtors' financial performance. Withdrawal of certain international lines of credit and heightened pressures from trade creditors have also weakened the Debtors' liquidity position. In short, as the economy continues to deteriorate in several of the Debtors' markets, the Debtors are struggling to maintain working capital sufficient to conduct operations while facing progressively unsustainable debt service obligations under a highly-leveraged capital structure.

6.  To ensure they maintain competitive operations, the Debtors have engaged in extensive negotiations with their prepetition secured lenders regarding a comprehensive debt restructuring. After weeks of discussions, the Debtors are before the Court with a pre-arranged restructuring plan that will reduce the Debtors' total funded debt by approximately 75%, provide the Debtors with adequate exit financing and provide substantial recoveries to the Debtors' valued suppliers that continue to do business with the reorganized company.

K&E 14375259.

7.     To evidence their support of the Debtors' restructuring, prepetition secured lenders holding more than 80% of the Debtors' bank debt have executed a restructuring support agreement (the "*RSA*"), which attaches a term sheet that sets forth the terms for a chapter 11 plan that is supported by these parties.  The Debtors intend to file shortly a proposed chapter 11 plan consistent with the terms contained in the plan term sheet.

8.     On the date hereof (the "***Commencement Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have filed a motion seeking joint administration of these chapter 11 cases.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  No committees have been appointed or designated.

9.     A description of the Debtors' businesses and operations, their capital structure and the circumstances leading up to and precipitating the commencement of these chapter 11 cases is set forth in the Williams Declaration.

## Relief Requested

10.    The Debtors' employees perform a variety of critical functions, including sales, customer service, information technology, purchasing and a variety of administrative, legal, accounting, finance and management related tasks. The skills and experience of the Debtors' employees, as well as their relationships with customers and vendors and knowledge of the Debtors' infrastructure are essential to the Debtors' ongoing operations and ability to effectively reorganize their businesses.  The vast majority of the Debtors' employees rely exclusively on their compensation to pay their daily living expenses.  To minimize the personal hardship the Debtors' employees would suffer if prepetition employment-related obligations were not paid

when due or as expected, and to maintain morale and enhance the Debtors' ability to retain employees during this critical restructuring process, the Debtors request the authority, to be exercised in their sole discretion, to pay and honor certain prepetition claims, honor obligations and to continue programs, in the ordinary course of business and consistent with past practice, relating to, among other things: (a) Unpaid Compensation, Deductions and Payroll Taxes, severance obligations (to the extent requested herein), Outplacement Services, Temporary Employee Compensation and Independent Contractor Compensation; (b) Reimbursable Expenses, American Express Corporate Card Expenses, Relocation Expenses and Expatriate Employee Expenses; and (c) Employee Benefit Programs (each as defined herein, and collectively the "***Employee Obligations***").

11.     Additionally, the Debtors request this court schedule a Final Hearing to consider entry of a Final Order granting them, in addition to the relief requested above, the authority to (a) pay and honor prepetition amounts up to $10,950 and postpetition amounts in the ordinary course and consistent with past practice pursuant to the Severance Program (as defined herein), (b) pay and honor Unpaid Compensation in excess of $10,950 on account of the Sales Incentive Plans and the Commission Programs (each as defined herein) for certain Employees, (c) pay and honor Independent Contractor Compensation (as defined herein) for five independent contractors in excess of $10,950 and (d) pay and honor certain prepetition claims, honor obligations and to continue programs, in the ordinary course of business and consistent with past practice, relating to (i) adoption assistance, (ii) tax planning, (iii) gym membership, (iv) the flex net plan, (v) financial planning and (vi) legal advice through Hyatt Legal Plans.

12.     The Debtors also request the right to modify, change and discontinue any of the Employee Obligations, and the policies related thereto, and to implement new Employee

Obligations in the ordinary course of business during the chapter 11 cases in their sole discretion without the need for further Court approval.

13. To the extent payments made hereunder are dishonored by the Debtors' financial institutions, the Debtors also request authority for such financial institutions to receive, process and honor and pay any and all replacement checks or wire transfer requests in respect of the relief requested herein.

14. Finally, to the extent any of the Debtors' Employees are asserting claims under the Workers' Compensation Program (as defined herein), the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit these Employees to proceed with their claims under the Workers' Compensation Program. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

**The Debtors' Workforce and Wage and Benefit Obligations**

**I.     The Debtors' Workforce**

15. As of the Commencement Date, the Debtors employ approximately 1,500 employees, of whom approximately 1,454 are full-time employees, regularly scheduled to work a minimum of 35, 37.5 or 40 hours per week, depending on location, on a continuing basis (the "***Full-Time Employees***"), and approximately 46 are part-time employees (the "***Part-Time Employees***" and, together with the Full-Time Employees, the "***Employees***").[2] The Debtors pay approximately 277 of their Employees (18%) on an hourly basis (the "***Hourly Employees***"), while the remaining 1,223 (82%) are paid on a salaried basis (the "***Salaried Employees***"). None

---

[2]     Because all of the Debtors are organized under the laws of various states in the United States, and because none of their foreign affiliates are parties to these chapter 11 cases, unless otherwise noted herein, the Debtors have limited the description of their work force and benefits programs to their domestic operations.

K&E 14375259.

of the Employees are unionized and none of the Debtors are a party to any collective bargaining agreement.

16.     In addition to their Employees, the Debtors supplement their workforce by utilizing (a) temporary employees (the "***Temporary Employees***") who are provided to the Debtors through temporary staffing agencies (the "***Temporary Staffing Agencies***") and (b) approximately 2,000 independent contractors (the "***Independent Contractors***") annually that are vital to the creative content of the Debtors' businesses.  The Independent Contractors include individuals who perform creative services on a freelance basis with respect to the creation of the Debtors' products and promotional materials, including, without limitation, writers, photographers, artists, researchers and editors.  In many cases, the Debtors procure the services of the Independent Contractors through individualized contracts that set forth the terms of each Independent Contractor's retention, including remuneration.

## II.     Wages, Salaries, Commissions and Other Compensation

### A.     Unpaid Compensation

17.     In the ordinary course of business, the Debtors pay the Employees on a bi-weekly basis.  The Debtors maintain a staggered payroll payment process under which (a) 484 Employees receive their compensation one week in arrears, (b) 383 Employees receive their compensation on a current basis and (c) 633 Employees receive their compensation one week ahead.

18.     In addition to regular wages and salaries, in the ordinary course of business, the Debtors offer approximately 103 non-insider[3] Employees who sell advertising space, trade

---

3     For the purpose of this Motion, the Debtors' insiders consist of the elected and executive officers of RDA Holding Co. and Reader's Digest, as set forth in the Debtors' annual reports filed with the Securities and Exchange Commission.

books, books and music the ability to participate in various sales incentive programs (the "*Sales Incentive Plans*").  The incentives provided under the Sales Incentive Plans are an important portion of the compensation package and are designed to encourage performance. Payments under the Sales Incentive Plans are typically earned when an Employee attains a specified performance goal and are paid quarterly through payroll.  Quarterly revenue targets for the Sales Incentive Plans are established during the first quarter of each fiscal year.  For fiscal year 2009, the Debtors paid approximately $2 million pursuant to the Sales Incentive Plans.  As of the Commencement Date, the Debtors estimate they owe approximately $250,000 on account of the Sales Incentive Plans for fiscal year 2010.

19.     In addition, as an integral component of compensation to approximately 55 of their Compass Learning and Weekly Reader Employees, the Debtors also offer certain commission programs (the "*Commission Programs*").  Due to the cyclical nature of the academic selling calendar, the majority of monthly commissions paid pursuant to the Commission Programs for a particular year are paid from July through September.  Under the Commission Programs, Employees earn commissions after (a) the Employee completes a sale of the Debtors' services and (b) the value or amount of such Employee's total sales meets or exceeds certain specified goals.  The Debtors paid $3.1 million in the aggregate pursuant to the Commission Programs for fiscal year 2009.  As of the Commencement Date, the Debtors estimate they owe approximately $200,000 on account of prepetition obligations related to the Commissions Programs.

