James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Proposed Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) | Case No. 09-_____(___) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING**
**AND LETTERS OF CREDIT, AND TO USE CASH COLLATERAL, (II) GRANTING**
**ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS,**
**(III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF**

The Reader's Digest Association, Inc. ("**_Reader's Digest_**") and certain of its affiliates, as

debtors and debtors in possession (collectively, the "**_Debtors_**"),[1] file this motion (the "**_Motion_**")

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home

for entry of (a) an interim order (the "***Interim DIP Order***"), substantially in the form attached hereto as **Exhibit A**, (i) authorizing the Debtors, on an interim basis, to (A) obtain postpetition financing on a senior secured, priming, superpriority basis, and (B) use the Cash Collateral (as defined below); (ii) granting adequate protection to the Prepetition Secured Lenders (as defined in the DIP Orders (as defined below)) for the priming of their existing liens on the Prepetition Collateral (as defined below) and the Debtors' use of the Cash Collateral; (iii) scheduling a hearing to consider entry of the Final DIP Order (as defined below); and (iv) granting related relief; and (b) a final order (the "***Final DIP Order***" and, together with the Interim DIP Order, the "***DIP Orders***") authorizing the relief granted in the Interim DIP Order on a permanent basis as described in this Motion. In support of this Motion, the Debtors submit the Declaration of Thomas A. Williams, Chief Financial Officer and Senior Vice President of The Reader's Digest Association, Inc., in Support of First Day Pleadings (the "***Williams Declaration***"), filed concurrently herewith, and the declaration of Jeffrey Finger, a Director of Miller Buckfire & Co., LLC ("***Miller Buckfire***"), the Debtors' proposed financial advisor and investment banker in these chapter 11 cases, attached hereto as **Exhibit B** and incorporated by reference herein (the "***Finger Declaration***"). In further support of this Motion, the Debtors respectfully state as follows:

<u>**Jurisdiction**</u>

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this District pursuant to 28 U.S.C. § 1408.

---

Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, Inc. (3276); World Almanac Education Group, Inc. (3781); World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is: 1 Reader's Digest Road, Pleasantville, NY 10570.

K&E 15431342.

3.     The statutory bases for the relief requested herein are sections 105(a), 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code (the "***Bankruptcy Code***," 11 U.S.C.§§ 101-1532), rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***").

## Relief Requested

4.     By this Motion, the Debtors request entry of the following two DIP Orders:

- The Interim DIP Order, among other things, providing the Debtors on an interim basis:

  - <u>Cash Collateral</u>:  authority to use the Debtors' cash on hand, cash proceeds of Prepetition Collateral, and other cash that constitutes the Prepetition Secured Lenders' "cash collateral," as that term is defined in section 363(a) of the Bankruptcy Code (the "***Cash Collateral***");

  - <u>DIP Facility</u>:  authority to obtain postpetition loans in a principal amount not to exceed $100,000,000 (the "***DIP Facility***") and other financial accommodations, pursuant to the terms and conditions of the Credit and Guarantee Agreement by and among Reader's Digest, as borrower, the other Debtors, as guarantors, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders from time to time party thereto (the "***DIP Agreement***"), substantially in the form attached as **<u>Exhibit C</u>** hereto;

  - <u>LC Facility</u>:  authority to cash collateralize Prepetition Letters of Credit (as defined below), which Prepetition Letters of Credit are issued and outstanding in the aggregate face amount of approximately $6,300,000, to cause the issuance and cash collateralization of replacements thereof in the aggregate outstanding face amount of up to approximately $4,700,000 (*i.e.*, $1,600,000 of the Prepetition Letters of Credit are not subject to replacement), and to cause the issuance and cash collateralization of supplemental and new letters of credit in an aggregate face amount not to exceed $5,500,000, in each case such cash collateralization to be to the extent of 105% of the outstanding face amount thereof (the "***LC Facility***" and, together with the DIP Facility, the "***Postpetition Facilities***"), pursuant to the terms and conditions of the Letters of Credit Side Letter by and between Reader's Digest, as account party, and JPMorgan Chase Bank, N.A., as issuer (the "***LC Agreement***" and, together with the DIP Agreement, the "***Postpetition Financing Agreements***") attached as **<u>Exhibit D</u>** hereto;[2]

---

[2]    The Debtors are not at this time seeking to assume any contractual obligations associated with the Prepetition Letters of Credit (as defined below).  Accordingly, if the Court authorizes the relief requested herein, such relief

- Postpetition Financing Agreements: authority to execute and deliver the DIP Agreement, the LC Agreement, and all agreements, documents and instruments contemplated by each (collectively, the "***Postpetition Financing Documents***"), and to take all actions necessary, appropriate or required to comply with the Debtors' obligations thereunder and under the DIP Orders;

- DIP Liens and Claims: authority to grant the DIP Agent, for its own benefit and the benefit of the DIP Lenders, senior, first priority, priming DIP Liens on the DIP Collateral securing, and the Superpriority Claims in respect of, the DIP Obligations (in each case, as defined below);

- Adequate Protection: approval of the Adequate Protection Liens, 507(b) Claims and other Adequate Protection Obligations (in each case, as defined below) to be provided to the Prepetition Agent (as defined below), on behalf of itself and the other Prepetition Secured Lenders, to protect the Prepetition Secured Lenders' interests in the Prepetition Collateral, including the Cash Collateral, and approval of the Adequate Protection Payments (as defined below) to be provided to the Prepetition Agent; and

- Final Hearing: a date for a hearing on the Motion to consider entry of the Final DIP Order, to be held no sooner than 15 days after the date of this Motion, and no later than 45 days after entry of the Interim DIP Order; and

- The Final DIP Order, among other things, authorizing the relief granted in the Interim DIP Order on a permanent basis, and providing the Debtors authority to obtain postpetition loans and other financial accommodations under the DIP Facility in a principal amount not to exceed $150,000,000.

### Concise Statement Pursuant to Local Rule 4001-2

5.      Pursuant to Bankruptcy Rules 4001(b), (c) and (d), and Local Rule 4001-2, the following is a concise statement and summary of the proposed material terms of the Postpetition Financing Agreements and DIP Orders:[3]

---

should not be deemed to constitute an assumption, adoption or reaffirmation by any Debtor of any Prepetition Letter of Credit-related programs, policies or agreements, or the Debtors' obligations with respect thereto, whether pursuant to section 365 of the Bankruptcy Code or otherwise, except as specifically set forth herein.

[3] Capitalized terms used in this statement but not otherwise defined herein shall have the meanings ascribed to such terms in the Postpetition Financing Agreements or DIP Orders, as applicable. This statement is qualified in its entirety by reference to the applicable provisions of the Postpetition Financing Agreements or the DIP Orders. To the extent there exists any inconsistency between this concise statement and the provisions of the Postpetition Financing Agreements or the DIP Orders, the provisions of the Postpetition Financing Agreements or the DIP Orders, as applicable, shall control.

K&E 15431342.

| | MATERIAL TERMS OF THE POSTPETITION FINANCING |
|---|---|
| **DIP Agreement Parties**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Debtor Parties**:<br><br>Borrower:      Reader's Digest (the "***Borrower***")<br><br>Guarantors:      RDA Holding Co. ("***Holdings***") and each of Borrower's direct and indirect, existing and future, domestic subsidiaries (the "***Guarantors***," and with the Borrower, collectively, the "***Loan Parties***")<br><br>**Bank Parties**:<br><br>Administrative Agent:      JPMorgan Chase Bank, N.A.<br>("***JPMCB***" and, in such capacity, the "***DIP Agent***")<br><br>Sole Lead Arranger:      J.P. Morgan Securities Inc.<br>(in such capacity, the "***DIP Arranger***")<br><br>Syndication Agent:      JPMCB<br><br>Senior Managing Agent:      General Electric Capital Corporation<br><br>Lenders:      Banks, financial institutions and other lenders party to the DIP Agreement (collectively with the DIP Agent, the "***DIP Lenders***") |
| **LC Agreement Parties**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Account Party:      Reader's Digest<br><br>Issuer:      JPMCB |
| **Maturity**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Agreement will terminate at the earliest of: (a) nine (9) months after the Closing Date or, if extended upon satisfaction of certain preconditions (including, without limitation, the payment of a fee equal to 1% of the principal balance of the DIP Facility outstanding as of the original maturity date), 12 months after the Closing Date; (b) 45 days after the entry of the Interim DIP Order (or a later date upon agreement from the required DIP Lenders) if the Final DIP Order has not been entered prior to the expiration of such period; (c) the effective date of a chapter 11 plan; and (d) the acceleration of the DIP Loans in accordance with the DIP Agreement. **(DIP Agmt., at § 1.01)** |
| **Exit Facility** | Upon satisfaction of the conditions set forth in the DIP Agreement and exit facility sheet annexed to the DIP Agreement, and otherwise in accordance with the terms thereof (including the completion of documentation governing the exit facility in form and substance satisfactory to a majority of the DIP Lenders), the DIP Loans shall be continued as or converted into exit financing for the Debtors. |

K&E 15431342.

| MATERIAL TERMS OF THE POSTPETITION FINANCING |
|---|

| | |
|---|---|
| **Purpose**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Facility**. The proceeds of the DIP Facility shall be used for working capital and other general corporate purposes of the Debtors, including, without limitation, to pay interest, fees and expenses in connection with the DIP Facility and to make intercompany loans to certain foreign subsidiaries and cash collateralize letters of credit, in each case to the extent permitted by the DIP Agreement. **(Int. DIP Ord., at ¶ 5(a))**<br><br>**Cash Collateral**. The Debtors are authorized to use the Cash Collateral for working capital and general corporate purposes in accordance with and subject to the terms and conditions of the Interim DIP Order and the DIP Agreement during the period from the Commencement Date through and including the Termination Date under the DIP Agreement. **(Int. DIP Ord., at ¶ 12)** |
| **Interest Rates**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Interest Rate**. Borrower may elect either (a) Base Rate or (b) Eurodollar Rate, in each case plus the Applicable Margin. As used herein:<br><br>• "*Base Rate*" means the greatest of the (i) rate of interest publicly announced by JPMCB as its prime rate in effect at its principal office in New York City (the "*Prime Rate*"), (ii) federal funds effective rate from time to time, plus 0.5%, and (iii) Eurodollar Rate for a one month Interest Period plus 1%. As of the Commencement Date, the Base Rate is equal to 4.5%;<br><br>• "*Eurodollar Rate*" means the greater of (i) the rate (adjusted for statutory reserve requirements for Eurocurrency liabilities) for deposits in dollars for a period equal to one, two, three or six months (at Borrower's option) appearing on the Reuters Screen LIBOR01 Page, and (ii) 3.50%. As of the Commencement Date, the Eurodollar Rate is equal to 3.5%; and<br><br>• "*Applicable Margin*" means (i) initially, (A) 9.0% *per annum* with respect to Base Rate Loans, and (B) 10.0% *per annum* with respect to Eurodollar Loans, and (ii) if the Twelve Month Facility Extension Option is exercised, (A) 10.0% *per annum* with respect to Base Rate Loans, and (B) 11.0% *per annum* with respect to Eurodollar Loans.<br><br>**Default Interest Rate**. 2.0% *per annum* above the then applicable rate.<br><br>**(DIP Agmt, at § 2.06, 2.08)** |

K&E 15431342.

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| **DIP Commitments**<br><br>*Local Rule 4001-2(a)(1); Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Agreement**. Total aggregate term loan commitment of $150,000,000 to be disbursed as:<br><br>• Initial DIP Loan:    $100,000,000 (or lesser amount approved by the Court and set forth in the Interim DIP order)<br><br>• Final DIP Loan:    $150,000,000 (less the amount of the initial DIP Loan actually borrowed) |
| **Letters of Credit**[4]<br><br>*Local Rule 4001-2(a)(1); Fed. R. Bankr. P. 4001(c)(1)(B)* | • **Existing Letters of Credit**: Upon the Borrower's request and for so long as there is sufficient cash collateralization, up to $4,700,000 in aggregate face amount of letters of credit to replace any drawn letters of credit outstanding under the Prepetition Agreement (as defined below) as of the Commencement Date (the "***Prepetition Letters of Credit***"); and<br><br>• **New Letters of Credit**: Up to $5,500,000 in aggregate face amount of new letters of credit, including letters of credit supplementing the Prepetition Letters of Credit, will be issued by JPMCB or an alternative issuer upon the Borrower's request and cash collateralization.<br><br>**(LC Agmt., at ¶ 2)** |
| **Funding Conditions**<br><br>*Local Rule 4001-2(a)(2); Local Rule 4001-2(h); Fed. R. Bankr. P. 4001(c)(1)(B)* | **Initial Borrowings**. Usual and customary for financings of this type, including delivery of loan documentation, legal opinion, corporate documents, an agreed upon Budget and Initial Cash Flow Forecast, cash collateralization of Prepetition Letters of Credit and payment of fees and reimbursement of expenses.<br><br>**Full Availability**. Usual and customary for financings of this type including entry of Final DIP Order.<br><br>**(DIP Agmt, at §§ 4.01 – 4.03)** |
| **Fees**<br><br>*Local Rule 4001-2(a)(3); Fed. R. Bankr. P. 4001(c)(1)(B)* | **Unused Commitment**. 2.0% *per annum* on the daily average unused portion of the Commitments payable monthly in arrears and on the Termination Date.<br><br>**Upfront and other Arrangement Fees**. As set forth in separate fee letters in favor of certain of the initial Lenders.<br><br>**Exit**. 1% of the aggregate amount of DIP Loans prepaid or repaid or Commitments terminated or reduced, or 3% of the aggregate principal amount of any DIP Loans continued or converted into exit financing, if applicable.<br><br>**Administrative Agency Fee**. As set forth in a separate letter in favor of the DIP Agent. |

---

[4] For the avoidance of doubt, the LC Agreement and all letters of credit issued under the LC Agreement pursuant to applicable provisions of the DIP Orders do not and shall not be deemed to constitute or give rise to any obligation to provide any financing other than the letters of credit set forth in the LC Agreement. Further, any letters of credit issued by JPMCB are obligations arising solely pursuant to and under the LC Agreement, and are not obligations in any way arising under or in connection with the DIP Agreement.

