# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) Case No. 09-23529 (RDD) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## NOTICE OF DISCLOSURE STATEMENT HEARING

<u>TO</u>: **ALL KNOWN CREDITORS OF THE DEBTORS AND OTHER PARTIES IN INTEREST IN THE ABOVE-CAPTIONED CHAPTER 11 CASES**

    **PLEASE TAKE NOTICE** that, The Reader's Digest Association, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"),[1] filed the *Disclosure Statement for the Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates* (as may be amended, modified or supplemented, the "***Disclosure Statement***") with the United States Bankruptcy Court for the Southern District of New York (the "***Court***"). The Debtors are submitting their Disclosure Statement pursuant to section 1125 of the Bankruptcy Code for use in the solicitation of votes to accept their chapter 11 plan (as may be amended, supplemented or modified, the "***Plan***"), a copy of which is annexed as a <u>Exhibit A</u> to the Disclosure Statement and was filed with the Court concurrently therewith. Capitalized terms used but not defined in this notice have the meanings set forth in the Disclosure Statement.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, Inc. (3276); World Almanac Education Group, Inc. (3781); World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is: 1 Reader's Digest Road, Pleasantville, NY 10570.

PLEASE TAKE FURTHER NOTICE that, a hearing is currently scheduled before the Honorable Robert D. Drain, United States Bankruptcy Judge, for **2:00 p.m. prevailing Eastern Time on November 5, 2009** (the "*Hearing*") at the Court, One Bowling Green, New York, New York 10004-1408, to consider, among other things, entry of an order (i) approving the adequacy of the Disclosure Statement, (ii) establishing certain procedures for soliciting and tabulating votes on the Plan and (iii) fixing important dates and deadlines with respect to voting on, and filing objections to, the Plan (the "*Order*"). **Please note**: the Debtors will file a motion (the "*Motion*") with the Court seeking entry of the Order on or before October 21, 2009.

PLEASE TAKE FURTHER NOTICE that, if you would like a copy of the Disclosure Statement, the Plan or related documents, please contact Kurtzman Carson Consultants LLC, the Debtors' noticing and claims agent retained in these chapter 11 cases, by calling (866) 967-0491, emailing KCC_RDA@kccllc.com, visiting http://www.kccllc.net/readers or writing Reader's Digest Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Ave., El Segundo, California 90245. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at http://www.nysb.uscourts.gov/.

PLEASE TAKE FURTHER NOTICE that, any written objections to the adequacy of the Disclosure Statement, the Motion or entry of the Order **must**: (i) conform to the applicable provisions of the Federal Rules of Bankruptcy Procedures (the "*Bankruptcy Rules*"), the Local Bankruptcy Rules for the Southern District of New York (the "*Local Bankruptcy Rules*") and that certain Order Establishing Certain Notice, Case Management and Administrative Procedures [Docket No. 92] (the "*Case Management Order*"); (ii) include the name of the objector, the nature and amount of the claims against or interests in the Debtors held thereby; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; (iv) be filed electronically with the Court in accordance with General Order M-242, with a hard copy delivered to chambers pursuant to Local Bankruptcy Rule 9028-1; and (v) be served in accordance with the Case Management Order so it is **actually received no later than 12:00 p.m. prevailing Eastern Time on November 3, 2009** (the "*Objection Deadline*"), by the Master Service List, the 2002 List and any Affected Party (as each is defined in the Case Management Order). A hard copy of any objection to the adequacy of the Disclosure Statement or the Motion must also be delivered via first class mail to the Office of the United States Trustee for the Southern District of New York, Attn: Andrea B. Schwartz, 33 Whitehall Street, 21st Floor, New York, New York 10004, within one business day of the Objection Deadline.[2]

PLEASE TAKE FURTHER NOTICE that, except as otherwise ordered by the Court, upon entry of the Order, the Debtors will cause the Disclosure Statement (and exhibits thereto, including the Plan) and the documents approved by the Court for soliciting votes on the Plan to all parties in interest entitled to vote on the Plan as set forth in the Order.

---

[2]    Copies of the Motion, the Case Management Order, the Master Service List, the 2002 List and all papers filed in these chapter 11 cases may be obtained, free of charge, from Kurtzman Carson Consultants LLC.

K&E 15592550.4

**PLEASE TAKE FURTHER NOTICE** that, the Disclosure Statement Hearing may be continued by the Court or the Debtors without further notice other than by announcement of same in open court and/or by filing and service, as applicable, of a notice of adjournment.

**PLEASE TAKE FURTHER NOTICE** that, if an objection to the Disclosure Statement, the Motion or the Order is not filed and served in accordance with this notice, the objecting party shall be barred from objecting to the approval of the adequacy of the Disclosure Statement, the Motion or the Order and shall not be heard at the Hearing to the fullest extent permitted under the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules.

Dated: October 9, 2009
      New York, New York

*/s/ Nicole L. Greenblatt*
James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Counsel to the Debtors and Debtors in Possession

---

**IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE,
PLEASE CONTACT THE RESTRUCTURING HOTLINE AT (866) 967-0491**

---

K&E 15592550.4

KIRKLAND & ELLIS LLP
James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446–4800
Facsimile: (212) 446–4900
Counsel for the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) | Case No. 09-23529 (RDD) |
| | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DISCLOSURE STATEMENT FOR THE**
**PROPOSED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**THE READER'S DIGEST ASSOCIATION, INC. AND ITS DEBTOR AFFILIATES[1]**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

Dated: October 9, 2009

---

[1] The Debtors in these chapter 11 cases who are the proponents of the Plan, along with the last four digits of each Debtor's federal tax identification number, are: Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, Inc. (3276); World Almanac Education Group, Inc. (3781); World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is: 1 Reader's Digest Road, Pleasantville, NY 10570. A schedule of the Debtors, including their jurisdiction of incorporation or formation and their Chapter 11 Case numbers, is attached hereto as **Exhibit B**.

<div style="border: 1px solid black; text-align: center; font-weight: bold;">

**IMPORTANT INFORMATION FOR YOU TO READ**

</div>

**THE DEADLINE TO VOTE ON THE PLAN IS [      ] 2009, AT [      ] P.M. EASTERN TIME.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

The Debtors are providing the information in this Disclosure Statement for the Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates to Holders of Claims entitled to vote on the Plan for the purpose of soliciting votes to accept the Plan. **Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose.**

This Disclosure Statement may not be deemed as providing any legal, financial, securities, tax or business advice. The Debtors urge any Holder of a Claim or Equity Interest to consult with its own advisors with respect to any such legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby. The Bankruptcy Court's approval of the adequacy of disclosure contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan. The Debtors have not authorized any entity to give any information about or concerning the plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

The Debtors urge every Holder of a Claim entitled to vote on the Plan to (1) read the entire Disclosure Statement and Plan carefully, (2) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in Section VII of this Disclosure Statement and (3) consult with your own advisors with respect to reviewing this Disclosure Statement, the Plan, all documents attached hereto or filed in connection herewith and the proposed transactions contemplated under the Plan **prior** to deciding whether to vote to accept or reject the Plan.

This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events in the Debtors' Chapter 11 Cases and certain documents related to the Plan. Although the Debtors believe that these summaries are fair and accurate, the same are all qualified in their entirety. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or other documents referenced herein, the Plan or such other documents will govern for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information contained in, or incorporated by reference into, this Disclosure Statement, such financial information has not been audited. The Debtors are generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and parties reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed.

This Disclosure Statement or the Plan does not constitute and may not be construed as an admission of fact, liability, stipulation or waiver. Rather, Holders of Claims and other parties in interest should construe this Disclosure Statement as a statement made in settlement negotiations related to contested matters, adversary proceedings and other pending or threatened litigation or actions. No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors or the reorganized Debtors may seek to investigate, file and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

| SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS |
| --- |

Neither this Disclosure Statement nor the Plan have been filed with the United States Securities And Exchange Commission (the "*SEC*") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. The securities to be issued on or after the effective date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "*Securities Act*") or any securities regulatory authority of any state under any state securities law ("*Blue Sky Law*"). The Debtors are relying on section 4(2) of the Securities Act and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt the issuance of new securities in connection with the solicitation and the Plan from registration under the Securities Act and blue sky law.

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. You are cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Any analyses, estimates or recovery projections may or may not turn out to be accurate.

Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is therefore highly speculative. The Debtors recommend that potential recipients of any securities issued pursuant to the Plan, including as part of the Rights Offering, consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

| QUESTIONS AND ADDITIONAL INFORMATION |
| --- |

If you would like to obtain copies of this Disclosure Statement, the Plan or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact Kurtzman Carson Consultants LLC by (i) calling (866) 967–0491, (ii) emailing kcc_rda@kccllc.com or (iii) visiting http://www.kccllc.net/readers.

# TABLE OF CONTENTS

**Page**

I.      EXECUTIVE SUMMARY ...................................................................................................I

    A.   General Structure of the Plan .............................................................................................i

    B.   Treatment of Claims and Interests Under the Plan ...........................................................iv

    C.   Voting On the Plan .......................................................................................................... vii

    D.   Additional Plan-Related Documents ............................................................................. viii

    E.   Confirmation and Consummation of the Plan ................................................................. ix

II.     BACKGROUND TO THESE CHAPTER 11 CASES .....................................................1

    A.   Corporate History and Current Structure .........................................................................1

    B.   Current Businesses and Operations ..................................................................................2

    C.   Prepetition Funded Indebtedness .....................................................................................7

    D.   Events Leading up to the Chapter 11 Filing ....................................................................8

III.    CHAPTER 11 CASES .....................................................................................................11

    A.   First Day Motions and Related Relief ...........................................................................11

    B.   Other Material Events in These Chapter 11 Cases .........................................................12

    C.   Committee Appointment and Participation .....................................................................13

IV.     SUMMARY OF THE PLAN ..........................................................................................14

    A.   General Basis for the Plan .............................................................................................14

    B.   Treatment of Unclassified Claims .................................................................................14

    C.   Classification and Treatment of Claims and Interests ....................................................16

    D.   Certain Means for Implementation of the Plan ..............................................................19

    E.   Post-Emergence Capital Structure .................................................................................21

    F.   Post-Effective Date Corporate Existence .......................................................................24

    G.   Compensation, Pension and Benefit plans and Related Matters .....................................25

    H.   Rights Offering and Subscription Process ......................................................................27

    I.   Preservation of Certain Rights of Action ......................................................................28

    J.   Treatment of Contracts and Leases ...............................................................................29

    K.   Distributions on Account of Allowed Claims ................................................................32

    L.   Resolution of Contingent, Unliquidated or Disputed Claims .........................................34

    M.   Settlement, Release, Injunction and Related Provisions ................................................35

    N.   Modifying, Revoking or Withdrawing the Plan .............................................................38

**V.**      **VALUATION AND FINANCIAL PROJECTIONS** .................................................................**39**

     A.    Valuation of the Reorganized Debtors ..........................................................39

     B.    Financial Projections ....................................................................................40

**VI.**      **CONFIRMATION AND CONSUMMATION OF THE PLAN**.................................................**42**

     A.    Statutory Requirements for Confirmation of the Plan....................................42

     B.    Conditions for Consummation of the Plan ...................................................45

     C.    Alternatives to Confirmation and Consummation of the Plan........................46

**VII.**      **PLAN-RELATED RISK FACTORS** ...............................................................................**47**

     A.    Risks Relating to Confirmation of the Plan ..................................................47

     B.    Risks Relating to Recoveries Under the Plan ...............................................47

     C.    Risks Relating to the Debtors' Businesses ....................................................48

     D.    Disclosure Statement Disclaimer .................................................................50

**VIII.**      **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**..............................**52**

     A.    Brief Overview and Disclosure ....................................................................52

     B.    Consequences to the Debtors ......................................................................53

     C.    Consequences to U.S. Holders of Allowed Claims .......................................55

     D.    Consequences to Non-U.S. Holders of Allowed Claims.................................59

     E.    Consequences to Rights Offering Participants ..............................................60

     F.    Withholding and Reporting ..........................................................................61

**IX.**      **GLOSSARY OF DEFINED TERMS** ..............................................................................**62**

**X.**      **RECOMMENDATION** ...............................................................................................**72**

## EXHIBITS

EXHIBIT A  Plan of Reorganization

EXHIBIT B  Corporate Structure Chart/Schedule of the Debtors

EXHIBIT C  Solicitation and Voting Procedures  [*To Come*]

EXHIBIT D  Reorganized Debtors' Financial Projections

EXHIBIT E  Liquidation Analysis

EXHIBIT F  Restructuring Support Agreement (together with the Restructuring Term Sheet)

EXHIBIT G  Subscription Procedures  [*To Come*]

> THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO
> THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

# I.
## EXECUTIVE SUMMARY

The Reader's Digest Association, Inc.,[2] a Delaware corporation with its primary headquarters in Pleasantville, New York, and its affiliates identified on the title page above, as debtors and debtors in possession (collectively, the "***Debtors***"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York on August 24, 2009 (the "***Commencement Date***").  The Debtors' Chapter 11 Cases are jointly administered under lead case number 09-23529 (RDD).

Prior to soliciting acceptances of a proposed chapter 11 plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization.

Accordingly, the Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code for use in the solicitation of votes to accept the *Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates* (the "***Plan***"), dated October 9, 2009, which the Debtors filed with the Bankruptcy Court concurrently herewith.  A copy of the Plan is also attached hereto as **<u>Exhibit A</u>**.  A hearing to consider Confirmation of the Plan is scheduled to be held in front of the Honorable Robert D. Drain on [___], 2009 at the Bankruptcy Court.

This Disclosure Statement contains, among other things, descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan being proposed by the Debtors as filed with the Bankruptcy Court on October 9, 2009.  Certain provisions of the Plan (and the descriptions and summaries contained herein), remain the subject of continuing negotiations among the Debtors and various parties, have not been finally agreed upon and may be modified.

In addition, this Disclosure Statement includes information about, without limitation, (i) the procedures by which the Debtors intend to solicit and tabulate votes on the Plan, (ii) the Plan Confirmation process, (iii) a description of the Debtors' businesses, prepetition operations, financial history and the events leading up to the commencement of these Chapter 11 Cases, (iv) the significant events that occurred thus far in these Chapter 11 Cases, (v) certain risk factors to be considered before voting on the Plan and (vi) discussions relating to securities registration and certain tax consequences of the Plan.

*As such, this Executive Summary is only a general overview of this Disclosure Statement and the material terms of, and transactions proposed by, the Plan, and is qualified in its entirety by reference to, and should be read in conjunction with, the more detailed discussions appearing elsewhere in this Disclosure Statement and the exhibits attached to this Disclosure Statement, including the Plan.*

## A.      GENERAL STRUCTURE OF THE PLAN

### 1.      Purpose and Effect of the Plan

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors.  The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.

---

[2]      All capitalized terms used but not otherwise defined herein shall have the meanings set forth in Section IX herein, titled "Glossary of Defined Terms."  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the "Glossary of Defined Terms" are inconsistent, the definition included in the Glossary of Defined Terms shall control.

As discussed in greater detail in Section I.D herein, entitled "Effect of Confirmation and Consummation of the Plan," a bankruptcy court's confirmation of a plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor and any other entities and persons as may be ordered by the bankruptcy court to the terms of the confirmed plan, whether or not such creditor or equity security holder is impaired under or has voted to accept the plan or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any debt arising prior to the Plan's Effective Date, substitute the obligations set forth in the Confirmed Plan therefor and terminate all of the rights and interests of equity security holders. Under the Plan, Claims and Interests are divided into Classes according to their relative seniority and other criteria.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate the substantive consolidation of the Debtors' estates. Instead, the Plan, although proposed jointly, constitutes a separate Plan for each of the 48 Debtors in these Chapter 11 Cases. A schedule of the Debtors, including their jurisdiction of incorporation or formation and their chapter 11 case numbers, is set forth on **Exhibit B** hereto. The terms of the Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan and pay certain of their continuing obligations in the ordinary course of the Reorganized Debtors' businesses.

The feasibility of the Plan is premised upon managements' ability to continue the implementation of its strategic business plan (the "*Business Plan*"). The Business Plan and accompanying financial projections are set forth on **Exhibit D**. Although the Debtors believe the Business Plan and projections are reasonable and appropriate, they include a number of assumptions that may differ from actual results and are subject to a number of risk factors. Importantly, the Business Plan and projections incorporate the Debtors' forecasts of the anticipated operating performance of the Company's foreign subsidiaries worldwide that are not subject to these Chapter 11 Cases.

2.        **Financial Restructurings Under the Plan**

As of the Commencement Date, the Debtors had outstanding debt in the aggregate principal amount of approximately $2,271,200,000, consisting primarily of approximately (a) $1,645,000,000 under their senior secured credit facility (including swap termination obligations and accrued and unpaid interest), (b) $628,200,000 in unsecured senior subordinated notes (including accrued interest); and (c) $2,800,000 in foreign lines of credit and a promissory note. Additionally, the Debtors estimate that an aggregate of approximately $[115] million was owing and outstanding to their trade creditors as of the Commencement Date.

The Reorganized Debtors will emerge with approximately 75% less funded debt after giving effect to the restructuring transactions contemplated by the Plan, which include the following:

- $150 million of loans outstanding under the Debtors' DIP Facility will be converted to the New First Priority Term Loan (or otherwise paid in full in Cash on the Effective Date) to be issued to the DIP Lenders on the Effective Date pursuant to, and subject to the terms of, the Exit Credit Agreement;

- the Debtors' prepetition Euro Term Loan in the approximate amount of $105.9 million outstanding under the Prepetition Credit Agreement as of the Commencement Date will be reinstated as amended on the terms set forth in the Exit Credit Agreement;

- $300 million of secured indebtedness under the Prepetition Credit Agreement (other than the Euro Term Loan) will be converted into the New Second Priority Term Loan issued to the Prepetition Lenders on the Effective Date pursuant to the New Second Priority Term Loan Agreement;

- the remaining secured indebtedness outstanding under the Prepetition Credit Agreement and any Adequate Protection Obligations that are not restructured under the New Second Priority Term Loan or part of the Reinstated Euro Term Loan will be converted into 100% of the New Common Stock (subject to dilution by the Management Equity Plan and the Rights Offering) and distributed Pro Rata

to the Prepetition Lenders on account of the obligations owed to them under the Prepetition Credit Agreement (other than the Euro Term Loan) and on account of the Adequate Protection Obligations;

- the Debtors' outstanding $600 million Senior Subordinated Notes will be canceled and discharged;

- the General Unsecured Claims of trade creditors with whom the Debtors intend to conduct business post emergence will be paid in full in Cash on the Effective Date or in the ordinary course of business;

- Holders of Other General Unsecured Claims will receive Cash in an amount equal to their Pro Rata share of $3 million; and

- Equity Interests in RDA Holding Co. will be extinguished.

The consummation of the financial restructurings contemplated by the Plan will significantly de-lever the Debtors' capital structure, leaving the Reorganized Debtors with approximately $555 million in funded debt. With a sustainable capital structure aligned with the Debtors' revised Business Plan, the Reorganized Debtors will be better positioned to compete more effectively in the competitive media and marketing industries.

As a result of the restructuring transactions contemplated by the Plan, the Debtors' senior secured lenders under the Prepetition Credit Agreement will own substantially all the New Common Stock in Reorganized Holdings, subject to dilution by shares of the New Common Stock issued in connection with the following:

- **Management Equity Plan**. The Plan provides that the New Board will grant equity awards in the form of restricted stock, options and/or warrants for 7.5% of the New Common Stock (on a fully diluted basis) to continuing employees and directors of the Reorganized Debtors; _provided_ that such equity grants will not include more than 2.5% in the form of restricted New Common Stock.

- **Rights Offering**. The Plan provides that Holders of Senior Subordinated Notes that are "Accredited Investors," as defined in Rule 501 of Regulation D promulgated under the Securities Act and "Qualified Institutional Buyers," as defined in Rule 144A promulgated under the Securities Act (each, an "_**Eligible Noteholder**_") shall have the right to participate in a Rights Offering of New Common Stock to be issued under the Plan on or soon after the Effective Date. Eligible Noteholders that participate in the Rights Offering will be able to purchase up to $[50-100] million (of no more than [10-20]%) of New Common Stock Pro Rata based on the principal amount of Senior Subordinated Note Claims held by such Eligible Noteholder. Proceeds from the Rights Offering, if any, will be used for general corporate purposes. **All Holders of Senior Subordinated Notes should refer to the procedures for subscribing to the Rights Offering set forth on <u>Exhibit G</u> hereto for further information about the Rights Offering.**

3.      **Recovery Analysis**

The Plan, which provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' businesses, maximizes creditor recoveries, provides for an equitable distribution to the Debtors' stakeholders and protects the jobs of employees.

In developing the Plan, the Debtors gave due consideration to various exit alternatives and engaged in significant discussions and negotiations with representatives and/or professionals of the senior secured lenders under the Prepetition Credit Agreement, whom the Debtors believe will be the primary economic stakeholders in the Reorganized Debtors. With the assistance of their professional advisors, the Debtors also conducted a careful review of their current operations, prospects as an ongoing business, financial projections and the Business Plan developed by management and estimated recoveries in a liquidation scenario, and concluded that recoveries to the Debtors' stakeholders will be maximized by the Debtors' continued operation as a going concern.

The Debtors believe that their businesses and assets have significant value that would <u>not</u> be realized in a liquidation, either in whole or in substantial part. Consistent with the valuation, liquidation and other analyses

prepared by the Debtors with the assistance of their advisors, the value of the Debtors is substantially greater as a going concern than in a liquidation.

Substantially all of the Debtors' assets are subject to valid and perfected liens held by the DIP Lenders and the Prepetition Lenders, which require payment in full prior to distributions to holders of unsecured claims against the Debtors. Thus, on a going-concern basis, because the obligations owed by the Debtors to the DIP Lenders and the Prepetition Lenders greatly exceeds the value of the Reorganized Debtors, minimal (if any) distributions would be made to any Holders of Claims against the Debtors other than the DIP Lenders and the Prepetition Lenders absent consummation of the proposed Plan. Further, as set forth in the attached Liquidation Analysis, outside of the proposed Plan, Holders non-priority unsecured Claims junior to the Claims of the DIP Lenders and Prepetition Lenders would receive no distribution in a liquidation of the Debtors' estates.

The Plan does not allocate all of the distributable value of the Reorganized Debtors to the Prepetition Lenders. Recognizing that general unsecured creditors are entitled to share in the value of any unencumbered assets, which in this case consists entirely of minority equity interests in the Debtors' first-tier foreign subsidiaries, the Plan is based on an allocation of that value among the various unsecured creditor constituencies.[3] After taking into account the substantial amount of any unencumbered value allocable to the Prepetition Lenders on account of (i) their unsecured deficiency claims and (ii) the unsecured Senior Subordinated Note Claims (which recoveries would be turned over to the Prepetition Lenders pursuant to the subordination provisions of the Senior Subordinated Notes Indenture), the Debtors believe the distributable value remaining for all other non-priority general unsecured claims is minimal (if any).

The Plan, however, contemplates that holders of Other General Unsecured Claims in Class 5 will share in an aggregate recovery of $3 million in Cash. As a result, pursuant to the Plan, general unsecured creditors in Class 5 stand to recover a premium (in the form of Cash) over what they would otherwise be entitled to receive under a strict waterfall recovery analysis.

The Debtors also believe that any alternative to Confirmation of the Plan, such as an attempt by another party to file a competing plan, would result in significant delays, litigation and additional costs, and could negatively affect value by causing unnecessary uncertainty with the Debtors' key customer and supplier constituencies, which could ultimately lower the recoveries for all Holders of Allowed Claims.

<div style="border:1px solid black; padding:8px; text-align:center;">

**ACCORDINGLY, FOR ALL OF THESE AND THE OTHER REASONS DESCRIBED HEREIN, THE DEBTORS URGE YOU TO TIMELY RETURN YOUR BALLOT ACCEPTING THE PLAN.**

</div>

## B.     TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

Although the Chapter 11 Cases are jointly administered pursuant to an order of the Bankruptcy Court, the Debtors are not proposing the substantive consolidation of their respective bankruptcy estates. Thus, although the Plan generally applies to all the Debtors, except where otherwise indicated: (a) the Plan constitutes 48 distinct chapter 11 plans, one for each Debtor; (b) for voting purposes, each holder of a Claim in a Voting Class will vote its Claims in such Class by individual Debtors; and (c) the classification scheme set forth in Article III of the Plan applies to each Debtor (to the extent there are no Claims in a certain Class against a particular Debtor, that Class will be deemed not to exist for any purpose whatsoever in respect of that Debtor).

### 1.     Administrative, DIP Facility and Priority Tax Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Facility Claims and Priority Tax Claims. Section IV of this Disclosure Statement explains the treatment of Administrative Claims, DIP Facility Claims and Priority Tax Claims under Article II of the Plan in greater detail; however, in summary, the Plan provides as follows:

---

[3]     For tax purposes, the Debtors pledged only 65% of the voting stock of their first-tier foreign subsidiaries to secure obligations under the Prepetition Credit Agreement.

K&E 15673799.

- **Allowed Administrative Claims.**  Allowed Administrative Claims will be paid in full in Cash (a) to the extent arising in the ordinary course of business, in the ordinary course of business, (b) on or soon after the Effective Date or, if not then due, the date when such Allowed Administrative Claim is due, (c) on or soon after the date an Administrative Claim is Allowed, (d) at a time and on terms agreed upon by such Holder and the Debtors or the Reorganized Debtors or (e) at a time and on terms set forth in an order of the Bankruptcy Court;

- **DIP Facility Claims.**  All DIP Facility Claims other than Claims under the DIP Facility that expressly survive the termination thereof will convert into the New First Priority Term Loan pursuant to the Exit Credit Agreement (subject to the terms of the DIP Facility) or be paid off in full and in Cash on the Effective Date; and

- **Priority Tax Claims.**  Priority Tax Claims due and payable on or prior to the Effective Date will be satisfied as soon as reasonably practicable after the Effective Date by payment in an amount equal to the amount (a) of the Allowed Priority Tax Claim, (b) agreed to by the Debtors and the Holder of such Allowed Priority Tax Claim or (c) of such Allowed Priority Tax Claim if paid in installment over a period not more than five years after the Commencement Date pursuant to 11 U.S.C. § 1129(a)(9)(C).

**2.        Claims and Equity Interests Classified Under the Plan**

The table below summarizes the classification and treatment of Claims and Interests under the Plan.  These summaries are qualified in their entirety by reference to the provisions of the Plan.  For a more detailed description of the terms and provisions of the Plan, see Section IV herein.  The table below also sets forth the estimated percentage recovery for holders of Claims and Interests in each Class and the Debtors' estimates of the amount of Claims that will ultimately become Allowed in each Class based upon (a) review by the Debtors of their books and records, (b) all Claims scheduled by the Debtors (as modified by the Bankruptcy Court through certain hearings) and (c) consideration of the provisions of the Plan that affect the allowance of certain Claims.  Because each Debtor's Plan contemplates distributions to Holders of Claims in the amount of the estimated percentage recoveries set forth below, the estimated aggregate Claim amounts in each Class and the estimated percentage recoveries in the table below are set forth for the Debtors on a consolidated basis.

**THE ESTIMATED PROJECTED RECOVERIES SET FORTH IN THE TABLE
BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES**

| Class | Treatment of Claims and Interests | Estimated % Recovery | |
|---|---|---|---|
| | | Plan | Liquidation |
| **Class 1:**<br>**Other Priority Claims** | Each Holder of an Allowed Class 1 Claim shall be paid in full in Cash on or as reasonably practicable after (i) the Effective Date, (ii) the date on which such Other Priority Claim against the Debtors becomes an Allowed Other Priority Claim or (iii) such other date as may be ordered by the Bankruptcy Court. | 100% | [0- 19]% |
| **Class 2:**<br>**Other Secured Claims** | In the sole discretion of the applicable Debtor, each Holder of an Allowed Class 2 Claim shall receive one of the following treatments:  (i) payment in full in Cash, including the payment of any interest required pursuant to section 506(b) of the Bankruptcy Code; (ii) delivery of the collateral securing such Allowed Class 2 Other Secured Claim; or (iii) other treatment that renders such Allowed Other Secured Claim Unimpaired. | 100% | [100]% |

K&E 15673799.

**SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES**

| Class | Treatment of Claims and Interests | Estimated % Recovery | |
|---|---|---|---|
| | | Plan | Liquidation |
| **Class 3:**<br><br>**Prepetition Credit Agreement Claims** | Holders of Allowed Prepetition Credit Agreement Claims and Adequate Protection Claims shall receive (i) the Reinstated Euro Term Loan; (ii) the New Second Priority Term Loan; and (iii) 100 % of the New Common Stock issued and outstanding as of the Effective Date (subject to dilution by shares issued in connection with the Management Equity Plan and Rights Offering).<br><br>Notwithstanding the foregoing, however, (a) the Euro Term Lenders as of the Distribution Record Date shall be the only Prepetition Lenders entitled to receive their Pro Rata share of the Reinstated Euro Term Loan on account of their exposure under the Euro Term Loan and (b) the Revolving Lenders, U.S. Term Lenders and Holders of Swap Claims as of the Distribution Record Date shall be the only Prepetition Lenders entitled to receive their Pro Rata share of the New Second Priority Term Loan and New Common Stock on account of their exposures under the Revolver Loan, U.S. Term Loan and Swap Claims, respectively (capitalized terms used but not defined in this paragraph have the meanings set forth in the Prepetition Credit Agreement). | [53% – 63%] | [13% – 17%] |
| **Class 4:**<br><br>**Unsecured Claims Related to Operations** | Each Holder of an Allowed Unsecured Ongoing Operations Claim will be paid in full in Cash (i) on the Effective Date or as soon as reasonably practicable thereafter or (ii) in the ordinary course of business in accordance with the terms of any agreement that governs such Allowed Unsecured Ongoing Operations Claim or in accordance with the course of practice between the Debtors and such Holder with respect to such Allowed Unsecured Ongoing Operations Claim. *Holders of Allowed Unsecured Ongoing Operations Claims are not entitled to postpetition interest, late fees or penalties on account of such Claims.* | approx. 100% | [0]% |
| **Class 5:**<br><br>**Other General Unsecured Claims** | Each Holder of an Allowed Other General Unsecured Claim shall receive Cash in an amount equal to their Pro Rata share of $3 million. | [2.5% – 2.7%] | [0]% |
| **Class 6:**<br><br>**Senior Subordinated Note Claims** | Holders of Senior Subordinated Note Claims shall not receive or retain any interest or property under the Plan on account of such Senior Subordinated Note Claims. The treatment of the Senior Subordinated Note Claims is in accordance with and gives effect to the provisions of section 510(a) of the Bankruptcy Code.<br><br>*Eligible Noteholders shall be entitled to participate in the Rights Offering.* | 0% | 0% |
| **Class 7:**<br><br>**Section 510(b) Claims** | Holders of Class 7 Section 510(b) Claims shall not receive any distribution on account of such 510(b) Claims, which shall be discharged on the Effective Date. | 0% | 0% |
| **Class 8:**<br><br>**Equity Interests** | There will be no distribution to the Holders of Class 8 Equity Interests, which will be deemed cancelled and of no further force and effect, whether surrendered for cancellation or otherwise, on the Effective Date. | 0% | 0% |
| **Class 9:**<br><br>**Intercompany Interests** | Intercompany Interests shall be reinstated on the Effective Date. | N/A | N/A |
| **Class 10:**<br><br>**Intercompany Claims** | To preserve the Debtors' corporate structure, Intercompany Claims may be reinstated as of the Effective Date or, at the Debtors' or Reorganized Debtors' option, cancelled or compromised, and no distribution will be made on account of Intercompany Claims under the Plan. | N/A | N/A |

K&E 15673799.

C.  **VOTING ON THE PLAN**

On **[___]**, 2009, the Bankruptcy Court entered an order (the "***Disclosure Statement Order***") approving, among other things, the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan and certain vote tabulation procedures (the "***Solicitation and Voting Procedures***") and establishing the deadline for filing objections to the Plan and scheduling the Confirmation Hearing.

> **THIS DISCUSSION OF THE SOLICITATION AND VOTING PROCESS IS ONLY A SUMMARY**.
> PLEASE REFER TO THE SOLICITATION AND VOTING PROCEDURES ATTACHED AS **EXHIBIT C**
> HERETO FOR THE COMPREHENSIVE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS.

1.  **Holders of Claims Entitled to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan.  As shown in the table below, the Debtors **are** soliciting votes to accept the Plan only from Holders of Claims in Classes 3, 4 and 5 (the "***Voting Classes***") because Holders of Claims in the Voting Classes are Impaired under the Plan and, therefore, have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from (a) Holders of Unimpaired Claims in Classes 1, 2 and 10 or Holders of Intercompany Interests in Class 9 because such parties are conclusively presumed to have accepted the Plan or (b) Holders of Claims in Classes 6 and 7 or Holders of Equity Interests in Class 8 because such parties are conclusively presumed to have rejected the Plan.  The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class) under the Plan:

<center><b>SUMMARY OF STATUS AND VOTING RIGHTS</b></center>

| Class | Claim/Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Prepetition Credit Agreement Secured Claims | Impaired | Entitled to Vote |
| 4 | Unsecured Claims Related to Operations | Impaired | Entitled to Vote |
| 5 | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Senior Subordinated Note Claims | Impaired | Deemed to Reject |
| 7 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 8 | Equity Interests | Impaired | Deemed to Reject |
| 9 | Intercompany Interests | Unimpaired | Deemed to Accept |
| 10 | Intercompany Claims | Unimpaired | Deemed to Accept |

2.  **Voting Record Date**

**The Voting Record Date is 5:00 p.m. prevailing Eastern Standard Time on [___], 2009**, which is the date on which it will be determined which Holders of Claims in Classes 3, 4 and 5 are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the Holder of a Claim.

3.  **Voting on the Plan**

**The Voting Deadline is [___] p.m. prevailing Pacific Time on [___], 2009**.  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed and delivered (either by using the return envelope provided, by first class mail, overnight courier or personal delivery) so that each Ballot is *actually received* on or before the Voting Deadline by the Noticing and Claims Agent at this address:

<center>
**Reader's Digest Balloting Center**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue**
**El Segundo, California  90245**
</center>

K&E 15673799.

### 4. Ballots Not Counted

**The following Ballots will not be counted toward Confirmation of the Plan:** (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim or transmitted by facsimile or other electronic means; (b) any Ballot cast by an entity that is not entitled to vote on the Plan; (c) any Ballot cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (d) any Ballot cast for a Claim that is subject to an objection pending as of the Record Date (unless temporarily allowed in accordance with the Solicitation and Voting Procedures); (e) any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Noticing and Claims Agent), the Indenture Trustee or the Debtors' financial or legal advisors; (e) any unsigned Ballot; or (f) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE VOTING AND CLAIMS AGENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS THE DEADLINE IS EXTENDED BY THE DEBTORS.**

---

### D. ADDITIONAL PLAN-RELATED DOCUMENTS

#### 1. Filing the Plan Supplement

The Debtors will file the Plan Supplement with the Bankruptcy Court prior to the Voting Deadline. The Noticing and Claims Agent will serve the 2002 List and Master List with a courtesy notice that will inform parties that the Plan Supplement was filed, list the information included therein and explain how copies of the Plan Supplement may be obtained. The Plan Supplement will include, without limitation:

- the forms of the Exit Credit Agreement and New Second Priority Term Loan Agreement;

- the Registration Rights Agreement and the Shareholders Agreement;

- the amended and restated organizational documents for Reorganized Holdings (and, if applicable, for other Reorganized Debtors);

- the forms of the Enterprise Value Maximization Plan and Variable Compensation Plan;

- the form of the Management Equity Plan; and

- the list of the Compensation and Benefit Programs to be rejected and/or assumed.

#### 2. Filing the Contract/Lease Schedule

The Debtors will file a schedule or schedules, as necessary, listing the Executory Contracts and Unexpired Leases the Debtors intend to assume and those the Debtors intend to reject pursuant to Article V of the Plan (the "*Contract/Lease Schedule*") with the Bankruptcy Court at least [25] days prior to the Confirmation Hearing. The Contract/Lease Schedule will include (a) the name of the non-debtor counterparty, (b) the legal description of the contract or lease to be assumed or rejected and (c) in the case of assumption, the proposed Cure, if any.

On or as soon as practicably thereafter, with the assistance of the Noticing and Claims Agent, the Debtors will serve the Contract/Lease Schedule and notice of filing upon each non-debtor counterparty listed thereon that will describe the procedures by which such parties may object to the proposed assumption or rejection of their respective Executory Contract or Unexpired Lease and explain how such disputes will be resolved by the Bankruptcy Court if the parties are not able to resolve a dispute consensually.

Objections, if any, to the proposed assumption and/or Cure or rejection by the Debtors of any Executory Contract or Unexpired Lease listed on the Contract/Lease Schedule, must be filed with the Bankruptcy Court and served so as to be *actually received* by the Debtors prior to the Confirmation Hearing on or before a date to be determined, but that in any event is consistent with the provisions of the Debtors' Case Management Order.

K&E 15673799.

Any counterparty to any Executory Contract or Unexpired Lease who fails to timely file and serve an objection in accordance with same will be deemed to have consented to the assumption or rejection of their respective Executory Contract or Unexpired Lease by the Debtors in accordance with Article V of the Plan.

## E.     CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.     Plan Objection Deadline

**The Plan Objection Deadline is [\_\_\_] p.m. prevailing Eastern Time on [\_\_\_], 2009**.  This means that written objections to Confirmation of the Plan, if any, which conform to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, must be filed, together with a proof of service, with the Bankruptcy Court and served so as to be *actually* *received* on or before the Plan Objection Deadline by:

- Counsel to the Debtors:  Kirkland & Ellis LLP, Attn:  Paul M. Basta and Nicole L. Greenblatt, 601 Lexington Avenue, New York, New York  10022;

- Special Counsel to the Debtors:  Curtis, Mallet-Prevost, Colt & Mosle LLP, Attn:  Steven J. Reisman, 101 Park Avenue, New York, New York  10178;

- Counsel to the DIP Agent and Prepetition Agent:  Simpson Thacher & Bartlett LLP, Attn:  Sandeep Qusba, 425 Lexington Avenue New York, New York 10017-3954;

- U.S. Trustee:  Office of the United States Trustee for the Southern District of New York, Attn:  Andrea B. Schwartz, Whitehall Street, 21st Floor, New York, New York 10004; and

- Counsel to the Creditors' Committee:  Otterbourg, Steindler, Houston & Rosen, P.C., Attn:  Scott L. Hazan and David M. Posner, 230 Park Avenue, New York, New York  10169.

### 2.     Confirmation Hearing

**The Confirmation Hearing will commence at [\_\_\_] a.m. prevailing Eastern Time on [\_\_\_], 2009** (the "*Confirmation Hearing Date*") before the Honorable Robert D. Drain, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York **[location to come]**.  At least 25 days prior to the Voting Deadline, the Debtors will (a) serve the Confirmation Hearing Notice upon all known creditors of the Debtors at least 25 days prior to the Confirmation Hearing Date and (b) publish the Confirmation Hearing Notice in the national editions of *The Wall Street Journal* and *USA Today*, which will contain, among other things, details regarding voting on and objecting to Confirmation of the Plan, including the Voting and Plan Objection Deadlines, and the date, time and location of the Confirmation Hearing.  The Confirmation Hearing Notice will also be posted on the Debtors' restructuring website (http://www.kccllc.net/readers).  **The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.**

### 3.     Effect of Confirmation and Consummation of the Plan

Following Confirmation, subject to Article VIII of the Plan, the Plan will be consummated on the Effective Date.  Among other things, on the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Article IX will become effective.  As such, it is important to read the provisions contained in Article IX of the Plan very carefully so that you understand how Confirmation and Consummation of the Plan – which effectuates such provisions – will affect you and any Claim you may hold against the Debtors so that you cast your vote accordingly.  **The Releasing Party Release set forth in Article IX.F. of the Plan provides that Holders of Claims who vote to <u>accept</u> the Plan <u>are</u> bound by the Releasing Party Release and Holders of Claims who vote to <u>reject</u> the Plan are <u>not</u> bound by the Releasing Party Release.**

<div style="border:1px solid black">

**THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE BANKRUPTCY CODE, INCLUDING SECTIONS 524 AND 1141 THEREOF, AND BY ALL OTHER APPLICABLE LAW.**

</div>

# II.
## BACKGROUND TO THESE CHAPTER 11 CASES

### A.    CORPORATE HISTORY AND CURRENT STRUCTURE

Founded in 1922, Reader's Digest is the parent company for each of the Debtors in these Chapter 11 Cases (other than RDA Holding (defined herein), its parent company) and certain direct and indirect foreign Affiliates which are not debtors in these Chapter 11 Cases (collectively, the "***Company***").  Headquartered in Pleasantville, New York since 1939, the Company has over 3,000 employees worldwide and achieves annual sales of approximately $2.2 billion.  The Company's early business strategy focused on developing product lines and growing market share, including internationally.  In February 1990, Reader's Digest went public, offering shares of its common stock on The New York Stock Exchange for the first time.  The Company's current corporate structure has since developed through organic growth and a series of acquisitions and other corporate transactions.

In May 2002, seeking to increase its presence with targeted customers and increase product offerings, Reader's Digest acquired Reiman Publications LLC, a leading publisher of lifestyle, cooking and nostalgia magazines and books based in Greendale, Wisconsin.  Prior to the acquisition, Reiman published 12 bi-monthly magazines with circulation of 16 million subscribers, seven of which were among the top 100 in the United States in circulation (the largest, *Taste of Home*, today is the nation's top-selling food magazine).

In March 2006, to further expand its market presence and grow its brand, Reader's Digest acquired Allrecipes.com, a leading independent food and social networking website based in Seattle, Washington.  Allrecipes.com is a social website that features recipes created, reviewed and rated by home cooks for food and entertaining enthusiasts.

In March 2007, an investor group led by affiliates of Ripplewood Holdings LLC ("***Ripplewood***") acquired all of the outstanding common equity of Reader's Digest (the "***Acquisition***").  Participants in the investor group included C.V. Starr & Co., GoldenTree Asset Management, L.P., GSO Capital Partners, J. Rothschild Group (Guernsey) Ltd., Merrill Lynch Capital Corporation and Solar Capital LLC or their respective affiliates.  As a result of the Acquisition, Reader's Digest and its majority-owned subsidiaries became privately owned by RDA Holding Co. ("***RDA Holding***"), a Delaware corporation.[4]  As part of the Acquisition, RDA Holding acquired WRC Media Inc., a leading publisher of supplementary educational materials for the school, library and home markets under the well-known brand of "Weekly Reader" among others, and acquired Direct Holdings U.S. Corp., a leading global direct marketer of Time Life brand products.[5]  Both WRC Media Inc. and Direct Holdings U.S. Corp. were entities affiliated with Ripplewood.

In the first half of fiscal 2009, Reader's Digest sold several underperforming businesses:  (i) Taste of Home Entertaining, Inc.; (ii) QSP, Inc. and Quality Service Programs, Inc. and their affiliated subsidiaries in the United States and Canada; and (iii) the principal operating assets of Books are Fun, Ltd.

After giving effect to the transactions described above, the following generally depicts the Company's current corporate structure:[6]

---

[4]    In addition to its common stock, RDA Holding also issued two series of preferred stock.

[5]    In 2008, Reader's Digest integrated WRC Media into its Schools & Educational Services business segment and Direct Holdings into its International business segment (Reader's Digest's business segments are discussed below).

[6]    A detailed organizational chart depicting the corporate structure of the Debtors is attached hereto as **Exhibit B**.



## B. CURRENT BUSINESSES AND OPERATIONS

The Debtors and their Affiliates market and sell products under 29 brands through extensive distribution channels to a highly-diversified global customer base—including end-user consumers, advertisers, merchants and school and educational customers—located in more than 75 countries around the world.  The Company's global businesses are organized across three business segments:  International, United States and School and Educational Services.  Reader's Digest and its domestic affiliates—the Debtors in these Chapter 11 Cases—principally conduct the Company's domestic business operations under the United States and School and Educational Services business segments.[7]

### 1. International Businesses and Operations

Reader's Digest holds certain assets and conducts certain operations through certain direct and indirect foreign affiliates which are not debtors in these Chapter 11 Cases.  The International segment is organized across three primary regions,  Europe, Canada & Latin America, and Asia Pacific.  With a strong global footprint, the Company is positioned to grow by leveraging its leading brands and services into existing and new markets.  In the past few years, the Company has launched new businesses giving it entry into more than 15 new markets, including the launch of new editions of Reader's Digest magazine in China, Romania, Serbia, Slovenia and Croatia.  In addition, local Allrecipes sites have been launched in eight new countries in the past 12 months including  United Kingdom and Ireland, Australia and New Zealand, France, Germany, Japan and People's Republic of China, with many more in development.  Reader's Digest is a truly global company with a  business model that allows the company to develop content, create products in certain countries and accelerate rollout across all regions with appropriate local adaptation.   This global business model coupled with the company's formula for quickly dispersing best practices around the world results in significant marketing, editorial, and creative efficiencies.

---

[7]    Although the operations of Debtor Direct Holdings U.S. Corp. ("**Direct Holdings**'') and its subsidiaries are included within the International segment for financial reporting purposes, they are described herein under U.S. Business operations.  With the exception of Direct Holdings IP LLC, a bankruptcy-remote entity wholly-owned by Direct Holdings, Direct Holdings and its domestic subsidiaries are Debtors.

Notwithstanding the current world-wide economic conditions, the Debtors' foreign businesses, as a whole, remain profitable and competitive, and generate positive cash flow, collectively contributing approximately 60% of global revenues.[8]  The Debtors' foreign operations are not included in these Chapter 11 Cases.  To minimize disruption to their international businesses and maintain the cash flow and earnings contributions of the international operations, however, the Debtors are permitted to provide their foreign affiliates with working capital support from the proceeds of the debtor-in-possession financing in an amount not to exceed $50 million — a key feature of the comprehensive restructuring solution reached with the Debtors' lenders.

### 2. U.S. Businesses and Operations

The Debtors and their predecessors have been at the forefront of the highly-competitive media and direct marketing industry for more than 80 years and, as a result, have engendered strong brand loyalty among their customers and established substantial credibility among distributors, marketing partners and competitors.  The Debtors also recognize that the traditional publishing supply chain is evolving, in some cases rapidly, to keep pace with the digitalization of popular culture.  As more and more consumers access media through digital channels, the Debtors' online presence has grown commensurately.  With 65 branded websites and strategic allegiances with leading Internet destinations, the Debtors believe they are uniquely able to capitalize on their iconic heritage and trusted brands, and leverage their media and marketing expertise to expand into multi-platform brands in the medium that best suits the "networked generation."

Through expanded digital investments and the development of new mobile, video and multimedia applications, including rolling out a new suite of products under the "Reader's Digest Version" banner, the Debtors are well-positioned to satisfy the growing consumer preference for on-demand, easily digestible content in a flexible format (*e.g.*, accessible, quick-hit content delivered through new media channels such as social networks, blogs and tags) and expand market penetration and grow brand equity in a new, younger consumer market.

The Debtors operate with an affinity-based focus, meaning, the Debtors market their portfolio of content assets around business divisions based on consumer affinity interests.  By organizing around branded-content communities, the Debtors leverage their leading businesses and brands into growth opportunities to better serve their consumers, many of whom seek information and entertainment by interacting with the Debtors' editors, advertisers and other consumers with similar interests.  Importantly, the Debtors are able to market multi-platform content portfolios and advertising packages to advertisers, which allows the Debtors to promote advertising growth across flagship *Reader's Digest* magazine and other key titles, including *Every Day with Rachael Ray* and *Taste of Home*, and build and grow the Debtors' digital assets.

Generally, the U.S. businesses roll up into four consumer affinity divisions:  RD Community, Food & Entertaining, Home & Garden and Health & Wellness.  Schools & Educational Services is a small division that serves the education market.  The Debtors' Direct Holdings subsidiaries operate a stand-alone direct response and retail marketing business for music, books and other products.

### (a) Affinity Divisions

The Debtors within the Reader's Digest Community affinity primarily market (i) magazines, including flagship *Reader's Digest* and its brand extensions, adult and children's trade books and reading series including Select Editions, (ii) home entertainment products, including recorded music collections, and (iii) websites, including readersdigest.com.

---

[8]    Including the Direct Holdings business, which has historically been reported in the International segment for external reporting purposes, total revenues for this segment is approximately 65% of global revenues.

K&E 15673799.

The Debtors within the Food & Entertaining affinity have the leading market share in the food magazine publishing market through *Taste of Home* (the largest paid circulation U.S. food magazine) and the award-winning magazine, *Every Day with Rachael Ray*. In addition to websites related to each of the foregoing, the Debtors also market Allrecipes.com, the largest food website and the leading social networking food site in the United States. The Debtors within this affinity also market cooking events and cooking schools, and publish cookbooks under the Taste of Home franchise and annual book programs that are marketed on an advanced consent basis (where customers agree to receive future annual editions unless they indicate otherwise). To complement the Debtors' philosophy (*i.e.*, building communities of interest around each brand by focusing on the positive aspects of people and their lifestyles and encouraging reader involvement) and enhance their brand equity, reader loyalty and editorial capability, the Debtors in this affinity division also publish annual book editions based on editorial content derived from reader-generated material published in magazines during that year.

The Debtors within the Home & Garden affinity publish several leading magazine brands in the home and garden space, including The *Family Handyman*, *Birds & Blooms*, *Reminisce* and *Country*, as well as bookazines and home and garden related books and also offer catalog merchandise and travel tours.

The Debtors within the Health & Wellness affinity publish books and magazines on heath and wellness topics, including Food Cures, Magic Foods for Better Blood Sugar, 759 Secrets for Beating Diabetes and Mind Stretchers. Products originated in this division continue to sell strongly for the Debtors' book businesses around the world, both in direct mail and in retail, fueling growth for other divisions.

(b)     School & Educational Services Businesses

The Debtors within the School & Educational Services segment (primarily WRC Media, Inc. and its subsidiaries) publish and market educational resources to schools, teachers and students, under the Weekly Reader and CompassLearning brands. Weekly Reader's product portfolio includes elementary and secondary magazines, books, workbooks, teacher resource materials and non-fiction reference books, as well as certain custom publishing products produced with the support of corporate sponsors and non-profit organizations and distributed to the educational community at no cost. CompassLearning publishes digital supplemental education materials and produces comprehensive digital educational assessment, curriculum, reporting and management tools aligned to local, state and national standards for use by pre-K through grade 12 students. Since 1990, over 13,000 schools in nearly 3,000 U.S. school districts have purchased CompassLearning products.

(c)     Direct Holdings and Related Businesses

Direct Holdings markets and retails music and video products under the Time Life trademark and trade name pursuant to a license agreement with Time Warner Inc. and Time Inc.[9] The music products sold by Direct Holdings primarily consist of content licensed through major record companies. Similarly, video products sold by Direct Holdings are licensed from various third-party licensors. Direct Holdings utilizes multiple channels to market its product, including long-form (typically 30 minute "infomercials") and short-form (two minutes or less) television advertising and the Internet. Direct Holdings' product fulfillment is outsourced. The Debtors also sell other non-published products through similar direct response television and Internet channels outside of the Direct Holdings unit. Most recently, this business has had tremendous success with the "AB Circle Pro" fitness product, which contributed approximately $21.5 million in net revenues in the last quarter of fiscal year 2009.

---

[9]     Prior to the commencement of these Chapter 11 Cases, the Debtors reached agreement with Time Warner Inc. and Time Inc. on the terms of an amended licensing agreement, which, among other things, assures that the Debtors maintain the rights to the license (and associated value) throughout the restructuring process and post-emergence. On October 7, 2009, the Bankruptcy Court entered an order approving the Debtors' assumption of the licensing agreement, as amended [Docket No. 155].

3.      **Global Supply Chain**

The Debtors market and sell their products through extensive distribution channels to a highly-diversified global customer base. To retain and grow that customer base (and attract corresponding advertising dollars), the Debtors must be able to procure goods and services at competitive prices and fulfill, produce and distribute their products timely and accurately. This necessitates carefully-choreographed, highly-integrated stages of development, production and delivery realized through a synchronization of the numerous third-party suppliers, vendors and service providers within the Debtors' global supply chain network.

Over the past several years, the Debtors have focused on realizing significant cost and revenue synergies among product affinities, including through infrastructure and distribution channels. Specifically, the Debtors have analyzed company-wide infrastructure to identify additional cost reduction opportunities within their supply chain and maintenance, repair and operations functions, and have been developing and implementing various operational initiatives aimed at maximizing supply chain and production efficiencies by eliminating unused capacities and right-sizing their work force.

Given the logistical challenges associated with the Debtors' supply chain network, particularly in light of the increasingly global nature of the Debtors' businesses, the Debtors outsource to unaffiliated third parties certain key business processes, including production, fulfillment, customer care, information technology and distribution functions. To realize synergies from their outsourcing partnerships and the year-over-year productivity improvement motivating this extensive investment, the Debtors have expended significant time and resources to develop working relationships with these vendors that the Debtors must preserve to maintain competitive operations.

Outsourcing enables the Debtors to capitalize on the relationships, resources and technological strengths of high-volume vendors to achieve cost structure efficiencies without capital investment or budget increases. As a result, the Debtors are able to create, produce and deliver higher-service products at lower cost points relative to the marketplace, facilitating competitive operations that better position the Debtors to take advantage of top-line growth potential. Outsourcing also improves supply chain visibility, which allows the Debtors to better respond to market changes. This is especially important in a downturn economy under tighter budgets, when supply chain savings can offset volatility in production costs to help meet performance objectives.

Notwithstanding the benefits of their outsourcing arrangements, outsourcing also inevitably limits the Debtors' ability to exercise direct control over outsourced operations, including their finished products, which increases the Debtors' exposure to supply chain interruptions and other external factors. This, combined with the inherent nature of the media and marketing industry—a dynamic and time-sensitive global marketplace driven largely by vacillating consumer preferences and influenced, sometimes significantly, by macroeconomic factors—requires the Debtors achieve the cooperation of their key vendors, service providers and outsourcing partners to ensure a dependable, accountable yet flexible supply chain.

4.      **Debtors' Employees, Management and Directors**

(a)      Employees

The Debtors employ approximately 1,500 employees, of whom approximately 1,454 are full-time employees (regularly scheduled to work a minimum of 35, 37.5 or 40 hours per week, depending on location) and approximately 46 are part-time employees. None of the Debtors' employees are unionized and none are party to any collective bargaining agreement. In addition, each year, the Debtors supplement their workforce by utilizing temporary employees and approximately 2,000 independent contractors that are vital to the creative content of the Debtors' businesses. These independent contractors include individuals who perform creative services on a freelance basis with respect to the creation of the Debtors' products and promotional materials, including, without limitation, writers, photographers, artists, researchers and editors.

K&E 15673799.

        (b)      <u>Management</u>

The Debtors' current senior management team has both deep-rooted and recent experience at the Debtors' businesses, and averages over 20 years of experience in the publishing industry. The following individuals comprise the Debtors' senior management team as of October 1, 2009 (all positions shown are with Reader's Digest or its Debtor Affiliates unless otherwise indicated). Executive officers are elected by the board of directors and serve at its pleasure. The compensation for the last fiscal year for certain members of the Debtors' management is set forth in the Debtors' Annual Report on Form 10-K for the fiscal year ended June 30, 2008, a copy of which can be obtained from the Debtors' investor relations website (http://phx.corporate-ir.net/phoenix.zhtml?c=71092&p=irol-IRhome) or the SEC's EDGAR system website (http://www.sec.gov/edgar.shtml).

- Mary G. Berner, President and Chief Executive Officer

- Tom Williams, Senior Vice President, Chief Financial Officer

- Andrea Newborn, Senior Vice President, General Counsel and Secretary

- Albert L. Perruzza, Senior Vice President, Global Operations, IT & Business Redesign

- Todd McCarty, Senior Vice President, Global Human Resources

- Amy J. Radin, Senior Vice President, Chief Marketing Officer

- Suzanne M. Grimes, President, Reader's Digest Community

- Eva Dillon, President and Group Publisher

- Alyce C. Alston, President, Emerging Businesses

- Dawn M. Zier, President, Global Consumer Marketing and President and CEO, Direct Holdings

- Susana D'Emic, Vice President, Corporate Controller

- Peggy Northrop, Vice President, Global Editor-in-Chief of Reader's Digest

- William Adler, Vice President, Global Communications

        (c)      <u>Board of Directors</u>

The following persons comprise the current board of directors of Reader's Digest:

- *Mary G. Berner, Director and Chief Executive Officer*. Mary G. Berner has served as the Chief Executive Officer and Director since March 2007. From November 1999 until January 2006, Ms. Berner led Fairchild Publications, Inc., first as President and CEO and then as President of Fairchild and an officer of Condé Nast when Fairchild became a division of Condé Nast Publications, Inc. in September 2005. Ms. Berner also serves as a director of the Reader's Digest Foundation, a charitable institution founded by Reader's Digest.

- *Don Leclair, Director*. Mr. Leclair has served as Director since July 2009. Mr. Leclair retired from Ford Motor Company in 2008, where he served in various financial roles, most recently as Chief Financial Officer from August 2003 to November 2008. Prior to holding the Chief Financial Officer position, Mr. Leclair served as Ford's Corporate Controller from November 2001 to July 2003, and as the Controller of its North American Automotive Operations from October 2000 to October 2001.

- *Paula Gavin, Director*. Ms. Gavin has served as Director since July 2009. Ms. Gavin has served as the President of National Urban Fellows, Inc. since June 2007. Previously, Ms. Gavin was the Chief Executive Officer for the New York City Center for Charter School Excellence, a nonprofit organization that promotes the development of charter schools. Prior to that, Ms. Gavin served as the President and Chief Executive Officer of the YMCA of Greater New York from 1990-2004. Prior to her position with the YMCA, Ms. Gavin held multiple executive positions with AT&T, before being named Vice President of Network Operations.

K&E 15673799.

## C.     PREPETITION FUNDED INDEBTEDNESS

As of the Commencement Date, the Debtors had outstanding debt in the aggregate principal amount of approximately $2,271,200,000, consisting primarily of approximately (a) $1,640,100,000 under their senior secured credit facility (including swap termination obligations and accrued and unpaid interest), (b) $628,200,000 in unsecured senior subordinated notes (including accrued interest); and (c) $2,800,000 in foreign lines of credit and a promissory note.  Additionally, the Debtors estimate that an aggregate of approximately $[115] million was owing and outstanding to their trade creditors as of the Commencement Date.

### 1.     Prepetition Credit Agreement

The Debtors' principal prepetition funded debt obligations arise under that certain Credit Agreement dated as of March 2, 2007 (the "***Prepetition Credit Agreement***"), by and among Holdings, Reader's Digest and certain of its affiliates, as borrowers, JPMorgan Chase Bank N.A., as agent (in such capacity, the "***Prepetition Agent***") and the lenders from time to time party thereto (collectively with the Prepetition Agent, the "***Prepetition Lenders***").  The Prepetition Credit Agreement provides for:  (i) a six year, $300 million revolving line of credit (including a $50 million letter of credit subfacility and a $30 million swing-line subfacility), approximately $293.7 million of which remains outstanding; (ii) a seven year, $1.31 billion U.S. term loan, approximately $1.18 billion of which remains outstanding; and (iii) a $100.0 million term loan (the "***Euro Term Loan***"), borrowed in an equivalent amount of Euros, to RD German Holdings GmbH (a non-debtor German Affiliate), which was converted to approximately U.S. $105.9 million on the Commencement Date, all of which remains outstanding.

All obligations under the Prepetition Credit Agreement (the "***Prepetition Obligations***") are guaranteed by RDA Holding Co. and substantially all of its direct and indirect domestic subsidiaries (the "***Prepetition Guarantors***"), all of which are Debtors in these Chapter 11 Cases.  The Prepetition Obligations, and the guarantees thereof, are also secured by substantially all of the tangible and intangible assets of Reader's Digest and the Prepetition Guarantors and, subject to certain customary exceptions, 65% of the voting equity interests of the first tier foreign non-Debtor subsidiaries of Reader's Digest.  As of August 21, 2009, the Debtors held approximately $90 million in global Cash that constituted Cash Collateral.[10]

The Euro Term Loan is guaranteed by certain of the Debtors and RD German Holdings GmbH and substantially all of its subsidiaries and, subject to certain customary exceptions, is secured by a pledge of all of the stock and assets of those subsidiaries.  In connection with the negotiations surrounding the DIP Facility and the Restructuring Support Agreement, the Prepetition Agent and certain Prepetition Lenders holding in excess of 50% of the Prepetition Obligations (in such capacity, the "***Required Lenders***") executed a Waiver and Amendment dated August 17, 2009, pursuant to which the Required Lenders agreed to modify certain provisions of the Prepetition Credit Agreement to avoid acceleration of the Euro Term Loan upon the commencement of these Chapter 11 Cases, in exchange for, among other things, an increase in the interest rates charged under the Prepetition Credit Agreement for the Euro Term Loan.[11]

To reduce interest rate volatility and comply with the interest rate provisions of the Prepetition Credit Agreement, on April 19, 2007 the Debtors entered into certain interest rate swap agreements with aggregate notional value of $750,000,000 (the "***Hedge Agreements***").  Under the Hedge Agreements, the Debtors receive floating-rate interest payments that offset the LIBOR component of the interest due on some of their floating-rate debt, and make fixed-rate interest payments over the term of the agreements.  The obligations under the Hedge Agreements are secured by the liens granted to the Prepetition Agent under the Collateral Documents (as defined in the Prepetition Credit Agreement).  The Debtors estimate that the value of swap termination costs arising under the Hedge Agreements is approximately $48.6 million as of the Commencement Date.

---

[10]   The Company has significant working capital requirements and requires minimum operating levels of "trapped Cash" of approximately $55-60 million globally.  As a result, only approximately $30 million in Cash was available to the U.S. Debtors as of the Commencement Date, which fell in the midst of the Debtors' largest seasonal need for working capital.  In preparation for the fall mailing season (Labor Day through winter holidays), the Debtors incur significant promotional costs in the period from July 1 through September 30.

[11]   The August 17, 2009 Waiver and Amendment increased the applicable margin on the Euro Term Loan to 2.5% (for base rate loans) and 3.5% (for Eurocurrency loans), and added a LIBOR floor of 3.5%.

K&E 15673799.

### 2. Senior Subordinated Notes

Prior to the Commencement Date, Reader's Digest issued $600.0 million in unregistered 9% Senior Subordinated Notes due 2017 through a private placement (as the same were exchanged in 2008 for an equal amount of registered 9% Senior Subordinated Notes due 2017, the "***Senior Subordinated Notes***"). The Senior Subordinated Notes are governed by that certain Indenture dated as of March 2, 2007, by and among Reader's Digest, as issuer, certain of the other Debtors, as guarantors, and The Bank of New York, as trustee (the "***Senior Subordinated Indenture***").

The Senior Subordinated Notes bear interest at the rate of 9% *per annum*, payable semi-annually in arrears on February 15 and August 15 of each year. The Debtors, with the consultation of their advisors, did not make the bi-annual interest payment due on August 17, 2009. Under the Senior Subordinated Indenture, the Debtors are afforded a 30-day grace period before the holders of the Senior Subordinated Notes are able to exercise default-related rights and remedies.

The Senior Subordinated Notes Indenture provides that the right of payment under the Senior Subordinated Notes is expressly subordinated to prior payment in full of the Debtors' Prepetition Obligations, and that the Prepetition Lenders are entitled to enforce this subordination provision. Further, the Notes Indenture provides that the Prepetition Obligations must be satisfied in full before holders of the Senior Subordinated Notes may receive any distributions in these Chapter 11 Cases on account of the Senior Subordinated Notes (except for certain permitted junior securities), and that the holders of the Notes will pay to the Prepetition Lenders any distributions received in these Chapter 11 Cases that do not comply with the above.[12]

## D. EVENTS LEADING UP TO THE CHAPTER 11 FILING

### 1. Adverse Impact of the Global Economic Crisis

The Debtors, like many of their competitors, suppliers and ancillary businesses within the media and marketing industry, have been affected by the recent and unexpected economic downturn. Because product sales in this marketplace are generally proportionate to consumer discretionary spending activity, macroeconomic conditions that impact consumer demand – *e.g.*, interest rates, unemployment levels, consumer confidence and credit availability – affect the Debtors' sales volume commensurately. Although the Debtors have fared well relative to their competitors, reductions in advertising and consumer spending has softened the Debtors' financial performance. Significant increases in fuel prices have also resulted in higher postal and delivery costs.

### 2. Prepetition Restructuring Efforts

In early 2009, the Debtors developed a "recession plan" and put in place certain cost saving initiatives and other strategic action items to manage the business for Cash, increase profitability and optimize the cost structure of the business. These initiatives included reducing corporate overhead, a planned global workforce reduction, suspension of matching contributions to the U.S. 401(k) retirement plan and consolidating various operations.

---

[12] Specifically, the Notes Indenture provides, in pertinent part, that "the payment of all Obligations owing in respect of the Notes is subordinated in right of payment, to the extent and in the manner provided in this Article 10, to the prior payment in full of all existing and future Senior Indebtedness of the Issuer [including the Prepetition Obligations] and that the subordination is for the benefit of and enforceable by the holders of such Senior Indebtedness." Notes Indenture, § 10.1. Additionally, the Indenture provides:

Upon any payment or distribution of the assets of the Issuer to creditors upon a total or partial liquidation or a total or partial dissolution of the Issuer or in a reorganization of or similar proceeding relating to the Issuer or its property: (i) the holders of Senior Indebtedness of the Issuer shall be entitled to receive payment in full in Cash of such Senior Indebtedness before Holders shall be entitled to receive any payment; and (ii) until the Senior Indebtedness of the Issuer is paid in full in Cash, any payment or distribution to which Holders of the Notes would be entitled but for the subordination provisions of this Indenture shall be made to holders of such Senior Indebtedness as their interests may appear, except that Holders of Notes may receive Permitted Junior Securities; and (iii) if a distribution is made to Holders of the Notes that, due to the subordination provisions, should not have been made to them, such Holders of the Notes are required to hold it in trust for the holders of Senior Indebtedness of the Issuer and pay it over to them as their interests may appear.

*See* Notes Indenture, at § 10.2.

K&E 15673799.

Despite these efforts, the Debtors have struggled to weather the economic storm constrained by the substantial debt on their balance sheet and associated debt service obligations. In February 2009, the Debtors made the last payment of interest on their Senior Subordinated Notes amidst simultaneous pressure from certain suppliers, many of whom are also suffering from the ongoing downturn and economic crisis (including working through their own restructuring issues). At around the same time, certain of the Debtors' international credit facilities and lines of credit were withdrawn, which also contributed to the Debtors' declining liquidity position prior to the Commencement Date.

Recognizing the need to address their highly leveraged capital structure, in February 2009, the Debtors retained Miller Buckfire & Co., LLC ("*Miller Buckfire*") as financial advisor and investment banker, to, among other things, investigate sources of debt or equity capital necessary to support the Debtors' Cash needs, and to explore the Debtors' restructuring options and help develop a comprehensive restructuring plan.

Shortly thereafter, the Debtors also retained AlixPartners to, among other things, assist the Debtors in managing their liquidity, establish visibility over daily receipts and disbursements forecasts and tighten control of their global Cash management system. The Debtors also tasked AlixPartners with assisting the Debtors in developing a revised, bottom-up, five-year business plan to form the basis for an appropriate restructuring or recapitalization transaction. In connection with developing the business plan, Reader's Digest and AlixPartners have identified certain cost saving initiatives designed to improve the cash EBITDA and free cash flow generation of Reader's Digest. These initiatives include a combination of high impact cost reductions and organizational streamlining and include, among other things, real estate consolidation, reduction in information technology spend and product utility improvements.

3.        **Restructuring Support Agreement**

In March 2009, the Prepetition Agent organized a steering committee of certain Prepetition Lenders (in such capacity, collectively, the "*Steering Committee*") to engage in discussions with the Debtors. The Prepetition Agent retained financial and legal advisors and began conducting significant diligence relating to the Debtors' business plan and growth prospects. Soon thereafter, the Debtors and the Steering Committee began discussions in earnest regarding a restructuring of the Prepetition Obligations.

While negotiating with the Steering Committee regarding a restructuring of the Prepetition Obligations, the Debtors also considered other potential restructuring alternatives, but ultimately determined that a consensual transaction with the Debtors' prepetition secured lenders to significantly reduce debt was in the best long-term interest of the Debtors. As discussions progressed and the Debtors' liquidity position weakened, the Debtors began discussions in earnest with the Steering Committee regarding the incremental financing the Debtors would need in the event the Debtors were required to commence Chapter 11 Cases.

The Debtors and their advisors ultimately concluded that they would require $150 million in financing and would need immediate access, with little or no delay, to the Cash Collateral and at least $100 million in debtor-in-possession ("*DIP*") financing to avoid immediate and irreparable harm to their estates, minimize disruption to their businesses caused by the commencement of these cases and instill confidence in their customers and suppliers. Importantly, the Commencement Date coincided with the Debtors' largest seasonal working capital need, given the significant promotional spend required in advance of the fall mailing season (Labor Day through the holiday season).

Although the Debtors, with the assistance of Miller Buckfire, solicited indications of interest from other sources, the Debtors' ability to obtain postpetition financing from alternative parties was complicated by several factors, including the Debtors' substantial amount of secured debt and lack of any significant unencumbered assets, the economic challenges facing the media, publishing and direct marketing industry, and the challenging debtor in possession financing market in general. Third party lenders unanimously indicated that they would require that the liens securing any postpetition financing prime (*i.e.*, be senior in priority to) existing liens on the Debtors' assets. The Debtors concluded, based on their discussions with the Prepetition Agent and Steering Committee, that the Prepetition Lenders were unlikely to consent to a third party postpetition financing secured by liens on the Debtors' assets senior to their own.

K&E 15673799.

Further, the Debtors and their advisors concluded that the value of the Debtors' encumbered assets relative to the amount of their senior secured debt, and the Debtors' lack of any significant unencumbered assets, made the outcome of a non-consensual priming of the Prepetition Lenders' liens highly uncertain. In the Debtors' case, obtaining postpetition financing was further complicated by the need to address the potential acceleration of the Euro Term Loan upon a bankruptcy filing. Absent a waiver and amendment, which could only be provided by the Debtors' Prepetition Lenders, the Debtors would have required additional funds of approximately $105.9 million to refinance the Euro Term Loan.

In light of the lack of practicable alternative sources of financing, and the costs and risks of a priming fight with the Prepetition Lenders, the Debtors and their advisors focused their efforts on negotiating a postpetition financing package with the Steering Committee on terms favorable to the Debtors, including obtaining the Waiver and Amendment to address a potential acceleration of the Euro Term Loan and receiving the right to convert any postpetition financing into an exit financing facility to provide the Debtors with the funding needed to emerge from, and to operate after their emergence from, chapter 11.

After weeks of extensive good-faith, arm's-length negotiations, the Debtors and the Steering Committee reached agreement on the terms of a more comprehensive restructuring solution, which includes (i) agreement on a significant de-leveraging of Reader's Digest's balance sheet to be implemented through a pre-arranged chapter 11 process; (ii) committed debtor-in-possession financing of up to $150 million at market terms to provide necessary liquidity through the restructuring process (including to foreign operations), which loan is convertible to exit financing on pre-negotiated terms; (iii) agreement on a sustainable exit capital structure that leaves approximately $555 million in total debt on the balance sheet, with the substantive terms of the exit financing arrangements agreed; and (iv) a waiver of any acceleration related to the Euro Term Loan facility (as a result of the commencement of these chapter 11 cases) to provide continued stability in Europe during this process.

On August 17, 2009, Reader's Digest announced that it had reached an agreement in principle with Prepetition Lenders holding over 80% of the Prepetition Credit Agreement Claims (the "***Consenting Lenders***") on the terms of a financial restructuring, evidenced by the Restructuring Support Agreement attached as **Exhibit F** hereto. Pursuant to the Restructuring Support Agreement, the Consenting Lenders agreed to, among other things, vote in favor of the Plan and all parties agreed to take necessary and appropriate actions consistent with their respective obligations and use reasonable best efforts to facilitate, the solicitation, Confirmation and Consummation of the Plan and the transactions contemplated thereby.

K&E 15673799.

# III.
# CHAPTER 11 CASES

## A.     FIRST DAY MOTIONS AND RELATED RELIEF

On or around the Commencement Date, in addition to filing voluntary petitions for relief, the Debtors also filed a number of motions (the "*Preliminary Motions*") with the Bankruptcy Court seeking relief designed to, among other things, prevent interruptions to the Debtors' business, ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers, provide access to much needed working capital and allow the Debtors to retain certain advisors to assist them with the administration of the Chapter 11 Cases. At preliminary hearings conducted on August 25, 2009 (the "*First Day Hearing*") and September 17, 2009, the Bankruptcy Court entered several orders approving the Preliminary Motions.

### 1.     Procedural Motions

To facilitate a smooth and efficient administration of these Chapter 11 Cases, the Bankruptcy Court entered certain "procedural" orders, by which the Bankruptcy Court (a) approved the joint administration of the Debtors' Chapter 11 Cases, (b) authorized the Debtors to prepare a list of creditors and file a consolidated list of their 50 largest unsecured creditors and (c) approved an extension of time to file their Schedules.

### 2.     Stabilizing Operations

Recognizing that any interruption of the Debtors' business, even for a brief period of time, would negatively impact their operations, customer relationships, revenue and profits, and facilitate a stabilization of their businesses and effectuate a smooth transition into operating as debtors in possession, the Debtors sought and obtained orders authorizing them to:

- maintain and administer customer programs and honor their obligations arising under or relating to those customer programs;

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

- continue insurance coverage, including performance under their self-insurance programs, and enter into new insurance policies, if necessary;

- maintain their existing cash management systems; and

- remit and pay certain taxes and fees.

In addition to the foregoing relief, to prevent the imposition of the automatic stay from disrupting their business and to ensure continued deliveries on favorable credit terms, the Debtors sought and obtained Bankruptcy Court approval to pay the prepetition claims of certain vendors and third-party service providers who the Debtors believed were essential to the ongoing operation of their business. Importantly, the Debtors were able to condition payments of these prepetition claims on the execution by the recipient supplier or service provider of a trade agreement, which, among other things, included certain provisions to ensure that the Debtors would receive customary trade terms throughout the pendency of these Chapter 11 Cases. The Debtors' ability to pay the Claims of these vendors and service providers was critical to maintaining their ongoing business operations at the early stages of their Chapter 11 Cases.

K&E 15673799.

3.      **Postpetition Financing and Use of Cash Collateral**

At the First Day Hearing, the Court authorized the Debtors to (1) enter into the DIP Facility and access $100 million upon entry of the interim DIP Order, (2) use Cash Collateral on the terms set forth in the interim DIP Order and (3) cash collateralize prepetition letters of credit and cause the issuance and cash collateralization of supplemental or new letters of credit.  On October 5, 2009, the Court entered the Final DIP Order authorizing the Debtors to, among other things, access the full amount of the DIP Facility and use Cash Collateral on a final basis pursuant to the terms of the Final DIP Order.

The proceeds of the DIP Facility, the use of Cash Collateral and access to letters of credit have allowed the Debtors to, among other things, continue their businesses in an orderly manner, maintain valuable relationships with vendors, suppliers, customers and employees, pay certain interest, fees and expenses owing under the DIP Credit Agreement, satisfy their adequate protection obligations and support working capital, general corporate and overall operational needs—all of which were necessary to preserve and maintain the going-concern value of the Debtors' business and, ultimately, help ensure a successful reorganization.  Additionally, funds drawn from the DIP Facility have also been used to fund certain working capital needs of the non-debtor Affiliates, including $[10 million] in proceeds sent to non-debtor Affiliates to support the Debtors' foreign operations.

4.      **Employment and Compensation of Professional Advisors**

With authorization from the Bankruptcy Court, the Debtors retained the following professional advisors to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases:  (a) Kirkland & Ellis LLP, as restructuring counsel; (b) Miller Buckfire, as investment banker and financial advisor; (c) AlixPartners, LLP, as restructuring advisor; (d) Curtis, Mallet-Prevost, Colt & Mosle LLP, as conflicts counsel; (e) Ernst & Young LLP, as auditor and tax advisor; and (f) Kurtzman Carson Consultants LLC, as the Noticing and Claims Agent.

The Debtors also sought and obtained orders approving and establishing procedures for the retention and compensation of certain professionals utilized in the ordinary course of the Debtors' business and the interim compensation and reimbursement of Retained Professionals.

B.      **OTHER MATERIAL EVENTS IN THESE CHAPTER 11 CASES**

1.      **Schedules and Statements**

On September 24, 2009, each of the Debtors filed Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (the "***Schedules***") with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code.

2.      **Claims Bar Date**

On October 7, 2009, the Bankruptcy Court entered an order (the "***Bar Date Order***") establishing November 16, 2009, at 4:30 p.m. prevailing Pacific Time, as the deadline by which all persons and entities must file and serve proofs of claim asserting claims that arose on or prior to the Commencement Date, including claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code against the Debtors in these Chapter 11 Cases (the "***Claims Bar Date***").  Additionally, the Claims Bar Date Order establishes February 10, 2010, at 4:30 p.m. prevailing Pacific Time, as the deadline by which all governmental units must file and serve proofs of claim asserting prepetition claims against any of the Debtors in these Chapter 11 Cases (the "***Government Bar Date***").

A deadline by which Claims asserting administrative expense priority must be filed with the Bankruptcy Court has not been established as of the date of this Disclosure Statement (with the exception of claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code, which must be filed on or before the Claims Bar Date). Instead, the Debtors are requesting that the Bankruptcy Court fix such a date as part of the Confirmation of the Plan (as discussed in Section IV.B herein, titled "Summary of the Plan").

K&E 15673799.

### 3.    Executory Contracts and Unexpired Leases

In connection with their restructuring efforts, the Debtors are attempting to enhance the competitiveness of their global operations, which, among other things, has involved a careful and comprehensive evaluation of all aspects of the Debtors' supply chain.  The Debtors intend to utilize the tools afforded a chapter 11 debtor to achieve the necessary cost savings and operational effectiveness envisioned in their revised strategic business plan, including modifying or, in some cases eliminating, burdensome or underutilized agreements and leases.

As such, the Debtors have been diligently engaged in extensive discussions with contract parties regarding the contributions such parties are making to the restructuring process and to the post-emergence businesses.  To that end, as of the undersigned date, the Debtors have filed a motion with the Court seeking authority to assume certain executory contracts, which is set to be considered at the next regularly scheduled omnibus hearing.  In addition, the Debtors have also been evaluating their real property leases.  To date, the Debtors have rejected several real property leases for locations the Debtors had vacated prior to the Commencement Date in connection with their prepetition restructuring efforts from which the Debtors did not realize financial value.

Pursuant to section 365(d)(4) of the Bankruptcy Code, the time within which the Debtors have to assume or reject unexpired leases of nonresidential real property is also scheduled to expire on December 22, 2009, unless extended by order of the Bankruptcy Court.  To that end, the Debtors intend to file a motion with the Bankruptcy Court requesting authority to extend this deadline through the earlier to occur of the Effective Date and March 22, 2010 (90 days from December 22, 2009).

## C.    COMMITTEE APPOINTMENT AND PARTICIPATION

### 1.    Appointment of the Creditors' Committee

On August 31, 2009, the U.S. Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.  On October 9, 2009, the U.S. Trustee appointed four additional members of the Creditors' Committee.  As of the date hereof, the Creditors' Committee Members include (a) The Bank of New York Mellon, (b) Wilfrid Aubrey LLC, (c) Thomas M. Kenney, (d) RR Donnelley & Sons Company, (e) Madison Paper Company (ALSIP Location), (f) Williams Lea, Inc., (g) New Page Corporation, (h) Michael John Bohane, (i) Peter Davenport, (j) Ross Jones and (k) HCL Technologies, Ltd.

The Creditors' Committee retained Otterbourg, Steindler, Houston & Rosen, P.C., as counsel, BDO Seidman, LLP, as financial advisor, and Trenwith Securities, LLC, as investment banker.

### 2.    Participation in The Chapter 11 Cases

Since the formation of the Creditors' Committee, the Debtors have worked cooperatively with the Creditors' Committee and its professionals to educate the Creditors' Committee about the Debtors' businesses and operations, prospects and financial condition.  In addition to providing customary diligence information, the Debtors and the Creditors' Committee and each of their professionals have engaged  in meaningful exchanges relating to the Debtors' DIP budget and revised long-term business plan, as well as payment of certain prepetition obligations under the applicable Preliminary Orders.  Most importantly, the Debtors and the Creditors' Committee, and their respective professionals, have engaged in, and will continue to engage in, arm's-length discussions and negotiations regarding valuation, distributable value available for all unsecured creditors and allocation of such recovery value under the Plan.

### 3.    Meeting of Creditors

The meeting of creditors pursuant to section 341 of the Bankruptcy Code was held on October 2, 2009.  In accordance with Bankruptcy Rule 9001(5) (which requires, at a minimum, that one representative of the Debtors appear at such meeting of creditors for the purpose of being examined the U.S. Trustee and other attending parties in interest), one representative of the Debtors as well as counsel to the Debtors attended the meeting and answered questions posed by the U.S. Trustee and other parties in interest present at the meeting.

K&E 15673799.

# IV.
## SUMMARY OF THE PLAN

THIS SECTION IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL SUCH TERMS AND PROVISIONS, AND SHOULD <u>NOT</u> BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF (INCLUDING ATTACHMENTS) WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION IV AND THE PLAN (INCLUDING ATTACHMENTS) THE LATTER SHALL GOVERN.

## A.    GENERAL BASIS FOR THE PLAN

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan, though proposed jointly, constitutes a separate chapter 11 plan of reorganization proposed by each Debtor. Therefore, the classifications set forth in Article III of the Plan shall be deemed to apply separately with respect to each plan proposed by each Debtor, except that Class 9 Equity Interests shall be deemed to apply only to the plan proposed by RDA Holding Co.

The terms of the Debtors' Plans are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan and pay their continuing obligations in the ordinary course of their businesses. Under the Plan, Claims against and Interests in the Debtors are divided into separate Classes according to their relative seniority and other criteria, and the Plan proposes recoveries for Holders of Claims against and Interests in the Debtors in such Classes, if any.

## B.    TREATMENT OF UNCLASSIFIED CLAIMS

Pursuant to and in accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Facility Claims and Priority Tax Claims.

### 1.    Administrative Claims

Administrative Claims are the actual and necessary costs and expenses of the Chapter 11 Cases that are Allowed under and in accordance with sections 330, 365, 503(b), 507(a)(1), 507(a)(2) and 507(b) of the Bankruptcy Code. *Allowed Administrative Claims do not include Claims filed after the applicable deadline set forth in the Confirmation Order* (except as otherwise provided by a separate order of the Bankruptcy Court). By way of example only, such expenses include the actual and necessary expenses of operating the Debtors' businesses during the pendency of the Chapter 11 Cases, including amounts owed to vendors providing goods and services to the Debtors during the Chapter 11 Cases. Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense and will be paid in accordance with Article XIII of the Plan.

The Plan provides that, subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Claim will be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if an Administrative Claim is Allowed after the Effective Date, on the date such

K&E 15673799.

Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as the case may be; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court. Notwithstanding the foregoing, the Plan also provides that Allowed Administrative Claims that arise in the ordinary course of the Debtors' or Reorganized Debtors' businesses shall be paid in full in Cash in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

(a)      Requests for Payment of Administrative Claims

All requests for payment of an Administrative Claim that accrued on or before the Effective Date that were not otherwise paid in the ordinary course of business must be filed with the Bankruptcy Court and served on the Debtors no later than [60] days from the Effective Date (the "***Administrative Claim Bar Date***"). A notice setting forth the Administrative Claim Bar Date will be filed on the Bankruptcy Court's docket and posted on the Debtors' restructuring website at http://www.kccllc.net/readers. Further notice of the Administrative Claim Bar Date will be provided as may be directed by the Bankruptcy Court. No request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order.

The Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtors may also choose to object to any Administrative Claim in the [180]-day period following the Administrative Claim Bar Date, subject to extensions by the Bankruptcy Court or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim will be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be allowed and, if so, in what amount.

**Any requests for payment of Administrative Claims that are not properly filed and served by the Administrative Claim Bar Date shall not appear on the Claims Register maintained by the Noticing and Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors or any action by the Bankruptcy Court.**

(b)      Payment of Professional Compensation and Reimbursement Claims

The Plan provides that all final requests for Professional Compensation and Reimbursement Claims shall be filed no later than 45 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Compensation and Reimbursement Claims shall be determined by the Bankruptcy Court.

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Retained Professionals shall estimate their Accrued Professional Compensation (net of any unapplied retainer amounts) prior to and as of the Effective Date and shall deliver such estimate to the Debtors on or before the Effective Date. If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional. Such estimate, however, will not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount so estimated as of the Effective Date shall comprise the "Professional Fee Reserve Amount."

**2.      DIP Facility Claims**

The Plan provides that all DIP Facility Claims other than Claims under the DIP Facility that expressly survive the termination thereof will (i) subject to the terms of the DIP Facility, convert into the New First Priority Term Loan pursuant to the Exit Credit Agreement or (ii) be paid off in full in Cash on the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for release of all such DIP Facility Claims.

3.        **Priority Tax Claims**

The Plan provides that each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive, as soon as reasonably practicable after the Effective Date, on account of, and in full and final satisfaction, settlement, release and discharge of and in exchange for, such Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an amount agreed to by the applicable Debtor or Reorganized Debtor, as applicable, and such Holder (although such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date); or (3) at the option of the Debtors, Cash in an aggregate amount of such Allowed Priority Claim payable in installment payments over a period not more than five years after the Commencement Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

The Plan further provides that any Allowed Priority Tax Claim not due and owing on or before the Effective Date will be paid in full in Cash in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

## C.        CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

If the Plan is confirmed by the Bankruptcy Court and consummated, (i) the Claims in certain Classes will be reinstated or modified and receive distributions equal to the full amount of such Claims, (ii) the Claims in certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims and (iii) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests.

1.        **Class 1 – Other Priority Claims**

The Plan defines an "Other Priority Claim" as any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

The Plan provides that each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as reasonably practicable after (a) the Effective Date, (b) the date on which such Other Priority Claim against the Debtors becomes an Allowed Other Priority Claim or (c) such other date as may be ordered by the Bankruptcy Court, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other Priority Claim against the Debtors (except to the extent that a Holder of an Allowed Other Priority Claim against the Debtors agrees to less favorable treatment).

Other Priority Claims are Unimpaired, and Holders of such Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.  The Debtors have estimated that the aggregate amount of Allowed Other Priority Claims payable under the Plan will be approximately $[___].

2.        **Class 2 – Other Secured Claims**

The Plan defines an "Other Secured Claim" as any secured Claim against the Debtors not specifically described in the Plan (and excluding DIP Facility Claims and the Prepetition Credit Agreement Claims).

The Plan provides that Holders of Allowed Other Secured Claims shall receive one of the following treatments, in the sole discretion of the applicable Debtor:  (a) payment in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, on or as reasonably practicable after the Effective Date on or as reasonably practicable after the Effective Date, the date on which such Other Secured Claim against the Debtors becomes an Allowed Other Secured Claim or such other date as may be ordered by the Bankruptcy Court, (b) delivery of the collateral securing any such Allowed Other Secured Claim; or (c) treatment in any other manner that shall render such Allowed Other Secured Claim Unimpaired, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other Secured Claim against the Debtors (except to the extent that a Holder of an Allowed Other Secured Claim against the Debtors agrees to less favorable treatment).

K&E 15673799.

Other Secured Claims are Unimpaired, and Holders of such Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan. The Debtors have estimated that the aggregate amount of Allowed Other Secured Claims payable under the Plan will be approximately $[___].

3.        **Class 3 – Prepetition Credit Agreement Claims**

The Plan defines "Prepetition Credit Agreement Claims" as all Claims arising out of the Prepetition Credit Agreement (including Adequate Protection Claims and secured Claims based upon hedging arrangements with certain of the Prepetition Lenders or their affiliates), which claims are deemed Allowed in an aggregate amount equal to $[1,645,000,000].

The Plan provides that each Holder of an Allowed Prepetition Credit Agreement Claim shall receive their Pro Rata share of each of (a) the Reinstated Euro Term Loan, (b) the New Second Priority Term Loan and (c) 100% of the New Common Stock issued and outstanding as of the Effective Date (subject to dilution by the Rights Offering and the Management Equity Plan), in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Prepetition Credit Agreement Claim against the Debtors.

Notwithstanding the foregoing paragraph, the Plan provides that the Euro Term Lenders (as defined in the Prepetition Credit Agreement) as of the Distribution Record Date shall be the only Prepetition Lenders entitled to receive their Pro Rata share of the Reinstated Euro Term Loan on account of their exposure under the Euro Term Loan (as defined in the Prepetition Credit Agreement). Additionally, the Revolving Lenders, U.S. Term Lenders (each as defined in the Prepetition Credit Agreement) and Holders of Swap Claims as of the Distribution Record Date shall be the only Prepetition Lenders entitled to receive their Pro Rata share of the New Second Priority Term Loan and (c) 100% of the New Common Stock issued and outstanding as of the Effective Date (subject to dilution by the Rights Offering and the Management Equity Plan) on account of their exposures under the Revolver Loan, U.S. Loan (each as defined in the Prepetition Credit Agreement) and Swap Claims. Under the Plan, the Letters of Credit shall continue to be treated in accordance with the provisions in paragraph 13(c) of the Final DIP Order.

Prepetition Credit Agreement Claims are Impaired, and Holders of such Class 3 Claims are entitled to vote to accept or reject the Plan.

4.        **Class 4 –Unsecured Ongoing Operations Claims**

The Plan defines an "Unsecured Ongoing Operations Claim" as a general unsecured Claim directly relating to and arising solely from the receipt of goods and services by the Debtors held by Persons with whom the Debtors are conducting business, and have determined they will continue to conduct business with as of the Effective Date (excluding any Administrative Claims).

The Plan provides that each Holder of an Allowed Unsecured Ongoing Operations Claim will be paid in full in Cash (a) on the Effective Date or as soon as reasonably practicable thereafter or (b) in the ordinary course of business in accordance with the terms of any agreement that governs such Allowed Unsecured Ongoing Operations Claim or in accordance with the course of practice between the Debtors and such Holder with respect to such Allowed Unsecured Ongoing Operations Claim, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Unsecured Ongoing Operations Claim against the Debtors (except to the extent that a Holder of an Allowed Unsecured Ongoing Operations Claim against the Debtors agrees to less favorable treatment). However, Holders of Unsecured Ongoing Operations Claims are not entitled to postpetition interest, late fees or other penalties on account of such Claims.

Holders of Allowed Unsecured Ongoing Operations Claims who received any payments from the Debtors during the Chapter 11 Cases pursuant to any order of the Bankruptcy Court shall not be excluded from receiving distributions under the Plan on account of such Claims unless such Claims were fully satisfied by any prior payments from the Debtors or otherwise waived. The Debtors reserve all rights to challenge the legal basis and amount of any asserted Unsecured Ongoing Operations Claim, and each such Holder reserves all rights and defenses with respect to any such challenge.

K&E 15673799.

Unsecured Ongoing Operations Claims are Impaired, and Holders of such Class 4 Claims are entitled to vote to accept or reject the Plan. The Debtors have estimated that the aggregate amount of Allowed Unsecured Ongoing Operations Claims payable under the Plan will be in the range of $[35–45] million (net of the total estimated amount of Cure payments required to assume Executory Contracts with Persons whom the Debtors are conducting business, and have determined they will continue to conduct business with, as of the Effective Date).

5.      **Class 5 – Other General Unsecured Claims**

The Claims in Class 5 consist of Holders of general unsecured Claims against the Debtors, including, without limitation: (a) vendors with whom the Debtors have determined they will not continue to do business as of the Effective Date; (b) landlords with prepetition rent and/or Claims based on rejection of Unexpired Leases, prepetition litigation and/or related claims; (c) parties to Executory Contracts or Unexpired Leases with the Debtors that are being rejected; (d) Holders of claims arising from the rejection or termination of the Debtors' unfunded, non-qualified retirement plans or deferred compensation arrangements, which include (i) the Excess Benefit Retirement Plan, (ii) the Executive Retirement Plan, (iii) the Executive Cash Balance Plan, (iv) the 1988 Supplemental Employee Retirement Plan and related agreements, (v) the Director and Roving Editors Plan and/or related agreements or arrangements, (vi) the Reader's Digest Deferred Compensation Plan or deferred compensation arrangements provided by any other Debtor; (e) Claims arising from any litigation or other court, administrative or regulatory proceeding, including, without limitation, damages or judgments entered against, or settlement amounts owing by a Debtor related thereto; and (f) Holders of Other General Unsecured Claims not otherwise included in Class 4 or Class 6.

The Plan provides that each Holder of an Allowed Other General Unsecured Claim shall receive their Pro Rata share of the Other General Unsecured Claims Distribution (which is $3 million in Cash) in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other General Unsecured Claim against the Debtors (except to the extent that a Holder of an Allowed Other General Unsecured Claim against the Debtors agrees to less favorable treatment).

Other General Unsecured Claims are Impaired, and Holders of such Class 5 Claims are entitled to vote to accept or reject the Plan. The Debtors have estimated that the aggregate amount of Allowed Other General Unsecured Claims payable under the Plan will be approximately $[110–120 million]. As a result, the Debtors estimate individual Holders of Allowed Other General Unsecured Claims are expected to recover approximately [2.5% to 2.7%] of the amount of their Allowed Other General Unsecured Claim.

6.      **Class 6 – Senior Subordinated Note Claims**

The Plan defines a "Senior Subordinated Note Claim" as any Claim derived from or based upon the Senior Subordinated Notes Indenture. On the Effective Date, Senior Subordinated Note Claims shall be deemed Allowed in the aggregate amount of $[628.2] million. The Plan provides that Holders of Senior Subordinated Note Claims shall not receive or retain any interest or property under the Plan on account of such Senior Subordinated Note Claims. The treatment of the Senior Subordinated Note Claims under the Plan is in accordance with and gives effect to the provisions of section 510(a) of the Bankruptcy Code.

Senior Subordinated Note Claims are Impaired, and Holders of such Class 6 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan.

*Eligible Noteholders are entitled to participate in the Rights Offering.*

7.      **Class 7 – Section 510(b) Claims**

The Plan defines a "Section 510(b) Claim" as any Claim against the Debtors arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim. The Plan provides that Holders of Section 510(b) Claims shall not receive any distribution on account of such 510(b) Claims. On the Effective Date, all Section 510(b) Claims shall be discharged.

K&E 15673799.

Section 510(b) Claims are Impaired, and Holders of such Class 7 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

**8.      Class 8 – Equity Interests**

The Plan defines an "Equity Interest" as any issued or unissued share of common stock, preferred stock or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, including section 510(b) Claims (excluding Intercompany Interests). The Plan provides that Holders of RDA Holding Co. Equity Interests shall not receive any distribution account of such RDA Holding Co. Equity Interests. On the Effective Date, all RDA Holding Co. Equity Interests shall be discharged, cancelled, released and extinguished.

Equity Interests are Impaired, and Holders of such Class 8 Equity Interests are conclusively deemed to have rejected the Plan pursuant to 1126(g) of the Bankruptcy Code. Therefore, Holders of RDA Holding Co. Equity Interests are not entitled to vote to accept or reject the Plan.

**9.      Class 9 – Intercompany Interests**

The Plan defines an "Intercompany Interest" as any Equity Interest in a Debtor held by another Debtor. Intercompany Interests are Unimpaired. The Plan provides that Intercompany Interests shall be reinstated on the Effective Date.

Intercompany Interests are Unimpaired, and Holders of such Class 9 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

**10.      Class 10 – Intercompany Claims**

The Plan defines an "Intercompany Claim" as any Claim held by a Debtor against another Debtor or any Claim held by an affiliate of a Debtor against a Debtor. To preserve the Debtors' corporate structure, the Plan provides that Intercompany Claims may (a) be reinstated as of the Effective Date or (b) at the Debtors' or Reorganized Debtors' option, be cancelled or compromised, and no distribution will be made on account of such Claims.

Intercompany Claims are Unimpaired, and Holders of Class 10 Intercompany Claims, by virtue of their status as a Debtor or an Affiliate of a Debtor, are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

**D.      CERTAIN MEANS FOR IMPLEMENTATION OF THE PLAN**

**1.      General Settlement of Claims**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlements of all Claims and Equity Interests and controversies resolved pursuant to the Plan. Distributions made to Holders of Allowed Claims in any Class are intended to be final.

**2.      Restructuring Transactions**

The Plan provides that, on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and

delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation, merger or consolidation with the appropriate governmental authorities pursuant to applicable law; and (d) all other actions that the Reorganized Debtors determine are necessary or appropriate.

3.       **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or in any agreement, instrument or other document relating thereto, on or after the Effective Date, all property of each Estate (including, without limitation, Causes of Action) and any property acquired including by any of the Debtors pursuant hereto shall vest in each respective Reorganized Debtor, free and clear of all liens, Claims, charges or other encumbrances.  Except as may be provided herein, on and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.       **Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors**

All Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be funded with Cash on hand.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.  However, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

5.       **Exemption from Certain Transfer Taxes and Recording Fees**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (a) the issuance, distribution, transfer or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

6.       **Effectuating Documents and Further Transactions**

The Debtors or the Reorganized Debtors, as applicable, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto.  The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.  Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

K&E 15673799.

## 7. Cancellation of Agreements, Senior Subordinated Notes and Equity Interests

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the Prepetition Credit Agreement, the Senior Subordinated Notes Indenture and any other certificate, equity security, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors and their Affiliates, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating or pertaining to any agreements, indentures, certificates of designation, by-laws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; except that:

a. the Prepetition Credit Agreement shall continue in effect solely for the purpose of: (i) allowing Holders of the Prepetition Credit Agreement Claims to receive the distributions provided for hereunder; (ii) allowing the Prepetition Agent to receive distributions from the Debtors and to make further distributions to the Holders of Prepetition Credit Agreement Claims on account of such Claims, as set forth in Article VI.A of the Plan; and (iii) preserving the Prepetition Agent's right to indemnification from the Debtors pursuant and subject to the terms of the Prepetition Credit Agreement in respect of any Claim or Cause of Action asserted against the Prepetition Agent; *provided* that any Claim or right to payment on account of such indemnification shall be an unsecured Claim and shall not be secured in any of the assets of the Debtors, Reorganized Debtors or their Affiliates; and

b. the foregoing shall not effect the cancellation of shares issued pursuant to the Plan nor any other shares held by one Debtor in the capital of another Debtor; *provided*, *further*, that, to the extent provided in the Exit Credit Agreement and the New Second Priority Term Loan Agreement, the guarantees of and Liens securing obligations under the Prepetition Credit Agreement shall not be cancelled and shall guarantee or secure obligations under and as set forth in the Exit Credit Agreement and the New Second Priority Term Loan Agreement and only such obligations.

## E. POST-EMERGENCE CAPITAL STRUCTURE

The consummation of the financial restructurings contemplated by the Plan will significantly de-lever the Debtors' capital structure, leaving the Reorganized Debtors with approximately $555 million in funded debt. Specifically, the Reorganized Debtors' capital structure upon their emergence from chapter 11 is summarized below.

### 1. Funded Indebtedness

On the Effective Date, the Reorganized Debtors will be authorized to execute and deliver the Exit Credit Agreement and the New Second Priority Term Loan Agreement (substantially in the forms set forth in the Plan Supplement) and any other documents necessary or appropriate to obtain exit financing and issue the New First Priority Term Loan, Reinstated Euro Term Loan and Second Priority Term Loan (and the Confirmation Order will constitute an order of the Bankruptcy Court approving entry into same).

The Exit Credit Agreement and New Second Priority Term Loan Agreement will set forth the terms, conditions and covenants governing the (a) New First Priority Term Loan and the Reinstated Euro Term Loan and (b) New Second Priority Term Loan, respectively.

The lenders under the Exit Credit Agreement and the New Second Priority Term Loan Agreement shall have valid, binding and enforceable liens on the collateral specified in the relevant agreements executed by the Reorganized Debtors in connection with the Exit Credit Agreement and the New Second Priority Term Loan

Agreement.  The other material terms of the Exit Credit Agreement and New Second Priority Term Loan Agreement are as follows:

|  | New First Priority Term Loan | Reinstated Euro Term Loan | New Second Priority Term Loan |
|---|---|---|---|
| **Facilities:** | $150 million | Approximately $105 million | $300 million |
| **Maturity:** | 3 years from the Effective Date | March 2, 2014 | Not earlier than the later maturity of:<br>• the New First Priority Term Loan and<br>• the Reinstated Euro Term Loan |
| **Interest:** | L + 1,000 bps with 3.5% LIBOR Floor | L + 550bps Cash + 450 PIK (toggle) with 3.5% LIBOR Floor | L + 550bps Cash + 650bps PIK (toggle) with 3.5% LIBOR Floor |
| **Security** | First priority lien on substantially all of the Debtors' assets | Same as New First Priority Term Loan and liens on foreign assets currently securing the Euro Term Loan | Second priority liens on substantially all of the Debtors' assets |

The guarantees, mortgages, pledges, liens and other security interests granted pursuant to or in connection with the Exit Credit Agreement and the New Second Priority Term Loan Agreement are granted in good faith as an inducement to the lenders to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the intercreditor agreement and other definitive documentation executed in connection with the Exit Credit Agreement and the New Second Priority Term Loan Agreement. Notwithstanding anything to the contrary in the Confirmation Order or the Plan, the Bankruptcy Court's retention of jurisdiction shall not govern the enforcement of the loan documentation executed in connection with the Exit Credit Agreement and the New Second Priority Term Loan Agreement or any rights or remedies related thereto.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

2.      **Reorganized Debtors' Equity Interests**

(a)      New Common Stock

The Plan provides that all Equity Interests will be deemed cancelled and of no further force and effect as of the Effective Date, whether surrendered for cancellation or otherwise.  On the Effective Date, Reorganized Holdings shall issue or reserve for issuance all of the New Common Stock.  The New Common Stock shall represent all of the Equity Interests in Reorganized Holdings as of the Effective Date and shall be issued to Holders of Prepetition Credit Agreement Claims (subject to dilution by the Management Equity Plan or the Rights Offering).  The Plan contemplates the Debtors' emergence from chapter 11 as a privately-held company.

From and after the Effective Date, subject to the right of the stockholders to amend the certificate of incorporation of Reorganized Holdings, Reorganized Holdings shall have one class and one series of New Common Stock, although the Shareholders Agreement shall provide an option for Holders to receive limited voting stock. Reorganized Holdings will comply with section 1123(a)(6) of the Bankruptcy Code to the extent applicable.

The Reorganized Debtors shall not be obligated to list the New Common Stock on a national securities exchange.  Likewise, the New Common Stock will be issued without registration under the Securities Act or any similar federal, state or local law, subject to the Registration Rights Agreement.  Except as otherwise provided in the Plan, under section 1145 of the Bankruptcy Code, any and all New Common Stock (other than as part of the Rights Offering) contemplated by the Plan and any and all settlement agreements incorporated in the Plan will be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Commission, if any, applicable at the time of any future transfer of such New Common Stock, (ii) any restrictions on the transferability of such New Common Stock and (iii) applicable regulatory approval.

K&E 15673799.

The issuance of the New Common Stock by Reorganized Holdings, including options or other equity awards reserved for the Management Equity Plan, is authorized without the need for further corporate action and all of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully-paid and non-assessable. For purposes of distribution, the New Common Stock will be deemed to have the Plan Equity Value, regardless of the date of distribution.

        (b)        <u>Registration Rights & Shareholders Agreements</u>

Certain holders of the New Common Stock shall be entitled to registration rights pursuant to the Registration Rights Agreement. On or soon after the Effective Date, the Reorganized Debtors and certain holders of New Common Stock shall enter into and deliver the Registration Rights Agreement and the Shareholders Agreement to each entity that is intended to be a party thereto or such agreements shall be deemed to be valid, binding and enforceable in accordance with their respective terms, and each holder of New Common Stock shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Holdings, and the Shareholders Agreement shall provide an option for Prepetition Lenders to receive limited voting stock.

        (c)        <u>Important Securities Law Disclosure</u>

The issuance of the New Common Stock (other than as part of the Rights Offering) and shares reserved for issuance under the Management Equity Plan will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, Rule 701 promulgated under the Securities Act or a "no sale" under the Securities Act to the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act, and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for Cash. In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

To the extent persons who receive New Common Stock are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Those persons would, however, be permitted to sell New Common Stock without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below.

**You should confer with your own legal advisors to help determine whether or not you are an "underwriter."**

Notwithstanding anything herein or in the Plan to the contrary, New Common Stock issued to participating Eligible Noteholders in connection with the Rights Offering will be issued under Section 4(2) of the Securities Act. Such New Common Stock will be "restricted securities" and cannot be sold absent registration under, or pursuant to an exemption from, the Securities Act.

F.    **POST-EFFECTIVE DATE CORPORATE EXISTENCE**

1.    **Organizational Documents**

Subject to any restructuring transactions permitted under Article IV of the Plan, the Plan provides that each Debtor shall continue to exist after the Effective Date as a separate corporate entity or limited liability company, with all the powers of a corporation or limited liability company pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents in the case of a limited liability company) in effect prior to the Effective Date, except to the extent such certificate of incorporation or bylaws (or other formation documents in the case of a limited liability company) are amended by or in connection with the Plan or otherwise. Any such amendments are deemed to be authorized pursuant to the Plan without the need for any other approvals, authorizations, actions or consents.

The Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan. Without limiting the generality of the foregoing, as of the Effective Date, Reorganized Holdings shall be governed by the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws. From and after the Effective Date, the organizational documents of each of the Reorganized Debtors will comply with section 1123(a)(6) of the Bankruptcy Code for so long as it is applicable.

As of the Effective Date, each Debtor's bylaws shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, directors, officers, employees or agents who were directors, officers, employees or agents of such Debtor, at any time prior to the Effective Date at least to the same extent as the bylaws of each of the respective Debtors on the Commencement Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors shall amend and/or restate its certificate of incorporation or bylaws before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations or such directors', officers', employees' or agents' rights; *provided* that, with respect to former officers and directors, the Debtors shall be obligated to indemnify such individuals only to the extent of available coverage under their D&O Liability Insurance Policies (and payable from the proceeds of such D&O Liability Insurance Policies), including the advancing of defense costs prior to final adjudication.

2.    **Post-Effective Date Governance**

(a)    Executive Officers

The existing officers of the Debtors shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the board of directors to remove or replace them in accordance with the Debtors' organizational documents and any applicable employment agreements.

(b)    New Board of Directors

The New Board shall consist of [7] directors. The Prepetition Lenders will identify potential directors through use of a search firm acceptable to the Prepetition Agent (with reasonable fees and expenses to be paid by the Debtors) and shall initially designate all such directors upon consultation with the Debtors' Chief Executive Officer. Certain independent directors may, however, be requested to continue to serve on the New Board. The existing directors of each of the subsidiary Debtors shall remain in their current capacities as directors of the applicable Reorganized Debtor until replaced or removed in accordance with the organizational documents of the applicable Reorganized Debtors.

*The identity of each of the members of the New Board will be disclosed prior to the Confirmation Hearing and any directors elected pursuant to this section shall be subject to approval of the Bankruptcy Court pursuant to section 1129(a)(5) of the Bankruptcy Code.*

### G. COMPENSATION, PENSION AND BENEFIT PLANS AND RELATED MATTERS

#### 1. Management Compensation Programs

The Plan contemplates the adoption of two incentive compensation programs that will provide customary cash-based incentives for continuing employees eligible to participate in such plans: (a) the Variable Compensation Plan and (b) the Enterprise Value Maximization Plan. The Plan also provides for the Management Equity Plan, which will grant equity awards to certain continuing employees and directors of the Reorganized Debtors. Each of the plans are described below. The terms and provisions of the Variable Compensation Plan, the Enterprise Value Maximization Plan and the Management Equity Plan will be set forth in the Plan Supplement filed prior to the Voting Deadline (as discussed in Section I.D entitled, "Documents to be Filed in Connection With the Plan").

##### (a) Variable Compensation Plan

The Variable Compensation Plan is a broad-based incentive plan designed to incent the delivery of shorter-term financial goals, including, among other things, incremental cash EBITDA for the fiscal year ending June 30, 2010, and provide strong retention value. This plan includes target award opportunities (expressed as a percentage of base salary) established relative to the grade level and criticality of the role of each participant. Awards will be payable in Cash at the end of the fiscal year ending June 30, 2010, and based upon audited results. Subject only to the occurrence of the Effective Date, the Plan provides that the Variable Compensation Plan shall become effective without any further action by the Reorganized Debtors.

##### (b) Enterprise Value Maximization Plan

The Enterprise Value Maximization Plan is an incremental executive plan designed to incent the delivery of longer-term value creation initiatives though rewarding (a) realization of increasing enterprise value and (b) speed to emergence, to executives with broad enterprise-wide responsibilities or those whom can impact time to emergence, respectively (with certain select participants receiving both). With respect to the former, performance is measured by enterprise-wide cash EBITDA at the end of a one-year performance period (the fiscal year ending in June 30, 2010), and the award is in the form of a Cash payment based on a Pro Rata share of cash EBITDA improvement over approved business plan cash EBITDA. With respect to the latter, the performance measure is based upon enterprise value created from the benefits of a prompt exit from bankruptcy. Those benefits include, among other things, (a) a shorter horizon after which senior and mid-level management will be able to devote full attention to business operations, (b) decreased exposure to trade risk from advertisers and vendors and (c) reduced costs of Retained Professionals. Subject only to the occurrence of the Effective Date, the Plan provides that the Enterprise Value Maximization Plan shall become effective without any further action by the Reorganized Debtors

##### (c) Management Equity Plan

The Management Equity Plan will provide for the granting of equity awards (up to 2.5% in the form of restricted New Common Stock and 5% in the form of options or warrants) for 7.5% of the New Common Stock (on a fully-diluted basis) to continuing employees of the Reorganized Debtors and members of the New Board. The pricing, vesting and exercise terms of the Management Equity Plan will be determined by the New Board upon consultation with the Reorganized Debtors' Chief Executive Officer. The New Board will adopt and implement the Management Equity Plan on or as soon as practical after the Effective Date; however, the Debtors reserve the right to amend the Management Equity Plan with the consent of the Prepetition Agent and the Required Consenting Lenders at any time prior to the Effective Date.

#### 2. Employee Compensation and Benefits Programs

For purposes of the Plan, the Reorganized Debtors' obligations under all employment and severance policies, and all compensation and benefit plans, policies and programs and other arrangements (and all amendments and modifications thereto), in each case in place as of the Effective Date, applicable to the Debtors' employees, former employees, retirees and non-employee directors and employees, former employees and retirees of their subsidiaries, including, without limitation, all savings plans, retirement plans (other than the Non-Qualified Retirement Plans), health care plans, disability plans, severance benefit plans, incentive plans and life, accidental death and dismemberment insurance plans (collectively, the "*Compensation and Benefits Programs*") shall be

K&E 15673799.

deemed assumed on the Effective Date pursuant to the provisions of section 365 and 1123 of the Bankruptcy Code, *except* with respect to any Compensation and Benefits Programs that (a) are listed in the Plan Supplement to be rejected or terminated, which includes, without limitation, the 2006 Income Continuation Plan for Senior Management., (b) have previously been rejected or terminated or (c) are the subject of pending rejection procedures or a motion to reject, or have been specifically waived by the beneficiaries of any employee benefit plan or contract as of the date the Confirmation Order is entered by the Bankruptcy Court.

The assumption or continuation of Compensation and Benefits Programs identified in the Plan Supplement shall not be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein (unless a Compensation and Benefits Program counterparty timely objects to the assumption or continuation contemplated by this Section in which case any such Compensation and Benefits Program shall be deemed rejected or discontinued as of immediately prior to the Commencement Date). No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption or continuation.

        (a)        <u>Retiree Health Benefits</u>

**The Reorganized Debtors' obligations with respect to the payment of "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code) SHALL continue for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, subject to any contractual rights to terminate or modify such benefits.**

The Reader's Digest Association, Inc. currently maintains a plan that provides post-retirement medical and dental benefits to various groups of former employees (and their spouses and dependents) and is intended to provide post-retirement medical and dental benefits to certain active employees of participating Debtors (and their spouses and dependents) upon such employees' future retirement.

Currently, the plan provides that former employees (and their spouses and dependents) who retired from participating Debtors on or after January 1, 1985 and have not attained age 65 are eligible for Debtor-subsidized retiree medical benefits through 2017 and Debtor-subsidized retiree dental benefits through 2009. For former employees (and their spouses and dependents) who retired from participating Debtors on and after January 1, 1985 and who have attained age 65 or older, the current plan provides for Debtor-subsidized retiree medical coverage through 2012 and Debtor-subsidized retiree dental coverage through 2009.

With respect to former employees (and their spouses and dependents) who retired from participating Debtors prior to January 1, 1985, retiree medical and dental benefits continue to be 100% -subsidized by the Debtors. The Reader's Digest Association, Inc. has reserved its rights to unilaterally amend, modify and terminate its retiree medical and dental plans to the extent consistent with applicable law.

The Debtors' actuaries have estimated that the accumulated post-retirement benefit obligation for retiree medical and dental benefits as of June 30, 2009, is $18 million.

        (b)        <u>Qualified Pension Plan</u>

**The Debtors or the Reorganized Debtors, as applicable, SHALL also continue the Pension Plan in accordance with its terms, and the Debtors or Reorganized Debtors, as applicable, shall satisfy the minimum funding standards and administer the Pension Plan in accordance with the provisions of ERISA and the Internal Revenue Code, subject to any contractual or statutory rights to terminate or modify such plan.**

The Reader's Digest Association, Inc. sponsors The Reader's Digest Association, Inc. Retirement Plan, (the "***Retirement Plan***"), which is a defined benefit pension plan in which most domestic employees of the Debtors are entitled to participate. Based on information provided by The Reader's Digest Association, Inc, as of June 30, 2009, the estimated projected benefit obligation under the Retirement Plan was $406 million and  the estimated market value of assets was approximately $509 million. **<u>As of the Commencement Date, the Retirement Plan was over-funded and the Debtors do not owe any prepetition amounts on account of this plan.</u>**

K&E 15673799.

To reduce the Cash cost of funding severance benefits, prior to the Commencement Date, as part of their prepetition restructuring initiatives, the Debtors amended the Reader's Digest Retirement Plan to provide a special pension credit to eligible terminated Employees terminated after April 1, 2009, and on or before December 31, 2009. This amendment effectively transferred the obligation to fund severance benefits from Reader's Digest to the Reader's Digest Retirement Plan. The Debtors expect to amend the Pension Plan to extend the program to include employees terminated through December 31, 2010.

<div align="center">(c)      <u>Non-Qualified Retirement Plans</u></div>

**For the avoidance of doubt, the Debtors SHALL NOT assume any obligations in connection with the Non-Qualified Retirement Plans in connection with the Plan. Claims arising from the discontinuation, rejection or termination of the Non-Qualified Retirement Plans will be treated as Other General Unsecured Claims.**

Finally, as of the Commencement Date, the Debtors provided retirement benefits pursuant to a series of unfunded non-qualified retirement and other deferred compensation arrangements. As set forth in the Plan, the Non-Qualified Retirement Plans include (i) the Excess Benefit Retirement Plan, (ii) the Executive Retirement Plan, (iii) the Executive Cash Balance Plan, (iv) the 1988 Supplemental Employee Retirement Plan and related agreements, (v) the Director and Roving Editors Plan and/or related agreements or arrangements, and (vi) the Reader's Digest Deferred Compensation Plan or deferred compensation arrangements provided by any other Debtor. The participants in these non-qualified plans generally include former executives, officers and directors of the Debtors as well as certain other former and current employees and freelancers.

As of the Commencement Date, the Debtors estimate their accumulated obligations and/or liability under such non-qualified retirement plans are approximately $[80] million. **As a result of the chapter 11 cases the Debtors have ceased making payments in connection with these programs.** **These benefits are unsecured claims which are treated as Other General Unsecured Claims in Class 5 under the Plan.**

**3.      Workers' Compensation Programs**

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under all applicable workers' compensation laws in states in which the Reorganized Debtors operate and the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order or approval of the Bankruptcy Court. Nothing in the Plan, however, shall (a) limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans or (b) be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

**H.      RIGHTS OFFERING AND SUBSCRIPTION PROCESS**

**1.      Exercise of Subscription Rights**

<div style="border:1px solid black; text-align:center;">

**THIS IS ONLY A SUMMARY OF THE RIGHTS OFFERING AND SUBSCRIPTION PROCESS. ALL HOLDERS OF SENIOR SUBORDINATED NOTES ARE REFERRED TO THE SUBSCRIPTION PROCEDURES SET FORTH ON <u>EXHIBIT G</u> FOR A COMPLETE DESCRIPTION REGARDING SAME.**

</div>

The Plan provides for a Rights Offering that will commence on [___], 2009. Eligible Noteholders shall have the right (a "***Subscription Right***") to purchase up to an aggregate of $[50-100] million of the New Common Stock on a Pro Rata basis, based on the amount of Senior Subordinated Note Claims held by a participating Eligible Noteholder compared to the aggregate amount of all Senior Subordinated Note Claims. Participating Eligible Noteholders may exercise all or any portion of its Subscription Rights. **The valid exercise of Subscription Rights shall be irrevocable.**

On the commencement date of the Rights Offering, Financial Balloting Group LLC (the "***Rights Offering Agent***"), will mail a subscription form (each, a "***Subscription Form***") and accompanying instructions for the proper completion, due execution and timely delivery of such Subscription Form, as well as instructions for payment, to each Eligible Noteholder.

To participate in the Rights Offering, each Eligible Noteholder must affirmatively elect to exercise its Subscription Rights on or before [___] (the "***Subscription Expiration Date***") by returning a duly-completed Subscription Form together with payment of the appropriate subscription purchase price as set forth in and pursuant to with the instructions that accompany the Subscription Form so both are *actually received* by the Rights Offering Agent on or before the Subscription Expiration Date in accordance with the attached Subscription Procedures. **The Subscription Rights are not transferable.**

## 2.      Failure To Timely Subscribe

If the Rights Offering Agent for any reason does not receive both a duly completed Subscription Form and immediately available funds as set forth above on or before the Subscription Expiration Date from a given Eligible Noteholder of Subscription Rights, then such Eligible Noteholder shall be deemed to have relinquished and waived its right to participate in the Rights Offering. Any attempt to exercise Subscription Rights after the Subscription Expiration Date shall be null and void and the Debtors shall not be obligated to honor any such purported exercise received by the Rights Offering Agent after the Subscription Expiration Date regardless of when the documents relating to such exercise were sent. The Debtors may use commercially reasonable efforts to give notice to any holder regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such holder of Subscription Rights and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate. However, neither the Debtors nor the Rights Offering Agent will have any obligation to provide such notice or incur any liability for failure to give such notification.

## 3.      Use of Rights Offering Proceeds

Payments made in accordance with the Rights Offering (the "***Rights Offering Funds***") shall be deposited and held in escrow pending the Effective Date in an account or accounts administered by the Rights Offering Agent, which shall: (a) not constitute property of the Debtors or the Debtors' Estates until the Effective Date; (b) be separate and apart from the Rights Offering Agent's general operating funds and any other funds subject to any lien or any Cash collateral arrangements; and (c) be maintained for the purpose of holding the funds for administration of the Rights Offering until the Effective Date. The Rights Offering Agent shall not use the Rights Offering Funds for any purpose other than to release the funds as directed by the Debtors or the Reorganized Debtors, as applicable, on the Effective Date and shall not encumber or permit the Rights Offering Funds to be encumbered by any lien or similar encumbrance. No interest will be paid to entities exercising Subscription Rights on account of amounts paid in connection with such exercise.

## I.      PRESERVATION OF CERTAIN RIGHTS OF ACTION

In accordance with section 1123(b) of the Bankruptcy Code but subject to the releases set forth in Article IX.E of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Commencement Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.

Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

K&E 15673799.

**No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.**

Subject to the releases set forth in Article IX of the Plan, the Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Person shall vest in the applicable Reorganized Debtor. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

Further, any recovery paid or payable to the Debtors or the Prepetition Lenders from proceeds of any Cause of Action against the Consenting Shareholders (either directly or indirectly or pursuant to the subordination provisions of the Senior Subordinated Notes Indenture) shall be payable to such Consenting Shareholders and if any of such parties receive any recovery on account of such Cause of Action, they shall hold the proceeds of any payment thereof in trust for the Consenting Shareholders and shall promptly transfer such proceeds or payment, as the case may be, to the Consenting Shareholders.

**J.      TREATMENT OF CONTRACTS AND LEASES**

**1.      Assumption of Executory Contracts and Unexpired Leases Generally**

Subject to the provisions herein, each of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) is identified on the list of Executory Contracts and Unexpired Leases to be rejected filed pursuant to the Plan Supplement, which such list shall be filed on or before the Contract/Lease Schedule Date and shall not be modified by the Debtors after the Contract/Lease Schedule Date; (3) is the subject of a separate motion or notice to reject filed by the Debtors on or before the Contract/Lease Schedule Date; *provided* that the Debtors shall not file any separate motions or notices to reject Executory Contracts or Unexpired Leases after the Contract/Lease Schedule Date if the Plan is still pending or has been consummated; or (4) previously expired or terminated pursuant to its own terms.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of such Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of such Executory Contracts and Unexpired Leases in the Plan are effective as of the Effective Date. Each such Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party prior to the Effective Date, shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or order of the Bankruptcy Court. Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify or supplement the Executory Contracts and Unexpired Leases identified in the Plan Supplement.

**2.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Any provisions or terms of the Debtors' Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, solely by Cure or by an agreed-upon waiver of Cure on or as soon as reasonably practicable after the Effective Date.

The Debtors will file the Contract/Lease Schedule(s) with the Bankruptcy Court at least [25] days prior to the Confirmation Hearing. The Contract/Lease Schedule will include (a) the name of the non-debtor counterparty, (b) the legal description of the contract or lease to be assumed or rejected and (c) in the case of assumption, the proposed Cure, if any. On or as soon as practicably thereafter, with the assistance of the Noticing and Claims Agent, the Debtors will serve the Contract/Lease Schedule and notice of filing upon each non-debtor counterparty listed thereon that will describe the procedures by which such parties may object to the proposed assumption or rejection of their respective Executory Contract or Unexpired Lease and explain how such disputes will be resolved by the Bankruptcy Court if the parties are not able to resolve a dispute consensually.

Objections, if any, to the proposed assumption and/or Cure or rejection by the Debtors of any Executory Contract or Unexpired Lease listed on the Contract/Lease Schedule, must be filed with the Bankruptcy Court and served so as to be *actually received* by the Debtors prior to the Confirmation Hearing on or before a date to be determined, but that in any event is consistent with the provisions of the Debtors' Case Management Order. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or Cure will be deemed to have assented to such matters (except that the Cure Objection Deadline shall not apply to any franchise or Executory Contract with a state or local franchise authority), and any subsequent or additional requests for Cure, other payments or assurances of future performance shall be disallowed, automatically and forever barred from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released and discharged, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary.

Nothing shall prevent the applicable Reorganized Debtor from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

In the event of a dispute regarding (1) the amount of any payments to Cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the applicable Debtor or Reorganized Debtor, and the counterparty to the Executory Contract or Unexpired Lease. If an objection to Cure is sustained by the Bankruptcy Court, the Reorganized Debtors in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, except any Executory Contract with a state or local franchise authority, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest (or payments relating to such change in control) or composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to or upon the effective date of assumption. Except as provided elsewhere herein, any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

**The Debtors or Reorganized Debtors, as applicable, reserve the right, either to reject or nullify, the assumption of any Executory Contract or Unexpired Lease no later than thirty (30) days after entry of any Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.**

### 3. Contracts and Leases Entered Into After the Commencement Date

Contracts and leases entered into after the Commencement Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

K&E 15673799.

4.      **Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise must be filed by Holders of such Claims with the Notice, Claims and Solicitation Agent no later than thirty days after the later of (a) the Effective Date or (b) the effective date of earlier rejection for such Holders to be entitled to receive distributions under the Plan on account of such Claims; _provided_ that any such Claims for earlier rejected contracts or leases must be filed by no later than 20 calendar days prior to the Voting Deadline for the Holder of such Claim to be entitled to vote on the Plan.

Any Proofs of Claim arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

5.      **Indemnification and Reimbursement Obligations**

On and from the Effective Date, and except as prohibited by applicable law or subject to the limitations set forth herein, the Reorganized Debtors shall assume all indemnification obligations currently in place, whether in the bylaws, certificates of incorporation (or other formation documents), board resolutions, employment contracts or other agreements for the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors and such current and former directors', officers', managers', and employees' respective Affiliates (collectively, the "***Indemnified Parties***").  Each Debtor's bylaws shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to such Indemnified Parties to the extent provided in Article V of the Plan.

Without limiting the foregoing and except as prohibited by applicable law, the Debtors shall indemnify and hold harmless each of the Indemnified Parties for all costs, expenses, loss, damage or liability incurred by any such Indemnified Party arising from or related in any way to any and all Causes of Action whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, including any claims or causes of action, whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, based in whole or in part upon any act or omission, transaction or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including those related in any way to:

- any action or omission of any such Indemnified Party with respect to any indebtedness of or any Equity Interest in the Debtors (including any action or omission of any such Indemnified Party with respect to the acquisition, holding, voting or disposition of any such investment);

- any action or omission of any such Indemnified Party in such Indemnified Party's capacity as an officer, director, member, employee, partner or agent of, or advisor to any Debtor;

- any disclosure made or not made by any Indemnified Party to any current or former Holder of any such indebtedness of or any such Equity Interest in the Debtors;

- any consideration paid to any such Indemnified Party by any of the Debtors in respect of any services provided by any such Indemnified Party to any Debtor; and

- any action taken or not taken in connection with the Chapter 11 Cases or the Plan.

In the event that any such Indemnified Party becomes involved in any action, proceeding or investigation brought by or against any Indemnified Party, as a result of matters to which the foregoing "Indemnification" may relate, the Reorganized Debtors shall promptly reimburse any such Indemnified Party for its reasonable and documented legal and other expenses (including advancing the costs of any investigation and preparation prior to

final adjudication) incurred in connection therewith as such expenses are incurred and after a request for indemnification is made in writing, with reasonable documentation in support thereof.

Notwithstanding anything herein to the contrary, with respect to former officers and directors, the Debtors' obligation to indemnify such individuals shall be limited to the extent of available coverage under their D&O Liability Insurance Policies (and payable from the proceeds of such D&O Liability Insurance Policies), including advancing the costs of any investigation and preparation prior to final adjudication as such expenses are incurred and after a request for indemnification is made in writing, with reasonable documentation in support thereof.

6.      **D&O Insurance Policies and Agreements**

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code, and entry of the Confirmation Order will constitute the Bankruptcy Court's approval of same. Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy" in effect on the Commencement Date) with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

## K.      DISTRIBUTIONS ON ACCOUNT OF ALLOWED CLAIMS

1.      **Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Initial Distribution Date; *provided*, *however*, that payments on account of General Unsecured Claims that become Allowed Claims on or before the Effective Date shall commence on the Effective Date.

2.      **Claims Allowed After the Effective Date**

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the first Periodic Distribution Date after the Disputed Claim becomes an Allowed Claim.

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims.

3.      **Timing and Calculation of Amounts to Be Distributed**

Except as otherwise provided in the Plan, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on or as soon as reasonably after the date that such a Claim becomes an Allowed Claim), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.

Distributions on account of Other General Unsecured Claims that become Allowed Claims before the Effective Date shall be paid on the Effective Date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class

treatment or in Article VI of the Plan. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

4. **Setoffs**

The Debtors and the Reorganized Debtors may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim. In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. **Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided herein.**

5. **Claims Paid or Payable by Third Parties**

(a) <u>Claims Paid by Third Parties</u>

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

(b) <u>Claims Payable by Insurers</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c) <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## L.    RESOLUTION OF CONTINGENT, UNLIQUIDATED OR DISPUTED CLAIMS

### 1.    Allowance of Claims

After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

### 2.    Prosecution of Objections to Claims

Any objections to Claims shall be filed no later than the Claims Objection Bar Date.  With respect to all Tort Claims, an objection is deemed to have been filed timely, thus making each such Tort Claim a Disputed Claim as of the Claims Objection Bar Date.  Each such Tort Claim shall remain a Disputed Claim unless and until it becomes an Allowed Claim.  After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date until the Claims Objection Bar Date, the Reorganized Debtors, shall have the exclusive authority to file objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.

### 3.    Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 4.    Disallowance of Claims

All Claims of any Entity from which property is sought by the Debtors or the Reorganized Debtors under section 542, 543, 550 or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be disallowed if the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

Except as otherwise agreed, any and all proofs of claim filed after the applicable claims bar date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late proof of claim is deemed timely filed by a Bankruptcy Court order on or before the later of (1) the Confirmation Hearing and (2) 45 days after the applicable claims bar date.

K&E 15673799.

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim filed shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

## M.      SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

### 1.      Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

### 2.      Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.  No Holder of a Senior Subordinated Note Claim shall receive any distribution on account of such Senior Subordinated Note Claim, and all Senior Subordinated Note Claims shall be extinguished.

### 3.      Discharge of Claims and Termination of Equity Interests

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the reorganized Debtors), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Commencement Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Equity Interests relate to services performed by the employees of the Debtors prior to the Commencement Date and arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring.

4. **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III of the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

5. **Debtor Release**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission or the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or related agreements, instruments or other documents, or upon any other act or omission, transaction, or occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct or gross negligence.**

**Notwithstanding anything to the contrary herein, the foregoing "Debtor Release" shall not operate to waive or release any Causes of Action of any Debtor: (1) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan, including, without limitation, the Exit Credit Agreement, New Second Priority Term Loan Agreement or the Shareholders' Agreement or documents, agreements or instruments executed in connection therewith or (2) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents.**

Entry of the Confirmation Order Shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors or the Reorganized Debtors asserting any claim released by the Debtor Release against any of the Released Parties.

6. **Releasing Party Release**

**Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Releasing**

K&E 15673799.

Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission or the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or related agreements, instruments or other documents, or upon any other act or omission, transaction, or occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct or gross negligence.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order Shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the consensual Releasing Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Releasing Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the Releasing Party Release against any of the Released Parties.

Notwithstanding anything in the Plan, no Person shall be discharged, released, or relieved from any liability with respect to the Pension Plan as a result of the Chapter 11 Cases or the Plan, nor shall the PBGC, the Pension Plan or any other Person be enjoined or precluded from enforcing any liability with respect to the Pension Plan as a result of the Chapter 11 Cases, the provisions of the Plan or confirmation of the Plan.

## 7. Consideration Provided by the Released Parties

Each of the Released Parties afforded value to the Debtors and aided in the reorganization process and have provided or will provide good and valuable consideration in exchange for the release provisions set forth in the Plan. Indeed, each of the provisions set forth in Article IX of the Plan were a critical component of, and gating item for, the Debtors' ability to achieve a prearranged plan of reorganization that provides maximum recovery value to the Debtors' creditors and affords the Reorganized Debtors the opportunity to restructure their businesses to compete effectively post-emergence. Accordingly, the Debtors believe that the release provisions of the Plan are appropriate.

## 8. Exculpation

Upon and effective as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring consultants and other professional advisors and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code , including section 1125(e) of the Bankruptcy Code. Except with respect to any acts or omissions expressly set forth in and preserved by the Plan, the Plan supplement or related documents, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the Chapter 11 Cases, including, without limitation, the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; formulating, negotiating, preparing, disseminating,

implementing and/or effecting the Restructuring Support Agreement, the DIP Credit Agreement, the Disclosure Statement and the Plan (including the Plan Supplement and any related contract, instrument, release or other agreement or document created or entered into in connection therewith); the solicitation of votes for the Plan and the pursuit of Confirmation and Consummation of the Plan; the administration of the Plan and/or the property to be distributed under the Plan; the offer and issuance of any securities under the Plan, including pursuant to the Rights Offering; and or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors. In all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its respective duties under, pursuant to or in connection with, the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall (1) exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of confidential information that causes damages or ultra vires acts as determined by a Final Order or (2) limit the liability of the professionals of the Exculpated Parties to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

9.    Injunction

The satisfaction, release and discharge pursuant to this Article IX of the Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process or act to collect, offset, or recover any Claim or Cause of Action satisfied, released, or discharged under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

N.    MODIFYING, REVOKING OR WITHDRAWING THE PLAN

Subject to the limitations contained in the Plan and the Restructuring Support Agreement, and in accordance with the Restructuring Support Agreement: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019. Subject to the Restructuring Support Agreement and conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

K&E 15673799.

<center>

**V.**

**VALUATION AND FINANCIAL PROJECTIONS**

</center>

---

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED DISTRIBUTABLE VALUE AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE VALUE OF THE NEW COMMON STOCK DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE.

---

## A. VALUATION OF THE REORGANIZED DEBTORS

In connection with developing the Plan, the Debtors directed Miller Buckfire to estimate the Reorganized Debtors' going-concern value. In preparing the estimated total enterprise value range, Miller Buckfire: (i) reviewed certain historical financial information of the Debtors for recent years and interim periods; (ii) met with certain members of senior management of the Debtors to discuss the Debtors' operations and future prospects; (iii) reviewed publicly available financial data and considered the market values of public companies deemed generally comparable to the operating businesses of the Debtors; (iv) considered certain economic and industry information relevant to the Debtors' operating businesses; (v) reviewed certain analyses prepared by other firms retained by the Debtors; and (vi) conducted such other analyses as Miller Buckfire deemed appropriate.

Although Miller Buckfire conducted a review and analysis of the Debtors' businesses, operating assets and liabilities, and business plans, Miller Buckfire relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors and by other firms retained by the Debtors and publicly available information. No independent evaluations or appraisals of the Debtors' assets were sought or were obtained in connection therewith.

In performing its analysis, Miller Buckfire applied two commonly-accepted valuation methodologies: (i) the discounted cash flow methodology and (ii) the comparable public companies trading multiples methodology. The comparable companies trading multiples methodology involved identifying a group of publicly-traded companies whose businesses, operating characteristics and geographic footprints are generally similar to the Debtors'. Miller Buckfire then developed a range of valuation multiples to apply to the Debtors' financial projections to derive a range of implied enterprise values for the Reorganized Debtors. The discounted cash flow methodology involved deriving the unlevered free cash flows that the Reorganized Debtors would generate assuming the financial projections were realized. To determine the Reorganized Debtors' enterprise value range, these cash flows and an estimated enterprise value at the end of the projection period were discounted to an assumed Emergence Date of December 31, 2009, using the Reorganized Debtors' estimated weighted average cost of capital.

Miller Buckfire estimates the total enterprise value of the Reorganized Debtors to be between approximately $900 million and $1,050 million, as of an assumed Effective Date of December 31, 2009. The range of total equity value, which takes into account the total enterprise value less estimated net debt outstanding as of an assumed Effective Date of December 31, 2009, was estimated by Miller Buckfire to be between approximately $475 million and $625 million.

This valuation is based upon information available to, and analyses undertaken by, Miller Buckfire as of October 1, 2009, and reflects, among other factors discussed below, the Debtors' income statements and balance sheets, current financial market conditions and the inherent uncertainty today as to the achievement of the Debtors' financial projections prepared by the Debtors with the assistance of AlixPartners.

This valuation also reflects a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, achieving the forecasts reflected in the financial projections, the amount of available Cash, market conditions and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein.

Additionally, an estimate of total enterprise value is not entirely mathematical but, rather, involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Moreover, the value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business.

Further, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates; conditions in the financial markets; the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Chapter 11 Cases or by other factors not possible to predict. Accordingly, the total enterprise value ascribed in the analysis does not purport to be an estimate of the post reorganization market trading value. Such trading value may be materially different from the total enterprise value ranges associated with Miller Buckfire's valuation analysis. Indeed, there can be no assurance that any trading market will develop for the New Common Stock. Furthermore, in the event that the actual distributions in these Chapter 11 Cases differ from those the Debtors assumed in their recovery analysis, impaired classes Claims holders actual recoveries could be significantly higher or lower than estimated by the Debtors.

The estimate of total enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of their businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a businesses.

Because valuation estimates are inherently subject to uncertainties, neither the Debtors, Miller Buckfire, nor any other person assumes responsibility for their accuracy, but the Debtors believe the estimates have been prepared in good faith based on reasonable assumptions.

## B.    FINANCIAL PROJECTIONS

As further discussed in Section VI.A of this Disclosure Statement, the Debtors believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors. In connection with developing the Plan, and for purposes of determining whether the Plan satisfies the "feasibility" standard, the Debtors, with the assistance of AlixPartners, prepared the financial projections for the years of 2010 through 2014 set forth on **Exhibit D** (the "*Financial Projections*"). In general, as illustrated by the Financial Projections, the Debtors believe that with a significantly de-leveraged capital structure, the Reorganized Debtors will be viable. The Debtors believe that the Reorganized Debtors will have sufficient liquidity to fund obligations as they arise, thereby maintaining value. Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. The Debtors prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management.

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date. Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the Debtors including, without limitation, an increased risk of inability to meet sales forecasts and higher reorganization expenses. Additionally, the estimates and assumptions in the Financial Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies. They also are based on factors such as industry performance, general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control.

Because future events and circumstances may differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be greater or less, perhaps materially, than those contained in the Financial Projections.

**No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtors' ability to achieve the projected results. Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance.**

**The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments. The Debtors do not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out. The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.**

# VI.
## CONFIRMATION AND CONSUMMATION OF THE PLAN

**A.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment:  (a) made before the Confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan (*discussed in more detail in Section VI.A.1 below*).

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code  (*discussed in more detail in Section VI.A.4 below*).

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the Clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtors will pay quarterly fees no later than the last day of the calendar month, following the calendar quarter for which the fee is owed in each of the Debtors' Chapter 11 Cases for each quarter (including any fraction thereof), to the Office of the U.S. Trustee, until the case is converted or dismissed, whichever occurs first.

## 1. Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court must: (a) estimate the Cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's Chapter 11 Cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

Accordingly, the Cash amount that would be available for satisfaction of Claims (other than Secured Claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation. Such Cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the Debtors' business and the use of chapter 7 for purposes of a liquidation.

As described in more detail in the Liquidation Analysis attached hereto as **Exhibit E**, the Debtors believe that confirmation of the Plan will provide each Holder of an Allowed Claim in an Impaired Class with a greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code because, among other reasons, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale of the Debtors' assets and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution. In addition, distributions in chapter 7 cases may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Cases and the Claims against the Debtors. Thus, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to such Classes.

## 2. Feasibility Requirements

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of, or the need for further financial reorganization, of the debtor unless the plan contemplates such liquidation or reorganization. As mentioned above, the Debtors have analyzed their ability to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their businesses. As demonstrated by their Financial Projections, the Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code because (a) Confirmation is not likely to be followed by liquidation of the Reorganized Debtors or (b) the need for further financial reorganization of the Reorganized Debtors. The Financial Projections, together with the assumptions on which they are based, are attached hereto as **Exhibit D**.

In general, as illustrated by the Financial Projections, the Debtors believe that with the significantly de-leveraged capital structure provided under the Plan, the Reorganized Debtors should have sufficient cash flow and availability to pay and service their debt obligations and to fund operations. The Debtors believe that Confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

3.        **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

Claims in Classes 1, 2, 9 and 10 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan.

Claims in Classes 3, 4 and 5 are Impaired under the Plan, and as a result, the Holders of Claims in such Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

4.        **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

(a)        No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes. Accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

(b)        Fair and Equitable

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

- Secured Claims. The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- Unsecured Claims. The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

- Equity Interests. The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:

  o the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or

  o if the class does not receive the amount required in the paragraph directly above, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code in view of the deemed rejection by Classes 6, 7 and 8. To the extent that any of the Voting Classes vote to reject the Plan, the Debtors further reserve the right to seek (a) Confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) to modify the Plan in accordance with Article XII.A of the Plan.

Notwithstanding the deemed rejection by Classes 6, 7 and 8 (or any Class that votes to reject the Plan, if applicable) the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests. As to Classes 6, 7 and 8, there is no class of equal priority receiving more favorable treatment and no class that is junior to such a dissenting class will receive or retain any property on account of the claims or equity interests in such class. The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## B.     CONDITIONS FOR CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date so long as certain conditions precedent are satisfied or waived in accordance with the Article VIII.B of the Plan, including:

- the Bankruptcy Court shall have approved the Disclosure Statement in a manner acceptable to the Debtors, the Prepetition Agent and the Required Consenting Lenders;

- the Plan and Plan Supplement shall be acceptable to the Debtors, the Prepetition Agent and Required Consenting Lenders;

- the Confirmation Order shall have been entered and become a Final Order in a form and in substance reasonably satisfactory to the Debtors, the Prepetition Agent and Required Consenting Lenders;

- all documents and agreements necessary to implement the Plan shall have been tendered for delivery and effected or executed; and

- all actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

## C.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.    Liquidation Under Chapter 7 of the Bankruptcy Code

If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets.  A discussion of the effect that a chapter 7 liquidation would have on the recovery of holders of Claims is set forth in Section [___]. herein, titled "Statutory Requirements for Confirmation of the Plan."  In performing the liquidation analysis, the Debtors have assumed that all Holders of Claims will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation.  The Debtors believes that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

### 2.    Filing of an Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets.  During the negotiations prior to the filing of the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan enables the Debtors to emerge from chapter 11 successfully and expeditiously, preserves their business and allows creditors to realize the highest recoveries under the circumstances. In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed.  Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation.  Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors.  In any liquidation, creditors would be paid their distribution in Cash, whereas, under the Plan, some creditors will receive a part of their distribution in New Common Stock (if issued).

<div align="center">

**VII.**
**PLAN-RELATED RISK FACTORS**

</div>

> PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY EACH OF THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  WHILE NUMEROUS, THESE RISK FACTORS SHOULD <u>NOT</u> BE CONSTRUED AS THE ONLY RISKS RELATING TO THE DEBTORS' BUSINESSES AND/OR THE PLAN.

The following provides a summary of various important considerations and risk factors associated with the Plan.  However, it is not exhaustive.  In considering whether to vote for or against the Plan, Holders of Claims in Voting Classes should read and carefully consider the factors set forth below and all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.  In addition, Holders of Claims in Voting Classes should also review the detailed discussion of the various risks and other factors associated with the Debtors' businesses and operations generally set forth under the section entitled "Risk Factors" in Reader's Digest's Annual Report on Form 10-K for the fiscal year ended June 30, 2008, and Reader's Digest's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2009, copies of which can be obtained from the Debtors' investor relations website (http://phx.corporate-ir.net/phoenix.zhtml?c=71092&p=irol-IRhome) or the SEC's EDGAR system website (http://www.sec.gov/edgar.shtml).

**A.      RISKS RELATING TO CONFIRMATION OF THE PLAN**

**1.      The Debtors May Not Be Able to Secure Confirmation of the Plan.**

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan, and there can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will Confirm the Plan.  Moreover, Confirmation of the Plan is subject to the conditions set forth in Article VIII.A of the Plan, which may not be achieved.  Finally, although the Debtors believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

**2.      The Restructuring Support Agreement May Terminate.**

The parties to the Restructuring Support Agreement have agreed to support the Plan provided certain conditions are met.  To the extent that the terms or conditions of the Restructuring Support Agreement are not satisfied, or to the extent events of termination arise under the Restructuring Support Agreement, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituents.  Any such loss of support could adversely affect the Debtors' ability to Confirm and Consummate the Plan.

**B.      RISKS RELATING TO RECOVERIES UNDER THE PLAN**

**1.      The Recovery to Holders of Allowed Claims Can Not be Stated With Absolute Certainty.**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates regarding the anticipated future performance of the Reorganized Debtors, including, without limitation, their ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital, as well as assumptions concerning general business and economic conditions and overall industry performance and trends, which the Debtors are unable to control.  Should any or all of these assumptions or estimates ultimately prove to be incorrect or not materialize, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. Also, because the liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.

The Claims estimates set forth herein are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences may adversely affect the percentage recovery to Holders of such Allowed Claims under the Plan. Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the Debtors' control, including, without limitation, (a) the successful reorganization of the Debtors, (b) an assumed date for the occurrence of the Effective Date, (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections, (d) the Debtors' ability to maintain adequate liquidity to fund operations and (e) the assumption that capital and equity markets remain consistent with current conditions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect, which could affect the percentage recovery to Holders of such Allowed Claims under the Plan, in some instances adversely. Also, the estimated recoveries to Holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders the subordination of any Allowed Claims to other Allowed Claims, whether the Debtors object to the amount or classification of any Claim, whether the Debtors satisfy the requisite conditions to enter into the Exit Credit Agreement or New Second Priority Term Loan Agreement or whether, subject to the terms and conditions of the Plan, the Debtors are required to modify certain terms or conditions of the Plan in order to Confirm the Plan. The occurrence of contingencies that could affect distributions available to Holders of Allowed Claims under the Plan, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

2.  **The Value of New Common Stock Can Not be Stated With Absolute Certainty.**

On the Effective Date, 100% of the New Common Stock will be issued to the Prepetition Lenders on account of their Prepetition Credit Agreement Claims and 7.5% of the New Common Stock (on a fully-diluted basis) will be reserved for issuance (whether as restricted stock, options or warrants) in connection with the Management Equity Plan to be granted at the discretion of the New Board. If the New Board distributes such equity interests, or warrants or options to acquire such equity interests, pursuant to the Management Equity Plan, it is contemplated that such distributions will dilute the New Common Stock issued to the Prepetition Lenders on account of Claims under the Plan and the ownership percentage represented by the New Common Stock distributed under the Plan, including in connection with the Rights Offering.

It is likewise contemplated that shares of New Common Stock issued to participating Eligible Noteholders in connection with the Rights Offering, if any, will dilute the New Common Stock issued to the Prepetition Lenders on account of Allowed Prepetition Credit Agreement Claims under the Plan and the ownership percentage represented by the New Common Stock distributed under the Plan.

C.  **RISKS RELATING TO THE DEBTORS' BUSINESSES**

1.  **Prolonged Continuation of the Chapter 11 Cases Is Likely To Harm the Debtors' Business.**

The prolonged continuation of these Chapter 11 Cases is likely to adversely affect the Debtors' business and operations. So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations. Prolonged continuation of the Chapter 11 Cases will also make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors'

business. In addition, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings. The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing, either under the DIP Credit Agreement or otherwise, in order to service their debt and other obligations. It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all. If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

### 2. The Debtors Are Subject to Restrictive Covenants That Impair Their Business Operations.

The DIP Credit Agreement includes financial covenants that, among other things, require the Debtors to achieve a minimum amount of consolidated EBITDA (as defined in the DIP Credit Agreement) and maintain a minimum amount of liquidity. If the Debtors are unable to achieve the results that are contemplated in their business plan, they may fail to comply with these covenants. Furthermore, the DIP Credit Agreement contains limitations on the Debtors' ability, among other things, to incur additional indebtedness, make capital expenditures, pay dividends, make investments (including acquisitions) or sell assets. If the Debtors fail to comply with the covenants in the DIP Credit Agreement and are unable to obtain a waiver or amendment of the DIP Credit Agreement, an event of default will occur thereunder. The DIP Credit Agreement contains other events of defaults customary for debtor-in-possession financings.

The Exit Credit Agreement and Second Priority Term Loan Agreement may likely include various restrictive covenants. These covenants could restrict the Reorganized Debtors' ability to, among other things: incur additional debt; make certain investments; enter into certain types of transactions with affiliates; limit dividends or other payments by or among the Reorganized Debtors; use assets as security in other transactions; pay dividends on the New Common Stock or repurchase equity interests; sell certain assets or merge with or into other companies; guarantee the debts of others; enter into new lines of business; make capital expenditures; prepay, redeem or exchange the Reorganized Debtors' debt; and form any joint ventures or subsidiary investments.

The Exit Credit Agreement and Second Priority Term Loan Agreement could also contain financial covenants and tests could limit the Reorganized Debtors' ability to react to market conditions, satisfy any extraordinary capital needs or otherwise restrict the Reorganized Debtors' financing and operations, and could require the Reorganized Debtors to periodically meet various financial ratios and tests, including maximum leverage, minimum EBITDA and fixed charge coverage and interest coverage levels. If the Reorganized Debtors fail to comply with such covenants and terms, the Reorganized Debtors would be required to obtain waivers from their lenders to maintain compliance under their exit financing agreements, which, if not obtained, would have a material adverse effect on the Reorganized Debtors' financial condition and future operating performance.

### 3. The Chapter 11 Cases May Affect the Tax Liability of Reorganized Debtors.

As of June 30, 2009, Reader's Digest had an aggregate amount of net operating loss, capital loss, alternative minimum tax credits and foreign tax credit carryforwards in the United States of approximately $548 million, $0 million, $11 million and $156 million, respectively. In connection with the Debtors' emergence from these Chapter 11 Cases, it is likely that such tax attributes will be significantly reduced due to the cancellation of indebtedness income, with any remaining tax attributes subject to limitation under Sections 382 and 383 of the IRC. A full valuation allowance has been recorded against the deferred tax assets related to these tax attributes in the condensed consolidated balance sheets for the quarterly period ended June 30, 2009.

**Holders of Claims should carefully review Section VIII herein, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Chapter 11 Cases and treatment of Allowed Claims under the Plan could adversely affect the Reorganized Debtors and such Holders.**

**D.   DISCLOSURE STATEMENT DISCLAIMER**

**1.   No Representations Made Outside this Disclosure Statement Are Authorized.**

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes. Except as otherwise provided herein or in the Plan, no representations relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Creditors' Committee and the United States Trustee.

**2.   The Debtors Relied on Certain Exemptions from Registration Under the Securities Act.**

This Disclosure Statement has not been filed with the Commission or any state regulatory authority. Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful. This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.

The offer of New Common Stock under the Plan has not been registered under the Securities Act or similar state securities or "blue sky" laws. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable nonbankruptcy law, the issuance of the New Common Stock or any shares reserved for issuance under the Management Equity Plan, will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, Rule 701 promulgated under the Securities Act or a "no sale" under the Securities Act as described herein.

**3.   The Information Herein Was Provided by the Debtors and Relied Upon by Their Advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

**4.   No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

**5.      No Admissions Are Made by This Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interest or any other parties in interest. The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Claims and Equity Interest and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

**VIII.**
**CERTAIN U.S. FEDERAL INCOME**
**TAX CONSEQUENCES OF THE PLAN**

**A.     BRIEF OVERVIEW AND DISCLOSURE**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain U.S. Holders and Non-U.S. Holders (each as defined below) of claims.  The following summary does not address the U.S. federal income tax consequences to holders of claims who are unimpaired or otherwise entitled to payment in full in Cash under the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "*IRC*"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "*IRS*") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

For purposes of this discussion, the term "U.S. Holder" means a Holder of a Claim, the New Common Stock, the New First Priority Term Loan, the New Second Priority Term Loan, the Reinstated Euro Term Loan or Subscription Rights that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation, or entity treated as a corporation, organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election to be treated as a U.S. person for U.S. federal income tax purposes or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

For purposes of this discussion, a "Non-U.S. Holder" means a Holder of a Claim, the New Common Stock, the New First Priority Term Loan, the New Second Priority Term Loan, the Reinstated Euro Term Loan or Subscription Rights that is, for U.S. federal income tax purposes, (i) a nonresident alien individual, (ii) a non-U.S. corporation or (iii) a non-U.S. estate or non-U.S. trust.  This summary does not address all aspects of U.S. federal income taxes that may be relevant to Non-U.S. Holders in light of their personal circumstances, and does not deal with federal taxes other than the federal income tax or with non-U.S., state, local or other tax considerations. Special rules, not discussed here, may apply to certain Non-U.S. Holders, including U.S. expatriates, controlled foreign corporations, passive foreign investment companies and corporations that accumulate earnings to avoid U.S. federal income tax. Such Non-U.S. Holders should consult their own tax advisors to determine the U.S. federal, state, local and other tax consequences that may be relevant to them.  In the case of a holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partner or the partnership. If you are a partner of a partnership that is, or will be, a Holder of a Claim, the New Common Stock, the New First Priority Term Loan, the New Second Priority Term Loan, the Reinstated Euro Term Loan or Subscription Rights, then you should consult your own tax advisors.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders in light of their individual circumstances.  This discussion does not address tax issues with respect to such holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies and those holding, or who will hold, a Claim, the New Common Stock, the New First Priority Term Loan, the New Second Priority Term Loan, the Reinstated Euro Term Loan or Subscription Rights, as part of a hedge, straddle, conversion or constructive sale transaction).  No aspect of state, local, estate, gift or non-U.S. taxation is addressed.

The following discussion assumes that each Holder of a Claim holds its New Common Stock, New First Priority Term Loan, New Second Priority Term Loan, Reinstated Euro Term Loan or Subscription Rights, as applicable, as a "capital asset" within the meaning of Section 1221 of the IRC.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO YOU. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

B.    CONSEQUENCES TO THE DEBTORS

1.    Cancellation of Indebtedness and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any new consideration given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to Section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) net operating losses ("**NOLs**"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC , though it has not been determined whether the Debtors would make this election. In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.

Because the Plan provides that holders of certain Claims will receive shares of the New Common Stock, the New First Priority Term Loan, the New Second Priority Term Loan, the Reinstated Euro Term Loan and/or Subscription Rights, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Common Stock and Subscription Rights, and the issue price of the New First Priority Term Loan, the New Second Priority Term Loan and the Reinstated Euro Term Loan. This value cannot be known with certainty until after the Effective Date. Following this reduction, the Debtors expect that, subject to the limitations discussed herein and subject to whether the Debtors decide to reduce first the basis in their depreciable assets, they may not have NOL carryforwards remaining after emergence from chapter 11, but will have other significant tax attributes remaining.

The American Recovery and Reinvestment Act of 2009 permits the Debtors to elect to defer the inclusion of COD Income, with the amount of COD Income becoming includible in the income of the electing Debtors ratably over a five-taxable year period beginning in the fifth taxable year after the COD Income arises. The collateral tax consequences of making such election are complex. The Debtors currently are analyzing whether to make the deferral election.

## 2. Limitation of NOL Carryforwards and Other Tax Attributes

The amount of the Debtors' tax attributes that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available tax attributes include: (a) the amount of tax losses incurred by the Debtors in 2009; (b) the fair market value of the New Common Stock and Subscription Rights, and the issue price of the New First Priority Term Loan, the New Second Priority Term Loan and the Reinstated Euro Term Loan; and (c) the amount of COD Income incurred by the Debtors in connection with consummation of the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and built-in losses (collectively, "**_Pre-Change Losses_**") that may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed in greater detail herein, the Debtors anticipate that the issuance of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies.

(a)     General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "**_Section 382 Limitation_**." In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (approximately 4.48% for the month of October 2009). If the Company is in a net unrealized built in gain position, the Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Common Stock, along with the cancellation of existing Equity Interests through the Plan, is expected to cause an ownership change with respect to the Debtors on the Effective Date. As a result, unless an exception applies, Section 382 of the IRC will apply to limit the Debtors' use of any remaining Pre-Change Losses after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

(b)     Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**_382(l)(5) Exception_**"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "***382(l)(6) Exception***").  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of any Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date.

3.     **Alternative Minimum Tax**

In general, an alternative minimum tax ("***AMT***") is imposed on a corporation's alternative minimum taxable income ("***AMTI***") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in 2001 and 2002, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards.

Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change.

C.     **CONSEQUENCES TO U.S. HOLDERS OF ALLOWED CLAIMS**

1.     **Holders of Allowed Prepetition Credit Agreement Claims**

The following discussion assumes that each U.S. Holder of an Allowed Prepetition Credit Agreement Claim holds such Claim as a "capital asset" within the meaning of Section 1221 of the IRC.  Pursuant to the Plan, each U.S. Holder of such Allowed Prepetition Credit Agreement Claim shall receive its Pro Rata share of the New Second Priority Term Loan, the Reinstated Euro Term Loan and the New Common Stock, as further described above.

(a)     Exchange of an Allowed Prepetition Credit Agreement Claim for New Common Stock

Whether a U.S. Holder of an Allowed Prepetition Credit Agreement Claim recognizes gain or loss as a result of the exchange of its Claim for New Common Stock depends on whether (i) the exchange qualifies as an exchange described in Section 351 of the IRC (each, a "***Section 351 Exchange***"), (ii) the U.S. Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Prepetition Credit Agreement Claim, (iii) the U.S. Holder has claimed a bad debt deduction or worthless security deduction with respect to such Allowed Prepetition Credit Agreement Claim and (iv) the U.S. Holder uses the accrual or cash method of accounting for tax purposes.

(i) *Treatment of a U.S. Holder of an Allowed Prepetition Credit Agreement Claim if the Exchange of its Claim for New Common Stock is Treated as a Section 351 Exchange*

The exchange of a U.S. Holder's Prepetition Credit Agreement Claim for New Common Stock is expected to be treated as a Section 351 Exchange, in which case a U.S. Holder of a surrendered Allowed Prepetition Credit Agreement Claim will recognize gain, but not loss, on the exchange. Specifically, the U.S. Holder will recognize (a) capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the amount of property other than stock treated as received in the exchange, and (b) ordinary interest income to the extent that the New Common Stock is treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the Allowed Prepetition Credit Agreement Claim (see "Accrued Interest" discussion below). In such case, a U.S. Holder's tax basis in its New Common Stock should be equal to the tax basis of the obligation constituting the Allowed Prepetition Credit Agreement Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of property other than stock treated as received in the exchange), and a U.S. Holder's holding period for its New Common Stock should include the holding period for the obligation constituting the surrendered Allowed Prepetition Credit Agreement Claim; *provided*, *however*, to the extent that any New Common Stock is treated as received in satisfaction of accrued but untaxed interest the tax basis of such New Common Stock should equal the amount of such accrued but untaxed interest, and the holding period for such New Common Stock should not include the holding period of the debt instrument constituting the surrendered Allowed Prepetition Credit Agreement Claim (*see* "Accrued Interest" discussion below).

(ii) *Treatment of a U.S. Holder of an Allowed Prepetition Credit Agreement Claim if the Exchange of its Claim for New Common Stock is Not Treated as a Section 351 Exchange*

If the exchange of an Allowed Prepetition Credit Agreement Claim for New Common Stock is not treated as a Section 351 Exchange, then a U.S. Holder of such a Claim should be treated as exchanging its Allowed Prepetition Credit Agreement Claim for New Common Stock in a fully taxable exchange. A U.S. Holder of an Allowed Prepetition Credit Agreement Claim who is subject to this treatment should recognize gain or loss equal to the difference (positive or negative) between (a) the fair market value of the shares of New Common Stock it receives in the exchange that is not allocable to accrued interest and (b) the U.S. Holder's adjusted tax basis in the obligation constituting the surrendered Allowed Prepetition Credit Agreement Claim treated as exchanged for New Common Stock. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Prepetition Credit Agreement Claim exchanged for New Common Stock were held for more than one year. To the extent that a portion of the New Common Stock is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income. See "Accrued Interest" below. A U.S. Holder's tax basis in the shares of New Common Stock received on the Effective Date should equal the fair market value of the shares of New Common Stock as of the Effective Date. A U.S. Holder's holding period for the New Common Stock received on the Effective Date should begin on the day following the Effective Date.

(iii) *Accrued Interest*

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income. Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.

Pursuant to the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

<p style="text-align:center">(iv) <em>Market Discount</em></p>

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

<p style="text-align:center">(b) <u>Exchange of an Allowed Prepetition Credit Agreement Claim for New Second Priority Term Loan or Reinstated Euro Term Loan</u></p>

Whether a U.S. Holder of an Allowed Prepetition Credit Agreement Claim recognizes gain or loss as a result of the exchange of its Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan depends on whether (i) the exchange qualifies as a tax-free recapitalization (which in turn depends on whether the debt underlying the Allowed Prepetition Credit Agreement Claim surrendered for the New Second Priority Term Loan or the Reinstated Euro Term Loan is treated as a "security" for the reorganization provisions of the IRC (see "Treatment of a Debt Instrument as a 'Security'" below)), (ii) the U.S. Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Prepetition Credit Agreement Claim, (iii) the U.S. Holder has claimed a bad debt deduction or worthless security deduction with respect to such Allowed Prepetition Credit Agreement Claim and (iv) the U.S. Holder uses the accrual or cash method of accounting for tax purposes.

<p style="text-align:center">(i) <em>Treatment of a Debt Instrument as a "Security"</em></p>

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U. S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued. Each U.S. Holder of an Allowed Prepetition Credit Agreement Claim should consult with its own tax advisor to determine whether or not the debt underlying its Allowed Prepetition Credit Agreement Claim is a "security" for U.S. federal income tax purposes.

*(ii)* *Treatment of a U.S. Holder of an Allowed Prepetition Credit Agreement Claim if the Exchange of its Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan is Treated as a Reorganization*

If a debt instrument constituting a surrendered Allowed Prepetition Credit Agreement Claim and the New Second Priority Term Loan or the Reinstated Euro Term Loan, as applicable, received in exchange therefor are each treated as a "security" for U.S. federal income tax purposes, the exchange of such Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan is expected to qualify as a recapitalization, and therefore a reorganization, under the IRC. If the exchange qualifies as a reorganization, the U.S. Holder of a surrendered Allowed Prepetition Credit Agreement Claim will recognize gain, but not loss, on the exchange. Specifically, the U.S. Holder will recognize (a) capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the amount of "other property" (*i.e.*, property that is not a "security" for U.S. federal income tax purposes and "securities" to the extent that the principal amount of securities received exceeds the principal amount of securities surrendered) treated as received in the exchange, and (b) ordinary interest income to the extent that the New Second Priority Term Loan or the Reinstated Euro Term Loan is treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the Allowed Prepetition Credit Agreement Claim (*see* "Accrued Interest" discussion above).

In such case, a U.S. Holder's tax basis in its New Second Priority Term Loan or its Reinstated Euro Term Loan should be equal to the tax basis of the obligation constituting the Allowed Prepetition Credit Agreement Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of "other property" treated as received in the exchange), and a U.S. Holder's holding period for its New Second Priority Term Loan or its Reinstated Euro Term Loan should include the holding period for the obligation constituting the surrendered Allowed Prepetition Credit Agreement Claim; *provided*, *however*, to the extent that the New Second Priority Term Loan or the Reinstated Euro Term Loan is treated as received in satisfaction of accrued but untaxed interest the tax basis of such New Second Priority Term Loan or Reinstated Euro Term Loan should equal the amount of such accrued but untaxed interest, and the holding period for such New Second Priority Term Loan or Reinstated Euro Term Loan should not include the holding period of the debt instrument constituting the surrendered Allowed Prepetition Credit Agreement Claim (*see* "Accrued Interest" discussion above).

*(iii)* *Treatment of a U.S. Holder of an Allowed Prepetition Credit Agreement Claim if the Exchange of its Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan is Not Treated as a Reorganization*

If the exchange of an Allowed Prepetition Credit Agreement Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan is not treated as a Reorganization, then a U.S. Holder of such a Claim should be treated as exchanging its Allowed Prepetition Credit Agreement Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan in a fully taxable exchange. A U.S. Holder of an Allowed Prepetition Credit Agreement Claim who is subject to this treatment should recognize gain or loss equal to the difference (positive or negative) between (a) the issue price of the New Second Priority Term Loan or the Reinstated Euro Term Loan it receives in the exchange that is not allocable to accrued interest and (b) the U.S. Holder's adjusted tax basis in the obligation constituting the surrendered Allowed Prepetition Credit Agreement Claim treated as exchanged for the New Second Priority Term Loan or the Reinstated Euro Term Loan. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Prepetition Credit Agreement Claim exchanged for the New Second Priority Term Loan or the Reinstated Euro Term Loan were held for more than one year. To the extent that a portion of the New Second Priority Term Loan or the Reinstated Euro Term Loan is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income (*see* "Accrued Interest" above). A U.S. Holder's tax basis in the shares of the New Second Priority Term Loan or the Reinstated Euro Term Loan received on the Effective Date should equal the issue price of the New Second Priority Term Loan or the Reinstated Euro Term Loan as of the Effective Date. A U.S. Holder's holding period for the New Second Priority Term Loan or the Reinstated Euro Term Loan received on the Effective Date should begin on the day following the Effective Date.

The determination of "issue price" for purposes of this analysis will depend, in part, on whether the debt instruments issued to a U.S. Holder or the property surrendered under the Plan are traded on an "established securities market" at any time during the 60-day period ending 30 days after the Effective Date. In general, a debt instrument (or the stock or securities exchanged therefor) will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems, or (iii) certain qualifying non-U.S. securities exchanges; (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value; or (c) in certain situations the price quotations are readily available from dealers, brokers or traders. The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading. The issue price of a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS).

## 2. Holders of Allowed Other General Unsecured Claims

Pursuant to the Plan, each U.S. Holder of an Allowed Other General Unsecured Claim shall receive their Pro Rata share of the Other General Unsecured Claims Distribution, as further described above. Such exchange should be treated as a taxable exchange under Section 1001 of the IRC. The U.S. Holder should recognize capital gain or loss equal to the difference between (i) the Cash received and (ii) the U.S. Holder's adjusted tax basis in its claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described above) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Other General Unsecured Claim were held for more than one year. To the extent that a portion of the Allowed Other General Unsecured Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income. See "Accrued Interest" above.

## D. CONSEQUENCES TO NON-U.S. HOLDERS OF ALLOWED CLAIMS

Any gain or interest income realized by a Non-U.S. Holder on the exchange of its claim generally will be exempt from U.S. federal income or withholding tax, provided that:

- such Non-U.S. Holder does not own, actually or constructively, 10 percent or more of the total combined voting power of all classes of the voting stock of RDA Holding, is not a controlled foreign corporation related, directly or indirectly, to RDA Holding through stock ownership, and is not a bank receiving interest described in Section 881(c)(3)(A) of the IRC;

- the statement requirement set forth in Section 871(h) or Section 881(c) of the IRC has been fulfilled with respect to the beneficial owner, as discussed below;

- such Non-U.S. Holder is not an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; and

- such gain or interest income is not effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States.

The statement requirement referred to in the preceding paragraph will generally be fulfilled if the beneficial owner of the property or Cash received on the exchange certifies on IRS Form W-8BEN (or such successor form as the IRS designates) under penalties of perjury that it is not a U.S. person and provides its name and address. The Non-U.S. Holder must provide the form to the Debtors or their paying agent, or in the case of a note held through a securities clearing organization, bank or other financial institution holding customers' securities in the ordinary course of its trade or business, to such organization, bank or other financial institution, which must in turn provide to the Debtors or their paying agent a statement that it has received the form and furnish a copy thereof; *provided*, that a non-U.S. financial institution will fulfill this requirement by filing IRS Form W-8IMY if it has entered into an agreement with the IRS to be treated as a qualified intermediary. These forms must be periodically updated.

If a Non-U.S. Holder is engaged in a trade or business in the United States, and if any gain or interest income realized on the exchange of its claim is effectively connected with the conduct of such trade or business, the Non-U.S. Holder, although exempt from the withholding tax discussed in the preceding paragraphs, will generally be subject to regular U.S. federal income tax on such gain or interest income in the same manner as if it were a U.S. Holder. In lieu of the certificate described in the preceding paragraph, such a Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates), in the manner described above, in order to claim an exemption from withholding tax. In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

## E.      CONSEQUENCES TO RIGHTS OFFERING PARTICIPANTS

The following discussion assumes that each U.S. Holder of an Allowed Senior Subordinated Note Claim holds such claim as a "capital asset" within the meaning of Section 1221 of the IRC.  Pursuant to the Plan, each Allowed Senior Subordinated Note Claim will be cancelled without any distribution, as further described above. Certain Holders of an Allowed Senior Subordinated Note Claim will receive Subscription Rights.  Section 165(g) of the IRC permits a "worthless security deduction" for any security that is a capital asset that becomes worthless within the taxable year.  Thus, depending in the case of U.S. Holders of Allowed Senior Subordinated Note Claims that receive Subscription Rights on whether the issuance of a Subscription Right is treated as a distribution of an independent piece of property and other factors, U.S. Holders of an Allowed Senior Subordinated Note Claim may be entitled to worthless security deductions.  The rules governing the timing, amount and character (ordinary or capital) of worthless security deductions place considerable emphasis on the facts and circumstances of the holder, the issuer, and the instrument with respect to which the deduction is claimed; U.S. Holders are therefore urged to consult their tax advisors with respect to their ability to take such a deduction.

The tax treatment of receipt of Subscription Rights by a U.S. Holder of an Allowed Senior Subordinated Note Claim is unclear.  The issuance of, and the exercise of or failure to exercise, the Subscription Rights could be treated as an independent transaction for U.S. federal income tax purposes and not as a transaction that is integrated with any of the exchanges described herein.  If so treated, a U.S. Holder that exercises a Subscription Right could be treated as directly exchanging the subscription price for the New Common Stock allocable to such Subscription Right in an exchange in which such U.S. Holder recognizes no gain or loss.  Such U.S. Holder would then have a tax basis in the New Common Stock received upon exercise of the Subscription Rights equal to the subscription price paid therefor.  In light of the fact that the Subscription Rights are non-transferable and must be exercised, if at all, only at emergence, the Debtors intend to treat the issuance and exercise or failure to exercise the Subscription Rights as an independent transaction not integrated with the distributions under the Plan for U.S. federal income tax purposes.

If the issuance of the Subscription Rights is treated as a distribution of an independent piece of property under the Plan, whether a U.S. Holder of an Allowed Senior Subordinated Note Claim recognizes gain or loss as a result of receipt of Subscription Rights depends on whether (i) the exchange qualifies as a tax-free recapitalization (which in turn depends on whether each of the debt underlying the Allowed Senior Subordinated Note Claim (see "Treatment of a Debt Instrument as a 'Security'" above) and the Subscription Right (by reason of its being a right to acquire New Common Stock or otherwise) is treated as a "security" for the reorganization provisions of the IRC), (ii) the U.S. Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Senior Subordinated Note Claim, (iii) the U.S. Holder has claimed a bad debt deduction or worthless security deduction with respect to such Allowed Senior Subordinated Note Claim and (iv) the U.S. Holder uses the accrual or cash method of accounting for tax purposes.

If the distribution of the Subscription Rights to a U.S. Holder of an Allowed Senior Subordinated Note Claim is treated as a taxable exchange, then each such U.S. Holder will recognize gain or loss in an amount equal to the difference (positive or negative) between (i) the fair market value of the Subscription Rights received by such U.S. Holder under the Plan, and (ii)  the U.S. Holder's tax basis in its Allowed Senior Subordinated Note Claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described above) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Senior Subordinated Note Claim were held for more than one year.  To the extent that a portion of the Allowed Senior Subordinated Note Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income  (see "Accrued Interest" above).

The aggregate tax basis of the Subscription Rights received would be the fair market value of the Subscription Rights on the date of the exchange, and the holding period for the Subscription Rights would begin on the day after the exchange. If a U.S. Holder of an Allowed Senior Subordinated Note Claim allows a Subscription Right received under the Plan to expire, it should recognize capital loss equal to its basis (if any) in such expiring Subscription Rights.

If both a Subscription Right and the debt underlying the Allowed Senior Subordinated Note Claim are treated as a "security" for U.S. federal income tax purposes, the receipt of such Subscription Right should qualify as a recapitalization, and therefore a reorganization, under the IRC. If the exchange qualifies as a reorganization, the U.S. Holder of a surrendered Allowed Senior Subordinated Note Claim will recognize gain, but not loss, on the exchange. Specifically, the U.S. Holder will recognize (a) capital gain, subject to the "market discount" rules discussed above, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the amount of "other property" (i.e., property that is not a "security" for U.S. federal income tax purposes and "securities" to the extent that the principal amount of securities received exceeds the principal amount of securities surrendered) treated as received in the exchange, and (b) ordinary interest income to the extent that the Subscription Right is treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the Allowed Senior Subordinated Note Claim (see "Accrued Interest" discussion above).

In such case, a U.S. Holder's tax basis in its Subscription Right should be equal to the tax basis of the obligation constituting the Allowed Senior Subordinated Note Claim treated as surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of "other property" treated as received in the exchange), and a U.S. Holder's holding period for its Subscription Right should include the holding period for the obligation constituting the surrendered Allowed Senior Subordinated Note Claim; provided, however, to the extent that the Subscription Right is treated as received in satisfaction of accrued but untaxed interest the tax basis of such Subscription Right should equal the amount of such accrued but untaxed interest, and the holding period for such Subscription Right should not include the holding period of the debt instrument constituting the surrendered Allowed Senior Subordinated Note Claim.

**F.      WITHHOLDING AND REPORTING**

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a holder of a claim. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. Additionally, backup withholding of taxes, currently at a rate of 28%, will apply to such payments if a U.S. Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

# IX.
## GLOSSARY OF DEFINED TERMS

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document will be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed will mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with the terms of such document or exhibit and subject to the Restructuring Support Agreement; (d) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof" and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (f) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

Unless the context otherwise requires, the following terms will have the following meanings when used in capitalized form herein:

1. "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent and/or unpaid fees and expenses (including, without limitation, Allowed success fees and Allowed Professional Compensation) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and Allowed under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date by any Retained Professionals in the Chapter 11 Cases, or that are awardable and allowable under section 503(b)(3)(F) of the Bankruptcy Code for the Creditors' Committee, that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not been previously paid regardless of whether a fee application has been filed for any such amount. To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Retained Professional's fees or expenses or Creditors' Committee Member's expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

2. "*Adequate Protection Claims*" shall have the meaning ascribed to "Section 507(b) Claims" as defined in paragraph 13(b) of the Final DIP Order.

3. "*Administrative Claim*" means a Claim (other than the Adequate Protection Claims and DIP Facility Claims) that has been timely filed, pursuant to the deadline and procedure set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court), for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Accrued Professional Compensation (to the extent Allowed by the Bankruptcy Court); and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911 1930. Administrative Claims do not include DIP Facility Claims, which are separately treated under the Plan.

4. "*Affiliate*" has the meaning set forth at section 101(2) of the Bankruptcy Code.

5. "*Allowed*" means, with respect to Claims: (a) any Claim, proof of which is timely filed by the applicable Claims Bar Date or which, pursuant to the Bankruptcy Code or a Final Order is not required to be filed; (b) any Claim that is listed in the Schedules as of the Effective Date as neither contingent, unliquidated or disputed, and for which no Proof of Claim has been timely filed; or (c) any Claim Allowed pursuant to the Plan; *provided*, *however,* that with respect to any Claim described in clause (a) above, such Claim shall be considered Allowed only if and to the extent that with respect to any Claim no objection to the allowance thereof has been interposed within

the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court or such an objection is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval of the Bankruptcy Court.

6. "*Amended and Restated Bylaws*" means the bylaws of Reorganized Holdings, substantially in the form included in the Plan Supplement.

7. "*Amended and Restated Certificate of Incorporation*" means the certificates of incorporation of the Reorganized Debtors, substantially in the form included in the Plan Supplement.

8. "*Avoidance Actions*" means any and all claims and causes of action which any of the Debtors, the debtors in possession, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

9. "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

10. "*Bankruptcy Code*" means Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

11. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York.

12. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

13. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

14. "*Case Management Order*" means that certain Order Establishing Certain Notice, Case Management and Administrative Procedures, entered by the Bankruptcy Court on September 17, 2009 [Docket No. 92].

15. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

16. "*Causes of Action*" means all actions, causes of action (including Avoidance Actions), Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Cases, including through the Effective Date.

17. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

18. "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

19.     "*Claims Bar Date*" means, as applicable, (a) 5:00 p.m. prevailing Pacific Time on November 16, 2009, (b) the Governmental Bar Date or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for filing such Claims.

20.     "*Claims Objection Bar Date*" means, for each Claim, the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims, as the same may be modified or extended from time to time by the Bankruptcy Court.

21.     "*Claims Register*" means the official register of Claims maintained by the Voting and Claims Agent.

22.     "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

23.     "*Commencement Date*" means August 24, 2009, the date on which the Debtors commenced the Chapter 11 Cases.

24.     "*Commission*" means the United States Securities and Exchange Commission.

25.     "*Compensation and Benefits Programs*" means all employment and severance policies, and all compensation and benefit plans, policies and programs and other arrangements (and all amendments and modifications thereto), in each case in place as of the Effective Date, applicable to the Debtors' employees, former employees, retirees and non-employee directors and employees, former employees and retirees of their subsidiaries, including, without limitation, all savings plans, retirement plans (other than the Non-Qualified Retirement Plans), health care plans, disability plans, severance benefit plans, incentive plans and life, accidental death and dismemberment insurance plans.

26.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article VII of the Plan having been:  (a) satisfied; or (b) waived pursuant to Article VII of the Plan.

27.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

28.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

29.     "*Confirmation Order*" means the order, in form and in substance reasonably satisfactory to the Debtors, the Prepetition Agent and the Required Consenting Lenders, of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30.     "*Consenting Lenders*" means those Prepetition Lenders party to the Restructuring Support Agreement.

31.     "*Consenting Shareholders*" means those Holders of Equity Interests party to the Restructuring Support Agreement.

32.     "*Consummation*" means the occurrence of the Effective Date.

33.     "*Contract/Lease Schedule Date*" means the latest date by which the Debtors shall file their list of Executory Contracts and Unexpired Leases to be rejected pursuant to the Plan, which shall be no later than [__] days prior to the Confirmation Hearing.

34.     "*Creditors' Committee*" means the official committee of unsecured creditors of the Debtors appointed by the Office of the United States Trustee for the Southern District of New York in the Chapter 11 Cases on August 31, 2009, pursuant to section 1102 of the Bankruptcy Code, comprising the Creditors' Committee Members and as reconstituted from time to time.

35. "*Creditors' Committee Members*" means the members of the Creditors' Committee as may be modified from time to time, namely: (a) The Bank of New York Mellon, (b) Wilfrid Aubrey LLC, (c) Thomas M. Kenney, (d) RR Donnelley & Sons Company, (e) Madison Paper Company (ALSIP Location), (f) Williams Lea, Inc., (g) New Page Corporation, (h) Michael John Bohane, (i) Peter Davenport, (j) Ross Jones and (k) HCL Technologies, Ltd.

36. "*Cure*" means the payment of Cash by the applicable Debtors, or the distribution of other property (as the applicable Debtors and the counterparty to the Executory Contract or Unexpired Lease may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (b) permit the Debtors to assume such Executory Contract or Unexpired Lease under sections 365 and 1123 of the Bankruptcy Code.

37. "*Cure Objection Deadline*" means the deadline for filing requests for payment of Cure, which shall be the later of: (a) thirty (30) days after the Effective Date or (b) thirty (30) days after the assumption or assumption and assignment of the applicable Executory Contract or Unexpired Lease, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors and the counterparty to the applicable Executory Contract or Unexpired Lease.

38. "*Debtor*" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

39. "*Debtors in Possession*" means, collectively, the Debtors, as debtors in possession in these Chapter 11 Cases.

40. "*DIP Agent*" means JPMorgan Chase Bank, N.A., in its capacity as syndication agent, administrative agent and collateral agent pursuant to the DIP Facility.

41. "*DIP Facility*" means that certain $150 million Credit and Guarantee Agreement, dated as of August 26, 2009, among The Reader's Digest Association, Inc., as borrower, and RDA Holding Co. and each direct and indirect, existing and future domestic subsidiary of The Reader's Digest Association, Inc., as guarantors, the DIP Agent, J.P. Morgan Securities Inc., as sole lead arranger and sole bookrunner, General Electric Capital Corporation, as senior managing agent, and the DIP Lenders, as may be amended, modified, ratified, extended, renewed, restated or replaced.

42. "*DIP Facility Claim*" means any Claim arising under or related to the DIP Facility.

43. "*DIP Lenders*" means the DIP Agent and the banks, financial institutions and other lenders party to the DIP Facility from time to time.

44. "*Disclosure Statement*" means the *Disclosure Statement for the Proposed Joint Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, the Disclosure Statement Order and any other applicable law, and which is reasonably satisfactory to the Prepetition Agent and the Required Consenting Lenders in all material respects.

45. "*Disclosure Statement Order*" means that certain *Order Approving the Debtors' Disclosure Statement and Relief Related Thereto*, entered by the Bankruptcy Court on [TO COME], as the order may be amended from time to time, and which shall be in form and substance satisfactory to the Prepetition Agent and the Required Consenting Lenders.

46. "*Disputed Claim*" means, with respect to any Claim, any Claim that is not yet Allowed.

47. "*Distribution Agent*" means any Entity or Entities chosen by the Debtors, which Entities may include, without limitation, the Voting and Claims Agent, to make or to facilitate distributions required by the Plan.

48.     "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Voting Deadline or such other date as designated in an order of the Bankruptcy Court.

49.     "*D&O Liability Insurance Policies*" means all insurance policies for directors and officers' liability maintained by the Debtors as of the Commencement Date.

50.     "*DTC*" means Depository Trust Company.

51.     "*Effective Date*" means the day that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article VIIA. of the Plan have been: (i) satisfied; or (ii) waived pursuant to Article VII.B of the Plan.

52.     "*Eligible Noteholder*" means any Holder of Senior Subordinated Notes that is an "Accredited Investor" within the meaning defined in Rule 501 of Regulation D promulgated under the Securities Act or a "Qualified Institutional Buyer" within the meaning defined in Rule 144A promulgated under the Securities Act.

53.     "*Enterprise Value Maximization Plan*" means that certain compensation plan set forth in the Plan Supplement to be adopted on the Effective Date.

54.     "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

55.     "*Equity Interest*" means any issued or unissued share of common stock, preferred stock or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, including section 510(b) Claims; *provided, however,* that Equity Interest does not include any Intercompany Interest.

56.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

57.     "*Exculpated Parties*" means, collectively: (a) the Reorganized Debtors; and (b) the Released Parties.

58.     "*Exculpation*" means the exculpation provision set forth in Article IX.G of the Plan.

59.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

60.     "*Exit Credit Agreement*" means an agreement substantially in the form set forth in the Plan Supplement on account of (a)(i) the New First Priority Term Loan or (ii) an alternative exit-financing facility provided that the DIP Facility is paid in full in Cash on the Effective Date and (b) the Reinstated Euro Term Loan.

61.     "*Final DIP Order*" means that certain Final Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral and (III) Granting Adequate Protection to Prepetition Secured Lenders, entered by the Bankruptcy Court on October 7, 2009 [Docket No. 152], as the order may be amended from time to time in accordance with the terms thereof and the DIP Facility.

62.     "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided, however,* that the possibility that a motion under Rule 60 of the Federal Rules of

Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

63. "*GAAP*" means generally accepted accounting principles.

64. "*Governmental Bar Date*" means 4:00 p.m. prevailing Pacific Time on February 20, 2010.

65. "*Holder*" means an Entity holding a Claim or an Equity Interest.

66. "*Impaired*" means any Claim in an Impaired Class.

67. "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

68. "*Indemnification Obligation*" means a Debtor's obligation under an Executory Contract assumed in the Chapter 11 Cases or otherwise to indemnify directors, officers, employees or agents of such Debtor who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacitates, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by such Debtor's respective certificate of incorporations, certificates of formation, bylaws, similar corporate documents and applicable law, as in effect as of the Effective Date.

69. "*Indenture Trustee*" means The Bank of New York Mellon as indenture trustee with respect to the Senior Subordinated Notes.

70. "*Initial Distribution Date*" means the date that is as soon as practicable after the Effective Date, but no later than  thirty (30) days after the Effective Date, when distributions under the Plan shall commence.

71. "*Intercompany Claim*" means, collectively, any Claim held by a Debtor against another Debtor or an Affiliate of a Debtor or any Claim held by an Affiliate of a Debtor against a Debtor.

72. "*Intercompany Interest*" means an Equity Interest in a Debtor held by another Debtor.

73. "*Interest*" means, together, Equity Interests and Intercompany Interests.

74. "*Interim Compensation Order*" means an order of the Bankruptcy Court allowing Retained Professionals to seek interim compensation in accordance with the procedures approved therein, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Retained Professional or otherwise.

75. "*Letters of Credit*" means the letters of credit referenced in paragraph 13(c) of the Final DIP Order.

76. "*Management Equity Plan*" means that certain post-Effective Date director and officer compensation program to be approved and implemented by the New Board as set forth in Article IV.L of the Plan. Equity awards in the form of restricted stock, options or warrants for 7.5% of the New Common Stock to be issued under the Plan will be allocated to the  Management Equity Plan (on a fully-diluted basis); *provided* that such equity grant shall not include more than 2.5% in the form of restricted New Common Stock.

77. "*New Board*" means the initial board of directors of Reorganized Holdings and RDA Inc., which shall initially be mirror boards.

78. "*New Common Stock*" means the common equity in Reorganized Holdings to be authorized, issued or reserved on the Effective Date pursuant to the Plan, which shall constitute all of the direct or indirect common equity of Reorganized Holdings.

79. "*New First Priority Term Loan*" means the first priority term loan facility to be converted from the DIP Facility in an amount equal to the aggregate amount, up to a maximum amount of $150 million, of loans outstanding under the DIP Facility on the date of conversion, to be issued on the Effective Date pursuant to the Exit Credit Agreement on terms consistent with those set forth on Annex 1 to the Restructuring Term Sheet.

80.     "*New Second Priority Term Loan*" means that certain $300 million second priority term loan facility having a maturity not earlier than the latest to occur of the maturity of the New First Priority Term Loan and the maturity of the Reinstated Euro Term Loan, to be issued on the Effective Date pursuant to the New Second Priority Term Loan Agreement on terms consistent with those set forth on Annex 1 to the Restructuring Term Sheet.

81.     "*New Second Priority Term Loan Agreement*" means that certain $300 million second lien term loan agreement among The Reader's Digest Association, Inc., as borrower, and RDA Holding Co. and each direct and indirect, existing and future domestic subsidiary of The Reader's Digest Association, Inc., as guarantors, and the Holders of Prepetition Credit Agreement Claims, substantially in the form of the agreement set forth in the Plan Supplement.

82.     "*Non-Qualified Retirement Plans*" means the Debtors' unfunded, non-qualified retirement plans or deferred compensation arrangements, including, but not limited to, the plans or arrangements known as (i) the Excess Benefit Retirement Plan, (ii) the Executive Retirement Plan, (iii) the Executive Cash Balance Plan, (iv) the 1988 Supplemental Employee Retirement Plan and related agreements, (v) the Director and Roving Editors Plan and/or related agreements or arrangements, and (vi) the Reader's Digest Deferred Compensation Plan or deferred compensation arrangements provided by any other Debtor.

83.     "*Noticing and Claims Agent*" means Kurtzman Carson Consultants LLC, in its capacity as notice, claims and balloting agent for the Debtors, pursuant to that certain *Order Authorizing and Approving the Retention of Kurtzman Carson Consultants LLC as Notice and Claims Agent*, entered by the Bankruptcy Court on August 28, 2009, [Docket No. 44].

84.     "*Other General Unsecured Claim*" means any unsecured Claim, other than Unsecured Ongoing Operations Claims and Senior Subordinated Note Claims, against one or more of the Debtors including, but not limited to (a) Claims arising from the rejection of Unexpired Leases and Executory Contracts to which a Debtor is a party, (b) claims arising from the rejection or termination of the Debtors' Non-Qualified Retirement Plans and (b) Claims arising from any litigation or other court, administrative or regulatory proceeding, including, without limitation, damages or judgments entered against, or settlement amounts owing by a Debtor related thereto.

85.     "*Other General Unsecured Claims Distribution*" means $3 million.

86.     "*Ordinary Course Professionals Order*" means that certain *Order Authorizing the Debtors' Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business Nunc Pro Tunc to the Commencement Date*, entered by the Bankruptcy Court on September 17, 2009 [Docket No. 89], as may be amended, modified or supplemented from time to time.

87.     "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim.

88.     "*Other Secured Claim*" means any secured Claim against the Debtors not specifically described herein, *provided*, *however*, that Other Secured Claims shall not include DIP Facility Claims and Prepetition Credit Agreement Secured Claims.

89.     "*Pension Plan*" means The Reader's Digest Association, Inc. Retirement Plan, which is a defined benefit pension plan.

90.     "*Periodic Distribution Date*" means the first Business Day that is as soon as reasonably practicable occurring no later than thirty (30) days after the Initial Distribution Date, and for the first eight (8) months thereafter, the first Business Day that is as soon as reasonably practicable occurring no later than thirty (30) days after the immediately preceding Periodic Distribution Date.

91.     "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

92.     "*Plan*" means the *Proposed Joint Plan of Reorganization of The Reader's Digest Associations, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* dated [October 9], 2009, as amended,

supplemented or modified from time to time, including, without limitation, the Plan Supplement, which is incorporated herein by reference, subject to the terms of the Restructuring Support Agreement.

93.     "*Plan Equity Value*" means [$____]

94.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules and exhibits to be filed on the Plan Supplement Filing Date, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules, comprising, without limitation, the following documents: (a) the form of the Exit Credit Agreement; (b) the form of the New Second Priority Term Loan Agreement; (c) the list of the Compensation and Benefit Programs to be rejected and/or assumed; (d) the Registration Rights Agreement (e) the Shareholders Agreement; (f) the Amended and Restated Certificate of Incorporation; (g) the Amended and Restated Bylaws; and (h) the forms of the Enterprise Value Maximization Plan and the Variable Compensation Plan.

95.     "*Plan Supplement Filing Date*" means the date that is five (5) business days prior to the Voting Deadline.

96.     "*Prepetition Agent*" means JP Morgan Chase Bank, N.A., in its capacity as administrative and collateral agent pursuant to the Prepetition Credit Agreement.

97.     "*Prepetition Credit Agreement*" means that certain Credit Agreement dated as of March 2, 2007, among The Reader's Digest Association, Inc., certain of its subsidiaries, the Prepetition Agent and the Prepetition Lenders party thereto, as amended, supplemented or otherwise modified.

98.     "*Prepetition Credit Agreement Claims*" means all claims arising under or in connection with the Prepetition Credit Agreement and/or the Prepetition Loan Documents, including, without limitation, all Adequate Protection Claims.

99.     "*Prepetition Lenders*" means those lenders party to the Prepetition Credit Agreement from time to time and their affiliates holding Swap Claims.

100.     "*Prepetition Loan Documents*" means each of the documents, agreements and instruments (including, without limitation, all collateral documents) executed and delivered from time to time in connection with the Prepetition Credit Agreement.

101.     "*Priority Tax Claim*" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

102.     "*Proof of Claim*" means a proof of claim filed against any of the Debtors in the Chapter 11 Cases.

103.     "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

104.     "*Record Date*" means 5:00 p.m. prevailing Eastern Time on [____], 2009.

105.     "*Registration Rights Agreement*" means a registration rights agreement substantially in the form set forth in the Plan Supplement obligating the Reorganized Debtors to register for resale certain shares of New Common Stock under the Securities Act in accordance with the terms set forth in such agreement, which shall be in form and substance satisfactory to the Required Consenting Lenders in all material respects.

106.     "*Reinstated Euro Term Loan*" means that certain Euro denominated term loan facility incurred pursuant to the terms of the Prepetition Credit Agreement as amended as of the Commencement Date and as such term loan will be further amended and restated on the terms set forth in, and forming part of, the Exit Credit Agreement and subject to the Restructuring Support Agreement.

107.    "*Released Parties*" means, collectively, (a) the Debtors and the Debtors' current and former officers and directors, (b) the Prepetition Agent and the Prepetition Lenders, (c) the DIP Agent and the DIP Lenders, (d) the Creditors' Committee and the Creditors' Committee Members, (e) the Consenting Shareholders, and (f) with respect to each of the Persons named in (a) — (e) above, such Person's directors, officers, shareholders, partners, members, employees, agents, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, accountants, and other professionals or representatives when acting in any such capacities and (g) with respect to each of the Persons named in (a) — (f) above, each in their respective capacities set forth in such clause.

108.    "*Releasing Parties*" means, collectively, (a) the Prepetition Agent and the Prepetition Lenders, (b) the DIP Agent and the DIP Lenders, (c) the Consenting Shareholders and (d) each Holder of a Claim or Equity Interest that affirmatively votes in favor of this Plan.

109.    "*Reorganized Debtors*" means the Debtors, in each case, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

110.    "*Reorganized Holdings*" means RDA Holding, Inc., as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

111.    "*Required Consenting Lenders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

112.    "*Restructuring Support Agreement*" means that certain restructuring support agreement, dated as of August 17, 2009, among the Debtors, the Consenting Lenders and the Consenting Shareholders, as amended, supplemented or otherwise modified from time to time subject to the terms thereof.

113.    "*Restructuring Term Sheet*" means the term sheet annexed as <u>Exhibit A</u> to the Restructuring Support Agreement.

114.    "*Retained Professional*" means any Entity: (a) employed in these Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

115.    "*Rights Offering*" means that certain rights offering by Reorganized Holdings pursuant to which Eligible Noteholders shall have the right to purchase up to $[50-100] million of New Common Stock at Plan Equity Value, which shall represent no more than [10-20]% of the New Common Stock (subject to dilution by the Management Equity Plan).

116.    "Subscription Procedures" means those procedures set forth on **<u>Exhibit G</u>** hereto.

117.    "*Senior Subordinated Notes*" means the 9% Senior Subordinated Notes due 2017, issued by The Reader's Digest Association, Inc. and guaranteed by RDA Holding Co. and each direct and indirect, existing and future domestic subsidiary of The Reader's Digest Association, Inc. pursuant to the Senior Subordinated Notes Indenture.

118.    "*Senior Subordinated Note Claim*" means any Claim derived from or based upon the Senior Subordinated Notes Indenture.

119.    "*Senior Subordinated Notes Indenture*" means that certain Indenture, dated as of March 2, 2007 among The Reader's Digest Association, Inc., as issuer, and RDA Holding Co. and each direct and indirect, existing and future domestic subsidiary of The Reader's Digest Association, Inc. as guarantors, and U.S. Bank National Association, as trustee.

120.    "*Schedules*" mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs filed by the Debtors pursuant to section 521 of

the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

121.     *"Section 510(b) Claim"* means any Claim against the Debtors arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

122.     *"Securities Act"* means the United States Securities Act of 1933, as amended.

123.     *"Shareholders Agreement"* means the stockholders' agreement with respect to the New Common Stock as set forth in the Plan Supplement, which shall be in material form and substance satisfactory to the Required Consenting Lenders and shall include an option for Holders to hold limited voting securities.

124.     *"Swap Claims"* means those secured Claims arising from hedging arrangements under, or in connection with, the Prepetition Credit Agreement with certain of the Prepetition Lenders or their Affiliates.

125.     *"Tort Claim"* means any Claim that has not been settled, compromised or otherwise resolved that: (a) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to protection of human health, safety or the environment.

126.     *"Unexpired Lease"* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

127.     *"Unimpaired"* means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

128.     *"Unimpaired Class"* means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

129.     *"Unsecured Ongoing Operations Claims"* means all general unsecured Claims directly relating to and arising solely from the receipt of goods and services by the Debtors arising with and held by Persons with whom the Debtors are conducting, and will continue to conduct, business as of the Effective Date; *provided*, *however*, that Unsecured Ongoing Operations Claims shall not include Administrative Claims.

130.     *"Variable Compensation Plan"* means that certain compensation plan Date in the form set forth in the Plan Supplement to be adopted as of the Effective Date.

131.     *"Voting Classes"* means, collectively, Classes 3, 4 and 5.

132.     *"Voting Deadline"* means [___] at 4:00 p.m. prevailing Pacific Time.

# X.
## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

_____

The Reader's Digest Association, Inc.
(for itself and on behalf of each of the Debtors)

By:          Thomas A. Williams

Title:       Senior Vice President and
             Chief Financial Officer

Dated:       October 9, 2009

Prepared by:

**KIRKLAND & ELLIS LLP**
James H. M. Sprayregen, P.C.
Paul M. Basta
Nicole L. Greenblatt
601 Lexington Avenue
New York, New York 10022–4611
Telephone:          (212) 446–4800
Facsimile:          (212) 446–4900

Counsel for the Debtors and Debtors in Possession

<u>**EXHIBIT A**</u>

**Plan of Reorganization**

James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Proposed Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) Case No. 09-23529 (RDD) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

---

**PROPOSED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**THE READER'S DIGEST ASSOCIATION, INC. AND ITS DEBTOR AFFILIATES**

---

**THIS DRAFT PLAN OF REORGANIZATION IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

Dated:  October 9, 2009

**<u>TABLE OF CONTENTS</u>**

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION  OF TIME,GOVERNING LAW AND
    DEFINED TERMS ..................................................................................................................1
    A.    Rules of Interpretation, Computation of Time and Governing Law ..................................1
    B.    Defined Terms .................................................................................................................2

ARTICLE II. ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS ........................11
    A.    Administrative Claims ...................................................................................................11
    B.    DIP Facility Claims.......................................................................................................12
    C.    Priority Tax Claims.......................................................................................................12

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY
    INTERESTS.........................................................................................................................12
    A.    Summary......................................................................................................................12
    B.    Classification and Treatment of Claims and Equity Interests .........................................13
    C.    Special Provision Governing Unimpaired Claims ..........................................................16
    D.    Acceptance or Rejection of the Plan ..............................................................................16
    E.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................17
    F.    Elimination of Vacant Classes ......................................................................................17

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN......................................................17
    A.    General Settlement of Claims ........................................................................................17
    B.    Restructuring Transactions ............................................................................................17
    C.    Corporate Existence ......................................................................................................17
    D.    Vesting of Assets in the Reorganized Debtors................................................................17
    E.    Indemnification Provisions in Organizational Documents...............................................18
    F.    Cancellation of Agreements, Senior Subordinated Notes and Equity Interests ................18
    G.    Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors .........................19
    H.    Approval of Exit Credit Agreement and New Second Priority Term Loan Agreement..................19
    I.    Reorganized Debtors' Equity Interests ..........................................................................19
    J.    Section 1145 Exemption ...............................................................................................20
    K.    Rights Offering .............................................................................................................20
    L.    Management Equity Plan ...............................................................................................22
    M.    Organizational Documents.............................................................................................20
    N.    Effectuating Documents; Further Transactions...............................................................20
    O.    Exemption from Certain Transfer Taxes and Recording Fees ..........................................21
    P.    Directors and Officers of Reorganized Holdings and other Reorganized Debtors.......................21
    Q.    Compensation Plans ......................................................................................................22
    R.    Preservation of Rights of Action ...................................................................................21

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...........23
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ......................23
    B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases....................24
    C.    Claims Based on Rejection of Executory Contracts and Unexpired Leases .....................25
    D.    Contracts and Leases Entered Into After the Commencement Date .................................25
    E.    Directors and Officers Insurance Policies and Agreements .............................................25
    F.    Indemnification and Reimbursement Obligations...........................................................25
    G.    Reservation of Rights ...................................................................................................26
    H.    Nonoccurence of Effective Date ...................................................................................26
    I.    Compensation and Benefit Programs .............................................................................22
    J.    Workers' Compensation Programs .................................................................................23

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..........................................................26
    A.    Distributions for Claims Allowed as of the Effective Date.............................................26

K&E 15660073.11

| | | |
|---|---|---|
| B. | Distributions on Account of Claims Allowed After the Effective Date | 27 |
| C. | Delivery and Distributions and Undeliverable or Unclaimed Distributions | 27 |
| D. | Compliance with Tax Requirements/Allocations | 29 |
| E. | Timing and Calculation of Amounts to Be Distributed | 29 |
| F. | Setoffs | 29 |
| G. | Surrender of Canceled Instruments or Securities | 30 |
| H. | Claims Paid or Payable by Third Parties | 30 |

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND
DISPUTED CLAIMS ........................................................................................................ 31
| | | |
|---|---|---|
| A. | Resolution of Disputed Claims | 31 |
| B. | Disallowance of Claims | 32 |
| C. | Amendments to Claim | 32 |

ARTICLE VIII. CONDITIONS PRECEDENT TO EFFECTIVE DATE ....................................... 32
| | | |
|---|---|---|
| A. | Conditions Precedent to Effective Date | 32 |
| B. | Waiver of Conditions | 33 |
| C. | Effect of Non Occurrence of Conditions to the Effective Date | 33 |

ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ............. 33
| | | |
|---|---|---|
| A. | Compromise and Settlement | 33 |
| B. | Subordinated Claims | 33 |
| C. | Discharge of Claims and Termination of Equity Interests | 34 |
| D. | Release of Liens | 34 |
| E. | Debtor Release | 34 |
| F. | Releasing Party Release | 35 |
| G. | Exculpation | 36 |
| H. | Injunction | 36 |

ARTICLE X. ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE EXPENSE CLAIMS .......... 37
| | | |
|---|---|---|
| A. | Professional Claims | 37 |
| B. | Other Administrative Claims | 37 |

ARTICLE XI. RETENTION OF JURISDICTION ................................................................... 38

ARTICLE XII. MODIFICATION, REVOCATION AND WITHDRAWAL OF THE PLAN .............. 39
| | | |
|---|---|---|
| A. | Modification of Plan | 39 |
| B. | Effect of Confirmation On Modifications | 40 |
| C. | Revocation of Plan | 40 |

ARTICLE XIII. MISCELLANEOUS PROVISIONS ................................................................ 40
| | | |
|---|---|---|
| A. | Immediate Binding Effect | 40 |
| B. | Additional Documents | 40 |
| C. | Payment of Statutory Fees | 40 |
| D. | Reservation of Rights | 41 |
| E. | Successors and Assigns | 41 |
| F. | Service of Documents | 41 |
| G. | Term of Injunctions or Stays | 42 |
| H. | Entire Agreement | 42 |
| I. | Governing Law | 42 |
| J. | Exhibits | 42 |
| K. | Nonseverability of Plan Provisions upon Confirmation | 42 |
| L. | Closing of Chapter 11 Cases | 43 |
| M. | Conflicts | 43 |
| N. | Dissolution of Creditors' Committee | 43 |

K&E 15660073.11

O.      Section 1125(e) Good Faith Compliance ............................................................... 43

P.      Further Assurances .............................................................................................. 43

Q.      No Stay of Confirmation Order ........................................................................... 43

R.      Waiver or Estoppel ............................................................................................. 43

K&E 15660073.11

**PROPOSED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
THE READER'S DIGEST ASSOCIATION, INC. AND ITS DEBTOR AFFILIATES**

The Reader's Digest Association, Inc. and [47] of its debtor affiliates as debtors and debtors in possession (collectively, the "***Debtors***")[1] propose the following joint plan of reorganization for the resolution of the outstanding claims against, and equity interests in, the Debtors.  None of the Debtors' subsidiaries located outside of the United States are chapter 11 Debtors.  These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court.  Capitalized terms used in the Plan and not otherwise defined herein shall have the meanings ascribed to such terms in Article I.B of the Plan.

Reference is made to the Disclosure Statement, filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections and future operations, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under this Plan.  Each of the Debtors is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

## ARTICLE I.

### RULES OF INTERPRETATION, COMPUTATION
### OF TIME,GOVERNING LAW AND DEFINED TERMS

A.      *Rules of Interpretation, Computation of Time and Governing Law*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with the terms of such document or exhibit and subject to the Restructuring Support Agreement; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code

---

[1]     The Debtors in these chapter 11 cases who are proponents of this Plan, along with the last four digits of each Debtor's federal tax identification number, are: Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, Inc. (3276); World Almanac Education Group, Inc. (3781); World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is:  1 Reader's Digest Road, Pleasantville, NY 10570.

shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

B.      *Defined Terms*

The following terms shall have the following meanings when used in capitalized form herein:

1.      "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent and/or unpaid fees and expenses (including, without limitation, Allowed success fees and Allowed Professional Compensation) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and Allowed under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date by any Retained Professionals in the Chapter 11 Cases, or that are awardable and allowable under section 503(b)(3)(F) of the Bankruptcy Code for the Creditors' Committee, that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not been previously paid regardless of whether a fee application has been filed for any such amount.  To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Retained Professional's fees or expenses or Creditors' Committee Member's expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

2.      "*Adequate Protection Claims*" shall have the meaning ascribed to "Section 507(b) Claims" as defined in paragraph 13(b) of the Final DIP Order.

3.      "*Administrative Claim*" means a Claim (other than the Adequate Protection Claims and DIP Facility Claims) that has been timely filed, pursuant to the deadline and procedure set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court), for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Accrued Professional Compensation (to the extent Allowed by the Bankruptcy Court); and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911 1930.  Administrative Claims do not include DIP Facility Claims, which are separately treated under the Plan.

4.      "*Affiliate*" has the meaning set forth at section 101(2) of the Bankruptcy Code.

5.      "*Allowed*" means, with respect to Claims:  (a) any Claim, proof of which is timely filed by the applicable Claims Bar Date or which, pursuant to the Bankruptcy Code or a Final Order is not required to be filed; (b) any Claim that is listed in the Schedules as of the Effective Date as neither contingent, unliquidated or disputed, and for which no Proof of Claim has been timely filed; or (c) any Claim Allowed pursuant to the Plan; *provided*, *however,* that with respect to any Claim described in clause (a) above, such Claim shall be considered Allowed only if and to the extent that with respect to any Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court or such an objection is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval of the Bankruptcy Court.

6.      "*Amended and Restated Bylaws*" means the bylaws of the Reorganized Debtors substantially in the form included in the Plan Supplement.

K&E 15660073.11

7.	"*Amended and Restated Certificate of Incorporation*" means the certificates of incorporation of the Reorganized Debtors substantially in the form included in the Plan Supplement.

8.	"*Avoidance Actions*" means any and all claims and causes of action which any of the Debtors, the debtors in possession, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

9.	"*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

10.	"*Bankruptcy Code*" means Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

11.	"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York.

12.	"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

13.	"*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

14.	"*Cash*" means the legal tender of the United States of America or the equivalent thereof.

15.	"*Causes of Action*" means all actions, causes of action (including Avoidance Actions), Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Cases, including through the Effective Date.

16.	"*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

17.	"*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

18.	"*Claims Bar Date*" means, as applicable, (a) November 16, 2009 at 5:00 p.m. prevailing Pacific Time, (b) the Governmental Bar Date or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for filing such Claims.

19.	"*Claims Objection Bar Date*" means, for each Claim, the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims, as the same may be modified or extended from time to time by the Bankruptcy Court.

20.	"*Claims Register*" means the official register of Claims maintained by the Voting and Claims Agent.

21.	"*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

22.     *"Commencement Date"* means August 24, 2009, the date on which the Debtors commenced the Chapter 11 Cases.

23.     "*Commission*" means the United States Securities and Exchange Commission.

24.     "*Compensation and Benefits Programs*" means all employment and severance policies, and all compensation and benefit plans, policies and programs and other arrangements (and all amendments and modifications thereto), in each case in place as of the Effective Date, applicable to the Debtors' employees, former employees, retirees and non-employee directors and employees, former employees and retirees of their subsidiaries, including, without limitation, all savings plans, retirement plans (other than the Non-Qualified Retirement Plans), health care plans, disability plans, severance benefit plans, incentive plans and life, accidental death and dismemberment insurance plans.

25.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX hereof having been:  (a) satisfied; or (b) waived pursuant to Article IX.B hereof.

26.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

27.     *"Confirmation Hearing"* means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

28.     "*Confirmation Order*" means the order, in form and in substance reasonably satisfactory to the Debtors, the Prepetition Agent and the Required Consenting Lenders, of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

29.     "*Consenting Lenders*" means those Prepetition Lenders party to the Restructuring Support Agreement.

30.     "*Consenting Shareholders*" means those Holders of Equity Interests party to the Restructuring Support Agreement.

31.     *"Consummation"* means the occurrence of the Effective Date.

32.     "*Contract/Lease Schedule Date*" means the latest date by which the Debtors shall file their list of Executory Contracts and Unexpired Leases to be rejected pursuant to the Plan, which shall be no later than [__] days prior to the Confirmation Hearing.

33.     "*Creditors' Committee*" means the official committee of unsecured creditors of the Debtors appointed by the Office of the United States Trustee for the Southern District of New York in the Chapter 11 Cases on August 31, 2009, pursuant to section 1102 of the Bankruptcy Code, comprising the Creditors' Committee Members and as reconstituted from time to time.

34.     "*Creditors' Committee Members*" means the members of the Creditors' Committee, namely: (a) The Bank of New York Mellon, (b) Wilfrid Aubrey LLC, (c) Thomas M. Kenney, (d) RR Donnelley & Sons Company, (e) Madison Paper Company (ALSIP Location), (f) Williams Lea, Inc. and (g) New Page Corporation.

35.     *"Cure"* means the payment of Cash by the applicable Debtors, or the distribution of other property (as the applicable Debtors and the counterparty to the Executory Contract or Unexpired Lease may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (b) permit the Debtors to assume such Executory Contract or Unexpired Lease under sections 365 and 1123 of the Bankruptcy Code.

36.     "*Cure Objection Deadline*" means the deadline for filing requests for payment of Cure, which shall be the later of: (a) thirty (30) days after the Effective Date or (b) thirty (30) days after the assumption or assumption and assignment of the applicable Executory Contract or Unexpired Lease, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors and the counterparty to the applicable Executory Contract or Unexpired Lease.

37.     "*Debtor*" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

38.     "*Debtors in Possession*" means, collectively, the Debtors, as debtors in possession in these Chapter 11 Cases.

39.     "*DIP Agent*" means JPMorgan Chase Bank, N.A., in its capacity as syndication agent, administrative agent and collateral agent pursuant to the DIP Facility.

40.     "*DIP Facility*" means that certain $150 million Credit and Guarantee Agreement, dated as of August 26, 2009, among The Reader's Digest Association, Inc., as borrower, and RDA Holding Co. and each direct and indirect, existing and future domestic subsidiary of The Reader's Digest Association, Inc., as guarantors, the DIP Agent, J.P. Morgan Securities Inc., as sole lead arranger and sole bookrunner, General Electric Capital Corporation, as senior managing agent, and the DIP Lenders, as may be amended, modified, ratified, extended, renewed, restated or replaced.

41.     "*DIP Facility Claim*" means any Claim arising under or related to the DIP Facility.

42.     "*DIP Lenders*" means the DIP Agent and the banks, financial institutions and other lenders party to the DIP Facility from time to time.

43.     "*Disclosure Statement*" means the *Disclosure Statement for the Proposed Joint Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, the Disclosure Statement Order and any other applicable law, and which is reasonably satisfactory to the Prepetition Agent and the Required Consenting Lenders in all material respects.

44.     "*Disclosure Statement Order*" means that certain *Order Approving the Debtors' Disclosure Statement and Relief Related Thereto*, entered by the Bankruptcy Court on [TO COME], as the order may be amended from time to time, and which shall be in form and substance satisfactory to the Prepetition Agent and the Required Consenting Lenders.

45.     "*Disputed Claim*" means, with respect to any Claim, any Claim that is not yet Allowed.

46.     "*Distribution Agent*" means any Entity or Entities chosen by the Debtors, which Entities may include, without limitation, the Voting and Claims Agent, to make or to facilitate distributions required by the Plan.

47.     "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Voting Deadline or such other date as designated in an order of the Bankruptcy Court.

48.     "*D&O Liability Insurance Policies*" means all insurance policies for directors and officers' liability maintained by the Debtors as of the Commencement Date.

49.     "*DTC*" means Depository Trust Company.

K&E 15660073.11

50.     "*Effective Date*" means the day that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article IX.A hereof have been: (i) satisfied; or (ii) waived pursuant to Article IX.B hereof.

51.     "*Enterprise Value Maximization Plan*" means that certain compensation plan set forth in the Plan Supplement to be adopted on the Effective Date.

52.     "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

53.     "*Equity Interest*" means any issued or unissued share of common stock, preferred stock or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, including section 510(b) Claims; *provided, however,* that Equity Interest does not include any Intercompany Interest.

54.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

55.     "*Exculpated Parties*" means, collectively: (a) the Reorganized Debtors; and (b) the Released Parties.

56.     "*Exculpation*" means the exculpation provision set forth in Article X.G hereof.

57.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

58.     "*Exit Credit Agreement*" means an agreement substantially in the form set forth in the Plan Supplement on account of (a)(i) the New First Priority Term Loan or (ii) an alternative exit-financing facility provided that the DIP Facility is paid in full in Cash on the Effective Date and (b) the Reinstated Euro Term Loan.

59.     "*Final DIP Order*" means that certain Final Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral and (III) Granting Adequate Protection to Prepetition Secured Lenders, entered by the Bankruptcy Court on October 7, 2009 [Docket # 152], as the order may be amended from time to time in accordance with the terms thereof and the DIP Facility.

60.     "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided, however,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

61.     "*Governmental Bar Date*" means [DATE].

62.     "*Holder*" means an Entity holding a Claim or an Equity Interest.

63.     "*Impaired*" means any Claim in an Impaired Class.

64.     "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

65.     "*Indemnification Obligation*" means a Debtor's obligation under an Executory Contract assumed in the Chapter 11 Cases or otherwise to indemnify directors, officers, employees or agents of such Debtor who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacitates, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by such Debtor's respective certificate of incorporations, certificates of formation, bylaws, similar corporate documents and applicable law, as in effect as of the Effective Date.

66.     "*Indenture Trustee*" means The Bank of New York Mellon as indenture trustee with respect to the Senior Subordinated Notes.

67.     "*Initial Distribution Date*" means the date that is as soon as practicable after the Effective Date, but no later than  thirty (30) days after the Effective Date, when distributions under the Plan shall commence.

68.     "*Intercompany Claim*" means, collectively, any Claim held by a Debtor against another Debtor or an Affiliate of a Debtor or any Claim held by an Affiliate of a Debtor against a Debtor.

69.     "*Intercompany Interest*" means an Equity Interest in a Debtor held by another Debtor.

70.     "*Interim Compensation Order*" means an order of the Bankruptcy Court allowing Retained Professionals to seek interim compensation in accordance with the procedures approved therein, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Retained Professional or otherwise.

71.     "*Letters of Credit*" means the letters of credit referenced in paragraph 13(c) of the Final DIP Order.

72.     "*Management Equity Plan*" means that certain post-Effective Date director and officer compensation program to be approved and implemented by the New Board as set forth in Article V.A hereto. Equity awards in the form of restricted stock, options or warrants for 7.5% of the New Common Stock to be issued under the Plan will be allocated to the  Management Equity Plan; *provided* that such equity grant shall not include more than 2.5% in the form of restricted New Common Stock.

73.     "*New Board*" means the initial board of directors of Reorganized Holdings and RDA Inc., which shall initially be mirror boards.

74.     "*New Common Stock*" means the common equity in Reorganized Holdings to be authorized, issued or reserved on the Effective Date pursuant to the Plan, which shall constitute all of the direct or indirect common equity of Reorganized Holdings.

75.     "*New First Priority Term Loan*" means the first priority term loan facility to be converted from the DIP Facility in an amount equal to the aggregate amount, up to a maximum amount of $150 million, of loans outstanding under the DIP Facility on the date of conversion, to be issued on the Effective Date pursuant to the Exit Credit Agreement on terms consistent with those set forth on Annex 1 to the Restructuring Term Sheet.

76.     "*New Second Priority Term Loan*" means that certain $300 million second priority term loan facility having a maturity not earlier than the latest to occur of the maturity of the New First Priority Term Loan and the maturity of the Reinstated Euro Term Loan, to be issued on the Effective Date pursuant to the New Second Priority Term Loan Agreement on terms consistent with those set forth on Annex 1 to the Restructuring Term Sheet.

77.     "*New Second Priority Term Loan Agreement*" means that certain $300 million second lien term loan agreement among The Reader's Digest Association, Inc., as borrower, and RDA Holding Co. and each direct and indirect, existing and future domestic subsidiary of The Reader's Digest Association, Inc., as guarantors, and the

7

Holders of Prepetition Credit Agreement Claims, substantially in the form of the agreement set forth in the Plan Supplement.

78. "*Non-Qualified Retirement Plans*" means the Debtors' unfunded, non-qualified retirement plans or deferred compensation arrangements, including, but not limited to, the plans or arrangements known as (i) the Excess Benefit Retirement Plan, (ii) the Executive Retirement Plan, (iii) the Executive Cash Balance Plan, (iv) the 1988 Supplemental Employee Retirement Plan and related agreements, (v) the Director and Roving Editors Plan and/or related agreements or arrangements, and (vi) the Reader's Digest Deferred Compensation Plan or deferred compensation arrangements provided by any other Debtor.

79. "*Noticing and Claims Agent*" means Kurtzman Carson Consultants LLC, in its capacity as notice, claims and balloting agent for the Debtors, pursuant to that certain *Order Authorizing and Approving the Retention of Kurtzman Carson Consultants LLC as Notice and Claims Agent*, entered by the Bankruptcy Court on August 28, 2009, [Docket No. 44].

80. "*Other General Unsecured Claim*" means any unsecured Claim, other than Unsecured Ongoing Operations Claims and Senior Subordinated Note Claims, against one or more of the Debtors including, but not limited to (a) Claims arising from the rejection of Unexpired Leases and Executory Contracts to which a Debtor is a party, (b) claims arising from the rejection or termination of the Debtors' Non-Qualified Retirement Plans and (c) Claims arising from any litigation or other court, administrative or regulatory proceeding, including, without limitation, damages or judgments entered against, or settlement amounts owing by a Debtor related thereto.

81. "*Other General Unsecured Claims Distribution*" means $3 million.

82. "*Ordinary Course Professionals Order*" means that certain *Order Authorizing the Debtors' Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business Nunc Pro Tunc to the Commencement Date*, entered by the Bankruptcy Court on September 17, 2009 [Docket No. 89], as may be amended, modified or supplemented from time to time.

83. "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim.

84. "*Other Secured Claim*" means any secured Claim against the Debtors not specifically described herein, *provided*, *however*, that Other Secured Claims shall not include DIP Facility Claims and Prepetition Credit Agreement Secured Claims.

85. "*Pension Plan*" means The Reader's Digest Association, Inc. Retirement Plan, which is a defined benefit pension plan.

86. "*Periodic Distribution Date*" means the first Business Day that is as soon as reasonably practicable occurring no later than thirty (30) days after the Initial Distribution Date, and for the first eight (8) months thereafter, the first Business Day that is as soon as reasonably practicable occurring no later than thirty (30) days after the immediately preceding Periodic Distribution Date.

87. "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

88. "*Plan*" means this *Proposed Joint Plan of Reorganization of The Reader's Digest Associations, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* dated [DATE], as amended, supplemented or modified from time to time, including, without limitation, the Plan Supplement, which is incorporated herein by reference, subject to the terms of the Restructuring Support Agreement.

89. "*Plan Equity Value*" means [$___]

90. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules and exhibits to be filed on the Plan Supplement Filing Date, as amended, modified or supplemented from time to time in

K&E 15660073.11

accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules, comprising, without limitation, the following documents: (a) the form of the Exit Credit Agreement; (b) the form of the New Second Priority Term Loan Agreement; (c) the list of the Compensation and Benefit Programs to be rejected and/or assumed; (d) the Registration Rights Agreement (f) the Shareholders Agreement; (g) the Amended and Restated Certificate(s) of Incorporation; (h) the Amended and Restated Bylaws; and (i) the forms of the Enterprise Value Maximization Plan and the Variable Compensation Plan.

91.    "*Plan Supplement Filing Date*" means the date that is five (5) business days prior to the Voting Deadline.

92.    "*Prepetition Agent*" means JP Morgan Chase Bank, N.A., in its capacity as administrative and collateral agent pursuant to the Prepetition Credit Agreement.

93.    "*Prepetition Credit Agreement*" means that certain Credit Agreement dated as of March 2, 2007, among The Reader's Digest Association, Inc., certain of its subsidiaries, the Prepetition Agent and the Prepetition Lenders party thereto, as amended, supplemented or otherwise modified.

94.    "*Prepetition Credit Agreement Claims*" means all claims arising under or in connection with the Prepetition Credit Agreement and/or the Prepetition Loan Documents, including, without limitation, all Adequate Protection Claims.

95.    "*Prepetition Lenders*" means those lenders party to the Prepetition Credit Agreement from time to time and their affiliates holding Swap Claims.

96.    "*Prepetition Loan Documents*" means each of the documents, agreements and instruments (including, without limitation, all collateral documents) executed and delivered from time to time in connection with the Prepetition Credit Agreement.

97.    "*Priority Tax Claim*" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

98.    "*Proof of Claim*" means a proof of claim filed against any of the Debtors in the Chapter 11 Cases.

99.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

100.    "*Record Date*" means 5:00 p.m. (NYC time) on [DATE].

101.    "*Registration Rights Agreement*" means a registration rights agreement substantially in the form set forth in the Plan Supplement obligating the Reorganized Debtors to register for resale certain shares of New Common Stock under the Securities Act in accordance with the terms set forth in such agreement, which shall be in form and substance satisfactory to the Required Consenting Lenders in all material respects.

102.    "*Reinstated Euro Term Loan*" means that certain Euro denominated term loan facility incurred pursuant to the terms of the Prepetition Credit Agreement as amended as of the Commencement Date and as such term loan will be further amended and restated on the terms set forth in, and forming part of, the Exit Credit Agreement and subject to the Restructuring Support Agreement.

103.    "*Released Parties*" means, collectively, (a) the Debtors and the Debtors' current and former officers and directors, (b) the Prepetition Agent and the Prepetition Lenders, (c) the DIP Agent and the DIP Lenders, (d) the Creditors' Committee and the Creditors' Committee Members, (e) the Consenting Shareholders, and (f) with respect to each of the Persons named in (a) — (e) above, such Person's directors, officers, shareholders, partners, members, employees, agents, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns,

attorneys, financial advisors, accountants, and other professionals or representatives when acting in any such capacities and (g) with respect to each of the Persons named in (a) — (f) above, each in their respective capacities set forth in such clause.

104. "*Releasing Parties*" means, collectively, (a) the Prepetition Agent and the Prepetition Lenders, (b) the DIP Agent and the DIP Lenders, (c) the Consenting Shareholders and (d) each Holder of a Claim or Equity Interest that affirmatively votes in favor of this Plan.

105. "*Reorganized Debtors*" means the Debtors, in each case, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

106. "*Reorganized Holdings*" means RDA Holding, Inc., as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

107. "*Required Consenting Lenders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

108. "*Restructuring Support Agreement*" means that certain restructuring support agreement, dated as of August 17, 2009, among the Debtors, the Consenting Lenders and the Consenting Shareholders, as amended, supplemented or otherwise modified from time to time subject to the terms thereof.

109. "*Restructuring Term Sheet*" means the term sheet annexed as <u>Exhibit A</u> to the Restructuring Support Agreement.

110. "*Retained Professional*" means any Entity: (a) employed in these Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

111. "*Rights Offering*" means that certain rights offering by Reorganized Holdings pursuant to which eligible Holders of Senior Subordinated Notes shall have the right to purchase up to \$[50-100] million of New Common Stock at Plan Equity Value, which shall represent no more than [10-20]% of the New Common Stock.

112. "*Senior Subordinated Notes*" means the 9% Senior Subordinated Notes due 2017, issued by The Reader's Digest Association, Inc. and guaranteed by RDA Holding Co. and each direct and indirect, existing and future domestic subsidiary of The Reader's Digest Association, Inc. pursuant to the Senior Subordinated Notes Indenture.

113. "*Senior Subordinated Note Claim*" means any Claim derived from or based upon the Senior Subordinated Notes Indentures.

114. "*Senior Subordinated Notes Indenture*" means that certain Indenture, dated as of March 2, 2007 among The Reader's Digest Association, Inc., as issuer, and RDA Holding Co. and each direct and indirect, existing and future domestic subsidiary of The Reader's Digest Association, Inc. as guarantors, and U.S. Bank National Association, as trustee.

115. "*Schedules*" mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

116. "*Section 510(b) Claim*" means any Claim against the Debtors arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or

K&E 15660073.11

sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

117. *"Securities Act"* means the United States Securities Act of 1933, as amended.

118. *"Shareholders Agreement"* means the stockholders' agreement with respect to the New Common Stock as set forth in the Plan Supplement, which shall be in material form and substance satisfactory to the Required Consenting Lenders and shall include an option for Holders to hold limited voting securities.

119. *"Swap Claims"* means those secured Claims arising from hedging arrangements under, or in connection with, the Prepetition Credit Agreement with certain of the Prepetition Lenders or their Affiliates.

120. *"Tort Claim"* means any Claim that has not been settled, compromised or otherwise resolved that: (a) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to protection of human health, safety or the environment.

121. *"Unexpired Lease"* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

122. *"Unimpaired"* means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

123. *"Unimpaired Class"* means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

124. *"Unsecured Ongoing Operations Claims"* means all general unsecured Claims directly relating to and arising solely from the receipt of goods and services by the Debtors arising with and held by Persons with whom the Debtors are conducting, and will continue to conduct, business as of the Effective Date; *provided*, *however*, that Unsecured Ongoing Operations Claims shall not include Administrative Claims.

125. *"Variable Compensation Plan"* means that certain compensation plan Date in the form set forth in the Plan Supplement to be adopted as of the Effective Date.

126. *"Voting Classes"* means, collectively, Classes 3, 4 and 5.

127. *"Voting Deadline"* means [DATE] at 4:00 p.m. prevailing Pacific Time for all Holders of Claims, which is the date and time by which all Ballots must be received by the Voting and Claims Agent in accordance with the Disclosure Statement Order, or such other date and time as may be established by the Bankruptcy Court with respect to any Voting Class.

## ARTICLE II.

## ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Equity Interests set forth in Article III.

A.      Administrative Claims

Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Claim will be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then

due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if an Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as the case may be; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided that, Allowed Administrative Claims that arise in the ordinary course of the Debtors' or Reorganized Debtors' business shall be paid in full in Cash in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions; provided, further, that Allowed Administrative Claims do not include Claims filed after the applicable deadline set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court).

B.      *DIP Facility Claims*

Notwithstanding anything to the contrary herein, in full and final satisfaction, settlement, release and discharge of and in exchange for release of all DIP Facility Claims (other than Claims under the DIP Facility that expressly survive the termination thereof), on the Effective Date, the DIP Facility Claims shall (i) subject to the terms of the DIP Facility, convert into the New First Priority Term Loan pursuant to the Exit Credit Agreement or (ii) be paid off in full in Cash.

C.      *Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive, as soon as reasonably practicable after the Effective Date, on account of such Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an amount agreed to by the applicable Debtor or Reorganized Debtor, as applicable, and such Holder; *provided, however,* that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (3) at the option of the Debtors, Cash in an aggregate amount of such Allowed Priority Claim payable in installment payments over a period not more than five years after the Commencement Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

# ARTICLE III.

# CLASSIFICATION AND TREATMENT
# OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

A.      *Summary*

1.      This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  Except for the Claims addressed in Article II above (or as otherwise set forth herein), all Claims against a particular Debtor are placed in Classes for each of the Debtors.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Facility Claims and Priority Tax Claims, as described in Article II.

2.      The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or an Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

3. Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Prepetition Credit Agreement Claims | Impaired | Entitled to Vote |
| 4 | Unsecured Ongoing Operations Claims | Impaired | Entitled to Vote |
| 5 | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Senior Subordinated Note Claims | Impaired | Deemed to Reject |
| 7 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 8 | Equity Interests | Impaired | Deemed to Reject |
| 9 | Intercompany Interests | Unimpaired | Deemed to Accept |
| 10 | Intercompany Claims | Unimpaired | Deemed to Accept |

B.    *Classification and Treatment of Claims and Equity Interests*

1.    Class 1 – Other Priority Claims

(a)    *Classification*:  Class 1 consists of the Other Priority Claims against the Debtors.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim against the  Debtors agrees to less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other Priority Claim against the Debtors, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as reasonably practicable after (i) the Effective Date, (ii) the date on which such Other Priority Claim against the Debtors becomes an Allowed Other Priority Claim or (iii) such other date as may be ordered by the Bankruptcy Court.

(c)    *Voting*:  Class 1 is Unimpaired and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Secured Claims

(a)    *Classification*:  Class 2 consists of the Other Secured Claims against the Debtors.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Other Secured Claim, Holders of Allowed Other Secured Claims shall receive one of the following treatments, in the sole discretion of the applicable Debtor, in full and final satisfaction of such Allowed Other Secured Claims: (i) the Debtors or the Reorganized Debtors shall pay such Allowed Other Secured Claims in full in Cash including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, (ii) the Debtors or the Reorganized Debtors shall deliver the collateral securing any such Allowed Other Secured Claim or (iii) the Debtors or the Reorganized Debtors shall otherwise treat any Allowed Other Secured Claim in any other manner such that the Claim shall be rendered Unimpaired.

(c)    *Voting*:  Class 2 is Unimpaired and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.

13

3. <u>Class 3 – Prepetition Credit Agreement Claims</u>

   (a)   *Classification*:  Class 3 consists of Prepetition Credit Agreement Claims against the Debtors.

   (b)   *Allowance*: On the Effective Date, Prepetition Credit Agreement Claims shall be deemed Allowed in the aggregate amount of [$1.645 billion].

   (c)   *Treatment*:  In exchange for full and final satisfaction, settlement, release and discharge of each Allowed Prepetition Credit Agreement Claim, each Holder of an Allowed Prepetition Credit Agreement Secured Claim shall receive their Pro Rata share of each of (i) the Reinstated Euro Term Loan, (ii) the New Second Priority Term Loan and (iii) 100% percent of the New Common Stock issued and outstanding as of the Effective Date (subject to dilution on account of the Rights Offering and the Management Equity Plan); *provided* that (x) the Euro Term Lenders (as defined in the Prepetition Credit Agreement) as of the Distribution Record Date shall be the only Prepetition Lenders entitled to receive the treatment set forth in clause (c)(i) on account of their exposure under the Euro Term Loan (as defined in the Prepetition Credit Agreement) and (y) the Revolving Lenders, U.S. Term Lenders (each as defined in the Prepetition Credit Agreement) and Holders of Swap Claims as of the Distribution Record Date shall be the only Prepetition Lenders entitled to receive the treatment set forth in clauses (c)(ii) and (iii) on account of their exposures under the Revolver Loan, U.S. Term Loan (each as defined in the Prepetition Credit Agreement) and Swap Claims.

   The Letters of Credit shall continue to be treated as set forth in paragraph 13(c) of the Final DIP Order.

   (d)   *Voting*:  Class 3 is Impaired and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

4. <u>Class 4 – Unsecured Ongoing Operations Claims</u>

   (a)   *Classification*:  Class 4 consists of Unsecured Ongoing Operations Claims against the Debtors.

   (b)   *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured Ongoing Operations Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Unsecured Ongoing Operations Claim, each Holder of an Allowed Unsecured Ongoing Operations Claim will be paid in full in Cash (i) on the Effective Date or as soon as reasonably practicable thereafter or (ii) in the ordinary course of business in accordance with the terms of any agreement that governs such Allowed Unsecured Ongoing Operations Claim or in accordance with the course of practice between the Debtors and such Holder with respect to such Allowed Unsecured Ongoing Operations Claim, *provided*, *however*, that Holders of Unsecured Ongoing Operations Claims are not entitled to postpetition interest, late fees or penalties on account of such Claims.  Holders of Allowed Unsecured Ongoing Operations Claims who received any payments from the Debtors during the Chapter 11 Cases pursuant to any order of the Bankruptcy Court shall not be excluded from receiving distributions under the Plan on account of such Claims unless such Claims were fully satisfied by any prior payments from the Debtors or otherwise waived.  The Debtors reserve all rights to challenge the legal basis and amount of any asserted Unsecured Ongoing Operations Claim, and each such Holder reserves all rights and defenses with respect to any such challenge.

K&E 15660073.11

(c)     *Voting*:  Class 4 is Impaired and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

5.   Class 5 – Other General Unsecured Claims

(a)     *Classification:*  Class 5 consists of Other General Unsecured Claims against the Debtors.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other General Unsecured Claim, each Holder of an Allowed Other General Unsecured Claim shall receive their Pro Rata share of the Other General Unsecured Claims Distribution.

(c)     *Voting:* Class 5 is Impaired and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

6.   Class 6 – Senior Subordinated Note Claims

(a)     *Classification*: Class 6 consists of Senior Subordinated Note Claims against the Debtors.

(b)     *Allowance*: On the Effective Date, Senior Subordinated Note Claims shall be deemed Allowed in the aggregate amount of [$628.2 million].

(c)     *Treatment*:  Holders of Subordinated Note Claims shall not receive or retain any interest or property under the Plan on account of such Senior Subordinated Note Claims.  The treatment of the Senior Subordinated Notes Claims under the Plan is in accordance with and gives effect to the provisions of section 510(a) of the Bankruptcy Code.

(d)     *Voting*:  Class 6 is Impaired and the Holders of Class 6 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan.

7.   Class 7 – Section 510(b) Claims

(a)     *Classification*:  Class 7 consists of Section 510(b) Claims against the Debtors.

(b)     Treatment:   Holders of Section 510(b) Claims shall not receive any distribution on account of such 510(b) Claims.  On the Effective Date, all Section 510(b) Claims shall be discharged.

(c)     Voting:  Class 7 is Impaired and holders of Class 7 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

8.   Class 8 – Equity Interests

(a)     *Classification*:  Class 8 consists of RDA Holding Co. Equity Interests.

(b)     *Treatment*:   Holders of RDA Holding Co. Equity Interests shall not receive any distribution on account of such RDA Holding Co. Equity Interests.  On the Effective Date, all RDA Holding Co. Equity Interests shall be discharged, cancelled, released and extinguished.

(c)     *Voting*:  Class 8 is Impaired and Holders of Class 8 Equity Interests are conclusively deemed to have rejected the Plan pursuant to 1126(g) of the Bankruptcy Code.

Therefore, Holders of RDA Holding Co. Equity Interests are not entitled to vote to accept or reject the Plan.

9. Class 9 – Intercompany Interests

    (a)      *Classification*: Class 9 consists of all Intercompany Interests in the Debtors.

    (b)      *Treatment*:  Intercompany Interests shall be reinstated on the Effective Date.

    (c)      *Voting*: Class 9 is Unimpaired, and Holders of Class 9 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

10. Class 10 – Intercompany Claims

    (a)      *Classification*: Class 10 consists of all Intercompany Claims.

    (b)      *Treatment*:  To preserve the Debtors' corporate structure, Intercompany Claims may be reinstated as of the Effective Date or, at the Debtors' or Reorganized Debtors' option, be cancelled or compromised, and no distribution shall be made on account of such Claims.

    (c)      *Voting*: Class 10 is Unimpaired, and Holders of Class 10 Intercompany Claims, by virtue of their status as a Debtor or an Affiliate of a Debtor, are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

C.      *Special Provision Governing Unimpaired Claims*

Except as otherwise provided herein, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.      *Acceptance or Rejection of the Plan*

1. Presumed Acceptance of Plan

Classes 1, 2, 9 and 10 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2. Voting Classes

Each Holder of an Allowed Claim in each of Classes 3, 4 and 5 shall be entitled to vote to accept or reject the Plan.

3. Presumed Rejection of Plan

Class 6 Senior Subordinated Notes Claims, Class 7 Section 510(b) Claims and Class 8 Equity Interests shall receive no distribution under the Plan on account of their Claims and Equity Interests and are, therefore, presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

4. Controversy Concerning Impairment

If a controversy arises as to whether any Claims, or any Class of Claims, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

16

E.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Acceptance of the Plan by either Class 3, 4 or 5 will satisfy section 1129(a)(10) of the Bankruptcy Code. The Debtors will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any rejecting class of Claims or Equity Interests.

F.      *Elimination of Vacant Classes*

Any Class of Claims that is not occupied as of the date of commencement of the Confirmation Hearing by the Holder of an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 (*i.e.*, no Ballots are cast in a Class entitled to vote on the Plan) shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptances or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims*

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlements of all Claims and Equity Interests and controversies resolved pursuant to the Plan.  Distributions made to Holders of Allowed Claims in any Class are intended to be final.

B.      *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, merger or consolidation with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the Reorganized Debtors determine are necessary or appropriate.

C.      *Corporate Existence*

Subject to any restructuring transactions as permitted under Article IV(B), each Debtor shall continue to exist after the Effective Date as a separate corporate entity or limited liability company, with all the powers of a corporation or limited liability company pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents in the case of a limited liability company) in effect prior to the Effective Date, except to the extent such certificate of incorporation or bylaws (or other formation documents in the case of a limited liability company) are amended by or in connection with the Plan or otherwise and, to the extent such documents are amended, such documents are deemed to be authorized pursuant hereto and without the need for any other approvals, authorizations, actions or consents.

D.      *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided herein or in any agreement, instrument or other document relating thereto, on or after the Effective Date, all property of each Estate (including, without limitation, Causes of Action) and any property acquired including by any of the Debtors pursuant hereto shall vest in each respective Reorganized Debtor,

17

free and clear of all liens, Claims, charges or other encumbrances. Except as may be provided herein, on and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

E.      *Indemnification Provisions in Organizational Documents*

As of the Effective Date, each Debtor's bylaws shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, directors, officers, employees or agents who were directors, officers, employees or agents of such Debtor, at any time prior to the Effective Date at least to the same extent as the bylaws of each of the respective Debtors on the Commencement Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors shall amend and/or restate its certificate of incorporation or bylaws before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations or such directors', officers', employees' or agents' rights; *provided* that, with respect to former officers and directors, the Debtors shall be obligated to indemnify such individuals only to the extent of available coverage under their D&O Liability Insurance Policies (and payable from the proceeds of such D&O Liability Insurance Policies), including the advancing of defense costs prior to final adjudication.

F.      *Cancellation of Agreements, Senior Subordinated Notes and Equity Interests*

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the Prepetition Credit Agreement, the Prepetition Loan Documents, the Senior Subordinated Notes Indenture and any other certificate, equity security, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors and their Affiliates, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating or pertaining to any agreements, indentures, certificates of designation, by-laws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; except that:

1.   The Prepetition Credit Agreement shall continue in effect solely for the purpose of: (a) allowing Holders of the Prepetition Credit Agreement Claims to receive the distributions provided for hereunder; (b) allowing the Prepetition Agent to receive distributions from the Debtors and to make further distributions to the Holders of Prepetition Credit Agreement Claims on account of such Claims, as set forth in Article VII.A of the Plan; and (c) preserving the Prepetition Agent's right to indemnification from the Debtors pursuant and subject to the terms of the Prepetition Credit Agreement in respect of any claim or cause of action asserted against the Prepetition Agent; provided that any claim or right to payment on account of such indemnification shall be an unsecured claim and shall not be secured in any of the assets of the Debtors, the Reorganized Debtors or their affiliates; and

2.   The foregoing shall not effect the cancellation of shares issued pursuant to the Plan nor any other shares held by one Debtor in the capital of another Debtor; and *provided*, *further*, *however*, that to the extent provided in the Exit Credit Agreement and the New Second Priority Term Loan Agreement, the guarantees of and Liens securing obligations under the Prepetition Credit Agreement shall not be cancelled and shall guarantee or secure obligations under and as set forth in the Exit Credit Agreement and the New Second Priority Term Loan Agreement and only such obligations.

K&E 15660073.11

G.      *Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors*

All Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be funded with Cash on hand.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors; *provided*, *however*, that the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

H.      *Approval of Exit Credit Agreement and New Second Priority Term Loan Agreement*

On the Effective Date, the Reorganized Debtors will enter into the Exit Credit Agreement and the New Second Priority Term Loan Agreement.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving (a) entry into the Exit Credit Agreement (and issuance of the New First Priority Term Loan and Reinstated Euro Term Loan), and (b) entry into the New Second Priority Term Loan Agreement (and issuance of the Second Priority Term Loan).  The lenders under the Exit Credit Agreement and the New Second Priority Term Loan Agreement shall have valid, binding and enforceable liens on the collateral specified in the relevant agreements executed by the Reorganized Debtors in connection with the Exit Credit Agreement and the New Second Priority Term Loan Agreement.  The guarantees, mortgages, pledges, liens and other security interests granted pursuant to or in connection with the Exit Credit Agreement and the New Second Priority Term Loan Agreement are granted in good faith as an inducement to the lenders to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the intercreditor agreement and other definitive documentation executed in connection with the Exit Credit Agreement and the New Second Priority Term Loan Agreement.  Notwithstanding anything to the contrary in the Confirmation Order or the Plan, the Bankruptcy Court's retention of jurisdiction shall not govern the enforcement of the loan documentation executed in connection with the Exit Credit Agreement and the New Second Priority Term Loan Agreement or any rights or remedies related thereto.

I.      *Reorganized Debtors' Equity Interests*

1.  New Common Stock

On the Effective Date, the Reorganized Debtors shall issue or reserve for issuance all of the New Common Stock.  The New Common Stock shall represent all of the Equity Interests in Reorganized Holdings as of the Effective Date and shall be issued to Holders of Prepetition Credit Agreement Claims, subject to dilution by equity issued in connection with the Management Equity Plan or the Rights Offering.  From and after the Effective Date, subject to the right of the stockholders to amend the certificate of incorporation of RDA Holding Co., Reorganized Holdings shall have one class and one series of New Common Stock; *provided* that the Shareholders Agreement shall provide an option for Holders to receive limited voting stock.  The issuance of the New Common Stock by Reorganized Holdings, including options or other equity awards reserved for the Management Equity Plan, is authorized without the need for further corporate action and all of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable.  For purposes of distribution, the New Common Stock will be deemed to have the Plan Equity Value, regardless of the date of distribution.

2.  Registration Rights & Shareholders Agreements

Certain holders of the New Common Stock shall be entitled to registration rights pursuant to the Registration Rights Agreement.  On or after the Effective Date, Reorganized Holdings and the Required Consenting

Lenders shall enter into and deliver a registration rights agreement and the Shareholders Agreement to each entity that is intended to be a party thereto or such agreements shall be deemed to be valid, binding and enforceable in accordance with their respective terms, and each holder of New Common Stock shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Holdings.

    3.    <u>Private Company</u>

On the Effective Date, the Reorganized Debtors shall be a private company. As such, the Reorganized Debtors will not list the New Common Stock on a national securities exchange.

## J.    *Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any securities pursuant to the Plan and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of securities. In addition, except as otherwise provided in the Plan, under section 1145 of the Bankruptcy Code, any and all New Common Stock contemplated by the Plan and any and all settlement agreements incorporated therein will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (2) the restrictions, if any, on the transferability of such Securities and instruments; and (3) applicable regulatory approval.

## K.    *Rights Offering*

The Debtors may issue up to $[50-100] million of the New Common Stock, which shall represent no more than [10-20]% of the New Common Stock, pursuant to the Rights Offering more fully described in the Disclosure Statement.

## L.    *Organizational Documents*

Subject to section IV.E of the Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan. Without limiting the generality of the foregoing, as of the Effective Date, Reorganized Holdings shall be governed by the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws. From and after the Effective Date, the organizational documents of each of the Reorganized Debtors will comply with section 1123(a)(6) of the Bankruptcy Code for so long as it is applicable.

## M.    *Effectuating Documents; Further Transactions*

The Debtors or the Reorganized Debtors, as applicable, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto. The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

K&E 15660073.11

*N.*     *Exemption from Certain Transfer Taxes and Recording Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

*O.*     *Directors and Officers of Reorganized Holdings and other Reorganized Debtors*

1.     The existing officers of the Debtors shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the board of directors to remove or replace them in accordance with the Debtors' organizational documents and any applicable employment agreements.

2.     The New Board shall consist of [7] directors.  The Prepetition Lenders shall identify potential directors through use of a search firm acceptable to the Prepetition Agent (with such reasonable fees and expenses to be paid by the Debtors) and shall initially designate all such directors upon consultation with the Debtors' Chief Executive Officer; *provided*, *however*, that certain independent directors may be requested to continue to serve on the New Board.  The identity of each of the members of the New Board will be disclosed prior to the Confirmation Hearing and any directors elected pursuant to this section shall be subject to approval of the Bankruptcy Court pursuant to section 1129(a)(5) of the Bankruptcy Code.  The existing directors of each of the subsidiary Debtors shall remain in their current capacities as directors of the applicable Reorganized Debtor until replaced or removed in accordance with the organizational documents of the applicable Reorganized Debtors.

*P.*     *Preservation of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code but subject to the releases set forth in Article X.E below, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Commencement Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

Subject to the releases set forth in Article X.E below, the Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Person shall vest in the applicable Reorganized Debtor, as the

case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

Further, any recovery paid or payable to the Debtors or the Prepetition Lenders from proceeds of any Cause of Action against the Consenting Shareholders (either directly or indirectly or pursuant to the subordination provisions of the Senior Subordinated Notes Indenture) shall be payable to such Consenting Shareholders, and if any of such parties receive any recovery on account of such Cause of Action, they shall hold the proceeds of any payment thereof in trust for the Consenting Shareholders and shall promptly transfer such proceeds or payment, as the case may be, to the Consenting Shareholders.

## ARTICLE V.
## COMPENSATION, PENSION AND BENEFITS PROGRAMS

A.      *Management Equity Plan*

On or as soon as practical after the Effective Date, the New Board will adopt and implement a Management Equity Plan whereby equity awards (in the form of restricted stock, options or warrants) for 7.5% of the New Common Stock (on a fully diluted basis) of the Reorganized Debtors will be granted to continuing employees of the Debtors and members of the New Board with pricing, vesting and exercise terms to be determined by the New Board upon consultation with the Reorganized Debtors' Chief Executive Officer; *provided*, that such equity awards shall not include more than 2.5% in the form of restricted New Common Stock. The Debtors reserve the right to amend the Management Equity Plan with the consent of the Prepetition Agent and the Required Consenting Lenders at any time prior to the Effective Date.

B.      *Compensation Plans*

Subject only to the occurrence of the Effective Date, the Enterprise Value Maximization Plan and the Variable Compensation Plan, which shall be set forth in the Plan Supplement, shall become effective without any further action by the Reorganized Debtors.

C.      *Compensation and Benefit Programs*

The Debtors do not believe that all of the Compensation and Benefits Programs are executory contracts but for purposes of the Plan, the Compensation and Benefits Programs shall be deemed to be, and shall be treated as though they are, Executory Contracts and, except as set forth below, the Reorganized Debtors' obligations under the Compensation and Benefits Programs shall be deemed assumed on the Effective Date pursuant to the provisions of section 365 and 1123 of the Bankruptcy Code, except for:

(a)      Compensation and Benefits Programs listed in the Plan Supplement to be rejected or terminated;

(b)      Compensation and Benefits Programs that have previously been rejected or terminated; and

(c)      Compensation and Benefits Programs that, as of the entry of the Confirmation Order, are the subject of pending rejection procedures or a motion to reject, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

The assumption or continuation of Compensation and Benefits Programs identified in the Plan Supplement shall not be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein (unless a Compensation and Benefits Program counterparty timely objects to the assumption or

continuation contemplated by this Section in which case any such Compensation and Benefits Program shall be deemed rejected or discontinued as of immediately prior to the Commencement Date). No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to this Section other than those applicable immediately prior to such assumption or continuation.

For the avoidance of doubt, the Debtors are not seeking to assume any obligations in connection with the Non-Qualified Retirement Plans in connection with the Plan. Claims arising from the discontinuation, rejection or termination of the Non-Qualified Retirement Plans will be treated as Other General Unsecured Claims in Class 5.

D.      *Continuation of Retiree Benefits and Pension Plan*

Notwithstanding anything to the contrary herein or otherwise, the Reorganized Debtors' obligations with respect to the payment of "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code) shall continue for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, and subject to any contractual rights to terminate or modify such benefits.

The Debtors or the Reorganized Debtors, as applicable, shall also continue the Pension Plan in accordance with its terms, and the Debtors or Reorganized Debtors, as applicable, shall satisfy the minimum funding standards and administer the Pension Plan in accordance with the provisions of ERISA and the Internal Revenue Code, subject to any contractual or statutory rights to terminate or modify such plan.

E.      *Workers' Compensation Programs*

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; provided, further, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

**Subject to the provisions herein, each of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) is identified on the list of Executory Contracts and Unexpired Leases to be rejected filed pursuant to the Plan Supplement, which list shall be filed on or before the Contract/Lease Schedule Date and shall not be modified by the Debtors after the Contract/Lease Schedule Date; (3) is the subject of a separate motion or notice to reject filed by the Debtors on or before the Contract/Lease Schedule Date; provided that the Debtors shall not file any separate motions or notices to reject Executory Contracts or Unexpired Leases after the Contract/Lease Schedule Date if the Plan is still pending or has been consummated; or (4) previously expired or terminated pursuant to its own terms.**

Except as expressly provided otherwise, the Plan shall give effect to any subordination rights as required by section 510(a) of the Bankruptcy Code.

23

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of such Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of such Executory Contracts and Unexpired Leases in the Plan are effective as of the Effective Date. Each such Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party prior to the Effective Date, shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or order of the Bankruptcy Court. Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify or supplement the Executory Contracts and Unexpired Leases identified in the Plan Supplement.

B. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any provisions or terms of the Debtors' Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, solely by Cure or by an agreed-upon waiver of Cure on or as soon as reasonably practicable after the Effective Date.

At least ten (10) days prior to the Confirmation Hearing, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, which will: (1) list the applicable amount of Cure, if any; (2) describe the procedures for filing objections thereto; and (3) explain the process by which related disputes will be resolved by the Bankruptcy Court; and the Debtors shall file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assumed and the proposed Cure.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure must be filed, served and actually received by the Debtors on or before the Cure Objection Deadline (which is that day that is at least five (5) days prior to the Confirmation Hearing). Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or Cure will be deemed to have assented to such matters (except that the Cure Objection Deadline shall not apply to any franchise or Executory Contract with a state or local franchise authority), and any subsequent or additional requests for Cure, other payments or assurances of future performance shall be disallowed, automatically and forever barred from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released and discharged, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; *provided*, *however*, that nothing shall prevent the applicable Reorganized Debtor from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

In the event of a dispute regarding (1) the amount of any payments to Cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the applicable Debtor or Reorganized Debtor, and the counterparty to the Executory Contract or Unexpired Lease. If an objection to Cure is sustained by the Bankruptcy Court, the Reorganized Debtors in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

The Debtors or Reorganized Debtors, as applicable, reserve the right, either to reject or nullify the assumption of any Executory Contract or Unexpired Lease no later than thirty days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, except any Executory Contract with a state or local franchise authority, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in

control or ownership interest (or payments relating to such change in control) or composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to or upon the effective date of assumption. Except as provided elsewhere herein, any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

C.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise must be filed by Holders of such Claims with the Notice, Claims and Solicitation Agent no later than thirty days after the later of (1) the Effective Date or (2) the effective date of earlier rejection for such Holders to be entitled to receive distributions under the Plan on account of such Claims; provided that any such Claims for earlier rejected contracts must be filed by no later than 20 calendar days prior to the Voting Deadline for the Holder of such Claim to be entitled to vote on the Plan. Any Proofs of Claim arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

D.      *Contracts and Leases Entered Into After the Commencement Date*

Contracts and leases entered into after the Commencement Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

E.      *Directors and Officers Insurance Policies and Agreements*

The Debtors do not believe that the D&O Liability Insurance Policies issued to, or entered into by, the Debtors prior to the Commencement Date constitute executory contracts. To the extent that such insurance policies or agreements are considered to be executory contracts, then, notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Commencement Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

F.      *Indemnification and Reimbursement Obligations*

On and from the Effective Date, and except as prohibited by applicable law or subject to the limitations set forth herein, the Reorganized Debtors shall assume all indemnification obligations currently in place, whether in the bylaws, certificates of incorporation (or other formation documents), board resolutions, employment contracts or other agreements for the current and former directors, officers, managers, employees, attorneys, other professionals

and agents of the Debtors and such current and former directors', officers', managers', and employees' respective Affiliates (collectively, the "Indemnified Parties"). Without limiting the foregoing and except as prohibited by applicable law, the Debtors shall indemnify and hold harmless each of the Indemnified Parties for all costs, expenses, loss, damage or liability incurred by any such Indemnified Party arising from or related in any way to any and all Causes of Action whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, including any claims or causes of action, whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, based in whole or in part upon any act or omission, transaction or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including those arising from or related in any way to: (1) any action or omission of any such Indemnified Party with respect to any indebtedness of or any Equity Interest in the Debtors (including any action or omission of any such Indemnified Party with respect to the acquisition, holding, voting or disposition of any such investment); (2) any action or omission of any such Indemnified Party in such Indemnified Party's capacity as an officer, director, member, employee, partner or agent of, or advisor to any Debtor; (3) any disclosure made or not made by any Indemnified Party to any current or former Holder of any such indebtedness of or any such Equity Interest in the Debtors; (4) any consideration paid to any such Indemnified Party by any of the Debtors in respect of any services provided by any such Indemnified Party to any Debtor; and (5) any action taken or not taken in connection with the Chapter 11 Cases or the Plan. In the event that any such Indemnified Party becomes involved in any action, proceeding or investigation brought by or against any Indemnified Party, as a result of matters to which the foregoing "Indemnification" may relate, the Reorganized Debtors shall promptly reimburse any such Indemnified Party for its reasonable and documented legal and other expenses (including advancing the costs of any investigation and preparation prior to final adjudication) incurred in connection therewith as such expenses are incurred and after a request for indemnification is made in writing, with reasonable documentation in support thereof; *provided, however, that,* with respect to former officers and directors, the Debtors' obligation to indemnify such individuals shall be limited to the extent of available coverage under their D&O Liability Insurance Policies (and payable from the proceeds of such D&O Liability Insurance Policies), including advancing the costs of any investigation and preparation prior to final adjudication as such expenses are incurred and after a request for indemnification is made in writing, with reasonable documentation in support thereof.

G.      *Reservation of Rights*

        Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H.      *Nonoccurence of Effective Date*

        In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions for Claims Allowed as of the Effective Date*

        Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Initial Distribution Date; *provided*, *however*, that payments on account of General Unsecured Claims that become Allowed Claims on or before the Effective Date shall commence on the Effective Date.

K&E 15660073.11

*B.      Distributions on Account of Claims Allowed After the Effective Date*

       1.      Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the first Periodic Distribution Date after the Disputed Claim becomes an Allowed Claim.

       2.      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims.

*C.      Delivery and Distributions and Undeliverable or Unclaimed Distributions*

       1.      Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim, other than one based on a publicly traded security is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

       2.      Delivery of Distributions in General

Except as otherwise provided herein, the Debtors or the Reorganized Debtors, as applicable, shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided, however,* that the manner of such distributions shall be determined at the discretion of the Debtors or the Reorganized Debtors, as applicable; and *provided further,* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim filed by that Holder.

       3.      Distributions by Distribution Agents

The Debtors and the Reorganized Debtors, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder. As a condition to serving as a Distribution Agent, a Distribution Agent must (a) affirm its obligation to facilitate the prompt distribution of any documents, (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required hereunder and (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required hereunder that are to be distributed by such Distribution Agent; *provided, however,* that the Indenture Trustee shall retain the right to setoff against the distributions required hereunder. The Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions or consents. The Distribution Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable. In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to

reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

4. Minimum Distributions

Notwithstanding anything herein to the contrary, the Reorganized Debtors shall not be required to make distributions or payments of less than $10 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar or fractional share of New Common Stock under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Common Stock (up or down), with half dollars and half shares of New Stock or less being rounded down.

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim if: (a) the aggregate amount of all distributions authorized to be made from on the Periodic Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Periodic Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $10, which shall be treated as an undeliverable distribution under Article VII.C.5 below.

5. Undeliverable Distributions

(a) Holding of Certain Undeliverable Distributions

If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtors (or their Distribution Agent) are notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors, subject to Article VII.C.5(b) hereof, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

(b) Failure to Claim Undeliverable Distributions

No later than [XX] days after the Effective Date, the Reorganized Debtors shall File with the Bankruptcy Court a list of the Holders of undeliverable distributions. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open. Any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtors of such Holder's then current address in accordance herewith within the latest of (i) one year after the Effective Date, (ii) 60 days after the attempted delivery of the undeliverable distribution and (iii) 180 days after the date such Claim becomes an Allowed Claim shall have its Claim for such undeliverable distribution discharged and shall be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property. In such cases, (i) any Cash or New Stock held for distribution on account of Allowed Claims shall be redistributed to Holders of Allowed Claims in the applicable Class on the next Periodic Distribution Date and (ii) any Cash held for distribution to other creditors shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and become property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

(c) Failure to Present Checks

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check. In an effort to ensure that all Holders of Allowed

Claims receive their allocated distributions, no later than 180 days after the issuance of such checks, the Reorganized Debtors shall File with the Bankruptcy Court a list of the Holders of any un-negotiated checks. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 240 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property. In such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

D.      *Compliance with Tax Requirements/Allocations*

        In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

        For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

E.      *Timing and Calculation of Amounts to Be Distributed*

        Except as otherwise provided herein, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class; *provided*, *however*, that distributions on account of Other General Unsecured Claims that become Allowed Claims before the Effective Date shall be paid on the Effective Date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in Article VII hereof. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

F.      *Setoffs*

        The Debtors and the Reorganized Debtors may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim. In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity

interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided herein.

G.    *Surrender of Canceled Instruments or Securities*

Each record Holder of a Senior Subordinated Note Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled pursuant to Article IV.F hereto, except to the extent otherwise provided herein.  The Indenture Trustee may (but shall not be required to) request that registered Holders of the Senior Subordinated Notes surrender their notes for cancellation.

H.    *Claims Paid or Payable by Third Parties.*

1.    Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.    Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

K&E 15660073.11

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.    *Resolution of Disputed Claims*

1.    Allowance of Claims

After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

2.    Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date until the Claims Objection Bar Date, the Reorganized Debtors, shall have the exclusive authority to file objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.  The Reorganized Debtors shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.  With respect to all Tort Claims, an objection is deemed to have been filed timely, thus making each such Claim a Disputed Claim as of the Claims Objection Bar Date.  Each such Tort Claim shall remain a Disputed Claim unless and until it becomes an Allowed Claim.

3.    Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

4.    Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Reorganized Debtors, and any Claim that has been amended may be adjusted thereon by the Reorganized Debtors, in both cases without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

5. Deadline to File Objections to Claims

Any objections to Claims shall be filed no later than the Claims Objection Bar Date.

B. *Disallowance of Claims*

All Claims of any Entity from which property is sought by the Debtors or the Reorganized Debtors under section 542, 543, 550 or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be disallowed if (i) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (ii) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER ON OR BEFORE THE LATER OF (1) THE CONFIRMATION HEARING AND (2) 45 DAYS AFTER THE APPLICABLE CLAIMS BAR DATE.**

C. *Amendments to Claim*

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim filed shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO EFFECTIVE DATE

A. *Conditions Precedent to Effective Date*

The following shall be satisfied or waived as conditions precedent to the Effective Date:

1. The Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Debtors, the Prepetition Agent and the Required Consenting Lenders, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2. The Plan and all Plan Supplement documents, including any amendments, modifications or supplements thereto, shall be reasonably acceptable to the Debtors, the Prepetition Agent and the Required Consenting Lenders.

3. The Confirmation Order shall have been entered and become a Final Order in form and in substance reasonably satisfactory to the Debtors, the Prepetition Agent and Required Consenting Lenders. The Confirmation Order shall provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan.

4. All documents and agreements necessary to implement the Plan, including, without limitation, the New Second Priority Term Loan Agreement and the Exit Credit Agreement shall have (a) been tendered for delivery and (b) been effected or executed. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

5. All actions, documents, certificates and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

B.     *Waiver of Conditions*

The Debtors or the Reorganized Debtors, as applicable, with the consent of the Prepetition Agent and the Required Consenting Lenders, may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm the Plan. The failure of the Debtors or Reorganized Debtors, as applicable, or the Prepetition Agent and the Required Consenting Lenders to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

C.     *Effect of Non Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

# ARTICLE X.

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.     *Compromise and Settlement*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

B.     *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable

subordination relating thereto. No Holder of a Senior Subordinated Note Claim shall receive any distribution on account of such Senior Subordinated Note Claim, and all Senior Subordinated Note Claims shall be extinguished.

C.      *Discharge of Claims and Termination of Equity Interests*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the reorganized Debtors), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Commencement Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Equity Interests relate to services performed by the employees of the Debtors prior to the Commencement Date and arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring.

D.      *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III hereof and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

E.      *Debtor Release*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission or the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions**

or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or related agreements, instruments or other documents, or upon any other act or omission, transaction, or occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct or gross negligence.

Notwithstanding anything to the contrary herein, the foregoing "Debtor Release" shall not operate to waive or release any Causes of Action of any Debtor: (1) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan, including, without limitation, the Exit Credit Agreement, New Second Priority Term Loan Agreement or the Shareholders Agreement or documents, agreements or instruments executed in connection therewith or (2) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents.

Entry of the Confirmation Order Shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors or the Reorganized Debtors asserting any claim released by the Debtor Release against any of the Released Parties.

F.      *Releasing Party Release*

Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission or the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or related agreements, instruments or other documents, or upon any other act or omission, transaction, or occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct or gross negligence.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order Shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the consensual Releasing Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's

finding that the Releasing Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the Releasing Party Release against any of the Released Parties.

Notwithstanding anything in the Plan, no Person shall be discharged, released, or relieved from any liability with respect to the Pension Plan as a result of the Chapter 11 Cases or the Plan, nor shall the PBGC, the Pension Plan or any other Person be enjoined or precluded from enforcing any liability with respect to the Pension Plan as a result of the Chapter 11 Cases, the provisions of the Plan or confirmation of the Plan.

G.     *Exculpation*

Upon and effective as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring consultants and other professional advisors and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code , including section 1125(e) of the Bankruptcy Code.

Except with respect to any acts or omissions expressly set forth in and preserved by the Plan, the Plan supplement or related documents, the Exculpated Parties shall neither have nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the Chapter 11 Cases, including, without limitation, the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; formulating, negotiating, preparing, disseminating, implementing and/or effecting the Restructuring Support Agreement, the DIP Credit Agreement, the Disclosure Statement and the Plan (including the Plan Supplement and any related contract, instrument, release or other agreement or document created or entered into in connection therewith); the solicitation of votes for the Plan and the pursuit of Confirmation and Consummation of the Plan; the administration of the Plan and/or the property to be distributed under the Plan; the offer and issuance of any securities under the Plan, including pursuant to the Rights Offering; and or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors.  In all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its respective duties under, pursuant to or in connection with, the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall (1) exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of confidential information that causes damages or ultra vires acts as determined by a Final Order or (2) limit the liability of the professionals of the Exculpated Parties to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

H.     *Injunction*

The satisfaction, release and discharge pursuant to this Article IX of the Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process or act to collect, offset, or recover any claim or Cause of Action satisfied, released, or discharged under the Plan or the Confirmation Order to the fullest extent authorized or  provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

K&E 15660073.11

# ARTICLE XI.

## ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE EXPENSE CLAIMS

A.    *Professional Claims.*

1.    <u>Final Fee Applications</u>.  All final requests for Professional Compensation and Reimbursement Claims shall be filed no later than 45 days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Compensation and Reimbursement Claims shall be determined by the Bankruptcy Court.

2.    <u>Payment of Interim Amounts</u>.  Except as otherwise provided in the Plan, Retained Professionals shall be paid pursuant to the Interim Compensation Order.

3.    <u>Professional Fee Escrow Account</u>.  On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount (defined below) for all Retained Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Retained Professionals with respect to whom fees or expenses have been held back pursuant to the Interim Compensation Order.  [Such funds shall not be considered property of the Reorganized Debtors.]  The remaining amount of Professional Compensation and Reimbursement Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals by the Reorganized Debtors from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by a Bankruptcy Court order.  When all Professional Compensation and Reimbursement Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall be paid to the Reorganized Debtors.

4.    <u>Professional Fee Reserve Amount</u>.  To receive payment for unbilled fees and expenses incurred through the Effective Date, the Retained Professionals shall estimate their Accrued Professional Compensation (net of any unapplied retainer amounts) prior to and as of the Effective Date and shall deliver such estimate to the Debtors on or before the Effective Date.  If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; *provided, however,* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional.  The total amount so estimated as of the Effective Date shall comprise the "Professional Fee Reserve Amount."

5.    <u>Post-Effective Date Fees and Expenses</u>.  Except as otherwise specifically provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall pay in Cash the reasonable legal fees and expenses incurred by that Reorganized Debtor after the Effective Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court.  Upon the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

6.    <u>Substantial Contribution Compensation and Expenses</u>.  Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules.

B.    *Other Administrative Claims*

All requests for payment of an Administrative Claim must be filed with the Voting and Claims Agent and served upon counsel to the Debtors or Reorganized Debtors, as applicable.  The Reorganized Debtors may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.  In the event that any party with standing objects to an Administrative Claim, the

K&E 15660073.11

Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order.

## ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

K&E 15660073.11

12.     Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     Enter an order or final decree concluding or closing the Chapter 11 Cases;

17.     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     Determine requests for the payment of Claims and Equity Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan (other than any dispute arising after the Effective Date under, or directly with respect to, the Exit Credit Agreement, the New Second Priority Term Loan Agreement and any intercreditor agreement, which disputes shall be adjudicated in accordance with the terms of such agreements);

21.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.     Enforce all orders previously entered by the Bankruptcy Court; and

24.     Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII.

## MODIFICATION, REVOCATION AND WITHDRAWAL OF THE PLAN

*A.     Modification of Plan*

Subject to the limitations contained in the Plan and the Restructuring Support Agreement, and in accordance with the Restructuring Support Agreement: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or

remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

B.      *Effect of Confirmation On Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation of Plan*

Subject to the Restructuring Support Agreement and conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.


# ARTICLE XIV.

# MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(g) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors and any and all Holders of Claims or Equity Interests (irrespective of whether Holders of such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Equity Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at a hearing pursuant to section 11238 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

D. *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtor with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

E. *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

F. *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors shall be sent by overnight mail to:

| Debtors | Counsel to Debtors |
|---|---|
| The Reader's Digest Association, Inc.<br>Reader's Digest Road<br>Pleasantville, New York, 10570<br>Attn:  Andrea Newborn, Senior Vice President, General Counsel and Corporate Secretary | Kirkland & Ellis LLP<br>601 Lexington Ave.<br>New York, New York 10022<br>Attn:  Paul M. Basta and  Nicole L. Greenblatt |
| **Special Counsel to the Debtors** | **United States Trustee** |
| Curtis, Mallet-Prevost, Colt & Mosle LLP<br>101 Park Avenue<br>New York, New York 10178<br>Attn:  Steven J. Reisman | Office of the United States Trustee<br>for the Southern District of New York<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn:  Andrea Schwartz |
| **Counsel to the Agent for the Debtors' Prepetition and Postpetition Lenders** | **Counsel to the Creditors' Committee** |
| Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York 10017<br>Attn.:  Sandeep Qusaba | Otterbourg, Steindler, Houston & Rosen, P.C.<br>230 Park Avenue<br>New York, NY 10169<br>Attn.:  Scott Hazan and David Posner |

After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed renewed requests for service.

In accordance with Bankruptcy Rules 2002 and 3020(c), within ten (10) Business Days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; *provided*, *however*, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. To supplement the notice described in the preceding sentence, within twenty days of the date of the Confirmation Order the Debtors shall publish the Notice of Confirmation once in The Wall Street Journal (National Edition).  Mailing and publication of the Notice of Confirmation in the time and manner set forth in the this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

*G.*        *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

*H.*        *Entire Agreement*

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

*I.*        *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

*J.*        *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date or the Solicitation Date, as applicable.  After the exhibits and documents are filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' private website at http://www.kccllc.net/readers or the Bankruptcy Court's website at www.nysb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

*K.*        *Nonseverability of Plan Provisions upon Confirmation*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors and the Administrative Agent; and (3) nonseverable and mutually dependent.

L.    *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.    *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control

N.    *Dissolution of Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, *however*, that after the entry of the Confirmation Order, the Creditors' Committee's functions shall be restricted to, and the Creditors' Committee shall not be heard on any issue except, obtaining a Final Order of the Bankruptcy Court authorizing or approving Accrued Professional Compensation of its Retained Professionals.

O.    *Section 1125(e) Good Faith Compliance*

The Debtors, Reorganized Debtors, the Prepetition Agent, the DIP Agent and the Creditors' Committee, and each of their respective Representatives, shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

P.    *Further Assurances*

The Debtors, Reorganized Debtors, all Holders of Claims receiving distributions hereunder and all other parties-in-interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

Q.    *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062.

R.    *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement or papers filed with the Bankruptcy Court prior to the Confirmation Date.

K&E 15660073.11

Respectfully submitted, as of the date first set forth above,

**The Reader's Digest Association, Inc. (on behalf of itself and all other Debtors)**

By: _/s/_ _____

Name:

Title:

**EXHIBIT B(1)**

**Corporate Structure Chart**



# RDA Holding Co. Structure – Debtors Only

UPDATED (K&E)
9/23/2009

## Exhibit B(2)

### Schedule of Debtors

| DEBTOR NAME | TAXPAYER ID | CASE NO. | DOMICILE |
|---|---|---|---|
| The Reader's Digest Association, Inc. | 13-1726769 | 09-23529 | Delaware |
| Alex Inc. | 13-3765531 | 09-23530 | Delaware |
| Allrecipes.com, Inc. | 91-1693797 | 09-23531 | Washington |
| Ardee Music Publishing, Inc. | 13-2852291 | 09-23532 | Delaware |
| Christmas Angel Productions, Inc. | 13-4062729 | 09-23533 | Delaware |
| CompassLearning, Inc. | 13-4066536 | 09-23534 | Delaware |
| Direct Entertainment Media Group, Inc. | 32-0272306 | 09-23535 | Delaware |
| Direct Holdings Americas Inc. | 13-2861045 | 09-23536 | Delaware |
| Direct Holdings Custom Publishing Inc. | 13-3867452 | 09-23537 | Delaware |
| Direct Holdings Customer Service, Inc. | 13-3389015 | 09-23538 | Delaware |
| Direct Holdings Education Inc. | 13-3765535 | 09-23539 | Delaware |
| Direct Holdings Libraries Inc. | 13-2537299 | 09-23540 | New York |
| Direct Holdings U.S. Corp. | 32-0134998 | 09-23541 | Delaware |
| Funk & Wagnalls Yearbook Corp. | 13-3603787 | 09-23542 | Delaware |
| Gareth Stevens, Inc. | 39-1462742 | 09-23543 | Wisconsin |
| Home Service Publications, Inc. | 13-3439525 | 09-23544 | Delaware |
| Pegasus Asia Investments Inc. | 13-3850077 | 09-23545 | Delaware |
| Pegasus Investment, Inc. | 13-3864252 | 09-23546 | Delaware |
| Pegasus Sales, Inc. | 13-1883259 | 09-23547 | Delaware |
| Pleasantville Music Publishing, Inc. | 13-2852289 | 09-23548 | Delaware |
| R.D. Manufacturing Corporation | 13-6120230 | 09-23549 | Delaware |
| RD Large Edition, Inc. | 13-3941489 | 09-23550 | Delaware |
| RD Publications, Inc. | 13-3439115 | 09-23551 | Delaware |
| RD Walking, Inc. | 13-3936509 | 09-23552 | Delaware |
| RDA Holding Co. | 37-1537045 | 09-23553 | Delaware |
| RDA Sub Co. | 42-1360501 | 09-23554 | Iowa |
| Reader's Digest Children's Publishing, Inc. | 13-3616326 | 09-23555 | Delaware |
| Reader's Digest Consumer Services, Inc. | 43-2018469 | 09-23556 | Delaware |
| Reader's Digest Entertainment, Inc. | 13-3144742 | 09-23557 | Delaware |
| Reader's Digest Financial Services, Inc. | 13-4177291 | 09-23558 | Delaware |
| Reader's Digest Latinoamerica, S.A. | 52-1275836 | 09-23559 | Delaware |
| Reader's Digest Sales and Services, Inc. | 13-1952377 | 09-20011 | Delaware |
| Reader's Digest Sub Nine, Inc. | 13-4062727 | 09-23560 | Delaware |
| Reader's Digest Young Families, Inc. | 06-1396158 | 09-23561 | Delaware |
| Reiman Manufacturing, LLC | 13-4358760 | 09-23562 | Delaware |
| Reiman Media Group, Inc. | 47-0861192 | 09-23563 | Delaware |
| Retirement Living Publishing Company, Inc. | 13-3439118 | 09-23564 | Delaware |
| Saguaro Road Records, Inc. | 32-0272310 | 09-23565 | Delaware |
| Taste of Home Media Group, Inc. | 47-0861190 | 09-23566 | Delaware |
| Taste of Home Productions, Inc. | 47-0861193 | 09-23567 | Delaware |
| Travel Publications, Inc. | 11-2832927 | 09-23568 | Delaware |
| W.A. Publications, LLC | 13-6120229 | 09-23569 | Delaware |
| WAPLA, LLC | 13-4199272 | 09-23570 | Delaware |
| Weekly Reader Corporation | 13-3603780 | 09-23571 | Delaware |
| Weekly Reader Custom Publishing, Inc. | 13-3783276 | 09-23572 | Delaware |
| World Almanac Education Group, Inc. | 13-3603781 | 09-23573 | Delaware |
| World Wide Country Tours, Inc. | 47-0861189 | 09-23574 | Delaware |
| WRC Media, Inc. | 13-4066536 | 09-23575 | Delaware |

## EXHIBIT C

**Solicitation and Voting Procedures**

[*To Come*]

# EXHIBIT D

## Financial Projections

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE READER'S DIGEST ASSOCIATION, | ) | Case No. 09-23539 (RDD) |
| INC., *et al.*, | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## FINANCIAL PROJECTIONS (UNAUDITED)
## FOR THE FISCAL YEARS ENDED 2010 – 2014

The Reader's Digest Association, Inc. ("***Reader's Digest***") and certain of its affiliates (collectively, the "***Debtors***") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the Bankruptcy Court for the Southern District of New York on August 24, 2009 (the "***Commencement Date***").

The Debtors are soliciting votes with respect to the *Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "***Plan***") as set forth in the Disclosure Statement for the Plan (as may be amended from time to time, the "***Disclosure Statement***"). All capitalized terms used by not defined herein have the meanings set forth in the Disclosure Statement.

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor thereto, unless such liquidation or reorganization is contemplated by the plan. Accordingly, in connection with the planning and development of the Plan, and for the purposes of determining whether the Plan satisfies this "feasibility" standard, the Debtors analyzed their ability, as Reorganized Debtors, to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

Specifically, with the assistance of their restructuring advisors, AlixPartners, LLP ("***AlixPartners***"), the Debtors developed and refined a bottom-up business plan and prepared these financial projections for the fiscal years 2010 through 2014 (the "***Projection Period***"). These projections are presented on a consolidated basis for the Debtors and their Affiliates (the "***Company***"). These projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below.

The Company does not, as a matter of course, publish its business plans and strategies, projections, anticipated financial position or results of operations. Accordingly, the Debtors do not intend to, and disclaim any obligation to, (i) furnish updated business plans or projections to Holders of Claims or Interests after the Confirmation Date, (ii) include such information in documents, if any, required to be filed with the Securities and Exchange Commission (the "***SEC***") or (iii) otherwise make such information public consistent with applicable law.

1

THE PROJECTIONS HAVE BEEN PREPARED EXCLUSIVELY BY THE DEBTORS, WITH ASSISTANCE OF ALIXPARTNERS. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT AT THE TIME AND TO THE BEST OF THEIR KNOWLEDGE, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

These projections should be read in conjunction with the assumptions, qualifications, notes and explanations set forth, referenced or otherwise described in, without limitation: (i) these projections; (ii) the Disclosure Statement, especially Section VII thereof; (iii) the Plan and the Plan Supplement; and (iv) the historical consolidated financial statements (including any notes and schedules thereto), other financial information and detailed discussion of the various risks and other factors associated with the Company's businesses and operations generally set forth under the section entitled "Risk Factors" in Reader's Digest's Annual Report on Form 10-K for the fiscal year ended June 30, 2008, and Reader's Digest's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2009, copies of which can be obtained from the Debtors' investor relations website (http://phx.corporate-ir.net/phoenix.zhtml?c=71092&p=irol-IRhome) or the SEC's EDGAR system website (http://www.sec.gov/edgar.shtml).

<u>**Important Accounting and Securities Law Disclosures**</u>

A.       <u>**Accounting Disclosure**</u>

Although some assumptions have been made, these projections do not reflect necessary or complete fresh-start reporting adjustments that may be required to be made on the Effective Date. The Debtors will be required to estimate the Debtors' reorganization value, the fair value of their assets and their actual liabilities as of the Effective Date. Such determinations will be based upon the fair values as of that date, which could be materially greater or less than the value assumed in these projections. Any fresh-start reporting adjustments that may be required in accordance with *Statement of Position 90-7 – Financial Reporting by Entities in Reorganization* under the Bankruptcy Code, including any allocation of the Debtors' reorganization value to the Debtors' assets in accordance with the procedures specified in *Financial Accounting Standards Board Statement 141 – Business Combinations*, will be made when the Debtors exit chapter 11.

K&E 15726988.

These projections were not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with Generally Accepted Accounting Principles ("*GAAP*") or the rules and regulations of the SEC regarding projections. Furthermore, these projections have not been audited by independent accountants.

**B.      Safe Harbor Statement Under The Private Securities Litigation Reform Act Of 1995**

These projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act of 1933, as amended (the "*Securities Act*") and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 (the "*Exchange Act*"). "Forward-looking statements" in these projections include the intent, belief or current expectations of the Debtors and members of its management team with respect to the timing of, completion of and scope of the current restructuring, reorganization plan, strategic business plan, bank financing, and debt and equity market conditions and the Debtors' future liquidity, as well as the assumptions upon which such statements are based.

While the Debtors believe that the expectations are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

Important factors currently known to management that could cause actual results to differ materially from those contemplated by the forward-looking statements in these projections include, without limitation: (i) further adverse developments with respect to the Company's liquidity position or operations of Debtors' businesses; (ii) adverse developments in Debtors' efforts to renegotiate their funding; (iii) adverse developments in the bank financing or public or private markets for debt or equity securities; (iii) adverse developments in the timing or results of Debtors' strategic business plan (including the time line to emerge from chapter 11); (iv) the ability of Debtors to retain and attract new clients and maintain favorable vendor relationships; (v) the difficulty in controlling industry costs and the ability of the Debtors to realize the anticipated general and administrative expense savings and overhead reductions presently contemplated in their business plans; (vi) the ability of the Debtors to return their operations to profitability; (vii) the level and nature of any restructuring and other one-time charges; (viii) the difficulty in estimating costs relating to exiting certain markets and consolidating and closing certain operations; and/or (ix) the possible negative effects of a change in applicable legislation.

K&E 15726988.

<u>**Key Assumptions**</u>

These projections were prepared by the Debtors, with the assistance of AlixPartners, in good faith based on various assumptions and estimates believed to be reasonable at the time of preparation, but which are subject to significant contingencies. These projections are also based upon forecasts of certain key economic variables, such as changes in the competitive environment (including the demand for Company's products), the ability to achieve certain cost reductions and the ability to stabilize and expand the Company's consumer and advertising revenue bases. Accordingly, because such assumptions, estimates and forecasts underlying these projections are inherently uncertain and subject to significant business, economic and competitive uncertainties (many of which are beyond the Company's control), actual results may vary, in some instances materially, from those presented herein. These projections assume the Plan will be confirmed, consummated and implemented in accordance with its stated terms.

**A.     <u>General Assumptions</u>**

1.     **Methodology**. These projections are based on the Debtors' detailed projections for fiscal years 2010-2014 (the Debtors operate on a June 30 fiscal year-end).

2.     **Emergence Date**. These projections are further based on the assumption that the Debtors will emerge from chapter 11 on or about December 31, 2009 – the assumed "Effective Date" of the Plan. If the Effective Date is significantly delayed, additional expenses, including professional fees, may be incurred and operating results may be negatively impacted. In addition, the Debtors believe that their businesses will be adversely impacted as a result of being in a prolonged chapter 11 process, particularly with respect to potential trade contraction, both domestically and internationally.

3.     **Macroeconomic & Industry Environment**. These projections assume there will be no substantial near-term improvement in the global macroeconomic environment. These projections also assume constant foreign currency exchange rates and stable commodity pricing environments. These projections further assume a stabilization of the print media sector, stabilization of customer bases, stabilization of response and payment rates in many of the Debtors' international markets (especially Europe) and an increasing dependence on expanding the Company's brands through digital platforms.

4.     **Revenues**. These projections assume that the Reader's Digest magazine revenue and operating profit continue to decline over the Projection Period, particularly in the United States. Specifically, the near-term projections assume a negative impact on the Company's profitability due to the current recessionary economic environment. These projections assume the Company's revenue will stabilize and begin to recover commencing in fiscal year 2011 and through the remainder of the Projection Period from a variety of factors, including improved subscription and advertising revenues in other U.S. magazines and increased direct marketing efforts and stabilized customer bases in foreign countries.

4

5.     **Operations**.  These projections are aggregated from operating forecasts for the Reorganized Debtors, which assume the Company maintains its global multi-brand media and direct marketing strategy, with an increasing focus on the development of digital media platforms.  These projections incorporate the Company's planned revenue and cost initiatives as well as operational restructuring activities, and assume no material asset dispositions during the Projection Period (and assume the Debtors continue to own and operate their CompassLearning division).  These projections further assume the Company will be able to retain and attract the employees required to execute its Business Plan.  The Company continually reviews its operations, the economic environment and the markets in which it competes, to evaluate the potential future profitability of each of its product lines.  The actual operations of the Company, as well as the financial results from operations, could vary significantly from the assumptions used to generate these projections as a result of, among other things, changes to the Company's future operations.

6.     **Other Assumptions**.  These projections also assume that:  (a) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Debtors; (b) there will be no change in GAAP in the United States that will have a material effect on the reported financial results of the Debtors; (c) the application of fresh-start reporting will not materially change the Debtors' accounting procedures; and (d) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Debtors.

## B.     Projected Consolidated Income Statement

1.     **Revenues**.  Net revenues are forecasted to decline 2.8% from fiscal year 2009 to 2010, then recover at an approximate 3.0% compound annual growth rate through fiscal year 2014.  In the United States, the increase is primarily driven by growth in magazine subscription and print advertising revenues in the "Food & Entertaining" affinity and increasing digital advertising revenues at AllRecipes.com.  Internationally, the recovery of books, video and music revenue is expected to improve consolidated revenues during the Projection Period.

- Subscription Revenue.  Generally, the Company sells subscriptions to its publications directly through its circulation management teams or through third-party marketing companies or agents. The Company receives a percentage of the total price of subscriptions sold through third-party sources based on specific agreement with each company. In addition to third-party sources, the Company has historically sold subscriptions using a variety of techniques including insert cards, direct mail and the Internet.  At present, the Company offers approximately 94 magazines, including 50 editions of its flagship *Reader's Digest* magazine, for subscription globally.  Fiscal year 2009 net subscription revenue totaled approximately $320.3 million in the United States and $194.1 million internationally.  Subscription revenues are estimated to constitute approximately 20% of net revenues in these projections and remain essentially flat during the Projection Period.

5

- <u>Advertising Revenue</u>.  Advertising rates and rate structures vary among publications and Internet properties and are based on, among other things, the circulation or audience of the particular property, the readership demographics, the scheduled frequency and the size and placement of the advertisement in the publication or website. Advertising revenue is influenced by a number of external factors, including the presence and relative positioning of competing publications, the amount and allocation of marketing expenditures by advertising clients and the extent to which customers elect to advertise using print and online media.  The Company believes that it is less reliant on advertising than many of its peers.  In the fiscal year 2009, net advertising revenue accounted for $128.0 million (13% of U.S. net revenue) and $52.3 million (4.0% of international net revenue).  Advertising revenues are estimated to constitute between 8.5% and 10.5% of net revenues in these projections.  Advertising revenues are projected to grow at a compound rate of approximately 9.0% during the Projection Period.

- <u>Newsstand Revenue</u>.  The Company estimates approximately 18.7 million single copies of magazines were sold through newsstands for the fiscal year 2009.  Generally, the Company receives a percentage of the cover price of an individual magazine sold through the newsstand with the balance of the cover price retained by the magazine's distributors, wholesalers and retailers.  Newsstand revenues are estimated to generate less than 4.0% of the Company's revenues in these projections.

- <u>Other Revenue</u>.  The Company derives significant revenues from a variety of non-magazine products, including single and series book sales, music, video and DVD products, primarily under the Reader's Digest brand name, and also from a licensing agreement with Time Warner Inc. and Time Inc.  In addition, the Company derives revenue from a variety of non-publishing products, including jewelry, merchandise, wine, vitamins and related health products, tours, financial services, mailing list rentals, royalty and license agreements.  Other revenue accounts for over 65% of net revenues in these projections, and is expected to grow at a compound rate of approximately 3.0% during the Projection Period.

2.      **Operating Expenses**.  The Company divides operating expenses into four distinct groups:  product costs, promotion costs, overhead costs and other costs.

- <u>Product Costs</u>.  The principal components of production costs are magazine paper, manufacturing costs such as paper for books, editorial, fulfillment and delivery (both through the mail and to retail outlets).  The supply and prices of paper are subject to volatility and may be significantly affected by many factors, including market and economic conditions.  Delivery costs are subject to local government post office price increases which, in the past, have been significant and difficult to forecast with any reasonable certainty.  For the Projection Period, product costs remain relatively stable in these projections at an average of approximately 46% of net revenues.

- Promotion Costs. Promotion costs are the costs incurred by the Company to retain or extend existing customers and to acquire new customers. These include the expenses associated with the production of solicitation materials, the postage/delivery costs for such materials, the cost of inducements or other incentives offered to subscribers and the cost of promoting the Debtors products at retail. Promotion costs decline from 28% of net revenues in fiscal 2010 to 25% in fiscal years 2012 through 2014. These projections assume reductions in promotion costs as a result of improved efficiency, favorable procurement agreements and certain benefits arising from a global promotion outsourcing contract.

- Overhead Costs. Overhead includes support functions and infrastructure to support the operations of the Company. Principal components include magazine advertising sales expense, marketing and research expense, management information systems, operations, procurement, executive management, human resources, finance and accounting. Overhead costs remain relatively stable in these projections at an average of approximately 24% of net revenues.

- Other Operating Costs. These projections include other costs that are included in the Company's operating profit. Total other operating expenses primarily include costs restructuring charges related to the Company's operational restructuring and global initiatives and the cost of administering these Cases. These costs total approximately $124.7 million in fiscal year 2010, and less than $5.0 million annually thereafter.

3. **Income Taxes**. Income tax expense in these projections are derived from the Company's latest tax forecast and assumed to represent cash taxes paid. The tax forecast assumes that the Debtors' will lose substantially all tax attributes on the Effective Date.

## C. **Projected Consolidated Balance Sheet**

1. **Current Assets**. The Company's significant current assets consist of accounts receivable, cash, prepaid expenses and inventory. Accounts receivable consist primarily of amounts due from customers and advertisers for subscriptions, advertising and non-magazine products and are net of allowances for returns and bad debts. Prepaid expenses consist primarily of expenses of subsequent magazine subscription issues, prepaid agent commissions, prepaid promotional expenses and other normal and customary prepaid expenses. Inventories consist of raw materials, work in process and finished goods inventory (net of customary reserves) primarily for the Company's non-magazine products.

2. **Non-Current Assets**. The Company's significant non-current assets include goodwill, intangible assets such as trademarks and customer lists, pension assets and long-term deferred tax assets.

K&E 15726988.

3. **Current Liabilities**. The Company's significant current liabilities consist of accounts payable, accrued expenses, payroll liabilities and unearned revenue. Accounts payable and accrued expenses consist primarily of trade payables and customary accruals, respectively. Unearned revenue is recorded by the Company as a liability to reflect the amount of future subscription revenues not yet earned nor fulfilled.

4. **Non-Current Liabilities**. The Company's significant non-current liabilities include the non-current portion of unearned revenue and the liabilities for the qualified pension plan and post-retirement medical benefits.

## D.   Post-Effective Date Capital Structure

1. **New First Priority Term Loan**. These projections assume the New First Priority Term Loan and Reinstated Euro Term Loan accrue quarterly cash interest at the higher of the annual rate of (a) three-month LIBOR or (b) 3.5% plus 1,000 basis points. The New First Priority Term Loan has mandatory amortization of 10% of the initial principal amount *per annum*, payable quarterly, with the first payment due on March 31, 2010. Subsequent payments shall be due on the last day of each of June, September, December and March thereafter, until December 31, 2012 (the maturity date), at which time all outstanding principal and interest is due and payable.

*2.* **Reinstated Euro Term Loan**. These projections assume the Reinstated Euro Term Loan accrue quarterly cash interest at the higher of the annual rate of (a) three-month LIBOR or (b) 3.5% plus 1,000 basis points. The Reinstated Euro Term Loan had mandatory amortization of 1% per annum of the initial principal amount, payable quarterly (0.25% of the initial principal amount or $0.3 million per quarter), with the first payment due on September 30, 2010. Subsequent payments shall be due 90 days following each payment thereafter, until March 2, 2014 (the maturity date), at which time all outstanding principal and interest is due and payable.

3. **New Second Priority Term Loan**. The New Second Priority Term Loan accrues quarterly cash interest at the higher of the annual rate of (a) three-month LIBOR or (b) 3.5% plus 1,200 basis points. The Second Priority Term Loan does not amortize prior to the assumed maturity date of March 2, 2014.

4. For illustrative purposes, the Debtors have assumed that all debt maturities will be refinanced on substantially similar terms throughout the Projection Period.

K&E 15726988.

**Reader's Digest Association, Inc., *et al.,* and non-debtor affiliates**

*Confidential - For discussion purposes only and subject to material change*

| (US$mm) | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 |
|---|---|---|---|---|---|
| **INCOME STATEMENT** | **Total** | **Total** | **Total** | **Total** | **Total** |
| Net revenue | $ 2121.0 | $ 2151.8 | $ 2229.8 | $ 2293.2 | $ 2363.1 |
| Product costs | 925.0 | 986.4 | 1030.2 | 1063.7 | 1096.4 |
| Promotion costs | 594.8 | 552.0 | 563.2 | 579.5 | 593.5 |
| Total overhead costs | 468.7 | 460.5 | 489.2 | 516.2 | 536.5 |
| Total other operating expenses | 124.7 | 4.0 | 2.7 | 1.2 | .7 |
| **Operating profit** | **7.8** | **148.9** | **144.5** | **132.6** | **136.0** |
| Other expense (income) | (1.1) | .9 | .8 | .8 | .8 |
| Interest expense, net | 79.4 | 79.2 | 79.1 | 80.9 | 80.6 |
| Income taxes | 20.1 | 35.7 | 31.6 | 27.6 | 35.4 |
| **Net income (loss) from continuing operations** | **(90.6)** | **33.1** | **33.0** | **23.3** | **19.2** |
| Gain associated with restructuring transaction | 1852.7 | - | - | - | - |
| **Net income** | **$ 1762.1** | **$ 33.1** | **$ 33.0** | **$ 23.3** | **$ 19.2** |
| **Cash EBITDA** | **$ 159.9** | **$ 184.3** | **$ 190.3** | **$ 190.3** | **$ 198.8** |

**Reader's Digest Association, Inc.,** *et al.,* **and non-debtor affiliates**

*Confidential - For discussion purposes only and subject to material change*

| (US$mm)<br>**BALANCE SHEET** | Estimated<br>Pre<br>Consummation<br>12/31/2009 | Total<br>Reorganization<br>Adjustments | Estimated<br>Post<br>Consummation<br>12/31/2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 |
|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | |
| Current assets: | | | | | | | | |
| Cash and equivalents | 200.7 | (71.0) | 129.7 | 150.5 | 187.7 | 229.2 | 271.2 | 315.9 |
| Accounts receivable, net | 302.7 | - | 302.7 | 246.0 | 241.0 | 248.3 | 255.0 | 262.7 |
| Inventories, net | 100.1 | - | 100.1 | 96.4 | 110.7 | 114.8 | 118.4 | 122.4 |
| Total other current assets | 192.8 | - | 192.8 | 192.7 | 175.2 | 169.0 | 167.1 | 167.6 |
| **Total current assets** | **796.3** | **(71.0)** | **725.3** | **685.6** | **714.6** | **761.3** | **811.7** | **868.6** |
| Fixed assets, net | 69.7 | - | 69.7 | 70.3 | 72.0 | 71.8 | 70.5 | 68.6 |
| Goodwill, net | 704.8 | - | 704.8 | 704.8 | 704.8 | 704.8 | 704.8 | 704.8 |
| Other intangible assets, net | 439.2 | - | 439.2 | 425.1 | 399.3 | 377.4 | 358.5 | 345.5 |
| Total other noncurrent assets | 330.5 | (40.8) | 289.7 | 303.8 | 314.2 | 312.8 | 297.9 | 272.0 |
| **Total noncurrent assets** | **1544.2** | **(40.8)** | **1503.4** | **1504.0** | **1490.3** | **1466.8** | **1431.7** | **1390.9** |
| **Total assets** | **$ 2340.5** | **$ (111.8)** | **$ 2228.7** | **$ 2189.6** | **$ 2204.9** | **$ 2228.1** | **$ 2243.4** | **$ 2259.5** |
| **LIABILITIES** | | | | | | | | |
| Current liabilities | | | | | | | | |
| Current debt | 163.3 | (147.2) | 16.1 | 16.1 | 16.1 | 16.1 | 16.1 | 16.1 |
| Accounts payable | 195.5 | - | 195.5 | 196.0 | 196.3 | 202.9 | 209.0 | 215.7 |
| Accrued expenses | 221.6 | - | 221.6 | 223.6 | 226.0 | 231.9 | 237.9 | 244.0 |
| Unearned revenue, current | 382.8 | - | 382.8 | 325.6 | 321.4 | 320.0 | 321.1 | 323.0 |
| Other current liabilities | 31.3 | - | 31.3 | 31.3 | 31.3 | 31.3 | 31.3 | 31.3 |
| **Total current liabilities** | **994.5** | **(147.2)** | **847.3** | **792.6** | **791.1** | **802.2** | **815.4** | **830.1** |
| Long-term debt | 2169.3 | (1630.0) | 539.3 | 531.2 | 515.1 | 499.0 | 483.0 | 466.9 |
| Unearned revenue | 145.4 | - | 145.4 | 128.5 | 123.7 | 122.0 | 120.3 | 118.6 |
| Liabilities subject to compromise | 85.6 | (85.6) | - | - | - | - | - | - |
| Other noncurrent liabilities | 206.0 | (32.7) | 173.3 | 180.4 | 184.1 | 179.9 | 175.3 | 174.2 |
| **Total noncurrent liabilities** | **2606.3** | **(1748.3)** | **858.0** | **840.1** | **822.9** | **800.9** | **778.6** | **759.7** |
| **Total liabilities** | **$ 3600.8** | **$ (1895.5)** | **$ 1705.3** | **$ 1632.7** | **$ 1614.0** | **$ 1603.1** | **$ 1594.0** | **$ 1589.8** |
| **SHAREHOLDERS' (DEFICIT) EQUITY** | | | | | | | | |
| **Shareholders' (deficit) equity** | **(1260.3)** | **1783.7** | **523.4** | **556.9** | **590.9** | **625.0** | **649.4** | **669.7** |
| **Total liabilities and shareholders' (deficit) equity** | **$ 2340.5** | **$ (111.8)** | **$ 2228.7** | **$ 2189.6** | **$ 2204.9** | **$ 2228.1** | **$ 2243.4** | **$ 2259.5** |

# Reader's Digest Association, Inc., *et al.*, and non-debtor affiliates

*Confidential - For discussion purposes only and subject to material change*

| (US$mm) | FY 2010 Total | FY 2011 Total | FY 2012 Total | FY 2013 Total | FY 2014 Total |
|---|---|---|---|---|---|
| **CASH FLOW STATEMENT** | | | | | |
| | | | | | |
| **CASH FLOWS FROM (USED IN) OPERATING ACTIVITIES** | | | | | |
| Net income (loss) from continuing operations | (90.6) | 33.1 | 33.0 | 23.3 | 19.2 |
| Adjustments to reconcile operating income (loss) to operating cash flows | | | | | |
| Depreciation and amortization | 47.3 | 44.3 | 40.9 | 38.4 | 32.9 |
| Other non-cash charges | 3.1 | 2.0 | 2.0 | 2.0 | 2.0 |
| Total non-cash items | 50.4 | 46.3 | 42.9 | 40.4 | 34.9 |
| Changes in assets and liabilities, net of effects of dispositions | | | | | |
| Accounts receivable, net | (13.4) | 5.0 | (7.2) | (6.7) | (7.6) |
| Accounts payable & accrued expenses | (39.7) | 2.7 | 12.5 | 12.1 | 12.8 |
| Unearned revenues | (37.3) | (8.9) | (3.1) | (.7) | .2 |
| Liabilities subject to compromise | 10.0 | - | - | - | - |
| Other assets and liabilities | 16.3 | (8.3) | (2.2) | 10.0 | 21.3 |
| Total changes in assets and liabilities | (64.1) | (9.5) | - | 14.7 | 26.7 |
| **Net change in cash from continuing operations** | **(104.3)** | **69.9** | **75.9** | **78.4** | **80.8** |
| Net change in cash from discontinued operations | (.5) | | | | |
| **Net change in cash from operations** | **$ (104.8)** | **$ 69.9** | **$ 75.9** | **$ 78.4** | **$ 80.8** |
| | | | | | |
| **CASH FLOWS FROM (USED IN) INVESTING ACTIVITIES** | | | | | |
| Capital expenditures | (19.1) | (20.1) | (18.6) | (18.1) | (18.1) |
| Purchases of intangible assets | (.7) | (.2) | (.2) | (.2) | - |
| Proceeds from note receivable | 7.4 | 5.7 | 2.5 | - | - |
| **Net change in cash from continuing investing activities** | **$ (12.4)** | **$ (14.6)** | **$ (16.3)** | **$ (18.3)** | **$ (18.1)** |
| | | | | | |
| **CASH FLOWS FROM (USED IN) FINANCING ACTIVITIES** | | | | | |
| Debt borrowings | 150.1 | - | - | - | - |
| Debt payments | (10.6) | (16.1) | (16.1) | (16.1) | (16.0) |
| Other, net | (2.1) | (2.0) | (2.0) | (2.0) | (2.0) |
| **Net change in cash from financing activities** | **$ 137.4** | **$ (18.1)** | **$ (18.1)** | **$ (18.1)** | **$ (18.0)** |
| Effect of foreign currency exchange rate fluctuations on cash & equivalent | 1.9 | - | - | - | - |
| Net change in cash & equivalents | 22.1 | 37.2 | 41.5 | 42.0 | 44.7 |
| Cash & equivalents, beginning of period | $ 128.4 | $ 150.5 | $ 187.7 | $ 229.2 | $ 271.2 |
| **Cash & equivalents, end of period** | **$ 150.5** | **$ 187.7** | **$ 229.2** | **$ 271.2** | **$ 315.9** |

**EXHIBIT E**

**Liquidation Analysis**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) Case No. 09-23539 (RDD) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## LIQUIDATION ANALYSIS

The Reader's Digest Association, Inc. ("***Reader's Digest***") and certain of its affiliates (collectively, the "***Debtors***") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the Bankruptcy Court for the Southern District of New York on August 24, 2009 (the "***Commencement Date***").

The Debtors are soliciting votes with respect to the *Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "***Plan***") as set forth in the Disclosure Statement for the Plan (as may be amended from time to time, the "***Disclosure Statement***"). All capitalized terms used by not defined in this liquidation analysis have the meanings set forth in the Disclosure Statement.

A chapter 11 plan cannot be confirmed unless the bankruptcy court determines that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test requires a bankruptcy court to find either that (i) all members of an impaired class of claims or interests have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date. Accordingly, with the assistance of their restructuring advisors, AlixPartners, LLP ("***AlixPartners***"), the Debtors prepared this hypothetical liquidation analysis in connection with filing their Disclosure Statement and Plan to assist the Court make the findings required under section 1129(a)(7) of the Bankruptcy Code to confirm their Plan.

This liquidation analysis indicates the estimated values that may be obtained from a disposition of the Debtors' assets under chapter 7 of the Bankruptcy Code as an alternative to the continued operation of the Debtors' businesses as contemplated by the Plan. Accordingly, the asset values discussed herein may be different than amounts set forth in the Plan.

> **Neither the Debtors nor their advisors make any representation or warranty that the actual results of a liquidation of the Debtors' assets would or would not approximate the assumptions represented herein, and actual results could vary, in some cases materially.**

<u>**General Assumptions**</u>

The determination of the costs of, and proceeds generated from, a hypothetical chapter 7 liquidation of the Debtors' assets is an uncertain process involving the extensive use of estimates and the assumptions described herein and in the Disclosure Statement (including exhibits, where applicable) which, although considered reasonable by the Debtors and their advisors, are inherently subject to business, economic and competitive uncertainties and contingencies beyond their control. Inevitably, certain assumptions set forth herein would not materialize in an actual chapter 7 liquidation scenario, and certain unanticipated events and circumstances could materialize, both of which would affect the ultimate results in an actual chapter 7 liquidation. *In light of the foregoing, it is important to read and understand these "General Assumptions" and the "Specific Assumptions and Notes" set forth below.*

This analysis is based on management's good faith assumptions believed to be reasonable in light of the circumstances under which they are based. This analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants. The estimates and assumptions, although considered reasonable by management, are inherently subject to significant uncertainties and contingencies beyond management's control. Accordingly, there can be no assurance that the results shown would be realized if the Debtors were liquidated, and actual results in such case could vary materially from those presented.

1. **Liquidation Period**. This liquidation analysis is predicated on the assumption that the Debtors would commence chapter 7 liquidation on December 31, 2009 (the "***Liquidation Date***"). Except as otherwise set forth herein, this analysis assumes that substantially all of the Debtors' U.S. and foreign assets will be liquidated over a 12-month period by a chapter 7 trustee (the "***Chapter 7 Trustee***") appointed on the Liquidation Date. This analysis assumes the orderly sale of certain foreign assets as going concerns and the shut-down and liquidation of the remaining foreign entities. With respect to the US businesses, this analysis contemplates the immediate shut down of the Debtors' U.S. operations on the Liquidation Date and a distressed liquidation sale of tangible and intangible assets over a 30 to 60 day period for several reasons:

- Because the Debtors' editorial, marketing and advertising work force consists of highly trained specialized employees with unique skills that are coveted by the Debtors' competitors, these employees could migrate to other employers.

- Over 35% of the Debtors' revenue in the United States is derived from the subscription sales, which would cease immediately in liquidation. Existing customers could demand refunds for their remaining magazine subscriptions. These circumstances could have an immediate and devastating impact to the Debtors' cash flow.

K&E 15706164.2

- Over 42% of the Debtors' revenue in the United States is based on products sold directly to end-user consumers. These are typically small dollar transactions which require solicitation for payment after merchandise has been delivered. Although historical collection rates for these revenue sources are high, in liquidation it could be prohibitively expensive to maintain the personnel to continue efforts to collect the amounts outstanding from each customer.

- A significant portion of the Debtors' assets are intangible, being comprised of trademarks, customer lists, brand names and goodwill. The value of these assets could diminish rapidly in a situation in which the assets are no longer functioning as going concerns.

- Because most (if not all) of the Debtors share various advertising, marketing, information technology, administrative and financial services, it would be difficult to sell individual businesses as a going concern.

2. **Asset Value**. Unless otherwise noted, this liquidation analysis is based on the balance sheet of the Debtors as projected at the Liquidation Date, which is consistent with the Debtors Business Plan.

3. **Claims Estimates**. Much of the information regarding the Debtors' liabilities was derived from the Statements of Financial Affairs and Schedules filed with the Court on September 25, 2009 (the *"Schedules"*). In preparing this liquidation analysis, the Debtors have estimated an amount of allowed claims for each class based upon a review of the Debtors' Schedules. Additional claims were estimated to include certain post-petition obligations. The estimate of all allowed claims in this liquidation analysis is based on the book value of those claims. No order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of allowed claims set forth in this liquidation analysis. The estimate of the amount of allowed claims set forth in this liquidation analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of allowed claims under the Plan. The actual amount of allowed claims could be materially different from the amount of claims estimated in this liquidation analysis.

4. **Liquidation Costs**. Conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code likely would result in additional costs to the estates, including, among other things, compensation of the Chapter 7 Trustee and retained counsel and professionals, asset disposition expenses, litigations expenses and unpaid administrative expenses incurred during the Chapter 11 Cases that are allowed in the chapter 7 cases. Except as otherwise stated, recoveries set forth herein are net of necessary liquidation expenses. If actual results were lower than those shown, or if the assumptions used in formulating this analysis were not realized, distribution to each member of each class of claims could be affected adversely.

5. **Non-Debtor Foreign Subsidiaries**. This analysis assumes that certain foreign subsidiaries will continue operating as going concerns, therefore limiting the exposure to chapter 7 and other liquidation expenses. If these subsidiaries were forced to file for insolvency

protection, the value of the recovery to the estates would be diminished. This analysis further assumes that certain foreign entities will continue operating as going concerns and would be sold in an orderly process. The value of these entities is detailed in Note 7 under the heading "Specific Assumptions and Notes" below. With the exception of these entities, all other foreign subsidiaries' assets are liquidated, with proceeds being returned to the foreign creditors.

6. **Certain Exclusions and Assumptions**. This liquidation analysis does not include estimates for the tax consequences that may be triggered upon the liquidation and sale events of assets in the manner described above. Such tax consequences may be material. In addition, this liquidation analysis does not include recoveries resulting from any potential preference, fraudulent transfer or other litigation or avoidance actions.

K&E 15706164.2

**Reader's Digest Association, Inc.**
**Liquidation Analysis - Exhibit E**
($ in 000s)

## I. CALCULATION OF NET ESTIMATED PROCEEDS AVAILABLE FOR ALLOCATION

| | Value @ 12/31/2009 (a) | Low | Medium | High | Low | Medium | High | See Note |
|---|---|---|---|---|---|---|---|---|
| | | Estimated Recovery Rate Range | | | Estimated Recovery on Collateral | | | |
| **A. STATEMENT OF ASSETS** | | | | | | | | |
| **Cash and Equivalents** | $ 160,731 | 100% | 100% | 100% | $ 160,731 | $ 160,731 | $ 160,731 | 1 |
| Net Product A/R | 63,167 | 65% | 70% | 75% | 41,059 | 44,217 | 47,375 | 2 |
| Net Subscription A/R | 15,895 | 0% | 0% | 0% | - | - | - | 2 |
| Net Newsstand A/R | 1,067 | 75% | 83% | 90% | 800 | 880 | 960 | 2 |
| Net Advertising A/R | 24,483 | 75% | 83% | 90% | 18,362 | 20,198 | 22,035 | 2 |
| Net List Rental A/R | 2,560 | 65% | 70% | 75% | 1,664 | 1,792 | 1,920 | 2 |
| Net Other A/R | 7,564 | 5% | 8% | 11% | 378 | 605 | 832 | 2 |
| **Accounts Receivable** | 114,736 | 54% | 59% | 64% | 62,263 | 67,692 | 73,122 | |
| Net Raw Materials | 9,393 | 6% | 11% | 16% | 555 | 1,025 | 1,495 | 3 |
| Net WIP | 1,501 | 0% | 0% | 0% | - | - | - | 3 |
| Net Finished Goods | 37,662 | 9% | 21% | 33% | 3,485 | 8,004 | 12,524 | 3 |
| **Inventory** | 48,556 | 8% | 19% | 29% | 4,040 | 9,030 | 14,019 | |
| Prepaid Promotion Expense | 8,869 | 0% | 0% | 0% | - | - | - | 4 |
| Expense of Subsequent Issues | 10,586 | 0% | 0% | 0% | - | - | - | 4 |
| Prepaid Agent Commissions | 34,777 | 0% | 0% | 0% | - | - | - | 4 |
| Royalty Advances | 5,743 | 0% | 0% | 0% | - | - | - | 4 |
| Other Prepaid/Current Assets | 25,583 | 0% | 3% | 5% | - | 640 | 1,279 | 4 |
| **Prepaid Assets** | 85,558 | 0% | 1% | 1% | 0 | 640 | 1,279 | |
| Deferred Tax Assets | 84,929 | 0% | 0% | 0% | - | - | - | 5 |
| Tax Receivables | 2,096 | 3% | 51% | 100% | 60 | 1,078 | 2,096 | |
| **Tax Assets** | 87,025 | 0% | 1% | 2% | 60 | 1,078 | 2,096 | |
| Real Property | 7,562 | 70% | 82% | 94% | 5,310 | 6,195 | 7,080 | 6 |
| Personal Property | 31,963 | 1% | 2% | 3% | 472 | 793 | 1,113 | 6 |
| **Fixed Assets** | 39,526 | 15% | 18% | 21% | 5,782 | 6,987 | 8,193 | |
| Germany/Canada | | | | | 16,700 | 25,700 | 34,700 | 7 |
| Other International | | | | | 25,000 | 26,500 | 28,000 | 7 |
| **Investment In Foreign Subsidiaries(b)** | 1,711,838 | 2% | 3% | 4% | 41,700 | 52,200 | 62,700 | |
| **Goodwill and Intangibles** | 956,337 | 13% | 14% | 16% | 119,975 | 136,475 | 152,975 | 8 |
| **Total Assets** | $ 3,204,306 | 12% | 12% | 15% | $ 394,551 | $ 434,833 | $ 475,114 | |
| **B.   RECOVERIES FROM EXERCISE OF AVOIDING POWERS** | | | | | - | - | - | |
| **C.   GROSS PROCEEDS** | | | | | 394,551 | 434,833 | 475,114 | |
| **D.   CREDITOR RECOVERY EXPENSES (POST-PETITION)** | | | | | | | | |
| Chapter 7 Trustee Fees (3% of Gross Proceeds) | | | | | (11,837) | (13,045) | (14,253) | 9 |
| Other G&A | | | | | (1,754) | (1,322) | (891) | 9 |
| Severance | | | | | (5,595) | (5,595) | (5,595) | 9 |
| Payroll | | | | | (1,667) | (1,333) | (1,000) | 9 |
| Professional Fees | | | | | (10,500) | (9,750) | (9,000) | 9 |
| Real Estate Broker Fees (5% of sale of real property) | | | | | (265) | (310) | (354) | 9 |
| Investment Banker Fees (2% of proceeds from sale of Europe, CALA & US) | | | | | (5,460) | (6,000) | (6,540) | 9 |
| **Total Post-Petition Administrative Expenses** | | | | | (37,077) | (37,355) | (37,633) | |
| **Net Estimated Proceeds Available for Allocation** | | | | | $ 357,475 | $ 397,478 | $ 437,481 | |
| **Proceeds Available For Distribution to Secured Claims** | | | | | $ 345,069 | $ 381,615 | $ 418,132 | 10 |
| **Proceeds Available For Distribution to Priority and Unsecured Claims** | | | | | $ 12,406 | $ 15,863 | $ 19,349 | 10 |

(a) Asset Values as of 12/31/09 unless otherwise noted.  All Liabilities as of the 8/24/09 unless otherwise noted.
(b) Analysis of foreign subsidiary value performed as of 12/31/09.

5

*II.    ALLOCATION OF NET ESTIMATED PROCEEDS TO SECURED CLAIMS*

| | Estimated Allowable Claims | | | Estimated Recovery on Administrative and Priority Claims | | | Estimated Recovery Range | | | See Note |
|---|---|---|---|---|---|---|---|---|---|---|
| | Low | Medium | High | Low | Medium | High | Low | Medium | High | |
| **Proceeds Available For Distribution to Secured Claims** | | | | $ 345,069 | $ 381,615 | $ 418,132 | | | | |
| DIP Lender Facility (a) | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 100.0% | 100.0% | 100.0% | 11 |
| DIP Facility Fees And Interest | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 100.0% | 100.0% | 100.0% | 11 |
| **Net Estimated Proceeds After DIP Lender Claims** | | | | $ 193,569 | $ 230,115 | $ 266,632 | | | | |
| Add: Proceeds From The Sale of Foreign Subsidiaries | | | | 105,300 | 105,300 | 105,300 | | | | 12 |
| **Net Estimated Proceeds Available For Distribution to Secured Claims** | | | | $ 298,869 | $ 335,415 | $ 371,932 | | | | |
| **Pre-Petition Secured Liabilities** | | - | - | | | | | | | |
| Senior Secured Revolving Credit Facility (b) | 350,344 | 350,344 | 350,344 | 44,041 | 52,356 | 60,664 | 12.6% | 14.9% | 17.3% | 12 |
| Euro Term Loan(c) | 105,300 | 105,300 | 105,300 | 105,300 | 105,300 | 105,300 | 100.0% | 100.0% | 100.0% | 12 |
| Secured Term Loan (b) | 1,189,500 | 1,189,500 | 1,189,500 | 149,528 | 177,759 | 205,968 | 12.6% | 14.9% | 17.3% | 12 |
| **Net Secured Distributions** | 1,645,144 | 1,645,144 | 1,645,144 | 298,869 | 335,415 | 371,932 | 18.2% | 20.4% | 22.6% | |
| **Net Estimated Proceeds After Secured Claims** | | | | $    - | $    - | $    - | | | | |
| **Secured Lender Deficiency Claim (General Unsecured Claim)** | | | | 1,346,275 | 1,309,729 | 1,273,212 | | | | |

(a)   $150 million balance of the DIP Facility assumed in cash and debt.
(b)   Includes accrued interest, swap expense, and letters of credit.
(c)   Euro Term Loan will recover from the proceeds of the sale of certain foreign subsidiaries

6

**III.    ALLOCATION OF NET ESTIMATED PROCEEDS TO ADMINSTRATIVE, PRIORITY AND UNSECURED CLAIMS**

| | Estimated Allowable Claims | | | Estimated Recovery on Unsecured Claims | | | Estimated Recovery Range | | | See Note |
|---|---|---|---|---|---|---|---|---|---|---|
| | Low | Medium | High | Low | Medium | High | Low | Medium | High | |
| **Proceeds Available For Distribution to Administrative, Priority and Unsecured Claims** | | | | $ 12,406 | $ 15,863 | $ 19,349 | | | | |
| **Less Admin Claims:** | | | | | | | | | | |
| 503(b)(9) Administrative Priority Claims | 9,759 | 7,807 | 5,855 | 946 | 1,081 | 1,119 | 9.7% | 13.8% | 19.1% | 13 |
| Post Petition Accounts Payable | 106,476 | 97,603 | 88,730 | 10,323 | 13,512 | 16,964 | 9.7% | 13.8% | 19.1% | 13 |
| Chapter 11 Professional Claims | 11,725 | 9,172 | 6,618 | 1,137 | 1,270 | 1,265 | 9.7% | 13.8% | 19.1% | 13 |
| Total Admin Claims Distributions | 127,960 | 114,582 | 101,204 | 12,406 | 15,863 | 19,349 | 9.7% | 13.8% | 19.1% | |
| **Net Estimated Proceeds After Admin Claims** | | | | $ - | $ - | $ - | | | | |
| **Less Priority Claims:** | | | | | | | | | | |
| Employee Priority Claims (a) | 1,700 | 1,650 | 1,600 | - | - | - | 0.0% | 0.0% | 0.0% | 14 |
| Consumer Deposits | 397,518 | 397,518 | 397,518 | - | - | - | 0.0% | 0.0% | 0.0% | 14 |
| Total Priority Claims Distributions | 399,218 | 399,168 | 399,118 | - | - | - | 0.0% | 0.0% | 0.0% | |
| **Net Estimated Proceeds After Priority Claims** | | | | $ - | $ - | $ - | | | | |
| **Notes Payable** | | | | | | | | | | |
| Senior Subordinated Notes(b) | 628,250 | 628,250 | 628,250 | - | - | - | 0.0% | 0.0% | 0.0% | 15 |
| Total Note Claims Distributions | 628,250 | 628,250 | 628,250 | - | - | - | 0.0% | 0.0% | 0.0% | |
| **General Unsecured Claims:** | | | | | | | | | | |
| Accounts Payable | 80,606 | 73,889 | 67,172 | - | - | - | 0.0% | 0.0% | 0.0% | 16 |
| Other Accrued Expenses | 27,606 | 25,305 | 23,005 | - | - | - | 0.0% | 0.0% | 0.0% | 16 |
| Accrued Royalties | 10,495 | 7,307 | 4,119 | - | - | - | 0.0% | 0.0% | 0.0% | 16 |
| Post Retirement and Other Employee Benefit Plans | 107,509 | 112,042 | 116,574 | - | - | - | 0.0% | 0.0% | 0.0% | 16 |
| Secured Lender Deficiency Claim | 1,346,275 | 1,309,729 | 1,273,212 | - | - | - | 0.0% | 0.0% | 0.0% | 16 |
| Real Estate Liquidated Damages | 15,280 | 15,280 | 15,280 | - | - | - | 0.0% | 0.0% | 0.0% | 16 |
| Unsecured Tax Liabilities | 15,000 | 11,250 | 7,500 | - | - | - | 0.0% | 0.0% | 0.0% | 16 |
| Other Notes Payable | 801 | 801 | 801 | - | - | - | 0.0% | 0.0% | 0.0% | 16 |
| Sweepstakes Claims | 20,000 | 10,000 | - | - | - | - | 0.0% | 0.0% | 0.0% | 16 |
| Total General Unsecured Claims Distributions | 1,623,572 | 1,565,603 | 1,507,663 | - | - | - | 0.0% | 0.0% | 0.0% | |
| **Total Notes and General Unsecured Distributions** | $ 2,251,822 | $ 2,193,853 | $ 2,135,913 | $ - | $ - | $ - | 0.0% | 0.0% | 0.0% | |

(a)    Employee priority claims includes estimated amounts for pre-petition severance.  Priority amounts assume employees paid in arrears with pre-petition claims are satisfied as part of the Chapter 11 cases.

(b)    All recoveries of the Senior Subordinated Notes are turned over to the senior secured lenders per the contractual subordination in the agreement.

7

<h2 style="text-align:center;"><strong><u>Specific Assumptions and Notes</u></strong></h2>

**1.     <u>Note 1 – Cash</u>**

As of the Liquidation Date, the Debtors are expected to have a global cash balance of $252.5 million, of which $177.2 million is attributable to U.S. bank accounts.  It is assumed in the analysis that cash in foreign bank accounts would be inaccessible in a liquidation. Additionally, it is estimated that as of the Liquidation Date the Debtor will have approximately $16.5 million of cash in the U.S for amounts relating to outstanding checks, payroll and cash collateralized sweepstakes which would be unavailable for distribution to the creditors of the estate.

**2.     <u>Note 2 – Accounts Receivable</u>**

The table below shows the composition and roll-forward of accounts receivable ("*A/R*") from July 31, 2009, to the estimated balance at the Liquidation Date:

| (US$ in millions) | 7/31/2009 | Change | 12/31/2009 |
|---|---|---|---|
| Net Product A/R | $          37.8 | $          25.4 | $          63.2 |
| Net Subscription A/R | 5.6 | 10.3 | 15.9 |
| Net Newsstand A/R | (4.6) | 5.6 | 1.1 |
| Net Advertising A/R | 17.9 | 6.6 | 24.5 |
| Net List Rental A/R | 1.8 | 0.7 | 2.6 |
| Net Other A/R | 14.7 | (7.1) | 7.6 |
| Total A/R | $          73.2 | $          41.5 | $          114.7 |

All amounts above are net of reserves for bad debt and returns.  Additionally, newsstand receivables are net of retail display allowances, which would be deducted by the Debtors' national distributor prior to remitting funds to the Debtors.

The Debtors anticipate that a Chapter 7 Trustee would receive a different recovery rate for each type of receivable.  It is estimated that the Debtors would be able to collect on 65%-75% of their product A/R due to an average cost of collection of approximately $3.50 per $20 of product as well as incremental customer bad debt.  Subscription receivables would be uncollectible due to uncertainty surrounding the Debtors' ability to serve any future issues of the magazines.  Newsstand A/R is anticipated to collect 75%-90% based on incremental charge backs from the Debtors' national distributor for promotional programs and distribution charges. Advertising A/R is anticipated to collect 75%-90% of the net receivable due to offsets by the advertisers for circulation shortfalls and other charges.  List rental would collect at 60%-75% due to set offs from third-party publishers on outstanding payables.  "Net Other A/R" primarily consists of contractual amounts due from certain vendors, which would be set off against outstanding amounts payable by the Debtors, resulting in a net collection rate of 5%-11% for these receivables.

K&E 15706164.2

3.    **Note 3 – Inventory**

The table below shows the composition and roll-forward of inventory from July 31, 2009, to the estimated balance at the Liquidation Date:

| (US$ in millions) | | 7/31/2009 | | Change | | 12/31/2009 |
|---|---|---|---|---|---|---|
| Raw Materials | $ | 7.5 | $ | 1.9 | $ | 9.4 |
| Work In-Process | | 3.6 | | (2.1) | | 1.5 |
| Finished Goods | | 40.3 | | (2.6) | | 37.7 |
| Total Inventory | $ | 51.4 | $ | (2.8) | $ | 48.6 |

All amounts above are net of reserves for obsolescence and damages.

The Debtors' raw materials are composed primarily of paper and other similar commodities. Based on the current market for these materials, the Debtors estimate that the gross recovery on these assets would be between 75%-85%. Additionally, there are $6.4 million of outstanding liabilities due to certain vendors which may have possessory lien rights to recover from the liquidation of the Debtors' raw materials. The estimated net recovery for raw materials is as follows:

| US$ in Millions | | Low | | Medium | | High |
|---|---|---|---|---|---|---|
| Raw Materials | $ | 9.4 | $ | 9.4 | $ | 9.4 |
| Range | | 75% | | 80% | | 85% |
| Gross Recovery | | 7.0 | | 7.5 | | 8.0 |
| Less - Possesory Lien | | (6.5) | | (6.5) | | (6.5) |
| Net Recovery | $ | 0.6 | $ | 1.0 | $ | 1.5 |

The Debtors' finished goods are comprised primarily of books, music and other entertainment products. Based on historical liquidations by the Debtors of excess inventory, finished goods are estimated to yield between 14%-38 of cost. Additionally, there are $1.8 million of outstanding liabilities due to certain vendors which may have possessory lien rights to recover from the liquidation of the Debtors' finished goods. The estimated recovery is as follows:

| US$ in Millions | | Low | | Medium | | High |
|---|---|---|---|---|---|---|
| Finished Goods | $ | 37.7 | $ | 37.7 | $ | 37.7 |
| Range | | 14% | | 26% | | 38% |
| Gross Recovery | | 5.3 | | 9.8 | | 14.3 |
| Less - Possesory Lien | | (1.8) | | (1.8) | | (1.8) |
| Net Recovery | $ | 3.5 | $ | 8.0 | $ | 12.5 |

"Work In-Progress" primarily represents magazines which are currently in production and have yet to be bound and completed and as such would likely yield no return in value.

9

## 4.     Note 4 – Prepaid Assets

The table below shows the composition and roll-forward of prepaid assets from July 31, 2009, to the estimated balance at the Liquidation Date:

| (US$ in millions) | 7/31/2009 | | Change | | 12/31/2009 |
|---|---|---|---|---|---|
| Prepaid Promotion Expenses | $ | 8.5 | $ | 0.4 | $ | 8.9 |
| Expenses of Subsequent Issues | | 19.6 | | (9.0) | | 10.6 |
| Prepaid Agent Commissions | | 28.5 | | 6.3 | | 34.8 |
| Royalty Advances | | 7.4 | | (1.7) | | 5.7 |
| Other Prepaid/Current Assets | | 28.6 | | (3.0) | | 25.6 |
| Total Prepaid | $ | 92.7 | $ | (7.1) | $ | 85.6 |

Prepaid promotion expenses are amounts paid to produce insert cards and other branded marketing materials for the purposes of soliciting the purchase of books, entertainment product and magazine subscriptions. Expenses for subsequent issues relate to prepaid amounts for magazine production, including editorial freelancers and printing costs for certain printers. Prepaid agent commissions represents amounts prepaid to scriber agents for the solicitation of subscription copies from consumers. None of these costs would be recoverable in a liquidation as the services have already have been provided.

Royalty advances represent future payments against future sales of licensed books and other products. These payments represent minimum graduates paid to licensors in return for the right to sell product. These advances would likely be set-off against sales of product and as such would not be recoverable in liquidation.

Other prepaid expenses include postage deposits, prepaid insurance, advances, prepaid rent and other miscellaneous assets. Most of this balance would be exhausted during the course of the liquidation or offset against other liabilities. The Debtors anticipate a recovery of 0%-5% against this asset.

## 5.     Note 5 – Deferred Tax Assets and Tax Receivables

The table below shows the composition and roll-forward of deferred tax assets from July 31, 2009, to the estimated balance at the Liquidation Date:

| US$ in Millions | 7/31/2009 | | Change | | 12/31/2009 |
|---|---|---|---|---|---|
| Deffered Tax Asset- US Current | $ | 5.0 | $ | (1.7) | $ | 3.3 |
| Deferred Tax Asset - US Longterm | | 41.8 | | 39.8 | | 81.6 |
| | $ | 46.8 | $ | 38.1 | $ | 84.9 |

Current deferred tax assets represent temporary differences between the treatment of revenues and expenses in a book versus tax methodology, including timing differences for depreciation, bad debt and revenue deferrals. Long-term deferred tax assets represent tax attributes such as net operating losses. In a liquidation scenario, the Debtors expect no recovery from these assets. The following table shows the estimated tax receivables projected at the Liquidation Date:

| Liquidated Tax Refunds Due | | 12/31/2009 |
|---|---|---|
| FY08 State Income Tax Returns | $ | 60 |
| Federal Income Taxes | | 1,898 |
| Illinois Sales & Use Tax | | 137 |
| Total | $ | 2,096 |

These amounts represent the Debtors' best estimate of potential federal and local tax refunds and are projected to be collected in full in the high end of the recovery analysis.

**6.    Note 6 – Fixed Assets**

The table below shows the composition and roll-forward of fixed assets from July 31, 2009, to the estimated balance at the Liquidation Date:

| (US$ in millions) | | 7/31/2009 | | Change | | 12/31/2009 |
|---|---|---|---|---|---|---|
| Land | $ | 1.3 | $ | 0.0 | $ | 1.3 |
| Building & Land Improvements | | 6.3 | | (0.1) | | 6.2 |
| Total Real Property | | 7.6 | | (0.0) | | 7.6 |
| | | | | | | |
| Computer Equipment | | 2.8 | | 0.6 | | 3.4 |
| Software | | 9.7 | | 1.4 | | 11.1 |
| Furntiure, Fixtures & Equipment | | 5.9 | | (0.7) | | 5.2 |
| Leasehold Improvements | | 12.2 | | (0.3) | | 11.9 |
| Construction In-Progress | | 0.3 | | - | | 0.3 |
| Total Personal Property | $ | 30.9 | $ | 1.0 | $ | 32.0 |

The above amounts represent the net book value of the various asset classes.

Real property consists of one building in the state of Wisconsin and three houses and one vacant lot in the state of New York.  The tax assessed values of these assets are as follows:

| | |
|---|---|
| 5400 S 60th ST | $5,292,600 |
| 31 Roaring Brook Rd | $735,294 |
| 57 Roaring Brook Rd | $825,882 |
| 15 Roaring Brook Rd | $1,144,705 |
| 21 Roaring Brook Rd | $851,176 |

The Debtors anticipate a recovery value in liquidation between 60-80% of the tax assessed property value, based on the distressed nature of the market and the limited time to market these properties.  This level of recovery would translate into 70%-93% of book values for these properties.

As of December 31, 2009, the net book value for personal property is projected to be $32.0 million.  Of this amount, $9.7 million was software, $0.3 million was construction in-

11

progress and $12.2 million was leasehold improvements. Because of potential difficulty in liquidating these assets, the Debtors do not anticipate any recovery value for these assets. The remaining net book value for personal property was $2.8 million for computer equipment and $5.9 million for furniture and fixtures. The Debtors would project net proceeds from the sales of these fixed assets as follows:

*Computer Equipment*

- Servers – 10%-20%

- Computers – 5%-15%

- Monitors & Other Equipment – 0%-5%

*Furniture & Fixtures*

- Modular Furniture – 10%-20%

- Other Furniture – 5%-15%

The percentages above represent the expected recoveries as a percentage of net book asset value. Based on these values, the Debtors estimate that the overall recovery for personal property to be 2%-4%.

## 7.     Note 7 – Investment in Foreign Subsidiaries

As of the Liquidation Date, the Debtors are assumed to have a net intercompany receivable balance of $20.8 million and a net investment in consolidated foreign subsidiaries of $1,691.0 million. The Debtors would anticipate recovering value from these assets through the sale of certain foreign subsidiaries as going concerns. The value of the foreign subsidiaries was determined using both a discounted cash flow analysis and a guideline company approach based on the Debtors' projections, by entity, from their 5-year business plan and using comparable public companies to determine market multiples and the weighted average cost of capital. Comparable company data was analyzed as of September 30, 2009.

The Debtors analyzed the impact of a U.S. chapter 7 liquidation on their base business plan for certain foreign subsidiaries and utilized these adjusted forecasts for their regional discounted cash flow analysis. The Debtors also applied certain discounts to the individual country values based on the estimated loss of promotional, editorial and marketing opportunities and cost sharing between entities. Additionally, the analysis assumes the continued use of the Reader's Digest brand by the international entities, with these entities paying a royalty for the continued use of this brand. All foreign entities not sold as going concerns were assumed to be liquidated with the proceeds used to pay down foreign debts.

The valuation for the international entities assumes that the Euro Term Loan will be repaid by the proceeds from the sale of the assets that secured that loan prior to any value being returned to the Debtors. The Debtors anticipate the net recovery for the assets secured by the loan to be as follows:

12

| US$ in Millions | | Low | | Medium | | High |
|---|---|---|---|---|---|---|
| Value Of Assets Secured By Euro Loan | $ | 122.0 | $ | 131.0 | $ | 140.0 |
| Amount Of Euro Loan | | (105.3) | | (105.3) | | (105.3) |
| Net Recovery To Debtor | $ | 16.7 | $ | 25.7 | $ | 34.7 |

Only 65% of the equity in the foreign subsidiaries is pledged as collateral for the secured revolver and term loan facilities in the United States. The following is the breakdown of the benefit to the Debtors' secured, priority and unsecured creditors:

| US$ in Millions | | | Low | | Medium | | High |
|---|---|---|---|---|---|---|---|
| Value Of Assets Secrued By Euro Loan | | $ | 16.7 | $ | 25.7 | $ | 34.7 |
| Value Of Other Assets | | | 25.0 | | 26.5 | | 28.0 |
| Total International Value | | | 41.7 | | 52.2 | | 62.7 |
| Value To Secured | 65% | | 27.1 | | 33.9 | | 40.8 |
| Value To Priority And Unsecured | 35% | | 14.6 | | 18.3 | | 21.9 |
| Total Value | 100% | $ | 41.7 | $ | 52.2 | $ | 62.7 |

## 8.    Note 8 – Goodwill and Intangible Assets

As of the Liquidation Date, the Debtors had a net goodwill balance of $517.3 million and a net intangible asset balance of $451.9 million. The Debtors assume that the Chapter 7 Trustee would terminate the operations of these assets and sell the trademarks and customer lists to maximize value for the estates.

The U.S. trade names were valued under a forced liquidation scenario and the Debtors considered both a market and income approach in estimating the value of the Debtors' U.S. trade names. The value of the Reader's Digest trade name associated with overseas going concern entities was determined using a standard relief from royalty discounted cash flow analysis which reflected the royalty previously discussed in Note 7 and a higher discount rate than the overseas enterprise valuations due to the increased risk and associated required return of acquiring this asset.

The Debtors' U.S. customer list was valued using a market approach which contemplated actual transactions for Reader's Digest customer names and similar customer lists adjusted for a final sale premise as well as the effects of the U.S. liquidation. In some instances, certain values were reflected assuming vendors have a possessory lien on the Debtors' customer lists and could recover on a secured basis to the extent of such vendor's outstanding prepetition claim.

13

The net value of the intangible assets is as follows:

| US$ in Millions | Low | | Medium | | high | |
|---|---|---|---|---|---|---|
| Value Of Customer List | $ | 7.6 | $ | 8.9 | $ | 10.2 |
| Possesory Lien | | (6.0) | | (6.0) | | (6.0) |
| Net Customer List | $ | 1.5 | $ | 2.8 | $ | 4.1 |
| Other Intangibles | | 118.4 | | 133.6 | | 148.8 |
| | | | | | | |
| Total Intangibles | $ | 120.0 | $ | 136.5 | $ | 153.0 |

## 9. Note 9 – Liquidation Costs

Conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code likely would result in additional costs to the estates, including, without limitation:

- Chapter 7 Trustee Fees – Liquidation expenses include Chapter 7 Trustee fees of 3% of total liquidation proceeds, net of cash on hand, and wind down costs.

- Wind-Down Expenses – For purposes of this liquidation analysis, wind-down costs include expenses relating to the corporate headquarters, including utility, phone, supplies and estimated costs for 20 employees who would assist the Chapter 7 Trustee with the wind down of the estates (250 Sq. ft. per employee plus 1800 Sq ft for the Debtors' data room at $15.5 per Sq ft.). At the high-end the Debtors assume six months at the above rate plus $15,000 of administrative costs and continuation of current lease and utilities for 30 days. At the low-end the Debtors assume ten months at the above rate plus $30,000 of administrative costs and the assumed continuation 60 days of current leases and utilities.

- Severance – Assumes a monthly cost of $9.4 million per month with an estimated 60 days of severance for each employee. This analysis assumes that severance for certain employees would be covered by excess assets in the Debtors qualified pension plan to the extent that they are members of the plan.

| US$ in Millions | Low-High | |
|---|---|---|
| Total Severance | $ | 18.7 |
| Amount Covered/Pension | | (13.2) |
| Net Severance | $ | 5.6 |

- Payroll – Estimated cost for 20 employees to assist with the collection of receivables, the liquidation of inventory and general finance functions. High end of the range assumes six months at an average cost of $8,333 per employee. Low end of the range assumes ten months.

K&E 15706164.2

- Professional Fees – Estimated costs for financial and legal advisors to the Chapter 7 Trustee. High end of the range assumes six months at a cost of $1.0 million per month and six months at a cost of $0.5 million per month. Low range assumes an additional $1.5 million of cost during the first three months.

- Real Estate Broker Fees – Real estate brokers will be required to liquidate the Debtors' properties in New York and Wisconsin. Estimated to be 5% of the net proceeds from the sale of Real Property.

- Investment Banker Fees – A media investment banker will be required to sell the Debtors' subscriber list and trademarks in the United States and the going-concern entities in Europe and Canada and Latin America. Cost estimated to be 2% of the net proceeds from these asset sales.

## 10.  Note 10 – Unencumbered Assets

Certain of the amounts recovered for the liquidation of the Debtors' assets have not been 100% pledged as collateral to either the DIP Lenders or the Prepetition Lenders. The values of such unencumbered assets, detailed in Note 7, would be reduced by their pro rata share of certain administrative expenses.

## 11.  Note 11 – DIP Facility

The Debtors obtained a $150 million debtor-in-possession facility (the "***DIP Facility***") from JP Morgan Chase Bank, N.A., as agent, and certain lenders party from time to time party thereto (collectively, the "***DIP Lenders***"). The DIP Facility is secured by a senior, first priority priming lien on substantially all of the Debtors' assets. The DIP Facility is estimated to be fully drawn and has first priority for payment from the liquidation of the Debtors' assets. The DIP Facility is assumed to be fully repaid on the Liquidation Date.

## 12.  Note 12 – Prepetition Secured Debt Obligations

As of the Commencement Date, the Debtors had outstanding secured debt obligations of $1,645,700,000 under their senior secured credit facility (including swap termination obligations and accrued and unpaid interest). The outstanding amount of the secured debt by category, including swaps and accrued interest, is as follows:

| (US$ in millions) | Revolver (inc. Swaps) | Term Loan | Euro Loan | Total |
|---|---|---|---|---|
| Principal | $ 293.6 | $ 1,182.8 | $ 103.9 | $ 1,580.3 |
| Swaps/Other | 54.3 | - | 2.0 | 56.3 |
| Accrued Interest | 2.4 | 6.7 | - | 9.1 |
| Balance As Of Petition | $ 350.3 | $ 1,189.5 | $ 105.9 | $ 1,645.7 |

This analysis assumes that the Euro Term Loan will recover from the sale of the Debtors' pledged international operations and from the pledged U.S. assets in the event that the value of the international entities is insufficient. Additionally, it is assumed that $0.6 million of principal of the Euro Term Loan will be paid prior to the Liquidation Date.

15

13. **Note 13 – Administrative Claims**

This analysis assumes that as of the Liquidation Date, the Debtors would have approximately $6.6 million to $11.7 million of unpaid chapter 11 professional fees and $88.7 million to $106.5 million of post petition accounts payable as a result of the conversion to chapter 7 cases. Additionally, as of the Commencement Date the Debtors had $5.9 million to $9.8 million of 503(b)(9) claims. This amount represents the Debtors' estimate of vendors who would be granted administrative expense priority for goods received by the Debtors within 20 days of the Commencement Date, net of any payments made to vendors in connection with trade agreements entered into during these Chapter 11 Cases.

14. **Note 14 – Priority Claims**

As of the Commencement Date, the Debtors had approximately $1.6 million to $1.7 million of unpaid prepetition severance amounts to employees that would qualify as priority claims up to the $10,950 limit. These amounts are not being covered by the Debtors' over funded pension plan.

The Debtors also have deferred subscription liabilities for future issues of the Debtors magazines and other prepaid products and services, which would be treated as consumer deposits under section 507(a)(7) of the Bankruptcy Code. The estimated value of this liability as of the Liquidation Date, is $397.5 million.

15. **Note 15 – Senior Subordinated Notes**

As of the Commencement Date, the Debtors had outstanding unsecured debt obligations in the aggregate principal and interest amounts of approximately $628.3 million in Senior Subordinated Notes governed by the Senior Subordinated Notes Indenture. Amounts outstanding are as follows:

| (US$ in millions) | Senior Sub Notes |
| --- | --- |
| Principal | $ 600.0 |
| Accrued Interest | 28.3 |
| Balance As Of Petition | $ 628.3 |

16. **Note 16 – Unsecured Claims**

The following amounts represent unsecured claims that are subject to compromise:

- Accounts Payable – Trade payables due to the Debtors' vendors. Low and High end of the range excludes amounts in which the vendor has a possessory lien or a priority claim under section 503(b)(9) of the Bankruptcy Code.

- Accrued Expenses – Estimated expense which the Debtors expect to receive an invoice for or expenses incurred which do not flow through payables as well as refunds to customers who have requested refunds for subscriptions.

16

- <u>Accrued Royalties</u> – Amount due to third parties for licensed products.

- <u>Post Retirement and Other Employee Benefit Plans</u> – Accrued amounts for the Debtors' Non-Qualified Retirement Plans and retiree medical plan. The Debtors have not contributed any assets towards these plans.

- <u>Prepetition Secured Lender Deficiency Claim</u> – Deficiency claim for insufficient assets to pay Prepetition lender secured claim.

- <u>Real Property Lease Rejections and Rejected Executory Contracts</u> – Estimated amount of lease rejection claims at the greater of 1 year or 15%.

- <u>Unsecured Tax Liabilities</u> – Contingent tax liabilities at the federal, state and international level. These amounts represent GAAP reserves for potential claims against tax positions.

- <u>Promissory Note</u> – As of the Commencement Date, the Debtors had approximately $0.8 million outstanding on a promissory note.

- <u>Sweepstakes Claims</u> – Claims for previously awarded sweepstakes winners which would require funding in a chapter 7 conversion.

In the event of liquidation, the aggregate amount of general unsecured claims will likely increase significantly (as reflected in the higher range estimate). For example, employees likely will file claims for wages, pensions and other benefits, some of which will be entitled to priority. Landlords may file large claims for both unsecured and priority amounts. The resulting increase in both general unsecured and priority claims will decrease percentage recoveries to holders of general unsecured claims.

K&E 15706164.2

**<u>EXHIBIT F</u>**

**Restructuring Support Agreement**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT is made and entered into as of August 17, 2009 (as amended, supplemented or otherwise modified in accordance with the terms hereof, this "Support Agreement", which term shall include Exhibits A, B and C and Schedule 1, each annexed hereto) by and among (i) RDA Holding Co. ("Holding"), The Reader's Digest Association, Inc. (the "Company"), and certain of the Company's subsidiaries set forth on Schedule 1 annexed hereto (together with Holding and the Company, the "Debtors"), (ii) the undersigned lenders under the Credit Agreement (as defined herein, and together with their permitted successors and assigns, each a "Consenting Lender"), and (iii) the undersigned shareholders of Holding (each, a "Consenting Shareholder," together with the Consenting Lenders and the Debtors the "Parties"):

WHEREAS, the Company and the Consenting Lenders have negotiated a restructuring and recapitalization transaction that will effectuate a financial restructuring of the Company's capital structure, including the Debtors' obligations under that certain Credit Agreement,[1] dated as of March 2, 2007 (as amended, supplemented or otherwise modified, the "Credit Agreement"), by and among the Debtors, certain financial institutions party thereto (the "Lenders") and JP Morgan Chase Bank, N.A., as administrative agent for the Lenders (in such capacity, the "Administrative Agent") pursuant to the terms and conditions set forth in the Restructuring Term Sheet attached hereto as Exhibit A (the "Term Sheet") and incorporated into this Support Agreement (the "Restructuring Transactions");

WHEREAS, the Debtors have requested, and certain Consenting Lenders have agreed, to provide a debtor-in-possession financing facility under that certain credit agreement (the "DIP Credit Agreement") referred to in the Commitment Letter dated as of August 14, 2009 (the "DIP Commitment Letter", which term shall include the Term Sheet attached thereto) subject to the terms and conditions thereof; and

WHEREAS, the Debtors contemplate filing voluntary petitions (the "Petitions") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (the date of filing of such voluntary petitions, the "Petition Date", and such cases being the "Chapter 11 Cases");

WHEREAS, concurrently with the execution hereof, the Debtors have received duly executed letters of resignation from those members of the current board of directors of the Debtors and their subsidiaries who are affiliated with, or employed by, any of the Consenting Shareholders or Ripplewood Holdings L.L.C.;

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound, agrees as follows:

**Section 1.  Conditions to Effectiveness of Support Agreement.**

This Support Agreement shall become effective and binding upon each of the Parties at 12:01 a.m. prevailing Eastern Time on the date on which all of the following conditions are satisfied (the "Effective Date"):

(a)     The Administrative Agent (or its counsel) and Cravath, Swaine & Moore LLP shall have received duly executed signature pages for this Support Agreement signed by the Debtors;

(b)     The Debtors shall have received duly executed signature pages for this Support Agreement from (i) Consenting Lenders holding at least 51% in principal amount of the prepetition Total Outstandings under the Credit Agreement and (ii) each of the Consenting Shareholders; provided, however, that the condition set forth in clause (b)(i) hereof may be waived with the consent of the Administrative Agent and the Debtors.

(c)     The Administrative Agent shall have received resolutions from each Debtor evidencing the corporate or similar authority of such Debtor to execute, deliver and perform its obligations under this Support Agreement; and

(d)     The Administrative Agent shall have received duly executed signature pages for the DIP Commitment Letter and the related fee letters, signed by the Debtors and the Consenting Lenders party thereto.

**Section 2.  Plan of Reorganization.**

**2.1     Support of Acceptable Plan.**

(a)     Subject to Sections 1125 and 1126 of the Bankruptcy Code (if and to the extent applicable), and so long as a Termination Event (as defined below) has not occurred, or has occurred but has been duly waived or cured in accordance with the terms hereof:

(1) each Debtor severally (and not jointly) agrees to:

(i)     use its reasonable best efforts to (A) support and consummate all of the Restructuring Transactions contemplated by the Term Sheet, this Support Agreement and the Acceptable Plan (as defined in Section 2.1(a)(1)(ii)), (B) take any and all necessary and

appropriate actions in furtherance of all of the Restructuring Transactions contemplated under this Support Agreement, the Acceptable Plan and the Term Sheet, (C) complete all of the Restructuring Transactions contemplated under this Support Agreement, the Term Sheet and the Acceptable Plan in accordance with the terms hereof and thereof and take all steps necessary and desirable to obtain the Confirmation Order (as defined in Section 2.1.(b)), and (D) obtain any and all required regulatory and/or third-party approvals for such Restructuring Transactions; and

(ii)     not (a) propose or support any plan of reorganization or liquidation in the Chapter 11 Cases other than a chapter 11 plan of reorganization incorporating the terms of the Term Sheet and which chapter 11 plan of reorganization is otherwise in all material respects, in form and substance reasonably satisfactory to the Administrative Agent and the Required Consenting Lenders (as defined in Section 9.14) (as amended, supplemented or otherwise modified subject to the terms hereof, the "<u>Acceptable Plan</u>") (b) take any action which is inconsistent with, or that would unreasonably delay or impede approval or confirmation of the Acceptable Plan or that is otherwise inconsistent with the express terms of this Support Agreement or (c) directly or indirectly seek, solicit, support or encourage any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, consolidation, liquidation or restructuring of any of the Debtors that could reasonably be expected to prevent, delay or impede the confirmation of the Acceptable Plan; and

(iii)    provide written notice to the Administrative Agent, within one (1) Business Day of making such determination, if any Debtor determines that its fiduciary duties require it to consider any plan other than the Acceptable Plan;

<u>provided</u>, <u>however</u>, that nothing contained in this Support Agreement shall be deemed to prevent any of the Debtors from taking or failing to take any action that it is obligated to take (or fail to take) in the performance of any fiduciary or similar duty which such Debtor owes to any other person.

(2)  each Consenting Lender, severally (and not jointly) agrees to:

(i)     use its reasonable best efforts to (A) support and consummate all of the Restructuring Transactions

contemplated by the Term Sheet and this Support Agreement and the Acceptable Plan, (B) take any and all necessary and appropriate actions in furtherance of all of the Restructuring Transactions contemplated under this Support Agreement and the Term Sheet and the Acceptable Plan, (C) complete all of the Restructuring Transactions contemplated under this Support Agreement and the Term Sheet and the Acceptable Plan in accordance with the terms hereof and thereof; and

(ii)     subject to the receipt by such Consenting Lender of a disclosure statement and other solicitation materials in respect of the Acceptable Plan, which disclosure statement and solicitation materials reflect the agreement set forth in this Support Agreement and the Term Sheet and have been approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and are in all material respects reasonably satisfactory to the Administrative Agent and the Required Consenting Lenders (collectively, the "Solicitation Materials"): (a) vote, to the extent such Consenting Lender is entitled to vote under the terms of the Acceptable Plan and the Bankruptcy Code, its claims against the Debtors to accept the Acceptable Plan by delivering its duly executed and completed ballot accepting such Acceptable Plan on a timely basis following the commencement of the solicitation and its actual receipt of the Solicitation Materials and ballot and (b) not change or withdraw (or cause to be changed or withdrawn) such vote.

For the avoidance of doubt, each of the Parties also agrees, severally and not jointly, that, unless this Support Agreement is terminated in accordance with the terms hereof, it will not take any action that would in any material respect interfere with, delay, or postpone the confirmation or consummation of the Acceptable Plan and implementation of the Restructuring Transactions, including, without limitation, objecting to the debtor-in-possession financing set forth in the DIP Commitment Letter or propose any alternative financing; provided, that nothing herein shall preclude any Consenting Shareholder from taking action that would interfere with the confirmation or consummation of any chapter 11 plan of reorganization or the Restructuring Transactions to the extent such chapter 11 plan does not contain all of the terms set forth in Section 2.2(b) hereof.

Nothing contained in this Support Agreement shall be deemed to (1) prevent any Party from taking, or failing to take, any action that it is obligated to take (or fail to take) in the performance of any fiduciary or similar duty which such Party owes to any other person.

(b)     Upon confirmation of the Acceptable Plan pursuant to an order in all material respects in form and substance reasonably satisfactory to the Administrative Agent and the Required Consenting Lenders (the

"<u>Confirmation Order</u>"), and so long as it is not subject to a stay and the conditions to effectiveness thereof have been satisfied or waived, the Consenting Lenders and the Debtors shall use commercially reasonable efforts to consummate the Acceptable Plan.

**2.2     Confirmation of Acceptable Plan.**

(a)     Without limiting any other provision hereof, the Debtors shall each use their reasonable best efforts to have the Acceptable Plan confirmed by the Bankruptcy Court as expeditiously as possible under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of the Bankruptcy Court (the federal and local rules being, the "<u>Bankruptcy Rules</u>") and within the timeframes contemplated by this Support Agreement.

(b)     Further, each of the Parties hereto agrees severally (and not jointly) that, in the event the Acceptable Plan is not confirmed for any reason, and regardless of whether this Support Agreement remains in effect or has terminated (in whole or in part with respect to any individual Consenting Lender), it will support (provided, however, that the Consenting Shareholders shall not be required to take any affirmative action to provide support in any Chapter 11 Cases), and not oppose or take any action that is inconsistent with, the inclusion in any alternative plan proposed to be confirmed in the Chapter 11 Cases of: (i) the releases set forth in Section 3 hereof and (ii) each of the terms set forth under the Term Sheet headings "Releases," "Indemnification," "Exculpation," "Claims of Holders of Senior Subordinated Notes" and "Avoidance Actions and Other Litigation;" <u>provided</u>, <u>however</u>, that the releases set forth in Section 3 herein shall be null and void and of no further force and effect as if the release was never granted with respect to any Party that has breached the terms of the penultimate paragraph of Section 2.1(a) hereof or any other terms herein in any material respect and there shall be no obligation to support the inclusion in any alternative plan of such release or of any of the terms identified in clause (ii) above with respect to such breaching Party; <u>provided further</u>, that if the Bankruptcy Court or any other court of competent jurisdiction deems any of the foregoing Term Sheet provisions illegal, invalid or unenforceable, then the obligation of the Parties to support any such provision shall no longer be enforceable, but shall not otherwise affect the obligations of the Parties with respect to the other provisions set forth herein.  This Section 2.2(b) shall survive termination of this Support Agreement for any reason or with respect to any Party.

**Section 3.  <u>Releases.</u>**

**3.1**     Immediately upon the Effective Date of this Support Agreement, except with respect to obligations expressly contained in this Support Agreement, (i) each of the Consenting Shareholders agrees, on behalf of itself (each, a "<u>Shareholder Releasing Party</u>," and collectively, the "<u>Shareholder Releasing Parties</u>"), to unconditionally and forever release and discharge each Consenting Lender and its directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, together with

their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns (collectively, the "Released Lender Parties") from any and all claims, actions, causes of action, suits, losses, obligations, liabilities, damages, judgments, awards, costs, and expenses (including attorneys' fees) of every kind, type, and nature whatsoever, whether known or unknown, absolute or contingent, asserted, threatened, or alleged, that such Shareholder Releasing Party (1) has, may have, or may claim to have, (2) heretofore had, may have had, or may claim to have had, or (3) hereafter may have, or may claim to have, against any of the Released Lender Parties, from the beginning of time up to and through the Effective Date of this Support Agreement, based on, arising out of, under or in connection with (A) the Credit Agreement and the other Loan Documents as defined therein, (B) the Obligations and (C) the Transactions, except for gross negligence, willful misconduct, criminal misconduct or actual fraud as determined by a final order entered by a court of competent jurisdiction, (ii) each of the Shareholder Releasing Parties agrees, neither individually nor collectively with any other person or entity, to bring any claim, action, cause of action, or suit that is based on, arising out of or under, or in connection with, any matters released by the Shareholder Releasing Parties under clause (i) above, and (iii) each of the Shareholder Releasing Parties severally (and not jointly) warrants and represents that it has not transferred or assigned to any person or entity any right based on, arising out of or under, or in connection with, any matters released by the Shareholder Releasing Parties under clause (i) above. Notwithstanding anything to the contrary herein, the Shareholder Releasing Parties shall not be deemed to have released the Debtors or any of their subsidiaries pursuant to this Section 3.1.

**3.2**      Immediately upon the Effective Date of this Support Agreement, except with respect to obligations expressly contained in this Support Agreement, (i) each of the Consenting Lenders agrees, on behalf of itself (each, a "Lender Releasing Party," and collectively, the "Lender Releasing Parties"), to unconditionally and forever release and discharge each Consenting Shareholder and its directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns and each current or former officer or director of any of the Debtors or any of their subsidiaries (collectively, the "Released Shareholder Parties") from any and all claims, actions, causes of action, suits, losses, obligations, liabilities, damages, judgments, awards, costs, and expenses (including attorneys' fees) of every kind, type, and nature whatsoever, whether known or unknown, absolute or contingent, asserted, threatened, or alleged, that such Lender Releasing Party (1) has, may have, or may claim to have, (2) heretofore had, may have had, or may claim to have had, or (3) hereafter may have, or may claim to have, against any of the Released Shareholder Parties, from the beginning of time up to and through the Effective Date of this Support Agreement, based on, arising out of, under or in connection with (A) the Credit Agreement and the other Loan Documents as defined therein, (B) the Obligations (C) the Transactions, (D) their services as directors or officers of the Debtors or any action, decision, or failure to act in their capacity as such with respect to the Debtors and (E) the Management Services

Agreement dated as of January 23, 2007 by and among Ripplewood Holdings L.L.C., Holding, the Company and the other parties thereto, except for gross negligence, willful misconduct, criminal misconduct or actual fraud as determined by a final order entered by a court of competent jurisdiction, (ii) each of the Lender Releasing Parties agrees, neither individually nor collectively with any other person or entity, to bring any claim, action, cause of action, or suit that is based on, arising out of or under, or in connection with, any matters released by the Lender Releasing Parties under clause (i) above, and (iii) each of the Lender Releasing Parties severally (and not jointly) warrants and represents that it has not transferred or assigned to any person or entity any right based on, arising out of or under, or in connection with, any matters released by the Lender Releasing Parties under clause (i) above.  Notwithstanding anything to the contrary herein, the Lender Releasing Parties shall not be deemed to have released the Debtors or any of their subsidiaries pursuant to this Section 3.2.

**Section 4.  Termination Events.**

**4.1     Termination Events.**

The occurrence of any of the following shall be a "Termination Event":

(a)     the consummation of the Restructuring Transactions contemplated by this Support Agreement and the effective date of the Acceptable Plan or a written agreement among the Debtors and the Required Consenting Lenders terminating this Support Agreement;

(b)     any court of competent jurisdiction or other competent governmental or regulatory authority issues an order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Restructuring Transactions contemplated by the Acceptable Plan or this Support Agreement;

(c)     the occurrence of any breach of this Support Agreement by any of the Parties (to the extent not otherwise cured or waived in accordance with the terms hereof); provided, that if any Party shall breach its obligations pursuant to this Support Agreement, the Termination Date arising as a result of such act or omission shall apply only to such Party and this Support Agreement shall otherwise remain in full force and effect with respect to the Debtors and all such remaining Parties; it being understood that if such breaches result in fewer than 51% of the Consenting Lenders remaining Parties to this Agreement, the Debtors shall have the right to terminate.

(d)     any Debtor withdraws the Acceptable Plan, publicly announces its intention not to support the Acceptable Plan or files any plan of reorganization or liquidation and/or disclosure statement that is not consistent with the Acceptable Plan, or publicly announces its support for

any such inconsistent plan and/or disclosure statement, gives the notice described in Section 2.1(a)(1)(iii) hereof, or otherwise evinces an intention not to proceed with the Acceptable Plan or to proceed with any alternative plan or form of transaction;

(e)     the entry of any order in the Chapter 11 Cases terminating the Debtors' exclusive right to file a plan or plans of reorganization pursuant to Section 1121 of the Bankruptcy Code; provided that such order is not the result of a motion filed by any Consenting Lender;

(f)     any of the Chapter 11 Cases shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee with plenary powers, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases or the Debtors shall file a motion or other request for such relief;

(g)     either (1) a filing by any Debtor of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of or seeking avoidance of the liens securing the obligations referred to in the Collateral Documents (collectively, the "Secured Obligations") or any other cause of action against and/or with respect to the Secured Obligations, the prepetition liens securing such Secured Obligations, the Administrative Agent or any of the Secured Parties (or if the Debtors support any such motion, application or adversary proceeding commenced by any third party or consent to the standing of any such third party) or (2) the entry of an order of the Bankruptcy Court providing relief against the interests of any Consenting Lender with respect to any of the foregoing causes of action or proceedings;

(h)     any material adverse change regarding the feasibility of the Acceptable Plan arising on or after the Effective Date of this Support Agreement, as determined by the Required Consenting Lenders (as defined in Section 9.14) in their reasonable discretion;

(i)     the amendment, modification of, or the filing of a pleading by any of the Debtors that seeks to amend or modify the Acceptable Plan, the Disclosure Statement or any documents related to the Acceptable Plan, notices, exhibits or appendices, which amendment, modification or filing is inconsistent with this Support Agreement and not otherwise consented to by the Required Consenting Lenders;

(j)     failure of the Debtors to commence the Chapter 11 Cases on or before 11:59 p.m. (New York City time) on September 10, 2009;

(k)     11:59 p.m. (New York City time) on the fourth (4th) Business Day after the Petition Date, unless prior thereto the Bankruptcy Court enters an interim order in the Chapter 11 Cases of the Debtors under, inter alia Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code in form and substance satisfactory to the Administrative Agent and the Required Consenting Lenders, authorizing the Debtors to incur postpetition financing and use cash collateral, granting adequate protection to the prepetition Secured Parties, and scheduling a final hearing pursuant to Bankruptcy Rule 4001(B) (the "Interim DIP Order");

(l)     11:59 p.m. (New York City time) on the forty-fifth (45th) day after the date of entry of the Interim DIP Order, unless prior thereto the Bankruptcy Court enters a final order in the Chapter 11 Cases of the Debtors under, inter alia Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code in form and substance satisfactory to the Administrative Agent and the Required Consenting Lenders, authorizing the Debtors to incur postpetition financing and use cash collateral and granting adequate protection to the prepetition Secured Parties (the "Final DIP Order" and together with the Interim DIP Order, the "DIP Orders");

(m)     the occurrence of an "Event of Default" under, and as such term is defined in, the DIP Credit Agreement and the acceleration of the obligations thereunder;

(n)     11:59 p.m. (New York City time) on the date that is 75 days after the Petition Date, if the Debtors shall not have filed the Acceptable Plan and the Disclosure Statement with the Bankruptcy Court on or before such time;

(o)     11:59 p.m. (New York City time), on the date that is 115 days after the Petition Date, unless the Bankruptcy Court has entered an order, in form and substance satisfactory to the Administrative Agent and the Required Consenting Lenders, approving the Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code on or before such time;

(p)     11:59 p.m. (New York City time), on the date that is 20 days following entry of the order approving the Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code, unless prior thereto the Company commences the solicitation of acceptances of the Acceptable Plan;

(q)     11:59 p.m. (New York City time), on the date that is 80 days following entry of an order approving the Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code unless the Bankruptcy Court has entered the Confirmation Order on or before such time; provided that, if the Debtors have satisfied the conditions required for the Twelve Month Facility Extension Option (as defined in the DIP Commitment Letter), this deadline shall be extended to 11:59 p.m. (New York City time) on the date

that is 120 days following entry of an order approving the Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code unless the Bankruptcy Court has entered the Confirmation Order on or before such time; or

(r)    11:59 p.m. (New York City time) on the thirtieth (30th) day after the date of entry of the Confirmation Order, unless the "effective date" of the Acceptable Plan has occurred prior thereto.

**4.2    Additional Debtor Termination Events.**

The Debtors may terminate this Support Agreement upon five (5) Business Days prior written notice to the Administrative Agent upon the occurrence of either of the following events: (i) the breach by any Consenting Lender of the representations, warranties, or covenants of such Consenting Lender set forth in this Support Agreement that would be reasonably likely to have a material adverse impact on the Debtors, or the consummation of the Restructuring Transactions, that remains uncured for a period of five (5) Business Days after receipt by such Consenting Lender of notice of such breach; or (ii) the board of directors of the Company reasonably determines based upon the advice of counsel that proceeding with the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties.

Notwithstanding anything to the contrary herein, the releases provided for in Section 3 hereof shall survive the termination of this Support Agreement under either Section 4.1 or 4.2 hereof; provided, that the releases set forth in Section 3 herein shall automatically be null and void and of no further force and effect as if the release had never been granted with respect to any Party that has breached the terms of the penultimate paragraph of Section 2.1(a) hereof or any other terms herein in any material respect.

**4.3    Termination Event Procedures.**

Upon the occurrence of a Termination Event under (i) Section 4.1 (a), (b), (d), (e), (f), (g), (i) or (m) of this Support Agreement, this Support Agreement shall automatically terminate without further action, and (ii) Section 4.1 (c), (h), (j), (k), (l), (n), (o), (p), (q) or (r) of this Support Agreement, five (5) Business Days after the Administrative Agent (on behalf of the Consenting Lenders) or, with respect to a Termination Event under Section 4.1(c) which has occurred as a result of a breach of this Support Agreement by any Party, the other non-breaching Parties, shall have given written notice of the occurrence of such Termination Event to the other parties hereto and such Termination Event shall not have been cured during such five (5) Business Days after receipt of such notice (or otherwise waived in writing by the requisite Parties in accordance with the terms hereof), this Support Agreement shall terminate (the date of termination under clause (i) or (ii) hereof being the "Termination Date"). For the avoidance of doubt, the automatic stay arising pursuant to Section 362 of the Bankruptcy Code in the Chapter 11

Cases shall be deemed waived or modified for purposes of providing notice hereunder or terminating this Support Agreement.

**Section 5.  Remedies.**

It is understood and agreed by each of the Parties that any breach of this Support Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and, accordingly, the Parties agree that, in addition to any other remedies, each Party shall be entitled, without the requirement of posting a bond or other security, to specific performance and injunctive or other equitable relief.  The Debtors each agree that for so long as any Party has not taken any action to prejudice the enforceability of this Support Agreement (including, without limitation, alleging in any pleading that this Support Agreement is unenforceable), and has taken such actions as are reasonably required or desirable for the enforcement hereof, then such Party shall have no liability for damages hereunder in the event a court determines that this Support Agreement is not enforceable.  Without limiting the provisions hereof, the Parties hereby agree that if any Party breaches the terms of the penultimate paragraph of Section 2.1(a) hereof or any other terms herein in any material respect (to the extent not otherwise cured or waived in accordance with the terms hereof), the release granted to such Party in Section 3 hereof shall be automatically null and void and of no further force and effect as if the release had never been granted to such breaching Party.

**Section 6.  Mutual Representations, Warranties and Covenants.**

**6.1  Power and Authority.**

Each Party severally, and not jointly, represents to each other Party that, as of the date of this Support Agreement, (i) such Party has all requisite corporate, partnership, or limited liability company power and authority to enter into this Support Agreement and to carry out the Restructuring Transactions contemplated by, and perform its respective obligations under, this Support Agreement, and (ii) the execution and delivery of this Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

**6.2  Enforceability.**

Each Party severally, and not jointly, represents to each other Party that this Support Agreement is the legally valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability or ruling of the Bankruptcy Court.

**6.3  Representation.**

Each of the Parties to this Support Agreement acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Support Agreement and the Restructuring Transactions

contemplated by this Support Agreement. Accordingly, any rule of law or any legal decision that would provide any Party hereto with a defense to the enforcement of the terms of this Support Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived. The provisions of this Support Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto. None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

**6.4     Governmental Consents.**

Each Party severally, and not jointly, represents to each other Party that, as of the date of this Support Agreement, the execution, delivery, and performance by it of this Support Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with, or by, any Federal, state, or other governmental authority or regulatory body, except (i) such filings as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities or "blue sky" laws, (ii) any filings in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Acceptable Plan, and (iii) in the case of the Debtors, (A) filings of amended articles of incorporation or formation or other organizational documents with applicable state authorities, and (B) other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the Debtors.

**6.5     Ownership.**

(a)     Each Consenting Lender severally, and not jointly, represents and warrants that, as of the date hereof, (i) such Consenting Lender either (A) is the sole legal and beneficial owner of its share of the prepetition Total Outstandings and loans (if any) under the DIP Credit Agreement referred to in the DIP Commitment Letter (the "DIP Loans") or (B) is the legal owner of its share of the prepetition Total Outstandings and DIP Loans (if any), and has the power and authority to bind the legal and beneficial owner(s) of such prepetition Total Outstandings and DIP Loans (if any) to the terms of this Support Agreement, (ii) such Consenting Lender (a) has full power and authority to vote on and consent to or (b) has received direction from the party having full power and authority to vote on and consent to such matters concerning its share of the prepetition Total Outstandings and DIP Loans (if any) and to exchange, convert, assign and transfer such prepetition Total Outstandings and DIP Loans (if any), and (iii) other than pursuant to this Support Agreement, such prepetition Total Outstandings are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would adversely affect in any way such Consenting Lender's performance of its obligations contained in this Support Agreement at the time such obligations are required to be performed.

(b)     Each of the Consenting Shareholders severally, and not jointly, represents and warrants that, as of the date hereof (i) it is the beneficial owner of equity interests, or

is the nominee, investment manager, or advisor for beneficial holders of the equity interests in Holding, and (ii) other than pursuant to this Support Agreement, such equity interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would adversely affect in any way such Consenting Shareholder's performance of its obligations contained in this Support Agreement at the time such obligations are required to be performed.

**6.6    Board Appointments.**

The Parties acknowledge and do not object that immediately prior to execution of this Support Agreement and his resignation, the sole director of Holding caused the appointment to the board of directors of Holding all of the then remaining directors of the Company's board of directors.   The Consenting Shareholders hereby agree that, notwithstanding anything to the contrary in any shareholders agreement, from and after the Effective Date of this Support Agreement, they shall not appoint or elect, or cause the appointment or election of, any members to the board of directors (or any committees thereof) of the Debtors or their subsidiaries.

**Section 7. <u>No Material Misstatement or Omission.</u>**

The Debtors represent that none of the material and information provided by or on behalf of the Debtors to the Administrative Agent, the Consenting Lenders and the Consenting Shareholders in connection with the Restructuring Transactions contemplated in this Support Agreement, when read or considered together, contains any untrue statement of a material fact or omits to state a material fact necessary in order to prevent the statements made therein from being materially misleading.

**Section 8. <u>Acknowledgement.</u>**

This Support Agreement and the Restructuring Transactions contemplated herein are the product of negotiations among the Debtors and the Consenting Lenders, together with their respective representatives.  This Support Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Acceptable Plan or any plan of reorganization for the purposes of Sections 1125 and 1126 of the Bankruptcy Code or otherwise.  The Debtors will not solicit acceptances of the Acceptable Plan from any Consenting Lender until such Consenting Lender has been provided with copies of a Disclosure Statement approved by the Bankruptcy Court.

**Section 9. <u>Miscellaneous Terms.</u>**

**9.1    Assignment; Transfer Restrictions.**

(a)    Each Consenting Lender hereby agrees, for so long as this Support Agreement shall remain in effect as to it, not to sell, assign, transfer, hypothecate or otherwise dispose of any of its pro rata share of the prepetition Total Outstandings or DIP Loans (if any) unless prior thereto

the transferee thereof executes and delivers a Lender Joinder (as defined in section 9.3(a)) to the Administrative Agent at least two (2) Business Days prior to the relevant transfer. Thereafter, such transferee shall be deemed to be a Consenting Lender for purposes of this Support Agreement.

(b)     Any sale, transfer, assignment, hypothecation or other disposition by any Consenting Lender of any or all of its pro rata share of the prepetition Total Outstandings or DIP Loans (if any) that does not comply with the procedures set forth in Section 9.1(a) shall be deemed void *ab initio*.

(c)     Nothing herein shall be construed to restrict any Consenting Lender's right to acquire additional prepetition Loans, participation interests in prepetition Letters of Credit or DIP Loans. To the extent any Consenting Lender acquires as legal owner additional prepetition Loans, participation interests in prepetition Letters of Credit or DIP Loans, the Parties agree that such prepetition Loans, participation interests in prepetition Letters of Credit and DIP Loans shall be deemed to be subject to the terms of this Support Agreement upon the Consenting Lender's acquisition of such additional prepetition Loans, participation interests in prepetition Letters of Credit or DIP Loans. Notwithstanding the foregoing provisions of this Section 9.1, any Consenting Lender may, at any time and without notice to or consent from any other party, pledge or grant a security interest in all or any portion of its rights (including, without limitation, rights to payment of interest and repayment of principal) under the prepetition Credit Agreement or the DIP Credit Agreement in order to secure obligations of such Consenting Lender to a Federal Reserve Bank; provided that no such pledge or grant of a security interest shall release such Consenting Lender from any of its obligations hereunder or substitute any such pledgee or grantee for such Consenting Lender as a party hereto.

(d)     Each Consenting Shareholder hereby agrees, for so long as this Support Agreement shall remain in effect as to it, not to sell, assign, transfer, hypothecate or otherwise dispose of any of its equity interests in Holding unless prior thereto the transferee thereof executes and delivers a Shareholder Joinder (as defined in Section 9.3(c)) to the Administrative Agent at least two (2) Business Days prior to the relevant transfer. Thereafter, such transferee shall be deemed to be a Consenting Shareholder for purposes of this Support Agreement.

(e)     Any sale, transfer, assignment, hypothecation or other disposition by any Consenting Shareholder of any or all of its equity interests that does not comply with the procedures set forth in Section 9.1(d) shall be deemed void *ab initio*.

**9.2    No Third Party Beneficiaries.**

Except for the Released Lender Parties and the Released Shareholder Parties, unless expressly stated herein, this Support Agreement shall be solely for the benefit of the Administrative Agent and the Parties and no other person or entity shall be a third party beneficiary.

**9.3    Joinder.**

(a)    Any person that receives or acquires a portion of the prepetition Total Outstandings or DIP Loans pursuant to a sale, assignment, transfer, hypothecation or other disposition of such prepetition Total Outstandings or DIP Loans by a Consenting Lender hereby agrees to be bound by all of the terms of the Term Sheet and this Support Agreement (as the same may be hereafter amended, restated or otherwise modified from time to time) (a "Joining Lender Party") by executing and delivering a joinder in the form of Exhibit B hereto (the "Lender Joinder") to the Administrative Agent. The Joining Lender Party shall thereafter be deemed to be a "Consenting Lender" and a Party for all purposes under this Support Agreement.

(b)    With respect to the aggregate principal amount of prepetition Total Outstandings or DIP Loans held by the Joining Lender Party upon consummation of the sale, assignment, transfer, hypothecation or other disposition of such prepetition Total Outstandings or DIP Loans, the Joining Lender Party hereby makes the representations and warranties of the Consenting Lenders set forth in Section 6 of this Support Agreement to each of the other Parties to this Support Agreement.

(c)    Any person that receives or acquires any portion of the equity interests pursuant to a sale, assignment, transfer, hypothecation or other disposition of such equity interests by a Consenting Shareholder hereby agrees to be bound by all of the terms of the Term Sheet and this Support Agreement (as the same may be hereafter amended, restated or otherwise modified from time to time) (a "Joining Shareholder Party") by executing and delivering a joinder in the form of Exhibit C hereto (the "Shareholder Joinder") to the Administrative Agent. The Joining Shareholder Party shall thereafter be deemed to be a "Consenting Shareholder" and a party for all purposes under this Support Agreement.

(d)    With respect to the equity interests held by the Joining Shareholder Party upon consummation of the sale, assignment, transfer, hypothecation or other disposition of such equity interests, the Joining Shareholder Party hereby makes the representations and warranties of the Consenting Shareholders set forth in Section 6 of this Support Agreement to each of the other Parties to this Support Agreement.

**9.4     Entire Agreement.**

This Support Agreement, including Exhibit A and Schedule 1 annexed hereto, constitutes the entire agreement of the Parties with respect to the subject matter of this Support Agreement, and supersedes all other prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Support Agreement.

**9.5     Counterparts.**

This Support Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.   Delivery of an executed signature page of this Support Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

**9.6     Settlement Discussions.**

This Support Agreement and the Term Sheet annexed hereto as Exhibit A is part of a proposed settlement of disputes among the Parties hereto.  Nothing herein shall be deemed to be an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Support Agreement and the Term Sheet annexed hereto as Exhibit A, documents and negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Support Agreement.

**9.7     Continued Banking Practices.**

Notwithstanding anything herein to the contrary, each Consenting Lender and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Debtor or any affiliate of any Debtor or any other Person, including, but not limited to, any Person proposing or entering into a transaction related to or involving any Debtor or any affiliate thereof.

**9.8     Reservation of Rights.**

(a)     Except as expressly provided in this Support Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of each of the Consenting Lenders to protect and preserve all of its rights and remedies under the DIP Credit Agreement, the DIP Orders or any other order of the Bankruptcy Court or other court of competent jurisdiction, or its full participation in the Chapter 11 Cases.

(b)     Without limiting Section 9.8(a) in any way, if the Restructuring Transactions contemplated by this Support Agreement or otherwise set

forth in the Acceptable Plan are not consummated as provided herein, if a Termination Date occurs, or if this Support Agreement is otherwise terminated for any reason, the Consenting Lenders each fully reserve any and all of their respective rights, remedies and interests under the Loan Documents, the DIP Credit Agreement and related post petition loan documents, applicable law and in equity; provided, that the releases set forth in Section 3 hereof shall continue to remain in full force and effect except with respect to any breaching Party that has breached the terms of the penultimate paragraph of Section 2.1(a) hereof or any other terms herein in any material respect.

(c)     Notwithstanding anything herein to the contrary, the Parties acknowledge that the support of each Consenting Lender contained in this Support Agreement relates solely to such Consenting Lender's rights and obligations as a lender under the prepetition Credit Agreement and the DIP Credit Agreement (if applicable) with respect to the principal amounts identified on such Consenting Lender's signature page and as provided in Section 9.1 and does not bind such Consenting Lender or its affiliates with respect to any other indebtedness, obligations or liabilities owed by the Company or any of its subsidiaries and affiliates to such Consenting Lender or any affiliate of such Consenting Lender (for the avoidance of doubt, if the Consenting Lender is specified on the relevant signature page as a particular group or business within an entity, "Consenting Lender" shall mean such group or business and shall not mean the entity or its affiliates, or any other desk or business thereof, or any third party funds advised thereby).  For purposes of this Support Agreement, "Consenting Lender" shall not include a holder of Loans under the prepetition Credit Agreement or DIP Loans signatory hereto in its capacity or to the extent of its holdings as a public-side broker, dealer or market maker of Loans under the prepetition Credit Agreement or DIP Loans or any other claim against or security in the Debtors.

**9.9     Successors.**

This Support Agreement is intended to bind the Parties and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 9.9 shall be deemed to permit any transfer, tender, vote or consent, of any claims other than in accordance with the terms of this Support Agreement.

**9.10     Publicity.**

The Parties agree that all public announcements of the entry into or the terms and conditions of this Support Agreement shall be mutually, reasonably acceptable to each of the Parties.

**9.11    Nondisparagement.**

Each Consenting Lender and each Consenting Shareholder, respectively, agrees severally (and not jointly), that it shall not make any malicious, disparaging or defamatory statements to any third party regarding any Consenting Lender or Consenting Shareholder or any of their respective affiliates, subsidiaries, directors, shareholders, members, officers or employees or any of their businesses or products or any aspect of any ownership thereof related to the Restructuring Transactions, the Credit Agreement, the Obligations, the Transactions, or the ownership or management of the Debtors; provided, that this provision shall not be deemed to limit any rights of any Party to make statements of fact in good faith in litigation  that is not prohibited by an applicable release in Section 3 or that is related to a breach of this Support Agreement.

**9.12    Governing Law; Waiver of Jury Trial; Indemnity.**

(a)    The Parties waive all rights to trial by jury in any jurisdiction in any action, suit, or proceeding brought to resolve any dispute between the Parties under this Support Agreement, whether sounding in contract, tort or otherwise.

(b)    This Support Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provision which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Support Agreement, each Party hereby irrevocably and unconditionally agrees for itself that, subject to the following sentence, any action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Support Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in any state or federal court of competent jurisdiction in New York County, State of New York, and by execution and delivery of this Support Agreement, each of the Parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceedings.

(c)    Notwithstanding the foregoing, if the Chapter 11 Cases are commenced, nothing in Section 9.12(a) or (b) shall limit the authority of the Bankruptcy Court to hear any matter related to or arising out of this Support Agreement.

**9.13    Pending Transfers.**

Notwithstanding anything to the contrary provided herein, if a Consenting Lender has assigned all or a portion of the Obligations under the Credit Agreement that it beneficially owns as of the date hereof but such assignment has not settled as of the date hereof (such Obligations, "Pending Transfer Credit Agreement Obligations"), then such Consenting Lender shall be permitted to exclude from the amount of the Obligations

listed on its signature page an amount of Pending Transfer Credit Agreement Obligations equal to the Pending Transfer Credit Agreement Obligations assigned to any transferee that has instructed such Consenting Lender not to execute this Agreement (such excluded Obligations, the "Excluded Credit Agreement Obligations"). Such Consenting Lender shall not be bound by the terms hereof with respect to any Excluded Credit Agreement Obligations.

**9.14    Amendments, Modifications, Waivers.**

This Support Agreement and the Acceptable Plan may only be modified, amended or supplemented, and any of the terms thereof may only be waived, by an agreement in writing signed by each of the Debtors and the Consenting Lenders holding at such time at least 66 2/3% of the prepetition Total Outstandings and the DIP Loans that are subject to the terms hereof and held by all Consenting Lenders (the "Required Consenting Lenders"); provided that any modifications, amendments or supplements to Annex 1 to the Term Sheet shall require the consent of each Consenting Lender; provided, further that if the modification, amendment or waiver at issue adversely impacts the treatment or rights of any Consenting Lender differently than other Consenting Lenders, the agreement in writing of such Consenting Lender whose treatment or rights are directly adversely impacted in a different manner than other Consenting Lenders shall also be required for such modification, amendment or waiver to be effective; provided further, that if the modification, amendment, supplement or waiver at issue relates to Sections 2.2(b), 3, 4.2, 5, 6 (only to the extent affecting Consenting Shareholders), 9.1 (only to the extent affecting Consenting Shareholders), 9.3 (only to the extent affecting Consenting Shareholders), 9.11 and 9.12 or otherwise directly adversely impacts the treatment or rights of any Consenting Shareholder, the agreement in writing of such Consenting Shareholder whose treatment or rights are directly adversely impacted shall also be required for such modification, amendment, supplement or waiver to be effective (this proviso shall not be modified, amended or supplemented, or any of its terms waived, without the prior written consent of each Consenting Shareholder).

**9.15    Consideration.**

It is hereby acknowledged by each of the Parties that no consideration shall be due or paid to the Parties for their agreement to support or not interfere with the Acceptable Plan in accordance with the terms and conditions of this Support Agreement, other than the obligations of the other Parties under this Support Agreement. The Company represents that, as of the Effective Date, no payments have been made to any of the Parties hereto that were not permitted to be made under the terms of the Credit Agreement.

**9.16    Severability of Provisions.**

If any provision of this Support Agreement for any reason is held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Support Agreement.

**9.17    Notices.**

All notices and other communications required or permitted hereunder shall be in writing and shall be deemed given when: (a) delivered personally or by overnight courier to the following address of the other Party hereto; or (b) sent by fax to the following fax number of the other Party hereto with the confirmatory copy delivered by overnight courier to the address of such Party listed below.

If to any Debtor, to counsel at the following address:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022-4611
Attention:  Paul M. Basta, Esq.

If to any Consenting Lender or Consenting Shareholder, the address set forth on its signature page.

If to the Administrative Agent, to:

JPMorgan Chase Bank, N.A
270 Park Avenue
New York New York 10017-2070
Attn:  Ms. Elizabeth Kelley

[SIGNATURE PAGES FOLLOW]

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

RDA HOLDING CO.

By: _____
    Name: Thomas A Williams
    Title: Senior Vice President and
           Chief Financial Officer

THE READER'S DIGEST
ASSOCIATION, INC.

By: _____
    Name: Thomas A Williams
    Title: Senior Vice President and
           Chief Financial Officer

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

Alex, Inc.
Allrecipes.com, Inc.
Ardee Music Publishing, Inc.
Christmas Angels Productions, Inc.
Compass Learning, Inc.
Direct Entertainment Media Group, Inc.
Direct Holdings Americas, Inc.
Direct Holdings Custom Publishing Inc.
Direct Holdings Customer Service, Inc.
Direct Holdings Education Inc.
Direct Holdings Libraries Inc.
Direct Holdings U.S. Corp.
Funk & Wagnalls Yearbook Corp.
Gareth Stevens, Inc.
Home Service Publications, Inc.
Pegasus Asia Investments, Inc.
Pegasus Investment, Inc.
Pegasus Sales, Inc.
Pleasantville Music Publishing, Inc.
R.D. Manufacturing Corporation
RD Large Edition, Inc.
RD Publications, Inc.
RD Walking, Inc.
RDA Sub Co.

Reader's Digest Children's Publishing, Inc.
Reader's Digest Consumer Services, Inc.
Reader's Digest Entertainment, Inc.
Reader's Digest Financial Services, Inc.
Reader's Digest Latinoamerica, S.A.
Reader's Digest Sales and Services, Inc.
Reader's Digest Sub Nine, Inc.
Readers Digest Young Families, Inc.
Reiman Manufacturing, LLC
Reiman Media Group, Inc.
Retirement Living Publishing Company, Inc.
Saguaro Road Records, Inc.
Taste of Home Media Group, Inc.
Taste of Home Productions, Inc.
Travel Publications, Inc.
W.A. Publications, LLC
WAPLA, LLC
Weekly Reader Corporation
Weekly Reader Custom Publishing, Inc.
World Almanac Education Group, Inc.
World Wide Country Tours, Inc.
WRC Media, Inc.

By: _____
    Name: Thomas A. Williams
    Title: Vice President

By: _____
    Name: Thomas A. Williams
    Title: Vice President

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

RDA INVESTORS I, LLC

By: _____
Name:
Title:

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

RDA INVESTORS II, LLC

By: _____
    Name:
    Title:

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

RDA INVESTORS III, LLC

By: _____

Name:

Title:

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

LVC ACQUISITION, L.L.C.

By: _____
Name:
Title:

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

LVC ACQUISITION II, L.L.C.

By: _____
     Name:
     Title:

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

EAC III, L.L.C.

By: _____
Name:
Title:

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

J. ROTHSCHILD GROUP (GUERNSEY) LTD.

By: _____

Name: MARK LE RAY     WILLIAM M FERRY

Title: DIRECTOR     DIRECTOR

**GoldenTree Credit Opportunities**
**Financing I, Limited**
**By: GoldenTree Asset Management, LP,**
**as a shareholder of RDA Holding Co.**

By: _____

Name: Karen Weber
Title: Director – Bank Debt

Address: 300 Park Avenue, 21st FL
New York, NY 10022

**GoldenTree MultiStrategy Financing, Ltd
By: GoldenTree Asset Management, LP,
as a shareholder of RDA Holding Co.**

By: _____
Name: Karen Weber
Title: Director – Bank Debt

Address: 300 Park Avenue, 21st FL
New York, NY 10022

**GoldenTree High Yield Value Master Fund, LP**
**By: GoldenTree Asset Management, LP, as a shareholder of RDA Holding Co.**

By: _Karen Weber_
        Name: Karen Weber
        Title: Director – Bank Debt

Address: 300 Park Avenue, 21st FL
New York, NY 10022

**GoldenTree Partners, LP**
**By: GoldenTree Asset Management, LP,**
**as a shareholder of RDA Holding Co.**

By: _Karen Weber_
Name: Karen Weber
Title: Director – Bank Debt

Address: 300 Park Avenue, 21st FL
New York, NY 10022

**GoldenTree Partners (100), LP**
**By: GoldenTree Asset Management, LP,**
**as a shareholder of RDA Holding Co.**

By: _____
        Name: Karen Weber
        Title: Director – Bank Debt

Address: 300 Park Avenue, 21st FL
      New York, NY 10022

**GoldenTree Offshore Fund, Ltd.**
**By: GoldenTree Asset Management, LP,**
**as a shareholder of RDA Holding Co.**

By: _____
        Name: Karen Weber
        Title: Director – Bank Debt

Address: 300 Park Avenue, 21st FL
New York, NY 10022

**GoldenTree European Financing B.V.**
**By: GoldenTree Asset Management UK**
**LLP, as a shareholder of RDA Holding**
**Co.**

By: _____
        Name: Karen Weber
        Title: Director – Bank Debt

Address: 300 Park Avenue, 21st FL
        New York, NY 10022

**GoldenTree Loan Opportunities III, Limited**
**By: GoldenTree Asset Management, LP, as a**
**Lender**

By: _____

        Name: Karen Weber
        Title: Director – Bank Debt
        Outstanding Principal Amount of
        prepetition Loans $9,793,466.62

Address: 300 Park Avenue, 21st FL
         New York, NY 10022

**GoldenTree Loan Opportunities IV, Limited**
**By: GoldenTree Asset Management, LP, as a**
**Lender**

By: _____
       Name: Karen Weber
       Title: Director – Bank Debt
       Outstanding Principal Amount of
       prepetition Loans $9,793,466.62

Address: 300 Park Avenue, 21st FL
         New York, NY 10022

**GoldenTree Loan Opportunities V, Limited**
**By: GoldenTree Asset Management, LP, as a**
**Lender**

By: _____
   Name: Karen Weber
   Title: Director – Bank Debt
   Outstanding Principal Amount of
   prepetition Loans $9,787,249.36

Address: 300 Park Avenue, 21st FL
   New York, NY 10022

**GoldenTree Credit Opportunities Financing I,
Limited
By: GoldenTree Asset Management, LP, as a
Lender**

By: _____

       Name: Karen Weber
       Title: Director – Bank Debt
       Outstanding Principal Amount of
       prepetition Loans $9,594,034.71

Address: 300 Park Avenue, 21st FL
         New York, NY 10022

**GN3 SIP Limited**
**By: GoldenTree Asset Management, LP, as a**
**Lender**

By: _____

       Name: Karen Weber
       Title: Director – Bank Debt
       Outstanding Principal Amount of
       prepetition Loans $14,637,690.35

Address: 300 Park Avenue, 21st FL
         New York, NY 10022

**NCM GT 2008-2 LLC, as a Lender**

By: _____

Name: James D. Jones

Title: Authorized Signatory

Outstanding Principal Amount of
prepetition Loans $ 6,754,586.23

Address: 750 Bering Dr. 5th Floor
Heston, TX 77433.

NCM GT 2008-2 LLC

prep:.

Address:

NCM GT 2008-2 LLC

prep:.

**GoldenTree Credit Opportunities Second
Financing, Limited
By: GoldenTree Asset Management, LP, as a
Lender**

By: _____

      Name: Karen Weber
      Title: Director – Bank Debt
      Outstanding Principal Amount of
      prepetition Loans $15,484,346.31

Address: 300 Park Avenue, 21st FL
        New York, NY 10022

**GoldenTree 2004 Trust**
**By: GoldenTree Asset Management, LP, as a**
**Lender**

By: _____
          Name: Karen Weber
          Title: Director – Bank Debt
          Outstanding Principal Amount of
          prepetition Loans $11,734,685.47

Address: 300 Park Avenue, 21st FL
          New York, NY 10022

**GoldenTree Leverage Loan Financing I, Limited**
**By: GoldenTree Leverage Loan Manager, LLC,**
**as a Lender**

By: _____
         Name: Karen Weber
         Title: Director – Bank Debt
         Outstanding Principal Amount of
         prepetition Loans $22,517,510.01

Address: 300 Park Avenue, 21st FL
          New York, NY 10022

**GoldenTree Credit Opportunities Master Fund, Ltd.**
**By: GoldenTree Asset Management, LP as a Lender**

By: _____
       Name: Karen Weber
       Title: Director – Bank Debt
       Outstanding Principal Amount of
       prepetition Loans EUR5,349,233.70

Address: 300 Park Avenue, 21st FL
        New York, NY 10022

**Laurelin II B.V.**
**By: GoldenTree Asset Management, LP as a**
**Lender**

By: _____

     Name: Karen Weber
     Title: Director – Bank Debt
     Outstanding Principal Amount of
     prepetition Loans EUR12,415,417.74

Address: 300 Park Avenue, 21st FL
       New York, NY 10022

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

GSO Special Situations Overseas Fund Ltd.
By: GSO Capital Partners LP, its investment advisor

By: _____

Name: _____

Title:     CHRISTOPHER H. SULLIVAN
            AUTHORIZED SIGNATORY

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

GSO Credit Opportunities Fund (Helios), L.P.
By: GSO Capital Partners LP, its investment advisor

By: _____

Name:         CHRISTOPHER H. SULLIVAN
               AUTHORIZED SIGNATORY

**Title:Title:**

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

GSO Special Situations Fund LP
By: GSO Capital Partners LP, its investment advisor

By: _____

Name:

Title:     Title:Title:     CHRISTOPHER H. SULLIVAN
                            AUTHORIZED SIGNATORY

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

MERRILL LYNCH CAPITAL CORPORATION

By: _Jack Purcell_____
Name: JACK PURCELL
Title: VICE PRESIDENT & AUTHORIZED SIGNATORY

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

SOLAR CAPITAL LLC

By: _____

Name: Michael Gross

Title: Authorized Signatory

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

DLJ INVESTMENT PARTNERS, L.P.

By: DLJ Investment Partners II, Inc.,
    its General Partner

By: _____
    Name: Doug M. Ladden
    Title: Principal

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

DLJ INVESTMENT PARTNERS II, L.P.

By: DLJ Investment Partners II, Inc.,
    its Managing General Partner

By: _____
    Name: Doug M. Ladden
    Title:  Principal

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

DLJIP II HOLDINGS, L.P.

By: DLJ Investment Partners II, Inc.,
    its General Partner

By: _____
    Name: Doug M. Ladden
    Title: Principal

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

DLJ MERCHANT BANKING PARTNERS II, L.P.

By: DLJ Merchant Banking II, Inc.,
    its Managing General Partner

By: _____
    Name: William L. Spiro
    Title:  Vice President

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

DLJ MERCHANT BANKING PARTNERS II-A, L.P.

By: DLJ Merchant Banking II, Inc.,
its Managing General Partner

By: _____
Name: William L. Spiro
Title: Vice President

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

DLJ OFFSHORE PARTNERS II, C.V.

By: DLJ Merchant Banking II, Inc.,
    as Advisory General Partner

By: _____
    Name: William L. Spiro
    Title:  Vice President

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

DLJ DIVERSIFIED PARTNERS, L.P.

By: DLJ Diversified Partners, Inc.,
    its Managing General Partner

By: _____
    Name: Doug M. Ladden
    Title:  Principal

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

DLJ DIVERSIFIED PARTNERS-A, L.P.

By: DLJ Diversified Partners, Inc.,
    its Managing General Partner

By: _____
    Name: Doug M. Ladden
    Title:  Principal

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

DLJ MB FUNDING II, INC.

By: _____

Name: William L. Spiro
Title: Vice President

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

DLJ MILLENNIUM PARTNERS, L.P.

By: DLJ Merchant Banking II, Inc.,
its Managing General Partner

By: _____
Name: William L. Spiro
Title: Vice President

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

DLJ MILLENNIUM PARTNERS-A, L.P.

By: DLJ Merchant Banking II, Inc.,
its Managing General Partner

By: _____
Name: William L. Spiro
Title: Vice President

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

DLJ EAB PARTNERS, L.P.

By: DLJ LBO Plans Management Corporation,
its General Partner

By: _____
Name: William L. Spiro
Title: Vice President

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

DLJ ESC II, L.P.

By: DLJ LBO Plans Management Corporation,
its General Partner

By: _____
Name: William L. Spiro
Title: Vice President

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

DLJ FIRST ESC, L.P.

By: DLJ LBO Plans Management Corporation,
    its Managing General Partner

By: _____
    Name: William L. Spiro
    Title:  Vice President

AND

By: DLJ LBO Plans Management Corporation II,
    its Special Limited Partner

By: _____
    Name: William L. Spiro
    Title:  Vice President

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY

By: _____

Name:
Title:     Howard Stern
         Its Authorized Representative

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

ARES LEVERAGED INVESTMENT FUND II, L.P.

By: _____
Name:
Title:     **AMERICO CASCELLA**
           **AUTHORIZED SIGNATORY**

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

ARES LEVERAGED INVESTMENT FUND, L.P.

By: _____
Name:
Title:

**AMERICO CASCELLA**
**AUTHORIZED SIGNATORY**

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

W CAPITAL PARTNERS, L.P.

By: _____

Name: Stephen Wertheimer

Title: Managing Director

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

STARR INTERNATIONAL USA
INVESTMENTS LLC

By: _Michael J. Horvath_
      Name: Michael J. Horvath
      Title: Associate Counsel

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

C.V. STARR & CO., INC.

By: *Michael J Horvath*
     Name: Michael J. Horvath
     Title: Associate Counsel

**Malibu CFPI Loan Funding LLC**                    , as a Lender

By: _____

Name:
Title: Adam Jacobs
Attorney-in-fact
Outstanding Principal Amount of
prepetition Loans ▬▬▬▬▬

Address: <u>540 West Madison Street</u>
<u>19th Floor – 7E</u>
<u>Attn: Terry Conner-Graham</u>
<u>Chicago, IL  60661</u>

**Pinehurst Trading, Inc., as a Lender**

By: _____
     Name: Stacy Lai President
     Title: Assistant Vice
     Outstanding Principal Amount of
     prepetition Loans █████████

Address: 214 N. Tryon, Charlotte, NC 28255

**[CONSENTING LENDER NAME], as a Lender**

American International Group, Inc.
By: AIG Global Investment Corp.,
Its Investment Adviser

Outstanding Principal Amount of
prepetition Loans ▨▨▨▨

Saturn CLO, Ltd.
By: AIG Global Investment Corp.,
its Collateral Manager

Outstanding Principal Amount of
prepetition Loans ▨▨▨▨

Galaxy V CLO, LTD
By: AIG Global Investment Corp.
its Collateral Manager

Outstanding Principal Amount of
prepetition Loans ▨▨▨▨

Galaxy VI CLO, LTD
By: AIG Global Investment Corp.
its Collateral Manager

Outstanding Principal Amount of
prepetition Loans ▨▨▨▨

Galaxy VII CLO, LTD
By: AIG Global Investment Corp.
it's Collateral Manager

Outstanding Principal Amount of
prepetition Loans ▨▨▨▨

Galaxy VIII CLO, LTD
By: AIG Global Investment Corp.
as Collateral Manager

Outstanding Principal Amount of
prepetition Loans ▨▨▨▨

By: _____

Name:
Title:    **W. Jeffrey Baxter
Managing Director**

**[CONSENTING LENDER NAME], as a Lender**

Euro-Galaxy CLO B.V.
By: AIG Investments Europe Limited
As Collateral Manager

Outstanding Principal Amount of
prepetition Loans ████████████

Euro-Galaxy II CLO B.V.
By: AIG Investments Europe Limited
As Collateral Manager

Outstanding Principal Amount of
prepetition Loans ████████████

By: _____
Name: **Steven S. Oh**
Title: **Authorized Signatory**

Address: _____

[CONSENTING LENDER NAME], as a Lender

Greynock CDO LTD.

By: Aladdin Capital Management LLC, as Manager

By: _____

Name: Ayo Kelly

Title: Authorized Signatory

Outstanding Principal Amount of
prepetition Loans ███████████████

Address: Aladdin Capital Management LLC
Six Landmark Square
Sixth floor
Stamford, CT 06901

**[CONSENTING LENDER NAME], as a Lender**

Landmark IV CDO LTD

By: Aladdin Capital Management LLC, as Manager

By: _Ayse Kelly_ (signature)

Name: Ayse Kelly

Title: Authorized Signatory

Outstanding Principal Amount of
prepetition Loans ███████████

Address: Aladdin Capital Management LLC
Six Landmark Square
Sixth floor
Stamford, CT 06901

[CONSENTING LENDER NAME], as a Lender

By: _____

Name:
Title:
Outstanding Principal Amount of
prepetition Loans ████████████████

Address: _____

NORTHWOODS CAPITAL VI, LIMITED
BY: ANGELO, GORDON & CO., L.P.
AS COLLATERAL MANAGER

BRUCE MARTIN
MANAGING DIRECTOR

**[CONSENTING LENDER NAME], as a Lender**

By: _____

Name:

Title:

Outstanding Principal Amount of

prepetition Loans ███████████████

Address: _____

BRUCE MARTIN
MANAGING DIRECTOR

NWIV

[CONSENTING LENDER NAME], as a Lender

By: _____
    Name:
    Title:
    Outstanding Principal Amount of
    prepetition Loans ███████████

Address: _____

BRUCE MARTIN
MANAGING DIRECTOR

*NWV*

**[CONSENTING LENDER NAME], as a Lender**

By: _____

Name:

Title:

Outstanding Principal Amount of
prepetition Loans ███████████████

Address: _____

**BRUCE MARTIN**
**MANAGING DIRECTOR**

| | |
|---|---|
| Ares X CLO Ltd.<br><br>By:     Ares CLO Management X, L.P.,<br>        Investment Manager<br><br>By:     Ares CLO GP X, LLC,<br>        Its General Partner<br><br><br>By:<br>Name:   ~~AMERICO CASCELLA~~<br>Title:   AUTHORIZED SIGNATORY<br>Outstanding Principal Amount of prepetition Loans ▄▄▄ | ARES XI CLO Ltd.<br><br>By: ARES CLO MANAGEMENT XI, L.P.<br><br>By: ARES CLO GP XI, LLC, ITS GENERAL PARTNER<br><br>By: ARES MANAGEMENT LLC, ITS MANAGER<br><br><br>By:<br>Name:   ~~AMERICO CASCELLA~~<br>Title:   AUTHORIZED SIGNATORY<br>Outstanding Principal Amount of prepetition Loans ▄▄▄ |
| ARES XII CLO LTD.<br><br>By: ARES CLO MANAGEMENT XII, L.P.<br><br>By: ARES CLO GP XII, LLC, ITS GENERAL PARTNER<br><br>By: ARES MANAGEMENT LLC, ITS MANAGER<br><br><br>By:<br>Name:   ~~AMERICO CASCELLA~~<br>Title:   AUTHORIZED SIGNATORY<br>Outstanding Principal Amount of prepetition Loans ▄▄▄ | ARES ENHANCED LOAN INVESTMENT STRATEGY III, LTD.<br><br>By: ARES ENHANCED LOAN MANAGEMENT III, L.P<br><br>By: ARES ENHANCED LOAN III GP, LLC, ITS GENERAL PARTNER<br><br>By: ARES MANAGEMENT LLC, ITS MANAGER<br><br>By:<br>Name:   ~~AMERICO CASCELLA~~<br>Title:   AUTHORIZED SIGNATORY<br>Outstanding Principal Amount of prepetition Loans ▄▄▄ |
| ARES ENHANCED LOAN INVESTMENT STRATEGY II, LTD.<br><br>By:     Ares Enhanced Loan Management II, L.P.,<br>        Investment Manager<br><br>By:     Ares Enhanced Loan GP II, LLC<br>        Its General Partner<br><br><br>By:<br>Name:   ~~AMERICO CASCELLA~~<br>Title:   AUTHORIZED SIGNATORY<br>Outstanding Principal Amount of prepetition Loans ▄▄▄ | Ares VIII CLO Ltd.<br><br>By:     Ares CLO Management VIII, L.P.,<br>        Investment Manager<br><br>By:     Ares CLO GP VIII, LLC,<br>        Its General Partner<br><br><br>By:<br>Name:   ~~AMERICO CASCELLA~~<br>Title:   AUTHORIZED SIGNATORY<br>Outstanding Principal Amount of prepetition Loans ▄▄▄ |

Address:     2000 Avenue of the Stars, 12th Floor
                  Los Angeles, CA 90067

# Ares Management, LLC as a Lender

| Ares IIR CLO Ltd. | ARES IIIR/IVR CLO LTD. |
|---|---|
| By:      Ares CLO Management IIR, L.P., <br>          Investment Manager <br><br> By:      Ares CLO GP IIR, LLC, <br>          Its General Partner <br><br><br> By: <br> Name:   AMERICO CASCELLA <br> Title:    AUTHORIZED SIGNATORY <br> Outstanding Principal Amount of prepetition Loans ▓▓▓▓ | By: ARES CLO MANAGEMENT IIIR/IVR, L.P. <br><br> By: ARES CLO GP IIIR/IVR, LLC, ITS GENERAL <br> PARTNER <br><br>   By: ARES MANAGEMENT LLC, ITS MANAGER <br><br> By: <br> Name:   AMERICO CASCELLA <br> Title:    AUTHORIZED SIGNATORY <br> Outstanding Principal Amount of prepetition Loans ▓▓▓▓ |
| Ares VR CLO Ltd. | Ares VIR CLO Ltd. |
| By:      Ares CLO Management VR, L.P., <br>          Investment Manager <br><br> By:      Ares CLO GP VR, LLC, <br>          Its General Partner <br><br><br> By: <br> Name:   AMERICO CASCELLA <br> Title:    AUTHORIZED SIGNATORY <br> Outstanding Principal Amount of prepetition Loans ▓▓▓▓ | By:      Ares CLO Management VIR, L.P., <br>          Investment Manager <br><br> By:      Ares CLO GP VIR, LLC, <br>          Its General Partner <br><br><br> By: <br> Name:   AMERICO CASCELLA <br> Title:    AUTHORIZED SIGNATORY <br> Outstanding Principal Amount of prepetition Loans ▓▓▓▓ |
| Ares VII CLO Ltd. | Ares IX CLO Ltd. |
| By:      Ares CLO Management VII, L.P., <br>          Investment Manager <br><br> By:      Ares CLO GP VII, LLC, <br>          Its General Partner <br><br><br> By: <br> Name:   AMERICO CASCELLA <br> Title:    AUTHORIZED SIGNATORY <br> Outstanding Principal Amount of prepetition Loans ▓▓▓▓ | By:      Ares CLO Management IX, L.P., <br>          Investment Manager <br><br> By:      Ares CLO GP IX, LLC, <br>          Its General Partner <br><br> By:      Ares Management LLC, <br>          Its Managing Member <br><br><br> By: <br> Name:   AMERICO CASCELLA <br> Title:    AUTHORIZED SIGNATORY <br> Outstanding Principal Amount of prepetition Loans ▓▓▓▓ |

**Black Diamond International Funding, Ltd.**
**By: BDCM Fund Adviser, L.L.C.**
**As Its Collateral Manager**

**as a Lender**

By: _____

Name:

Title: Stephen H. Deckoff
Managing Director

Outstanding Principal Amount of
prepetition Loans $ ████████

Address: _____

**BLUEMOUNTAIN CLO III LTD.**
**By: BLUEMOUNTAIN CAPITAL**
**MANAGEMENT LLC,**
**Its Collateral Manager, as a Lender**

By: _/s/ Michael Abatemarco_

       Name: Michael Abatemarco
       Title:  Associate
       Outstanding Principal Amount of
       prepetition Loans ▉▉▉▉▉▉▉▉

Address:     280 Park Avenue 5th floor east
           New York, NY, 10017

**BLUEMOUNTAIN CLO II LTD.**
**By: BLUEMOUNTAIN CAPITAL**
**MANAGEMENT LLC,**
**Its Collateral Manager, as a Lender**

By: _Michael Abatemarco_

      Name: Michael Abatemarco
      Title: Associate
      Outstanding Principal Amount of
      prepetition Loans ███████

Address:    280 Park Avenue 5th floor east
             New York, NY, 10017

By: Callidus Debt Partners CLO Fund IV Ltd.
By: Its Collateral Manager,
Callidus Capital Management, LLC.

, as a Lender

By: _____

    Name: _____ Ira Ginsburg

    Title: _____ Principal

Outstanding Principal Amount of
prepetition Loans $ ▓▓▓▓▓▓▓▓▓▓▓

Address: _____

By: Callidus Debt Partners CLO Fund VI, Ltd.
By: Its Collateral Manager
Callidus Capital Management, LLC

                             , as a Lender

By: _____

Name:               Ira Ginsburg

Title:              Principal

Outstanding Principal Amount of
prepetition Loans ▓▓▓▓▓▓▓▓▓▓▓▓

Address: _____

[Restructuring Support Agreement – Consenting Lender]

**By:  MAPS CLO Fund II, Ltd.**
**By:  Its Collateral Manager,**
**Callidus Capital Management, LLC**

, as a Lender

By: _____

Name: Ira Ginsburg

Title: Principal

Outstanding Principal Amount of
prepetition Loans ▅▅▅▅▅▅▅▅

Address: _____

[Restructuring Support Agreement – Consenting Lender]

CANPARTNERS INVESTMENTS IV, LLC,
a California limited liability company

By: CANYON CAPITAL ADVISORS LLC,
a Delaware limited liability company, its Manager

By: _____
    Name: Mitchell R. Julis
    Title: Co-Chairman & Co-CEO
    Outstanding Principal Amount of
    prepetition Loans ███████████

Address:
    2000 Avenue of the Stars
    Floor 11
    Los Angeles, CA 90067

**Canyon Capital CLO 2004-1, LTD. , as a Lender**
BY: Canyon Capital Advisors LLC, a
Delaware Limited Liability Company, its
Collateral Manager

By: _____
    Name: Michael M. Leyland
    Title:   Authorized Signatory
    Outstanding Principal Amount of
    prepetition Loans ▮▮▮▮▮▮▮▮▮
Address: _____

2000 Avenue of the Stars
Floor 11
Los Angeles, CA 90067

**Canyon Capital CLO 2006-1, LTD. , as a Lender**
BY: Canyon Capital Advisors LLC, a
Delaware Limited Liability Company, its
Collateral Manager

By: _____
Name: Michael M. Leyland
Title: Authorized Signatory
Outstanding Principal Amount of
prepetition Loans ████████
Address: _____

2000 Avenue of the Stars
Floor 11
Los Angeles, CA 90067

**Canyon Capital CLO 2007-1, LTD. , as a Lender**
BY: Canyon Capital Advisors LLC, a Delaware Limited Liability Company, its Collateral Manager

By: _Michael M. Loyland_

Name: Michael M. Loyland
Title:  Authorized Signatory
Outstanding Principal Amount of prepetition Loans ████████

Address: _____

2000 Avenue of the Stars
Floor 11
Los Angeles, CA 90067

CANYON SPECIAL OPPORTUNITIES MASTER
FUND (CAYMAN), LTD.,

    an Exempted Company incorporated in the
    Cayman Islands with limited liability

By: CANYON CAPITAL ADVISORS LLC, its
investment Advisor

    a Delaware limited liability company, its
    Investment Advisor

By: _____

    Name:  Mitchell R. Julis
    Title: Co-Chairman & Co-CEO
    Outstanding Principal Amount of
    prepetition Loans ██████████████

Address:
    2000 Avenue of the Stars
    Floor 11
    Los Angeles, CA 90067

**Carlyle High Yield Partners VI, Ltd. as a Lender**

By: _____
        Name: Linda Pace
        Title: Managing Director

        Outstanding Principal Amount of
        prepetition Loans ███████████ _____

Address:   The Carlyle Group
          520 Madison Ave
          41st Floor
          New York, NY 10022

**Carlyle High Yield Partners VII, Ltd. as a Lender**

By: _____
       Name: Linda Pace
       Title: Managing Director

       Outstanding Principal Amount of
       prepetition Loans $█████████████

Address:   The Carlyle Group
          520 Madison Ave
          41st Floor
          New York, NY 10022

**Carlyle High Yield Partners VIII, Ltd. as a Lender**

By: _____
      Name: Linda Pace
      Title: Managing Director

      Outstanding Principal Amount of
      prepetition Loans ████████████

Address:   The Carlyle Group
          520 Madison Ave
          41st Floor
          New York, NY 10022

**Carlyle High Yield Partners IX, Ltd. as a Lender**

By: _____
     Name: Linda Pace
     Title: Managing Director

     Outstanding Principal Amount of
     prepetition Loans ███████████

Address:   The Carlyle Group
        520 Madison Ave
        41st Floor
        New York, NY 10022

**Carlyle High Yield Partners IV, Ltd. as a Lender**

By: _____
       Name: Linda Pace
       Title: Managing Director

       Outstanding Principal Amount of
       prepetition Loans ████████████

Address:   The Carlyle Group
          520 Madison Ave
          41st Floor
          New York, NY 10022

**Carlyle High Yield Partners X, Ltd. as a Lender**

By: _____
     Name: Linda Pace
     Title: Managing Director

     Outstanding Principal Amount of
     prepetition Loans ███████████

Address:   The Carlyle Group
           520 Madison Ave
           41st Floor
           New York, NY 10022

**Carlyle Credit Partners Financing I, Ltd. as a Lender**

By: _____
     Name: Linda Pace
     Title: Managing Director

     Outstanding Principal Amount of
     prepetition Loans ▮▮▮▮▮▮▮▮▮

Address:   The Carlyle Group
          520 Madison Ave
          41st Floor
          New York, NY 10022

**Carlyle Credit Partners Financing I, Ltd. as a Lender**

By: _____
     Name: Linda Pace
     Title: Managing Director

     Outstanding Principal Amount of
     prepetition Loans ███████████

Address:   The Carlyle Group
         520 Madison Ave
         41st Floor
         New York, NY 10022

Chatham Asset High Yield Master Fund, LTD

By: Chatham Asset Management, LLC
Investment Advisor

By: _____
      Name: Kevin O'Malley
      Title: Member
      Outstanding Principal Amount of
      Prepetition Loans: ███████████

Address:  Chatham Asset Management
          26 Main Street, Suite 204
          Chatham, NJ  07928

Chatham Asset Leveraged Loan Offshore Fund,
LTD

By: Chatham Asset Management, LLC
Investment Advisor

By: _____
         Name: Kevin O'Malley
         Title: Member
         Outstanding Principal Amount of
         Prepetition Loans: ████████

Address:  Chatham Asset Management
          26 Main Street, Suite 204
          Chatham, NJ  07928

**CIFC FUNDING 2007-III, LTD, as a Lender**

By: _____
Name: S. Vaccaro
Title: Co-Chief Investment Officer
Outstanding Principal Amount of
prepetition Loans: ███████████

Address: 250 Park Ave, 5th Floor
New York, NY 10177

**Contrarian Funds LLC**
**By Contrarian Capital Management L.L.C. as**
**manager,**
**as a Lender**

By: _____

     Name:   **JANICE M. STANTON**
     Title)      **MEMBER**
     Outstanding Principal Amount of
     prepetition Loans ██████████

Address: _____
     411 West Putnam Ave.
     Greenwich CT 06830

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

[DEBTOR SIGNATURE BLOCK]

By: _____
          Name:
          Title:

Atrium V       , as a Lender

By: _____
          Name:
          Title:
          Outstanding Principal Amount of
          prepetition Loans ████████████

Address: _____

LINDA R. KARN
AUTHORIZED SIGNATORY

14

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

[DEBTOR SIGNATURE BLOCK]

By: _____
       Name:
       Title:

Atrium VI     , as a Lender

By: _____
       Name:
       Title:
       Outstanding Principal Amount of
       prepetition Loans ▮▮▮▮▮▮▮▮

Address: _____

LINDA R. KARN
AUTHORIZED SIGNATORY

14

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

DEBTOR SIGNATURE BLOCK

By: _____
       Name:
       Title:

Cadogan Square CLO II B.V.
as a Lender

By: _____
       Name:   Roberta Girard
       Title:    Vice President

By: _____
       Name:   Daragh Murphy
       Title:    Vice President

Outstanding Principal Amount of prepetition
Loans _____

Address: Parnassustoren, Locatellikade 1
         1076 AZ Amsterdam, The
         Netherlands

14

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

DEBTOR SIGNATURE BLOCK

By: _____
      Name:
      Title:

Cadogan Square CLO III B.V.
as a Lender

By: _____
      Name: Roberta Girard
      Title: Vice President

By: _____
      Name: Daragh Murphy
      Title: Vice President

Outstanding Principal Amount of prepetition Loans

▬▬▬▬▬

Address: Parnassustoren, Locatellikade 1
        1076 AZ Amsterdam, The
        Netherlands

14

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

DEBTOR SIGNATURE BLOCK

By: _____
    Name:
    Title:

Cadogan Square CLO IV B.V.
as a Lender

By: _____
    Name: Roberta Girard
    Title: Vice President

By: _____
    Name: Daragh Murphy
    Title: Vice President

Outstanding Principal Amount of prepetition Loans

Address: Parnassustoren, Locatellikade 1
        1076 AZ Amsterdam, The Netherlands

14

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

[DEBTOR SIGNATURE BLOCK]

By: _____

      Name:

      Title:

*Castle Garden Funding* , as a Lender

By: _____

      Name:

      Title:

      Outstanding Principal Amount of

      prepetition Loans ███████████

Address: _____

LINDA R. KARN
AUTHORIZED SIGNATORY.

14

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

[DEBTOR SIGNATURE BLOCK]

By: _____
     Name:
     Title:

*Credit Susse Syndicated Loan Fund*, as a Lender

By: _____
     Name:
     Title:
     Outstanding Principal Amount of
     prepetition Loans ████████

Address: _____

LINDA R. KARN
AUTHORIZED SIGNATORY

14

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

[DEBTOR SIGNATURE BLOCK]

By: _____
     Name:
     Title:

CSAM Funding III , as a Lender

By: _Linda Karn_
     Name:
     Title:
     Outstanding Principal Amount of
     prepetition Loans ████████████

Address: _____

LINDA R. KARN
AUTHORIZED SIGNATORY

14

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

[DEBTOR SIGNATURE BLOCK]

By: _____
        Name:
        Title:

CSAM Funding IV , as a Lender

By: _Linda Karn_____
        Name:
        Title:
        Outstanding Principal Amount of
        prepetition Loans ▮▮▮▮▮▮▮▮▮▮▮

Address: _____

LINDA R. KARN
AUTHORIZED SIGNATORY

14

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

[DEBTOR SIGNATURE BLOCK]

By: _____
          Name:
          Title:

Madison Park Fund MpI, Ltd.as a Lender

By: _____
          Name:
          Title:
          Outstanding Principal Amount of
          prepetition Loans ███████████████

Address: _____

LINDA R. KARN
AUTHORIZED SIGNATORY

14

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

[DEBTOR SIGNATURE BLOCK]

By: _____
          Name:
          Title:

*Madison Park Funding II, Ltd.*, as a Lender

By: _____
          Name:
          Title:
          Outstanding Principal Amount of
          prepetition Loans ▓▓▓▓▓▓▓▓

Address: _____

LINDA R. KARN
AUTHORIZED SIGNATORY

14

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

[DEBTOR SIGNATURE BLOCK]


By: _____
         Name:
         Title:


[~~LENDER SIGNATURE BLOCKS~~], as a
Lender   *Madison Park Funding III, Ltd.*

By:   *Linda Karn*
      Name:
      Title:
      Outstanding Principal Amount of
      prepetition Loans ███████████

Address: _____

           LINDA R. KARN
         AUTHORIZED SIGNATORY

14

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

[DEBTOR SIGNATURE BLOCK]

By: _____
        Name:
        Title:


Madison Park Funding IV, Ltd. as a Lender

By: _____Linda Karn_____
        Name:
        Title:
        Outstanding Principal Amount of
        prepetition Loans ▓▓▓▓▓▓▓▓

Address: _____

LINDA R. KARN
AUTHORIZED SIGNATORY

14

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

[DEBTOR SIGNATURE BLOCK]

By: _____
    Name:
    Title:

Madison Park Funding II, Ltd, as a Lender

By: _____
    Name:
    Title:
    Outstanding Principal Amount of
    prepetition Loans $▮▮▮▮▮▮▮

Address: _____

LINDA R. KARN
AUTHORIZED SIGNATORY

14

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

[DEBTOR SIGNATURE BLOCK]

By: _____
      Name:
      Title:

Madison Park Funding VI, Ltd. as a Lender

By: _____
      Name:
      Title:
      Outstanding Principal Amount of
      prepetition Loans ███████████

Address: _____

LINDA R. KARN
AUTHORIZED SIGNATORY

14

**CREDIT SUISSE LOAN FUNDING LLC, as a Lender**

By: _____
     Name: Robert Healey
     Title: Director

By: _____
     Name: Ronald Gotz
     Title: Authorized Signatory
     Outstanding Principal Amount of
     prepetition Loans ▬▬▬▬▬

Address:     11 Madison Avenue
              New York, NY 10010

**DK Acquisition Partners, L.P., as a Lender**
**By: M.H. Davidson & Co., its General Partner**

By: _____ Avi F_____

      Name: Avi Friedman
      Title: General Partner
      Outstanding Principal Amount of
      prepetition Loans ██████████

Address: ___65 East 55th St.___
         New York, NY 10022

**Deutsche Bank AG New York Branch, as a Lender**
**By: DB Services New Jersey, Inc.**

By: _____ Angeline Quiniano
    Name:
    Title:   Assistant Vice President

By: _____
    Name:   Deirdre D. Cesario
    Title:    Assistant Vice President

Outstanding Principal Amount of prepetition Loans ███████████

**Aurum CLO 2002-1 Ltd.**
By: Deutsche Investment Management Americas, Inc.
(as successor in interest to Deutsche Asset Management, Inc.)
    As Sub-Adviser

By: _____
        Eric S. Meyer, Managing Director

By: _____
        Name: Antonio V. Versaci
        Title:  Director




        Outstanding Principal Amount of
        prepetition Loans █████████████

Address: _____

**DWS Floating Rate Plus Fund**
By: Deutsche Investment Management Americas Inc.,
    Investment Advisor

By: _____
      Eric S. Meyer, Managing Director

By: _____
      Name: Antonio V. Versaci
      Title:  Director

Outstanding Principal Amount of
prepetition Loans ███████████

Address: _____

## Flagship CLO III

By: Deutsche Investment Management Americas, Inc.
(as successor in interest to Deutsche Asset Management, Inc.)
   As Sub-Adviser

By: _____
   Eric S. Meyer, Managing Director


By: _____
   Name: Antonio V. Versaci
   Title:  Director




   Outstanding Principal Amount of
   prepetition Loans ████████████

Address: _____

**Flagship CLO IV**
By: Deutsche Investment Management Americas, Inc.
(as successor in interest to Deutsche Asset Management, Inc.)
  As Sub-Adviser

By: _____
              Eric S. Meyer, Managing Director

By: _____
              Name: Antonio V. Versaci
              Title:   Director

Outstanding Principal Amount of
prepetition Loans ███████████████

Address: _____

**Flagship CLO V**
By: Deutsche Investment Management Americas, Inc.
(as successor in interest to Deutsche Asset Management, Inc.)
 As Collateral Manager

By: _____
        Eric S. Meyer, Managing Director


By: _____
        Name: Antonio V. Versaci
        Title:  Director


                    Outstanding Principal Amount of
                    prepetition Loans █████████████

Address: _____

**Flagship CLO VI**
By: Deutsche Investment Management Americas, Inc.
    As Collateral Manager

By: _____

    Eric S. Meyer,  Managing Director

By: _____
    Name: Antonio V. Versaci
    Title:  Director

Outstanding Principal Amount of
prepetition Loans ▊▊▊▊▊▊▊▊▊▊

Address: _____

BIG SKY III SENIOR LOAN TRUST
BY: EATON VANCE MANAGEMENT, **as a Lender**
AS INVESTMENT ADVISOR

By: _____
Craig P. Russ
Name:
Title: Vice President

Outstanding Principal Amount of
prepetition Loans ██████████████

Address: 2 International Place, 9th Floor
Boston, MA 02110

Eaton Vance CDO IX Ltd.
By: Eaton Vance Management as a Lender
as Investment Advisor

By: _____
Craig P. Russ

Name: Craig P. Russ
Title: Vice President

Outstanding Principal Amount of
prepetition Loans ███████████

Address: 2 International Place, 9th Flr
Boston MA 0110

Eaton Vance **CDO VII PLC**
By: Eaton Vance Management
as Interim Investment Advisor , as a Lender

By: _____
        Craig P. Russ

Name:
Title: **Vice President**

Outstanding Principal Amount of
prepetition Loans ███████████

Address: _Z International Place, 9th Floor_
            _Boston, MA 02110_

Eaton Vance CDO VIII, Ltd. , as a Lender
By: Eaton Vance Management
As Investment Advisor

By: _____ Craig P. Russ _____
       Name:
       Title:   Vice President
       Outstanding Principal Amount of
       prepetition Loans █████████

Address: 7 International Place, 9th Flor
          Boston MA 02110

Eaton Vance CDO X PLC
By: Eaton Vance Management, as a Lender
As Investment Advisor

By: _____
       Name: ~~Craig P. Russ~~
       Title: Vice President

Outstanding Principal Amount of
prepetition Loans ██████████

Address: 2 International Plc, Gth Flor
         Boston MA 02110

EATON VANCE FLOATING-RATE
INCOME TRUST
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

, as a Lender

By: _____
        Name: Craig P. Russ
        Title: Vice President
        Outstanding Principal Amount of
        prepetition Loans█████████████

Address: 2 International Place, 9th Flr
          Boston MA 02110

[Restructuring Support Agreement – Consenting Lender]

GRAYSON & CO
BY: BOSTON MANAGEMENT AND RESEARCH
AS INVESTMENT ADVISOR

, as a Lender

By: _____ *Craig P Russ* _____
Name: ~~Craig P. Russ~~
Title: Vice President

Outstanding Principal Amount of
prepetition Loans ███████████

Address: _2 International Place, 9th Flr_
_Boston MA 02110_

EATON VANCE INSTITUTIONAL SENIOR LOAN FUND
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR     as a Lender

By: _____*Craig P. Russ*_____
Name: ~~Craig P. Russ~~
Title: Vice President

Outstanding Principal Amount of
prepetition Loans █████████

Address: 2 International Place, 9th Flr
         Boston MA 02110

**EATON VANCE**
**LIMITED DURATION INCOME FUND**
**BY: EATON VANCE MANAGEMENT, as a Lender**
**AS INVESTMENT ADVISOR**

By: _____ *Craig P. Russ* _____
        Name: ~~Craig P. Russ~~
        Title:   Vice President

        Outstanding Principal Amount of
        prepetition Loans █████████████

Address: _____ 2 International Place, 9th Floor _____
                Boston MA 02110

Eaton Vance Loan Opportunities Fund, LTD.
By: Eaton Vance Management as Investment Advisor, as a Lender

By: _____
       Name:    Craig P. Russ
       Title:    Vice President
       Outstanding Principal Amount of
       prepetition Loans █████████

Address:    2 International Place 9th Flo
                  Boston, MA 02110

Eaton Vance Medallion
Floating-Rate Income Portfolio
By: Eaton Vance Management
    As Investment Advisor

                                                      , as a Lender

By: _____

       Name:  Craig P. Russ
       Title:  Vice President

       Outstanding Principal Amount of
       prepetition Loans ████████████

Address: _2 Winterstreet Place, 9th Flor_
         _Boston MA 02110_

SENIOR DEBT PORTFOLIO
By: Boston Management and Research
as Investment Advisor

By: _Craig P. Russ_

Name: Craig P. Russ
Title: Vice President
Outstanding Principal Amount of
prepetition Loans ███████████

Address: _Zwlernahiae Place, 9u flor_
_Boston, MA 0210_

EATON VANCE SENIOR
FLOATING-RATE TRUST , as a Lender
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

By: _____
Name:  Craig P. Russ
Title:  Vice President

Outstanding Principal Amount of
prepetition Loans ███████████

Address: 7 International Place, 9th Floor
Boston, MA 02110

[Restructuring Support Agreement – Consenting Lender]

EATON VANCE SHORT DURATION
DIVERSIFIED INCOME FUND
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR , as a Lender

By: _____
Name: Craig P. Russ
Title: Vice President

Outstanding Principal Amount of
prepetition Loans ████████████

Address: _Unknown Addr, as Per_
_Boston MA 02W_

**EATON VANCE**
**VT FLOATING-RATE INCOME FUND**
**BY: EATON VANCE MANAGEMENT**
**AS INVESTMENT ADVISOR**

, as a Lender

By: _____

       Name: ~~Craig P. Russ~~
       Title:   Vice President

       Outstanding Principal Amount of
       prepetition Loans ▬▬▬▬▬▬

Address: _____ Two International Place Fl. Flor
             Boston, MA 0219

[Restructuring Support Agreement – Consenting Lender]

EATON VANCE SENIOR INCOME TRUST
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR                    , as a Lender

By: _____
        *Craig P. Russ*
    Name: ~~Craig P. Russ~~
    Title:  Vice President
    Outstanding Principal Amount of
    prepetition Loans ████████████

Address: _2 International Place, 9th Flr_
         _Boston MA 0210_

THE NORINCHUKIN BANK, NEW YORK BRANCH,
through State Street Bank and Trust Company N.A. as
Fiduciary Custodian
By: Eaton Vance Management, Attorney-in-fact, **as a Lender**

By: _____

Name: ~~Craig P. Russ~~

Title: **Vice President**

Outstanding Principal Amount of
prepetition Loans ▮▮▮▮▮▮▮▮▮

Address: _2 International Place_
_9th Floor_
_Boston, MA 02110_

**GENERAL ELECTRIC CAPITAL CORPORATION, as a Lender**

**Consenting Lender: Media, Communications & Entertainment, a division of Sponsor Finance, a business segment of General Electric Capital Corporation**

By: _____
       Name: Jason Soto
       Title: Duly Authorized Signatory
       Outstanding Principal Amount of
       prepetition Loans ▌▌▌▌▌▌▌▌

Address: 201 Merritt 7, Norwalk, CT 06851

[Restructuring Support Agreement – Consenting Lender]

**GN3 SIP Limited**
**By: GoldenTree Asset Management, LP, as a**
**Lender**

By: _____
        Name: Karen Weber
        Title: Director – Bank Debt
        Outstanding Principal Amount of
        prepetition Loans ▄▄▄▄▄▄▄▄▄

Address: 300 Park Avenue, 21st FL
        New York, NY 10022

**GoldenTree 2004 Trust**
**By: GoldenTree Asset Management, LP, as a**
**Lender**

By: _Karen Weber_

      Name: Karen Weber
      Title: Director – Bank Debt
      Outstanding Principal Amount of
      prepetition Loans▮▮▮▮▮▮

Address: 300 Park Avenue, 21st FL
        New York, NY 10022

**GoldenTree Credit Opportunities Financing I, Limited**
**By: GoldenTree Asset Management, LP, as a Lender**

By: _____
        Name: Karen Weber
        Title: Director – Bank Debt
        Outstanding Principal Amount of
        prepetition Loans ▇▇▇▇▇▇▇▇

Address: 300 Park Avenue, 21st FL
        New York, NY 10022

**GoldenTree Credit Opportunities Master Fund, Ltd.**
**By: GoldenTree Asset Management, LP as a Lender**

By: _Karen Weber_
        Name: Karen Weber
        Title: Director – Bank Debt
        Outstanding Principal Amount of
        prepetition Loans ▮▮▮▮▮▮▮▮▮▮

Address: 300 Park Avenue, 21st FL
        New York, NY 10022

**GoldenTree Credit Opportunities Second
Financing, Limited
By: GoldenTree Asset Management, LP, as a
Lender**

By: _____

        Name: Karen Weber
        Title: Director – Bank Debt
        Outstanding Principal Amount of
        prepetition Loans ███████████

Address: 300 Park Avenue, 21ˢᵗ FL
         New York, NY 10022

**GoldenTree European Financing B.V.**
**By: GoldenTree Asset Management UK**
**LLP, as a shareholder of RDA Holding**
**Co.**

By: _____
Name: Karen Weber
Title: Director – Bank Debt

Address: 300 Park Avenue, 21st FL
New York, NY 10022

**GoldenTree Leverage Loan Financing I, Limited**
**By: GoldenTree Leverage Loan Manager, LLC,**
**as a Lender**

By: _Karen Weber_
       Name: Karen Weber
       Title: Director – Bank Debt
       Outstanding Principal Amount of
       prepetition Loans ▓▓▓▓▓▓▓▓▶

Address: 300 Park Avenue, 21st FL
       New York, NY 10022

**GoldenTree Loan Opportunities III, Limited**
**By: GoldenTree Asset Management, LP, as a**
**Lender**

By: _____

      Name: Karen Weber
      Title: Director – Bank Debt
      Outstanding Principal Amount of
      prepetition Loans ███████████

Address: 300 Park Avenue, 21st FL
         New York, NY 10022

**GoldenTree Loan Opportunities IV, Limited**
**By: GoldenTree Asset Management, LP, as a**
**Lender**

By: _____

        Name: Karen Weber
        Title: Director – Bank Debt
        Outstanding Principal Amount of
        prepetition Loans ██████████

Address: 300 Park Avenue, 21st FL
        New York, NY 10022

**GoldenTree Loan Opportunities V, Limited**
**By: GoldenTree Asset Management, LP, as a**
**Lender**

By: _____

     Name: Karen Weber
     Title: Director – Bank Debt
     Outstanding Principal Amount of
     prepetition Loans ████████████

Address: 300 Park Avenue, 21st FL
        New York, NY 10022

**Laurelin II B.V.**
**By: GoldenTree Asset Management, LP as a**
**Lender**

By: _____
          Name: Karen Weber
          Title: Director – Bank Debt
          Outstanding Principal Amount of
          prepetition Loans ███████████

Address: 300 Park Avenue, 21st FL
         New York, NY 10022

**NCM GT 2008-2 LLC, as a Lender**

~~ing Support Agreement~~

By: _____

Name: James D. Jones

Title: Authorized Signatory

Outstanding Principal Amount of prepetition Loans ████████████

Address: 750 Berins Dr. 5th Floor
Haslon, TX 77433.

NCM GT 2008-2 LLC

~~ing Support Agreement~~

prep

Address

NCM GT 2008-2 LLC

~~ing Support Agreement~~

prep

**Hartford Institutional Trust, on behalf of its Floating Rate Bank Loan Series**
**By: Hartford Investment Management Company, as a Lender its Investment Manager**

By: _____

Name: Michael J. Bacevich

Title: Managing Director

Outstanding Principal Amount of prepetition Loans ▮▮▮▮▮▮

Address: 5J Farmington Ave

Hartford, CT 06105

**Stedman Loan Fund II, LTD**

, as a Lender

By: _____

Name: Patrick Cook

Title: Assistant Vice-President

Outstanding Principal Amount of
prepetition Loans ███████████

Address: <u>540 West Madison Street</u>
<u>19th Floor – 7E</u>
<u>Attn: Terry Conner-Graham</u>
<u>Chicago, IL   60661</u>

[Restructuring Support Agreement – Consenting Lender]

**Signature Block:**

The Hartford Mutual Funds, Inc., on behalf of The Hartford
Floating Rate Fund
    By Hartford Investment Management Company, its
    Sub-advisor

, as a Lender

By: _____

    Name:    Michael J. Bacevich
    Title:    Managing Director
    Outstanding Principal Amount of
    prepetition Loans: ████████████

Address: 55 Farmington Ave
         Hartford, CT 06105

**ING International (II) Senior Bank Loans USD, as a Lender**

By: _____

          Name:     Mohamed Basma
          Title:      Vice President


          Outstanding Principal Amount of
          prepetition Loans ██████████▶

          Address: ING Investment Management Co.
                      7337 E. Doubletree Ranch Road
                      Scottsdale, AZ 85258-2034

**ING Investment Management CLO I, LTD., as a Lender**

By: _____
          Name:       Mohamed Basma
          Title:         Vice President

Outstanding Principal Amount of
prepetition Loans ███████

Address: ING Investment Management Co.
               7337 E. Doubletree Ranch Road
               Scottsdale, AZ  85258-2034

[Restructuring Support Agreement – Consenting Lender]

**ING International II Senior Bank Loans Euro,
as a Lender**

By: _____

    Name:      Mohamed Basma

    Title:       Vice President

Outstanding Principal Amount of
prepetition Loans ████████████████

Address: ING Investment Management Co.
         7337 E. Doubletree Ranch Road
         Scottsdale, AZ  85258-2034

**ING Investment Management CLO II, LTD., as a Lender**

By: _____

      Name:     Mohamed Basma

      Title:      Vice President

Outstanding Principal Amount of
prepetition Loans ▮▮▮▮▮▮

Address: ING Investment Management Co.
          7337 E. Doubletree Ranch Road
          Scottsdale, AZ  85258-2034

[Restructuring Support Agreement – Consenting Lender]

**ING Investment Management CLO III, LTD., as a Lender**

By: _____

    Name:    **Mohamed Basma**
    Title:      **Vice President**

Outstanding Principal Amount of
prepetition Loans ▓▓▓▓▓

Address: ING Investment Management Co.
         7337 E. Doubletree Ranch Road
         Scottsdale, AZ  85258-2034

**ING Investment Management CLO IV, LTD., as a Lender**

By: _____ Mohamed Basma

     Name:

     Title:       Vice President

Outstanding Principal Amount of prepetition Loans ▆▆▆▆

Address: ING Investment Management Co.
          7337 E. Doubletree Ranch Road
          Scottsdale, AZ 85258-2034

**ING Investment Management CLO V, LTD., as a Lender**

By: _____
      Name:     **Mohamed Basma**
      Title:      **Vice President**

Outstanding Principal Amount of
prepetition Loans████████

Address: ING Investment Management Co.
        7337 E. Doubletree Ranch Road
        Scottsdale, AZ  85258-2034

**ING Prime Rate Trust, as a Lender**

By: _____

Name:      Mohamed Basma

Title:       Vice President

Outstanding Principal Amount of
prepetition Loans: ▓▓▓▓▓▓▓▓▓▓▓

Address: ING Investment Management Co.
        7337 E. Doubletree Ranch Road
        Scottsdale, AZ  85258-2034

**ING Senior Income Fund, as a Lender**

By: _____

Name:    ~~Mohamed Basma~~

Title:    **Vice President**


Outstanding Principal Amount of
prepetition Loans: ████████

Address: ING Investment Management Co.
7337 E. Doubletree Ranch Road
Scottsdale, AZ 85258-2034

**JPMorgan Chase Bank, N.A., as a Lender**

By: _____

    Name: Elizabeth Kelley
    Title: Managing Director
    Outstanding Principal Amount of
    prepetition Loans ▮▮▮▮▮▮▮▮

Address: _____

**Genesis CLO 2007-2 LTD, as a Lender**
By LLCP Advisors LLC as Collateral Manager

By: _____
     Name: Tejs Broberg
     Title: Vice President
     Outstanding Principal Amount of
     prepetition Loans ███████████

Address:     335 N Maple Dr. #130
               Beverly Hills CA 90210

**GANNETT PEAK CLO I, LTD.**
By: McDonnell Investment Management, LLC,
as Investment Manager

, **as a Lender**

By: _____

Name:    Kathleen A. Zarn
Title:     Vice President

Outstanding Principal Amount of
prepetition Loans ██████████████

Address: _____

**WIND RIVER CLO II – TATE INVESTORS, LTD.**
By: McDonnell Investment Management, LLC, as Manager

**, as a Lender**

By: _____
Name:  Kathleen A. Zarn
Title:  Vice President
Outstanding Principal Amount of
prepetition Loans ███████████

Address: _____

**WIND RIVER CLO I LTD.**
By: McDonnell Investment Management, LLC, as Manager

, as a Lender

By: _____
Name:    Kathleen A. Zarn
Title:    Vice President
Outstanding Principal Amount of
prepetition Loans ██████████

Address: _____

**MERRILL LYNCH CAPITAL
CORPORATION, as a Lender**

By: _____
Name: Stephen J. Quine
Title: VP
Outstanding Principal Amount of
prepetition Loans: ███████

Address: _____

**Clydesdale CLO 2006, Ltd., as a Lender**

By: _Robert Hoffman_
     Name: ROBERT HOFFMAN
     Title: EXECUTIVE DIRECTOR
     Outstanding Principal Amount of
     prepetition Loans █████████
          2 World Financial Center
     Address: Bldg. B 18th Floor
          New York, NY 10281

NOMURA CORPORATE RESEARCH
AND ASSET MANAGEMENT INC.
AS
INVESTMENT MANAGER

**Clydesdale CLO 2007, Ltd., as a Lender**

By: _____ *Robert Hoffman* _____

Name: ROBERT HOFFMAN

Title: EXECUTIVE DIRECTOR

Outstanding Principal Amount of prepetition Loans ▓▓▓▓▓▓▓▓

Address: 2 World Financial Center
Bldg. B 18th Floor.
New York NY 10281

NOMURA CORPORATE RESEARCH AND ASSET MANAGEMENT INC.
AS
INVESTMENT MANAGER

**Nomura Bond & Loan Fund, as a Lender**

By: _Robert _____

Name:  **ROBERT HOFFMAN**
Title:  **EXECUTIVE DIRECTOR**
Outstanding Principal Amount of
prepetition Loans ▮▮▮▮▮▮▮▮

                2 World Financial Center
Address: _Bldg  B  18th  Floor_
         _New York, NY  10281_

By: Mitsubishi UFJ Trust & Banking Corporation as Trustee
By: Nomura Corporate Research & Asset Management Inc.
Attorney in Fact

**NCRAM Senior Loan Trust 2005, as a Lender**

By: _Robert Hoffman_
Name: ROBERT HOFFMAN
Title: EXECUTIVE DIRECTOR
Outstanding Principal Amount of
prepetition Loans ▮▮▮▮▮▮▮▮

Address: 2 World Financial Center
Bldg. B 18th Floor
New York NY 10281

NOMURA CORPORATE RESEARCH
AND ASSET MANAGEMENT INC.
AS
INVESTMENT ADVISER

[See Below], as a Lender

By: _____

Name:

Title: **Michael B. Nechamkin**
Senior Portfolio Manager

Outstanding Principal Amount of
prepetition Loans ██████████

Address: _____

| | |
|---|---|
| **Octagon Investment Partners IX, Ltd.**<br>**By: Octagon Credit Investors, LLC**<br>**as Manager** | Outstanding Principal Amount of<br>prepetition Loans ██████████ |
| **Octagon Investment Partners VI, Ltd.**<br>**By: Octagon Credit Investors, LLC**<br>**as collateral manager** | Outstanding Principal Amount of<br>prepetition Loans ██████████ |
| **Octagon Investment Partners X, Ltd.**<br>**By: Octagon Credit Investors, LLC**<br>**as Collateral Manager** | Outstanding Principal Amount of<br>prepetition Loans ██████████ |
| **Octagon Investment Partners VIII, Ltd.**<br>**By: Octagon Credit Investors, LLC**<br>**as collateral manager** | Outstanding Principal Amount of<br>prepetition Loans ██████████ |
| **Octagon Investment Partners XI, Ltd.**<br>**By: Octagon Credit Investors, LLC**<br>**as Collateral Manager** | Outstanding Principal Amount of<br>prepetition Loans ██████████ |
| **Hamlet II, Ltd.**<br>**By: Octagon Credit Investors, LLC**<br>**as Portfolio Manager** | Outstanding Principal Amount of<br>prepetition Loans ██████████ |
| **Potential CLO I Ltd.**<br>**By: Octagon Credit Investors, LLC**<br>**as Attorney in Fact** | Outstanding Principal Amount of<br>prepetition Loans ██████████ |

**Primus CLO I Ltd., as a Lender**

By:     **Primus Asset Management, Inc.
        as Collateral Manager**

By:     _____
        Name: Nick Campbell
        Title: Portfolio Manager
        Outstanding Principal Amount of
        Prepetition Loans: ███████

Address:    360 Madison Ave.
            23rd Floor
            New York, NY 10017

**Cavalry CLO I Ltd., as a Lender**

By: Regiment Capital Management LLC
     as its Investment Advisor

By: _Mark A. Brostowski_____
     Name: Mark Brostowski
     Title: Partner
     Outstanding Principal Amount of
     prepetition Loans ███████

Address: C/O Regiment Capital Management LLC
         222 Berkeley Street, 12th Floor
         Boston, MA 02116

**Grand Central Asset Trust REG Series , as a Lender**

By: _____

Name: **Adam Jacobs**

Title: **Attorney-In-Fact**

Outstanding Principal Amount of
prepetition Loans ▮▮▮▮▮▮

Address: <u>540 West Madison Street</u>
<u>19th Floor – 7E</u>
<u>Attn: Terry Conner-Graham</u>
<u>Chicago, IL 60661</u>

**President & Fellows of Harvard College, as a
Lender**

By: Regiment Capital Management LLC
as its Investment Advisor

By: _Mark G. Brostowski_
       Name: Mark Brostowski
       Title: Partner
       Outstanding Principal Amount of
       prepetition Loans ██████████

Address: C/O Regiment Capital Management LLC
           222 Berkeley Street, 12th Floor
           Boston, MA 02116

**Regiment Capital Ltd., as a Lender**

By: Regiment Capital Management LLC
as its Investment Advisor

By: _Mark C Brostowsk_

     Name:  Mark Brostowski
     Title:  Partner
     Outstanding Principal Amount of
     prepetition Loans ███████

Address:  Regiment Capital Management LLC
          222 Berkeley Street, 12th Floor
          Boston, MA 02116

**XL Investment Management Ltd., as a Lender**

By: Regiment Capital Management LLC
as its Investment Advisor

By: *Mark G. Brostowski*
      Name: Mark Brostowski
      Title: Partner
      Outstanding Principal Amount of
      prepetition Loans ███████

Address: C/O Regiment Capital Management LLC
         222 Berkeley Street, 12th Floor
         Boston, MA 02116

RiverSource Bond Series, Inc. -
RiverSource Floating Rate Fund

**, as a Lender**

By: _Robin C. Stancil (signature)_
           Name:   Robin C. Stancil
           Title:    Assistant Vice President
           Outstanding Principal Amount of
           prepetition Loans ▮▮▮▮▮▮

Address:   RiverSource Investments, LLC

           100 N. Sepulveda Blvd., Suite 650
           El Segundo, CA 90245

Cent CDO 12 Limited
By: RiverSource Investments,
LLC as Collateral Manager

, **as a Lender**

By: _____

Name: Robin C. Stancil
Title: Director of Operations
Outstanding Principal Amount of
prepetition Loans ██████████

Address: _____RiverSource Investments, LLC_____

100 N. Sepulveda Blvd., Suite 650
El Segundo, CA 90245

Cent CDO 14 Limited
By: RiverSource Investments,
LLC as Collateral Manager

**, as a Lender**

By: _____

Name: Robin C. Stancil

Title: Director of Operations

Outstanding Principal Amount of
prepetition Loans ██████████

Address: RiverSource Investments, LLC
_____

100 N. Sepulveda Blvd., Suite 650
El Segundo, CA 90245

**CONSENTING LENDER NAME, as a Lender**

Cornerstone CLO Ltd.
By Stone Tower Debt Advisors LLC
As Its Collateral Manager

By: _____
      Name:
      Title:
      Outstanding Principal Amount of
      prepetition Loans ███████████

Address: _____

**CONSENTING LENDER NAME, as a Lender**

Rampart CLO 2007 Ltd.
By Stone Tower Debt Advisors LLC
As Its Collateral Manager

By: _____
      Name:
      Title:
      Outstanding Principal Amount of
      prepetition Loans ████████

Address: _____

**CONSENTING LENDER NAME, as a Lender**

Stone Tower CLO VII Ltd.
By Stone Tower Debt Advisors LLC
As Its Collateral Manager

By: _____

      Name:     Michael ~~~~~~~~~
      Title:     Authorized Signatory
      Outstanding Principal Amount of
      prepetition Loans ▮▮▮▮▮▮

Address: _____

**CONSENTING LENDER NAME, as a Lender**

Stone Tower CLO VIII Ltd.
By Stone Tower Debt Advisors LLC
As Its Collateral Manager

By: _____
        Name:       Michael W. DalPercio
        Title:        Authorized Signatory
        Outstanding Principal Amount of
        prepetition Loans ███████████

Address: _____

**Trimaran CLO VII Ltd**
**By Trimaran Advisors, L.L.C., as a Lender**

By: _____
Name: Dominick J. Mazzitelli
Title: Managing Director
Outstanding Principal Amount of
prepetition Loans ███████████

Address: 1325 Avenue of the Americas
34th Floor
New York, New York 10019

**Foothill CLO I, Ltd.**

**By: The Foothill Group, Inc.,**
**_____as attorney-in-fact_____**
**as a Lender**

By: _____
        Name: Greg Apkarian
        Title: Managing Member
        Outstanding Principal Amount of
        prepetition Loans ███████████

Address:   Greg Apkarian
                  C/o Wells Fargo Foothill
                  2450 Colorado Avenue, Suite 3000 West
                  Santa Monica, CA 90404
                  Phone Number: (310) 453-7393
                  Fax No. (310) 453-7470

**The Foothill Group, Inc.**
**as a Lender**

By: _____
        Name: Greg Apkarian
        Title: V.P.
        Outstanding Principal Amount of
        prepetition Loans ████████████

Address:  Greg Apkarian
           C/o Wells Fargo Foothill
           2450 Colorado Avenue, Suite 3000 West
           Santa Monica, CA 90404
           Phone Number: (310) 453-7393
           Fax No. (310) 453-7470

# SCHEDULE I

Alex, Inc.
Allrecipes.com, Inc.
Ardee Music Publishing, Inc.
Christmas Angels Productions, Inc.
Compass Learning, Inc.
Direct Entertainment Media Group, Inc.
Direct Holdings Americas, Inc.
Direct Holdings Custom Publishing Inc.
Direct Holdings Customer Service, Inc.
Direct Holdings Education Inc.
Direct Holdings Libraries Inc.
Direct Holdings U.S. Corp.
Funk & Wagnalls Yearbook Corp.
Gareth Stevens, Inc.
Home Service Publications, Inc.
Pegasus Asia Investments, Inc.
Pegasus Investment, Inc.
Pegasus Sales, Inc.
Pleasantville Music Publishing, Inc.
R.D. Manufacturing Corporation
RD Large Edition, Inc.
RD Publications, Inc.
RD Walking, Inc.
RDA Sub Co.
Reader's Digest Children's Publishing, Inc.
Reader's Digest Consumer Services, Inc.
Reader's Digest Entertainment, Inc.
Reader's Digest Financial Services, Inc.
Reader's Digest Latinoamerica, S.A.
Reader's Digest Sales and Services, Inc.
Reader's Digest Sub Nine, Inc.
Readers Digest Young Families, Inc.
Reiman Manufacturing, LLC
Reiman Media Group, Inc.
Retirement Living Publishing Company, Inc.
Saguaro Road Records, Inc.
Taste of Home Media Group, Inc.
Taste of Home Productions, Inc.
Travel Publications, Inc.
W.A. Publications, LLC
WAPLA, LLC
Weekly Reader Corporation
Weekly Reader Custom Publishing, Inc.
World Almanac Education Group, Inc.
World Wide Country Tours, Inc.
WRC Media, Inc.

# PROPOSED RESTRUCTURING TERM SHEET

_____

**THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.   THIS TERM SHEET CONTAINS MATERIAL NON-PUBLIC INFORMATION ABOUT A PUBLIC COMPANY AND, THEREFORE, IS SUBJECT TO FEDERAL SECURITIES LAWS.**

**THIS TERM SHEET IS PROVIDED IN CONFIDENCE AND MAY BE DISTRIBUTED ONLY WITH THE EXPRESS WRITTEN CONSENT OF THE COMPANY AND THE ADMINISTRATIVE AGENT.  THE TERM SHEET IS PROVIDED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THE TERM SHEET IS INTENDED TO BE ENTITLED TO THE PROTECTIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION AND INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS.  FURTHER, NOTHING IN THE TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON HOLDING, ITS SUBSIDIARIES, THE ADMINISTRATIVE AGENT OR THE LENDERS.**

| | OVERVIEW |
|---|---|
| **Transaction Summary** | This term sheet (the "Term Sheet") describes a restructuring transaction (the "Restructuring") pursuant to which RDA Holding Co. ("Holding" and once reorganized, "Reorganized Holding") and various of its domestic subsidiaries will restructure their capital structure through a pre-negotiated joint plan of reorganization filed in connection with cases commenced  under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").<br><br>This Term Sheet outlines the proposed capital structure and other material terms and conditions of the Restructuring.  The Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the definitive documentation governing the Restructuring, which remain subject to further discussion and negotiation.<br><br>The pro forma exit capital structure of material long term indebtedness is set forth under the heading "Debt Facilities" on Annex 1 attached hereto. |

| | |
|---|---|
| **Secured Debt to be Restructured** | Indebtedness to be treated under a plan of reorganization (the "<u>Acceptable Plan</u>") will include:<br><br>(i) approximately $1.6 billion outstanding under that certain Credit Agreement dated as of March 2, 2007 (the "<u>Pre-Petition Credit Agreement</u>") among The Reader's Digest Association, Inc., ("<u>RD</u>") and certain of its subsidiaries, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, the "<u>Administrative Agent</u>"), and the lenders party thereto (the "<u>Secured Lenders</u>"); and<br><br>(ii) termination claims under certain Swap Contracts (as defined in the Pre-Petition Credit Agreement) (the "<u>Swap Claims</u>" and the holders of such claims, together with the prepetition Secured Lenders, the "<u>Secured Parties</u>").<br><br>Such indebtedness will be restructured pursuant to the Acceptable Plan to be filed jointly by Holding, RD and certain of RD's domestic subsidiaries (collectively, the "<u>Debtors</u>") in proceedings (the "<u>Cases</u>") to be commenced under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. |
| **DIP/Exit Credit Facility** | See term sheet annexed to the DIP Commitment Letter. |
| **Adequate Protection for Pre-Petition Obligations** | See term sheet annexed to the DIP Commitment Letter. |
| | <div align="center">**Treatment of Claims and Equity Interests**</div> |
| **DIP Claims** | The debtor in possession financing facility (the "<u>DIP Facility</u>") shall, on the effective date of the Acceptable Plan (the "<u>Effective Date</u>"), convert to the Exit Financing facility in accordance with the terms of the DIP Facility or be paid in full in cash. |
| **Administrative Claims** | Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) of the Bankruptcy Code, will receive payment in full (in cash) of the unpaid portion of its allowed administrative claim on the Effective Date or as soon thereafter as practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such claim and the Debtors. |
| **Priority Tax Claims** | Priority tax claims will be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. |
| **Other Priority Claims** | All other priority claims will be paid in full (in cash) on the Effective Date, or as soon thereafter as practicable, or treated in any other manner so that such claim will otherwise be rendered unimpaired. |
| **Pre-Petition Credit Agreement Claims** | (a) On the Effective Date, the aggregate outstanding principal amount of Term Loans, Revolving Loans, Euro Term Loans and Swap Claims (as each such term is defined in the Pre-Petition Credit Agreement or herein, as applicable) and the interest accrued and unpaid as of the Petition Date (collectively, the "<u>Pre-Petition Obligations</u>") will be restructured into<br><br>(i) $300 million term loan (the "<u>Second Priority Restructured Term Loan Facility</u>") on the terms set forth on Annex 1 hereto; and<br><br>(ii) The Euro Term Loan[1] shall be reinstated and the prepetition guaranties made by the Debtors (together with any collateral granted by the Debtors) for the benefit of the holders of the Euro Term Loan shall be |

---

[1] Required Consenting Lenders and Debtors to agree on different classification, if appropriate.

|  | reinstated; provided that the Euro Term Loan shall be amended with the consent of Required Lenders to be consistent with Annex 1 hereto. |
|---|---|
|  | (b)  The prepetition Secured Parties shall convert that portion of the Pre-Petition Obligations which is not restructured under the Second Priority Restructured Term Loan Facility or part of the reinstated Euro Term Loan into not less than 100% (subject to dilution by the Management Incentive Plan, the Equity Buy-In Option and equity issued to such other creditor classes as may be agreed to by the Required Consenting Lenders and the Debtors) of the new common stock of Reorganized Holding (the "New Common Stock") to be issued and outstanding on the Effective Date of the Acceptable Plan, with such New Common Stock to be distributed on a pro rata basis in accordance with the prepetition Secured Parties' holdings of such Pre-Petition Obligations. |
|  | (c) Notwithstanding anything herein to the contrary (i) the Euro Term Lenders shall only be entitled to receive the treatment set forth in clause (a)(ii) on account of their Euro Term Loan exposure and (ii) the Revolving Lenders and U.S. Term Lenders shall only be entitled to receive the treatment set forth in clauses (a)(i) and (b) on account of their Revolver Loan and U.S. Loan exposures. |
|  | Impaired - entitled to vote. |
| **Other Secured Claims** | Each holder thereof will receive the following treatment:  (a) payment in full (in cash) on the Effective Date or as soon thereafter as practicable; (b) delivery of collateral securing any such claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (c) such other treatment as is necessary to satisfy section 1129 of the Bankruptcy Code.<br><br>Unimpaired; not entitled to vote – deemed to accept. |
| **Unsecured Claims Related to Operations** | Each holder of unsecured claims related to operations will receive payment in full in cash as and when such claims become due and payable in the ordinary course of business, or otherwise receive such treatment as to render such holder unimpaired.   The Debtors may elect to separate general unsecured claims into appropriate subclasses.<br><br>Unimpaired; not entitled to vote – deemed to accept.[2] |
| **Claims of holders of Senior Subordinated Notes** | Holders of Senior Subordinated Notes (as defined in that certain Indenture dated March 2, 2007) shall not receive any distributions.  Any agreement to provide a distribution to holders of Senior Subordinated Notes shall require the consent of the Debtors and the Required Consenting Lenders and shall require holders of the Senior Subordinated Notes to vote in favor of and otherwise support the Acceptable Plan and all of the provisions thereof.[3]<br><br>Impaired; not entitled to vote – deemed to reject. |
| **General Unsecured Claims** | TBD |
| **Existing Equity Interests** | All existing common and preferred equity interests in Holding or other existing securities consisting of (or convertible into) equity interests in Holding, including any warrants or vested or unvested options to purchase equity interests in Holding, shall be extinguished as of the Effective Date.  All |

---

[2]   The Debtors may elect to renegotiate and/or reject certain executory contracts and to separately classify and impair any claims arising therefrom.

| | equity interests of Holding's subsidiaries shall continue to be held by Holding and the subsidiaries of Holding holding such equity interests prior to the commencement of the Cases. |
| --- | --- |
| | Impaired; not entitled to vote – deemed to reject. |
| **Equity Buy-In Option** | The Prepetition Secured Parties agree that the Company may issue up to $50-100 million of the New Common Stock, which shall represent no more than 10%-20% of the New Common Stock, pursuant to a mechanism to be agreed. The buy-in right would be available to holders of Senior Subordinated Notes that are qualified institutional buyers (as defined in Rule 144A under the Securities Act of 1933), with the proceeds of such offering to be distributed to Reorganized Holding. Participating holders shall be provided with registration rights entitling them to participate in any registration statement filed by Reorganized Holdings subject to customary limitations. |
| | <u>**General Provisions**</u> |
| **Management Incentive Programs** | The Acceptable Plan will provide that promptly on or after the effective date, equity awards (in the form of restricted stock, options or warrants) for 7.5% of the New Common Stock (on a fully diluted basis) of Reorganized Holding will be granted to continuing employees of the Debtors and members of the new board of directors by the new board of directors of Reorganized Holding, with pricing, vesting and exercise terms to be determined by the new board upon consultation with the CEO; <u>provided</u>, that such equity grant shall not include more than 2.5% in the form of restricted New Common Stock. Such equity awards shall be on terms reflective of a policy of rewarding the contribution of management to the long-term financial performance of the reorganized Debtors. |
| | The Acceptable Plan will further provide for assumption of the compensation plans presented by management to the Consenting Lenders referred to as the "EV Max Plan" and the "Variable Compensation Plan" in the forms annexed hereto as Annexes 2 and 3, respectively, for fiscal year 2010. |
| | The Consenting Lenders further agree to support a motion to support the employee retention plan annexed hereto as Annex 4. |
| **Employment Agreements** | Consenting Lenders agree that the employment agreements with the Company's CEO and CFO will be modified as agreed to in writing by the Commitment Parties (as defined in the DIP Commitment Letter) to change, among other things, base salaries during the chapter 11 case and the timing of payment or amount of severance. |
| **Cancellation of Instruments, Certificates and Other Documents** | On the Effective Date, except to the extent otherwise provided in the Acceptable Plan, all instruments, certificates and other documents evidencing debt or equity interests in Holding or (as it relates to debt only) RD will be cancelled, and the obligations of RD or Reorganized Holding and its subsidiaries thereunder, or in any way related thereto, will be discharged. |
| **Issuance of New Securities; Execution of Acceptable Plan Documents** | On the Effective Date, or as soon as reasonably practicable thereafter, Reorganized Holding will issue all securities, instruments, certificates and other documents required to be issued pursuant to the Acceptable Plan. |
| **Executory Contracts and Unexpired Leases** | The Acceptable Plan will provide for the assumption or rejection, as the case may be, of executory contracts and unexpired leases identified in a supplement to the Acceptable Plan to the extent that any such executory contracts and unexpired leases have not been otherwise assumed or rejected. |

| | |
|---|---|
| **Intercompany Claims** | On the Effective Date, Holding will, at its discretion, reinstate or compromise, as the case may be, intercompany claims between and among Holding and its subsidiaries. |
| **Resolution of Disputed Claims** | The Acceptable Plan will provide for the resolution of disputed claims and any reserves therefor. |
| **Avoidance Actions and Other Litigation** | The reorganized Debtors will retain all rights to commence and pursue any and all claims and causes of action arising under the sections 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively, the "<u>Avoidance Actions</u>") and other litigation.

The Acceptable Plan will not provide for any funding of a litigation trust that can be used to fund litigation against the Released Shareholder Parties.

The Acceptable Plan will provide that any recovery payable to the Debtors or the Lenders from proceeds of any cause of action of any kind or nature (including under Chapter 5 of the Bankruptcy Code) against the Consenting Shareholders (either directly or indirectly on account of the subordination provisions in indenture related to the Senior Subordinated Notes) shall be payable to such Consenting Shareholders, and if such party shall receive any recovery in respect of such cause of action, it shall hold the proceeds or payment thereof in trust for the Consenting Shareholders and shall promptly transfer such proceeds or payment, as the case may be, to the Consenting Shareholders. |
| **Exemption from Section 1145** | The issuance of the New Common Stock in Reorganized Holding will be exempted from applicable securities laws and/or from SEC registration under section 1145 of the Bankruptcy Code. |
| **Tax Issues** | The parties agree to use their commercially reasonable best efforts to complete the financial restructuring of the Debtors contemplated by this Term Sheet in a manner that best preserves the tax attributes of the Debtors and in a manner satisfactory to the Required Consenting Lenders. |
| **Retention of Jurisdiction** | The Acceptable Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| | **Corporate Governance/Charter Provisions/Registration Rights** |
| **Board of Directors of Reorganized Holding** | The board of directors of Reorganized Holding shall be comprised of a number of directors to be agreed. The prepetition Secured Parties shall identify directors through use of a search firm acceptable to the Administrative Agent and reimbursed by the Debtors and shall initially designate all such directors upon consultation with the CEO; provided, that certain current independent directors may be requested to continue to serve on the Board of Directors of Reorganized Holding. |
| **Reorganized Holding as a private company.** | Reorganized Holding shall be a private company upon the Effective Date. |
| **Description of Capital Stock** | From and after the Effective Date, subject to the right of the stockholders to amend the Certificate of Incorporation of Reorganized Holding after the Effective Date, Reorganized Holding shall have one class and one series of New Common Stock. |

| | |
|---|---|
| **CHARTER; BYLAWS** | The charter and bylaws of each Debtor shall be restated consistent with section 1123(a)(6) of the Bankruptcy Code and otherwise in form and substance satisfactory to the Administrative Agent and the Required Consenting Lenders. |
| **REGISTRATION RIGHTS; STOCKHOLDERS AGREEMENT** | The supplement to the Acceptable Plan shall provide for a registration rights agreement and stockholders agreement with respect to the New Common Stock in material form and substance reasonably satisfactory to the Required Consenting Lenders. |
| | **Release and Related Provisions** |
| **Releases** | The Acceptable Plan will ratify the releases set forth in the Support Agreement and provide for mutual releases among the Consenting Shareholders, the prepetition lenders under the Credit Agreement, the DIP Lenders, the Debtors and their respective current and former directors, officers and professional advisors of any and all claims or causes of action, known or unknown, relating to any prepetition date acts or omissions..

The Debtors release of third parties will be provided for in the Acceptable Plan only to the extent, after investigation, the Board of Directors determines it is appropriate. |
| **Exculpation** | The Acceptable Plan will contain ordinary and customary exculpation provisions among the Consenting Shareholders, the prepetition lenders under the Credit Agreement, the DIP Lenders, the Debtors and their respective directors, officers and professional advisors of any and all claims or causes of action, known or unknown, relating to any prepetition date acts or omissions. |
| **Indemnification** | The Acceptable Plan (i) will contain ordinary and customary indemnification provisions for indemnification of current and former directors and officers of the Debtors to the extent of available D&O coverage and payable from the proceeds of such D&O policies, including the advancing of defense costs prior to final adjudication; provided, that, to the extent proceeds of such policies are deemed property of the Debtors' estates in the Chapter 11 Cases the Debtors will use reasonable best efforts to seek relief from the Bankruptcy Court to have them advanced and (ii) shall provide that the Debtors shall maintain their current D&O insurance coverage in place as of the Effective Date of the Support Agreement for current and former directors and officers of the Debtors. |
| **Discharge** | The Acceptable Plan will contain ordinary and customary discharge provisions. |
| **Injunction** | The Acceptable Plan will contain ordinary and customary injunction provisions. |
| **Compromise and Settlement** | The Acceptable Plan will contain ordinary and customary compromise and settlement provisions. |
| | **Acceptable Plan Implementation** |
| **Restructuring Support Agreement** | Execution of Restructuring Support Agreement. |
| | **Conditions** |
| **Certain Conditions** | See Restructuring Support Agreement and DIP Commitment Letter. |

**ANNEX 1**

**Summary of Reader's Digest Association, Inc.**
**Exit Capital Structure and Debt Facilities[1]**

1.      Capital Structure at Exit

Debt Facilities:                         First Priority Term Loan (the "First Priority Term Loan")
converted from the Borrower's (as defined below) Senior
Secured Priming Debtor-in-Possession Credit Facility (the "DIP
Facility") in an amount equal to the aggregate amount, up to a
maximum amount of $150,000,000, of loans outstanding under
the DIP Facility on the date of conversion.

Euro Term Loan continued from the Existing Credit Agreement
in an amount equal to the aggregate amount, up to a maximum
amount of the U.S. dollar equivalent of €74,019,383.13, of the
Euro Term Loan outstanding under the Existing Credit
Agreement on the date of continuation and having the maturity
date set forth in the Existing Credit Agreement.[2]

$300,000,000 Second Priority Restructured Term Loan having a
maturity not earlier than the latest to occur of the maturity of the
First Priority Term Loan and the maturity of the Euro Term Loan
(the "Second Priority Term Loan").[3]  The Second Priority Term
Loan will be paid as partial consideration in respect of the
obligations of the Debtors under the Existing Credit Agreement.

Interest Rate:                          The interest rate applicable to the First Priority Term Loan is set
forth below under "Basic Terms of First Priority Term Loan –
Interest Rate".

---

[1]     Capitalized terms used and not otherwise defined herein shall have the meanings given such terms in
the Term Sheet to which this summary is attached.

[2]     The Euro Term Loan will be documented under the same credit agreement (the "Exit Credit
Agreement") as the First Priority Term Loan, will benefit from the same covenants, events of default
and guarantees as the First Priority Term Loan and will be secured on a pari passu basis with the First
Priority Term Loan in respect of the collateral securing the First Priority Term Loan.  In addition, the
Euro Term Loan will continue to benefit from the Overseas Guarantees (as defined in the Existing
Credit Agreement) and the collateral pledged by the German Borrower and the Overseas Guarantors
(as each is defined in the Existing Credit Agreement) to the same extent and with the same priority as
is mandated by the Existing Credit Agreement.  The Exit Credit Agreement will provide for a CAM
substantially similar to that provided in the Existing Credit Agreement.  The continuation of the Euro
Term Loan under the Exit Credit Agreement will be subject to the vote of the Required Lenders under
(and as defined in) the Existing Credit Agreement.

[3]     The Second Priority Term Loan will benefit from the same guarantees as the First Priority Term Loan
and will be secured on a second priority basis to the First Priority Term Loan in respect of the collateral
securing the First Priority Term Loan.  Such second priority lien will be subject to an intercreditor
agreement on terms and conditions satisfactory to the Required Lenders.

The Euro Term Loan and the Second Priority Term Loan will bear interest at a rate per annum equal to (a) the ABR plus the Applicable Margin (any loan bearing interest based upon the ABR, an "<u>ABR Loan</u>") or (b) the Eurodollar Rate plus the Applicable Margin (any loan bearing interest based upon the Eurodollar Rate, a "<u>Eurodollar Loan</u>), at the Borrower's option. Interest shall be payable in cash on each Interest Payment Date except as set forth below under "PIK Election".

As used herein:

"<u>ABR</u>" means the highest of (i) the rate of interest publicly announced by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City, (ii) the federal funds effective rate from time to time <u>plus</u> 0.5% and (iii) the Eurodollar Rate for a one month Interest Period <u>plus</u> 1%.

"<u>Applicable Margin</u>" means (a) in the case of the Euro Term Loan, (i) 9.0% per annum with respect to ABR Loans and (ii) 10.0% per annum with respect to Eurodollar Loans and (b) in the case of the Second Priority Term Loan, (i) 11.0% per annum with respect to ABR Loans and (ii) 12.0% per annum with respect to Eurodollar Loans.

"<u>Eurodollar Rate</u>" means the greater of (i) the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for deposits in dollars for a period equal to three months appearing on the Reuters Screen LIBOR01 Page and (ii) 3.50% per annum.

| | |
|---|---|
| Interest Payment Dates: | Quarterly in arrears. |
| Default Rate: | 2.0% per annum above the then applicable rate. |
| PIK Election: | A portion of the Applicable Margin equal to 4.5% per annum, in the case of the Euro Term Loan, and 6.5% per annum, in the case of the Second Priority Term Loan, will be paid, at the Borrower's option, in cash (a "<u>Cash Election</u>") or by adding such interest to the principal amount of the outstanding Euro Term Loan or Second Priority Term Loan, as the case may be (a "<u>PIK Election</u>" and, together with a Cash Election, an "<u>Election</u>"), in each case, in arrears on each Interest Payment Date.  The Borrower will be permitted to make a Cash Election and/or a PIK Election with respect to all or any portion of the principal amount of the Euro Term Loan and the Second Priority Term Loan, subject to minimum thresholds to be agreed upon; <u>provided</u>, that the Borrower shall not be permitted to make a PIK Election if the consolidated EBITDA of the Borrower and its consolidated subsidiaries for the period of twelve months most recently ended on or prior to the interest period for which such Election is being made exceeds $160,000,000, in the case of the Euro Term Loan, and $180,000,000, in the case of the Second |

Priority Term Loan.

The Borrower shall make an Election with respect to each interest period with respect to the Euro Term Loan and the Second Priority Term Loan by providing at least 10 days' prior notice to the administrative agent for the Euro Term Loan or the Second Priority Term Loan, as the case may be, prior to the beginning of such interest period.

2.      Basic Terms of First Priority Term Loan

| | |
|---|---|
| Borrower: | The Reader's Digest Association, Inc. a Delaware corporation (the "<u>Borrower</u>"). |
| Guarantors: | RDA Holding Co., a Delaware corporation (the "<u>Parent</u>"), and each direct and indirect, existing and future domestic subsidiary of the Borrower (collectively, the "<u>Guarantors</u>"). |
| Lenders: | The Lenders under the DIP Facility. |
| Administrative Agent: | JPMorgan Chase Bank, N.A. |
| Amortization: | $15,000,000 per year, payable quarterly. |
| Term: | Three years from the date of conversion. |
| Collateral: | First priority lien on substantially all of the assets of the Borrower and the Guarantors, subject to customary exceptions to be agreed by the Required Lenders. |
| Mandatory Prepayments: | Substantially consistent with the Existing Credit Agreement with such changes as are appropriate for a facility of this type or are otherwise required by the Required Lenders and which shall include a requirement that the First Priority Term Loan be prepaid with excess cash flow pursuant to a mechanism to be agreed. |
| Interest Rate: | The ABR or Eurodollar Rate plus, in each case, the Applicable Margin in effect under the DIP Facility on the date of conversion. |
| Certain Conditions: | The conversion of the loans outstanding under the DIP Facility into the First Priority Term Loan will be subject to customary closing conditions, including, without limitation, the following conditions precedent: |
| | (a)  A Plan of Reorganization substantially consistent with the restructuring support agreement (including the term sheet annexed thereto) entered into among the Lenders and the Debtors prior to the Petition Date (the "<u>Restructuring Support Agreement</u>") shall have been confirmed pursuant to a |

confirmation order of the Bankruptcy Court substantially consistent with the Restructuring Support Agreement and such order shall not have been reversed, modified, amended, stayed or vacated;

(b)  The Restructuring Support Agreement shall have been in full force and effect from the execution thereof to the effective date of the Plan of Reorganization;

(c)  The Administrative Agent and the Required Lenders shall be satisfied with the form of the definitive loan documentation and related security and closing documents (the "<u>Definitive Documentation</u>");

(d)  No Default or Event of Default under the Definitive Documentation or the DIP Facility shall have occurred and be continuing; and

(e)  Representations and warranties shall be true and correct in all material respects.

| | |
|---|---|
| Financial Covenants: | Minimum LTM EBITDA and minimum LTM fixed charge coverage ratio (in each case, tested quarterly), maximum capital expenditures and minimum liquidity (tested monthly) and such other financial covenants as may be required by the Required Lenders. |
| Representations and Warranties; Affirmative and Negative Covenants; Events of Default; Other Miscellaneous Provisions: | Substantially consistent with the Existing Credit Agreement with such changes as are appropriate for a facility of this type or are otherwise required by the Required Lenders. |
| Governing Law and Forum: | New York law. |
| Counsel to the Administrative Agent and the Lead Arranger: | Simpson Thacher & Bartlett LLP |

**ANNEX 2**

**Reward for Increasing Enterprise Value/**
**Enterprise Value Maximization Plan (EVMax)**

| | |
|---|---|
| **Summary** | Incremental executive plan designed to incent the delivery of longer-term financial goals<br>Group 1 - To reward for the realization of maximum enterprise value<br>Group 2 - To reward executives for time to emergence |
| **Participation** | Participation limited to executives that have broad enterprise wide responsibilities or those that can impact time to emergence. Select group will participate in both. All EVMax participants are also participants in the Variable Comp Plan. |
| **Performance Measure** | Group 1 - Enterprise wide Cash EBITDA as measured in accordance with approved plan Cash EBITDA at end of each year in two-year performance period (June 2010 and June 2011)<br>Group 2 - Incremental savings not contemplated in plan (driven by time to emergence) |
| **Performance Award** | Group 1 – Cash payment based on pro-rata share of Cash EBITDA improvement over approved plan Cash EBITDA<br>Group 2 – Cash payment based on a portion of saved professional fees due to early exit |
| **Performance Measurement Period** | Group 1 - One year at Fiscal Year End<br>Group 2 - Time to Emergence |
| **Payout Frequency** | Group 1 - Paid at the end of 2010 Fiscal Year<br>Group 2 - Paid in full at emergence with a 6 month claw back provision |

**Enterprise Maximization Plan (EVMAX) - Value Creation 2010**

| | | |
|---|---|---|
| **2010 EBITDA** | $ | 170.3 |
| **Column to Use** | | **Bonus** |
| **EBITDA Proj to use:** | $ | **174.6** |
| **Bonus Dollars:** | $ | 3.0 |

| | | | |
|---|---|---|---|
| | | **2010 Only** | |
| | | **Bonus** | |
| | 174.6 | $ | 3.0 |
| | 183.4 | $ | 3.7 |
| | 192.5 | $ | 4.7 |
| **EBITDA** | 202.2 | $ | 5.6 |
| | 212.3 | $ | 6.8 |
| | 222.9 | $ | 7.8 |
| | 234.0 | $ | 8.4 |
| | 245.7 | $ | 9.1 |
| | 258.0 | $ | 9.7 |
| | 270.9 | $ | 10.3 |

**Enterprise Maximization Plan (EMAX) - Time To Exit**

(Dollars in Millions)

| Choose Exit Date >>> | | Jan-10 |
|---|---|---|
| Type: | | TTE Bonus |
| Corresponding Bonus Dollars: | $ | 2.6 |

| Exit on or Before >>> | 1/31/10 | 2/28/10 | 3/31/10 | 4/30/10 | 5/31/10 | 6/30/10 | 7/31/10 |
|---|---|---|---|---|---|---|---|
| TTE Bonus | $ 2.6 | $ 2.2 | $ 1.7 | $ 1.3 | $ 1.3 | $ .7 | $ - |

**ANNEX 3**

**Pay for Performance/Variable Comp Plan**

| Summary | Broad-based plan designed to incent delivery of short-term, financial goals (incremental Cash EBITDA and Free Cash Flow) |
|---|---|
| **Participants** | Includes specified level employees which provides a consistent pay for performance philosophy among all executives |
| **Target Award Opportunities** | Target award opportunity (expressed as a % of base salary) established for each participant relative to employee grade level and criticality of role |
| **Performance Measure** | Cash flow and Cash EBITDA. Executives have 100% of their opportunity based on financial results. Performance will be measured at the corporate level with CEO discretion of +/- 10% at the operating unit level, assuming no change in total pool available. |
| **Performance Award** | Cash payment |
| **Performance Measurement Period** | Annual measure to recognize short-term goals and provide strong retention and incentive value |
| **Payout Frequency** | Paid out annually based on audited results for 2010. |

CONFIDENTIAL - SUBJECT TO MATERIAL REVISION

| 2010 Approved Plan Pre-Bonus EBITDA Target: | $ 170.30 |
|---|---|

**EBITDA & Bonus Ratios**

| Incremental Dollar and Percent Improvement Over EBITDA Target | | Raw Bonus $ | Target Bonus as % of Incremental EBITDA After Pmt |
|---|---|---|---|
| $ - | 0.0% | $ 15.00 | 0.0% |
| 3.41 | 2.0% | 16.70 | 50.0% |
| 6.81 | 4.0% | 18.37 | 49.0% |
| 10.22 | 6.0% | 20.01 | 48.0% |
| 13.62 | 8.0% | 21.61 | 47.0% |
| 17.03 | 10.0% | 23.17 | 46.0% |
| 20.44 | 12.0% | 24.71 | 45.0% |
| 23.84 | 14.0% | 26.21 | 44.0% |
| 27.25 | 16.0% | 27.67 | 43.0% |
| 30.65 | 18.0% | 29.10 | 42.0% |
| 34.06 | 20.0% | 30.50 | 41.0% |
| 37.47 | 22.0% | 31.86 | 40.0% |
| 40.87 | 24.0% | 33.19 | 39.0% |
| 44.28 | 26.0% | 34.48 | 38.0% |
| 47.68 | 28.0% | 35.74 | 37.0% |
| 51.09 | 30.0% | 36.97 | 36.0% |
| 54.50 | 32.0% | 38.16 | 35.0% |
| 57.90 | 34.0% | 39.32 | 34.0% |
| 61.31 | 36.0% | 40.44 | 33.0% |
| $ 64.71 | 38.0% | 41.53 | 32.0% |

**ANNEX 4**

**Retain Talent/Talent Plan**

| Summary | Intended to provide select lower level employees with protection and assurance during restructuring period; payment subject only to continued employment at Reader's Digest. |
|---|---|
| **Participation** | Limited number of low level critical employees are eligible to receive a retention award (expressed as a percent of base salary).  No more than 10% of US population is eligible.  Anyone in Retention Plan is not eligible for Variance Comp Plan or any other plans. |
| **Award Opportunities** | Range from 3 - 6% of current base salary. |
| **Payout Frequency** | First installment of retention payment (25% of total target award) will be payable at earlier of 90 days or at emergence.  The balance (75%) would be paid at time of emergence.  Each participant must be employed on last day of each service period to receive an award. |

## EXHIBIT B

## LENDER JOINER

This Lender Joinder to the Restructuring Support Agreement, dated as of August 17, 2009, by and among RDA Holding Co., The Reader's Digest Association, Inc. (the "Company"), and certain of the Company's subsidiaries and affiliates set forth on Schedule 1 of the Support Agreement (as defined herein and annexed hereto on Annex I), the Consenting Lenders signatory thereto and the Consenting Shareholders signatory thereto (the "Support Agreement), is executed and delivered by [_____] (the "Joining Lender Party") as of [_____], 20[__]. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Support Agreement.

1. <u>Agreement to be Bound</u>. The Joining Lender Party hereby agrees to be bound by all of the terms of the Support Agreement, attached to this Lender Joinder as Annex I (as the same may be hereafter amended, restated or otherwise modified from time to time). The Joining Party shall hereafter be deemed to be a "Consenting Lender" and a party for all purposes under the Support Agreement.

2. <u>Representations and Warranties</u>. With respect to the aggregate principal amount of prepetition Total Outstandings and/or DIP Loans held by the Joining Lender Party upon consummation of the sale, assignment, transfer, hypothecation or other disposition of such prepetition Total Outstandings and/or DIP Loans, the Joining Lender Party hereby makes the representations and warranties of the Consenting Lenders set forth in Section 6 of the Support Agreement to each of the other Parties in the Support Agreement.

3. <u>Governing Law</u>. This Lender Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

\* \* \* \* \*

[THE REMAINDER OF THIS PAGE IS
INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Joining Lender Party has caused this Lender Joinder to be executed as of the date first written above.

_____
Entity Name of Joining Lender Party


Authorized Signatory:

By:     _____
        Name:
        Title:

        Principal Amount of
        prepetition Loans $_____

        Principal Amount of
        DIP Loans $_____

        Address: _____

<u>Restructuring Support Agreement</u>

# EXHIBIT C

## SHAREHOLDER JOINDER

This Shareholder Joinder to the Restructuring Support Agreement, dated as of August 17, 2009, by and among RDA Holding Co., The Reader's Digest Association, Inc. (the "Company"), and certain of the Company's subsidiaries and affiliates set forth on Schedule 1 of the Support Agreement (as defined herein and annexed hereto on Annex I), the Consenting Lenders signatory thereto and the Consenting Shareholders signatory thereto (the "Support Agreement), is executed and delivered by [_____] (the "Joining Shareholder Party") as of [_____], 20[__]. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Support Agreement.

1.     Agreement to be Bound.  The Joining Shareholder Party hereby agrees to be bound by all of the terms of the Support Agreement, attached to this Shareholder Joinder as Annex I (as the same may be hereafter amended, restated or otherwise modified from time to time).  The Joining Shareholder Party shall hereafter be deemed to be a "Consenting Shareholder" and a party for all purposes under the Support Agreement.

2.     Representations and Warranties.  With respect to the equity interests held by the Joining Shareholder Party upon consummation of the sale, assignment, transfer, hypothecation or other disposition of such equity interests, the Joining Shareholder Party hereby makes the representations and warranties of the Consenting Shareholders set forth in Section 6 of the Support Agreement to each of the other Parties in the Support Agreement.

3.     Governing Law.  This Lender Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

\* \* \* \* \*

[THE REMAINDER OF THIS PAGE IS
INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Joining Shareholder Party has caused this Shareholder Joinder to be executed as of the date first written above.

_____
Entity Name of Joining Shareholder Party


Authorized Signatory:

By:        _____
           Name:
           Title:

           Address: _____

Restructuring Support Agreement

**<u>EXHIBIT G</u>**

**Subscription Procedures**

[*To Come*]