James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) | No. 09-23529 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**NOTICE OF HEARING ON DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING AND AUTHORIZING BIDDING PROCEDURES WITH STALKING HORSE BID PROTECTIONS IN CONNECTION WITH THE SALE OF THE COMPASSLEARNING, INC. BUSINESS; (B) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE BY AUCTION AND SALE HEARING; (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND NOTICING AND DETERMINING CURE AMOUNTS RELATED THERETO; (D) SCHEDULING THE SALE HEARING AND OTHER RELATED DATES AND DEADLINES; AND (E) AUTHORIZING ONE-TIME SALE-RELATED INCENTIVE PAYMENTS TO CERTAIN NON-INSIDERS**

　　　　　**PLEASE TAKE NOTICE THAT** a hearing on <u>only</u> the portion of the attached motion (the "***Motion***") of The Reader's Digest Association, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"),[1] for entry of an order, substantially in the

---

[1]　　The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, Inc. (3276); World Almanac Education Group, Inc. (3781);

form annexed as Exhibit A to the Motion: (a) authorizing and approving bidding procedures with stalking horse bid protections in connection with the sale of the CompassLearning, Inc. business; (b) approving the form and manner of notice of the auction by sale and sale hearing; (c) approving procedures for the assumption and assignment of contracts and leases and noticing of related cure amounts; (d) scheduling the sale hearing and setting other related dates and deadlines; and (e) authorizing and approving one-time, sale-related payments to certain non-insider employees (the "**Bidding Procedures Order**"), is set for **December 18, 2009, at 10:00 a.m. prevailing Eastern Time**, before the Honorable Robert D. Drain, United States Bankruptcy Judge for the Bankruptcy Court for the Southern District of New York (the "**Court**") at the Hon. Charles L. Brieant Jr. Federal Building and Courthouse, Room 118, 300 Quarropas Street, White Plains, New York 10601.[2]

 **PLEASE TAKE FURTHER NOTICE THAT** objections, if any, to the relief requested in the Motion relating to the Bidding Procedures Order **must**: (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedures, the Local Bankruptcy Rules and the Case Management Order [Docket No. 92]; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; (d) be filed electronically with the Court in accordance with General Order M-242, with a hard copy delivered to chambers pursuant to Local Bankruptcy Rule 9028-1; and (e) be served in accordance with the Case Management Order so *actually* *received* no later than **5:00 p.m. prevailing Eastern Time on December 11, 2009** (the "*Objection Deadline*") by the following parties:

| Debtors | Counsel to Debtors |
|---|---|
| The Reader's Digest Association, Inc.<br>1 Reader's Digest Road<br>Pleasantville, New York, 10570<br>Attn: Andrea Newborn, Senior Vice President,<br>General Counsel and Corporate Secretary | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn: Paul M. Basta and Nicole L. Greenblatt |
| **Counsel to the Creditors' Committee** | **United States Trustee** |
| Otterbourg, Steindler, Houston & Rosen, P.C.<br>230 Park Avenue<br>New York, New York 10169<br>Attn: Scott L. Hazan and David M. Posner | Office of the United States Trustee<br>for the Southern District of New York<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn: Andrea Schwartz |
| **Counsel to the Agent for the<br>Debtors' Prepetition and Postpetition Lenders** | **Counsel to the Stalking Horse Bidder** |
| Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York 10017<br>Attn: Peter V. Pantaleo and Morris J. Massel | Latham & Watkins LLP<br>355 South Grand Avenue<br>Los Angeles California 90071-1560<br>Attn: Gregory O. Lunt and Christopher R. Pflug |

 **PLEASE TAKE FURTHER NOTICE THAT** a printed copy of any objections to the Motion or entry of the Bidding Procedures Order must also be delivered via first class mail within one business day of the Objection Deadline to the: Office of the United States Trustee for

---

World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is: 1 Reader's Digest Road, Pleasantville, NY 10570.

[2] Capitalized terms used but not defined herein have the meanings set forth in the Motion.

the Southern District of New York, Attn:  Andrea B. Schwartz, 33 Whitehall Street, 21st Floor, New York, New York 10004.[3]

**PLEASE TAKE FURTHER NOTICE THAT** a hearing to consider entry of an order authorizing and approving (a) the sale of substantially all of the assets of CompassLearning, Inc. free and clear of all liens, claims, interests and encumbrances and (b) the assumption and assignment of contracts and leases in connection therewith (the "*Sale Order*") will be held at a later date scheduled by the Court pursuant to the Bidding Procedures Order.  **Notice of this hearing and any related dates and deadlines, including the deadline to object to entry of the Sale Order, will be served in accordance with the Bidding Procedures Order, substantially in the form annexed as <u>Exhibit D</u> to the Motion.**

**PLEASE TAKE FURTHER NOTICE THAT**, if no objections are timely filed and served with respect to the Motion, the Debtors shall submit the Bidding Procedures Order, substantially in the form annexed as <u>Exhibit A</u> to the Motion, to the Court, which order the Court may enter with no further notice or opportunity to be heard.

Dated:  December 3, 2009          */s/ Nicole L. Greenblatt*
     New York, New York          James H.M. Sprayregen P.C.
     Paul M. Basta
     Nicole L. Greenblatt
     KIRKLAND & ELLIS LLP
     601 Lexington Avenue
     New York, New York  10022-4611
     Telephone:     (212) 446-4800
     Facsimile:     (212) 446-4900

     Counsel to the Debtors and Debtors in Possession

---

**IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE,
PLEASE CONTACT THE RESTRUCTURING HOTLINE AT (866) 967-0491**

---

[3]     Copies of the Motion, the Case Management Order, the Master Service List, the 2002 List and all pleadings and other papers filed in these chapter 11 cases may be obtained, free of charge, by visiting the Debtors' restructuring website at:  http://www.kccllc.net/readers.

James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) No. 09-23529 (RDD) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (A) APPROVING AND AUTHORIZING BIDDING PROCEDURES WITH STALKING HORSE BID PROTECTIONS IN CONNECTION WITH THE SALE OF THE COMPASSLEARNING, INC. BUSINESS; (B) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE BY AUCTION AND SALE HEARING; (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND NOTICING AND DETERMINING CURE AMOUNTS RELATED THERETO; (D) SCHEDULING THE SALE HEARING AND OTHER RELATED DATES AND DEADLINES; (E) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (F) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (VII) AUTHORIZING ONE-TIME SALE-RELATED INCENTIVE PAYMENTS TO CERTAIN NON-INSIDERS**

The Reader's Digest Association, Inc. ("**Reader's Digest**") and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"),[1] submit this motion for entry of the Bidding Procedures Order and Sale Order (as each term is each defined herein).  In support of this motion, the Debtors respectfully state as follows:

## Jurisdiction

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this Court under 28 U.S.C. § 1408.

3.      The statutory bases for the relief requested herein are sections 105(a), 363, 365 and 1146(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 6004-1, 6006-1 and 9006-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") and the Sale Guidelines for the Conduct of Asset Sales established and adopted by the United States Bankruptcy Court for the Southern District of New York pursuant to General Order M-331 (the "**Sale Guidelines**").

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, Inc. (3276); World Almanac Education Group, Inc. (3781); World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is:  1 Reader's Digest Road, Pleasantville, NY 10570.

2

**Relief Requested**

4.        By this motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "***Bidding Procedures Order***") and, after notice and a hearing, an order, substantially in the form attached hereto as **Exhibit F** (the "***Sale Order***"):

> a.        authorizing and approving the bidding procedures for competitive bidding in connection with the Sale (defined herein), substantially in the form attached hereto as **Exhibit B** (the "***Bidding Procedures***"), including the stalking horse bid protections required pursuant to the terms of the APA (defined herein) attached hereto as **Exhibit C**;
>
> b.        approving the form and manner of notice of the sale by auction, the sale hearing and related matters, substantially in the form attached hereto as **Exhibit D** (the "***Sale Notice***");
>
> c.        authorizing and approving procedures for the assumption and assignment of contracts and leases;
>
> d.        authorizing and approving the sale of substantially all of the assets of CompassLearning, Inc. free and clear of all liens, claims, interests and encumbrances (the "***Sale***") pursuant to the terms of either:
>
>> •        that certain Asset Purchase Agreement dated November 30, 2009, by and between CompassLearning, Inc. ("***CompassLearning***") and WRC Media, Inc. ("***WRC***"), and CompassLearning Acquisition Corporation, a Delaware corporate formed by Marlin Equity II, L.P. (the "***Stalking Horse Bidder***") to facilitate the sale, which is attached hereto as **Exhibit C** (the "***APA***");[2] *or*, *alternatively*,
>>
>> •        a marked version of the APA, in a form substantially similar to the APA attached hereto, among CompassLearning, Inc., WRC Media, Inc. and the other successful bidder arising from the Auction in accordance with the Bidding Procedures;
>
> e.        authorizing and approving the assumption and assignment of executory contracts and unexpired leases to the Stalking Horse Bidder or successful bidder arising from the Auction;