20.     The Debtors' payroll obligations generally include wages, salaries and overtime compensation, as well as payments related to the sales incentives and commissions described above.  On average, the Debtors' gross payroll is approximately $4.4 million per bi-weekly pay

K&E 14375259.

period.  The majority of the Debtors' payroll is made by direct deposit through electronic transfer of funds to the Employee's accounts with the balance of Employees receiving checks.[4]

21.     As of the Commencement Date, the Debtors estimate they owe approximately $1.1 million on account of accrued wages, salaries, obligations under the Sales Incentive Plans and Commission Programs and other cash compensation (excluding reimbursable expenses, severance and vacation pay) that was earned prior to the Commencement Date (the "**_Unpaid Compensation_**").  The Debtors do not intend to pay any Employees Unpaid Compensation in excess of the $10,950 cap imposed by section 507(a)(4) of the Bankruptcy Code pursuant to the Interim Order.[5]

### B.     Gross Pay Deductions, Governmental Withholdings and Payroll Taxes.

22.     For each applicable pay period, the Debtors routinely deduct, directly or through ADP, certain amounts from Employee paychecks, including, without limitation, (a) garnishments, child support and service charges and similar deductions and (b) other pre- and after-tax deductions payable pursuant to certain of the employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, legally ordered deductions and

---

[4]     The Debtors utilize Automatic Data Processing ("**_ADP_**") to provide payroll processing, accounting, tax computation, check preparation, payroll transfer administration and various administrative services and to fund their payroll in advance.  Specifically, each payroll period, the Debtors fund certain disbursement accounts with the amounts necessary to satisfy the Debtors' payroll obligations.  ADP then processes direct deposit transfers or administers payroll checks to Employees.  The services of ADP are crucial to the smooth functioning of the Debtors' payroll system because they ensure that (a) Employees are paid on time, (b) source deductions are appropriately determined, (c) payroll reporting is accurate and (d) appropriate amounts are remitted to taxing authorities and other payees.  The Debtors pay ADP approximately $12,000 per month for its payroll services.  As of the Commencement Date, the Debtors estimate they owe approximately $30,000 to ADP on account of payroll services.  By this Motion, the Debtors seek the authority to pay all outstanding prepetition amounts to ADP.

[5]     The Debtors believe they owe approximately 20 Employees in excess of $10,950 on account of Sales Incentive Plans or Commission Programs.  Because the services provided by the Employees are critical to the Debtors' estates and because the Employees rely on this compensation, the Debtors seek authority to continue to make all payments pursuant to the Sales Incentive Plans and Commission Programs pursuant to the Final Order.

miscellaneous deductions) (collectively, the "***Deductions***"). On average, the Debtors deduct a total of approximately $700,000 from Employees' paychecks per bi-weekly pay period which the Debtors remit (directly or through ADP) to the appropriate third-party recipients. The Debtors, however, may not have forwarded certain of the Deductions to the appropriate third-party recipients prior to the Commencement Date. Accordingly, the Debtors seek authority to forward prepetition Deductions (and to continue to forward Deductions on a postpetition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

23.     In addition to the Deductions, federal and state laws require the Debtors to withhold amounts related to federal, state and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state or local taxing authority (collectively, the "***Withheld Amounts***"). The Debtors must then match from their own funds for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively the "***Employer Payroll Taxes***," and together with the Withheld Amounts, the "***Payroll Taxes***"). In the aggregate, the Payroll Taxes, including both the Employee and employer portions, total approximately $1.8 million per bi-weekly pay period. As of the Commencement Date, the Debtors estimate they owe approximately $425,000 on account of prepetition Payroll Taxes.

24.     To the extent any of the Deductions or Payroll Taxes may not have been forwarded to the appropriate third-party recipients, the Debtors seek authority to forward prepetition Deductions and Payroll Taxes (and to continue to forward Deductions and Payroll

K&E 14375259.

Taxes on a postpetition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.[6]

### C. Employee Bonus Programs

25.     To encourage Employees to maximize their efforts and performance, the Debtors have historically maintained annual bonus programs that bring substantial value to the Debtors' estates by encouraging Employees to achieve company-wide goals and targets.

26.     For the fiscal year ended June 30, 2009, the Debtors maintained two employee bonus plans:[7]

a.      a performance incentive plan that covered approximately 700 Employees and non-Debtors affiliate management employees based on achievement of annual performance objectives (the "*MIP*"); and

b.      an incentive plan for approximately 2,200 Employees and non-Debtor affiliate non-management employees that rewards such Employees for achievement of annual performance objectives (the "*AIP*").

27.     In addition, prior to the Commencement Date, the Debtors offered a long-term incentive program to senior management Employees, including insiders, who contribute to, and significantly impact, the Debtors' long-term financial operating performance (the "*Long-Term Incentive Plan*" and together with the MIP and AIP, the "*Employee Bonus Programs*"). The Long-Term Incentive Plan was designed to align senior executives with the long-term goals of the company and reward them for achievement of those goals.  Approximately 75 Employees were eligible to receive payments subject to satisfaction of certain pre-set performance metrics.

---

[6]     ADP is also responsible for administering payment of all Payroll Taxes to applicable third parties on the Debtors' behalf.

[7]     On August 7, 2009, in the ordinary course of business, the Debtors and their non-Debtor affiliates, as authorized by the Compensation Committee of the Debtors' Board of Directors, paid certain discretionary awards totaling $5.8 million in the aggregate in bonus payments.

K&E 14375259.

No payments have been made under the Long-Term Incentive Plan for the fiscal year ended 2009.

28. By this Motion, the Debtors are not seeking approval of any of the Employee Bonus Programs or authority to make any prepetition or postpetition payments under these programs in either the Interim Order or Final Order. In connection with the RSA, the Consenting Lenders have agreed to revise the terms of new annual bonus programs designed to incent performance of specific objectives consistent with the Debtors' revised business plan. Approval of these programs will be sought in connection with confirmation of a plan of reorganization. Pursuant to the Restructuring Support Agreement, the Consenting Lenders have also agreed to support payments under a retention plan for lower level employees during the course of these chapter 11 cases. The Debtors intend to file a request on separate motion to seek approval from this Court prior to making any such payments.

D. **Severance Obligations**

i. *Severance Program*

29. In their normal course of operations, the Debtors maintain a policy of offering severance payments to all Employees who have been involuntarily terminated in connection with a business decision or other restructuring initiative (the "***Severance Program***").[8] Under the Debtors' Severance Program, Employees accrue two weeks of severance pay for every year of service with a minimum of at least four weeks of salary continuation (with individual severance payments varying based on level of experience). Typically, payments to the terminated

---

[8] In addition to the Severance Program, certain employment contracts entered into by the Debtors contain independent severance provisions. By this Motion, the Debtors are not seeking authority to honor and pay any such postpetition severance obligations at this time. The Debtors reserve the right to assume these obligations at a later date upon notice and an opportunity to object.

K&E 14375259.

Employee pursuant to the Severance Program begin after execution of a release and meeting other conditions and are made through the Debtors bi-weekly payroll.

30.     In addition, the Debtors offer outplacement and career transition services (the "***Outplacement Services***") to involuntarily terminated employees through Right Management Inc.  Outplacement Services provide terminated employees with resume assistance, networking opportunities, career coaching and employment researching opportunities.  The duration of outplacement services is based on the Employee's level in the organization and can range from two to 52 weeks.  As of the Commencement Date, there are 160 former employees actively using Outplacement Services and the Debtors owe approximately $62,500 on account of such services.

31.     The Debtors believe it is critical to maintaining Employee morale and loyalty that they be authorized to continue the Severance Program and the Outplacement Services in the ordinary course of business after the Commencement Date.  The Debtors cannot afford for the Employees to leave their jobs while the Debtors continue to need their services during this critical process and there is no guarantee that the Debtors could attract new employees of comparable quality and character.  Moreover, even if otherwise available, a new employee would lack the unique knowledge and historical perspective of the Debtors possessed by the Employees.