| **MATERIAL TERMS OF THE POSTPETITION FINANCING** |
|---|

| | |
|---|---|
| **Liens and Priorities**<br><br>*Local Rule 4001-2(a)(4); Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Liens**.  Subject to the Carve-Out, as security for the DIP Obligations the DIP Agent, for its own benefit and the benefit of the DIP Lenders, (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "***DIP Collateral***," *provided* that, notwithstanding anything herein to the contrary, the DIP Collateral shall not include, and the DIP Liens shall not attach to, the LC Cash Collateral), (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to the DIP Orders and the Postpetition Financing Documents, the "***DIP Liens***"): |

a. **First Priority Liens**.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property in which the Debtors have an interest, whether existing on or as of the Commencement Date or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Commencement Date (the "***Unencumbered Property***"), including, without limitation, any and all unencumbered cash, accounts receivable, inventory, general intangibles, contracts, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of the subsidiaries of Holdings or any other Debtor and the proceeds of all of the foregoing; *provided* that the Debtors shall not be required to pledge in excess of 65% of the capital stock of their direct foreign subsidiaries or any of the capital stock or interests of indirect foreign subsidiaries (if adverse tax consequences would result to the Borrower); *provided further* that the Unencumbered Property shall not include the Avoidance Actions and any assets upon which security may not be lawfully granted, but **_subject to the entry of the Final Order, Unencumbered Property shall include any proceeds or property recovered in respect of any Avoidance Actions._**

b. **Junior Priority Liens**.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior lien on and security interest in all tangible and intangible prepetition and postpetition property in which the Debtors have an interest (other than the property described in the following paragraph (c), as to which the DIP Liens will be as described in such clause), whether now existing or hereafter acquired (other than the LC Cash Collateral) and all proceeds thereof, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Commencement Date or to valid and unavoidable liens in existence immediately prior to the Commencement Date that are perfected after the Commencement Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the DIP Agent and the DIP Lenders shall be junior to such valid, perfected and unavoidable liens.

c. **Priming Liens**.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all now or hereafter acquired Prepetition Collateral (other than the LC Cash Collateral) and all proceeds thereof.  The DIP Liens on the Prepetition Collateral shall be senior in all respects to the security interests in and liens on the Prepetition Collateral of the Prepetition Agent and the Prepetition Secured Lenders (including, without limitation, the Adequate Protection Liens (as defined below)) (collectively, the "***Primed Liens***"), but shall be junior to any valid, perfected and unavoidable security interests in and liens on the Prepetition Collateral that were valid as of the Commencement Date, including as permitted by section 546(b) of the Bankruptcy Code.

d. **No Senior Liens**.  The DIP Liens and the Adequate Protection Liens shall not be subject or subordinate to any lien or security interest that is avoided

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| **Carve-Out**<br><br>*Local Rule 4001-2(a)(5)* | "*Carve Out*" shall mean the sum of: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under 28 U.S.C. § 1930(a), and (b) at any time after the first business day after the occurrence and during the continuance of an Event of Default under the DIP Agreement, and delivery of notice thereof to the U.S. Trustee and each of the lead counsel for the Debtors and the Committee (once appointed) (the "Carve Out Notice"), to the extent allowed at any time, whether before or after delivery of a Carve Out Notice, whether by interim order, procedural order or otherwise, the payment of accrued and unpaid professional fees, costs and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors and the Committee and allowed by this Court, in an aggregate amount not exceeding $10,000,000 (the "Carve Out Cap") (plus all unpaid Professional Fees allowed by this Court at any time that were incurred on or prior to the business day following delivery of the Carve Out Notice); provided that (A) the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent, the DIP Lenders, the Prepetition Secured Lenders or the Prepetition Agent, (B) so long as no Event of Default shall have occurred and be continuing, the Carve Out shall not be reduced by the payment of fees and expenses allowed by this Court and payable under sections 328, 330 and 331 of the Bankruptcy Code, and (C) nothing in the Interim DIP Order shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates.<br><br>**(Int. DIP Ord., at ¶ 6(b))** |
| **Payments on Prepetition Debt; Cash Collateralization**<br><br>*Local Rule 4001-2(a)(7); Fed. R. Bankr. P. 4001(c)(1)(B)(ii)* | All Prepetition Letters of Credit, in the face amount of $6,300,000, shall, contemporaneously with the initial funding under the DIP Facility, be irrevocably cash collateralized at 105% of the face amounts thereof on terms reasonably satisfactory to the issuing lender and the Administrative Agent (the "*Prepetition LC Cash Collateral*" and, together with the Future LC Cash Collateral, the "*LC Cash Collateral*"). **(Int. DIP Ord., at ¶ 13(c))**<br><br>The Debtors and their non-Debtor affiliates will also continue to pay the principal and interest owed on the Euro Term Loan as and when due under the Prepetition Agreement. |
| **Covenants**<br><br>*Local Rule 4001-2(a)(8); Fed. R. Bankr. P. 4001(c)(1)(B)* | **Affirmative Covenants**. Usual and customary for financings of this type, including, without limitation, delivery of financial statements, cash flow forecasts, MD&A analysis, variance reports and compliance certificates, hosting of lender conference calls, preservation of corporate existence, maintenance of properties, insurance, corporate books and records and facility ratings, compliance with laws, further assurances with respect to DIP Collateral and restrictions on the use of proceeds of the DIP Loans. **(DIP Agmt, at §§ 6.01 – 6.17)**<br><br>**Negative Covenants**. Usual and customary for financings of this type, including, without limitation: (a) restrictions on liens, investments, indebtedness (including guarantees), fundamental changes, changes to the nature of the business, dispositions, dividends and distributions, affiliate transactions, sale and leaseback transactions, swap contracts, prepayment of indebtedness other than the DIP Loans and capital expenditures; and (b) financial covenants regarding consolidated fixed charge coverage ratio, minimum cumulative consolidated EBITDA and minimum liquidity. **(DIP Agmt, at §§ 7.01 – 7.17)** |

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| **Limitations**<br><br>*Fed. R. Bankr. P. 4001-2(a)(9)* | DIP Facility, DIP Collateral, Prepetition Collateral (including Cash Collateral) or the Carve Out may not be used to:<br><br>a.  object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Agreement, the Prepetition Agreement or the liens or claims granted under the DIP Orders, DIP Agreement or Prepetition Agreement;<br><br>b.  assert any Claims and Defenses or any other causes of action against the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Secured Lenders or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors;<br><br>c.  prevent, hinder or otherwise delay the DIP Agent's or the Prepetition Agent's assertion, enforcement or realization on the Prepetition Collateral or the DIP Collateral in accordance with the DIP Agreement, the Prepetition Agreement or the DIP Orders;<br><br>d.  seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Lenders under the DIP Orders or under the DIP Agreement or the Prepetition Agreement, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent; or<br><br>e.  pay any amount on account of any claims arising prior to the Commencement Date unless such payments are (i) approved by an Order of this Court and (ii) permitted under the DIP Agreement; *provided* that, no more than an aggregate of $[*100,000*] of the Prepetition Collateral (including the Cash Collateral), DIP Facility, the DIP Collateral or the Carve Out may be used by the Committee to investigate the validity, enforceability or priority of the Prepetition Obligations or the liens on the Prepetition Collateral securing the Prepetition Obligations, or investigate any Claims and Defenses or other causes of action against the Prepetition Agent or the Prepetition Secured Lenders.<br><br>**(Int. DIP Ord., at ¶ 18)** |
| **Events of Default**<br><br>*Local Rule 4001-2(a)(10);*<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Usual and customary for financings of this type, including, without limitation, non-payment of principal, interest and fees, defaults under affirmative and negative covenants, breaches of representations and warranties, bankruptcy of non-debtors, judgment defaults, cross defaults, failure to comply with ERISA rules and regulations, change of control, dismissal or conversion of the bankruptcy cases, entry of an order granting superpriority claims to other creditors, non-permitted prepetition debt payments, relief from automatic stay, failure to comply with bankruptcy orders and certain milestones, invalidation of superpriority claims, timing for the filing and confirmation of a bankruptcy plan, liens and guarantees.  **(DIP Agmt, at § 8.01)** |
| **Change of Control**<br><br>*Local Rule 4001-2(a)(11)* | "***Change of Control***" means the earliest to occur of: (a) the acquisition of ownership by any Person or group of Equity Interests representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings; (b) the board of directors of Holdings ceasing to consist of a majority of the Continuing Directors; and (c) Holdings ceasing to own, directly, all of the outstanding Equity Interests of the Borrower.  **(DIP Agmt, at § 1.01)** |

K&E 15431342.

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| **Milestones**<br><br>*Local Rule 4001-2(a)(12);*<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(v-vi)* | The DIP Agreement contains the following deadlines relating to the filing of the chapter 11 plan and disclosure statement, including:<br><br>● **Filing**.  On or before the date that is 75 days from the Commencement Date, the Debtors shall file a chapter 11 plan of reorganization and related disclosure statement with the Court.<br><br>● **Disclosure Statement Approval**.  On or before the date that is 115 days from the Commencement Date, the Court shall have entered an order approving the adequacy of the Debtors' disclosure statement.<br><br>● **Confirmation**.  On or before the date that is 80 days following entry of the order approving the disclosure statement, or, if the Debtors have met the conditions for the additional three month extension, 120 days following entry of the order approving the disclosure statement, the Court shall have entered an order confirming the Debtors' chapter 11 plan of reorganization.<br><br>● **Effective Date**.  On or before the date that is 30 days following entry of the confirmation order, the Debtors' chapter 11 plan of reorganization shall go effective.<br><br>**(DIP Agmt, at § 8.01(q))** |

K&E 15431342.

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| **Repayment**<br>*Local Rule*<br>*4001-2(a)(13)* | **Optional Repayment**. The Borrower may, upon three (3) Business Days notice to the DIP Agent, at any time or from time to time, voluntarily prepay DIP Loans in whole or in part without premium or penalty (except the exit fees provided § 2.07(b)); *provided* that any prepayment of (a) Eurodollar Rate Loans shall be in a principal amount of **$5,000,000** or a whole multiple of **$1,000,000** in excess thereof; and (b) Base Rate Loans shall be in a principal amount of **$1,000,000** or a whole multiple of **$500,000** in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.<br><br>**Mandatory Repayment**. The Borrower must repay certain of the DIP Obligations upon the occurrence of certain events or transactions, including:<br><br>&bull; **Asset Disposition/Casualty Event**. If the Debtors or any of Holdings' non-Debtor subsidiaries dispose of any assets (other than those expressly provided in the DIP Agreement) or any Casualty Event occurs that results in the realization or receipt of Net Cash Proceeds, Borrower shall cause to be prepaid on or prior to the date that is five (5) Business Days, or ten (10) Business Days if the first recipient of such Net Cash Proceeds is a Foreign Subsidiary, after the date of the realization or receipt of such Net Cash Proceeds Loans in an amount equal to 100% of all Net Cash Proceeds received; *provided* that up to $5,000,000 in the aggregate of Net Cash Proceeds from such dispositions and up to $8,000,000 in proceeds from Casualty Events may be excluded from the prepayment of the DIP Loan; *provided further* that no such prepayment shall be required with respect to such portion of such Net Cash Proceeds, up to $4,000,000 in the aggregate, that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest in accordance with the DIP Agreement.<br><br>&bull; **Issuance of Debt/Equity**. If the Debtors or any of Holdings' non-Debtor subsidiaries realize any Net Cash Proceeds from the incurrence of indebtedness after the Closing Date or from the issuance or sale of stock of the Debtors or of any of Holdings' non-Debtor subsidiaries, Borrower shall cause to be prepaid 100% of such Net Cash Proceeds, subject in each case to customary exceptions.<br><br>**(DIP Agmt, at § 2.03)** |
| **Joint Liability**<br>*Local Rule*<br>*4001-2(a)(14);*<br>*Local Rule 4001-2(e)* | All obligations of the Borrower are guaranteed, on a joint and several basis, by Holdings and each of its existing and future domestic subsidiaries. All intercompany indebtedness shall be subordinated to the DIP Loans in accordance with the terms of the security agreement. **(DIP Agmt, at ¶ 7.03)** |

K&E 15431342.

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| **Non-Debtor Affiliates**<br><br>*Local Rule 4001-2(a)(15)* | The Borrower shall be permitted to advance via intercompany loans, an amount not to exceed (a) $40,000,000 in the aggregate to Uitgeversmaatschappij The Reader's Digest B.V., (b) $12,000,000 in the aggregate to The Reader's Digest Association (Canada) ULC, and (c) $5,000,000 in the aggregate to The Reader's Digest Association Pty. Limited (Australia); *provided* that the aggregate amount of all advances made pursuant to clauses (a), (b) and (c) above shall not exceed $50,000,000 at any one time outstanding; *provided further* that any portion of such $50,000,000 that is not so advanced or that is advanced and repaid by the borrowers under such intercompany loans may be invested in one or more foreign subsidiaries of the Borrower in amounts and for purposes to be agreed. Such intercompany loans shall be in form and substance satisfactory to the DIP Agent and pledged as collateral to the DIP Lenders pursuant to terms and documentation reasonably satisfactory to the DIP Agent. The proceeds of the DIP Loans may not be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lenders, the DIP Agent or any parties to the Prepetition Agreement. **(DIP Agmt., at § 7.02)** |
| **Acknowledgements**<br><br>*Local Rule 4001-2(f)*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii);* | The Debtors make certain customary admissions and stipulations with respect to (a) the aggregate amount of prepetition indebtedness owing to the Prepetition Secured Lenders, (b) the validity, enforceability and priority of the liens and security interests granted to the Prepetition Agent to secure the Prepetition Obligations, (c) the binding nature of the Prepetition Obligations in respect of the Debtors, and (d) the waiving of claims and defenses against the Prepetition Secured Lenders regarding the Prepetition Obligations **(Int. DIP Ord., at ¶ 3)**; *provided* that the above shall not be binding on any other party in interest if and to the extent such party (x) duly files an adversary proceeding with respect to all or a portion the above on or before the later of (i) 75 days after entry of the Interim DIP Order, and (ii) with respect to a Committee, 60 days after formation of the Committee, and (y) is successful in such adversary proceeding. **(Int. DIP Ord., at ¶ 17)** |
| **Automatic Stay**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | **DIP Facility.** Subject to five (5) business days' prior notice to the Debtors and certain other parties, the automatic stay is vacated to permit the exercise of remedies by the DIP Agent and the DIP Lenders to the extent set forth in the DIP Orders. **(Int. DIP Ord., at ¶ 8(a))**<br><br>**LC Agreement.** JPMCB shall be authorized to immediately, and without further notice or action, debit amounts from the LC Cash Collateral to pay all accrued and unpaid fees with respect to the Prepetition Letters of Credit and reimburse itself for each drawing under such letters of credit. **(Int. DIP Ord., at ¶ 13(c))** |

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| **Waivers and Consents**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(v);*<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vii-x)* | **Non-Bankruptcy Law**.  The DIP Liens, Adequate Protection Liens and other interests granted to the DIP Agent, the DIP Lenders or the Prepetition Agent are deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of the Interim DIP Order.  **(Int. DIP Ord., at ¶ 15(a))** |
| | **Estate Claims**.  The Debtors admit, stipulate, and agree that the Debtors do not have any claims, counterclaims, causes of action, defenses, setoff or recoupment rights, whether arising under the Bankruptcy Code or applicable nonbankruptcy law, against the Prepetition Agent, the Prepetition Secured Lenders and their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors (the "***Claims and Defenses***") against the DIP Lenders **(Int. DIP Ord., at ¶ 3)**; *provided* that the above shall not be binding on any other party in interest if and to the extent such party (a) duly files an adversary proceeding with respect to all or a portion the above on or before the later of (i) 75 days after entry of the Interim DIP Order, and (ii) with respect to a Committee, 60 days after formation of the Committee, and (b) is successful in such adversary proceeding.  **(Int. DIP Ord., at ¶ 17)** |
| | **Indemnification**.  Usual and customary for financings of this type, including that Borrower shall indemnify and hold harmless the DIP Agent and DIP Lenders and their respective agents, representatives and professionals from and against any and all liabilities, claims and customary actions of this nature, in any way relating to the DIP Agreement and related transactions and negotiations.  **(DIP Agmt, at § 12.05)** |
| | **Section 506(c)**.  ***Subject to and effective upon entry of the Final DIP Order*** and to the extent provided for therein, except to the extent of the Carve Out, no expenses of administration of the cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law or in equity, without the prior written consent of the DIP Agent or the Prepetition Agent, as the case may be, and no such consent shall be implied from any other action or inaction by the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Lenders.  **(Int. DIP Ord., at ¶ 9)** |

## Background

6.     As described in the Williams Declaration, the Debtors and their non-debtor affiliates (collectively, the "***Company***") are a global multi-brand media and direct marketing company that markets books, magazines, home entertainment products, online networking websites and educational products.  With its global headquarters located in Pleasantville, New York, the Company has over 3,000 employees worldwide, including approximately 1,500 in the United States, and achieves annual sales of approximately $2.2 billion.