---

[2]        Certain of the APA schedules are redacted due to the confidential, competitive and/or proprietary nature of certain information contained therein.  However, a non-redacted version of such schedules or, as applicable, such confidential, competitive and/or proprietary information, will be provided to:  (a) potential bidders party to an appropriate confidentiality agreement with the Debtors in accordance with the Bidding Procedures (as defined herein); (b) the Court, *in camera*; (c) the U.S. Trustee; (d) counsel to the Committee pursuant to the confidentiality requirements set forth in Section 4.1(b) of the Committee Bylaws; (e) counsel to the Prepetition Agent (as defined in the Plan) pursuant to confidentiality agreements in place between the parties; and (f) parties in interest upon reasonable written request of undersigned counsel; *provided* that the Debtors reserve all rights to deny any request where necessary, in their business judgment, to protect the confidential, competitive and/or proprietary nature of any requested information, or, alternatively, to refer parties to Committee counsel, as appropriate.

f.      authorizing and approving the one-time, sale-related incentive payments to certain non-insider employees of CompassLearning described herein;

g.      establishing the following dates and deadlines, subject to modification:

- Preliminary Bid Deadline:  December 31, 2009, as the last date by which potential bidders may deliver the bid documents required to participate in the auction pursuant to the Bidding Procedures;

- Sale Objection Deadline:  January 4, 2010 at 4:00 p.m. prevailing Eastern Time, as the deadline to object to the Sale transactions and/or the assumption and assignment of Assumed Contracts or cure amounts related thereto (the "**Sale Objection Deadline**");

- Bid Deadline:  January 5, 2010 at 5:00 p.m. prevailing Eastern Time, as the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures (the "**Bid Deadline**");

- Auction:  January 7, 2010 at 10:00 a.m. prevailing Eastern Time, as the date and time the auction, if one is needed (the "**Auction**"), will be held at the offices of Kirkland & Ellis LLP, located at:  601 Lexington Avenue, New York, New York  10022; and

- Sale Hearing:  January [11], 2010, at [10:00 a.m.] prevailing Eastern Time, as the date and time the sale hearing (the "**Sale Hearing**") will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge for the Bankruptcy Court for the Southern District of New York.

5.      In support of the Debtors' request for entry of the Bidding Procedures Order, the Debtors submit the declaration of John M. Cesarz attached hereto as **Exhibit E** and incorporated by reference herein (the "**Cesarz Declaration**").[3]  The Debtors reserve the right to file and serve any supplemental declaration, including any declaration summarizing the competitive bidding and sale process and the results thereof, in support of their request for entry of the Sale Order prior to the Sale Hearing, as appropriate and necessary in the Debtors' business judgment.

---

[3]    John M. Cesarz is a Vice President with Miller Buckfire & Co., LLC ("**Miller Buckfire**"), the financial advisory services and investment banking firm retained by the Debtors in connection with these chapter 11 cases.  For a more detailed description of Miller Buckfire's qualifications, experience and role in these chapter 11 cases, please refer to the Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Miller Buckfire & Co., LLC as Financial Advisor and Investment Banker for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Commencement Date [Docket No. 45].

K&E 15660983.16

**Introduction**

6.      On August 24, 2009 (the "***Commencement Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court has entered an order authorizing the joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  On August 31, 2009, the United States Trustee for the Southern District of New York (the "***U.S. Trustee***") appointed an official committee of unsecured creditors pursuant to section 1102(a)(1) of the Bankruptcy Code (as subsequently revised, the "***Committee***").

**Background**

**A.      The CompassLearning Business**

7.      CompassLearning, Inc. ("***CompassLearning***") is a research-based, educational technology company that produces and markets a wide-range of digital supplemental education materials, including, generally, educational formative assessment products, interactive state and national standards-based electronic curriculum and a management and reporting system for the school, library and home markets.  CompassLearning also provides onsite technical support and seminar consulting/teacher training professional services for educators to facilitate curriculum development and technology integration in the classrooms using CompassLearning products.

8.      CompassLearning is a wholly-owned subsidiary of WRC Media, Inc. ("***WRC***"), which, in turn, is wholly-owned by Reader's Digest.[4]  Together with CompassLearning, WRC and its other wholly-owned subsidiary, Weekly Reader Corporation ("***Weekly Reader***"), conduct

---

[4]      A more detailed description of the CompassLearning business, operations and corporate structure is set froth in the *Disclosure Statement for the Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and its Debtor Affiliates* [Docket No. 162] (the "***Disclosure Statement***"), approved by order of the Court entered on November 30, 2009 [Docket No. 318].

operations under the School and Educational Services ("**SES**") segment of the company's global operations. In 2008, general economic conditions combined with significant competition and cost pressures contributed to declining revenue and operating profits for the SES segment, and the two other major assets in this business segment – QSP and Books Are Fun – were sold or otherwise divested in August and November 2008, respectively. Since that time, Weekly Reader and CompassLearning have been the sole companies operating within the SES segment.[5]

## B. Events Leading up to the Sale

9. In connection with their ongoing restructuring efforts, the Debtors are mindful of the need to manage cash, maximize resources and maintain flexibility to implement their revised business plan. Indeed, the Debtors remain focused on enhancing the competitiveness of their global operations, engaging in a careful and comprehensive evaluation of their operations, asset portfolio and business strategies. Through this analysis, it became increasingly clear that there is no identifiable synergy between CompassLearning and any of the other businesses within the Reader's Digest enterprise. As a result, the Debtors identified the CompassLearning business as a "non-core" asset. This, coupled with historic fiscal underperformance, prompted the Debtors to consider exploring all potentially available strategic alternatives for the CompassLearning business, including a sale pursuant to section 363of the Bankruptcy Code.

## C. Overview of the Extensive Marketing and Sales Efforts

10. In late August 2009, the Debtors, together with Miller Buckfire & Co., LLC ("**Miller Buckfire**") launched an extensive marketing and sale process for the CompassLearning business, aggressively canvassing the marketplace to identify potential financial or strategic

---

[5] As detailed in the Disclosure Statement, the company operates under three distinct business segments: International, United States and SES. In the first half of fiscal 2009, the Company sold several underperforming businesses, including: (i) Taste of Home Entertaining, Inc.; (ii) QSP, Inc. and Quality Service Programs, Inc. and their affiliated subsidiaries in the United States and Canada; and (iii) the principal operating assets of Books are Fun, Ltd.

partners. Miller Buckfire contacted, or was contacted by, 122 potential buyers (35 strategic and 87 financial) who Miller Buckfire identified as parties interested or likely to be interested in acquiring CompassLearning, distributed a confidential information memorandum to over half of those parties (the "***CIM Recipients***") and requested preliminary letters of interest by September 29, 2009. Approximately sixteen CIM Recipients responded with preliminary letters of interest (the "***Potential Purchasers***"). The preliminary letters of interest came from a variety of Potential Purchasers, including both strategic and financial buyers.

11.     After evaluating these preliminary letters of interest, the Debtors, in consultation with Miller Buckfire, opted to pursue further discussions with eight Potential Purchasers (both strategic and financial). Each of these eight Potential Purchasers received access to the CompassLearning data room, a management presentation and a draft of the APA. On November 4, 2009, four of the eight Potential Purchasers submitted "second round" letters of interest, three of which included marked APAs. After considering these three marked APAs, the Debtors, in consultation with their advisors, narrowed the selection down to two Potential Purchasers.

12.     The Debtors continued to work with these two Potential Purchasers to satisfy further diligence requests, while simultaneously negotiating the terms of a stalking horse asset purchase agreement, bidding procedures and proposed form of the sale order. On November 30, 2009, after extensive, arms-length and good faith negotiations, CompassLearning and WRC and the Stalking Horse Bidder executed the APA, subject to higher or better offers through an auction process as well as the approval of the Court.

13.     Accordingly, with a stalking horse bidding floor and APA in place (the key terms of which have already been subject to a fulsome market test) the Debtors now seek to promptly effectuate the Sale to the Stalking Horse Bidder, subject to competitive bids and Court approval.