32.     Accordingly, pursuant to the Final Order, the Debtors seek authority to make postpetition payments to non-insiders terminated after the Commencement Date, if any, pursuant to the Severance Program in accordance with their past practices and to continue the outplacement program.  The Debtors are not seeking interim relief on account of the Severance Program.  Furthermore, the Debtors' insiders are explicitly excluded from the relief requested herein.  To the extent the Debtors propose to provide severance payments to any insiders during

the chapter 11 cases, the Debtors will seek approval from this Court prior to making any such payments.

    ii.  *Unpaid Severance Obligations*

  33.  As of the Commencement Date, the Debtors also owe approximately $1.7 million to 66 non-insider employees who were terminated prior to the Commencement Date on account of the Severance Program or other severance arrangements (the "***Unpaid Severance***").[9]  By this Motion, the Debtors are seeking authority, but not direction, to pay, pursuant to the Final Order, Unpaid Severance obligations to any individual up to the $10,950 cap imposed by section 507(a)(4) of the Bankruptcy Code, up to a total amount of approximately $610,000.

## III. Supplemental Workforce Obligations

### A. Temporary Employee Compensation

  34.  When necessary in the ordinary course of business, the Debtors employ the services of Temporary Employees who are placed with the Debtors through Temporary Staffing Agencies to handle projects or overflow work.  The Debtors typically remit compensation for the Temporary Employees to the Temporary Staffing Agencies on a weekly or bi-weekly basis through certain corporate purchase credit cards with American Express or the Debtors' accounts payable (the "***Temporary Employee Compensation***").  On average, the Debtors pay approximately $150,000 per month on account of Temporary Employees.  As of the Commencement Date, the Debtors estimate they owe Temporary Staffing Agencies

---

[9] To reduce the cash cost of funding severance benefits, prior to the Commencement Date, as part of their prepetition restructuring initiatives, the Debtors amended the Reader's Digest Retirement Plan (as defined herein) to provide a special pension credit to eligible terminated Employees terminated after April 1, 2009 and on or before December 31, 2009.  This amendment effectively transferred the obligation to fund severance benefits from Reader's Digest to the Reader's Digest Retirement Plan.  The amounts set forth herein for Unpaid Severance do not include severance obligations owed to Employees currently receiving payments from the Reader's Digest Retirement Plan, which payments will be unaffected by the commencement of these chapter 11 cases.

approximately $75,000 for prepetition services provided by Temporary Employees. The Debtors believe it is necessary to pay the obligations of the Temporary Staffing Agencies so that these agencies will continue to provide adequate staffing to Reader's Digest and, therefore, are requesting authority to pay, in their discretion, the Temporary Employee Compensation in the ordinary course of business and consistent with past practices. The Debtors do not seek authority to pay any Temporary Staffing Agency amounts for individual employees in excess of the $10,950 priority cap.

### B. Independent Contractor Compensation

35. The Debtors engage approximately 2,000 Independent Contractors annually who are vital to the creative content of the Debtors' businesses. The Independent Contractors include individuals who perform creative services on a freelance basis with respect to the creation of the Debtors' products and promotional materials, including, without limitation, writers, photographers, artists, researchers and editors. None of the Independent Contractors falls within the definition of "professional" under the Bankruptcy Code. The Debtors remit compensation to the Independent Contractors (the "***Independent Contractor Compensation***") through their accounts payable process. On average, the Debtors pay a total of approximately $2.9 million per month to Independent Contractors. As of the Commencement Date, the Debtors estimate they owe 161 Independent Contractors approximately $350,000 in the aggregate for prepetition services. Because continued performance and contributions by the Independent Contractors are so important to the Debtors' operations and reorganization efforts, the Debtors request authority to pay, in their sole discretion, all unpaid Independent Contractor Compensation in the ordinary course of business and consistent with past practice.[10]

---

[10] The Debtors estimate five Independent Contractors are owed more than $10,950 on account of Independent Contractor Compensation in an aggregate amount of approximately $80,000.

## IV. Reimbursable Expenses, American Express Corporate Card Expenses, Relocation Expenses and Expatriate Employee Expenses

### A. Reimbursable Expenses

36.     In the ordinary course of business, the Debtors reimburse Employees and directors for certain reasonable and customary expenses incurred in the scope of their employment and on behalf of the Debtors (collectively, the "***Reimbursable Expenses***"), including, without limitation, expenses related to (a) business travel, (b) professional development, (c) business entertainment, (d) communications (*i.e.*, use of cellular telephone, PDA and internet access for business purposes) and (e) other expenses allowed pursuant to the Debtors' travel and entertainment policy. These Reimbursable Expenses are either paid personally by the Employee or charged to an American Express Corporate Card (as defined herein).

37.     The Debtors utilize Gelco Expense Management ("***Gelco***") to administer and process the Reimbursable Expenses. Employees input their expenses and supporting documentation into a software management program provided and administered by Gelco, and, thereafter, the expenses are reviewed according to the Debtors' travel and expense policies. Upon approval, Gelco notifies the Debtors as to the amount of funds needed to cover the Reimbursable Expenses and the Debtors fund the required amount to a disbursement account held at JP Morgan Chase Bank, N.A. Gelco then remits payment directly to the Debtors' Employees and American Express. The Debtors pay Gelco approximately $12,000 per month for reimbursement services.

38.     In the aggregate, the Debtors' Employees incur, on average, approximately $1 million per month in Reimbursable Expenses. Of this amount, approximately $200,000 is reimbursed directly to the Debtors' Employees and the remainder is paid to American Express.

K&E 14375259.

Although the Debtors request that Employees submit reimbursement requests promptly, not all of the Employees do so. Based on historical figures, the Debtors estimate they could owe approximately $500,000 on account of prepetition Reimbursable Expenses as of the Commencement Date, including amounts reimbursed directly to the Employees and to American Express.

### B. American Express Corporate Cards

39.     To streamline payment of Reimbursable Expenses, the Debtors have policies whereby American Express issues company credit cards to approximately 700 Employees for travel, commutation and certain business-related expenses (the "***American Express Corporate Cards***"). The expenses are ordinary course expenses that the Employees incur in performing their job functions. Included in this category are all expenses incurred on the Employees' American Express Corporate Cards. It is essential to the continued operation of the Debtors' businesses that the Debtors be permitted to continue reimbursing employees for such expenses. American Express debits the Debtors' account for the amount due, which is typically approximately $800,000 per month (the "***American Express Corporate Card Expenses***").[11]

### C. Relocation Expenses and Expatriate Employee Expenses

40.     In the ordinary course of business, the Debtors pay or reimburse Employees for relocation expenses incurred at the Debtors' request or for the Debtors' benefit (the "***Relocation Expenses***"), which payments are processed through a third-party administrator, Weichert Relocation Resources Inc. ("***Weichert***"). Specifically, Weichert pays the Employees for relocation expenses and the Debtors reimburse Weichert for such payments.

---

[11]     Although the Debtors pay invoices for the American Express Corporate Cards, the accounts are held in the names of individual employees and, therefore, to the extent the Debtors fail to remit payment to American Express for valid and legitimate charges, the Employees may be personally liable for the same.

K&E 14375259.

41.     In addition, Weichert provides critical services to six of the Debtors' Employees who are U.S. expatriate employees (the "***Expatriate Employees***") and are engaged on international assignments.  The Expatriate Employees play a key role in the performance of Reader's Digest's worldwide operations.  In addition to base pay, the Debtors pay or refund all assignment allowances, relocation expenses, tax costs and service fees (collectively, the "***Expatriate Employee Expenses***") incurred by Expatriate Employees through Weichert.  The Debtors reimburse Weichert for the Expatriate Employee Expenses paid to their Expatriate Employees through the accounts payable process.

42.     On average, the Debtors typically pay Weichert approximately $55,000 per month for Relocation Expenses and Expatriate Employee Expenses.  As of the Commencement Date, the Debtors believe that Weichert is owed approximately $40,000 on account of Relocation Expenses and Expatriate Employee Expenses.

43.     All of the above referenced expenses were incurred as business expenses on the Debtors' behalf and with the understanding that the Employees' would be reimbursed.  Accordingly, by this Motion, the Debtors seek to continue making such payments in the ordinary course (and regardless of whether the costs are allocable to the prepetition or postpetition period) to avoid harming Employees who incurred Reimbursable Expenses, American Express Corporate Card Expenses, Relocation Expenses or Expatriate Employee Expenses and who may have already paid or may become personally liable for them.