7.     Despite their leading industry position, the Debtors have not been immune to the global financial crisis.  The current recession has resulted in reductions in the Debtors'

K&E 15431342.

advertising, retail and subscription revenues, placing pressure on the Debtors' financial performance. Withdrawal of certain international lines of credit and heightened pressures from trade creditors have also weakened the Debtors' liquidity position. In short, as the economy continues to deteriorate in several of the Debtors' markets, the Debtors are struggling to maintain working capital sufficient to conduct operations while facing progressively unsustainable debt service obligations under a highly-leveraged capital structure.

8.      To ensure they maintain competitive operations, the Debtors have engaged in extensive negotiations with their prepetition secured lenders regarding a comprehensive debt restructuring. After weeks of discussions, the Debtors are before the Court with a pre-arranged restructuring plan that will reduce the Debtors' total funded debt by approximately 75%, provide the Debtors with adequate exit financing and provide substantial recoveries to the Debtors' valued suppliers that continue to do business with the reorganized company.

9.      To evidence their support of the Debtors' restructuring, prepetition secured lenders holding more than 80% of the Debtors' bank debt have executed a restructuring support agreement, which attaches a term sheet that sets forth the terms for a chapter 11 plan that is supported by these parties. The Debtors intend to file shortly a proposed chapter 11 plan consistent with the terms contained in the plan term sheet.

10.     On the date hereof (the "***Commencement Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors have filed a motion seeking joint administration of these chapter 11 cases. No

K&E 15431342.

request for the appointment of a trustee or examiner has been made in these chapter 11 cases. No committees have been appointed or designated.

11.     A description of the Debtors' businesses and operations, and the circumstances leading up to and precipitating the commencement of these chapter 11 cases, is set forth in the Williams Declaration.

## I.     Prepetition Capitalization

12.     As of the Commencement Date, the Debtors' principal capital structure consists of secured revolving and term loan facilities, senior unsecured notes and equity. Specifically, the Debtors have outstanding debt for borrowed money in the aggregate principal amount of approximately $2,183,100,000, consisting primarily of: (a) approximately $1,580,300,000 in secured borrowings under their senior secured credit facility; (b) approximately $600 million in principal amount of unsecured senior subordinated notes; and (c) approximately $2,800,000 in foreign lines of credit and a promissory note. The Debtors also have debt obligations associated with termination costs under certain swap agreements.

### A.     Prepetition Credit Agreement

13.     The Debtors' principal prepetition funded debt obligations arise under that certain Credit Agreement dated as of March 2, 2007 (as amended, modified, waived or supplemented from time to time, the "***Prepetition Agreement***"), by and among Holdings, Reader's Digest and certain of its affiliates, as borrowers, JPMCB, as agent (in such capacity, the "***Prepetition Agent***") and the other Prepetition Secured Lenders, which provided the Debtors with a six (6) year, $300,000,000 revolving line of credit-including a $50,000,000 letter of credit subfacility and a $30,000,000 swing-line subfacility (and which is fully-drawn, including letters of

credit)-and a seven (7) year, $1.21 billion U.S. term loan (approximately $1.18 billion of which remains outstanding). [5]

14.      To reduce interest rate volatility and comply with the interest rate provisions of the Prepetition Agreement, on April 19, 2007 the Debtors entered into certain interest rate swap agreements with aggregate notional value of $750,000,000 (the "***Hedge Agreements***").  Under the Hedge Agreements, the Debtors receive floating-rate interest payments that offset the LIBOR component of the interest due on some of their floating-rate debt, and make fixed-rate interest payments over the term of the agreements.  The obligations under the Hedge Agreements are secured by the liens granted to the Prepetition Agent under the Collateral Documents (as defined in the Prepetition Agreement).

15.      The Prepetition Agreement also provided for a $100,000,000 term loan (the "***Euro Term Loan***"), payable in an equivalent amount of Euros, to RD German Holdings GmbH, a non-debtor German subsidiary of Reader's Digest (of which approximately €74,019,384 or $103.9 million remains outstanding).  The Euro Term Loan is guaranteed by RD German Holdings GmbH and substantially all of its subsidiaries and, subject to certain customary exceptions, is secured by a pledge of all of the stock of those subsidiaries.  In connection with the negotiations surrounding the Prepetition Facilities and the Restructuring Support Agreement among the Debtors, certain of their shareholders and certain of the Prepetition Secured Lenders (the "***RSA***"), the Debtors, the Prepetition Agent and certain Prepetition Secured Lenders holding in excess of 50% of the Prepetition Obligations (in such capacity, the "***Required Lenders***")

---

[5]    Under the Prepetition Agreement, the U.S. term loan (prepetition) bears interest, at the Debtors' option, at either (a) a base rate (determined by reference to the higher of the prime rate and the federal funds rate, plus 0.50%) plus 1.00%, or (b) a Eurocurrency rate (determined by reference to the rate for Eurocurrency deposits for a period selected by the Debtors) plus 2.00%.  Borrowings under the prepetition revolving credit facility bear interest *per annum* at a percentage equal to, at the Debtors' option, either (x) the base rate plus a margin of up to 1.25% (depending on the Debtors' leverage ratio), or (y) the Eurocurrency rate plus a margin of up to 2.25% (depending on the Debtors' leverage ratio).

executed a Waiver and Amendment dated August 17, 2009 (the "***Waiver and Amendment***"), pursuant to which (a) certain provisions of the Prepetition Agreement were amended to avoid acceleration of the Euro Term Loan upon the commencement of these chapter 11 cases, and (b) the Required Lenders consented to the DIP Agreement and the Debtors' performance thereunder, in exchange for, among other things, an increase in the interest rates charged on the Euro Term Loan (for clarification, only the Euro Term Loan shall receive current pay interest during the pendency of these chapter 11 cases, on account of the Euro Term Loan exposure).[6]

16.     All obligations under the Prepetition Agreement, including obligations arising under the Hedge Agreements and the Euro Term Loan (collectively, the "***Prepetition Obligations***"), are guaranteed by Holdings and substantially all of its direct and indirect domestic subsidiaries (the "***Prepetition Guarantors***"), all of which are Debtors in these chapter 11 cases. The Prepetition Obligations, and the guarantees thereof, are also secured by substantially all of the tangible and intangible assets of Reader's Digest and the Prepetition Guarantors and the proceeds therefrom, subject to certain exceptions, 65% of the voting and 100% of the non-voting equity interests of the first tier foreign non-Debtor subsidiaries of Reader's Digest, and the Cash Collateral (constituting, among other things, proceeds of collateral pledged to secure the Prepetition Obligations). As of the Commencement Date, the Debtors held approximately $90 million in cash that constituted Cash Collateral.[7]

---

[6]    Specifically, the Waiver and Amendment increased the applicable margin for the Euro Term Loan to 2.5% for base rate loans and 3.5% for Eurocurrency rate loans, and established a Eurocurrency rate "floor" of 3.5% for the Euro Term Loan.

[7]    The Company has significant working capital requirements and requires minimum operating levels of "trapped cash" of approximately $55-60 million globally. As a result, only approximately $30 million in cash is available to the U.S. Debtors as of the Commencement Date. The Debtors are also in the midst of their largest seasonal need for working capital. In preparation for the fall mailing season (labor day through winter holidays), the Debtors incur significant promotional costs in the period from July 1 through September 30.

K&E 15431342.

**B. Unsecured Senior Subordinated Notes**

17. Prior to the Commencement Date, Reader's Digest issued $600,000,000 in unregistered 9% Senior Subordinated Notes due 2017 through a private placement (as the same were exchanged in 2008 for an equal amount of registered 9% Senior Subordinated Notes due 2017, the "***Notes***").  The Notes are governed by that certain Indenture dated as of March 2, 2007 (the "***Notes Indenture***"), by and among Reader's Digest, as issuer, certain of the other Debtors and non-Debtor affiliates of Reader's Digest, as guarantors, and The Bank of New York, as trustee.  The Notes bear interest at the rate of 9% *per annum*, payable semi-annually in arrears on February 15 and August 15 of each year.

18. The Notes Indenture provides that the right of payment under the Notes is expressly subordinated to prior payment in full of the Debtors' Prepetition Obligations, and that the Prepetition Secured Lenders are entitled to enforce this subordination provision.  Further, the Notes Indenture provides that the Prepetition Obligations must be satisfied in full before holders of the Notes may receive any distributions in these chapter 11 cases on account of the Notes (except for certain permitted junior securities), and that the holders of the Notes will pay over to the Prepetition Secured Lenders any distributions received in these chapter 11 cases that do not comply with the above.[8]

---

[8] Specifically, the Notes Indenture provides, in pertinent part, that "the payment of all Obligations owing in respect of the Notes is subordinated in right of payment, to the extent and in the manner provided in this Article 10, to the prior payment in full of all existing and future Senior Indebtedness of the Issuer [including the Prepetition Obligations] and that the subordination is for the benefit of and enforceable by the holders of such Senior Indebtedness."  Notes Indenture, § 10.1.  Additionally,

> Upon any payment or distribution of the assets of the Issuer to creditors upon a total or partial liquidation or a total or partial dissolution of the Issuer or in a reorganization of or similar proceeding relating to the Issuer or its property:  (i) the holders of Senior Indebtedness of the Issuer shall be entitled to receive payment in full in cash of such Senior Indebtedness before Holders shall be entitled to receive any payment; and (ii) until the Senior Indebtedness of the Issuer is paid in full in cash, any payment or distribution to which Holders of the Notes would be entitled but for the subordination provisions of this Indenture shall be made to holders of such Senior Indebtedness as their interests may appear, except that Holders of Notes may receive

19.     As discussed in greater detail in the Williams Declaration, the Debtors did not make the semi-annual interest payment due to holders of the Notes on August 17, 2009.

## II.     Proposed Postpetition Financing

### A.     Need for Postpetition Financing

20.     The recent and unexpected global economic crisis has adversely impacted the Debtors' financial condition, as well as their ability to maintain the liquidity they require to operate their business. Much like that of their competitors, the Debtors' advertising, retail and subscription revenues have declined in the past year, reducing profitability. Withdrawal of foreign lines of credit and pressure from trade creditors have also weakened the Debtors' liquidity position in the period leading up to the commencement of these chapter 11 cases. As a result, the Debtors' ability to maintain working capital sufficient to operate their businesses has significantly declined. At the same time, the Debtors' faced progressively unsustainable debt service obligations related to their significant funded debt.

21.     Accordingly, and in recognition of the Debtors' highly leveraged capital structure, in February 2009, the Debtors retained Miller Buckfire to evaluate strategic alternatives for restructuring their debt obligations and improving liquidity. Shortly thereafter, the Debtors began discussions with a steering committee of their Prepetition Secured Lenders (the "***Steering Committee***") and its advisors regarding a restructuring of the Prepetition Obligations, including the incremental financing the Debtors would need in the event the Debtors were required to commence chapter 11 cases. The Debtors ultimately concluded that they would require $150

---

Permitted Junior Securities; and (iii) if a distribution is made to Holders of the Notes that, due to the subordination provisions, should not have been made to them, such Holders of the Notes are required to hold it in trust for the holders of Senior Indebtedness of the Issuer and pay it over to them as their interests may appear.

Notes Indenture, § 10.2

K&E 15431342.

million in financing and would need immediate access, with little or no delay, to the Cash Collateral and at least $100 million in postpetition financing to avoid immediate and irreparable harm to their estates, minimize disruption to their businesses caused by the commencement of these cases and instill confidence in their customers and suppliers. Importantly, the timing of these cases coincides with the Debtors' largest seasonal working capital need, given significant promotional spend required in advance of the fall mailing season (labor day through the holiday season).

**B.     The Debtors' Marketing**
**        Efforts for Postpetition Financing**

22.     While negotiating with the Steering Committee regarding a restructuring of the Prepetition Obligations, and facing a liquidity shortfall, the Debtors began discussions in earnest with the Steering Committee regarding the terms and conditions of the DIP Facility. The Debtors also approached certain other stakeholders to determine whether they would provide postpetition financing. Miller Buckfire also identified a number of other entities that might be willing to provide at least $150 million in postpetition financing to the Debtors, and solicited indications of interest in providing such financing from approximately 20 financial institutions, hedge funds and private equity funds active in the postpetition financing market. Based on the responses received to Miller Buckfire's solicitations, the Debtors executed confidentiality agreements with, and distributed a confidential financing overview memorandum to, seven (7) of these institutions.

23.     The Debtors' ability to obtain postpetition financing from alternative parties was complicated by several factors, including the Debtors' substantial amount of secured debt and lack of any significant unencumbered assets, the economic challenges facing the media, publishing and direct marketing industry, and the challenging debtor in possession financing

market in general.  Third party lenders unanimously indicated that they would require that the liens securing any postpetition financing prime (*i.e.*, be senior in priority to) existing liens on the Debtors' assets.  The Debtors concluded, based on their discussions with the Prepetition Agent and Steering Committee, that the Prepetition Secured Lenders were unlikely to consent to a third party postpetition financing secured by liens on the Debtors' assets senior to their own.  Further, the Debtors and their advisors concluded that the value of the Debtors' encumbered assets relative to the amount of their senior secured debt, and the Debtors' lack of any significant unencumbered assets, made the outcome of a non-consensual priming of the Prepetition Secured Lenders' liens highly uncertain.

24.     In the Debtors' case, obtaining postpetition financing was further complicated by the need to address the potential acceleration of the Euro Term Loan upon a potential event of default.  Absent a waiver and amendment, which could only be provided by the Debtors' Prepetition Secured Lenders, the Debtors would require additional funds of approximately $100 million to refinance the Euro Term Loan.