# Overview of the Proposed Sale

## A.    Material Terms of the APA

14.    The principal terms of the APA are summarized in the following chart:[6]

| APA Provision | Summary Description |
|---|---|
| **APA Parties** | Sellers:    WRC Media, Inc. and CompassLearning, Inc.<br><br>Buyer:    CompassLearning Acquisition Corporation<br><br>Guarantor:    Marlin Equity II, L.P. |
| **Purchase Price** | $20,250,000 ($43,184,290, including assumed liabilities). ***See APA, at § 2(d).*** |
| **Deposit** | $1,500,000 deposited into escrow account by Buyer upon execution of the APA. ***See APA, at § 2(d)(ii).*** |
| **Bid Protections** | Break-Up Fee:    $607,500 (an amount equal to 3% of the Initial Purchase Price of $20,250,000). ***See APA, at § 8(c)(v).***<br><br>Reimbursable Expenses:    up to a cap of $300,000. ***See APA, at § 1.*** |
| **Acquired Assets** | Assets to be purchased by the Stalking Horse Bidder (the "***Acquired Assets***"), include, without limitation, all of Sellers' right, title and interest in and to all of Sellers' properties, assets and rights of every nature, kind and description, tangible and intangible (including goodwill), whether real, personal or mixed, whether accrued, contingent or otherwise, existing as of the Closing Date, in each case that are used primarily in the Business. ***See APA, at § 1.*** |
| **Assumed Liabilities** | Liabilities that will be assumed by the Stalking Horse Bidder (the "***Assumed Liabilities***"), include, without limitation: (i) liabilities relating exclusively to Buyer's ownership or operation of the Business or Acquired Assets that arise exclusively from events, facts or circumstances that occur after the Closing; (ii) all Current Liabilities (as reflected on the Closing Balance Sheet), including liabilities for deferred revenue, (iii) Transfer Taxes and certain Property Taxes, and (iv) all Liabilities of the Business for payroll, vacation and sick leave, accrued in respect of the Covered Employees, in each case, incurred in the Ordinary Course of Business and only to the extent reflected on the Final Balance Sheet. ***See APA, at § 1.*** |
| **Assumption of Executory Contracts and Unexpired Leases and Assignment to the Stalking Horse Bidder** | All Intellectual Property used in the Business, all Leases and the related Leased Real Property and other Contracts used primarily in the Business that are proposed to be assigned to Buyer pursuant to section 365 of the Bankruptcy Code in connection with the Sale transactions set forth in the APA are listed on <u>Annex A</u> to the APA (as the same may be revised, amended and supplemented from time to time by Buyer prior to the Closing pursuant to § 9(o) of the APA, collectively, the "***Assumed Contracts***"). ***See APA, § 1.***<br><br>The Debtors are responsible for paying all costs associated with curing defaults arising under the Assumed Contracts as a condition precedent to closing the Sale. ***See APA, at § 5(j).*** Based on their books and records, the Debtors estimate that the aggregate cure costs will not exceed $600,000. |

---

[6]    This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the APA, the latter governs in all respects. Capitalized terms used but not defined in this chart have the meaning ascribed in the APA.

| APA Provision | Summary Description |
|---|---|
| **Employment Provisions** | Effective as of the Closing, Buyer shall make offers of employment to officers and employees of Sellers and their Affiliates whose duties relate, or in connection with the transactions contemplated in the APA are expected to relate, primarily or exclusively to the operation of the Business (i) at substantially the same base salaries or, as applicable, base wage rates and (ii) that provide for employee benefit plans (within the meaning of § 3(3) of ERISA) that are substantially comparable or more favorable to such employees in the aggregate than those in which they participated prior to the Closing (excluding any severance policies, defined benefit pension, equity compensation programs and annual incentive opportunities) beginning on the first day of the calendar month immediately following the Closing Date. *See* **APA, at § 6(f)(i).** |
| | Buyer shall grant all Transferred Employees credit after the Closing for continuous service with Sellers or any of their respective Affiliates and their respective predecessors prior to the Closing (to the extent such service was recognized by Sellers and their respective Affiliates) for purposes of participation and vesting and, in the case of any Buyer severance plan or program (if any), benefit accruals under any Buyer Plan. **The Debtors are not be responsible for any severance payment liabilities.** *See* **APA, at § 6(f)(ii).** |
| **Closing Conditions** | <u>Buyer/Guarantor.</u> Closing conditions typical and customary for transactions of this kind, including, without limitation: (i) Bankruptcy Court shall have entered a final Bidding Procedures Order and Sale Order; (ii) representations and warranties shall be true and correct in all material respects; (iii) compliance with all applicable APA covenants; (iv) all scheduled required consents received; (v) no injunction or decree, if any, issued by a Governmental Entity in place; (vi) no Material Adverse Change having occurred; (vii) all defaults cured and amounts paid by Sellers in connection with the Assumed Contracts; and (ix) all closing deliverables delivered to Buyer. *See* **APA, at § 7(a).** |
| | <u>Sellers.</u> Closing conditions typical and customary for transactions of this kind, including, without limitation: (i) representations and warranties shall be true in all material respects; (ii) compliance with all applicable APA covenants; (iii) all scheduled required consents received; (iv) no injunction or decree, if any, issued by a Governmental Entity in place; and (v) all closing deliverables delivered to Sellers. *See* **APA, at § 7(b).** |
| **Representations, Warranties and Covenants** | Representations, warranties and covenants made or agreed to by the parties typical and customary for transactions of this kind, including, without limitation, representations, warranties and covenants relating to organization/good standing, authorization of Transaction, non-contravention, title to and condition of Assets, financial statements, employees and employee benefits, legal compliance, intellectual property, tax matters, accuracy or completeness of material contracts, litigation, brokers fees, absence of changes and disclosure waiver. *See* **APA, at § 3.** |
| **Use of Sale Proceeds** | Sale proceeds will be available (a) to pay costs and expenses incurred in connection with the Sale, <u>including</u> bonus awards proposed under the Closing Incentive Plan, (b) for general corporate purposes and (c) to pay for the administration of these cases through and until confirmation of the Plan, subject to the terms of the Credit and Guarantee Agreement dated August 26, 2009 (the "***DIP Credit Agreement***"), among the Debtors, J.P. Morgan Chase Bank, N.A., as agent and the lenders from time to time party thereto (collectively, the "***DIP Lenders***"). |

| APA Provision | Summary Description |
|---|---|
| **Excluded Assets** | "***Excluded Assets***" are assets that will be not be purchased by Buyer, including, without limitation, all of the assets of Sellers relating to:<br><br>• all Records related to (a) Taxes paid or payable by either Seller or any of its Affiliates or (b) any Subsidiary of either Seller other than Compass;<br><br>• any income Taxes of either Seller or any of its Affiliates;<br><br>• all Cash (including the Purchase Price);<br><br>• all rights under Contracts that are not an Assumed Contract;<br><br>• any current assets not related to the Business of Sellers or their Affiliates (other than CompassLearning); and<br><br>• assets maintained pursuant to, or in connection with, any Employee Benefit Plan; and<br><br>• all of the assets of Sellers that are not Acquired Assets.<br><br>*See* **APA, at § 1.** |
| **Excluded Liabilities** | "***Excluded Liabilities***" are Liabilities that will not be assumed by Buyer, including, without limitation, all Liabilities arising under, based upon or relating to:<br><br>• indebtedness for borrowed money (which includes all net finance leases, capital leases and obligations of Sellers under the DIP Credit Agreement);<br><br>• other than Accrued Employee Obligations, any Employee Benefit Plan or any other employee related liabilities (including any Liabilities arising or relating to any Executive Termination);<br><br>• Excluded Assets, including Contracts that are not Assumed Contracts;<br><br>• Tax Liability of Sellers relating to the Pre-Closing Period;<br><br>• Cure Amounts;<br><br>• fees relating to brokers, finders or other consultants and advisors to Sellers;<br><br>• any theory of successor liability, alter ego liability or any similar legal or equitable theory;<br><br>• any Assumed Contract that arising after the Closing Date;<br><br>• any pre-closing Litigation;<br><br>• Sellers' conduct of the Business or ownership of the Acquired Assets prior to the Closing Date;<br><br>• accrued expenses, accounts payable of Sellers arising from or associated with the Business, the Acquired Assets or the Permits arising from events, facts or circumstances occurring before Closing, except to the extent expressly identified as an Assumed Liability; and<br><br>• all other Liabilities that are not otherwise Assumed Liabilities.<br><br>*See* **APA, at § 1.** |