## V.     <u>Employee Benefits</u>

44.     In the ordinary course of business, the Debtors maintain various employment benefit plans and policies, including, without limitation, health care, dental and vision plans (and health and dental care for eligible retirees), flexible spending and health savings accounts, workers' compensation benefits, vacation time and other paid leaves of absence, qualified

K&E 14375259.

retirement savings plans, life insurance, accidental death and dismemberment insurance, business travel accident insurance, short- and long-term disability insurance, an employee assistance program, auto and homeowners insurance, qualified transportation benefits, company automobile allowances, reimbursement for gym membership, a flex net plan, a financial planning plan and a plan to obtain legal advice (collectively, the "***Employee Benefit Programs***"). Any Employee who is regularly scheduled to work 20 or more hours per week is eligible for the Employee Benefits Programs. As of the Commencement Date, there were approximately 1,500 Employees and their dependants eligible for the Employee Benefits Programs (the "***Program Participants***"). By this Motion, the Debtors seek to pay prepetition claims (if applicable), honor obligations and to continue programs, in the ordinary course of business and consistent with past practice, relating to the Employee Benefit Programs.

### A. Health Care Plan

45. Program Participants are eligible to receive medical, dental and vision insurance (collectively, the "***Health Care Plan***"). As the Health Care Plan is self-insured, the Debtors pay all associated fees and claims costs net of Employee contributions. The following is a brief summary of the Health Care Plan:

    a.   <u>Medical Plan</u>. Through Aetna Inc. ("***Aetna***"), the Debtors offer Program Participants a point-of-service or a consumer driven health medical plan (the "***Medical Plan***").[12] Both of these plans include prescription drug coverage.[13] The Debtors pay approximately $950,000 per month on account of the Medical Plan, net of Employee contributions.

---

[12] In addition to the medical coverage provided by Aetna the Debtors maintain regional HMOs and PPOs for Program Participants. Approximately 85 Program Participants and 8 Eligible Retirees (as defined herein) working in New York, New Jersey or Connecticut participate in a HMO through Oxford. Approximately 72 Program Participants of Allrecipes.com, Inc. in Washington participate in a PPO through The Regence Group.

[13] As part of the Medical Plan, the Debtors have contracted with Towers Perrin and Aetna Inc. to participate in a prescription drug purchasing cooperative. Through this program, the Debtors obtain a "best rate" guarantee from Aetna on prescription drug prices.

K&E 14375259.

b.    <u>Dental Plan</u>.  Aetna also administers the Debtors' dental plan (the "***Dental Plan***"). The Dental Plan is a network based plan that offers financial incentives to see an approved network provider. The Dental Plan provides coverage for preventive, basic, major and orthodontic services. The Debtors pay approximately $115,000 per month on account of the Dental Plan, net of Employee contributions.

c.    <u>Vision Plan</u>.  Aetna also administers the Debtors' vision plan (the "***Vision Plan***"). The Vision Plan is an Employee-pay-all program.

46.    As of the Commencement Date, the Debtors provide medical coverage, including prescription drug coverage, to approximately 1,500 Employees, dental coverage to approximately 1,150 Employees and vision coverage to approximately 931 Employees.

47.    Certain prepetition benefits relating to the Health Care Plan were owed but remain unpaid as of the Commencement Date because these obligations have accrued either in whole or in part prior to the Commencement Date, but will not become payable in the ordinary course of business until a later date. The Debtors seek authority to pay all prepetition amounts that, as of the Commencement Date, had accrued but remained unpaid.

**B.    The Reader's Digest Medical and Dental Plans for Eligible Retirees**

48.    In addition, certain retired Employees (the "***Eligible Retirees***") are eligible for coverage under the Reader's Digest Medical and Dental Plans for Eligible Retirees. The Debtors offer a standard plan and a point-of-service plan to Eligible Retirees through Aetna. As of the Commencement Date, the Debtors provide medical and/or dental coverage to approximately 1,400 Eligible Retirees. The Debtors pay approximately $250,000 per month on account of medical and dental coverage to Eligible Retirees.

49.    Certain prepetition benefits relating to the Reader's Digest Medical and Dental Plans for Eligible Retirees were owed but remain unpaid as of the Commencement Date because these obligations have accrued either in whole or in part prior to the Commencement Date, but will not become payable in the ordinary course of business until a later date.

K&E 14375259.

50.     The Debtors estimate there are approximately $1.4 million incurred but not reported claims pursuant to the Health Care Plan and the Reader's Digest Medical and Dental Plans for Eligible Retirees as of the Commencement Date.

### C.     Flexible Spending and Health Saving Accounts

51.     The Debtors also offer Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible out-of-pocket health care and dependent care expenses (the "***Flexible Benefit Plans***").  Aetna  administers the Flexible Benefit Plan.  There is a $5,000 limit on each of the Flexible Benefit Plans (health care and dependent care).  Currently, approximately 600 Employees participate.  Aetna's administration of the Flexible Benefit Plan costs the Debtors approximately $3,500 per month and the Debtors withhold approximately $74,000 per month on account of Employee contributions to the Flexible Benefit Plan.  As of the Commencement Date, the Debtors do not believe they owe any prepetition amounts on account of administrative costs relating to the Flexible Benefit Plans, and have no collections on account of Employee contributions to the Flexible Benefit Plans.  Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding.

52.     In addition, the Debtors offer Employees the ability to contribute a portion of their pre-tax compensation to health savings accounts (the "***Health Savings Accounts***") to help Employees save for future qualified medical and retiree health expenses on a tax-free basis. Aetna administers the Health Savings Accounts, and these accounts are held at JP Morgan Chase Bank, N.A.  Employees who enroll in the consumer driven health plans (as opposed to the point-of-service health plan options) may elect to open a Health Savings Account administered through Aetna.  Currently, approximately 80 Employees participate.  The administration of the Health Savings Accounts costs the Debtors approximately $350 per month and the Debtors withhold

approximately $3,800 per month on account of Employee contributions to the Health Savings Accounts. As of the Commencement Date, the Debtors do not believe they owe any prepetition amounts on account of administrative costs relating to the Health Savings Accounts and have collected approximately $3,800 in Employee contributions to the Health Savings Accounts which they will deposit in the applicable accounts.

### D. Workers' Compensation

53.     The Debtors provide workers' compensation insurance for their Employees at the statutorily required levels (the "***Workers' Compensation Program***"). The Insurance Company of the State of Pennsylvania and the New Hampshire Insurance Company administer and pay the Debtors' workers' compensation claims through a guaranteed cost program. The Debtors' annual insurance premium is $385,000 for the policy period April 1, 2009 through April 1, 2010. As of the Commencement Date, the Debtors do not believe they owe any prepetition amounts on account of the Workers' Compensation Program. Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding.

54.     In addition, in Washington, Ohio and New Mexico, in accordance with applicable state law, the Debtors make certain payments to provide workers' compensation coverage to their Employees pursuant to state administered workers' compensation programs. The Debtors' annual payments in connection with these programs are approximately $54,000 in the aggregate. As of the Commencement Date, the Debtors do not believe they owe any prepetition amounts to these states on account of the Workers' Compensation Program. Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding.

### E. Vacation and Leaves of Absence

55.     The Debtors provide paid vacation time to their Employees, which begins to accrue after the Employee completes one full year of service (the "***Vacation Time***"). The

amount of Vacation Time available to a particular Employee ranges from three to five weeks and is determined by the Employee's length of service. Generally, Employees are required to use their Vacation Time during the year in which it is earned (*i.e.*, unused Vacation Time may not be carried over into the next year). Employees accrue 1/12 of the maximum vacation allotment on the last day of each full month worked during the calendar year. If an Employee leaves the Debtors' employ, whether voluntarily or involuntarily, his or her accrued and unused Vacation Time, if any, will be calculated and cashed out in the Employees' final paycheck. As of June 30, 2009, the Debtors' Employees have accrued approximately $4.3 million on account of unused Vacation Time. This amount, however, is not a current cash payment obligation, as Employees only are entitled to be paid for accrued and unused Vacation Time in the event the Employees leave the Debtors' employ. By this Motion, the Debtors are requesting authority to pay and honor accrued and unused Vacation Time in the ordinary course and consistent with past practice, *provided however*, that the Debtors will not pay any Employee in excess of $10,950 on account of such accrued but unused Vacation Time.