25.     In light of the lack of practicable alternative sources of financing, and the cost of a priming fight with the Prepetition Secured Lenders, the Debtors and their advisors focused their efforts on negotiating a postpetition financing package with the Steering Committee on terms favorable to the Debtors, including obtaining the Waiver and Amendment to address a potential acceleration of the Euro Term Loan as a result of the Debtors commencing these chapter 11 cases and receiving the right to convert any postpetition financing into an exit financing facility to provide the Debtors with the funding needed to emerge from, and to operate after their emergence from, chapter 11.  The Debtors' believe the DIP Facility will allow them to meet their liquidity needs, remain competitive in their industry, meet their obligations to vendors and

suppliers while minimizing disruption to day-to-day operations, fund restructuring costs and capital expenditures, and satisfy working capital requirements. The Debtors further believe that their right to convert the DIP Facility into exit facility financing will instill confidence in the Debtors' stakeholders and allow for an expeditious and successful emergence from these chapter 11 cases.

## III.    The Postpetition Financing

### A.    The DIP Facility

26.    After extended good faith, arm's-length negotiations, the DIP Lenders agreed to provide the DIP Facility on the terms provided in the DIP Agreement as summarized above. The proceeds of the DIP Facility, which the Debtors estimate will be sufficient to support them through the pendency of these chapter 11 cases, will be used (a) for general working capital and other purposes permitted under the DIP Agreement (including funding foreign operations), (b) to fund the costs of administering these chapter 11 cases, and (c) to pay all fees and expenses provided under the DIP Agreement and authorized by the Court. Additionally (and importantly), at the Debtors' option, the DIP Facility is convertible into an exit facility, which should facilitate the Debtors' expeditious emergence from chapter 11. Furthermore, the DIP Agreement is an important part of a larger deal, as evidenced by the RSA, pursuant to which the Prepetition Secured Lenders party to the RSA have agreed to support a plan of reorganization with substantial economic and non-economic benefits to the Debtors' estates.

### B.    Use of Cash Collateral

27.    The DIP Agreement also provides the Debtors with immediate access to the Cash Collateral, subject to the terms and conditions of the DIP Agreement and the Interim DIP Order. Immediate access to the Cash Collateral will (a) ensure that the Debtors have sufficient working capital to, among other things, pay their employees and vendors, (b) enable the Debtors to honor

their prepetition obligations under and in accordance with other "first-day" orders entered by the Court, and (c) satisfy administrative expenses incurred in connection with the commencement of these chapter 11 cases. By providing the Debtors with the immediate right to use the Cash Collateral in whichever of the Debtors' accounts it is currently held, the DIP Agreement also avoids any business disruptions that would result if the Debtors were required to borrow under a postpetition facility to replenish their various operating accounts.

### C. Letters of Credit

28.     In the ordinary course of their business, the Debtors are required to provide letters of credit to secure the payment or performance of certain obligations, including, for example, to secure certain surety bonds related to sweepstakes promotions and real estate leases. The Debtors forecast that certain Prepetition Letters of Credit will expire during these chapter 11 cases while the Debtors' related payment and performance obligations will continue. Additionally, the Debtors anticipate that they will require new letters of credit (including additional letters of credit to supplement existing Prepetition Letters of Credit) to secure certain postpetition obligations arising in the ordinary course of their business. As such, the Debtors and JPMCB have negotiated the LC Agreement, pursuant to which JPMCB may provide the Debtors with renewals of Prepetition Letters of Credit as well as supplemental or additional letters of credit, in a face amount not to exceed $10,200,000 in the aggregate. In addition, the DIP Agreement permits the Debtors to cash collateralize the Prepetition Letters of Credit and new letters of credit in face amount not to exceed $5,500,000, whether issued by JPMCB or any other third party.

### D. Adequate Protection Obligations

29.     The Debtors and the Prepetition Secured Lenders have agreed on consideration that will adequately protect the Prepetition Secured Lenders' interests in the Debtors' property

24

from diminution in value caused by the Debtors' use of the Cash Collateral and the priming of the Prepetition Secured Lenders' liens. Specifically, the Debtors have agreed to provide, in each case only to the extent provided under section 507(b) of the Bankruptcy Code, (a) the Adequate Protection Liens - valid, perfected replacement security interests and liens in and on all of the DIP Collateral, subordinate to the Permitted Prepetition Liens and the DIP Liens; and (b) the 507(b) Claims - superpriority administrative expense claims with priority in payment greater than all other administrative expense claims allowed in these chapter 11 cases and subject only to the Superpriority Claims. In addition, the Debtors have agreed to (x) pay the Adequate Protection Payments - fees and expenses of the Prepetition Agent, the Steering Committee and certain of their professionals; and (y) provide to the Prepetition Agent any written financial information or periodic reporting that is provided to, or required to be provided to, the DIP Agent or the DIP Lenders.

### Basis for Relief

**I.     The Debtors Should be Authorized to Obtain
        Postpetition Financing through the Postpetition Financing Agreements**

> **A.     Entering into the Postpetition Financing Agreements
>          is an Exercise of the Debtors' Sound Business Judgment**

30.     For the reasons set forth in greater detail below, the Court should authorize the Debtors to enter into the Postpetition Financing Agreements, and obtain access to the Postpetition Facilities and the Cash Collateral, as an exercise of the Debtors' sound business judgment. At their core, the statutory predicates for a debtor to enter into postpetition financing agreements require the exercise of sound business judgment.

31.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and

policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) ("the applicable factors can be synthesized as follows:  (1) That the proposed financing is an exercise of sound and reasonable business judgment . . . .").

32.     Furthermore, in determining whether the Debtors' have exercised sound business judgment in deciding to enter into the Postpetition Financing Agreements, the Court should consider the economic terms of the Postpetition Facilities in light of current market conditions. *See, e.g.,* Transcript of Record at 734 35:24 1, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009) (recognizing "the terms that are now available for DIP facilities in the current economic environment aren't as desirable" as in the past).  Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms,

> a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125 (Bankr. S.D.N.Y. July 6, 2009).

33.     The Debtors' execution of the Postpetition Financing Agreements is an exercise of their sound business judgment that warrants approval by the Court. Prior to the Commencement Date, the Debtors and their advisors undertook a detailed investigation as to the Debtors projected financing needs during the pendency of any chapter 11 case, and determined that the Debtors would require significant postpetition financing to support their operational and restructuring activities. Accordingly, the Debtors negotiated the Postpetition Financing Agreements with the DIP Lenders in good faith, at arm's-length, and with the assistance of outside counsel, in order to obtain the required postpetition financing on terms favorable to the Debtors. Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the Postpetition Financing Agreements provide a greater amount of financing on more favorable terms than any other reasonably available alternative.

34.     Specifically, as noted above, the Postpetition Financing Agreements will provide the Debtors with access to $100,000,000 immediately after entry of the Interim DIP Order and up to a total of $150,000,000 after entry of the Final DIP Order, which the Debtors and their advisors have independently determined should be sufficient to support the Debtors' ongoing

K&E 15431342.

operations and reorganization activities through the pendency of these chapter 11 cases. Additionally, the Postpetition Financing Agreements provide the Debtors with access to the Cash Collateral, which relieves the Debtors of the cost of borrowing additional amounts to replace that cash. Finally, the Postpetition Financing Agreements include provisions allowing the Debtors, at their option, to convert the Postpetition Facilities into exit financing, which ensures that the Debtors will have an adequate source of liquidity to successfully emerge from chapter 11.

35. As importantly, the Debtors negotiated the Postpetition Financing Agreements as part of their larger discussions with the Prepetition Secured Lenders regarding a consensual restructuring of the Debtors' principal prepetition obligations. As detailed in the Williams Declaration, the Prepetition Secured Lenders have overwhelmingly voted to support the RSA, which resulted from those discussions. The Prepetition Financing Agreements are a reflection of the cooperation among the Debtors and the Prepetition Secured Lenders and the Prepetition Secured Lenders' support for the Debtors' restructuring plans, both of which are critical to the Debtors' ability to expeditiously and successfully conclude these chapter 11 cases. Accordingly, entering into the Postpetition Financing Agreements constitutes an exercise of the Debtors' sound business judgment that should be approved by the Court.

**B.      The Debtors Should be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis**

36. Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both. Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

37.     In order to satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*) 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989).  *See also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

38.     As described above, the Debtors and Miller Buckfire identified and solicited offers from approximately 20 potential postpetition lenders over the course of several months. Seven (7) of those potential lenders executed confidentiality agreements with the Debtors and

conducted diligence regarding potential postpetition financing terms. Notwithstanding these efforts, the Debtors were simply unable to obtain sufficient, or any, postpetition financing in the form of unsecured credit or as an administrative expense. The Debtors' significant secured debt and lack of any unencumbered assets precludes them from obtaining postpetition financing in the amount they require on terms other than on a secured and superpriority basis. The Court should therefore authorize the Debtors to provide the DIP Agent, on behalf of itself and the other DIP Lenders, senior liens on the Debtors' unencumbered property as provided in section 364(c)(3) of the Bankruptcy Code, and junior liens on the Debtors' property that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Commencement Date (other than the Primed Liens) or to valid and unavoidable liens in existence immediately prior to the Commencement Date that are perfected after the Commencement Date as permitted by section 546(b) of the Bankruptcy Code, as provided in section 364(c)(2) of the Bankruptcy Code; as well as to grant the Debtors' repayment obligations under the Postpetition Financing Agreements superpriority administrative expense status as provided for in section 364(c)(1) of the Bankruptcy Code.

**C.    The Debtors Should be Authorized to Obtain
Postpetition Financing Secured by First Priority Priming Liens**

39.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienhonders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1).

40.    When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether

the transaction will enhance the value of the Debtors' assets. Courts consider a number of factors, including, without limitation:

> (a)    whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

> (b)    whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

> (c)    whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s);

> (d)    whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

> (e)    whether the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37-39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862-79, *cited in* Transcript of Record at 733:3-7, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (15th ed. rev. 2008). The Postpetition Financing Agreements satisfy each of these factors.

41.    First, as described above, the Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that the DIP Lenders offered the only viable option for obtaining the postpetition financing the Debtors require. The Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the Postpetition Financing Agreements, and those agreements reflect the most favorable terms on which the DIP Lenders were willing to offer financing. No alternative financing is available to the Debtors, and the Debtors are not able to obtain financing from the DIP Lenders other than financing secured by first priority priming liens.

K&E 15431342.

42.     Second, the Debtors need the funds to be provided under the Postpetition Financing Agreements to preserve the value of their estates for the benefit of all creditors and other parties in interest.  Absent the Postpetition Facilities and use of the Cash Collateral, the Debtors will be unable to operate their business or prosecute their chapter 11 cases, and may be required to immediately shut down their operations, which will threaten the Debtors' significant going concern value.  Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these chapter 11 cases is in the best interest of all stakeholders.

43.     Third, the Postpetition Financing Agreements will provide the Debtors with immediate access to $100,000,000 in postpetition financing, which the Debtors and their advisors have independently determined is sufficient and, as discussed in greater detail below, necessary to allow the Debtors to maintain their operations and their relationships with key constituents notwithstanding the commencement of these chapter 11 cases.  Further, the Postpetition Financing Agreements provide the Debtors with use of the Cash Collateral, which will maintain the Debtors' ability to access liquidity in the same accounts as prior to the Commencement Date, without the disruption or delay that would result if the Debtors were required to set aside that cash and re-fund their accounts with new postpetition borrowings. Finally, the Postpetition Financing Agreements provide the Debtors with access to letters of credit in sufficient aggregate amount to support the Debtors' continued operations as their Prepetition Letters of Credit expire.  Accordingly, the terms of the Prepetition Financing Agreements are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these chapter 11 cases.

44.     Fourth, as described in greater detail above and in the Williams Declaration and Finger Declaration, the Debtors and the DIP Lenders negotiated the Postpetition Financing Agreements in good faith and at arm's-length, and the Debtors' entry into the Postpetition Financing Agreements is an exercise of their sound business judgment and is in the best interests of their estates, creditors and other parties in interest.

45.     Fifth, as described below, the Debtors will provide adequate protection for the Prepetition Secured Lenders' interests in the Prepetition Collateral.

**D.    The Interests of the Prepetition Secured Lenders Are Adequately Protected**

46.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

47.     The adequate protection provided by the Adequate Protection Obligations summarized above and set forth in the DIP Orders is fair and reasonable, and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.  As described above, the Debtors propose, in each case subject to the Carve Out, to (a) pay the Adequate Protection

K&E 15431342.

Payments, (b) grant the Prepetition Secured Lenders the 507(b) Claims (subject and junior to the Superpriority Claims granted to the DIP Lenders) to the extent of any diminution in value of the Prepetition Collateral as a result of the chapter 11 cases, (c) grant Adequate Protection Liens (subject and junior to the DIP Liens) to the extent of any diminution in the value of the Prepetition Collateral to the extent provided under section 507(b) of the Bankruptcy Code, and (d) provide Adequate Protection Reports.

48.     In exchange for, and in reliance on, the Adequate Protection Obligations, the Prepetition Agent and the DIP Lenders have consented to the priming of their prepetition liens. Specifically, the Waiver and Amendment provides that, subject to the terms thereof, the Prepetition Secured Lenders consent to the Debtors' execution and performance of, and compliance with the terms of, the Postpetition Financing Agreements and the DIP Orders. Furthermore, pursuant to the terms of the RSA, each of the Prepetition Secured Lenders party thereto has agreed not to object or propose alternatives to the DIP Agreement. Accordingly, the Court should find that the Adequate Protection Obligations are fair and reasonable, and satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**II.     The Debtors Should be Authorized to Use the Cash Collateral**

49.     Section 363(c) of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral. Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless-
>
> (A)  each entity that has an interest in such cash collateral consents; or
>
> (B)  the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2). Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or

without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

50.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral.  First, pursuant to te the Postpetition Financing Agreements, the Prepetition Agent and the DIP Lenders have consented to the Debtors' use of the Cash Collateral.

51.     Second, the Prepetition Secured Lenders' interests in the Cash Collateral is adequately protected in satisfaction of section 363(e) of the Bankruptcy Code.[9]  As described above, the Debtors are providing the Prepetition Secured Lenders with the Adequate Protection Obligations, which are fair and reasonable, and adequately protect the Prepetition Secured Lenders' interests in the Prepetition Collateral from diminution caused by the Postpetition Financing Agreements, including by the Debtors' use of the Cash Collateral pursuant to the terms thereof.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

III.    **Certain Provisions of the DIP Financing Agreements**

   A.    **The Debtors Should be Authorized to Pay the Fees Required by the DIP Lenders**

52.     As described above, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders in exchange for their providing the Postpetition Facilities.  Specifically, the Debtors will pay to the DIP Lenders certain up front and other arrangement fees in favor of certain of the DIP Lenders, and an administrative agency fee in favor of the DIP Agent, in each case as set forth in a confidential side letter.  The Debtors have provided or will

---

[9]    The Debtors are not aware of any entity other than the Debtors and the Prepetition Secured Lenders that has or purports to have an interest in the Cash Collateral.

K&E 15431342.

provide copies of these confidential side letters to the United States Trustee for the Southern District of New York (the "*U.S. Trustee*"), to the Court, and to the professionals for any committee appointed in the Debtors' chapter 11 cases. The Debtors request, however, that these side letters and their contents be kept confidential pursuant to Bankruptcy Rule 9018, and be limited to the parties listed above (including being limited to only the professionals for any committee), in order to protect the sensitive commercial information of the DIP Agent and the DIP Lenders contained therein.