10

| APA Provision | Summary Description |
|---|---|
| **Termination Provisions** | Termination rights typical and customary transactions of this kind, including, without limitation:<br><br>• <u>By Buyer in the event of:</u> (i) non-fulfillment of Buyer's closing conditions, (ii) a breach by Sellers that remains uncured for 7 days after receipt of written notice thereof, (iii) Sellers' entry into a Competing Transaction or upon election by either Seller's board of directors to pursue a Competing Transaction, (iv) the conversion of the Chapter 11 Cases into a Chapter 7 case, (v) the filing of a plan of reorganization or liquidation by Sellers in its Chapter 11 Case that is inconsistent with the terms of the APA or (vi) the effectiveness of a plan of reorganization prior to the Closing, or (vii) the non-entry of (a) the Bidding Procedures Order by December 31, 2009 or (b) the Sale Order by February 1, 2010.<br><br>• <u>By Sellers in the event of:</u> (i) non-fulfillment of Sellers' closing conditions or (ii) a breach by Buyer that remains uncured for 7 days after receipt of written notice thereof.<br><br>• <u>By either Buyer or Sellers in the event of:</u> (i) the Bankruptcy Court's entry of an order that approves a Competing Transaction or stays the Sale Order, (ii) a non-appealable Decree of a Governmental Entity restraining or enjoining the consummation of the transactions, (iii) the arrival of the Drop Dead Date without the consummation of the transactions contemplated by the APA provided, however, that the arrival of such date is not solely the result of the material failure to fulfill any of the obligations under the APA by the Party requesting the termination, or (iv) mutual written consent of Sellers and Buyer.<br><br>*See* **APA, at § 8(a).** |

## B. "Extraordinary Provisions" Under the Sale Guidelines

15. The APA contains the following terms, conditions and provisions that may be considered "Extraordinary Provisions" under Section I.D of the Sale Guidelines:[7]

    a.   **Management Agreements**. The APA contains provisions regarding post-Sale employment offers to be extended to certain officers and employees whose duties relate to the Sale or operation of the business. *See* APA, at § 6(f). The Debtors believe these provisions are typical and customary for transactions of this kind.

    b.   **Private Sale**. The APA provides for an exclusivity period (from the date the APA was executed through December 10, 2009), during which time the Debtors must refrain from actively marketing the business. After that period ends, the Debtors are able to respond to unsolicited inquires, proposals or offers from parties interested in a Competing Transaction (defined in the APA) as set forth in the APA. *See* **APA, at ¶ 5(h).**

---

[7]   This list of possible "Extraordinary Provisions" (as such term is defined in the Sale Guidelines) is not intended to be an admission that any of these provisions are unusual relief in sales transactions of this nature conducted pursuant to section 363 of the Bankruptcy Code.

K&E 15660983.16

c.      **Successor Liability**.   The APA requires that the proposed Sale Order include certain findings that the Acquired Assets are being sold free of successor or other similar liability.  ***See* APA, at § 5(g)(F)**.  In light of the extensive marketing and open and notorious nature of this sale transaction, and the form and manner of the Sale Notice, including that it contains an express disclosure regarding successor liability findings in the Sale Order, the Debtors believe affected parties will have sufficient notice of the Sale and, therefore, inclusion of successor liability findings in the Sale Order is appropriate and reasonable, especially balanced against the Sale's benefits.

d.      **Stay Waiver**.  The APA requires that the Sale Order provide for a waiver of the 10-day stay of the Sale Order arising under Bankruptcy Rules 6004(g) and 6004(d), including the parties' ability to close the Sale and assign the Assumed Contracts.  ***See* APA, at § 5(g)(I)**.  Because the hearing to consider confirmation of the Plan is presently scheduled to be held on January 15, 2010,[8] the parties seek to close the Sale before that time, but in any event, prior to (or at the latest concurrent to) the effective date of the Plan.  Moreover, the Sale was extensively marketed and notice of the Sale was and will be further adequately provided to all parties in interest.   Therefore, the Debtors submit there are adequate grounds to waive the ten-10 stay so that the Sale Order is effective immediately.

e.      **Record Retention**.   The Debtors will have access to their books and records to administer the bankruptcy estate.  ***See* APA, at § 6(d).**

f.      **Fraudulent Conveyance**.  The APA requires that the Sale Order provide that the APA and the transactions contemplated thereby are not subject to avoidance by the Debtors or any trustee.  ***See* APA, at § 1**.  Balanced against the benefits of the Sale, the Debtors believe including this finding in the Sale Order is appropriate and reasonable.

g.      **Tax Exemption**.   Under the APA, Buyer is responsible for payment of any transfer taxes not eliminated through application of section 1146(a) of the Bankruptcy Code.  ***See* APA, at ¶ 6(h).**  While the Debtors believe the Sale will trigger nominal (if any) transfer tax liability, to the extent any transfer tax liability does arise from any transfers of property effectuated as part of the Sale, the Debtors submit that such transfers should be deemed "under a plan" and exempted from transfer tax liability pursuant to section 1146(a) of the Bankruptcy Code in light of the substantial benefits inured to the estate from the Sale proceeds, including funds to proceed toward confirmation of the Plan.[9]

---

[8]   On November 5, 2009, the Court entered that certain Agreed Order Establishing Discovery Protocol and Schedule Related to Confirmation of Debtors' Proposed Chapter 11 Plan [Docket No. 240], pursuant to which the Court has scheduled January 15, 2010, for the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**").

[9]   *See In re Jacoby-Bender, Inc.*, 758 F.2d 840, 841 (2d Cir. 1985) (where debtor's reorganization was aided by an exemption from taxation of property to a third party, "[t]hat the plan did not empower the debtor to make a specific sale or deliver a specific deed is irrelevant to our

**Bidding Procedures Order**

## A.    Outline of the Bidding Procedures

16.    The Bidding Procedures are intended to permit a fair and efficient competitive sale process, consistent with the timeline of these cases, to confirm that the stalking horse bid is, indeed, the best offer, or promptly identify the alternative bid that is higher or otherwise better. Because the Bidding Procedures are attached as **Exhibit B** hereto, they are not restated herein. Generally speaking however, the Bidding Procedures establish, among other things:

- the requirements Potential Bidders must satisfy in order to participate in the bidding process and become "Acceptable Bidders" (*See* Bid. Proc., at ¶ D);

- the availability of, access to and conduct during due diligence by Acceptable Bidders (*See* Bid. Proc., at ¶ E);

- the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger an Auction, including the minimum consideration that must be provided and the terms and conditions that must be satisfied, by any Acceptable Bidder (other than the Stalking Horse Bidder) to be considered the "Qualified Bidder" (*See* Bid. Proc., at ¶¶ F, G);

- the manner in which Qualified Bids will be evaluated by the Sale Debtors to determine the Starting Bid for the Auction (*See* Bid. Proc., at ¶ H);

- the procedures for conducting the Auction, if any (*See* Bid. Proc., at ¶ J);

- the criteria by which the "Successful Bidder" will be selected the Debtors, in consultation with their advisors (*See* Bid. Proc., at ¶ K); and

- various other matters relating to the Sale process generally, including regarding the Sale Hearing, designation of a back-up bidder, payment of the Bid Protections, return of any good faith deposits and certain reservations of rights (*See* Bid. Proc., at ¶¶ L – P).

17.    Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified

---

determination that the delivery of the deed took place 'under' the plan within the meaning of section 1146(c)."); *In re Beulah Church of God In Christ Jesus, Inc.*, 316 B.R. 41 (RDD) (Bankr. S.D.N.Y. 2004) ("focusing on the role of the particular transfer at issue in enabling the debtor's plan, rather than on a temporal test, recognizes the realities of how distressed businesses are restructured in chapter 11").

bid proposals, and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for their estates in consultation with key parties set forth therein.

## B.    <u>Form and Manner of Sale Notice</u>

18.    Within two business days of entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice upon the following parties in accordance with the Sale Guidelines: (i) the Master List and 2002 List (as both terms are defined in the Order Establishing Certain Notice, Case Management and Administrative Procedures, the "***Case Management Order***");[10] (ii) any parties who have expressed a written interest in the Acquired Assets; (iii) parties who are known or reasonably believed to have asserted any lien, encumbrance, claim or other interest in the Acquired Assets, (iv) all applicable state and local taxing authorities and (v) all governmental agencies that is an interested party with respect to the Sale and transactions proposed thereunder.