56.     The Debtors also allow Employees to take certain other leaves of absence for personal reasons, many of which are required by law (collectively, the "***Leaves of Absence***"). Leaves of Absence include family medical leaves, maternity leaves, military leaves, bereavement leaves, jury duty, voting leave, personal leaves, sick leaves and disability leaves. Employees also receive two floating holidays per year. Employees are neither permitted to carry over unused personal days from one year to the next nor cash out their unused personal days upon termination or resignation.

### F.     Qualified Retirement Savings Plans

57.     The Debtors maintain two qualified retirement pension plans for the benefit of Program Participants (collectively, the "***Retirement Savings Plans***").

K&E 14375259.

(i)     *The 401(k) Plan*

58.     The Debtors maintain a qualified defined contribution savings plan for the benefit of all eligible Employees meeting the requirements of section 401(a) and 401(k) of the Internal Revenue Code (the "***401(k) Plan***") who are scheduled to work a minimum of 1,000 hours per year.  There are approximately 1,168 Employees and 1,274 inactive participants with current account balances in the 401(k) Plan.  The approximate bi-weekly amount withheld from such Employees' paychecks for 401(k) contributions is $316,000.  The Debtors do not currently have a matching program to induce eligible Employees to participate in the 401(k) Plan.[14]  Vanguard is the record keeper and the trustee of the 401(k) Plan.

(ii)    *The Reader's Digest Retirement Plan*

59.     Reader's Digest maintains a qualified cash balance defined benefit retirement plan for the benefit of eligible Employees of Reader's Digest and Reader's Digest Milwaukee (the "***Reader's Digest Retirement Plan***").  Retirement benefits under the Reader's Digest Retirement Plan are fully paid from assets in the plan.  Employees receive base credits (based on pay) and an interest credit in their accounts on a monthly basis.  Participants are fully vested after three years of service.  Northern Trust Corporation is the trustee for the Reader's Digest Retirement Plan, and Mercer LLC ("***Mercer***") is the actuary and administrator.[15]  There are approximately 1,950

---

[14]    Prior to the Commencement Date, the Debtors instituted a limited matching program to induce eligible Employees to participate in the 401(k) plan.  Under the program, the Debtors matched 50 percent of the first six percent of an Employee's compensation that is contributed and participants were fully vested in matching contributions after five years (with matches vesting at 20 percent per year).  However, on March 1, 2009, the Debtors suspended the limited matching program.

[15]    In addition to utilizing Mercer as actuary for the Reader's Digest Retirement Plan, Mercer also operates the Debtors' call center devoted to the Reader's Digest Retirement Plan.  The Debtors pay Mercer approximately $65,000 per month for these services.  As of the Commencement Date, the Debtors estimate they owe approximately $65,000 to Mercer on account of these services.

participants under the plan.  As of the Commencement Date, the Reader's Digest Retirement Plan is overfunded and the Debtors do not owe any prepetition amounts on account of this plan.[16]

### G.    Life, Disability and Accident Insurance

60.    The Debtors provide all Employees with term life, accidental death and dismemberment insurance coverage through Metlife, Inc.  This coverage is fully paid by the Debtors, and Employees are eligible for term life, accidental death and dismemberment insurance on their first day of service.  On average, this coverage costs the Debtors approximately $10,000 per month.  As of the Commencement Date, the Debtors do not believe they owe any prepetition amounts on account of basic term life insurance.  Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding.

61.    In addition to the coverage described above, Employees are also eligible to purchase supplemental life insurance through Metlife.  Group universal life insurance coverage is available for Employees and eligible dependants, but must be elected within the first 30 days of employment and premiums are paid exclusively by the Employees.  Premiums for this coverage are paid through regular payroll deductions from the participating Employees' paychecks.

62.    The Debtors also offer business travel insurance through American International Life Assurance Company of New York to all Employees who travel to conduct business on the Debtors' behalf.  The premiums associated with this insurance are fully paid by the Debtors and Employees are eligible for business travel insurance on their first day of service.  As of the

---

[16]    In addition, as of the Commencement Date, the Debtors provided retirement benefits pursuant to a series of unfunded non-qualified retirement and other deferred compensation arrangements (the "**Non-Qualified Retirement Plans**").  The participants in these Non-Qualified Retirement Plans include former executives, officers and directors of the Debtors as well as certain current Employees.  As of the Commencement Date, the Debtors estimate the Non-Qualified Retirement Plans have an accumulated obligation of approximately $90 million.  These benefits are unsecured claims.

Commencement Date, the Debtors do not believe they owe any prepetition amounts on account of business travel insurance. Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding.

**H.      Short- and Long-Term Disability Plan**

63.      The Debtors provide all Employees with short and long-term disability benefits through Aetna (the "***Disability Benefits***"). On average, the Disability Benefits cost the Debtors approximately $4,700 and $34,000 per month, respectively. As of the Commencement Date, the Debtors do not believe they owe any prepetition amounts on account of Disability Benefits. Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding.

**I.      Other Employee Benefit Programs**

- *Adoption Assistance*. The Debtors offer Employees an adoption assistance program. Upon providing certain required paperwork, Employees are eligible to receive up to $2,000 towards an adoption. As of the Commencement Date, the Debtors do not believe they owe any prepetition amounts on account of the adoption assistance program. Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding. The Debtors seek authority to continue this program pursuant to the Final Order.

- *Employee Assistance Program*. The Debtors offer an employee assistance program (the "***Employee Assistance Program***") at no cost to Employees. The Employee Assistance Program offers free and confidential access to licensed psychiatrists and social workers to Employees and their immediate family members. The Debtors pay approximately $23,000 per month on account of the Employee Assistance Program. As of the Commencement Date, the Debtors do not believe they owe any prepetition amounts on account of the Employee Assistance Program. Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding.

- *Tax Planning*. In the ordinary course of business the Debtors utilize PricewaterhouseCoopers to perform tax planning and assist in preparation of complex tax returns for approximately 20 people, including Expatriate Employees, at an annual cost of approximately $155,000 per year. As of the Commencement Date, the Debtors do not believe they owe any

K&E 14375259.

prepetition amounts relating to these tax planning and tax preparation services. Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding. The Debtors seek authority to continue this program pursuant to the Final Order.

- *Automobile Allowances*. The Debtors provide automobile allowances to certain sales Employees who use their automobiles for business purposes. There are 16 non-executive Employees who receive monthly automobile allowances, which total approximately $10,000 per month in the aggregate. As of the Commencement Date, the Debtors do not believe they owe any prepetition amounts on account of the automobile allowances program. Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding.

- *Gym Membership*. The Debtors reimburse Employees up to $250 per year for certain fees and expenses related to gym membership and related sports center fees to encourage healthy life choices and reduce medical costs. The Debtors pay approximately $1,800 per month on account of this program. Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding. The Debtors seek authority to continue this program pursuant to the Final Order.

- *Flex Net Plan*. The Debtors offer a flex net compensation program that has provided for the recruitment and retention of executives by allowing for various paid elements from other company compensation programs to be compensated for within the structure of a company plan. The Flex net plan, which is a core element of compensation for its participants, reimburses expenses relating to (a) health and personal fitness, (b) financial planning, (c) family life (e.g., travel expenses for children accompanying an Employee on a business trip) and (d) education and computer equipment for home use. Reimbursements are made quarterly and all reimbursement requests must be submitted by March 31 following the calendar year in which the expenses are incurred. The flex net plan closed to new participants as of January 1, 2009. The Debtors believe there are approximately 21 eligible participants in the program which costs the Debtors approximately $361,500 per year. As of the Commencement Date, the Debtors do not believe they owe any prepetition amounts on account of the flex net plan. To the extent prepetition amounts exist, the Debtors are not seeking to pay such prepetition amounts pursuant to this Motion. The Debtors seek authority to continue this program postpetition in the ordinary course and consistent with past practice pursuant to a Final Order.

- *Financial Planning*. The Debtors provide financial planning advice to certain management and non-management Employees. Pursuant to this program, 13 management Employees receive individual financial planning

27

advice. In addition, other Employees may utilize a call center administered by The Ayco Company, LP that provides financial planning services. These services cost the Debtors approximately $30,000 per month. As of the Commencement Date, the Debtors estimate they owe approximately $25,000 on account of the financial planning program. The Debtors are not seeking to pay such prepetition amounts pursuant to this Motion. By this Motion, the Debtors seek authority to continue this program postpetition in the ordinary course and consistent with past practice pursuant to a Final Order.