53. Additionally, the Debtors have agreed, subject to Court approval, to pay an unused commitment fee equal to 2.0% *per annum* on the daily average unused portion of the DIP Facility, payable monthly, and to pay an exit fee equal to 1% of the aggregate amount of DIP Loans prepaid, repaid, terminated or reduced, or 3% of the aggregate principal amount of any DIP Loans continued or converted into exit financing, if applicable.

54. The fees the Debtors have agreed to pay to the DIP Lenders, together with the other provisions of the DIP Financing Agreements, represent the most favorable terms to the Debtors on which the DIP Lenders would agree to make the Postpetition Facilities available. The Debtors considered the fees described above when determining in their sound business judgment that the Postpetition Financing Agreements constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute their chapter 11 cases, and paying these fees in order to obtain the Postpetition Facilities is in the best interests of the Debtors' estates, creditors and other parties in interest.

55. Courts routinely authorize debtors to pay fees similar to those the Debtors propose to pay, where the associated financing is, in the debtors' business judgment, beneficial to the debtors' estates. *See, e.g.*, *In re Gen. Growth Prop., Inc.*, Case No. 09-11977 (Bankr. S.D.N.Y.

K&E 15431342.

May 14, 2009) (approving 3.75% exit fee); *In re Aleris Int'l. Inc.*, Case No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving 3.5% exit fee and 3.5% front-end net adjustment against each lender's initial commitment); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (approving an up-front 3% facility fee); *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (approving exit fee of 3%); *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del. Jan. 28, 2008) (approving a 2.5% fees related to refinancing and extending a postpetition financing facility); *In re DJK Residential*, Case No. 08-10375 (Bankr. S.D.N.Y. Feb. 29, 2008) (approving 3% fee in connection with postpetition financing). Accordingly, the Court should authorize the Debtors to pay the fees provided under the Postpetition Financing Agreements in connection with entering into those agreements.

**B.** **The Debtors Should be Authorized to Cash Collateralize the Prepetition Letters of Credit**

56.     The Debtors have also agreed, as part of the consideration for the DIP Lenders offering the Postpetition Facilities, to cash collateralize all Prepetition Letters of Credit, in an amount equal to 105% of their undrawn amount, within one business day after entry of the Interim DIP Order.  As of the Commencement Date, the aggregate undrawn amount of the Prepetition Letters of Credit was $6,300,000.  Accordingly, the Debtors will be required to set aside approximately $6,615,000 to collateralize these letters of credit until they expire or are replaced.  The Debtors have accounted for this use of cash in their projections, and are confident that the Postpetition Facilities and Cash Collateral will provide them with sufficient liquidity to maintain operations and administer these chapter 11 cases, even after they have cash collateralized the Prepetition Letters of Credit.  Further, the incremental cost to the Debtors of borrowing additional funds under the Postpetition Facilities to make up for the cash used to collateralize the Prepetition Letters of Credit is *de minimis* when compared to the Debtors' assets

37

and liabilities, and the benefits the Debtors will receive by entering into the Postpetition Financing Agreements. Accordingly, the Court should authorize the Debtors to cash collateralize the Prepetition Letters of Credit in connection with entering into the Postpetition Financing Agreements.

### C. Extraordinary Provisions

57. Finally, the Debtors have agreed to certain provisions in the Postpetition Financing Agreements that are or may be considered "extraordinary provisions" under the Court's General Order No. M-274. Specifically, the Debtors have agreed to the following provisions:

- Proceeds of Avoidance Actions. The Superpriority Claims shall be chargeable against and, subject to entry of the Final DIP Order, the DIP Liens shall include liens on, the proceeds of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under section 502(d), 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code.

- Waiver of 506(c) Claims. Subject to entry of the Final DIP Order, the Debtors shall be deemed to have waived any right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any other applicable law or principle of equity.

- Termination upon Relief from Stay. The DIP Agent may accelerate the DIP Loans and terminate the DIP Lenders' commitments under the DIP Agreement based on, among other things, entry of an order or orders granting relief from the automatic stay provided under section 362 of the Bankruptcy Code with respect to Debtors' assets having a value, in the aggregate, in excess of $1,000,000.

58. The terms of the Postpetition Financing Agreements, including the extraordinary provisions described above, constitute, on the whole, the most favorable terms on which the Debtors could obtain needed postpetition financing. Although, in the course of their negotiations with the DIP Lenders, the Debtors explored whether the DIP Lenders would provide the Postpetition Facilities without one or more of these provisions, the Debtors and their advisors determined in their sound business judgment that the terms of the Postpetition Financing

K&E 15431342.

Agreements, including these provisions, were superior to any other set of terms reasonably available to the Debtors that excluded one or more of these provisions. The benefits provided by the Postpetition Facilities inure to the benefit of the Debtors' estates, creditors and other parties in interest, and the estates as a whole are best served by the Debtors' entering into the Postpetition Financing Agreements, notwithstanding their inclusion of these "extraordinary" provisions.

## IV. The DIP Lenders Should be Deemed Good Faith Lenders under Section 364(e)

59. Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

60. As explained in detail herein and in the Williams Declaration and the Finger Declaration, the Postpetition Financing Agreements are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's-length, good faith negotiations between the Debtors and the DIP Lenders. The terms and conditions of the Postpetition Financing Agreements are fair and reasonable, and the proceeds of the Postpetition Financings will be used only for purposes that are permissible under the Bankruptcy Code. Further, no

K&E 15431342.

consideration is being provided to any party to the Postpetition Financing Agreements other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## V.  Modification of the Automatic Stay is Warranted

61.     The Postpetition Financing Agreements and the proposed Interim DIP Order contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of Default (as such term is defined in the DIP Agreement), all rights and remedies provided for in the DIP Agreement, and to take various other actions without further order of or application to the Court. The Postpetition Financing Agreements provide, however, that the DIP Lenders must provide the Debtors and various other parties, including the U.S. Trustee and counsel to any committee appointed in these chapter 11 cases, with five (5) business days prior written notice before exercising any enforcement rights or remedies, which will allow the Debtors and other interested parties to seek an expedited hearing before the Court for the purpose of determining whether, in fact, an Event of Default has occurred and is continuing.

62.     Stay modification provisions of this sort are ordinary features of DIP facilities and, in the Debtors' business judgment, are reasonable under the circumstances. *See, e.g.*, *In re Gen. Growth Prop. Inc.*, Case No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009); *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. Apr. 23, 2009); *In re Wellman, Inc.*, Case No. 08-10595 (Bankr. S.D.N.Y. Apr. 7, 2008); *In re Musicland Holding Corp.*, Case No. 06-10064 (Bankr. S.D.N.Y. Feb. 21, 2006); *In re Muzak Holdings LLC*, Case No. 09-10422 (Bankr. D. Del. Mar. 12, 2009).

40

**VI.    The Debtors Require Immediate Access to
the Cash Collateral and Postpetition Facilities**

63.    The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2) and (c)(2).    In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions. *See, e.g., Ames Dep't Stores*, 115 B.R. at 36.

64.    The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to use the Cash Collateral and to borrow up to $100,000,000 under the Postpetition Financing Agreements is not granted promptly after the Commencement Date.    In the normal course of their business, the Debtors require approximately $60,000,000 in free cash to maintain operations and fund their cash management system to a level sufficient to support their global business activities.    If the Debtors' free cash drops below this minimum threshold, their ability to satisfy ordinary course obligations and continue normal business activities may be disrupted.    Further, the Debtors anticipate that the commencement of these chapter 11 cases will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering these chapter 11 cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these chapter 11 cases. Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain their relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers and

K&E 15431342.

otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.

65.     The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances. *See, e.g., In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (order approving postpetition financing on an interim basis); *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (same); *In re Lenox Sales, Inc.*, Case No. 08-14679 (S.D.N.Y. Nov. 25, 2008) (same); *In re Wellman, Inc.*, No. 08-10595 (S.D.N.Y. Feb. 27, 2008) (same). Accordingly, for all of the reasons set forth above, prompt entry of the Interim DIP Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

### Request for a Final Hearing

66.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, which is no sooner than 15 days after the date of this Motion and no later than [25] days after the entry of the Interim DIP Order, to hold a hearing to consider entry of the Final DIP Order and the permanent approval of the relief requested in this Motion.[10] The Debtors also request authority to serve a copy of the signed Interim DIP Order, which fixes the time and date for the filing of objections, if any, to entry of the Final DIP Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final DIP Order under Bankruptcy Rule 4001(c)(2).

---

[10]   The DIP Agreement requires that the Final DIP Order be entered no later than [45] days after entry of the Interim DIP Order.

K&E 15431342.

## Motion Practice

67.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this Motion.  Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## Notice

68.     Bankruptcy Rule 4001 sets forth the notice requirements with respect to a motion to obtain credit pursuant to section 364 of the Bankruptcy Code.  Specifically, Bankruptcy Rule 4001(c) provides that a motion pursuant to section 364 must be served on all committees (or their authorized agents) appointed in the debtor's chapter 11 case pursuant to section 1102 of the Bankruptcy Code, and on such other entities as the court may direct, and must be accompanied by a copy of the credit agreement.  Fed. R. Bankr. P. 4001(c)(1).  Bankruptcy Rule 4001 further provides that a hearing on the motion may be held "no earlier than 15 days after service of the motion."  Fed. R. Bankr. P. 4001(c)(2).  Finally, Bankruptcy Rule 4001(d) provides that (a) a motion for approval to modify or terminate the automatic stay shall be served on any official creditors committee, on the creditors included on the list filed under Bankruptcy Rule 1007(d), and on other such entities as the court may direct, and (b) objections may be filed within 15 days of the mailing of notice of the motion and the time for filing objections thereto. Fed. R. Bankr. P. 4001(d)(1) and (2).

69.     The Debtors have provided or will provide notice of this Motion, including a copy of the Postpetition Financing Agreements, by electronic mail, facsimile and/or overnight mail to: (a) the Office of the U.S. Trustee; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (c) counsel to the DIP Agent; (d) counsel to the Prepetition Agent; (e) counsel to the indenture trustee for the Debtors' senior subordinated notes; (f) the Internal Revenue Service; and (g) the Securities and Exchange Commission.  Due to the

43

urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that further notice of this Motion is neither required nor necessary, and that the notice of this Motion described above satisfies the requirements of Bankruptcy Rule 4001.

## No Prior Request

70.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and in the Williams Declaration and the Finger Declaration, the Debtors respectfully request that the Court (a) enter the Interim DIP Order and the Final DIP Order granting the relief requested herein on an interim and permanent basis, respectively, and (b) grant such other and further relief as is just and proper.

Dated:  August 24, 2009
     New York, New York

/s/ *Nicole L. Greenblatt*
James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

Proposed Counsel to the Debtors
and Debtors in Possession

K&E 15431342.

# **Exhibit A**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) | Case No. [_____] |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

INTERIM ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND BANKRUPTCY RULES. 2002, 4001 AND 9014 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS, AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)

Upon the motion, dated August 24, 2009 (the "Motion"), of RDA Holding Co. (the "Parent"), The Reader's

Digest Association, Inc. (the "Borrower") and each direct and indirect domestic subsidiary of the Borrower, each as

debtor and debtor in possession (collectively, the "Debtors")[1] in the above-captioned cases (the "Cases")

commenced on August 24, 2009 (the "Petition Date") for interim and final orders under sections 105, 361, 362,

363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101,

et seq. (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (as amended, the "Bankruptcy Rules"), and the Local Bankruptcy Rules for the United States Bankruptcy

Court for the Southern District of New York (the "Bankruptcy Court"), seeking:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, Inc. (3276); World Almanac Education Group, Inc. (3781); World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is: 1 Reader's Digest Road, Pleasantville, NY 10570.

(I)         authorization (a) for the Borrower to obtain $150,000,000 in aggregate principal amount of postpetition financing (the "<u>DIP Financing</u>") on the terms and conditions set forth in this interim order (this "<u>Order</u>"), the Final Order (as defined below) and the Credit Agreement (substantially in the form annexed to the Motion as Exhibit A, and as hereafter amended, supplemented or otherwise modified from time to time, the "<u>DIP Agreement</u>";[2] together with all agreements, documents and instruments delivered or executed in connection therewith, as hereafter amended, supplemented or otherwise modified from time to time, the "<u>DIP Documents</u>"), among the Borrower, the Guarantors (as defined below), JPMorgan Chase Bank, N.A. ("<u>JPMorgan</u>"), as Administrative Agent (in such capacity, the "<u>DIP Agent</u>") for itself and a syndicate of other financial institutions (collectively, the "<u>DIP Lenders</u>"), and (b) for each of the Debtors, other than the Borrower (the "<u>Guarantors</u>"), to guaranty on a secured basis the Borrower's obligations in respect of the DIP Financing;

(II)        authorization for the Debtors to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(III)       authorization for the Debtors to (a) use the Cash Collateral (as defined in paragraph 11 below) pursuant to sections 361, 362 and 363 of the Bankruptcy Code, and all other Prepetition Collateral (as defined in paragraph 3(b) below) and (b) provide adequate protection to the lenders (including lenders or their affiliates which entered into, on a prepetition basis, Secured Hedge Agreements (as defined in the Prepetition Credit Agreement) or are owed Cash Management Obligations (as defined in the Prepetition Credit Agreement), collectively, the "<u>Prepetition Secured Lenders</u>") under the Credit Agreement, dated as of March 2, 2007 (as amended, supplemented or otherwise modified, the "<u>Prepetition Credit Agreement</u>"; and together with any other security, pledge or guaranty agreements and all other documentation executed in connection with any of the foregoing, each as amended, supplemented or otherwise modified, the "<u>Prepetition Loan Documents</u>"), among the Borrower, the Parent, foreign and domestic

---

[2]         Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the DIP Agreement.

2

subsidiaries of the Borrower, the Prepetition Secured Lenders and JPMorgan, as administrative agent and collateral agent (in such capacity, the "Prepetition Agent") for the Prepetition Secured Lenders;

(IV) authorization for the DIP Agent to accelerate the Loans and terminate the Commitments under the DIP Agreement (subject to the terms thereof) upon the occurrence and continuance of an Event of Default, including without limitation, upon the entry of an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code in respect of the Debtors' assets having a value in excess of $1,000,000, which constitutes an "Extraordinary Provision" (an "Extraordinary Provision") under General Order No. M-274 of the Bankruptcy Court (the "General Order");

(V) subject to entry of the Final Order, authorization to grant liens to the DIP Lenders on the proceeds of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (collectively, the "Avoidance Actions"), which grant constitutes an Extraordinary Provision under the General Order;

(VI) subject to entry of the Final Order, the waiver by the Debtors of any right to seek to surcharge the DIP Collateral (as defined in paragraph 7 below) pursuant to section 506(c) of the Bankruptcy Code or any other applicable law or principle of equity, which constitutes an Extraordinary Provision under the General Order;

(VII) to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of this Order (a) authorizing the Borrower, on an interim basis, to borrow under the DIP Agreement an aggregate principal amount not to exceed $100,000,000 at any time outstanding prior to the entry of the Final Order, to be used for working capital and general corporate purposes of the Debtors and their respective subsidiaries, including investments and loans into and for the benefit of foreign subsidiaries, (b) authorizing the Debtors to use the Cash Collateral and the other Prepetition Collateral, including to cash collateralize letters of credit issued pursuant to the Prepetition Credit

3

Agreement, (in each case, with respect to clauses (a) and (b), subject to the terms and conditions of the DIP Agreement) and (c) granting adequate protection to the Prepetition Secured Lenders; and

(VIII)    to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "<u>Final Hearing</u>") for this Court to consider entry of the Final Order authorizing and approving on a final basis the relief requested in the Motion, including without limitation, for the Borrower on a final basis to utilize the DIP Financing and for the Debtors to continue to use the Cash Collateral and the other Prepetition Collateral subject to the terms of the DIP Documents.