19.    The Debtors submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including, without limitation: (i) the date, time and place of the Auction (if one is held); (ii) the Bidding Procedures and the dates and deadlines related thereto; (iii) the objection deadline for the sale motion and the date, time and place of the Sale Hearing; (iv) reasonably specific identification of the Acquired Assets; (v) instructions for promptly obtaining a copy of the APA; (vi) representations describing the Sale as being free and clear of liens, claims, interests and other encumbrances, with all such liens, claims, interests and other encumbrances attaching with the same validity and priority to the sale proceeds; (vii) the commitment by the Stalking Horse Bidder to assume certain liabilities of the Debtors; and (viii) notice of the proposed assumption and assignment of contracts and

---

[10]   The Master List includes the (i) U.S. Trustee, (ii) the members of and counsel to the Committee, (iii) counsel to the Prepetition Agent and DIP Agent (as defined in the Plan), (iv) the indenture trustee for the Debtors' senior subordinated notes, (v) counsel to the ad hoc committee of unsecured noteholders, (vi) the attorneys general for each of the States in which the Debtors conduct operations, (vii) the Environmental Protection Agency, (viii) the Internal Revenue Service, (ix) the Pension Benefit Guaranty Corporation and (x) the SEC.

leases to the Stalking Horse Bidder pursuant to the APA (or to another Successful Bidder arising from the Auction, if any), the proposed cure amounts relating thereto and the right, procedures and deadlines for objecting thereto, and no other or further notice of the Sale shall be required. Accordingly, the Debtors request the form and manner of the Sale Notice be approved.

**C.      Summary of the Assumption Procedures**

20.      The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Assumed Contracts in connection with the Sale (the "***Assumption Procedures***").  Because the Assumption Procedures are set forth in detail in the attached Bidding Procedures Order they are not restated herein. Generally speaking however, the Assumption Procedures (a) outline the process by which the Debtors will serve notice to all counterparties to the Assumed Contracts regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right and the procedures to object thereto, and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of Assumed Contracts to the extent necessary.

**D.      Principal Terms of the Closing Incentive Plan**

21.      The Debtors are also seeking authority to make one-time, sale-related incentive payments (the "***Closing Incentive Plan***") to eight non-insider employees.  In the exercise of their business judgment and in accordance with agreements reached with the DIP Lenders, the Debtors determined that providing reasonable contingent payments, funded from proceeds of the Sale – which would otherwise go to the DIP Lenders and not to unsecured creditors in these cases – will properly incentivize and compensate certain non-insider employees for their efforts taken in connection with the Sale.  These eight individuals are uniquely positioned, because of their experience and expertise with and in the educational software industry, to maximize Sale value, and it has been (and continues to be) imperative that they work with the Debtors' advisors

to vigorously market the CompassLearning business, solicit competing bids, assist with the due diligence process and, ultimately, negotiate and consummate a sale that maximizes distributable value for the estates. Further, the Closing Incentive Plan is especially important because these employees are the primary points of contact for all potential purchasers—both "financial" and "strategic."[11]

22. For these and other reasons described herein, the Debtors determined, in their business judgment, that it was necessary and desirable to offer certain key employees an incentive bonus intended to motivate such employees to continue performing at optimal levels and remain focused on maximizing Sale value throughout the entire sale process. The Closing Incentive Plan is similar to a compensation plan formerly maintained by CompassLearning, only now, instead of being tied to performance levels, the plan is designed to align the interests of Eligible Employees with the interests of the bankruptcy estate to encourage maximum sale value.

23. Among other things, in formulating the Closing Incentive Plan, the Debtors considered which employees would bear the brunt of the additional workload associated with the additional responsibilities of the chapter 11 sale process (the least of which include diligence requests and record management), which employees would be likely to have the greatest impact on the sale results and which employees would be the driving force behind implementation of the going-concern sale. As a result of these considerations, these eight employees were ultimately selected as the employees for which an extra incentive was needed and desired.

24. Having narrowed the potential participants to the eight employees, the Debtors worked with their advisors, including K&E attorneys who specialize in employee benefits and compensation, to develop an incentive plan comparable with market practices, appropriately

---

[11] While financial buyers often maintain the acquired business as an investment portfolio, strategic buyers often seek to incorporate the target company into its existing business operations to capture synergies, typically eliminating duplicative departments, divisions and personnel in connection therewith.

tailored to meet the Debtors' need to properly motivate these key employees and consistent with the timing of these cases. The Closing Incentive Plan is the culmination of such efforts.

25.     The salient terms of the Closing Incentive Plan are the following:

| Term/Condition | Summary Description |
|---|---|
| **Eligible Employees** | Eight (8) key employees are eligible for incentive compensation under the Closing Incentive Plan (the "***Eligible Employees***"). Significantly, **no** Eligible Employees are "insiders" within the meaning of section 101(31) of the Bankruptcy Code. |
| **Payment Conditions** | The proposed bonus award under the Closing Incentive Plan is a one-time, lump-sum cash payment, payable in accordance with historic payroll practices, including applicable tax withholding, on or soon after consummation of the Sale. <br><br> **NO incentive payments will be paid if the Sale is not consummated. Likewise, NO incentive payments will be made to any Eligible Employee (a) who is terminated prior to consummation of the Sale or (b) who voluntarily terminates his or her employment prior to consummation of the Sale.** |
| **Potential Award Amounts** | The target amount of the bonus award is based upon a percentage of each Eligible Employee's current base salary. The actual amount of the bonus varies depending upon the amount of proceeds (or deal value) received in connection with the Sale:[12] <br><br> <u>Sale Proceeds</u>    <u>% of Salary Award</u>    <u>Total Plan Payout</u> <br><br> $12 million    20% – 40%    $360,280 <br> $15 million    25% – 50%    $450,350 <br> $20 million    33% – 67%    $600,467 <br> $25 million    42% – 83%    $750,583 <br><br> In the event the deal value is between any two of the deal values described above, the bonus amount will be interpolated accordingly. **If the final Sale value exceeds $25 million, each Eligible Employee will receive $5,000 for each $1 million in Sale value above $25 million in proceeds.** |

26.     In light of the foregoing (and as discussed more fully below), the Debtors submit their decision to implement the Closing Incentive Plan and make the award payments contemplated thereunder is well-within their business judgment and, therefore, should be authorized and approved as set forth herein.

---

[12]     "Proceeds" for purposes of the Closing Incentive Plan, are defined as the Purchase Price net of the Bid Protections (if applicable).

## Basis for Relief

### A.    The Bidding Procedures Are Fair, Appropriate and Should be Approved.

27.    "When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold."  John J. Jerome & Robert D. Drain, *Bankruptcy Court Is Newest Arena for M&A Action*, N.Y.L.J., June 3, 1991.  In furtherance of that goal, bidding procedures, such as those proposed here, may be used in court-supervised asset sales because they streamline the acquisition process, "help to provide an adequate basis by which to compare offers" and ultimately, maximize value.  *See id.*; *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets").  In overseeing an asset sale subject to an auction process, the bankruptcy court walks a tightrope between:

> on the one hand, providing for an orderly bidding process, recognizing the danger that absent such a fixed and fair process bidders may decline to participate in the auction; and, on the other hand, retaining the liberty to respond to differing circumstances so as to obtain the greatest return for the bankrupt estate.

*In re Fin. News Network, Inc.*, 980 F.2d 165, 166 (2d. 1992).  Because the court must perform this difficult balancing act, "a bankruptcy judge's broad discretionary power in conducting the sale of a debtor's assets should not be narrowed by technical rules mindlessly followed" that "reduce the broad discretion and flexibility a bankruptcy court must necessarily have to enhance the value of the estates before it." *See id.* at 169-70.

28.    Here, the Debtors submit that the Bidding Procedures are fair and appropriate under the circumstances, consistent with procedures routinely approved by courts in this district and in the best interest of the Debtors' estates.  The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the net value realized from the Sale by these estates.

18

In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provides potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

29.     At the same time, the Bidding Procedures provide the Debtors with an adequate opportunity to consider competing bids and select the highest and best offer for the completion of the Sale.  Entering into the APA with the Stalking Horse Bidder ensures the Debtors obtain fair market value by setting the minimum purchase price which will be tested in the marketplace. As such, the Debtors and their creditors can be assured that, taking into account the financial condition of CompassLearning and the economy, the consideration obtained will be fair and reasonable and at or above market.

**(i)     The Bid Protections Have Sound Business Purpose and Should be Approved.**

30.     The Debtors are also requesting approval of a break-up fee equal to 3% of the "Initial Purchase Price" of $20,250,000 ($607,500) and up to $300,000 for reimbursement of expenses (the "***Bid Protections***") to be paid to the Stalking Horse Bidder upon the occurrence of certain "triggering events" typical and customary for transactions of this kind, including, among other things, consummation of a competing transaction, an uncured breach of the APA or failure to have a final Sale Order or otherwise consummate the Sale within the agreed timeframe.