### J. Employee Pay-All Benefit Programs

- *Auto and Homeowners Insurance Plan.* The Debtors offer Employees the ability to purchase automobile and homeowners insurance through Metlife via automatic payroll deduction. Both of these insurance policies are Employee-pay-all programs. There is no administrative cost to the Debtors for this program.

- *Qualified Transportation Benefits.* The Debtors offer Employees the ability to contribute a portion of their pre-tax compensation, up to a maximum of $3,500 per year, for qualified transportation costs. Aetna administers the qualified transportation benefits program. This program is an Employee-pay-all program. Prior to the Commencement Date, there were approximately 220 Employees participating in the qualified transportation benefits program. The administrative costs of this program costs the Debtors approximately $2,200 per month. As of the Commencement Date, the Debtors do not believe they owe any prepetition amounts on account of qualified transportation benefits.

- *Hyatt Premier Legal Plan.* The Debtors offer Employees the ability to obtain legal advice from Hyatt Legal Plans, a subsidiary of Metlife and pay for such services through automatic payroll deduction. This program is an Employee-pay-all program. There is no administrative cost to the Debtors for maintaining this program. As of the Commencement Date, approximately 185 Employees participate in the plan. The Debtors seek authority to continue this program pursuant to the Final Order.

### Basis for Relief

## I. Sufficient Cause Exists to Authorize the Debtors to Honor Employee Wage and Benefit Obligations.

### A. Certain of the Employee Obligations are Entitled to Priority Treatment.

64. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of Employee Obligations to priority treatment. As priority claims, the Debtors are required to pay

these claims in full to confirm a chapter 11 plan. *See* U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for (a) wages, salaries or commissions, including vacation, severance and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan). As noted, the Debtors believe they owe certain Employees and five Independent Contractors more than $10,950 on account of Unpaid Compensation and Independent Contractor Compensation.. Additionally, the contributions to the Employee Benefit Program do not exceed the priority cap provided by section 507(a)(5) of the Bankruptcy Code. Thus, granting the relief sought herein only affects the timing of payments to Employees, and does not negatively impact recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of Employee Obligations at this time enhances value for the benefit of all interested parties.

### B. Payment of Certain of the Employee Obligations Is Required by Law.

65. The Debtors also seek authority to pay Deductions and Payroll Taxes to the appropriate entities. These amounts principally represent Employee earnings that governments, Employees and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain Deductions, including contributions to the Employee Benefit Programs and child support and alimony payments, are not property of the Debtors' estates because they have been withheld from Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b). Further, federal and state laws require the Debtors and their officers to make certain tax payments that have been withheld from their Employees' paychecks. *See* 26 U.S.C. § 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *DuCharmes & Co., Inc. v. State of Mich* (*In re DuCharmes & Co.*), 852 F.2d 194, 196 (6th Cir.

1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Deductions and Payroll Taxes are not property of the Debtors' estate, the Debtors request that the Court authorize them to transmit the Payroll Taxes to the proper parties in the ordinary course of business.

66. Similarly, pursuant to state law, the Debtors must maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state law may prohibit them from operating. Payment of all workers' compensation amounts, therefore, is crucial to the continued operation of the Debtors' businesses.

## II. Payment of the Employee Obligations is Warranted Under Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity.

67. Courts generally acknowledge that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances. *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); *see also Armstrong World Indus., Inc. v. James A. Phillips, Inc.,* (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers who were potential lien claimants). In authorizing payments of certain prepetition obligations, courts have relied on several legal theories, rooted in sections 1107(a), 1108, 363(b) and 507 of the Bankruptcy Code.

68. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can

fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . . ." *Id.*

69.     Consistent with a debtor's fiduciary duties, courts have also authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 175 (discussing prior order authorizing payment of prepetition wage claims pursuant to section 363(b); relief appropriate where payment was needed to "preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale."); *see also Armstrong* 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors). Specifically, the business judgment standard requires that a debtor "articulate some business justification, other than the mere appeasement of major creditors." *Ionosphere Clubs* 98 B.R. at 175.

70.     In addition, the Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may permit pre-plan payments of prepetition obligations when essential to the continued operation of the debtor's business. Specifically, the Court may use its power under section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment"

rule (also referred to as the "doctrine of necessity").  *In re NVR L.P.,* 147 B.R. 126, 127 (Bankr. E.D. Va. 1992).

71.     The "doctrine of necessity" or the "necessity of payment" rule originated in railway cases and was first articulated in *Miltenberger v. Logansport, C. & S.W.R. Co.*, 106 U.S. 286 (1882).  The doctrine was expanded to non-railroad debtors in the mid-century, *see Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in a hotel reorganization case, that the court was not "helpless" to apply the rule to supply creditors of non-railroad debtors where the alternative was the cessation of operations), and has long been recognized as precedent within the Second Circuit.  *See Ionosphere Clubs*, 98 B.R. at 175-76.  The "doctrine of necessity" or the "necessity of payment" rule has long been recognized as precedent within the Second Circuit. *Id.* at 175-176.  Today, the rationale for the necessity of payment rule — the rehabilitation of a debtor in reorganization cases — is "the paramount policy and goal of Chapter 11." *Id.*; *see also In re Just For Feet*, 242 B.R. 821, 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code", but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); *Burchinal v. Cent. Wash. Bank* (*In re Adams Apple, Inc.*), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when

necessary for rehabilitation . . ." is appropriate); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp.* (*In re Chateaugay Corp.*), 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); 3 COLLIER ON BANKRUPTCY, 105.04[5][a] (15th ed. rev. 2004) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

72.     Courts also have permitted postpetition payment of prepetition claims pursuant to section 105(a) in other situations, such as if nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan. *See In re UNR Indus.*, 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting the debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); *Ionosphere Clubs*, 98 B.R. at 177 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

73.     This flexible approach is particularly critical where prepetition creditors – here, the Employees and related third parties – provide vital goods or services to a debtor that would be unavailable if the debtor did not satisfy its prepetition obligations.  For example, in *In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), the bankruptcy court stated that "a bankruptcy court may exercise its equity powers under §105(a) [of the Bankruptcy Code] to authorize payment of pre-petition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least

proportionately.'" *Id.* (citation omitted)  The court explained that "a *per se* rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932.

74.     The Debtors submit that the relief requested represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates and is therefore justified under section 363(b), as well as under section 105(a) of the Bankruptcy Code and Bankruptcy Rule 6003.  Paying prepetition wages, employee benefits and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  Indeed, the Debtors believe the without the relief requested herein being granted, their Employees may seek alternative opportunities, perhaps with the Debtors' competitors.  Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to meet their customer obligations and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully reorganize.  The loss of valuable Employees and resulting recruiting of new personnel that would be necessary to find replacements (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations.  Accordingly, there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefit and related obligations, including the Employee wages and benefits that accrued prepetition.

75.     In addition, the majority of the Debtors' Employees rely exclusively on their compensation, benefits and reimbursement of expenses to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor their obligations for unpaid compensation, benefits and reimbursable

expenses. Moreover, failure to satisfy such obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses. Furthermore, if the Court does not authorize the Debtors to honor their various obligations under the insurance programs, the Employees will not receive health coverage and, thus, may become obligated to pay certain health care claims in cases where the Debtors have not paid the respective insurance providers. The loss of health care coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency. Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at a critical juncture.

76.     The importance of a debtor's employees to its operations has been repeatedly recognized by courts in this district in granting relief similar to the relief requested herein. *See, e.g.*, *In re ION Media Networks, Inc.*, Case No. 09-13125 (Bankr. S.D.N.Y. May 21, 2009); *In re Charter Communications, Inc.* Case No. 09-11435 (Bankr. S.D.N.Y. Apr. 15, 2009); *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. Apr. 13, 2009); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009); *In re Wellman, Inc.*, Case No. 08-10595 (Bankr. S.D.N.Y. Feb. 26, 2008); *In re DJK Residential LLC (SIRVA, Inc.)*, Case No. 08-10375 (Bankr. S.D.N.Y. Feb. 7, 2008); *In re Dura Auto. Sys. Inc.*, Case No. 06-11202 (Bankr. S.D.N.Y. Nov. 21, 2006); *In re Dana Corp.*, Case No. 06-10354   (Bankr. S.D.N.Y. Mar. 3, 2006); *In re Musicland Holding Corp.*, No. 06-10064 (Bankr.) S.D.N.Y. Feb. 23, 2006); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 21, 2005); *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. Oct. 13, 2005); *In re Delta Airlines, Inc.*, No. 05-17923 (Bankr. S.D.N.Y. Sep. 16, 2005); *In re Tower Auto., Inc.*, No. 05-10578 (Bankr. S.D.N.Y. Feb. 3, 2005).