The Interim Hearing having been held by this Court on _____ __, 2009, and upon the record made by the Debtors at the Interim Hearing, including, without limitation, the admission into evidence of the Declaration of Thomas A. Williams, Chief Financial Officer and Senior Vice President of The Reader's Digest Association, Inc., in Support of First Day Pleadings and the Declaration of Jeffrey E. Finger, a Director of Miller Buckfire & Co., LLC, the Debtors' proposed financial advisor and investment banker, both of which were filed contemporaneous with the Motion, and the other evidence submitted or addressed and the arguments of counsel made at the Interim Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Jurisdiction*.  This Court has core jurisdiction over the Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      *Notice*.  Notice of the Motion, the relief requested therein and the Interim Hearing was served by the Debtors on their thirty largest (on a consolidated basis) unsecured creditors, the DIP Agent, the Prepetition Agent and the Office of the United States Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>).  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c), and no further notice of the relief sought at the Interim Hearing is necessary or required.

3.      *Debtors' Stipulations*.  Subject to the limitations contained in paragraphs 17 and 18 below, the Debtors admit, stipulate, and agree that:

4

(a)        as of the Petition Date, the Debtors were truly and justly indebted and liable to the Prepetition Secured Lenders, without objection, defense, counterclaim or offset of any kind, (i) in the aggregate principal amount of not less than $1,582,545,556 in respect of loans made under the Prepetition Credit Agreement, (ii) $6,300,000 in undrawn available amounts under letters of credit issued pursuant to the Prepetition Credit Agreement plus amounts owed under Secured Hedge Agreements with the Hedge Banks (as defined in the Prepetition Credit Agreement), accrued and unpaid interest, any Cash Management Obligations owed to any Prepetition Secured Lender, all Secured Obligations (as defined in the Prepetition Credit Agreement) and fees and expenses (including fees and expenses of attorneys and advisors) as provided in the Prepetition Loan Documents and applicable Secured Hedge Agreements (collectively, the "Prepetition Obligations");

(b)        the liens and security interests granted to the Prepetition Agent to secure the Prepetition Obligations are (i) valid, binding, perfected, enforceable, first priority (subject to permitted exceptions under the Prepetition Credit Agreement) liens on and security interests in the personal and real property constituting "Collateral" under, and as defined in, the Prepetition Loan Documents in respect of the Prepetition Obligations (together with the Cash Collateral, the "Prepetition Collateral"), (ii) not subject to valid objection, defense, counterclaim, offset, contest, attachment, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) subject and subordinate only to (A) after giving effect to this Order, the Carve Out (as defined in paragraph 6(b) below) and the liens and security interests granted to secure the DIP Financing and the Adequate Protection Obligations (as defined in paragraph 13 below), and (B) valid, perfected and unavoidable liens permitted under the Prepetition Loan Documents to the extent such permitted liens are senior to the liens securing the Prepetition Obligations (the "Permitted Prepetition Liens"); provided that, notwithstanding anything herein to the contrary, the L/C Cash Collateral (as defined in paragraph 13(c) below) shall not be subject to the Carve Out or the security interests or liens granted to secure the DIP Financing or the claims thereunder;

(c)        the Prepetition Obligations constitute the legal, valid and binding obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code); and

(d)        (i) no portion of the Prepetition Obligations shall be subject to valid objection, defense, counterclaim, offset, avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (ii) the Debtors do not have any claims, counterclaims, causes of action, defenses,

5

setoff or recoupment rights, whether arising under the Bankruptcy Code or applicable nonbankruptcy law, against the Prepetition Agent, the Prepetition Secured Lenders and their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors.

4.    *Findings Regarding The DIP Financing.*

(a)    Good cause has been shown for the entry of this Order.

(b)    The Debtors have an immediate need to obtain the DIP Financing and to use the Prepetition Collateral, including the Cash Collateral, in order to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors and their domestic and foreign subsidiaries, and satisfy payroll obligations and other working capital and general corporate purposes of the Debtors and their domestic and foreign subsidiaries.   The Debtors' use of the Prepetition Collateral (including the Cash Collateral) is necessary to ensure that the Debtors have sufficient working capital and liquidity to preserve and maintain the going concern value of the Debtors' estates.

(c)    The Debtors are unable to obtain financing, when taken as a whole, on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.   The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting (i) the priming DIP Liens (as defined in paragraph 7 below) and (ii) the Superpriority Claims (as defined in paragraph 6(a) below), in each case on the terms and conditions set forth in this Order and the DIP Documents.

(d)    The terms of the DIP Financing and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are appropriate under the circumstances and constitute reasonably equivalent value and fair consideration.

(e)    The DIP Documents and the use of the Prepetition Collateral (including the Cash Collateral) have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agent and the informal steering committee of the Prepetition Secured Lenders, and all of the Debtors' obligations and indebtedness arising under or in connection with the DIP Financing, including without limitation, (i) all Loans made to the Debtors pursuant to the DIP

Agreement and (ii) all other obligations of the Debtors under the DIP Documents and this Order now and hereafter owing to the DIP Agent or any DIP Lender (collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Agent and the DIP Lenders in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, in the event that this Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(f)     The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent granting the interim relief set forth in this Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Financing and the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Order and the DIP Documents are, therefore, in the best interest of the Debtors' estates.

5.     *Authorization Of The DIP Financing And The DIP Documents.*

(a)     The Debtors are hereby authorized to enter into and perform under the DIP Documents and, in the case of the Borrower, to borrow under the DIP Agreement pending entry of the Final Order up to an aggregate principal amount of $100,000,000 for working capital and other general corporate purposes of the Debtors, including without limitation, to pay interest, fees and expenses in connection with the DIP Financing and to make intercompany loans to foreign subsidiaries to the extent permitted by the DIP Agreement.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts and to execute and deliver all instruments and documents that the DIP Agent determines to be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Documents, including without limitation:

(i)     the execution, delivery and performance of the DIP Documents;

(ii)     the execution, delivery and performance of the guarantees of the obligations of the Borrower by the other Debtors;

(iii)     the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case in such form as the Debtors, the DIP Agent and the requisite DIP Lenders may agree, and no further approval of this Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees paid in

7

connection therewith) that do not (A) shorten the maturity of the Loans, (B) increase the Commitments or the rate of interest payable on the Loans under the DIP Agreement, or (C) change any Event of Default, add any covenants or amend the covenants therein, in each case as applicable to the Debtors, in any such case to be materially more restrictive; provided, however, that, after any such amendment, waiver, consent or other modification becomes effective, a copy of any such amendment, waiver, consent or other modification shall be filed by the Debtors with this Court and served by the Debtors on the U.S. Trustee and the statutory committee of unsecured creditors appointed in the Cases (the "Committee");

(iv)     the non-refundable payment to the DIP Agent, its affiliates and the DIP Lenders, as the case may be, of the fees set forth in the DIP Documents and any separate fee letter with the DIP Agent or its affiliates; and

(v)     the performance of all other acts required under or in connection with the DIP Documents.

(c)     Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Order and the DIP Documents.  No obligation, payment, transfer or grant of security under the DIP Documents or this Order shall be stayed, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.     *Superpriority Claims.*

(a)     Except to the extent expressly set forth in this Order in respect of the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims (the "Superpriority Claims") against the Debtors with priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-

8

consensual lien, levy or attachment; provided that, notwithstanding anything herein to the contrary, the L/C Cash Collateral shall not be subject to the Superpriority Claims and such Superpriority Claims shall not be paid from the L/C Cash Collateral.

(b)     For purposes hereof, the "Carve Out" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and (ii) at any time after the first business day after the occurrence and during the continuance of an Event of Default under the DIP Agreement and delivery of notice thereof to the U.S. Trustee and each of the lead counsel for the Debtors and the Committee (once appointed) (the "Carve Out Notice"), to the extent allowed at any time, whether before or after delivery of a Carve Out Notice, whether by interim order, procedural order or otherwise, the payment of accrued and unpaid professional fees, costs and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors and the Committee and allowed by this Court, in an aggregate amount not exceeding $10,000,000 (the "Carve Out Cap") (plus all unpaid Professional Fees allowed by this Court at any time that were incurred on or prior to the business day following delivery of the Carve Out Notice); provided that (A) the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent, the DIP Lenders, the Prepetition Secured Lenders or the Prepetition Agent, (B) so long as no Event of Default shall have occurred and be continuing, the Carve Out shall not be reduced by the payment of fees and expenses allowed by this Court and payable under sections 328, 330 and 331 of the Bankruptcy Code, and (C) nothing in this Order shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates.  For the avoidance of doubt and notwithstanding anything to the contrary herein, in the DIP Documents, or in the Prepetition Credit Agreement and related documents and agreements, the Carve Out shall be senior to all liens securing the DIP Obligations, the adequate protection liens, all claims and any and all other forms of adequate protection, liens or claims securing the DIP Obligations and Prepetition Obligations granted or recognized as valid, including the liens and security interests granted to the Prepetition Secured Lenders; provided that the L/C Cash Collateral shall not be subject to the Carve Out and the L/C Cash Collateral shall not be used for the payment of the Carve Out or any portion thereof. Upon delivery of a Carve Out Notice, prior to making any distributions, the Debtors shall deposit an amount equal to the Professional Fees incurred and unpaid as of such time, plus an amount equal to the Carve Out Cap in a segregated account to be

9

utilized solely for the payment of Professional Fees, and the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders shall not hinder or delay the Debtors' compliance with the foregoing deposit requirement. Notwithstanding the foregoing deposit, no portion of the Professional Fees otherwise within the Carve Out shall cease to be within the Carve Out.

7.      *DIP Liens*.  As security for the DIP Obligations, effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Agent of any property, the following security interests and liens are hereby granted to the DIP Agent, for its own benefit and the benefit of the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "DIP Collateral"; provided that, notwithstanding anything herein to the contrary, the DIP Collateral shall not include, and the DIP Liens shall not attach to, the L/C Cash Collateral), subject only to the Carve Out (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Order and the DIP Documents, the "DIP Liens"):

(a)      First Lien On Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property in which the Debtors have an interest, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date (collectively, the "Unencumbered Property"), including without limitation, any and all unencumbered cash, accounts receivable, inventory, general intangibles, contracts, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, capital stock of the subsidiaries of the Parent or any other Debtor and the proceeds of all of the foregoing; provided that, the Debtor shall not be required to pledge in excess of 65% of the capital stock of their direct foreign subsidiaries or any of the capital stock or interests of indirect foreign subsidiaries (if adverse tax consequences would result to the Borrower); provided further that the Unencumbered Property shall not include the Avoidance Actions and any assets upon which security may not be lawfully granted, but subject to the entry of the Final Order, Unencumbered Property shall include any proceeds or property recovered in respect of any Avoidance Actions.

10

(b)  <u>Liens Junior To Certain Existing Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property in which the Debtors have an interest (other than the property described in paragraph 7(c), as to which the DIP Liens will be as described in such clause), whether now existing or hereafter acquired (other than the L/C Cash Collateral) and all proceeds thereof, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the DIP Agent and the DIP Lenders shall be junior to such valid, perfected and unavoidable liens.

(c)  <u>Liens Priming Prepetition Secured Lenders' Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all now or hereafter acquired Prepetition Collateral (other than the L/C Cash Collateral) and all proceeds thereof.  The DIP Liens on the Prepetition Collateral shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of the Prepetition Agent and the Prepetition Secured Lenders (including, without limitation, the Adequate Protection Liens (as defined in paragraph 13(a) below)), but shall be junior to any valid, perfected and unavoidable security interests in and liens on the Prepetition Collateral that were valid and senior to the liens of the Prepetition Agent and the Prepetition Secured Lenders as of the Petition Date, including as permitted by section 546(b) of the Bankruptcy Code.

(d)  <u>Liens Senior To Certain Other Liens</u>.  The DIP Liens and the Adequate Protection Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

8.  *Remedies After Event of Default.*

(a)  The automatic stay under section 362 of the Bankruptcy Code is vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, (i) immediately upon the occurrence and during the continuance of an Event of Default, all rights and remedies under the DIP Documents, other than those rights and remedies against the DIP Collateral as provided in clause (ii) below, and (ii) upon the occurrence

11

and during the continuance of an Event of Default, and following the giving of five business days' prior written notice to the Debtors (with a copy to lead counsel for the Debtors, lead counsel to the Committee and to the U.S. Trustee), all rights and remedies against the DIP Collateral provided for in the DIP Documents and this Order (including, without limitation, the right to setoff monies of the Debtors in accounts maintained with the DIP Agent or any DIP Lender and the right to prohibit further use of Cash Collateral), in each case subject to the funding requirement set forth in paragraph 6(b) of this Order. In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing. In no event shall the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral. The DIP Agent's or any DIP Lender's delay or failure to exercise rights and remedies under the DIP Documents or this Order shall not constitute a waiver of the DIP Agent's or the DIP Lenders' rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Agreement.

(b)       Following an Event of Default, the Prepetition Secured Lenders may not exercise any rights or remedies under the Prepetition Loan Documents or this Order (other than with respect to the L/C Cash Collateral) unless and until all DIP Obligations have been paid in full in cash and all commitments thereunder have been terminated. After all DIP Obligations have been paid in full in cash and all commitments thereunder have been terminated, the Prepetition Secured Lenders may prohibit further use of the Cash Collateral and/or exercise such other rights or remedies as provided herein or in the Prepetition Loan Documents, in each case subject to the funding requirement set forth in paragraph 6(b) of this Order. If, prior to the payment in full in cash of all DIP Obligations and all commitments thereunder having been terminated, the Prepetition Secured Lenders receive any DIP Collateral or proceeds thereof, the DIP Lenders shall have the right to seek to recover any such DIP Collateral or proceeds.

9.       *Limitation On Charging Expenses Against Collateral*.  Subject to and effective upon entry of the Final Order and to the extent provided for therein, except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law or in

12

equity, without the prior written consent of the DIP Agent or the Prepetition Agent, as the case may be, and no such consent shall be implied from any other action or inaction by the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Lenders.

10. *Payments Free and Clear.* Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders or the Prepetition Agent on behalf of the Prepetition Secured Lenders pursuant to the provisions of this Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability.