31.     Bankruptcy courts in the Second Circuit analyze the appropriateness of bidding incentives such as these under the "business judgment rule" standard, and is it well established in this district that courts consider whether (i) the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation, (ii) the fee hampers, rather than encourages, bidding and (iii) the amount of the fee is unreasonable relative to the proposed purchase price. *See Integrated Resources*, 147 B.R. at 657-8 (to evaluate bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's

actions taken in good faith, absent self-dealing and in the exercise of honest judgment); *see also*

*Fin. News Network*, 980 F.2d 165 (2d Cir. 1992). The Debtors submit that the Bid Protections

pass must under each of the three foregoing factors.

32.     First, the Bid Protections are the product of good faith, arm's-length negotiations

between parties acting not in their own self-interest but, rather, in the interest of the bankruptcy

estates consistent with the fiduciaries duties imposed in connection therewith. Further, the APA

provisions relating to the Bid Protections (as well as the other APA provisions) were scrutinized

by the Debtors' professionals, reviewed and vetted with outside advisors through the marketing

process and approved by the Debtors' board. Finally, a good indicator of the lack of self-dealing

here is the premium obtained for the Acquired Assets, especially given the present market.

33.     Second, the Debtors believe, based on their reasoned business judgment, that the

presence of the Bid Protections enhance their ability to maximize value without chilling bidding.

The Bid Protections were a material inducement for, and a condition of, the Stalking Horse

Bidder's agreement to enter into the APA Agreement. Indeed, granting these Bid Protections

convinced the Stalking Horse Bidder to enter into the APA which, in turn, assures the Debtors of

a Sale to a contractually-committed bidder at a price they believe is fair and reasonable and

provides the upside opportunity that the Debtors could potentially receive a higher or otherwise

better offer at the Auction which, absent such a bid floor, might never have otherwise been

realized. *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding

incentives "legitimately necessary to convince a white knight to enter the bidding by providing

some form of compensation for the risks it is undertaking.").

K&E 15660983.16

34.     Third, the Debtors believe, based on their reasoned business judgment, that the Bid Protections are reasonable and appropriate relative to the size, nature and complexity of this transaction and the commitments made and resources expended by the Stalking Horse Bidder in connection therewith in view of:

- the meaningful floor established by the APA for competitive bidding;

- the substantial benefits already inured to the Debtors and their estates from having a stalking horse bid serving as a catalyst for other potential or actual bidders to confirm that the Debtors receive the highest and best offer by subjecting the Sale to an open auction and competitive bidding;

- the need of the Debtors to move forward with a transaction with a high likelihood of closure assured by a contractually committed party at a fair and reasonable price consistent with the confirmation timeline of these chapter 11 cases;

- the extensive due diligence, analysis and negotiations undertaken by the Stalking Horse Bidder in connection with the Sale; and

- the risks borne by the Stalking Horse Bidder for being the stalking horse in this transaction and any opportunity costs incurred as a result thereof.

35.     The Debtors further believe, and are advised, that the amounts of each of the Bid Protections are comparable to market and bid protections approved by courts in this district. *See, e.g.*, *In re G+G Retail, Inc.*, No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006) (3% break-up fee); *In re Refco Inc.*, No. 05-60006 (RDD) (Bankr. S.D.N.Y. Oct. 26, 2005) (2.8% break-up fee); *In re Allegiance Telecom, Inc.* No. 03-13057 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2004) (2.1% break-up fee, $5 million expense reimbursement); *In re Twinlab Corp.*, No. 03-15564 (RDD) (Bankr. S.D.N.Y. Sept. 26, 2003) (5.3% break-up fee and $1 million expense reimbursement ); *In re Loral Space & Commnc's Ltd.*, No. 03-41710 (RDD) (Bankr. S.D.N.Y. Aug. 18, 2003) (2% break-up fee and $8 million expense reimbursement); *see also In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y. April 7, 2009) (3% break-up fee and $5,000,000 expense reimbursement); *In re Silicon Graphics, Inc.*, No. 09-11701 (MG) (Bankr. S.D.N.Y. April 3,

2009) (2.8% break-up fee and $750,000 expense reimbursement); *In re Bally Total Fitness of Greater NY, Inc.*, No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (4.3% break-up fee and 2.1% expense reimbursement).

36.     Accordingly, the Debtors submit that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances and, because the standard used by courts in this district in approving similar protections has been satisfied here, the Debtors respectfully submit that the Bid Protections should be approved.

**B.      The Form and Manner of the Sale Notice Should be Approved.**

37.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 20 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein. The Sale Notice complies with the Sale Guidelines, and the Debtors submit that notice of this motion and the related hearing to consider entry of the Bidding Procedures Order coupled with service of the Sale Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002, Local Bankruptcy Rule 2002-1 and the Sale Guidelines.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice proposed herein.

**C.      The Assumption Procedures Are Appropriate and Should be Approved.**

38.     In connection with the assumption and assignment of the Assumed Contracts, the Debtors believe it is necessary to establish a process by which (i) the Debtors and counterparties to Assumed Contracts can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code, and (ii) such counterparties can object to the assumption and assignment of Assumed Contracts and/or related cure amounts.

22

39. As set forth in the Bidding Procedures Order, the Debtors also requesting that any party that fails to object to the proposed assumption and assignment of any Assumed Contract be deemed to consent to (i) the assumption and assignment of the applicable Assumed Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order and (ii) notwithstanding any anti-alienation provision or other restriction on assignment. *See, e.g., Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

40. The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to parties to the Assumed Contracts and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request the Court approve the Assumption Procedures set forth in the Bidding Procedures Order.

**D.      The Sale Should be Approved as an Exercise of Sound Business Judgment.**

41. Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing. Section 363(b) does not, however, provide a standard for determining when such a sale should be authorized if proposed outside confirmation of a chapter 11 plan. Fortunately for courts in the Second Circuit, that standard is well-established: a debtor's decision to sell assets outside the ordinary course of business must be based upon sound business judgment. *See, e.g., Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *Official Comm. of Unsecured Creditors of LTV Aerospace and Defense Co. v. LTV Corp. ( In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir.1992); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Integrated Res.*, 147 B.R. at 656 (law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that in making a

23

business decision, the directors acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company).

42.     When determining whether to approve a proposed sale under section 363, courts generally apply standards that, although stated various ways, represent essentially a business judgment test.  *See In re Global Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003).  In *Lionel*, the Court of Appeals for the Second Circuit listed several (albeit not exhaustive) factors bankruptcy courts in this district may consider in conducting a section 363(b) analysis, including, for example, whether (i) a "sound business purpose" exists that justifies the sale, (ii) adequate and reasonable notice has been provided to interested parties, (iii) the sale value obtained is fair and reasonable and (iv) the debtor acted in good faith.  *See id.* (citing *Lionel*, 722 F.2d at 1071.

**(i)     A Sound Business Purpose Exists for the Sale.**

43.     The Debtors have a sound business justification for entering into this transaction, including converting underperforming assets into cash that can be used to pay creditors or fund the estate through confirmation a chapter 11 plan that effectuates a discharge of the remaining claims, interests, liens and other "Excluded Liabilities" not assumed as part of the Sale pursuant to sections 541 and  1141 of the Bankruptcy Code.

44.     Notably, it was not without consideration that the APA was executed.  Indeed, it was only after (a) potential alternatives were evaluated, (b) the transaction was aggressively marketed, (c) multiple rounds of competing proposals were evaluated and analyzed and (d) all of the foregoing was presented to the members of the board (who, in conjunction with advice from experienced professionals, discharged their fiduciary duties, exercised sound and appropriate business judgment and determined to pursue the Sale on the terms of the APA, subject to competitive bidding sanctioned by the Court), that CompassLearning and WRC entered into, and agreed to be bound by, the APA.

24

45.     Thus, for the reasons set forth herein, as will be further shown at the Sale Hearing, because the APA (or any marked APA, as the case may be) constitutes (or will constitute) the highest or otherwise best offer, on balance of the facts and circumstances of moment, and provides greater recovery for these estates than any known or practicably available alternative, the Debtors submit that the execution thereof represents sound reasonable business judgment.

**(ii)     Adequate and Reasonable Notice of the Sale Will be Provided.**

46.     As described above, the Sale Notice (a) will be served in a manner that provides 20-days notice of the date, time and location of the Sale Hearing, (b) informs interested parties of the deadlines for objecting to the Sale or the assumption and assignment of Assumed Contracts and (c) otherwise includes all information relevant to parties interested in or affected by the Sale in accordance with the Sale Guidelines.  Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest, and, as such, the Debtors are confident the Sale Notice will be properly vetted by the time of service thereof.