### III.  The Debtors Seek a Waiver of the Automatic
Stay As It Applies to Workers' Compensation Claims.

77.     Section 362(a) of the Bankruptcy Code operates to stay:

> the commencement or continuation, including the issuance or
> employment of process of a judicial, administrative, or other action
> or proceeding against the debtor that was or could have been
> commenced before the commencement of the case under this title,
> or to receive a claim against the debtor that arose before the
> commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1).  Section 362, however, permits a debtor or other parties in interest to

request a modification or termination of the automatic stay for "cause."  *Id*. at § 362(d)(1).

78.     The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to

permit the Employees to proceed with their workers' compensation claims in the appropriate

judicial or administrative forum.  The Debtors believe that cause exists to modify the automatic

stay because staying the workers' compensation claims could have a detrimental effect on the

financial well-being and morale of the Employees and lead to the departure of certain Employees

who are critical at this juncture.  Such departures could cause a severe disruption in the Debtors'

businesses to the detriment of all parties in interest.

### IV.  Cause Exists to Authorize the Debtors' Financial
Institutions to Honor Checks and Electronic Fund Transfers.

79.     The Debtors have sufficient funds to pay the amounts described herein in the

ordinary course of business by virtue of expected cash flows from ongoing business operations

and anticipated access to debtor-in-possession financing and cash collateral.  Also, under the

Debtors' existing cash management system, the Debtors can readily identify checks or wire

transfer requests as relating to an authorized payment in respect of the Employee Obligations.

Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating

to authorized payments, will not be honored inadvertently and that the Court should authorize all

applicable financial institutions, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests in respect of the relief requested herein.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied.

80.     Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 20 days after the Commencement Date if the relief is necessary to avoid immediate and irreparable harm.  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001(c)(2)); *see also* Fed. R. Bankr. P. 6003, Committee Notes (noting that cases applying Bankruptcy Rule 4001(b)(2) and (c)(2) may "provide guidance" for relief under Bankruptcy Rule 6003).

81.     As described above, the Debtors' Employees, Temporary Employees and Independent Contractors are vital to the Debtors' operations.  Failure to satisfy obligations with respect to these persons in the ordinary course of business during the first 20 days of these chapter 11 cases will jeopardize their loyalty and trust, causing Employees, Temporary Employees and Independent Contractors to leave the Debtors' employ, severely disrupting the Debtors' operations at a critical juncture.

82.     Moreover, the Debtors' Employees, Temporary Employees and Independent Contractors rely on their compensation, benefits and reimbursement of expenses to pay their living expenses and the effect could be financially ruinous if the Debtors cannot pay them in the ordinary course of business.    Accordingly, the Debtors submit they have satisfied the requirements of Bankruptcy Rule 6003 to support immediate payment of the Employee Obligations.

K&E 14375259.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

83.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Motion Practice

84.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this Motion.  Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## Notice

85.     The Debtors have provided or will provide notice of this Motion by electronic mail, facsimile and/or by overnight mail to:  (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (c) counsel to the agent for the Debtors' proposed postpetition secured lenders; (d) counsel to the agent for the Debtors' prepetition secured lenders; (e) counsel to the indenture trustee for the Debtors' senior subordinated notes; (f) the Internal Revenue Service; and (g) the Securities and Exchange Commission. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that further notice of this Motion is neither required nor necessary.

## No Prior Request

86.     No prior motion for the relief requested herein has been made to this or any other court.

K&E 14375259.

WHEREFORE, for the reasons set forth herein and in the Williams Declaration, the Debtors respectfully request that the Court (a) enter interim and final orders, substantially in the form attached hereto as **Exhibit A** and **Exhibit B** granting the relief requested herein and (b) grant such other and further relief as is just and proper.

Dated: August 24, 2009
     New York, New York

/s/ *Nicole L. Greenblatt*

James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Proposed Counsel to the Debtors
and Debtors in Possession

K&E 14375259.

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) Case No. 09-_____(___) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

## INTERIM ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (A) PAY CERTAIN PREPETITION WAGES AND REIMBURSABLE EMPLOYEE EXPENSES, (B) PAY AND HONOR EMPLOYEE MEDICAL AND OTHER BENEFITS AND (C) CONTINUE EMPLOYEE BENEFITS PROGRAMS

Upon the motion (the "***Motion***")[1] of The Reader's Digest Association, Inc. ("***Reader's Digest***") and certain of its affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"),[2] for entry of an interim order (the "***Interim Order***") authorizing, but not directing, the Debtors (a) to pay certain prepetition wages, salaries and other compensation, taxes, withholdings and reimbursable employee expenses, (b) to pay and honor

---

[1]  All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

[2]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, Inc. (3276); World Almanac Education Group, Inc. (3781); World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is: 1 Reader's Digest Road, Pleasantville, NY 10570.

obligations relating to medical and other benefits programs, (c) to continue their employee benefits programs on a postpetition basis, (d) authorizing financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests related to the foregoing and (e) scheduling a final hearing (the "***Final Hearing***") to consider entry of the Final Order; and upon the Declaration of Thomas A. Williams, Chief Financial Officer and Senior Vice President of The Reader's Digest Association, Inc., in Support of First Day Pleadings (the "***Williams Declaration***"); and the Court having found that this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and the Court having found that the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1408; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest; and notice of the Motion appearing adequate and appropriate under the circumstances; and the Court having found that no other or further notice need be provided; and the Court having reviewed the Motion and having heard statements in support of the Motion at a hearing held before the Court (the "***Hearing***"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the Court having found that relief requested in the Motion is necessary to prevent immediate and irreparable harm; and any objections to the relief requested herein having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefore, it is hereby ORDERED THAT:

1.    The Motion is granted on an interim basis to the extent set forth herein.

K&E 14375259.

2.     The Final Hearing shall be held on _____, 2009 at ___:____ a.m./p.m. prevailing Eastern Time.  Any objections or responses to the Motion shall be filed on or before _____, 2009 at 4:00 p.m. and served on parties in interest as required by the Local Rules.

3.     The Debtors are authorized, but not directed, to pay and honor all prepetition obligations associated with the Employee Obligations and to continue the Employee Obligations in the ordinary course of business to the extent requested in the Motion; *provided*, *however*, that the Debtors may not pay any (a) Employee more than $10,950 on account of Unpaid Compensation; (b) Temporary Employee more than $10,950 on account of Temporary Employee Compensation or (c) Independent Contractor more than $10,950 on account of Independent Contractor Compensation; *provided further*, *however*, that the Debtors are not authorized to pay and honor prepetition and postpetition amounts related to the Severance Program prior to the Final Hearing and entry of a Final Order approving the same; *provided further*, *however*, that the Debtors may not continue programs related to (a) adoption assistance, (b) tax planning, (c) gym membership, (d) the flex net plan, (e) financial planning and (f) Hyatt premier legal plan until a Final Order is entered approving the same.

4.     The Debtors will not pay any Employee in excess of $10,950 on account of accrued but unused Vacation Time.

5.     The Debtors and any applicable third parties are authorized to continue to allocate and distribute Deductions and Payroll Taxes to the appropriate third-party recipients or taxing authorities in accordance with the Debtors' stated policies and prepetition practices.

6.     The Debtors are authorized, but not directed, to continue to honor their obligations, including any prepetition obligations to Employees for Reimbursable Expenses,

American Express Corporate Card Expenses, Expatriate Employee Expenses and Relocation Expenses in accordance with the Debtors' stated policies and prepetition practices.