11. *The Cash Collateral.* All of the Debtors' cash, including, without limitation, all cash and other amounts from time to time on deposit or maintained by the Debtors in any account or accounts with any Prepetition Secured Lender and any cash proceeds of the disposition of any Prepetition Collateral, constitute proceeds of the Prepetition Collateral and, therefore, are cash collateral of the Prepetition Secured Lenders within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

12. *Use Of Prepetition Collateral (including Cash Collateral).* The Debtors are hereby authorized to use the Prepetition Collateral, including the Cash Collateral, during the period from the Petition Date through and including the Termination Date under the DIP Agreement for working capital and general corporate purposes in accordance with and subject to the terms and conditions of this Order and the DIP Agreement; provided that, (a) the Prepetition Secured Lenders are granted adequate protection as hereinafter set forth and (b) except on the terms of this Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.

13. *Adequate Protection.* The Prepetition Agent and the Prepetition Secured Lenders are entitled, pursuant to sections 361, 363(c)(2) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, the use of Cash Collateral, in an amount equal to the aggregate diminution in value of the Prepetition Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of any Prepetition Collateral, including the Cash Collateral, the priming of the Prepetition Agent's liens on the Prepetition Collateral by the DIP Liens, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, to the extent provided for under section 507(b) of the Bankruptcy Code (such diminution in value, the "Adequate Protection Obligations"). As adequate protection, the Prepetition Agent and the Prepetition Secured Lenders are hereby granted the following:

(a)    Adequate Protection Liens.  As security for the payment of the Adequate Protection Obligations, the Prepetition Agent (for itself and for the benefit of the Prepetition Secured Lenders) is hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "Adequate Protection Liens"), subject and subordinate only to (i) the Permitted Prepetition Liens, (ii) the DIP Liens, and (iii) the Carve Out.

(b)    Section 507(b) Claim.  The Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331, 503(b), 506(c), 507(a), 726, 1113 and 1114 of the Bankruptcy Code, subject and subordinate only to (i) the Carve Out and (ii) the Superpriority Claims granted in respect of the DIP Obligations.  Except to the extent expressly set forth in this Order, the Prepetition Agent and the Prepetition Secured Lenders shall not receive or retain any payments, property or other amounts in respect of the 507(b) Claims unless and until the payment in full in cash of all obligations arising under or relating to the Loans under the DIP Agreement and the termination of the commitments under the DIP Agreement (the "Discharge of the DIP Obligations"); provided, however, that, the Prepetition Secured Lenders shall have irrevocably agreed, pursuant to section 1129(a)(9) of the Bankruptcy Code, that such 507(b) Claims may be paid under any plan of reorganization in any combination of cash, debt, equity or other property having a value on the effective date of the plan equal to the allowed amount of such claims.

(c)    L/C Cash Collateral.  Within one business day of entry of this Order, the Debtors shall immediately and irrevocably cash collateralize each undrawn letter of credit issued under the Prepetition Credit Agreement and each letter of credit issued hereafter on a bilateral basis (to the extent permitted by the DIP Agreement), in each case, in an amount equal to 105% of the face amount of such letter of credit (such cash collateral being the "L/C Cash Collateral").  The L/C Cash Collateral shall be subject to documentation in form and substance reasonably satisfactory to the issuing lender thereof, the Debtors and the issuing lender thereof shall be irrevocably authorized to immediately, and without further notice or action, debit amounts from the L/C Cash Collateral to: (i) pay all accrued and unpaid fees with respect to the letters of credit and (ii) reimburse itself for each drawing under such letter of credit.  For the avoidance of doubt, the Debtors are hereby authorized to enter into such

14

cash collateral arrangements and to incur obligations with respect thereto (including causing the issuance of new letters of credit).

(d)      Fees and Expenses.  The Prepetition Agent shall receive from the Debtors reimbursement of all fees and expenses incurred or accrued, whether prior to or after the Petition Date, by the Prepetition Agent under the Prepetition Loan Documents, including without limitation, the reasonable fees and disbursements of one financial advisor (which may include an additional accounting firm) and one lead counsel (in each relevant jurisdiction) to the Prepetition Agent, Specified Lenders and the Lead Arranger.  None of the fees and expenses payable pursuant to this paragraph 13(d) shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.  The Debtors shall pay the fees and expenses provided for in this paragraph 13(d) promptly (but no later than ten (10) business days) after invoices for such fees and expenses shall have been submitted to the Debtors, and the Debtors shall promptly provide copies of such invoices to the Committee and the U.S. Trustee.  The Debtors shall, or shall cause their subsidiaries to, pay "breakage" costs suffered by the Euro Term Lenders (as defined in the Prepetition Credit Agreement) on account of their Euro Term Loans (as defined in the Prepetition Credit Agreement) as determined in accordance with the Prepetition Credit Agreement and, in any event, not to exceed $20,000.

(e)      Information.  The Debtors shall promptly provide to the Prepetition Agent any written financial information or periodic reporting that is provided to, or required to be provided to, the DIP Agent or the DIP Lenders, with such information and reporting being subject to the confidentiality undertakings set forth in the Prepetition Credit Agreement.

(f)      Application of Proceeds.  So long as the Discharge of the DIP Obligations and all other DIP Obligations has not occurred, all proceeds of any Prepetition Collateral pursuant to the enforcement of any of the Prepetition Loan Documents or the exercise of any remedial provision thereunder or under the Final Order, together with all other proceeds received by any Prepetition Secured Lender as a result of any such enforcement or the exercise of any such remedial provision or as a result of any distribution of or in respect of any Prepetition Collateral (whether or not expressly characterized as such), or the application of any Prepetition Collateral (or proceeds thereof) to the payment thereof or any distribution of Prepetition Collateral (or proceeds thereof) upon the liquidation or dissolution of any Debtor, shall be turned over by the Prepetition Agent to the DIP Agent until the

15

Discharge of the DIP Obligations has occurred. Upon the Discharge of the DIP Obligations, subject to the terms hereof, the DIP Agent shall deliver to the Prepetition Agent any proceeds of Prepetition Collateral held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct, to be applied by the Prepetition Secured Lenders in such order as specified in the Prepetition Loan Documents.

14.     *Reservation of Rights of Prepetition Secured Lenders.*

(a)     Based upon the consent of the Prepetition Secured Lenders, this Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Agent and the Prepetition Secured Lenders. Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Agent and the Prepetition Secured Lenders pursuant hereto is without prejudice to the right of the Prepetition Agent to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors or any other party in interest to contest any such modification. Except as expressly provided herein, nothing contained in this Order (including, without limitation, the authorization to use any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to the Prepetition Agent or any Prepetition Secured Lender. The consent of the Prepetition Agent and the Prepetition Secured Lenders to the priming of the Prepetition Agent's liens on the Prepetition Collateral by the DIP Liens (a) is limited to the DIP Financing and (b) does not constitute, and shall not be construed as constituting, an acknowledgement or stipulation by the Prepetition Agent or the Prepetition Secured Lenders that, absent such consent, their interests in the Prepetition Collateral would be adequately protected pursuant to this Order.

(b)     In the event that the DIP Financing is repaid in full and terminated, the Debtors will continue to be bound by the covenants and subject to the Events of Default contained in the DIP Agreement (as in effect immediately prior to its termination), which will be for the benefit of the Prepetition Secured Lenders.

15.     *Perfection Of DIP Liens And Adequate Protection Liens.*

(a)     The DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Secured Lenders are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or

16

not the DIP Agent or the Prepetition Agent shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Order.

(b) A certified copy of this Order may, in the discretion of the DIP Agent or the Prepetition Agent, as the case may be, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

(c) The Debtors shall execute and deliver to the DIP Agent and the Prepetition Agent, as the case may be, all such agreements, financing statements, instruments and other documents as the DIP Agent and the Prepetition Agent may reasonably request to evidence, confirm, validate or perfect the DIP Liens and the Adequate Protection Liens.

(d) Subject to entry of the Final Order and to the extent provided for therein, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other DIP Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect with respect to the granting of DIP Liens or Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Lenders or the Prepetition Secured Lenders in accordance with the terms of the DIP Documents or this Order.

16. *Preservation Of Rights Granted Under The Order.*

(a) No claim or lien having a priority senior to or *pari passu* with those granted by this Order to the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Secured Lenders shall be granted or allowed and the DIP Liens and the Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy

Code or subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b) The Debtors shall not seek, and it shall constitute an Event of Default under the DIP Agreement and a termination of the right to use Cash Collateral if any of the Debtors seeks, or if there is entered, (i) any modification of this Order without the prior written consent of the DIP Agent and the Prepetition Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent or the Prepetition Agent, or (ii) an order converting or dismissing any of the Cases. If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (A) the Superpriority Claims, the 507(b) Claims, the other administrative expense claims granted pursuant to this Order, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Order until all DIP Obligations and all Adequate Protection Obligations shall have been paid and satisfied in full (and that such Superpriority Claims, the 507(b) Claims, the other administrative expense claims granted pursuant to this Order, the DIP Liens and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (A) above.

(c) If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity, priority or enforceability of any DIP Obligations or the Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agent, as applicable, of the effective date of such reversal, stay, modification or vacatur or (ii) the validity, priority or enforceability of the DIP liens or the Adequate Protection Liens. Notwithstanding any such reversal, stay, modification or vacatur, any use of Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors to the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Lenders, as the case may be, prior to the actual receipt of written notice by the DIP Agent and the Prepetition Agent of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Order, and the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Secured Lenders shall be entitled to all of the rights, remedies, privileges and benefits granted in sections 363(m) and 364(e) of the Bankruptcy Code, this Order and pursuant to the DIP Documents.

509600-0292-11403-Active.11711683.3

(d)     Except as expressly provided in this Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the Adequate Protection Obligations, the 507(b) Claims and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Secured Lenders granted by this Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Cases or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors having waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Order and the DIP Documents shall continue in the Cases, in any successor cases if the Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Adequate Protection Liens, the DIP Obligations, the Superpriority Claims, the Section 507(b) Claims, the other administrative expense claims granted pursuant to this Order, and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Secured Lenders granted by this Order and the DIP Documents shall continue in full force and effect until all DIP Obligations and all Adequate Protection Obligations are indefeasibly paid in full in cash.

17.     *Effect Of Stipulations On Third Parties*.  The stipulations and admissions contained in this Order, including without limitation, in paragraphs 3 and 11 of this Order, shall be binding solely upon the Debtors in all circumstances.  The stipulations and admissions contained in this Order, including without limitation, in paragraphs 3 and 11 of this Order, shall be binding upon all other parties in interest, including without limitation, the Committee, unless (a) the Committee or any other party-in-interest, in each case, with requisite standing, has duly filed an adversary proceeding (subject to the limitations contained herein, including without limitation, in paragraph 18) by no later than the date that is the later of (i) in the case of any such adversary proceeding filed by a party-in-interest with requisite standing other than the Committee, 75 days after the date of entry of this Order, (ii) in the case of any such adversary proceeding filed by the Committee, 60 days after the appointment of the Committee, and (iii) any such later date agreed to in writing by the Prepetition Agent (A) challenging the validity, enforceability, priority or extent of the Prepetition Obligations or the liens on the Prepetition Collateral securing the Prepetition Obligations or (B) otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Agent or any of the Prepetition Secured Lenders or their respective agents, affiliates, subsidiaries, directors, officers,

19

representatives, attorneys or advisors in connection with any matter related to the Prepetition Obligations or the Prepetition Collateral and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding; provided that, as to the Debtors, all such Claims and Defenses are hereby irrevocably waived and relinquished as of the Petition Date.  If no such adversary proceeding is duly filed in respect of the Prepetition Obligations, (x) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Cases and any subsequent chapter 7 case, (y) the liens on the Prepetition Collateral securing the Prepetition Obligations, as the case may be, shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 3(b), not subject to defense, counterclaim, recharacterization, subordination or avoidance and (z) the Prepetition Obligations, the Prepetition Agent and the Prepetition Secured Lenders, as the case may be, and the liens on the Prepetition Collateral granted to secure the Prepetition Obligations shall not be subject to any other or further challenge by the Committee or any other party-in-interest, and such Committee or party-in-interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or 11 trustee appointed or elected for any of the Debtors).  If any such adversary proceeding is duly filed, the stipulations and admissions contained in paragraphs 3 and 11 of this Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on the Committee and any other party-in-interest, except as to any such findings and admissions that were expressly and successfully challenged in such adversary proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Claims and Defenses with respect to the Prepetition Loan Documents or the Prepetition Obligations or any liens granted by any Debtor to secure any of the foregoing.

18.      *Limitation On Use Of DIP Financing And DIP Collateral*.  The Debtors shall use the DIP Financing and the Prepetition Collateral (including the Cash Collateral) solely as provided in this Order and the DIP Documents.  Notwithstanding anything herein or in any other order of this Court to the contrary, no Loans under the DIP Agreement, DIP Collateral, Prepetition Collateral (including the Cash Collateral) or the Carve Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount

due under the DIP Documents, the Prepetition Loan Documents or the liens or claims granted under this Order, the DIP Documents or the Prepetition Loan Documents, (b) assert any Claims and Defenses or any other causes of action against the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Secured Lenders or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the DIP Agent's or the Prepetition Agent's assertion, enforcement or realization on the Prepetition Collateral or the DIP Collateral in accordance with the DIP Documents, the Prepetition Loan Documents or this Order, (d) seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Lenders hereunder or under the DIP Documents or the Prepetition Loan Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an Order of this Court and (ii) permitted under the DIP Documents; provided that, no more than an aggregate of $100,000 of the Prepetition Collateral (including the Cash Collateral), Loans under the DIP Agreement, the DIP Collateral or the Carve Out may be used by the Committee to investigate the validity, enforceability or priority of the Prepetition Obligations or the liens on the Prepetition Collateral securing the Prepetition Obligations, or investigate any Claims and Defenses or other causes action against the Prepetition Agent or the Prepetition Secured Lenders.

19.     *Insurance*.  To the extent the Prepetition Agent is listed as loss payee under the Debtors' insurance policies, the DIP Agent is also deemed to be the loss payee under the Debtors' insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, first, to the payment in full of the DIP Obligations, and second, to the payment of the Prepetition Obligations.

509600-0292-11403-Active.11711683.3

20.     *Master Proof of Claim.*

(a)     To facilitate the processing of claims, to ease the burden upon this Court and to reduce any unnecessary expense to the Debtors' estates, the Prepetition Agent is authorized (but not required) to file a single master proof of claim on behalf of itself and the Prepetition Secured Lenders on account of their claims arising under the Prepetition Loan Documents and hereunder against all Debtors (the "Master Proof of Claim"), and the Prepetition Agent shall not be required to file a verified statement pursuant to Rule 2019 of the Bankruptcy Rules in any of the Cases.

(b)     Upon filing of the Master Proof of Claim, the Prepetition Agent, each Prepetition Secured Lender and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors arising under the Prepetition Loan Documents and the claims (as defined in section 101 of the Bankruptcy Code) of the Prepetition Agent and each Prepetition Secured Lender (and each of their respective successors and assigns) named in the Master Proof of Claim shall be allowed as if each such entity had filed a separate proof of claim in each of the Cases in the amount set forth in the Master Proof of Claim; provided that the Prepetition Agent may, but shall not be required, to amend the Master Proof of Claim from time to time to, among other things, reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from any transfer of any such claims.