**(iii)     The Sale and Purchase Price Reflects a Fair Value Transaction.**

47.     It is a well-settled that, where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In Re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "§ 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction").  This is especially true here, where the Acquired Assets and related transaction have both been subjected to an extensive marketing process, reviewed by outside professionals firms and intensively scrutinized by the Debtors and their retained advisors.

48.     Moreover, even as the Debtors move forward with the Sale, starting on December 10, 2009, Miller Buckfire will continue to market the transaction and solicit other offers for the Acquired Assets and other CompassLearning assets consistent with the Bidding Procedures and subject to the APA, including, for example, by contacting previously solicited parties, providing acceptable bidders with data room access and requested information and otherwise assisting the Debtors with all efforts to increase transaction value.  In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the APA purchase price will, conclusively, be fair value.

     **(iv)**    **The Sale Has Been Proposed in Good Faith and Without Collusion and the Stalking Horse Bidder or Successful Bidder Is a "Good Faith Purchaser**

49.     While the Bankruptcy Code does not define "good faith," the Second Circuit has held that the good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may not be made.  *See, e.g., Gucci*, 126 F.3d at 390 (a purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders") (internal citations omitted); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

50.     The Debtors submit the Stalking Horse Bidder, or other successful bidder arising from the Auction, is or would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and the APA, or any marked version thereof, is or would be a good faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[13]  First, the consideration to be received by the Debtors pursuant to the APA is substantial,

---

[13]     Section 363(m) of the Bankruptcy Code provides that:

       [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such

fair and reasonable.  Second, the parties entered into the APA in good faith, and after extensive, arm's-length negotiations, during which both parties were represented by competent counsel of similar bargaining positions.  Third, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale or APA to be avoided under section 363(n) of the Bankruptcy Code.  Finally, the Stalking Horse Bidder's offer was evaluated and approved by the board in consultation with the Debtors' professionals.  Accordingly, the Debtors believe that the Stalking Horse Bidder (or other successful bidder) and APA (or marked APA) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### (v)    The Sale Should be Approved "Free and Clear" Under § 363(f).

51.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (i) applicable nonbankruptcy law permits such a free and clear sale; (ii) the holder of the interest consents; (iii) the interest is a lien and the sales price of the property exceeds the value of all liens on the property; (iv) the interest is in bona fide dispute; or (v) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f); *see also Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 50 (S.D.N.Y. 2005) (where a sale is to be free and clear of existing liens and interests other than those of the estate, one or more of the criteria specified in section 363(f) of the statute must also be met); *In re Dundee Equity Corp.*, 1992 WL 53743 (Bankr. S.D.N.Y 1992) (same).

---

property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

*See* 11 U.S.C. § 363(m).

52.     The Debtors believe that any of the parties holding liens in their Assets could be compelled to accept a monetary satisfaction of such interests.  Moreover, the Debtors believe that the purchase price for the Acquired Assets will exceed the economic value of any liens.  This Court has adopted the view that the "aggregate value of all liens" referenced in section 363(f)(3) of the Bankruptcy Code means the actual economic value of the liens, not their face amount.  *See In re Beker Indus., Inc.*, 63 B.R. 474, 477 (Bankr. S.D.N.Y. 1986).  Thus, where the purchase price for a debtor's assets is the best available under the circumstances, a court may authorize the sale free and clear of existing liens, claims and encumbrances pursuant to section 363(f)(3) of the Bankruptcy Code even if the purchase price is less than the face amount of liens, claims and encumbrances.  *See id.* at 477-78.  In this instance, the procedures outlined herein, and the Debtors' extensive and continuing efforts to market their businesses, ensure that the purchase price paid for their is the best available.  Therefore, the Sale should be approved free and clear of any and all liens, claims and encumbrances regardless of their face amount.

53.     In addition, the DIP Agent (and Prepetition Agent) on behalf of the DIP Lenders, has consented to the Sale and the Debtors' use of the proceeds generated therefrom (and certain other holders of liens may have consented or, absent any objection to this motion, may be deemed to have consented).  Finally, the Sale Order provides that any lien, claim or encumbrance in the Acquired Assets will attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  Accordingly, the Debtors believe that the Sale will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and the sale of their Assets should be approved free and clear of all liens, claims and encumbrances.

K&E 15660983.16

**E.**      **Assumption and Assignment of Contracts and Leases Should be Approved.**

      **(i)**      **The Assumption of the Contacts and Leases Reflects Business Judgment.**

54.      Here too, the Debtors must demonstrate that the assumption of the Assumed Contracts in connection with the Sale reflects sound business judgment. *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993) (purpose behind allowing assumption under section 365(a), is to permit the debtor, subject to the approval of the court, to use valuable property of the estate); *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) (business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage").

55.      In the Second Circuit, a motion to assume an executory contract is considered a summary proceeding, whereby courts efficiently review a "debtor's decision to adhere to a particular contract in the course of the swift administration of the bankruptcy estate." *See Orion Pictures*, 4 F.3d 1099.  In conducting such review, bankruptcy courts should "examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it." *Id.*  (the court "sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed").

56.      In other words, the Court must place itself in the position of the Debtors and determine "whether assuming the contract would be a good business decision or a bad one." *Penn Traffic*, 524 F.3d at 383; *Orion Pictures*, 4 F.3d 1099.  If a debtor's business judgment has been exercised reasonably, the court should approve the assumption of an executory contact. *See In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997); *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); *Ionosphere.*, 100 B.R. at 673.

K&E 15660983.16

57.     Here, a review of relevant facts shows that the Court should approve the decision to assume the Assumed Contracts in connection with the Sale as a sound exercise of their business judgment, consistent with the well-settled standard in this district governing same.

- <u>First</u>, the Assumed Contracts are necessary to run the CompassLearning business; as such, they are essential to inducing the best offer for the Acquired Assets.

- <u>Second</u>, it is unlikely that any purchaser would want to acquire any company on a going-concern basis unless the contracts and leases needed to conduct the business and manage the day-to-day operations were included in the transaction.

- <u>Third</u>, the APA provides that the assumption of Assumed Contracts is integral to, and inextricably integrated in, the Sale.

- <u>Finally</u>, the Assumed Contracts will be assumed though the process approved by the Court by the Bidding Procedures Order and, thus, will likely have been reviewed by key constituents.

58.     Accordingly, the Debtors submit that the assumption of the Assumed Contracts by way of the Assumption Procedures should be approved as an exercise of their business judgment.

**(ii)     Defaults Under the Assumed Contracts Will be Cured Through the Sale.**

59.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest if its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code: (a) that a debtor cure, or provide adequate assurance of prompt cure, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *Matter of Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

K&E 15660983.16

60.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied (and promptly) because the APA requires <u>as a condition to close</u> the Sale, that the Debtors cure all defaults associated with, or required to properly assume, the Assumed Contracts.  Because the Bidding Procedures Order (once approved) provides a clear process by which to resolve disputes over cure or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

**(iii)     Non-Debtor Parties Will be Adequately Assured of Future Performance.**

61.     Similarly, the Debtors submit that the third requirement of section 365(b)(1)(C) of the Bankruptcy Code – adequate assurance of future performance – is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *Matter of U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance. *Matter of Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources to perform and has expressed a willingness to devote sufficient funding to its business to do so).

62.     The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder (or other successful bidder) will be satisfied at the Sale Hearing.  As required by the Bidding Procedures,

31

the Debtors will evaluate the financial wherewithal of potential bidders prior to designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness and ability of the interested party to perform under the Assumed Contracts). Further, all counterparties will be provided with notice of the proposed assumption and assignment and will have adequate time and opportunity to object to the assumption or proposed cure amount or otherwise be heard with respect thereto.

**F.      The Closing Incentive Plan Is Fair, Appropriate and Should be Approved.**

63.      The Debtors submit that implementation of the Closing Incentive Plan is essential to ensure that key employees continue to focus on supporting and maintaining the operations of the CompassLearning business to drive sale value in the coming weeks, and represent a valid exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates and stakeholders in these chapter 11 cases. Whether based on sale value, performance or other financial metrics, the appropriate standard for reviewing a management compensation plan such as the Closing Incentive Plan, is the business judgment standard applicable to actions taken outside the ordinary course under section 363(b) of the Bankruptcy Code. *See, e.g., In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006); *Plusfunds Group*, No. 06-10402 (Bankr. S.D.N.Y. April 19, 2006); *In re Musicland Holding Corp.*, No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006); *see also In re Delphi Corp.*, No. 05-44481, Hr'g. Tr., 239:1-20 (RDD) (Bankr. S.D.N.Y. Feb. 10, 2006) (request for approval of long- and short-term key employee compensation program should be decided under section 363(b) of the Bankruptcy Code).