7. The Debtors are authorized, but not directed, to honor the Employee Benefit Programs, including, without limitation, the: (a) Health Care Plan; (b) Reader's Digest Medical and Dental Plans for Eligible Retirees, (c) Flexible Benefit Plan and Health Savings Accounts; (d) Workers' Compensation Program; (e) Vacation Time and Leaves of Absence; (f) Qualified Retirement Savings Plans; (g) Life, Disability and Accident Insurance; (h) short- and long-term disability benefits; (i) Employee Assistance Program; (j) auto and homeowners insurance plan; (k) qualified transportation benefits; and (l) company automobile allowances; and to make any necessary contributions to such programs and pay any unpaid premium, claim or amount owed as of the Petition Date with respect thereto.

8. Pursuant to Section 362(d) of the Bankruptcy Code, (a) Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum under the Workers' Compensation Program and the Debtors are authorized to pay all prepetition amounts relating thereto in the ordinary course of business and (b) the notice requirements pursuant to Bankruptcy Rule 4001(d) with respect to clause (a) are waived. This modification of the Automatic Stay pertains solely to claims under the Workers' Compensation Program.

9. The Debtors are authorized, but not directed, to pay all processing and administrative fees associated with and all costs and expenses incidental to payment of the Employee Obligations.

10. To the extent any of the payments authorized to be made pursuant to this Interim Order are of the kinds described in sections 507(a)(4) or 507(a)(5) of the Bankruptcy Code,

K&E 14375259.

payments to any individual Employee shall not exceed the applicable caps set forth in such sections pending entry of a final order on the Motion.

11.      Nothing herein shall be deemed to authorize the payment of any amounts that may be subject to section 503(c) of the Bankruptcy Code.

12.      In accordance with this Interim Order and any other order of this Court, each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the Employee Obligations is directed to honor checks presented for payment and all fund transfer requests made by the Debtors related to the Employee Obligations to the extent that sufficient funds are on deposit in such accounts.

13.      The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with any Employee Obligations authorized to be paid by this Interim Order.

14.      Nothing contained herein is intended or should be construed to create an administrative priority claim on account of Employee Obligations.

15.      Nothing contained in the Motion or this Interim Order shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtors or any approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code.

16.      The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion or otherwise deemed waived.

17.      The requirements set forth in Bankruptcy Rule 6004(a) are satisfied by the contents of the Motion.

K&E 14375259.

18.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

19.     The requirements set forth in Local Rule 9013-1(b) are satisfied by the contents of the Motion.

20.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Interim Order in accordance with the Motion.

21.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York
Date: _____ __, 2009

_____
United States Bankruptcy Judge

K&E 14375259.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) | Case No. 09-_____(___) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

## FINAL ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (A) PAY CERTAIN PREPETITION WAGES AND REIMBURSABLE EMPLOYEE EXPENSES, (B) PAY AND HONOR EMPLOYEE MEDICAL AND OTHER BENEFITS AND (C) CONTINUE EMPLOYEE BENEFITS PROGRAMS

Upon the motion (the "***Motion***")[1] of The Reader's Digest Association, Inc. ("***Reader's Digest***") and certain of its affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"),[2] for entry of a final order (the "***Final Order***") authorizing, but not directing, the Debtors (a) to pay certain prepetition wages, salaries and other compensation, taxes, withholdings and reimbursable employee expenses, (b) to pay and honor obligations

---

[1]   All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

[2]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, Inc. (3276); World Almanac Education Group, Inc. (3781); World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is: 1 Reader's Digest Road, Pleasantville, NY 10570.

relating to medical and other benefits programs, (c) to continue their employee benefits programs on a postpetition basis and (d) authorizing financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests related to the foregoing; and upon the Declaration of Thomas A. Williams, Chief Financial Officer and Senior Vice President of The Reader's Digest Association, Inc., in Support of First Day Pleadings (the "***Williams Declaration***"); and the Court having entered an interim order approving the Motion on an interim basis on _____, 2009 [Docket No. __] (the "***Interim Order***") and the Court having found that this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and the Court having found that the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1408; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest; and notice of the Motion appearing adequate and appropriate under the circumstances; and the Court having found that no other or further notice need be provided; and the Court having reviewed the Motion and having heard statements in support of the Motion at a hearing held before the Court (the "***Hearing***"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the Court having found that relief requested in the Motion is necessary to prevent immediate and irreparable harm; and any objections to the relief requested herein having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefore, it is hereby ORDERED THAT:

1.  The Motion is granted on a final basis to the extent set forth herein.

2.       The Debtors are authorized, but not directed, to pay and honor all prepetition obligations associated with the Employee Obligations and to continue the Employee Obligations in the ordinary course of business to the extent requested in the Motion.

3.       The Debtors and any applicable third parties are authorized to continue to allocate and distribute Deductions and Payroll Taxes to the appropriate third-party recipients or taxing authorities in accordance with the Debtors' stated policies and prepetition practices.

4.       The Debtors are authorized, but not directed, to continue to honor their obligations, including any prepetition obligations to Employees for Reimbursable Expenses, American Express Corporate Card Expenses, Expatriate Employee Expenses and Relocation Expenses in accordance with the Debtors' stated policies and prepetition practices.

5.       The Debtors are authorized, but not directed, to honor the Employee Benefit Programs, including, without limitation, the: (a) Health Care Plan; (b) Reader's Digest Medical and Dental Plans for Eligible Retirees; (c) Flexible Benefit Plan and Health Savings Accounts; (d) Workers' Compensation Program; (e) Vacation Time and Leaves of Absence; (f) Qualified Retirement Savings Plans; (g) Life, Disability and Accident Insurance; (h) short- and long-term disability benefits; (i) Employee Assistance Program; (j) tax planning; (k) auto and homeowners insurance plan; (l) qualified transportation benefits; (m) company automobile allowances; (n) gym membership; (o) the flex net plan; (p) financial planning; (q) Hyatt premier legal plan; and (r) the adoption assistance program; and to make any necessary contributions to such programs and pay any unpaid premium, claim or amount owed as of the Petition Date with respect thereto.

6.       The Debtors will not pay any Employee in excess of $10,950 on account of accrued but unused Vacation Time.

K&E 14375259.

7.     Pursuant to Section 362(d) of the Bankruptcy Code, (a) Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum under the Workers' Compensation Program and the Debtors are authorized to pay all prepetition amounts relating thereto in the ordinary course of business and (b) the notice requirements pursuant to Bankruptcy Rule 4001(d) with respect to clause (a) are waived. This modification of the Automatic Stay pertains solely to claims under the Workers' Compensation Program.

8.     The Debtors are authorized, but not directed, to pay all processing and administrative fees associated with and all costs and expenses incidental to payment of the Employee Obligations.

9.     The Debtors are authorized, but not directed, to maintain and honor, in the ordinary course of business, in accordance with the Debtors' prepetition policies and practices and in the Debtors' sole discretion, the Severance Program postpetition with respect to the Debtors' non-insiders in accordance with the Debtors' past practices subject to any limitations under section 503(c)(2) of the Bankruptcy Code.

10.     The Debtors are authorized, but not directed, to pay all remaining unpaid severance obligations to former employees pursuant to the Severance Plan, *provided, however* that the Debtors may not make severance payments on account of prepetition unpaid severance obligations in excess of the $10,950 cap imposed by section 507(a)(4) of the Bankruptcy Code.

11.     The Debtors are authorized, but not directed, to modify, change and discontinue any of the Employee Obligations, and the policies related thereto, and to implement new Employee Obligations in the ordinary course of business during the chapter 11 cases in their sole discretion without the need for further Court approval.

K&E 14375259.

12.     In accordance with this Final Order and any other order of this Court, each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the Employee Obligations is directed to honor checks presented for payment and all fund transfer requests made by the Debtors related to the Employee Obligations to the extent that sufficient funds are on deposit in such accounts.

13.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with any Employee Obligations authorized to by paid by this Final Order.

14.     Nothing contained herein is intended or should be construed to create an administrative priority claim on account of Employee Obligations.

15.     Nothing contained in the Motion or this Final Order shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtors.

16.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied by the contests of the Motion.

17.     Notwithstanding the possible applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.

18.     The requirements set forth in Local Rule 9013-1(b) are satisfied by the contents of the Motion.

19.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Final Order in accordance with the Motion.

K&E 14375259.

20.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Final Order.

New York, New York
Date: _____ __, 2009

_____
United States Bankruptcy Judge

K&E 14375259.