(c)     The provisions set forth in paragraphs (a) and (b) above and the Master Proof of Claim are intended solely for the purpose of administrative convenience and, except to the extent set forth herein or therein, neither the provisions of this paragraph nor the Master Proof of Claim shall affect the substantive rights of the Debtors, the Committee, the Prepetition Agent, the Prepetition Secured Lenders or any other party in interest or their respective successors in interest, including without limitation, the right of each Prepetition Secured Lender (or its successor in interest) to vote separately on any plan of reorganization proposed in the Cases.

21.     *Order Governs.*  In the event of any inconsistency between the provisions of this Order and the DIP Documents, the provisions of this Order shall govern.

22.     *Binding Effect; Successors And Assigns.*  The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties-in-interest in the Cases, including without limitation, the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Secured Lenders, the Committee, and the

509600-0292-11403-Active.11711683.3

Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Secured Lenders and the Debtors and their respective successors and assigns; provided that, except to the extent expressly set forth in this Order, the DIP Agent, the Prepetition Agent, the DIP Lenders and the Prepetition Secured Lenders shall have no obligation to permit the use of Cash Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

23.     *Limitation of Liability*.  In determining to make any loan under the DIP Agreement, permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Order or the DIP Documents, the DIP Agent, the Prepetition Agent, the DIP Lenders and the Prepetition Secured Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing in this Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Lenders any liability for any claims arising from the pre-petition or post-petition activities of any of the Debtors and their affiliates (as defined in section 101(2) of the Bankruptcy Code).

24.     *Effectiveness*.  This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof as of the Petition Date, and there shall be no stay of execution of effectiveness of this Order.

25.     *Final Hearing*.  The Final Hearing is scheduled for _____ __, 2009 at ____ _.m., prevailing Eastern time, before this Court.

26.     *Final Hearing Notice*.  The Debtors shall promptly mail copies of this Order (which shall constitute adequate notice of the Final Hearing, including, without limitation, notice of the Extraordinary Provisions described in the introductory language to this Order) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to the Committee after the same has

23

been appointed, or Committee counsel, if the same shall have been appointed. Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served upon (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attention: Paul M. Basta, Esq. (paul.basta@kirkland.com), Leonard Klingbaum, Esq. (leonard.klingbaum@kirkland.com) and Nicole L. Greenblatt, Esq. (nicole.greenblatt@kirkland.com), attorneys for the Debtors, (b) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Attention: Sandy Qusba, Esq., attorney for the DIP Agent and the Prepetition Agent, and (c) the Office of the U.S. Trustee for the Southern District of New York, and shall be filed with the Clerk of the United States Bankruptcy Court, Southern District of New York, in each case to allow actual receipt by the foregoing no later than _____ __, 2009 at [4:00 p.m.], prevailing Eastern time.

Dated: _____ __, 2009
New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

24

# Exhibit B

James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

Proposed Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | Case No. 09-_____(___) |
| Debtors. | Joint Administration Requested |

**DECLARATION OF JEFFREY E. FINGER IN SUPPORT OF**
**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING**
**AND LETTERS OF CREDIT, AND TO USE CASH COLLATERAL, (II) GRANTING**
**ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS,**
**(III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF**

Jeffrey E. Finger, being duly sworn, deposes and states:

1.      I am a Director of Miller Buckfire & Co., LLC, ("***Miller Buckfire***"), a financial

advisory and investment banking firm, the proposed financial advisor and investment banker in

these chapter 11 cases for The Reader's Digest Association, Inc. and certain of its affiliates, as

debtors and debtors in possession (collectively, "***Reader's Digest***" or the "***Debtors***").[1]  I submit

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); (Continued…)

this declaration (the "**Declaration**") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing and Letters of Credit, and to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "**DIP Motion**"), which seeks approval of the Debtors' senior secured priming credit facility of $150 million (the "**DIP Facility**"),[2] the use of cash collateral ("**Cash Collateral**"), and the entry into letters of credit ("**LC Facility**," together with the DIP Facility, the "**Postpetition Facilities**").[3]

2.      The statements in this Declaration are, except where specifically noted, based on either my personal knowledge or opinion, on information that I have received from the Debtors' employees or advisors and/or employees of Miller Buckfire working directly with me or under my supervision, direction or control, or from the Debtors' records maintained in the ordinary course of their business.  I am not being compensated specifically for this testimony other than through payments received by Miller Buckfire as a professional to be retained by the Debtors.  If

---

Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, Inc. (3276); World Almanac Education Group, Inc. (3781); World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is:  1 Reader's Digest Road, Pleasantville, NY 10570.

[2]     The significant terms of the DIP Facility are set forth in greater detail in the DIP Motion.

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Motion.

I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

<u>**Qualifications**</u>

3.     Miller Buckfire is an independent firm that provides strategic and financial advisory services in large-scale corporate restructuring transactions. Miller Buckfire is principally owned and controlled by its employees. Miller Buckfire currently has approximately 75 employees. Miller Buckfire's professionals have extensive experience in providing financial advisory and investment banking services to financially distressed companies, creditors, equity holders and other constituencies in reorganization proceedings and complex financial restructurings, both in and out-of-court.

4.     I received a Bachelor of Arts degree in Economics from the University of Michigan. I also received a Masters of Business Administration degree, with concentrations in finance, strategy and entrepreneurship, from the University of Chicago Graduate School of Business. I started my career in investment banking at John Nuveen & Co. in 1996. In 1997, I joined Wasserstein Perella & Company, a predecessor of Miller Buckfire, in the mergers and acquisitions group. In 2001, I joined the financial restructuring group of Dresdner Kleinwort Wasserstein, also a predecessor of Miller Buckfire. I have been with Miller Buckfire and its predecessors for ten years. I have extensive experience representing companies in restructuring, financing and M&A transactions. In addition to working with the Debtors in the above-captioned cases, my restructuring experience includes engagements with Amtrol, Inc., Danka Business Systems PLC, Dura Automotive Systems, Inc., Grupo TMM, S.A., Huntsman Corporation, Interstate Bakeries Corporation, Lear Corporation and Spiegel, Inc./Eddie Bauer Inc., among others.

## The Debtors' Need for Postpetition Financing

5.      Since February 2009, Miller Buckfire has rendered financial advisory services to the Debtors in connection with the evaluation of strategic alternatives for restructuring their debt obligations, and improving their liquidity and overall financial condition.  In advising the Debtors, Miller Buckfire has developed a great deal of institutional knowledge regarding the Debtors' businesses, finances and operations.

6.      The Debtors have faced a number of financial challenges that have placed a strain on their liquidity situation, precipitating the filing of the Chapter 11 Cases.  These challenges include, among others, withdrawal of foreign lines of credit, deteriorating domestic and foreign demand for the Debtors' products and services, expenditures associated with the Debtors' operational restructuring efforts, and increases in both postage and delivery costs.

7.      Based upon the information provided to me by the Debtors, as detailed in the DIP Motion and Williams Declaration, the Debtors will require additional liquidity beyond the use of their current Cash Collateral to fund the costs and expenses of administering the Chapter 11 Cases as well as to fund their ongoing business operations.

8.      In light of the foregoing, I believe the Debtors require the postpetition financing and a long term restructuring solution to continue as a going concern.  The proposed Postpetition Facilities and the use of Cash Collateral will provide the Debtors with sufficient liquidity to meet their obligations to vendors and customers, to fund operational restructuring costs and capital expenditures, and to satisfy working capital requirements and other operational expenses, all of which will preserve the value of the Debtors' estates.  Further, implementation of the postpetition financing will minimize disruption to the Debtors' businesses and instill confidence in their various creditor constituencies, including suppliers, vendors, service providers and employees. This will assure those constituencies of the Debtors' ability to seamlessly transition their

businesses through chapter 11, and ultimately to reorganize in a successful and expedient manner. Moreover, the successful balance sheet restructuring currently contemplated by the Debtors' proposed plan term sheet and restructuring support agreement depends on the Debtors' access to postpetition financing.

9. In this case, the proposed financing not only satisfies the Debtors' postpetition liquidity requirements, but is also convertible into an exit financing facility on agreed upon terms. Given the weakness in the current credit markets, the option to convert into exit financing constitutes an especially valuable feature and will aid the Debtors substantially in achieving their restructuring goals.

10. I believe that without access to the Postpetition Facilities and the Cash Collateral as provided in the DIP Motion, the Debtors will suffer significant impairment to their business operations to the material detriment of creditors, customers, vendors, employees and other parties in interest.

## Efforts to Obtain Postpetition Financing and the Marketing Process

11. In May 2009, the Debtors' began discussions with JP Morgan Chase Bank, N.A (the "***Prepetition Agent***"), a steering committee of certain prepetition lenders (the "***Steering Committee***") and their advisors regarding a potential balance sheet restructuring, including the need for incremental financing. Miller Buckfire also solicited debtor-in-possession financing proposals from certain of the Debtors' existing stakeholders.

12. In addition, Miller Buckfire solicited indications of interest from approximately 20 sophisticated financial institutions, hedge funds and private equity funds active in the debtor-in-possession market in an effort to obtain alternative proposals for debtor-in-possession financing. Such discussions included institutions both contacted directly by Miller Buckfire as well as unsolicited inbound contacts from certain parties. In particular, Miller Buckfire solicited

these parties' interest in providing funding on either a priming or junior lien basis. The Debtors executed confidentiality agreements with and distributed a confidential financing overview memorandum to seven of these parties. Miller Buckfire and the Debtors identified potential investors based on a number of factors, including their known desire to invest in the media, publishing and direct marketing sectors, their experience in investing in financially distressed companies, and their ability to quickly complete diligence and fund a transaction through debtor-in-possession financing.

13. The Debtors' ability to obtain debtor-in-possession financing from alternative parties was complicated by several factors, including the Debtors' substantial level of secured debt, the Debtors' lack of significant unencumbered assets, the challenging market for debtor-in-possession financing in general, and the challenging media, publishing and direct marketing industry environment, each exacerbated by the global economic recession. Substantially all of the Debtors' assets are encumbered by the Prepetition Facilities, and it became apparent the Debtors would be unable to provide the Prepetition Lenders with reasonable adequate protection for their first priority liens in the event the Debtors received financing from a source other than the Prepetition Lenders.

14. Under these circumstances, in the absence of a successful priming fight, any third party debtor-in-possession loan would have required the consent of the Prepetition Lenders. The Debtors would have been unlikely to obtain such consent without the support of the Prepetition Agent and the Steering Committee. It was similarly apparent that the credit markets and the Debtors' existing capital structure likely foreclosed any opportunities for the Debtors to access unsecured or junior credit.

15. In the Debtors' case, obtaining postpetition financing was further complicated by the need to address the potential acceleration of the Euro Term Loan upon a potential event of default. Absent a waiver and amendment ("**Amendment**"), which could only be provided by the Debtors' Prepetition Lenders, the Debtors would require additional funds of approximately $100 million to refinance the Euro Term Loan. The Debtors, therefore, continued negotiations on the terms of a DIP Facility with the Steering Committee, which included an Amendment to be provided by the Steering Committee and other Prepetition Lenders to address the potential acceleration by holders of the Euro Term Loan upon an event of default.

16. On a parallel track, the Debtors negotiated the terms of a proposed debtor-in-possession financing with certain other stakeholders, as well as conducted various discussions and negotiations with these parties regarding the terms of a comprehensive and consensual restructuring. During the course of these negotiations it became apparent that the Prepetition Lenders would not consent to be primed by any third-party debtor-in-possession financing, meaning that any third-party proposal was inherently subject to an expensive, time-consuming and unpredictable priming fight. In addition, only the Prepetition Lenders had the ability to address Amendment of the Euro Term Loan.

17. While initial discussions with the Steering Committee focused on the terms of a DIP Facility, the Debtors maintained their goal of a comprehensive deleveraging solution that would allow the Debtors to ensure an expeditious emergence from chapter 11. Consistent with this goal, the Debtors were able to negotiate with the Steering Committee the key elements of a comprehensive restructuring solution, which included (i) the terms of the conversion of the DIP Facility into exit financing, (ii) the substantive terms of the Debtors' debt capital structure upon

confirmation of an Acceptable Plan and (iii) the terms of a restructuring support agreement ("**RSA**"), in addition to the Amendment and DIP Facility on the best possible terms.

18.    As a result of these factors, other potential lenders did not put forth financing arrangements that would support the Debtors' operational needs and facilitate an expeditious balance sheet restructuring as the DIP Facility and RSA currently contemplate.  Given the absence of competing proposals, I believe that the DIP Facility remains the most favorable, and in fact the only, financing option available to the Debtors.

## The Terms of the DIP Facility are the Best Available Under Current Market Conditions

19.    The significant terms of the DIP Facility are set forth in the Motion.  In summary, the DIP Lenders will provide a postpetition financing facility in an aggregate principal amount of $150 million, consisting entirely of new money loans.  The DIP Facility is convertible into a first priority secured term loan exit facility upon the effective date of an Acceptable Plan under the RSA.  The Debtors may elect that the loans comprising each borrowing bear interest at a rate per annum equal to (a) the Base Rate plus 9.0% or (b) the Eurodollar Rate plus 10.0% with a 3.5% Eurodollar Rate floor.[4]  The Debtors have agreed, subject to Court approval, to pay to the DIP Lenders certain up front and other arrangement fees in favor of the DIP Lenders, and an administrative agency fee in favor of the DIP Agent, in each case as set forth in a confidential side letter.  Additionally, the Debtors have agreed, subject to Court approval, to pay  a 2.0% unused commitment fee and exit fees equal to 1.0% of the aggregate amount of loans prepaid or repaid or commitments terminated or reduced, plus, to the extent not otherwise prepaid or repaid,

---

[4]    If the Twelve Month Facility Extension Option is exercised, the Applicable Margin increases to 10.0% and 11.0% for each Base Rate Loan and Eurodollar Loan, respectively.  The fee associated with the Twelve Month Facility Extension Option is 1.0%.

3.0% of the aggregate principal amount of any loans continued or converted into exit financing, if applicable.[4]

20.     I am generally aware that terms similar to those included in the Postpetition Facilities have been approved in numerous recent and/or ongoing chapter 11 cases.  In difficult credit markets where many companies are languishing in chapter 11 because they cannot obtain sufficient exit financing, the Exit Facility feature of the DIP Facility is particularly advantageous because it ensures that the Debtors will have sufficient liquidity to transition through chapter 11, and aligns their balance sheet to their business plan to emerge better positioned for growth.  This provides substantial flexibility for the Debtors and reduces the risks in the chapter 11 process for the Debtors and all of their constituencies.

21.     Under the circumstances, I believe the Debtors achieved the best possible outcome for their debtor-in-possession financing.  I believe that the terms of the DIP Facility are fair and reasonable.  Moreover, the Postpetition Facilities and Cash Collateral address the Debtors' liquidity needs, will enable the Debtors to preserve their value as a going concern, and will increase the prospect of completing a successful, rapid reorganization.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

New York, New York
Dated: August 24, 2009

By:
Name:      Jeffrey E. Finger
Title:      Director
            Miller Buckfire & Co., LLC