64.      In considering whether a proposed key employee incentive compensation plan, such as the Closing Incentive Plan, meets the "sound business judgment" test, courts in this district consider several non-exclusive factors, including whether:

- there is a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, in the case of a performance incentive plan, is the plan calculated to achieve the desired performance;

32

- the cost of the plan is reasonable in the context of the debtor's assets, liabilities and earning potential;

- the scope of the plan is fair and reasonable, does it apply to all employees, and does it discriminate unfairly;

- the plan or proposal is consistent with industry standards;

- the due diligence efforts of the debtor including with respect to investigating the need for a plan, analyzing which key employees need to be incentivized, determining what is available and reviewing what is generally applicable in a particular industry; or

- the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.

*See In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006) (commonly referred to as "Dana II"). Although the Debtors believe the Closing Incentive Plan meets the *Dana II* factors, the compensation structure proposed under the Closing Incentive Plan does not have to satisfy each and every factor to be approved. *See In re Global Home Prods.*, 369 B.R. at 786 (debtors' performance-based compensation structure was a proper exercise of debtors' business judgment even though, for instance, the debtors did not use a benefits consultant to structure the program); *Dana II*, 358 B.R. at 571 (courts take a "holistic" view of compensation packages).

65. An analysis of the Closing Incentive Plan establishes that the *Dana II* factors are satisfied here, and, thus, the Debtors submit that the Closing Incentive Plan should be approved as an exercise of their considered business judgment, consistent with their fiduciary duties as debtors in possession and the underlying goals of the chapter 11 sale process.

- <u>First</u>, there is a reasonable relationship between the plan proposed and the results to be obtained. Achievement of any payouts under plans is directly tied to sale value. Therefore, the Closing Incentive Plan seeks to properly incentivize employees to perform at the highest levels during the sale process by aligning their incentive pay to the Sale purchase price.

- <u>Second</u>, the aggregate cost of the Closing Incentive Plan is reasonable relative to the distributable value potentially obtained though the consummation of the Sale. For example, a $25 million purchase price triggers an aggregate payout

of $750,583 – approximately 3% of total cash consideration received based on the figures assumed for purposes of this example.

- Third, the scope of the Closing Incentive Plan is fair and reasonable. The plan is to be applied to eight senior employees who are essential to the achieving maximum sale value.

- Fourth, the Closing Incentive Plan is consistent with market standards.

- Fifth, above noted, the Debtors undertook significant due diligence efforts in investigating the need for a plan and analyzed comparable plans.

- Sixth, although the Debtors did not separately retain a benefits consultant to structure the program, the Debtors received advice from their professional advisors, including Kirkland & Ellis attorneys who focus on, and have extensive experience handling, matters relating to executive compensation, benefits and ERISA issues in complex business transactions such as mergers, leveraged buyouts and other acquisitions.

66. Moreover, recognizing that incentive compensation plans like the Closing Incentive Plan implemented in connection with a chapter 11 asset sale can be a highly-efficient, cost-effective means to maximize value for the bankruptcy estate, courts in this district regularly approve incentive programs, similar to the Closing Incentive Plan, under the business judgment standard of section 363(b) of the Bankruptcy Code. *See, e.g., In re Fortunoff Holdings, LLC*, No. 09-10497 (RDD) (Bankr. S.D.N.Y. April 17, 2009) (approving a wind down incentive plan); *In re Refco Inc.*, No. 05-60006 (RDD) (Bankr. S.D.N.Y. Jan. 18, 2006) (approving a wind down incentive plan); *see also In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. June 3, 2009) (approving sale-related incentive plan for insiders and non-insiders); *In re Portrait Corp. of America, Inc.*, No. 06-22541 (Bankr. S.D.N.Y. June 6, 2007) (approving sales incentive plan); *In re PlusFunds Group, Inc.*, No. 06-10402 (JMP) (Bankr. S.D.N.Y. April 19, 2006) (same).

67. To reiterate, the Debtors do not believe that any of the Eligible Employees could be considered an "insider" within the meaning of section 101(31) of the Bankruptcy Code,

thereby not implicating any of the requirements of section 503 of the Bankruptcy Code.[14]  Out of

an abundance of caution, however, the Debtors submit the Closing Incentive Plan could just as

easily be approved pursuant to section 503(c)(3) of the Bankruptcy Code because the Closing

Incentive Plan would be reviewed under the same standard above described for section 363(b):

the business judgment standard.  *See Dana*, 358 B.R. at 576 (test to evaluate compensation

proposals under section 503(c)(3) of the Bankruptcy Code is "sound business judgment" test);

*see also Nobex*, 2006 Bankr. LEXIS 417, Hr'g Tr. at 86-87 (Bankr. D. Del. Jan. 12, 2006)

(§ 503(c)(3) standard is "nothing more than a reiteration" of business judgment test under § 363).

68.    For the reasons set forth herein, the Debtors believe they have adequately shown

that the Closing Incentive Plan has a sound business purpose – maximizing Sale value through

motivation of employees key with respect thereto – in satisfaction of section 363(b) of the

Bankruptcy Code (and, if relevant, section 503(c)).  Therefore, the Debtors submit the Closing

Incentive Plan should be approved under the Bidding Procedures Order on the terms herein.

## **Motion Practice**

69.    This motion includes citations to the applicable rules and statutory authorities

upon which the relief requested herein is predicated, and a discussion of their application to this

---

[14]   Because the Closing Incentive Bonus Plan contains neither retention nor severance competence, section 503(c)(1) and (2) do not apply for the reasons set forth herein.  it is clear that the Closing Bonus Incentive Plan has the primary purpose of enticing the eligible employees to work harder in the face of a challenging sale process with a primary focus on driving maximum sale value (as opposed to merely remaining employed).  To the extent that the Closing Incentive Bonus Plan has some retentive aspects, any such retentive aspects are of no moment, as they do not change the fundamental purpose of this plan—to motivate the eligible employees to meet meaningful deal value ranges.  *See, e.g., In re Global Home Prods.*, 369 B.R. at 785 (the entire analysis changes if a plan is not primarily motivated to retain personnel); *Nellson Nutraceutical*, 369 B.R. at 802 (although the modification of the bonus program has some retentive effect, it is for the primary purpose of motivating employees and, thus, section 503(c)(1) limitations not applicable); *Dana* II, 358 B.R. at 571 (merely because a plan has some retentive effect does not mean the plan overall is retentive rather than incentivizing in nature).  In contrast, by the statute's plain language, section 503(c)(1) of the Bankruptcy Code addresses only the requirements for severance plans.  Neither provision applies to performance-based incentive plans. *See, e.g., In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Apr. 26, 2006), Hr'g Tr. at 84-85 (sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to incentive programs); *Musicland* (Bankr. S.D.N.Y. Feb. 1, 2006) (debtor continuing to provide incentive based compensation under management incentive plan did not violate section 503(c) of the Bankruptcy Code); *Dana*, 358 B.R. at 576 (applying section 503(c)(3) of the Bankruptcy Code to evaluate management incentive plan in absence of applicability of sections 503(c)(1) or 501(c)(2) of the Bankruptcy Code); *see also In re Nobex*, (Bankr. D. Del. Jan. 12, 2006), Hr'g Tr. at 67 (section 503(c)(1) of the Bankruptcy Code does not apply to incentive programs); *In re Werner Holding Co., Inc.*, No. 06-10578 (KJC) (Bankr. D. Del. Dec. 20, 2006, Dec. 27, 2006) (ordering relief requested in connection with debtors' incentive plans pursuant to sections 363(b) and 503(c) of the Bankruptcy Code).

K&E 15660983.16

motion. Accordingly, the Debtors submit that this motion satisfies the requirements of Local Bankruptcy Rule 9013-1(a), as applicable.

## Notice

70. Pursuant to and in accordance with the Case Management Order, notice of this motion has been provided to the Master Service List and the 2002 List (as each such term is defined in the Case Management Order). Due to the nature of the relief requested herein, the Debtors respectfully submit that further notice of this motion is neither required nor necessary.

## No Prior Request

71. No prior motion for the relief requested herein has been made to this or any other court.

K&E 15660983.16

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter the Bidding Procedures Order and the Sale Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit F**, respectively, granting the applicable relief requested herein, and granting such other and further relief as is just and proper.

Dated:  December 3, 2009
        New York, New York

*/s/ Nicole L. Greenblatt*
James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Counsel to the Debtors
and Debtors in Possession

K&E 15660983.16