James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Counsel to the Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) | No. 09-23529 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

### DEBTORS' (A) REPLY TO OBJECTIONS TO CONFIRMATION OF THE THIRD AMENDED PROPOSED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE READER'S DIGEST ASSOCIATION, INC. AND ITS DEBTOR AFFILIATES AND (B) MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE PLAN[1]

Dated: January 11, 2010

---

1   The Debtors in these chapter 11 cases who are proponents of this Plan, along with the last four digits of each Debtor's federal tax identification number, are: Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, Inc. (3276); World Almanac Education Group, Inc. (3781); World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is: 1 Reader's Digest Road, Pleasantville, NY 10570.

# Table of Contents

Preliminary Statement ................................................................................................1

Background ..................................................................................................................8
- A. The Debtors' Unsecured Creditors ...............................................................8
  - (i) The Trade Claims .................................................................................8
  - (ii) The Retiree Claims ............................................................................10
- B. The Debtors' Plan and Disclosure Statement ............................................13
- C. Voting Results ............................................................................................16
- D. Plan Modifications ....................................................................................17

Argument ..................................................................................................................17

Part I. Reply to Unfair Discrimination Objections ...............................................17
- A. The Bankruptcy Code Only Prohibits Discrimination That Is "Unfair;" The Debtors' Plan Does Not Unfairly Discriminate.............................................17
  - (i) There Are Legitimate Business Reasons that Justify the Different Treatment of Class 4 and Class 5...............................................................19
  - (ii) The Proposed Treatment of Class 4 is Necessary to the Reorganization; The Debtors Cannot Consummate the Plan Without the Discrimination.............................................................24
  - (i) The Debtors Diligently and in Good Faith Selected Claims for Class 4 Consistent with the Rationale for Disparate Treatment. ...............25
  - (i) The Discrimination Is Proportionate to the Underlying Rationale. ...........27
  - (ii) Eliminating the Discrimination Would Not Increase Class 5 Recoveries.............................................................28
- B. The Unfair Discrimination Objections Rely on Inapposite Case Law .................30

Part II. Plan Satisfies Uncontested Confirmation Standards ...................................36

II. The Plan Satisfies the Applicable Confirmation Requirements of § 1129....................36
- A. The Plan Complies With the Applicable Provisions of Title 11 (§ 1129(a)(1)).................................................................36
  - (i) The Plan Properly Designates Classes of Claims and Interests (§ 1122).................................................................36
  - (ii) The Mandatory Provisions of the Plan Should be Approved (§1123(a)). .................................................................39
  - (iii) The Discretionary Provisions of the Plan Should be Approved (§ 1123(b)). .................................................................40
- B. The Disclosure and Solicitation Requirements Are Satisfied (§ 1129(a)(2)).................................................................45
- C. The Plan Was Proposed in Good Faith (§ 1129(a)(3)). .........................................46
- D. Payments Under the Plan Are Subject to Court Approval (§ 1129(a)(4))............47
- E. The Plan Properly Discloses Post-Confirmation Management (§ 1129(a)(5))................................................................48

F.     The Plan Does Not Require Regulatory Approval (§ 1129(a)(6)).........................51

G.    The Plan Satisfies the "Best Interests of Creditors" Test (§ 1129(a)(7)).............51

H.    The Plan Has Been Accepted by the Requisite Classes (§ 1129(a)(8))................54

I.     The Plan Provides for the Payment of Priority Claims (§ 1129(a)(9))..................55

J.     The Plan Has Been Accepted by at Least One Impaired Class (§ 1129(a)(10))......................................................................................................55

K.    The Plan Is Feasible (§ 1129(a)(11)). ...............................................................56

       (i)     The Debtors Have Restructured Existing Debt.........................................57

       (ii)    The Debtors Have Sufficient Cash and  Have Secured Valuable Exit Financing...........................................................................................58

       (iii)   The Plan Has Been Scrutinized and Validated by Key Stakeholders............................................................................................59

L.     The Plan Provides for the Payment of Certain Statutory Fees (§ 1129(a)(12))....................................................................................................59

M.   The Plan Provides for the Continuation of Retiree Benefits (§ 1129(a)(13))....................................................................................................60

N.    The Plan Satisfies the Applicable "Cram Down" Requirements of § 1129(b)...........................................................................................................61

O.    The Management Incentive Programs Are Appropriate and Permissible and Should Be Approved................................................................................63

       (i)     Payments Under the Management Incentive Programs Do Not Implicate Section 503(c) but Would Be Permissible Even if They Did...........................................................................................................64

       (ii)    Payments Under the Management Incentive  Programs Satisfy the Requirements of Section 1129(a)(4)...............................................67

III.    **The Debtors' Request for a Limited Waiver of Stay to Consummate the Plan Should be Approved.** .......................................................................................**68**

**Conclusion** ....................................................................................................................**70**

K&E 16165851.3

## Table of Authorities

**Cases**

*Adelphia*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ............................................................................... passim

*Aetna Cas. & Sur. Co. v. Chateaugay Corp. (In re Chateaugay Corp.)*,
    89 F.3d 942 (2d Cir. 1996) ......................................................................................... 20, 36, 38

*Aetna Cas. & Sur. Co. v.Clerk (In re Chateaugay Corp.)*,
    89 F.3d 942 (2d Cir. 1996) ..................................................................................................... 19

*Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*,
    21 F.3d 477 (2d Cir. 1994) ..................................................................................................... 36

*In re 11,111 Inc.*,
    117 B.R. 471 (Bankr. D. Minn. 1990) .................................................................................... 20

*In re 11,111, Inc.*,
    117 B.R. 471 (Bankr. D. Minn. 1990) .............................................................................. 27, 38

*In re 222 Liberty Assocs.*,
    108 B.R. 971 (Bankr. E.D. Pa. 1990) ........................................................................ 30, 32, 38

*In re 499 W. Warren St. Assocs., Ltd. P'ship*,
    151 B.R. 307 (Bankr. N.D.N.Y. 1992) .................................................................................. 36

*In re 500 Fifth Ave. Assocs.*,
    148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ................................................................................ 35

*In re AG Consultants Grain Div., Inc.*,
    77 B.R. 665 (Bankr. N.D. Ind. 1987) ..................................................................................... 48

*In re Allegiance Telecom, Inc.*,
    No. 03-13057 (RDD) (Bankr. S.D.N.Y. June 10, 2004) ......................................................... 40

*In re Am. Solar King Corp.*,
    90 B.R. 808 (Bankr. W.D. Tex. 1988) ................................................................................... 47

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006) ................................................................................................. 19

*In re Aztec Co.*,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) ............................................................................... 19

*In re Baldwin United Corp.*,
    43 B.R. 888 (Bankr. S.D. Ohio 1984) .................................................................................... 40

iv

*In re Barney & Carey Co.*,
  170 B.R. 17 (Bankr. D. Mass. 1994) ........................................................................... 30

*In re Beyond.com Corp.*,
  289 B.R. 138 (Bankr. N.D. Cal. 2003) ......................................................................... 48

*In re Buttonwood Partners, Ltd.*,
  111 B.R. 57 (Bankr. S.D.N.Y. 1990) .............................................................. 5, 18, 32

*In re Calpine Corp.*,
  Case No. 05-60200, 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007), *stay denied*, 2008
  WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008), *appeal denied*, 390 B.R. 508 (S.D.N.Y. 2008)37,
  40, 41

*In re Cellular Info Sys., Inc.*,
  171 B.R. 926 (Bankr. S.D.N.Y. 1994) ......................................................................... 46

*In re Charter Communications*,
  No. 09-11435, 2009 WL 3841971 (JMP) (Bankr. S.D.N.Y. Nov. 17, 2009) .................... passim

*In re Chateaugay Corp.*,
  177 B.R. 176 (Bankr. S.D.N.Y. 1995) ......................................................................... 19

*In re Chateaugay*,
  80 B.R. 279 (S.D.N.Y.1987) ....................................................................................... 17, 30

*In re Coram Healthcare Corp.*,
  315 B.R. 321 (Bankr. D. Del. 2004) .......................................................................... 20, 38

*In re Cornerstone Propane, L.P.*,
  No. 04-13856 (RDD) (Bankr. S.D.N.Y. Nov. 4, 2004) ................................................. 37

*In re Creekstone Apts.Assc., L.P. v. Resolution Trust Corp.*,
  168 B.R. 639 (Bankr. M.D. Tenn. 1994) ..................................................................... 26

*In re DBSD N.A., Inc.*,
  2009 WL 3491060 (REG) (Oct. 26, 2009) .................................................... 28, 29, 40, 55

*In re DJK Residential, LLC*,
  No. 08-10375 (JMP) (Bankr. S.D.N.Y. May 2, 2008) .......................................... 29, 33, 40, 42

*In re Dow Corning Corp.*,
  244 B.R. 696 (Bankr. E.D. Mich. 1999) ..................................................................... 19

*In re Drexel Burnham Lambert Group, Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) .................................................... 26, 36, 45, 48

v

*In re Drexel Burnham Lambert Group, Inc.*,
   960 F.2d 285 (2d Cir. 1992), cert denied, 506 U.S. 1088 (1993) ...................................... 41, 53

*In re Eagle Bus Mfg., Inc.*,
   134 B.R. 584, 599 (Bankr. S.D. Tex. 1991), *aff'd*, 158 B.R. 42 (S.D. Tex. 1993) .................. 48

*In re FF Holdings Corp. & Farm Fresh, Inc.*,
   1998 U.S. Dist. LEXIS 10741 (D. Del. Feb. 17, 1998) ..................................................... 32, 38

*In re Freymiller Trucking, Inc.*,
   190 B.R. 913 (Bankr. W.D. Okla. 1996)............................................................................... 18

*In re Frontier Holdings, LLC*,
   No. 08-112198 (RDD) (Bankr. S.D.N.Y. Sept. 10, 2009) ....................................................... 21

*In re Gaston & Snow*,
   Nos. 93-8517, 93 Civ. 8628, 1996 WL 694421 (JGK) (S.D.N.Y. Dec. 04, 1996) .................. 45

*In re Genesis Health Ventures, Inc.*,
   266 B.R. 591 (Bankr. D.Del. 2001) ..................................................................................... 28

*In re Global Crossing Ltd.*,
   No. 02-40188 (Bankr. S.D.N.Y. Dec. 26, 2002) ..................................................................... 37

*In re Graphic Comm'cns, Inc.*,
   200 B.R. 143 (Bankr. E.D. Mich. 1996) ........................................................................ 30, 32

*In re Great Bay Hotel & Casino, Inc.*,
   251 B.R. 213 (Bankr. D.N.J. 2000) ...................................................................................... 38

*In re Hagerstown Fiber Ltd. P'ship.*,
   No. 98-41988 (SMB) (Bankr. S.D.N.Y. Aug. 24, 1998) ....................................................... 29

*In re Ionosphere Clubs, Inc.*,
   98 B.R. 174 (Bankr. S.D.N.Y. 1989) ............................................................................. 17, 30

*In re Jewish Memorial Hospital*,
   13 B.R. 417 (BRL) (Bankr. S.D.N.Y. 1981).................................................................. 17, 31

*In re Journal Register Comp.*,
   407 B.R. 520 (Bankr. S.D.N.Y. 2009) ..................................................................... 29, 30, 58

*In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc.*,
   149 B.R. 306 (Bankr. E.D.N.Y. 1992)........................................................... 20, 27, 32, 38

*In re LeBlanc*,
   622 F.2d 872, 23 C.B.C. 436 (5th Cir. 1980).................................................................... 27

K&E 16165851.3

*In re NTL Inc,*
    No. 02-41316 (Bankr. S.D.N.Y. September 5, 2002) ............................................................ 29

*In re One Times Square Associates Ltd. P'ship.,*
    159 B.R. 695 (Bankr. S.D.N.Y. 1993) ............................................................ 35, 36

*In re Oneida Ltd.,*
    351 B.R. 79 (Bankr. S.D.N.Y. 2006) ............................................................ 42, 43

*In re Pine Lake Village Apt. Co.,*
    19 B.R. 819 (Bankr. S.D.N.Y. 1982) ............................................................ 31

*In re Prudential Energy Co.,*
    58 B.R. 857 (Bankr.S.D.N.Y.1986) ............................................................ 55

*In re RCN Corp.,* No. 04-13638 (RDD) (Bankr. S.D.N.Y Dec. 8, 2004) ............................................................ 28, 29

*In re Refco,*
    No. 05-60006 (RDD) (Bankr. S.D.N.Y. Dec. 15, 2006) ............................................................ 29

*In re Richard Buick, Inc.,*
    126 B.R. 840 (Bankr.E.D.Pa.1991) ............................................................ 38

*In re Riggel,*
    142 B.R. 199 (Bankr. S.D. Ohio 1992) ............................................................ 37

*In re Rivers End Apts., Ltd.,*
    167 B.R. 470 (Bankr. S.D. Ohio 1994) ............................................................ 21

*In re Rochem,*
    58 B.R. 541 (Bankr.D.N.J. 1985) ............................................................ 19, 27

*In re Sentry Operating Company of Texas, Inc.,*
    264 B.R. 850 (Bankr. S.D. Texas 2001) ............................................................ 25, 30, 31

*In re Sherwood Square Assocs.,*
    107 B.R. 872 (Bankr. D. Md. 1989) ............................................................ 49

*In re Silicon Graphics, Inc.,*
    363 B.R. 690 (BRL) (Bankr. S.D.N.Y. 2007) ............................................................ 23

*In re Snyders Drug Stores, Inc.,*
    307 B.R. 889 (N. D. Ohio 2004) ............................................................ 25, 33

*In re Stratford Assocs. Ltd. P'ship,*
    145 B.R. 689 (Bankr. D. Kan. 1992) ............................................................ 48

*In re Teletroncis Servs., Inc.,*
    762 F.2d 185 (2d Cir. 1985) ............................................................ 40

K&E 16165851.3

*In re Texaco Inc.*,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988) ................................................................ 44, 49, 55

*In re The Leslie Fay Cos.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997) .................................................................. 50, 58

*In re Tower Automotive, Inc.*,
    No. 05-10578 (Bankr. S.D.N.Y. July 12, 2007) ................................................... 37, 40

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) .............................................................. 35, 44, 48

*In re Transcare Corp.*,
    No. 02-14385 (RDD) (Bankr. S.D.N.Y. July 16, 2003) ....................................... 28, 29

*In re U.S. Truck Co.*,
    42 B.R. 790 (Bankr. E.D. Mich. 1984) ...................................................................... 21

*In re U.S. Truck Co.*,
    42 B.R. 790 (Bankr. E.D. Mich. 1984), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ........... 21

*In re Union Fin. Servs. Group*,
    303 B.R. 390 (Bankr E.D. Mo. 2003) ....................................................................... 29

*In re Worldcom, Inc.*,
    No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ............... passim

*In re XO Commc'ns., Inc.*,
    No. 02-12947 (AJG) (Bankr. S.D.N.Y. Aug. 26, 2002) ........................................... 29

*Koelbl v. Glessing (In re Koelbl)*,
    751 F.2d 137 (2d Cir. 1984) ..................................................................................... 46

*Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
    150 F.3d 503 (5th Cir. 1998), cert. denied, 526 U.S. 1144 (1999) ........................... 67

*Manati Sugar Co. v. Mock*,
    75 F.2d 284 (2d Cir. 1935) ....................................................................................... 45

*Mason v. Paradise Irr. Dist.*,
    326 U.S. 536 (1946) .................................................................................................. 21

*Matter of U.S. Truck Co., Inc.*,
    42 B.R. 790 (Bankr. Mich. 1984) ............................................................................. 19

*Mercury Capital Corp. v. Millford Connecticut Assoc., L.P.*,
    354 B.R. 1 (D. Conn. 2006) ...................................................................................... 18

K&E 16165851.3

*Moran v. Hong Kong & Shanghai Banking Corp. (In re Deltacorp, Inc.),*
  179 B.R. 773 (Bankr.S.D.N.Y.1995) .............................................................. 26

*n re Tucson Self-Storage, Inc.,*
  166 B.R. 892 (B.A.P. 9th Cir. 1994) ............................................................. 30

*Pan Am Corp. v. Delta Air Lines, Inc.,*
  175 B.R. 438 (S.D.N.Y.1994) ...................................................................... 45

*RTC v. MacKenzie,*
  60 F.3d 972 (2d Cir.1995) ........................................................................... 23

*U.S. Shipping Partners, LP,*
  No. 09-12711 (RDD) (Bankr. S.D.N.Y. Oct. 2, 2009) .......................... 29

*Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.),*
  326 B.R. 497 (S.D.N.Y. 2005) ................................................................... 41

*WHBA Real Estate Ltd. P'ship v. Lafayette Hotel P'ship (In re Lafayette Hotel P'ship),*
  227 B.R. 445 (S.D.N.Y. 1998) ................................................................... 36

**Statutes**

11 U.S.C. § 1114 ........................................................................... 3, 22, 23, 59

11 U.S.C. § 1114(a) ...................................................................................... 59

11 U.S.C. § 1122 ........................................................................ 35, 38, 44, 64

11 U.S.C. § 1122(a) ............................................................................ 35, 36, 37

11 U.S.C. § 1123 ................................................................................ 35, 44, 64

11 U.S.C. § 1123(b) ........................................................................... 39, 40, 44

11 U.S.C. § 1126(c) ...................................................................................... 53

11 U.S.C. § 1126(d) ...................................................................................... 53

11 U.S.C. § 1126(f) ....................................................................................... 53

11 U.S.C. § 1127(a) ...................................................................................... 17

11 U.S.C. § 1129 ................................................................................... passim

11 U.S.C. § 1129(a) ...................................................................................... 60

11 U.S.C. § 1129(a)(1) ..................................................................... 35, 44, 63, 64

ix

11 U.S.C. § 1129(a)(10) .................................................................................................. 54, 55

11 U.S.C. § 1129(a)(11) .................................................................................................. 55, 58

11 U.S.C. § 1129(a)(12) .................................................................................................. 58, 59

11 U.S.C. § 1129(a)(13) .................................................................................................. 59, 60

11 U.S.C. § 1129(a)(2) .................................................................................................... 44, 45

11 U.S.C. § 1129(a)(3) .................................................................................................... 45, 46

11 U.S.C. § 1129(a)(4) ........................................................................................ 46, 47, 66, 67

11 U.S.C. § 1129(a)(5) ............................................................................................ 47, 48, 50

11 U.S.C. § 1129(a)(5)(A)(i) ................................................................................................. 47

11 U.S.C. § 1129(a)(5)(A)(ii) ................................................................................................ 48

11 U.S.C. § 1129(a)(5)(B) ..................................................................................................... 49

11 U.S.C. § 1129(a)(6) .......................................................................................................... 50

11 U.S.C. § 1129(a)(7) ................................................................................................ 50, 51, 52

11 U.S.C. § 1129(a)(8) ................................................................................................ 53, 54, 60

11 U.S.C. § 1129(a)(9) .......................................................................................................... 54

11 U.S.C. § 1129(a)(9)(A) ..................................................................................................... 54

11 U.S.C. § 1129(a)(9)(B) ..................................................................................................... 54

11 U.S.C. § 1129(a)(9)(C) ..................................................................................................... 54

11 U.S.C. § 1129(b) .......................................................................................................... passim

11 U.S.C. § 1129(b)(1) .......................................................................................................... 60

11 U.S.C. § 1129(b)(2)(B) ..................................................................................................... 61

11 U.S.C. § 1129(b)(2)(B)(ii) ................................................................................................ 61

11 U.S.C. § 1129(b)(2)(C)(ii) ................................................................................................ 61

11 U.S.C. § 502(b)(6) ........................................................................................................... 22

11 U.S.C. § 502(b)(7) ........................................................................................................... 22

K&E 16165851.3

11 U.S.C. § 503 .................................................................................................... 64

11 U.S.C. § 503(c) ..................................................................................... 63, 64, 66

11 U.S.C. § 503(c)(1) ...................................................................................... 64, 65

11 U.S.C. § 503(c)(2) ............................................................................................. 65

11 U.S.C. § 503(c)(3) ............................................................................................. 65

11 U.S.C. § 507(a) ................................................................................................. 54

11 U.S.C. § 510(a) .......................................................................................... 37, 60

28 U.S.C. § 1930 ................................................................................................... 58

28 U.S.C. § 1930(a)(6) .......................................................................................... 59

29 U.S.C. 1051(2) ................................................................................................. 23

29 U.S.C. 1081(a)(3) ............................................................................................. 23

29 U.S.C. 1101(a)(1) ............................................................................................. 23

31 U.S.C. § 3717 ................................................................................................... 59

## Other Authorities

COLLIER ON BANKRUPTCY,
   15th Rev. Ed. (2007), ¶ 1129.03[5][b] ................................................................. 48

H.R. Rep. No. 95-595 (1977) ................................................................................ 35

S. Rep. No. 95-989 (1978) .............................................................................. 35, 53

## Rules

Bankr. Rule 3020 ............................................................................................ 67, 68

Bankr. Rule 3020(e) .............................................................................................. 67

K&E 16165851.3

The Reader's Digest Association, Inc. ("**_Reader's Digest_**") and its affiliates listed on the title page above, as debtors and debtors in possession (collectively, the "**_Debtors_**"), submit this memorandum of law in support of confirmation of the Third Amended Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates [Docket No. 310] (as amended, the "**_Plan_**") pursuant to section 1129 of title 11 of the United States Code (the "**_Bankruptcy Code_**").[1]  The Debtors respectfully state as follows:[2]

## Preliminary Statement

1.       The Court should confirm the Plan, which preserves the going concern value of the business and maximizes recoveries to <u>all</u> creditors.  Faced with an unsustainable capital structure, over the last six months, Reader's Digest has reached agreements with their key economic stakeholders on the terms of a complicated, multi-national financial and operational restructuring.

2.       Prior to the Petition Date, Reader's Digest entered into a restructuring support agreement with its senior secured lenders and former stockholders that would reduce the company's debt burden by 75% — from more than $2.2 billion to $555 million — and provide the company with the capital necessary to finance its global operations through a restructuring process.

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

[2]    In further support hereof, and of confirmation of the Plan, the following documents are being filed concurrently herewith:  (i) the Declaration of Thomas A. Williams, Chief Financial Officer and Senior Vice President of Reader's Digest (the "**_Williams Declaration_**"); (ii) the Declaration of Albert L. Perruzza, Senior Vice President, Global Operations, Information Technology and Business Redesign of Reader's Digest (the "**_Perruzza Declaration_**"); (iii) the Declaration of Jeffrey R. Finger, a Director of Miller Buckfire & Co, LLC, in Support of the Plan (the "**_Finger Declaration_**");  (iv) the Declaration of Lawrence Young, a Managing Director of AlixPartners, LLP, in Support of the Plan (the "**_Young Declaration_**"); and (v) the Declaration of Douglas J. Friske, a Managing Principal of Towers Watson Pennsylvania Inc., in Support of the Plan (the " **_Declaration_**"), each of which is incorporated herein by reference.

K&E 16165851.3

3.     During these chapter 11 cases, the Debtors have reached agreement with the Creditors' Committee (which represents the interests of <u>all</u> unsecured creditors),[3] the company's noteholders who hold $628 million in claims, the landlord for the Debtors' long-time global headquarters, the landlords for the Debtors' new corporate headquarters locations, pension trustees in the United Kingdom and key trade constituencies.  The Debtors have entered into an agreement to sell their CompassLearning business, a non-core asset, and are actively seeking bond financing alternatives to lower their cost of capital.

4.     Indeed, for a case where the senior secured lenders have a deficiency claim of more than $600 million and have been permanently primed by a $150 million debt-in-possession financing facility, the Plan reflects extraordinary results: (i) many of the Debtors' trade creditors will be paid in full, allowing the Debtors to preserve valuable trade relationships, (ii) general unsecured creditors entitled to little or no recovery will receive their pro rata share of $4 million in cash, (iii) out-of-the money noteholders will receive warrants, (iv) thousands of current *and former* employees will continue to receive pension payments from the Debtors' over-funded, qualified pension plan, (v) retiree medical benefits will continue for more than 1,300 retired employees, and (vi) a dedicated management team is in place and properly motivated to transition the company out of chapter 11 and achieve cost-savings and performance results that will drive value for the benefit of the new stakeholders.

5.     One objection to the Plan remains — whether the Plan unfairly discriminates by treating holders of general unsecured claims different than trade creditors whose continued

---

[3]     On August 31, 2009, the United States Trustee for the Southern District of New York (the "***U.S. Trustee***") appointed the Committee, which initially included seven members of the Debtors' key unsecured creditor constituencies: four trade creditors, two noteholder representatives and one Retiree (as defined herein).   On October 9, 2009, the U.S. Trustee increased the Committee to eleven members by adding three additional Retirees and one additional trade creditor.  The increase in Committee size followed a request by the Retirees to appoint a separate statutory committee of retirees in these cases, which was denied.

support generates value and goodwill essential to the going concern enterprise.  The objection comes from of a group of approximately 250 former executives, managers and freelancers (the "***Retirees***") who have unsecured claims against the Debtors because the Debtors are no longer able to fund certain supplemental retirement benefits provided through several non-qualified retirement plans or deferred compensation arrangements (the "***Non-Qualified Plans***").

6.      The Debtors recognize the human hardship the bankruptcy (and proposed Plan treatment) imposes on certain of the less fortunate Retirees.  Some of the Retirees have not yet been fully paid out (or, in very few cases, received any payment) on the money they may have invested in certain programs and were not given the opportunity to cash out as part of the 2007 leveraged buy out.  Undoubtedly, for some Retirees, their claims to non-qualified retirement benefits constitute a large portion of their anticipated retirement income. Indeed, the greatest hardship likely falls on the Retirees with the smallest claims.  As reflected in several of the letters filed with the Court, the total *amount* of claims among the class of Retirees is disproportionately allocated to a small number of current and former senior executives.[4]

7.      Yet no amount of sympathy for the Retirees alters the Debtors' duty to reorganize the company according to the provisions set forth in the Bankruptcy Code.  The Plan provides Retirees with more than what they are entitled to under the law and, for the reasons set forth herein, the unfair discrimination objections should be overruled.

8.      The facts related to this controversy are not in dispute:

- The Retirees claims are general unsecured claims.  Although some of the claims relate to a supplemental executive retirement plan and deferred compensation plans to which certain Retirees have contributed a portion of their compensation

---

[4]     The top 18 Claims related to the Non-Qualified Plans (6% of the approximately 300 claims related to the Non-Qualified Plans, which include current employees) account for $39 million, or 50%, of the total dollar amount of claims.  The top four Retiree Claims (all held by the most senior level former executives) represent $18 million, or 23%, of the $78 million in total Non-Qualified Claims.

that has not been repaid,[5] money invested in such programs constitutes property of the estate. Unlike shareholders who will see their entire equity stake wiped out under the Plan, the Plan provides for a cash recovery to the Retirees as set forth below.

- The Plan does not impair the benefits of the Retirees that are protected by section 1114 of the Bankruptcy Code. There are approximately 1,300 retirees currently receiving medical benefits from the Debtors, including the vast majority of the participants in the Non-Qualified Plans. The accumulated benefit obligation associated with the Debtors' postretirement medical and dental plans is approximately $18.4 million. Funding these benefits will cost approximately $4 million per year.

- Importantly, the Debtors also maintain a *qualified* cash balance defined benefit retirement plan (the **"Retirement Plan"**) that currently has approximately 4,800 participants (approximately 3,500 are inactive employees) and which is *over-funded*. Payments under the Retirement Plan are not affected by these chapter 11 cases and participants will continue to receive benefits under the Retirement Plan. The Debtors believe the vast majority of the Retiree participants in the Non-Qualified Plans also participated in the Retirement Plan, which has an accumulated retirement benefit obligation of approximately $406 million.[6] The Debtors estimate that more than 80% of the Retirees participating in the Non-Qualified Plans will continue to receive (or have received via lump sum payments) benefits under the qualified Retirement Plan.

- The unsecured claims of the Retirees related to the supplemental Non-Qualified Plans are not entitled to any recovery. Unsecured creditors in these cases are out of the money as Reader's Digest is worth approximately $600 million less than the prepetition senior bank debt. As noted by counsel for the Retirees at the Disclosure Statement Hearing, "[t]here's no doubt, I think, if this were an out and out litigation no money would flow to the unsecureds. I'm [not] here to argue that point, your Honor."[7]

- While the Debtors would of course desire to see the Retirees receive additional consideration, the Retirees, like holders of general trade claims, litigation claims and lease and contract rejection damage claims in Class 5 (General Unsecured Claims), are not providing ongoing support to the reorganized company.

---

[5]  Less than $5 million of the $78 million of Claims related to the Non-Qualified Plans represent claims by Retirees who elected to invest their own money in certain of the Non-Qualified Plans and have not yet received payments up to the full amount invested.

[6]  All of the accumulated postretirement benefit obligation/projected benefit obligation information ("**PBO**") referenced herein is based upon the Actuarial Valuation Report for the Fiscal Years Ending June 30, 2008 and June 30, 2009 for The Reader's Digest Association, Inc. U.S. Pension and Postretirement Benefit Plans (the "**Mercer Report**"), attached as Exhibit A to the Declaration of Thomas A. Williams filed in support hereof.

[7]  Disclosure Statement Hr'g. Tr., 16:2-4, Nov. 24, 2009.

K&E 16165851.3

- The Debtors have unused funds available under the $25 million basket authorized as part of the first-day Critical Trade Order sufficient to pay the claims in Class 4 (Ongoing Operations Claims) in full. These claims do not need to be paid under the Plan.

9.     The Debtors have worked diligently to address this Court's concerns expressed at the Disclosure Statement hearing. Specifically, the Court asked whether Class 4 is limited to only those vendors who provide a net benefit to the estates. The Debtors have determined with great diligence which vendors would be placed in Class 4 and the total payments expected to be made trade creditors in Class 4 will be approximately $6.5 million, which, as noted, is within the authority already granted in the Critical Trade Order entered on the first day of these chapter 11 cases. Through application of selective criteria for determining Class 4 Claims (all as more fully set forth in the Declaration of Albert Perruzza filed in support hereof), the Debtors have narrowly tailored the payments in full to Class 4 to achieve the objective of the discriminatory treatment—to preserve the goodwill and associated value of important trade creditors who will continue to provide a net benefit to the company.

10.     Moreover, the Debtors worked with the senior secured lenders in an effort to improve the recoveries to the Retirees. One element of an unfair discrimination analysis is whether the Plan can be confirmed without the discrimination.[8] In this case, it is not possible to confirm a plan that pays all $110-120 million of general unsecured claims in full. The lenders would not, and cannot be expected to, subordinate their recovery to all general unsecured claims. It makes perfect sense, on the other hand, that the lenders — who are financing the Debtors' operations — would agree to allocate a portion of their recovery to the Debtors' important trade

---

[8] *See In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) ("for discriminatory treatment of claims to be fair, four tests must be satisfied: whether (i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without discrimination, (iii) the discrimination is proposed in good faith and (iv) the degree of discrimination is in direct proportion to its rationale" but also noting that the second prong assessing whether the plan cannot be consummated without discrimination is not dispositive of the question of unfair discrimination).

K&E 16165851.3

partners in order to generate goodwill and drive go-forward enterprise value in an effort to improve the value of the business.

11.     Alternatively, the Plan could be amended to place <u>all</u> general unsecured claims in one class — including critical trade claims, non-critical trade claims, Retiree claims and, importantly, the unsecured deficiency claims of the senior secured lenders (as the lenders would not waive their deficiency claim in this alternative plan structure).  In that scenario, *i.e.,* if the Retirees were to succeed in their objection to have all unsecured claims treated equally <u>and</u> if the lenders would consent to the same amount of dollars being paid to unsecured creditors, the holders of general unsecured claims, including the Retirees, would be entitled to share in less than  $1 million in additional value.[9]

12.     This alternative plan structure would accomplish nothing.  The Debtors would lose the significant operational benefits of paying their ongoing trade vendors in full, and the additional value that <u>may</u> flow to Class 5 Claims would not meaningfully improve recoveries to the $110-120 million of Claims estimated in Class 5, including those of the Retirees.  Indeed, in a scenario where the Debtors would enjoy no operational benefits from paying out of the money unsecured claims, there would be little reason for the lenders to agree to provide any recovery at all out of their pockets to unsecured creditors.

13.     Instead, in an effort to address the hardship faced by the less fortunate Retirees, and to direct funds where they are needed most, the Prepetition Lenders have now agreed to allow the Debtors to allocate up to $1 million in cash, which the Debtors will pay, on a post-Effective Date basis, to certain qualifying Retirees.[10]  The lenders have agreed to do this at the

---

[9]     *See* Williams Declaration, at ¶ 13.

[10]    Within sixty days of the Effective Date, the Debtors will establish a process, which will be communicated to the Retirees, regarding the eligibility and application requirements for hardship funds.  The Debtors will use their

Debtors request without conditions and purely for the purpose of further mitigating economic harm for certain hardship cases.

14. In light of the relatively small size of the critical trade class that will be paid under the Plan, and with this new concession by the Prepetition Lenders, the Plan more than meets the unfair discrimination challenges for all the following reasons:

- There are legitimate, reasonable business reasons supporting the disparate treatment of the dissimilar Claims in Classes 4 and 5;

- The Plan cannot be consummated absent the discrimination because the senior secured lenders have not agreed (and will not agree) to subordinate their claims to all general unsecured creditors; they have, however, required as a condition to their debt for equity exchange that ongoing operations claims be paid in full;

- The Debtors have carefully, and in good faith, determined the class of vendors slated for Class 4 treatment based on the valuable contributions the Class 4 Claimants have made and will continue to make to the Debtors' ongoing operations;

- Paying the Claims of this select group of important trade creditors is necessary to the success of these reorganization efforts and is already fully authorized pursuant to the Critical Trade Order;

- The degree of disparate treatment is directly related to the rationale for favoring the Debtors' vendors who will generate substantially more value than the amount being paid; and

- The discrimination does not result in any prejudice to the dissenting Class 5 creditors, who have no entitlement to the money otherwise allocated to Class 4.

15. Accordingly, the Debtors request that the Court overrule the objections to confirmation and confirm the Plan in furtherance of the rehabilitative policies of the Bankruptcy Code.

---

own employees (or employees of The Reader's Digest Foundation) who have experience in managing these types of charitable funds to administer the program.

16.     This memorandum is organized into two parts:  Following a discussion the relevant background, Part I sets forth the Debtors' response to the unfair discrimination objection filed by the Reader's Digest Retiree Group, LLC (the "***RDRG***").[11]  Part II presents the Debtors' "case in chief" that the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  In addition, the Debtors have filed several declarations in support of the Plan, which are referenced where appropriate throughout the Memorandum.

## Background

17.     To understand the unfair discrimination dispute, the Court needs to understand the composition of the Debtors' general unsecured creditors.

## A.     The Debtors' Unsecured Creditors

(i)     The Trade Claims

18.     Over the past several years and prior to the commencement of these chapter 11 cases, the Debtors have realized significant cost savings through the rationalization of their supply chain.  As a result, in large part, of various outsourcing and other similar initiatives, the Debtors have substantially streamlined the costs associated with their supply chain, maintenance, repair and operations functions, resulting in the following trade vendor characteristics:[12]

---

[11]   One other substantive Plan objection was filed by one of the Debtors' non-critical trade vendors, Opera Solutions, LLC ("***Opera***"), because its claim has been classified in Class 5 of the Plan.  *See* Objection of Opera Solutions, LLC To Third Amended Proposed Joint Chapter 11 Plan Of Reorganization Of The Reader's Digest Association, Inc. And Its Debtor Affiliates [Docket No. 451].  Opera asserts substantially the same "unfair discrimination" objections as the RDRG (and joined in the objection of RDRG).  Therefore, the Debtors submit that the Reply to the RDRG Objection set forth in Part I hereto applies equally to the Opera Objection.  *See also* Perruzza Declaration at ¶ 24-28.

All other objections to the Plan relate to the Debtors' proposed assumption of certain executory contracts and unexpired leases and the related cure amounts payable in connection therewith.  The Debtors are working with the objecting parties to resolve the disputes and will update the Court on the status of these objections prior to or at the Confirmation Hearing.

[12]   *See* Perruzza Decl., at ¶ 6.

- The Debtors' top 20 vendors account for more than $400 million (or 55%) of the Debtors' total annual vendor spend.

- The Debtors trade relationships are in large part contractual, with payments to contract counterparties accounting for more than $280 million in total annual spend. The Debtors' top seven strategic outsourcing partners alone account for approximately $150 million in annual spend.

- The Debtors nevertheless have a large number of vendors, including individual freelancers or providers of proprietary content or services. These vendors generally do not account for significant spend in terms of dollars per vendor but make very significant contributions of intellectual property vital to the product creation at the very heart of the Debtors' revenue opportunities.

- The Debtors also have non-contractual relationships with critical suppliers, including: paper suppliers, packaging, product fulfillment and distribution suppliers; suppliers of proprietary music product and television commercial airtime to Debtors' Direct Holdings business; and have freelancer and other third party vendors that provide unique creative content, marketing support and other critical support to Debtors' businesses.

19.     As of the Petition Date, the Debtors estimate they had outstanding accounts payable of approximately $105 million.[13] Treatment of the Debtors' prepetition trade claims in connection with these chapter 11 cases is as follows:

- Approximately $55 million has been or will be paid in connection with contract "cure" payments, either through early assumptions authorized by this Court or contracts being assumed in connection with the Plan. The Debtors have also extracted savings of more than $5 million as a result of agreed cure reductions so total payments and associated savings related to contract cure payments account for approximately $60 million of the Debtors' prepetition trade debt.

- Approximately $18 million has been paid out during these cases pursuant to the Court's Order, dated September 17, 2009 [Docket No. 91] (the "**_Critical Trade Order_**") authorizing the Debtors to pay prepetition claims of certain critical suppliers up to $25 million. As a result, the Debtors have approximately $7 million in unused funds available under this

---

[13]    Approximately $5 million of the amount reflected in the Debtors' accounts payable system relates to tax payables, customer obligations, employee benefit or other employee related payments, which have been paid during the course of these Chapter 11 Cases pursuant to the authority set forth in one or more "first-day" orders.

K&E 16165851.3

basket.[14] Through the payments made to date, the Debtors have also extracted approximately $2 million in agreed concessions on prepetition claims from the trade agreement counterparties, so critical trade payments and related savings account for approximately $20 million of the Debtors' prepetition trade debt.

- Of the approximately $20 million in trade claims that have not been addressed through contract assumptions or critical vendor payments, approximately $13 million are included in Class 5 (General Unsecured Claims) and will receive their *pro rata* share of the $4 million "pot" available to satisfy all Class 5 General Unsecured Claims.

- Through the work of the Debtors, less than $7 million of Claims have been selected for payment in full (without interest) as Class 4 Ongoing Operations Claims, which is within the authority granted by the Critical Trade Order. The Perruzza Declaration sets forth the process the Debtors used to determine critical vendor status.

(ii)     The Retiree Claims

20.     The claims held by the Retirees objecting to confirmation are generally related to their participation in a series of unfunded, non-qualified retirement and other deferred compensation arrangements that provide supplemental pension payments.[15]

21.     The Debtors' qualified Retirement Plan has approximately 4,800 participants (approximately 3,500 are inactive employees) and is over funded. Payments under the Retirement Plan are not affected by these chapter 11 cases and participants will continue to receive benefits under the Retirement Plan.[16] The Debtors designed certain of the Non-Qualified

---

[14]     The Debtors also received authority to pay up to $8 million, in addition to the $25 million, to certain lien claimants. Approximately $140,000 has been spent under the Lien authority provided in the Critical Trade Order.

[15]     In addition to the claims held by approximately 250 former employees of the Debtors, the total liability associated with the Non-Qualified Plans also includes liabilities to approximately 50 active employees. Claims held by active employees comprise approximately $5.5 million of the total $78 million (or 7%) of the claims associated with the Non-Qualified Plans.

[16]     Indeed, the docket reflects a noticeable absence of objections (or any involvement) by the Pension Benefit Guaranty Corporation in these chapter 11 cases because, unlike other recent and highly publicized chapter 11 cases where pensioners are losing or reducing their ERISA qualified benefits based on the deterioration of assets in many company pension plans, the Debtors' pensioners are in the relatively unique position of having a fully funded program.

K&E 16165851.3

Plans to supplement and complement pension benefits provided under the qualified Retirement Plan, but should not be confused with the kind of pension benefits protected under the Employee Retirement Income Security Act of 1974 ("***ERISA***").

22.     The following is a brief summary of the affected "Non-Qualified Plans" and the corresponding participant information, as well as the associated projected benefit obligations/accumulated postretirement benefit obligations (collectively, the "***PBO***") based on the Mercer Report, attached as Exhibit A to the Williams Declaration:

- Excess Benefit Retirement Plan: The Excess Plan provided additional retirement benefits on income above the annual compensation limits set forth in the tax law as well as in the qualified Retirement Plan itself (*e.g.,* for the 2009 plan year the limit was $245,000; in prior years it was less). In other words, at higher levels of annual income (above $245,000 in 2009), the company could not contribute to the qualified Retirement Plan for amounts earned above this limit and would, instead, contribute additional retirement benefits based on the income above the limit to the Excess Plan. By definition, therefore, the Excess Plan was only open to participants considered highly compensated by the Internal Revenue Service. Excess plans like the Debtors' are very common in conjunction with defined benefit contribution plans like the Debtors' qualified Retirement Plan. The Debtors believe approximately 115 Retirees were eligible or receiving benefits under the Excess Plan. There are also approximately 50 active employees eligible for the Excess Plan, none of whom have received any payments. The Excess Plan PBO liability represents approximately $21 million or 28% of the total liability related to the Non-Qualified Plans.

- Executive Retirement Plan: Employees in this retirement plan were among the most senior and highly compensated levels in the company. The plan provided for enhanced retirement benefits for life and, in some cases, their spouses life. The Debtors believe approximately 16 executive level individuals participated in this plan, including former CEO and Group Presidents. The Executive Retirement Plan represents approximately $18 million or 24% of the total PBO liability related to the Non-Qualified Plans.

- Executive Cash Balance Plan: This plan, like the Executive Retirement Plan, provided the most senior and highly compensated executives with benefits that were complementary, and in addition to, the cash balance provisions of the qualified and Excess Retirement Plans. The four executive level individuals participating in this plan (former CEO, CFO and two Group Presidents) account for approximately $2 million or 3% of the total PBO liability related to the Non-Qualified Plans.

K&E 16165851.3

- <u>Supplemental Employee Retirement Plan (SERP)</u>: The SERPs were individual agreements with certain management employees that provided for supplemental retirement benefits. Prevalent in the 1980's, SERP plans gave employees the opportunity to contribute pre-tax income, generally over a five year period, either directly or, in most cases, through deductions from bonus or salary payments. In exchange for the employee contributions, the company made an unsecured promise to provide a fixed dollar retirement benefit, which would be paid out over 15 years beginning at age 65 (or 55 with a 3% per year reduction factor). Generally, by the second annual payment, the employee has received more in benefits than he/she paid into the plan, without taking into account the tax savings and time value of money implicit in the initial contributions.[17]

  There are 75 retired and three active participants with balances due under the SERPs. There are twelve individuals who have not yet commenced payments under their SERP, including two active employees. 66 participants have already received more in benefits than they deferred in income. The SERP liability represents approximately $23 million or 30% of the total non-qualified liability.

- <u>Deferred Compensation Plan</u>:[18] This plan provided management level employees the opportunity to defer bonus payments for retirement and tax planning purposes. Notably, the Debtors provided participants in the deferred compensation plan the opportunity to withdraw their deferrals in connection with the 2007 leveraged buy out. There are 20 participants who have approximately $3.6 million in this plan. Together with the $3.9 million liability associated with two Direct Holdings deferred compensation arrangements, these plans represent approximately 10% of the total PBO liability associated with the Non-Qualified Plans.

- <u>Direct & Roving Editor Arrangements</u>: There is no actual "plan" associated with the "Direct and Roving Editors Plan." In large part, it is the aggregate of individual agreements for monthly or annual retirement payments to certain individuals, including certain writers, editors and researchers who generated

---

[17] When SERP programs like the Debtors were implemented, companies often used corporate-owned life insurance (COLI) as a "hedge" against the cost of the program. Generally, companies expected the long term returns from the policies would recover the cost of the program over the life expectancy of the insured. Some of the correspondence the Court received from the Retirees suggest there may be recourse to the COLI policies for certain SERP arrangements. All COLI policies purchased in connection with the SERP, however, were for the benefit of the corporation and were recorded on the books as assets of Reader's Digest. *See* Williams Decl. at ¶ 77.

[18] In addition to The Reader's Digest Association Inc. Deferred Compensation Plan described here, debtor Direct Holdings U.S. Corp. has legacy individual deferred compensation arrangements with two individuals who were never employees of any of the Debtors in these chapter 11 cases. Obligations related to those arrangements are estimated to be $3.9 million.

K&E 16165851.3

stories for the flagship magazine.[19]  Generally, and distinct from the plans described above, the benefit amounts are not large, ranging from about $1,000 to $20,000 annually.  Some of these individuals also had small qualified pensions from the company, but many of them were "roving" writers (freelancers) who contributed to the magazine on an ad-hoc basis and may not have been employees of the Company.  All of these non-qualified promises were unsecured, with payments made directly by the company out of general corporate assets.

There are approximately 55 individual participants in these arrangements who are likely the most impacted by these chapter 11 cases and the cessation of benefits.  The Direct and Roving Editors arrangements represent approximately $5.4 million, or 7%, of the total non-qualified liability.[20]

## B.    The Debtors' Plan and Disclosure Statement

23.    On October 9, 2009, the Debtors filed the initial versions of their proposed Plan and Disclosure Statement [Docket Nos. 162 and 163].  Subsequently, the Debtors filed amended versions of the Plan and Disclosure Statement on November 3, 2009 [Docket Nos. 219 and 220][21] and again, with additional changes, on November 19, 2009 [Docket Nos. 291 and 292],[22] for the purpose of incorporating comments from, and settlements with, key constituents, as well as comments from the Court.  After further negotiations and in an effort to address concerns raised by the Creditors' Committee, on November 24, 2009, the Debtors filed a further amended Plan and Disclosure Statement [Docket Nos. 309 and 310],[23] which, among other things,

---

[19]    Claims under this "plan" also include those held by nine former directors who had been receiving pensions of $32,000 per year.

[20]    Eliminating the claims of the nine former directors, the claims represent $3.1 million, or 4%, of the total Non-Qualified liability.

[21]    First Amended Proposed Joint Chapter 11 Plan of The Reader's Digest Association, Inc. and Its Debtor Affiliates [Docket No. 219] and Disclosure Statement for the First Amended Proposed Joint Chapter 11 Plan of The Reader's Digest Association, Inc. and Its Debtor Affiliates [Docket No. 220].

[22]    Second Amended Proposed Joint Chapter 11 Plan of The Reader's Digest Association, Inc. and Its Debtor Affiliates [Docket No. 291] and Disclosure Statement for the Second Amended Proposed Joint Chapter 11 Plan of The Reader's Digest Association, Inc. and Its Debtor Affiliates [Docket No. 292].

[23]    Disclosure Statement for the Third Amended Proposed Joint Chapter 11 Plan of The Reader's Digest Association, Inc. and Its Debtor Affiliates [Docket No. 309] and Third Amended Proposed Joint Chapter 11 Plan of The Reader's Digest Association, Inc. and Its Debtor Affiliates [Docket No. 310].

K&E 16165851.3

improved the treatment for Class 5 (General Unsecured Claims) by increasing the total funding available for distribution to the class from $3 million to $4 million, and provided for a distribution of New Warrants to Class 6 (Senior Subordinated Noteholders). As a result of the agreement reflected in the revised Plan, the Creditors' Committee withdrew its objection to the Plan, noting "[t]here was a clear improvement from the perspective of the majority of the committee."[24]

24. At the Disclosure Statement hearing held on November 24, 2009, the Court approved the Disclosure Statement and related solicitation and voting procedures, subject to the provision of certain modifications noted on the record of the Disclosure Statement hearing. On November 30, 2009, the Debtors filed the solicitation versions of the Plan and Disclosure Statement reflecting the Court's comments [Docket Nos. 316 and 317],[25] and the Court entered the order approving the Disclosure Statement [Docket No. 318].[26] Thereafter, the Debtors commenced solicitation for the Plan in compliance with the Disclosure Statement Order.

---

[24] *See* Hr'g Tr., 11:7-8, Nov. 24, 2009; *see also* Creditors' Committee Letter in Support of Plan dated Nov. 30, 2009 ("The Debtors' prepetition debt structure is daunting. Furthermore, in this very difficult economic environment, the publishing and direct marketing industries are facing unique and difficult challenges. While the Committee sought to obtain greater recoveries for the General Unsecured Creditors, it concluded that the recovery provided for in the Plan is the best recovery that could be obtained under the extremely difficult and challenging circumstances of these cases. The distributions provided for in the Plan reflect the efforts of the parties to resolve and compromise fairly the issues created by these Chapter 11 cases and provide the best opportunity for the continuity of the business of the Debtors. The Committee believes that the Plan is in the best interests of the Debtors, their estates and creditors.").

[25] Disclosure Statement for the Third Amended Proposed Joint Chapter 11 Plan of The Reader's Digest Association, Inc. and Its Debtor Affiliates [Docket No. 316] and Third Amended Proposed Joint Chapter 11 Plan of The Reader's Digest Association, Inc. and Its Debtor Affiliates [Docket No. 317].

[26] Order (I) Approving the Adequacy of the Debtors' Disclosure Statement, (II) Fixing Dates and Deadlines Related to Confirmation of the Plan, (III) Approving Certain Procedures for Soliciting and Tabulating the Votes on, and for Objecting to, the Plan, (IV) Authorizing the Retention of Financial Balloting Group LLC as Securities Solicitation Agent, and (V) Approving the Manner and Form of the Notices and Other Documents Related Thereto [Docket No. 318].

25.     On December 11, 2009, the Debtors filed the Plan Supplement (as defined in the Plan) [Docket No. 358].[27]  The Debtors supplemented the Plan Supplement on December 30, 2009 [Docket No. 424][28] and January 6, 2010 [Docket No. 466].[29]  Further, on January 8, 2010, the Debtors amended certain exhibits to the Plan Supplement [Docket No. 514].[30]

26.     On December 16, 2009, the Debtors filed the schedules of executory contracts and unexpired leases to be assumed or rejected in connection with the Plan [Docket Nos. 366 and 367] (the "**Contract/Lease Schedules**").[31]  Prior to the Confirmation Hearing, the Debtors will be filing amended Contract/Lease Schedules to (a) reflect the Debtors' decision to reject certain agreements previously scheduled for assumption and/or (b) to resolve objections of certain counterparties with respect to cure amounts.  The updated schedules will also reflect that the Debtors are assuming amended employment agreements that will extend the employment of the current Chief Executive Officer and Chief Financial Officer on the terms set forth in the letter agreements entered into in connection with the Restructuring Support Agreement.

27.     The Debtors will also file the proposed (i) Findings of Fact, Conclusions of Law and Order Confirming the Debtors' Joint Plan of Reorganization and (ii) a chart summarizing the other objections to the Plan (which, as above noted, relate to the Debtors' proposed assumption

---

[27]  Plan Supplement for the Third Amended Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates [Docket No. 358].

[28]  First Supplement to the Plan Supplement for the Third Amended Proposed Joint Chapter 11 Plan or Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates [Docket No. 423].

[29]  Second Supplement to the Plan Supplement for the Third Amended Proposed Joint Chapter 11 Plan or Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates [466].

[30]  Amended Exhibits to the Plan Supplement for the Third Amended Proposed Joint Chapter 11 Plan or Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates [Docket No. 514].

[31]  Schedule of Executory Contracts and Unexpired Leases Proposed to Be Rejected Pursuant to the Third Amended Proposed Joint Chapter 11 Plan or Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates [Docket No. 366] and Schedule of Executory Contracts and Unexpired Leases Proposed to Be Rejected Pursuant to the Third Amended Proposed Joint Chapter 11 Plan or Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates [Docket No. 367].

of certain executory contracts and unexpired leases and the related cure amounts payable in connection therewith) and status thereof prior to the Confirmation Hearing.

## C.    Voting Results

28.    Contemporaneously herewith, the Debtors filed the voting certifications of the Court-appointed solicitation agents, Kurtzman Carson Consultants LLC and Financial Balloting Group (collectively, the *"Voting Certifications"*).[32]

29.    As summarized in the chart below, and set forth in greater detail in the Voting Certifications, the Plan has been overwhelmingly accepted by the vast majority of creditors entitled to vote on the Plan.

30.    With the exception of Class 5, Classes 3, 4, 6 and 10 all voted to accept the Plan by overwhelming majorities in both dollar amount and numbers:

| Class | Ballots Voting to Accept | | Result |
| | % Number | % Amount | |
|---|---|---|---|
| **Class 3:** Prepetition Credit Agreement Claims | 100% | 100% | Voted to Accept |
| **Class 4:** Unsecured Claims Related to Operations | 99 % | 99% | Voted to Accept |
| **Class 5:** Other General Unsecured Claims | 52% | 34% | Voted to Reject |
| **Class 6:** Senior Subordinated Note Claims | 99% | 99% | Voted to Accept |
| **Class 10:** Intercompany Claims | 100% | 100% | Voted to Accept |

31.    Class 5 voted by 66% in dollar amount to reject the Plan.  As discussed below, the Debtors satisfy the "cram down" requirements of section 1129(b) of the Bankruptcy Code with respect to the Rejecting Class.

---

[32]    *See* Affidavit of Alison M. Tearnen, of Kurtzman Carson Consultants LLC Pursuant to Local Bankruptcy Rule 3018-1(a) with Respect to the Tabulation of Votes (the "*KCC Voting Certification*"); Affidavit of Jane Sullivan of Financial Balloting Group LLC with Respect to the Tabulation of Votes in Support of the Plan (the "*FBG Voting Certification*").

### D.     Plan Modifications

32.     The Debtors are making certain non-material modifications to the Plan, including amending the Plan to reflect the agreement reached with the Holders of Class 6 Senior Subordinated Notes, which modifies the terms of the New Warrants to provide that the strike price associated with the New Warrants will accrete by 5% per annum, rather than 10% per annum, in the fourth year of the New Warrant term, and that the Debtors will pay the reasonable and documented fees of the advisors to the Ad Hoc Noteholder Group up to a cap of $100,000. The Debtors will file shortly a blackline reflecting the modification with the Court.

33.     The Debtors submit that none of the Plan modifications adversely affects the treatment of those Classes of Claims that voted to accept the Plan pursuant to, and in accordance with, section 1127(a) of the Bankruptcy Code.[33]

## Argument

### Part I.
### Reply to Unfair Discrimination Objections

34.     The Plan does not discriminate unfairly with respect to the impaired Class 5 (General Unsecured Claims) that has voted to reject the Plan.  The Objections filed by the Retirees and Opera should be overruled.[34]

### A.     The Bankruptcy Code Only Prohibits Discrimination That Is "Unfair;" The Debtors' Plan Does Not Unfairly Discriminate.

35.     Section 1129(b) of the Bankruptcy Code does not prohibit discrimination in treatment between classes, but rather it prohibits only discrimination that is "unfair."[35]  Notably,

---

[33]     11 U.S.C. § 1127(a) ("The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of the title. After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.").

[34]     *See* Perruzza Declaration at ¶24-28.

the Bankruptcy Code does not set forth a standard for determining when "unfair discrimination" exists.[36]  Rather, courts typically look to the particular facts and circumstances of the case.  Generally, courts have found that a plan unfairly discriminates in violation of section 1129(b) only if similarly situated claims are treated differently *without a reasonable basis for the disparate treatment*.  There is no unfair discrimination where two classes receiving different treatment are comprised of dissimilar claims or interest.[37]  Likewise, there is no unfair discrimination if, taking into account the particular facts and circumstances of the case, there is a reasonable basis for the disparate treatment.[38]

36.     In analyzing the fairness of discrimination, courts in this circuit have consistently applied a four-part test (the "***Buttonwood Test***"), which considers whether (a) there is a reasonable basis for discriminating, (b) the debtor cannot consummate the plan without discrimination, (c) the discrimination is proposed in good faith and (d) the degree of

---

[35]     *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177-8 (Bankr. S.D.N.Y. 1989) ("In the context of reorganization, a majority of both cases and commentators have rejected the concept that all creditors of equal rank must receive equal treatment.") (citing *In re Chateaugay*, 80 B.R. 279 (S.D.N.Y.1987)); *In re Jewish Memorial Hospital*, 13 B.R. 417, 420 (BRL) (Bankr. S.D.N.Y. 1981) ("the Bankruptcy Act does not establish inexorable rules for distribution that can never be deviated from in the interest of justice and equity").

[36]     *See In re 203 N. LaSalle St. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established").  *See also Johns-Manville*, 68 B.R. at 636 ("The language and legislative history of the statute provides little guidance in applying the 'unfair discrimination' standard."); *see, e.g.*, *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances.").

[37]     *See In re Worldcom, Inc.*, No. 02-13533, 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003) (unfair discrimination occurs "where similarly situated classes are treated differently without a reasonable basis for the disparate treatment.").

[38]     *See In re Charter Communications*, No. 09-11435, 2009 WL 3841971, at * (JMP) (Bankr. S.D.N.Y. Nov. 17, 2009) ("The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination") (citing Buttonwood, 111 B.R. at 63); *WorldCom*, 2003 WL 23861928, at *59 ("a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment."); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57 (Bankr. S.D.N.Y. 1990) (same); *Mercury Capital Corp. v. Millford Connecticut Assoc., L.P.*, 354 B.R. 1, 10 (D. Conn. 2006) ("A plan unfairly discriminates ... if similar claims are treated differently without a reasonable basis.").

K&E 16165851.3

discrimination is in direct proportion to its rationale.[39]  In giving effect to the proscription against

unfair discrimination (*i.e.*, to prevent the "unfair" preferential payment of one creditor class *to

the detriment* of another), courts have also appropriately considered the actual harm (if any) to

the dissenting class resulting from the discrimination.[40]

   37. Using this analytical framework, the different treatment of Classes 4 and 5 under

the Plan, while discriminatory, is not "unfair" because unsecured creditors are not entitled to any

recovery and there is a reasonable, legitimate basis for the discrimination in treatment among the

two Classes based on the very *different* legal and factual nature of the claims.

   (i) There Are Legitimate Business Reasons that
     Justify the Different Treatment of Class 4 and Class 5.

   38. The first, and most important, **Buttonwood** factor is whether there is a legitimate

reason to justify the discriminatory treatment.  In this case, there is a legitimate and "fair" reason

to differentiate treatment between classes because Class 4 Claims are dissimilar to Class 5

Claims.[41]  Class 4 consists of claims of holders that provide a "net benefit" to the estate through

the terms of their ongoing business relationships with the company while Class 5 consists of

claims of holders that do not provide a net benefit to the estate.  As courts in this and other

---

[39] *See In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) ("for discriminatory treatment of claims to be fair, four tests must be satisfied" but also noting that the second prong assessing whether the plan cannot be consummated without discrimination is not dispositive of the question of unfair discrimination).

[40] *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (noting that courts "have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination."); *see also, In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (presumption of unfair discrimination can be rebutted "by showing that, outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset its gain.") (citing *In re Dow Corning Corp.,* 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999))

[41] *See In re Chateaugay Corp.,* 177 B.R. 176, 186 (Bankr. S.D.N.Y. 1995) (allowing plan to "classify separately and treat differentlyclaims that are similar" if a "rational basis exists to do so"), *af'd sub nom., Aetna Cas. & Sur. Co. v.Clerk (In re Chateaugay Corp.)*, 89 F.3d 942 (2d Cir. 1996).

districts have repeatedly found, simply because two classes of claims are of equal priority does not mean that they are similarly situated.[42]

39.     Class 4 consists of important trade creditors who provide goods and services utilized in day-to-day operations. Specifically, the members of Class 4 are creditors who contribute actual value and otherwise benefit the company on a go-forward basis, and whose continued cooperation will enable the Debtors to maintain viable, competitive operations after emergence.[43] After a thoughtful and extensive selection process, the Debtors determined that paying the Claims of these trade creditors backstops the all-important message that everything is "business as usual," a key component to maintaining goodwill for the reorganized enterprise and to better position the Debtors for future economic viability.[44]

40.     Specifically, Class 4 consists of important vendors who remain unpaid for goods and/or services provided prior to the Commencement Date. These are vendors with whom the Debtors do not have long-term contracts being assumed under the Plan.[45] In most, if not all

---

[42]     *See Matter of U.S. Truck Co., Inc.*, 42 B.R. 790, 795 (Bankr. Mich. 1984) ("In a word, an analysis that "all unsecured claims are equal" is simplistic and mischievous. There is surely no satisfactory *a priori* rule that some types of unsecured claims may not be 'substantially similar.' . . . The Code does not require such a lock-up [of all non-nuisance unsecured claims in a single cell]."). In *In re Rochem*, 58 B.R. 541, 643 (Bankr.D.N.J. 1985) (discriminatory treatment was found to be reasonable "if premised on the basis of the claims in question," finding it was appropriate to treat the objecting creditor, a tort claimant whose claim was unliquidated and disputed, differently than an unsecured trade claimant); *In re 11,111 Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990) (separate classification and unequal treatment from unsecured creditors appropriate and discrimination not unfair where equity security creditors were aware of the debtor's financial condition and put their money at risk, such that they were "in a unique position to influence the ongoing financial and business operations of the debtor").

[43]     *See* Perruzza Decl., at ¶ 16; Williams Decl., at ¶ 59.

[44]     *See* Perruzza Decl., at ¶ 10-11; Williams Decl., at ¶ 63-64; *see also Chateaugay*, 89 F.3d at 949-50 ("Congress gave reorganizing debtors considerable flexibility in their treatment of general unsecured creditors to position themselves for future economic viability."); *In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc.*, 149 B.R. 306, 309 (Bankr. E.D.N.Y. 1992) (reasonable basis exists for separate classification and treatment because payment of one class of claims necessary to debtor's ability to continue to operate business); *see also In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) (citing cases) (separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business).

[45]     *See* Perruzza Decl., at ¶ 19.

instances, the payment term is set forth directly on the invoice or purchase order or otherwise agreed by the parties, meaning Class 4 Claims are day-to-day operations claims which, outside of the bankruptcy context, are short-term liabilities with a known maturity date.[46] In fact, the claims in Class 4 largely correspond to the types of claims the Debtors' described at the "first-day" hearing in these cases as presenting the greatest level of importance to the business, including paper suppliers, packaging, product fulfillment and distribution suppliers; suppliers of proprietary music product and television commercial airtime to the Debtors' Direct Holdings or "time life" business that cannot be replaced (or at least without substantial replacement costs).[47] Indeed, because the Debtors have reserved payments authorized under the Critical Trade Order, the Debtors already have authority to pay the full amount of Class 4 Claims under the Critical Trade Order (to which the Retirees did not object), the Plan treatment is hardly discriminatory at all, let alone "unfair," inasmuch as the Class 4 claimants arguably have a unique right to payment outside the Plan. In any event, it has long been recognized that the payment of higher recoveries

---

[46]   *Id.*; *see In re Adelphia Commc'ns.*, 368 B.R. 140, 276 (Bankr. S.D.N.Y. 2007) (separate classification and treatment of trade claims appropriate because trade claims are generally liquidated claims, as opposed to other unsecured claims, which include unliquidated litigation and rejection damage claims, because separate classification insulates the former against the risk that the latter are not capable of precise estimation); *In re U.S. Truck Co.*, 42 B.R. 790, 796 (Bankr. E.D. Mich. 1984) (unsecured trade claims and workers' compensation benefits found to be materially dissimilar based on differences in "salient legal characteristics" of claims, including contingent and open-ended aspects of workers' compensation benefits claims, warranting separate classification), *aff'd*, 800 F.2d 581 (6th Cir. 1986); *In re Rivers End Apts., Ltd.*, 167 B.R. 470, 487-88 (Bankr. S.D. Ohio 1994) (different treatment of the trade creditors – a higher distribution by virtue of much earlier payment – and the holder of a deficiency claim was justified because trade creditors "anticipate payment on a short-term basis" as opposed to lenders with deficiency claims who have "no reasonable anticipation of quick payment.).

[47]   *See generally* First Day Hr'g. Tr., 29-30 ("really those parties who are truly critical based on the criteria we've identified. And, really, no other source exists to get the product. We don't have any leverage."); *see also* Debtors' Motion For Entry Of Interim And Final Orders Authorizing Debtors To Pay Certain Prepetition Claims Of Critical Vendors And Lien Claimants, Approving Related Procedures And Authorizing And Directing All Financial Institutions To Honor All Related Payment Requests [Docket No. 8], at ¶¶ 22-30. *See also* Perruzza Decl., at ¶ 19, 21.

on account of claims that will generate a net benefit to the going concern enterprise does not constitute unfair discrimination.[48]

41.    By stark contrast, payment of the general unsecured claims included in Class 5 would provide no economic value to the Debtors on a go-forward basis and the Plan treats them accordingly.[49]   Indeed, Class 5 comprises the quintessential "no-benefit" claims that are almost always subject to impairment and discharge in bankruptcy, including contract and lease rejection damage claims (which arguably include the Retiree Claims related to unprotected, unfunded, non-qualified pension arrangements)[50] and general litigation claims.   Not only is there no legitimate reason to provide preferential treatment to these kinds of unsecured "rejection damage" claims, the Bankruptcy Code expressly reflects a policy of limiting or "capping" such claims.[51]

42.    Indeed, although the Debtors are sympathetic to the Retirees, as a legal matter, the Class 5 claims of the Retirees arise from the discontinuation, rejection or termination of

---

[48]   *See 203 N. Lasalle St. P'ship*, 126 F. 3d at 969 (noting differences in recoveries between trade creditors and deficiency judgment does not constitute unfair discrimination); *U.S. Truck Co.*, 800 F.2d at 587 (accepting the separate classification of creditor that had "a different stake in the future viability of the reorganized company" as supported by a legitimate business justification); *see also Mason v. Paradise Irr. Dist.*, 326 U.S. 536, 541-2 (1946) ("It has long been recognized in reorganization law that those who put new money into the distressed enterprise may be given a participation in the reorganization plan reasonably equivalent to their contribution. That rule is based on practical necessities."); *In re Frontier Holdings, LLC*, No. 08-112198, at ¶ 24 (RDD) (Bankr. S.D.N.Y. Sept. 10, 2009) (finding reasonable basis for disparate treatment among classes where the one class of interests were to be reinstated for the ultimate benefit of the reorganized debtor).

[49]   Although the Debtors are mindful that payment of the Retiree claims would generate goodwill in a charitable sense, in light of the losses being absorbed by the senior secured lenders, coupled with the continuing qualified pension and retiree medical benefits, payments to former employees who are no longer delivering value to the go-forward enterprise on account of these non-qualified, unsecured claims would be attenuated.

[50]   "Non-Qualified Retirement Plans" include (i) the Excess Benefit Retirement Plan, (ii) the Executive Retirement Plan, (iii) the Executive Cash Balance Plan, (iv) the 1988 Supplemental Employee Retirement Plan and related agreements, (v) the Director and Roving Editors Plan and/or related agreements or arrangements, and (vi) the Reader's Digest Deferred Compensation Plan or deferred compensation arrangements provided by any other Debtor.  *See* Discl. Stmt., at § IV.G.2(c).  To be clear, these claims are not "retiree benefits" within the meaning of section 1114 of the Bankruptcy Code.

[51]   *See, e.g.*, 11 U.S.C. § 502(b)(6) (capping rejection damage claims); 11 U.S.C. § 502(b)(7)  (capping damage claims arising under employment agreements).

unfunded, non-qualified retirement and other deferred compensation arrangements, which are essentially contractual arrangements between the Debtors and the participant. The significant liabilities associated with the Non-Qualified Plans are owed to *former* executives, managers, officers and directors who are no longer providing a service to the Debtors. The vast majority in amount of the claims (approximately $74 million out of the $78 million), relate to plans that were available only to former highly compensated individuals who qualified for participation in the Debtors' various 'top hat' plans[52] and who could reasonably be expected to have the business acumen to understand the nature of these supplemental benefit plans, including the investment risk (and divestiture options) associated with such arrangements. In all cases, the promises were unfunded and any money invested became property of the estate subject to the general claims of creditors.[53] In other words, quite unlike pension benefits provided under the Debtors' qualified Retirement Plan and subject to the statutory protections of ERISA, or retiree medical benefits subject to the protections of section 1114 of the Bankruptcy Code, there is simply no legitimate legal basis to differentiate the supplemental benefits claims included in Class 5 for special treatment.

---

[52] ERISA defines a "top hat" plan as: "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). "Congress exempted 'top hat' plans from ERISA's substantive protections because it believed that, unlike other employees, management and highly compensated employees have sufficient bargaining power to negotiate favorable deferred compensation plans and are capable of taking the risks attendant to such plans into account." *See In re Silicon Graphics, Inc.*, 363 B.R. 690, 697 (BRL) (Bankr. S.D.N.Y. 2007) (citing *RTC v. MacKenzie*, 60 F.3d 972 (2d Cir.1995) (Second Circuit "rejected the argument that participants in a deferred compensation plan are entitled to "a superior right to ... trust assets where [the participant's] claim to those assets was made prior to receivership" where assets of the plan were subjected to general creditors of the employers so that the plans' participants could potentially obtain tax benefits).

K&E 16165851.3

(ii)     The Proposed Treatment of Class 4 is Necessary to the Reorganization;
The Debtors Cannot Consummate the Plan Without the Discrimination

43.     As to the second **_Buttonwood_** factor, given the position of the Debtors' senior secured lenders, it is difficult to confirm a plan that forces the lenders to provide value to unsecured creditors. Although the Prepetition Lenders agreed as part of the Restructuring Support Agreement to fund ongoing operational trade payments out of their recoveries, they would not agree to subordinate their claims to creditors who were not supporting the reorganized company.[54]

44.     Consummation of the Plan without the disparate treatment between Classes 4 and 5 is, therefore, impossible without the requisite consents. The Prepetition Senior lenders, who are subordinating a piece of their recovery for the benefit of Class 4, have not agreed, in their own business discretion, to subordinate their claims beyond the level necessary or desirable to preserve enterprise value and future economic viability, and they should not now be required to subordinate themselves to claims that will not provide sufficient value.[55] This is particularly true where, as here, if the Retirees were to succeed in their unfair discrimination arguments and all general unsecured claims (Class 4, Class 5 and the lenders' deficiency claims) were to be treated equally (and further assuming — without any basis — that the lenders would consent to the same amount of dollars being allocated to unsecured claims), the improved recoveries to Class 5 Genreal Unsecured Creditors would, at best, be less than an incremental $1 million, and the incremental recovery to the Retirees most in need would be negligible. As noted above, the lenders have agreed to make this amount available to fund a hardship program in order to target funds to those Retirees most in need.

---

[54]     _See_ Williams Decl., at ¶ 65.

[55]     _See_ Williams Decl., at ¶ 65.

K&E 16165851.3

(i)     The Debtors Diligently and in Good Faith Selected Claims for
Class 4 Consistent with the Rationale for Disparate Treatment.

45.     The third ***Buttonwood*** factor is whether the discrimination is proposed in good faith.  Mindful of the goal of preserving trade relationships, the Debtors — including senior management — extensively canvassed their unsecured creditors and have spent considerable time and effort throughout these chapter 11 cases (and especially in the period leading up to solicitation and the Confirmation Hearing), identifying and narrowing Claims for full payment based on, among other things, the extent of the net benefit each payment was expected to yield.  Here, unlike the cases so heavily relied upon by the Retirees, the evidence shows that the discrimination is "reasonably tailored to foster only those relationships that are critical to the success of the Debtor."[56]

46.     Prior to the Petition Date, and with the agreement reflected in the Restructuring Support Agreement, the Debtors launched an extensive and well-planned communications campaign, in an effort to, among other things, mitigate a possible "run on trade" during the chapter 11 proceedings.[57]  The Debtors communicated a "business as usual" and "payment in full" message to key trade creditors.  The Debtors believe this messaging was essential to ensuring, and did ensure, the Debtors' smooth transition into, and throughout the, bankruptcy by motivating valued trade partners to continue to provide the Debtors with goods and services needed to maintain operations, especially in light of having "stretched" payment terms of their supply base as a result of liquidity contraints.[58]

---

[56]     *In re Snyders Drug Stores, Inc.*, 307 B.R. 889, 895 (N. D. Ohio 2004); *see also In re Sentry Operating Company of Texas, Inc.*, 264 B.R. 850, 861 (Bankr. S.D. Texas 2001); *See* Perruzza Decl., at ¶ 12-18.

[57]     *See* Perruzza Decl., at ¶ 10; Williams Decl., at ¶ 63.

[58]     *See* Perruzza Decl., at ¶ 11; Williams Decl., at ¶ 63.

K&E 16165851.3

47.     As described in the Perruzza Declaration, during these chapter 11 cases, the Debtors continued to refine their list of "critical vendors" and paid prepetition claims of certain vendors pursuant to the Critical Trade Order only if the estate received some form of concession or other net benefit through execution of a trade agreement.[59]   As the record in these cases reflects, the Debtors have been conservative with funds authorized under the Critical Trade Order and the Debtors' vendors have nevertheless agreed to support the Debtors through this restructuring process — largely in reliance on the Debtors' assurances that it was "business as usual."[60]  As such, the Debtors have continued to receive valuable goods and services throughout these cases notwithstanding that most vendors have not yet received payment of their prepetition claims.[61]

48.     Further, the Debtors strongly believe that failure to honor their promise of "payment-in-full" to the Class 4 claimants is likely to damage the Debtors' reputation at this critical turning point.[62]  Reputational damage, especially for a long-standing business like The Reader's Digest, whose brand equity is a valuable asset, could cause irreparable harm to the estate and, importantly, the reorganized enterprise, thereby undermining the significant

---

[59]   *See* Perruzza Decl., at ¶ 13.

[60]   *See* Perruzza Decl., at ¶ 11; *see also* Hr'g. Tr., 12:1-5, Sept. 17, 2009 ("I've had several early complaints by vendors as to how rigorous the debtor is being as regards critical vendor payments.  And it would appear to demonstrate that they're spending their money wisely.").

[61]   *Compare Worldcom*, 2003 WL 23861928, at *59 (appropriate for debtors to consider the relative prejudice to creditors that may have relied upon the debtors in order to formulate a fundamentally fair chapter 11 plan and was "a valid business justification and reasonable basis for the disparate treatment of undersecured creditors") (citing *Moran v. Hong Kong & Shanghai Banking Corp. (In re Deltacorp, Inc.)*, 179 B.R. 773, 777 & n. 5 (Bankr.S.D.N.Y.1995)) *with In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714, 717 (Bankr. S.D.N.Y. 1991)(noting that there is no provision in the Bankruptcy Code prohibiting discrimination against classes who vote against a plan).

[62]   *See* Perruzza Decl., at ¶ 23; Williams Decl., at ¶ 64.

K&E 16165851.3

restructuring efforts made to date (including eliminating non-critical trade liabilities and "forced" additional supply chain rationalization).[63]

(i)     The Discrimination Is Proportionate to the Underlying Rationale.

49.     The Plan also satisfies the fourth ***Buttonwood*** factor.   Given the underlying rationale — to make payments that will contribute to going-concern value of enterprise — the benefits provided by payment of Class 4 Claims, including those already provided throughout these cases by way of continuing to provide goods and services on extended credit while the businesses were transitioned into chapter 11 operations, far outweigh the aggregate amount of the payment estimated to be made to Class 4.[64]   Not only is the aggregate amount payable to the Class as a whole small, but the magnitude of payments to individual Class 4 creditors is generally small.[65]

---

63  *See, e.g., In re Creekstone Apts.Assc., L.P. v. Resolution Trust Corp.,* 168 B.R. 639, 644 (Bankr. M.D. Tenn. 1994) (court found the discrimination between classes of claimants fair in view of the debtor's showing that favorable treatment of general unsecured claims was necessary to maintain the debtor's ability to obtain trade credit from vendors and the lack of evidence demonstrating that the discrimination was meant to favor insiders).

64  *See In re Kliegl Bros. Universal Elec. Stage Lighting Co.,* 149 B.R. 306, 309 (Bankr. E.D.N.Y.1992) (finding seventy-five percent distribution on union member wage claims versus fifteen percent on other unsecured claims justified by the "suggestion" that the union might strike and there was a critical need for the debtor to continue to utilize the services of the union's members, although recognizing that "there [had] been no testimony to support such a finding"); *see also In re 11,111, Inc.,* 117 B.R. 471, 477-78 (Bankr. D. Minn. 1990) (finding no unfair discrimination against insiders when the debtor's plan proposed to pay nothing to insiders despite paying forty percent to general unsecured creditors due to fact that insiders were uniquely positioned to influence the debtor's ongoing financial and business operations, notwithstanding allowance of insiders' claims and rejection of arguments that such claims should be subordinated); *In re LeBlanc,* 622 F.2d 872, 879, 23 C.B.C. 436 (5th Cir. 1980) (upholding plan which paid unsecured claims of trade creditors 40% and which paid unsecured insider claims nothing); *In re 203 North LaSalle Street Ltd. P'ship,* 190 B.R. 567, 586 (Bankr. N.D. Ill. 1995) , *aff'd,* 195 B.R. 692 (N.D. Ill. 1996) , *aff'd,* 126 F.3d 955 (7th Cir. 1997) , *rev'd on other grounds,* 526 U.S. 434, 119 S. Ct. 1411, 143 L. Ed. 2d 607, 41 C.B.C.2d 526 (1999) (confirming plan in which trade creditors   receive 100%, non-recourse deficiency receives present value 16% of claims, and insider claims subordinated or waived), *aff'd,* 195 B.R. 692 (N.D. Ill. 1996) .

65  *See* Perruzza Decl., at ¶ 20; *see also In re Rochem,* Ltd., 58 B.R. 641, 643-44 (Bankr. D. N.J. 1985) (finding no unfair discrimination when the debtor's plan proposed a payment of one-tenth of one-percent distribution on $35 million tort claim within 180 days of plan confirmation versus fifty percent distribution to trade creditors over a period of thirty-six months).

50. The Debtors estimate the total amount of Class 4 Claims payable under the Plan is approximately $6.5 million. As the Court is aware, the Debtors were authorized to pay up to $25 million pursuant to the Critical Trade Order in the early stages of these Chapter 11 Cases.[66] As the record reflects, mindful of their fiduciary duty to conserve resources and safeguard value for the estate (and notwithstanding "the very real need" for such funds given their limited leverage against vendor demands), the Debtors did not view the availability of such funds as "a license to spend."[67] As a result, the Debtors already have Court authority (outside of the Plan) to satisfy the estimated amount of Allowed Class 4 Claims payable under the Plan.

51. When viewed in light of the value to be received by the estate from such payments, the discrimination is more than proportionate to its rationale – to pay only those claims that would yield value to the estate. The Debtors expect that, in the not-so long-term, payments to Class 4 vendors will generate enough goodwill to more than offset the amount paid. This is especially the case when replacement and transition costs are considered, particularly if certain vendors were to end their business relationships with the Debtors (causing, in some cases, customers to switch to competitors).[68]

(ii) Eliminating the Discrimination Would Not Increase Class 5 Recoveries.

52. Even assuming that Retirees could somehow persuade this Court that the treatment of Class 4 under the Plan is "unfair," there is no detriment to the creditors in Class 5. Whether considered a "gift" or a carve-out of property to which the Prepetition Lenders are otherwise entitled to, the enhanced recovery to members of Class 4 is attributable to the

---

[66] *See* Critical Trade Order, at ¶ 2.

[67] *See generally* Hr'g. Tr., 27-35 (Aug. 24, 2009).

[68] *See* Perruzza Decl., at ¶ 23; Williams Decl., at ¶ 67.

Prepetition Lenders and, thus, does not run afoul of the Bankruptcy Code.[69] "There is no unfair discrimination in a Plan provision that allows the [senior secured lenders and DIP lenders] voluntarily to assign to unsecured creditors cash collateral proceeds that otherwise would rightfully belong to the secured creditors, particularly in the context of a reorganization where continued relations with those unsecured creditors are important to the future business of the reorganized Debtors."[70]  It is well-settled in the Second Circuit that senior creditors "are generally free to do whatever they wish with the bankruptcy dividends they receive, including sharing them with other creditors, so long as recoveries received under the Plan by other creditors are not impacted."[71]

53.    In their objection, the Retirees focus on discrediting any gifting argument advanced by the Debtors by questioning whether the recovery to Class 4 is a true "gift" or rather,

---

[69]  *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 618 (Bankr. D.Del. 2001) (when gift is payable from proceeds otherwise distributable to senior secured creditors, they are "free to allocate such value without violating the 'fair and equitable' requirement" of 1129(b));  *see also Worldcom*, 2003 WL 23861928, at *60 ("greater value received by the members of the Ad Hoc MCI Trade Claims Committee as a result of the Contributions does not violate the Bankruptcy Code . . .because it "is not the result of the Debtors' distribution of estate property to such creditors"); *In re DBSD N.A., Inc.*, 2009 WL 3491060, 09-13061 (REG) (Oct. 26, 2009) (gifting doctrine defeated absolute priority rule objection to reinstatement of intercompany interests by subsidiary-specific creditor not paid in full); *In re RCN Corp.*, No. 04-13638, Findings of Fact and Conclusions of Law at *18 (RDD) (Bankr. S.D.N.Y Dec. 8, 2004) (approving, under section 1129(b) , plan that gave distributions to junior equity interests pursuant to gift from unsecured creditor class, even though subordinated claims would receive nothing under the plan, and preferred stock interests were paid less than in full, "based on the agreement of holders of RCN General Unsecured Claims to voluntarily allocate a portion of the value that they would otherwise receive" to those other holders); *In re Transcare Corp.*, No. 02-14385 (RDD) (Bankr. S.D.N.Y. July 16, 2003) (approving plan whereby senior lenders relinquished a portion of the recoveries which such parties were otherwise entitled to receive but which were distributed to other creditors with the consent of such senior lenders under the plan).

[70]  *In re Union Fin. Servs. Group*, 303 B.R. 390, 423 (Bankr E.D. Mo. 2003).

[71]   *See, e.g.*, *U.S. Shipping Partners, LP*, No. 09-12711 (RDD) (Bankr. S.D.N.Y. Oct. 2, 2009, 2009); *In re Refco*, No. 05-60006 (RDD) (Bankr. S.D.N.Y. Dec. 15, 2006); *In re RCN Corp.*, No. 04-13638 (RDD) (Bankr. S.D.N.Y Dec. 8, 2004); *In re Transcare Corp.*, No. 02-14385 (RDD) (Bankr. S.D.N.Y. July 16, 2003); *see also In re DBSD N.A., Inc.*, 09-13061 (REG) (Bankr. S.D.N.Y. Oct. 26, 2009); *In re Journal Register Comp.*, 407 B.R. 520, 534 (Bankr. S.D.N.Y. 2009); *In re DJK Residential, LLC*, No. 08-10375 (JMP) (Bankr. S.D.N.Y. May 7, 2008); *Adelphia*, 368 B.R. 140, 276 (Bankr. S.D.N.Y. 2007); *Worldcom*, No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003); *In re XO Commc'ns., Inc.*, No. 02-12947 (AJG) (Bankr. S.D.N.Y. Aug. 26, 2002); *In re NTL Inc*, No. 02-41316 (Bankr. S.D.N.Y. September 5, 2002); *In re Hagerstown Fiber Ltd. P'ship.*, No. 98-41988 (SMB) (Bankr. S.D.N.Y. Aug. 24, 1998).

property of the estate. Under the facts of these cases, however, whether the gift is or is "not clearly demarcated as separate property of the secured lenders" is of no moment. The Retirees are not making an absolute priority objection and arguing that a *junior* class is improperly receiving a recovery between a senior class that is not being paid. They are making an unfair discrimination argument. The ***Buttonwood*** test on unfair discrimination requires a "reasonableness" inquiry and in making a reasonableness inquiry it is perfectly appropriate for the Court to consider that the Retirees are not entitled to <u>any</u> recovery without concessions from the secured lenders.

54.     Moreover, even if the discriminatory treatment was removed from the Plan, the recoveries of the Class 5 creditors would <u>not</u> be increased. Rather, this "would only put the 'gift' at risk by providing the [Prepetition] Lenders with an opportunity to withdraw their offer."[72] Such a result benefits no-one. To the contrary, it could harm to these estates.[73]

**B.     The Unfair Discrimination Objections Rely on Inapposite Case Law**

55.     The cases the Retirees cite are inapposite and do not warrant a different result. Indeed, the Retirees focus on a number of cases that stand for the well-settled principle that an undersecured lenders' deficiency claim may not be classified separately from general unsecured claims, much less treated differently. *See* RDRG Obj., at ¶¶ 15-20. (citing *In re 222 Liberty Assoc.,* 108 B.R. 971 (Bankr. E.D. Pa. 1990); *In re Graphic Comm'cns, Inc.*, 200 B.R. 143 (Bankr. E.D. Mich. 1996); *In re Tucson Self-Storage, Inc.*, 166 B.R. 892 (B.A.P. 9th Cir. 1994); *In re Barney & Carey Co.*, 170 B.R. 17 (Bankr. D. Mass. 1994)). These cases are not relevant

---

[72]     *See, e.g., In re Journal Register*, 407 B.R. at 533 ("if the Court excised the gift provision from the Plan, the recoveries of the "disfavored" []creditors would not be increased. This would only put the "gift" at risk by providing the Secured Lenders with an opportunity to withdraw their offer").

[73]     *See* Perruzza Decl., at ¶ 23.

here and indeed would result in the Retirees' claims being drowned by a $600 million deficiency claim.

56.     The Retirees also attempt to articulate a hard and fast rule that creditors with claims of equal rank are entitled to identical treatment.  RDRG Obj., at ¶ 10 (citing *In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 863 (Bankr. S.D. Tex. 2001)).  But courts in the Second Circuit and elsewhere have rejected this concept.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177-8 (Bankr. S.D.N.Y. 1989) ("In the context of reorganization, a majority of both cases and commentators have rejected the concept that all creditors of equal rank must receive equal treatment.") (citing *In re Chateaugay*, 80 B.R. 279 (S.D.N.Y. 1987)); *see also In re Charter Comm'cns, Inc.*, No. 09-11435, 2009 WL 3841971, at *36 (Bankr. S.D.N.Y. Nov. 17, 2009) (rejecting argument that claims of the same priority level are per se entitled to equal treatment); *In re Jewish Mem'l Hosp.*, 13 B.R. 417, 420 (Bankr. S.D.N.Y. 1981) ("the Bankruptcy Act does not establish inexorable rules for distribution that can never be deviated from in the interest of justice and equity").

57.     Notably, the *Sentry* case the Retirees rely on so heavily does not support this rule either.  In *Sentry*, the court held that "separate classification of creditors with similar claims is permissible if necessary for the plan to effect a distribution scheme that is statutorily permissible" as long as the definition of the class is "narrowly and carefully drawn."[74]  The court also found that a classification scheme "designed to preserve and to enhance the value of the estate's assets' was a "permissible" purpose.[75]  Although the *Sentry* court did not approve the plan's proposed disparate treatment, its ruling was based on its finding that the class of trade

---

[74]     *See Sentry*, 264 B.R. at 853.

[75]     *Id.* at 861.

claims the debtors sought to pay contained a substantial number of creditors that appeared "to be paid for reasons other than preservation of value" and thus, that there did not appear to be sufficient "contribution to preservation of value through the plan that justifies the payout differential."[76] As supported by the evidence set forth in the Perruzza and Williams Declarations that is not the case here.

58.     *Johns Manville* also does not state a categorical rule against discriminatory treatment.  In *Johns Manville*, the court cited to *In re Pine Lake Village Apt. Co.*, 19 B.R. 819 (Bankr. S.D.N.Y. 1982) for the proposition that disparate treatment of similarly situated claims is inappropriate.[77]  But *Pine Lake Village* also dealt with the well-settled principle that undersecured creditors' deficiency claims may not be separately classified and treated from general unsecured claims.[78]  Moreover, the *Johns Manville* court did not actually reach this issue as it found that the interests of the class at issue were not similar to those of any other class.  In any event, *Johns Manville* applied the so-called "mechanical approach," which has been rejected as overly-restrictive by *Buttonwood* and subsequent courts in favor of the multi-pronged "broad test" applied herein (and by the Retirees[79]).

59.     In applying the *Buttonwood* test, the Retirees respond to four cases cited by the Debtors in support of the proposition that fair discrimination is permissible.  RDRG Obj., at ¶ 16. Notably, the Retirees acknowledge that *In re Kliegl Bros. Universal Electric Stage Lighting Co.*, 149 B.R. 306 (Bankr. E.D.N.Y. 1992) and *In re FF Holdings Corp. & Farm Fresh, Inc.*, 1998

---

[76]     *Id.* at 864 (internal quotations omitted).

[77]     *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1986), *aff'd*, 843 F.2d 636 (2d Cir. 1988).

[78]     19 B.R. at 832.

[79]     RDRG Obj., at ¶ 13.

K&E 16165851.3

U.S. Dist. LEXIS 10741 (D. Del. Feb. 17, 1998) *support* the proposed Plan treatment of Classes 4 and 5. And although the Retirees attempt to downplay the Debtors' cites to *In re 222 Liberty Assoc.* and *In re Graphic Comm'cns, Inc.*, both of those cases support separate classification and treatment where, as here, a debtor needs to remain on good terms with trade creditors for the sake of future operations.[80] Indeed, as noted above, the *222 Liberty* and *Graphic Comm'cns* courts denied the separate classification and treatment of the claims at issue because they were undersecured deficiency claims classified separately from general unsecured claims. Decisions regarding deficiency claims simply are not relevant here.

60. *In re Snyders Drug Stores, Inc.* likewise supports the Plan rather than the Retirees' argument.[81] Like most courts, the *Snyders Drug* court noted that different classification and treatment of essential trade vendors from other unsecured creditors—there, landlords—is justified but denied the proposed differentiation in that case because the debtors had failed to show that they had appropriately narrowed their trade class given that it contained more than 2,500 vendors.[82] The court also took issue with the debtors' inclusion of certain lessors in their essential trade vendor class when they had classified landlords separately. Here, as set forth in the Perruza and Williams Declarations, the Debtors have propounded ample evidence to support that Class 4 trade vendors have been carefully selected in a manner consistent with the rationale for disparate treatment.[83]

---

[80] *See In re Graphic Comm'cns, Inc.*, 200 B.R. 143, 147 (Bankr. E.D. Mich. 1996) (business reason supported separate classification of debtor's business competitor from trade creditors); *In re 222 Liberty Assocs.*, 108 B.R. 971, 990 (Bankr. E.D. Pa. 1990) (debtor's need to remain on good terms with trade creditors for sake of future operations is an independent reasonable ground for separate classification).

[81] *In re Snyders Drug Stores, Inc.*, 307 B.R. 889, 895 (N.D. Ohio 2004).

[82] *Id.* at 895.

[83] *See* Perruzza Decl., at ¶ 12-18; Williams Decl., at ¶ 64-67.

61.     Finally, the Retirees cite two undersecured deficiency cases and a chapter 13 case in support of their argument that courts categorically refuse to confirm disparate treatment of 50% or more.   RDRG Obj., at ¶ 20.   Not only are these cases inapposite to the facts and circumstances of this complex, large-scale reorganization case, the Retirees fail to mention recent decisions in this Circuit in which courts approved disparate treatment far greater than 50%.   *See, e.g., Charter Comm'cns*, 2009 WL 3841971 at *36 (100% for general unsecured (trade) creditors vs. 32.7% for unsecured noteholders);   *In re DJK Residential LLC*, No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008) (100% for ongoing trade creditors vs. 25% for general unsecured creditors).   Moreover, the Retirees' emphasis on the difference in percentages of distributions to Classes 4 and 5, i.e., 100% vs. 3.6%, is misleading.   Class 4 is comprised of approximately 800 ongoing trade vendors, many of whom are small-scale content and service providers and all of whom are precisely the types of vendors the Debtors have consistently referenced as essential to preserve the going concern value of the Debtors' business. Importantly, as noted above, the Debtors have adequate funds available pursuant to the authority already granted under the Critical Trade Order to pay the full amount of Class 4 trade vendors. Paying Claims in Class 4 in full will cost an additional approximately $6.5 million, whereas the aggregate amount of Claims in Class 5 is approximately $110-120 million.   Folding Class 4 in with Class 5 would increase recoveries to Holders of Allowed Claims in Class 5 by no more than $1 million (after giving effect to the Banks' deficiency claim).   Given the importance of the proposed differentiation between Classes 4 and 5 to preserving going concern value, this disparate treatment is more than justified under applicable law.

62.     Accordingly, for all of the reasons set forth herein, in the supporting papers and on the record of these Chapter 11 Cases, and as will be further demonstrated at the Confirmation Hearing, the Debtors respectfully request that the Court overrule the Objections on the merits.

K&E 16165851.3

**Part II.**
**Plan Satisfies Uncontested Confirmation Standards**

II.    **The Plan Satisfies the Applicable Confirmation Requirements of § 1129.**

63.    The Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code and should be confirmed.

A.    **The Plan Complies With the Applicable Provisions of Title 11 (§ 1129(a)(1)).**

64.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the "applicable provisions" of the Bankruptcy Code. The legislative history relating to this provision explains that section 1129(a)(1) of the Bankruptcy Code encompasses and incorporates the requirements of section 1122 and 1123 of the Bankruptcy Code, which govern classification of claims and interests and the contents of the plan, respectively.[84]

(i)    The Plan Properly Designates Classes of Claims and Interests (§ 1122).

65.    The Plan satisfies section 1122 of the Bankruptcy Code, which provides that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[85] In the Second Circuit, a plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code.[86] Indeed, classification is constrained by three straight-forward rules: (i) a plan proponent may not classify substantially similar claims in separate classes for the sole

---

[84]    *See* S. Rep. No. 95-989, at 126 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *see also In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986) (confirmation objections under section 1129(a)(1) usually involve failure of plan to conform to either §§ 1122(a) or 1123 of Bankruptcy Code), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

[85]    11 U.S.C. § 1122(a).

[86]    *See In re Charter Communications*, No. 09-11435, 2009 WL 3841971, at *70 (JMP) (Bankr. S.D.N.Y. Nov. 17, 2009) (debtors "enjoy considerable discretion when classifying similar claims in different classes"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case"); *In re One Times Square Associates Ltd. P'ship.*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993) (separate classification can not "offend one's sensibility of due process and fair play").

K&E 16165851.3

purpose of obtaining at least one impaired assenting class; (ii) dissimilar claims may not be classified together; and (iii) similar claims may be classified separately if a legitimate reason exists for doing so.[87]

66.     The Plan properly classifies Claims and Interests into ten Classes based upon their legal and/or factual nature or other relevant and objective criteria, establishing that a legitimate basis exists for the classification scheme under the Plan that "does not offend one's sensibility of due process and fair play."[88]     The Claims or Interests within each particular Class are substantially similar to each other, and the classification structure is necessary to implement certain aspects of the Plan.  Thus, as set forth in more detail below, the classification scheme proposed under the Plan is consistent with the flexible standard of section 1122(a).

67.     First, dissimilar Claims and Interests are not classified together under the Plan.  In part, the classification scheme follows the Debtors' capital structure, for example, debt and equity are classified separately and secured debt is generally classified separately from unsecured debt.[89]  Other aspects of the classification scheme reasonably recognize the different legal or

---

[87]     *See* (i) *Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*, 21 F.3d 477, 483 (2d Cir. 1994) ("separate classification of unsecured claims solely to create an impaired assenting class will not be permitted"); *WHBA Real Estate Ltd. P'ship v. Lafayette Hotel P'ship (In re Lafayette Hotel P'ship)*, 227 B.R. 445, 449 (S.D.N.Y. 1998) (same); *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 151 B.R. 307, 312 (Bankr. N.D.N.Y. 1992) (classification must be done for reasons unrelated to an attempt to gerrymander an affirmative vote on a reorganization plan); (ii) *Aetna Cas. & Sur. Co. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) ("classification is constrained by two straight-forward rules: dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason"); and (iii) *In re Worldcom, Inc.*, 2003 WL 23861928, at *47 (Bankr. S.D.N.Y. Oct., 31, 1993) ("Even if the court were to determine that [different classes of unsecured claims] are "substantially similar" to each other, section 1122(a) would not require that all such substantially similar claims be classified together.  Rather, section 1122(a) requires that, if claims are classified together, then they must be substantially similar."); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) (section 1122(a) of the Bankruptcy Code does "not require that similar classes be grouped together, but merely that any group be homogenous").

[88]     *See In re Adelphia Commc'ns.*, 368 B.R. 140, 246-7 (REG) (Bankr. S.D.N.Y. 2007) (quoting *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993)).

[89]     As described in the Disclosure Statement, the Plan treats all claims of the Prepetition Lenders arising under the Prepetition Credit Agreement, including both their secured and unsecured deficiency Claims, in Class 3, taking into account the appropriate recoveries allocable to such Claims.  *See* Discl. Stmt., at ¶ 8 n.6.  The specified

factual nature of Claims or Interests, such as, Other Priority Claims in Class 3, which are separately classified due to their required treatment under the Bankruptcy Code; Intercompany Claims in Class 10, which do not involve third-party creditors; or Interests in Classes 8 and 9, which are classified depending on if they are held by non-debtors or Debtors, respectively.[90]

68.     Second, while Senior Subordinated Notes Claims in Class 6, Unsecured Claims Related to Operations in Class 4 and Other General Unsecured Claims Class 5 are all unsecured Claims, there are intercreditor subordination provisions recognized by section 510(a) of the Bankruptcy Code that distinguish the latter from the former.[91]   Senior Subordinated Notes Claims are properly classified separately in accordance with section 1122(a).[92]

69.     Third, as discussed in Part I above, there are reasonable, legitimate and equitable justifications for separately classifying unsecured Claims in Class 4 (Unsecured Claims Related to Operations) and unsecured Claims in Class 5 (Other General Unsecured Claims).[93]

---

Plan treatment of the Prepetition Credit Agreement Claims was negotiated in connection with the Restructuring Support Agreement, and the classification facilitates satisfaction of the Prepetition Credit Agreement Claims through a mixed distribution of debt and equity in accordance with the Restructuring Support Agreement.

[90]    *In re Riggel*, 142 B.R. 199 (Bankr. S.D. Ohio 1992) (classification based on Bankruptcy Code is acceptable).

[91]    *See* Discl. Stmt., at § II.C.2 (describing the Senior Subordinated Notes in detail, including the subordination provision set forth in the Senior Subordinated Notes Indenture).

[92]    *See Charter Commc'ns*, 2009 WL 3841971, at *73 ("Indeed, far from being an anomaly indicative of an intent to gerrymander, bankruptcy courts administering other large chapter 11 cases have accepted separate classification of convertible note claims from general unsecured claims."); *see also In re Cornerstone Propane, L.P.*, No. 04-13856 (RDD), Confir. Hr'g Tr. 87:11-19 (Bankr. S.D.N.Y. Nov. 4, 2004) ("based on the subordination agreement, I find a perfectly valid basis to separately classify this claim from other unsecured claims, as have numerous other courts . . . The interests of [noteholder], under its subordinated note, are materially different than the interests of unsecured creditors generally, and that fact is properly recognized in the classification scheme."); *see, e.g., Charter Commc'ns*, No. 09-11435 (JMP) (Bankr. S.D.N.Y. Nov. 17, 2009); *In re Calpine Corp.*, Case No. 05-60200, 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007), *stay denied*, 2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008), *appeal denied*, 390 B.R. 508 (S.D.N.Y. 2008) (order confirming chapter 11 plan separately classifying unsecured notes claims from general unsecured claims); *In re Tower Automotive, Inc.*, No. 05-10578 (Bankr. S.D.N.Y. July 12, 2007) (same); *In re Global Crossing Ltd.*, No. 02-40188 (Bankr. S.D.N.Y. Dec. 26, 2002) (same).

[93]    Courts have found a "legitimate business reason" exists where, among other things, a debtor's business would be adversely affected if the debtor was precluded from separately classifying creditors for purposes of treating certain groups essential to a reorganized debtor's ongoing business differently than those that are not. *See, e.g.,*

70. Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1122 of the Bankruptcy Code.

        (ii)    <u>The Mandatory Provisions of the Plan Should be Approved (§1123(a)).</u>

71. The Plan meets the seven mandatory requirements of section 1123(a), which require that a plan:[94]

- as required by section 1123(a)(1) of the Bankruptcy Code, Article III.B of the Plan designates Classes of Claims and Interests;

- as required by section 1123(a)(2) of the Bankruptcy Code, Article III.B of the Plan specifies which Classes of Claims and Interests are not impaired under the Plan;

- as required by section 1123(a)(3) of the Bankruptcy Code, Article III.B of the Plan specifies the treatment of each Class of Claims or Interests that is impaired under the Plan;

- as required by section 1123(a)(4) of the Bankruptcy Code, Article III.B of the Plan provides the same treatment for each Claim or Interest within a particular Class (unless the holder of a particular Claim or Interest agrees to less favorable treatment on account of its Claim or Interest);

- as required by section 1123(a)(5) of the Bankruptcy Code, the provisions of Article IV of the Plan provide adequate means for the Plan's implementation

---

*In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) ("Numerous courts have held that separate classification and treatment of trade claims is acceptable if the separate classification is justified because they are essential to a reorganized debtor's ongoing business.") (citing *In re FF Holdings Corp. & Farm Fresh, Inc.*, 1998 U.S. Dist. LEXIS 10741, *16 (D. Del. Feb. 17, 1998); *see also Chateaugay*, 89 F.3d at 949-50 ("Congress gave reorganizing debtors considerable flexibility in their treatment of general unsecured creditors to position themselves for future economic viability."); *In re Kleigl Bros. Universal Electric Stage Lighting Co.*, 149 B.R. 306 (Bankr. E.D.N.Y. 1992) (lighting company permissibly segregated union's unsecured claim because debtor's ability to operate union shop is critical to ability to function successfully in industry); *In re Great Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000) (separate classification of similar claims permitted when "promotes the rehabilitative goals of chapter 11"); *In re 11,111, Inc.*, 117 B.R. 471, 476 (Bankr. D. Minn. 1990) (same); *In re Richard Buick, Inc.*, 126 B.R. 840, 852 (Bankr.E.D.Pa.1991)); *In re 222 Liberty Assocs.*, 108 B.R. 971, 990 (Bankr. E.D. Pa. 1990) (debtor's need to remain on good terms with trade creditors for sake of future operations is an independent reasonable ground for separate classification); *In re Richard Buick, Inc.*, 126 B.R. 840 (Bankr. E.D. Pa. 1991) (separate classification of dealer claims was necessary to future success of business to re-establish good relationship with dealers whose trades would supply vehicles sold).

94    *See* 11 U.S.C. § 1123(a)(1).

- as required by section 1123(a)(6) of the Bankruptcy Code, Article IV.K of the Plan provides that the organizational documents of the Reorganized Debtors will be amended, as necessary, to satisfy the provisions of the Plan and the Bankruptcy Code, including section 1123(a)(6), and the amended and restated constituent documents of Reorganized Holdings provide that the company will not issue non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code; and

- as required by section 1123(a)(7) of the Bankruptcy Code, Article IV.N of the Plan properly and adequately discloses or otherwise identifies the manner by which the individuals proposed to serve as the officers and directors of the Reorganized Debtors will be selected, consistent with the interests of creditors and equity security holders and with public policy.

72. Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1123(a) of the Bankruptcy Code.

(iii) The Discretionary Provisions of the Plan Should be Approved (§ 1123(b)).

73. Section 1123(b) of the Bankruptcy Code identifies the discretionary provisions that may be included in a plan of reorganization. For example, a plan may, among other things: (a) impair or leave unimpaired any class of claims or interests; (b) modify or leave unaffected the rights of holders of secured or unsecured claims; (c) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee or other representative of claims or interests; and/or (d) provide for the assumption or rejection of executory contracts and unexpired leases. In addition to the enumerated provisions, section 1123(b) of the Bankruptcy Code also provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."

74. Here, the Plan includes various discretionary provisions that are consistent with the discretionary authority vested under section 1123(b) of the Bankruptcy Code. For example, the Plan impairs certain Classes of Claims and Interests and leaves others Unimpaired, proposes treatment for contracts and leases, provides a structure for Claim allowance and disallowance and establishes a distribution process for the satisfaction of Allowed Claims. In addition, the

40

Plan contains provisions implementing certain releases and exculpations, discharging claims and interests and permanently enjoining certain causes of action. Each of these provisions are proper because, among other things, (a) they are the product of arm's-length negotiations, (b) have been critical to obtaining the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and equitable and in the best interests of the Debtors, these estates and the Chapter 11 Cases and (e) consistent with the relevant provisions of the Bankruptcy Code and Second Circuit law. Such provisions are discussed in turn below, but, in summary, satisfy the requirements of section 1123(b). No objections to the Plan have been filed on the basis of the Plan's inclusion of any of these discretionary provisions.

75. **First**, Article X.E of the Plan provides for a release by the Debtors of various Claims, Interests and Causes of Action (the "***Debtor Release***"). Here, the Debtor Release is fair, equitable and in the best interests of the estate, was negotiated at arm's-length and in good faith and reflects the Debtors' prudent business judgment consistent with the relevant standard in this circuit.[95] The Debtor Release reflects a reasonable balance of the risk and expense of litigation, on the one hand, against the benefits of early resolution of disputes and issues, on the other hand, removing what could otherwise be potentially substantial impediments to a prompt and successful emergence from bankruptcy.[96]

76. Indeed, as set forth more fully in the Disclosure Statement, the Debtors, with the assistance of counsel, spent considerable time investigating potential Avoidance Claims and

---

[95] *See* Williams Decl., at ¶ 28-29; *see, e.g. Charter*, No. 09-11435 (JMP) (Bankr. S.D.N.Y. Nov. 17, 2009); *In re In re DBSD North America, Inc.*, No. 09-13061 (REG) (Bankr. S.D.N.Y. Oct. 26, 2009); *DJK Residential LLC*, No. 08-10375 (JMP) (Bankr. S.D.N.Y. May 7, 2008); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 19, 2007); *In re Tower Auto., Inc.*, No. 05-10578 (ALG) (Bankr. S.D.N.Y. July 9, 2007); *In re Global Crossing*, No. 02-40188 (REG) (Bankr. S.D.N.Y. 2002).

[96] *See In re Allegiance Telecom, Inc.*, No. 03-13057, Conf. Order, at ¶ 61 (RDD) (Bankr. S.D.N.Y. June 10, 2004) ("avoidance of long and complicated litigation is one of the principal rationales for debtors entering into settlements with creditors") (citing *In re Baldwin United Corp.*, 43 B.R. 888 (Bankr. S.D. Ohio 1984), *In re Teletroncis Servs., Inc.*, 762 F.2d 185, 188-89 (2d Cir. 1985); *In re W.T. Grant Co.*, 699 F.2d at 608).

other Causes of Action against the parties being released pursuant to the Plan, including the

Consenting Shareholders, and do not believe there is evidence suggesting viable claims that

would result in substantial recoveries (if any) to general unsecured creditors.  Counsel presented

the results of the release investigation to the members of an independent board of directors who

determined, in a sound exercise of their business judgment, that the Debtors' release of third

parties pursuant to the Plan is appropriate and reasonable under the circumstances, particularly

because the relative strength of the claims being released are more than offset by the significant

benefits the Debtors are receiving under the Plan.[97]

77.     **Second**, the Plan includes an exculpation provision, which is set forth in

Article X.G of the Plan (the "***Exculpation***").  Courts evaluate exculpation provisions based upon

a number of factors, including whether the provision is integral to the plan and whether

protection from liability was necessary for plan negotiations.[98]  Generally speaking, the effect of

an appropriate exculpation provision is to set a standard of care of gross negligence or willful

misconduct in future litigation for acts arising out of the restructuring.[99]  Additionally, where a

court finds that a plan has been proposed in good faith and meets the other requirements of

---

[97]   *See* Discl. Stmt., § IV.N.5.  Moreover, even if any Claims or Causes of Action were available against the
      Released Parties, they are the property of the Debtors alone, the derivative prosecution of which would require
      an "STN order" upon a showing that such action was in the best interests of the estates.

[98]   *See In re Bally*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate
      because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re
      Worldcom, Inc.*, Case No. 02-13533, 2003 WL 23861928 at *28 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving an
      exculpation provision where it "was an essential element of the Plan formulation process and negotiations");
      *Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 501, 503 (S.D.N.Y. 2005) excising
      similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to
      all those who participated in good faith to bring it into fruition"); *In re Drexel Burnham Lambert Group, Inc.*,
      960 F.2d 285, 293 (2d Cir. 1992), cert denied, 506 U.S. 1088 (1993).

[99]   *See In re Calpine Corp.*, Case No. 05-60200, 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007), *stay
      denied*, 2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008), *appeal denied*, 390 B.R. 508 (S.D.N.Y. 2008)
      (finding that an exculpation provision that did not relieve any party of liability for gross negligence or willful
      misconduct and was appropriate); *In re Enron Corp.*, 326 B.R. at 501 (holding that an exculpation provision
      was appropriate where such provision excluded gross negligence and willful misconduct).

confirmation, approval of an exculpation provision is appropriate as well, to set the standard of liability for those involved in the negotiation and formulation of that plan.[100] Exculpation clauses appropriately prevent collateral attacks against parties that have made substantial contributions to a debtor's reorganization. Courts have specified certain parties that generally are appropriate candidates for exculpation, including where the exculpation is consensual and properly noticed or parties to "unique transactions" who "contribute substantial consideration to the reorganization."[101]

78. Here, the Exculpation is important to these Chapter 11 Cases. As described more fully in the Williams Declaration, the Plan and the Restructuring Support Agreement are the product of extensive negotiations with numerous parties that were conducted at arm's-length and in good faith.[102] Indeed, negotiation and compromise were crucial to the development of a feasible, confirmable Plan, which, among other things, would not have occurred absent the protections afforded to the constituents involved by the Exculpation. Further, in light of the carve-out for criminal conduct, gross negligence and willful misconduct, the standard of care established by the Exculpation is entirely consistent with, and appropriate under, applicable Second Circuit law.[103]

---

[100] *See In re Worldcom, Inc.*, 2003 WL 23861928, at *28.

[101] *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007), *stay granted*, 361 B.R. 337 (S.D.N.Y. 2007), *appeal dismissed*, 367 B.R. 84 (S.D.N.Y. 2007), *appeal dismissed*, 371 B.R. 660 (S.D.N.Y. 2007), *order aff'd*, 544 F.3d 420 (2d Cir. 2008).

[102] *See* Williams Decl., at ¶ 30-31.

[103] *See, e.g.*, *see also In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr. S.D.N.Y. 2006) (approving exculpation provision that covered prepetition lenders, DIP lenders, creditor committees and their members, and the respective affiliates of each except in cases of gross negligence, willful misconduct, fraud, or criminal conduct over an objection that was raised but "not pursue[d] at the confirmation hearing" and noting that the language "generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptional"); *In re DJK Residential LLC*, Case No. 08-10375, (Bankr. S.D.N.Y. May 7, 2008) (approving an exculpation provision that excluded gross negligence and willful misconduct without unresolved objections); *In re Bally*, 2007 WL 2779438, at *8 (same).

K&E 16165851.3

79.     Finally, it should be emphasized that the Exculpation provision is not a mandatory release of all liability, but instead establishes the appropriate standard of liability with respect to the parties exculpated.

80.     **Third**, the Plan includes a consensual third party release, which is set forth in Article XF of the Plan (the "***Releasing Party Release***").  A consensual third party release such as that here, where consent exists when a party votes to accept a plan, are frequently approved by in the Second Circuit.[104]  Indeed, only those holders of Claims and Interests who to accept the Plan grant a release to the Released Parties.[105]  The consensual aspect of the Releasing Party Release was conspicuously noticed in, without limitation, the Disclosure Statement, the Plan, the Confirmation Hearing Notice mailed to parties in interest and published in two national publications, the non-voting notices mailed to certain parties in interest and each of the ballots sent to voting creditors.

81.     In addition to being consensual, the Releasing Party Release is warranted because of the unique circumstances in the Chapter 11 Cases.  Thus, even if the Court were to somehow find this release to be non-consensual (it is not), the release should nevertheless be found to be consistent with Second Circuit precedent.  There can be no dispute that the Released Parties have been integral to these cases and to the Debtors' ability to propose a confirmable chapter 11 plan.[106]  As this Court is aware, the Chapter 11 Cases have progressed very quickly, something the Debtors believe is a testament to the cooperation of, and compromise made by, each of the

---

[104]   *See, e.g., In re Adelphia Commc'ns*, 368 B.R. at 268  (upholding releases with respect to those who voted in favor of plan); *In re Oneida Ltd.*, 351 B.R. at 94 (approving consensual release and exculpation provisions); *see also In re Specialty Equip.*, 3 F.3d at 1047 ("[C]ourts have found releases that are consensual and non-coercive to be in accord with the strictures of the Bankruptcy Code) (citation omitted).

[105]   *See* Plan, at Article X.F; *see also* Discl. Stmt., at § I.3.F.

[106]   *See* Williams Decl., at ¶ 32-33.

K&E 16165851.3

major constituents in these cases, and which underscores the success of the Debtors' reorganization efforts. Indeed, it is primarily due to the commitments made by these parties to work together to accomplish this restructuring that the Debtors are seeking to emerge from chapter 11 with 75% less funded debt after less than six months in bankruptcy with critical trade relationships intact, jobs preserved and a business plan designed to target growth opportunities.

82. Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1123(b) of the Bankruptcy Code.

83. In light of the foregoing, because the Plan fully complies with section 1122 and 1123 of the Bankruptcy Code, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

### B. The Disclosure and Solicitation Requirements Are Satisfied (§ 1129(a)(2)).

84. The principal purpose of section 1129(a)(2) is to ensure that a plan proponent has complied with the requirements of the Bankruptcy Code regarding solicitation of acceptances of the plan.[107] Pursuant to the Solicitation Procedures Order, the Court approved, among other things, (i) the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, (ii) the other solicitation materials transmitted to creditors entitled to vote on the Plan, (iii) the timing and method of delivery of such materials and (iv) the rules for tabulating votes on the Plan.

85. Consistent therewith, the Debtors, with the assistance of KCC and FBG, distributed Solicitation Packages to over 4,300 creditors holding Claims in the Voting Classes.

---

[107] *See, e.g.*, *In re Texaco Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988) ("The principal purpose of Section 1129(a)(2) is to assure that the proponents have complied with the requirements of section 1125 in the solicitation of acceptances to the plan."); *In re Johns-Manville Corp.*, 68 B.R. at 629-30; *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) ("(section 1129(a)(2) requires that "the proponent must comply with the ban on post-petition solicitation of the plan unaccompanied by a written disclosure statement approved by the court in accordance with Code §§ 1125 and 1126.").

A Printed copy of the Confirmation Hearing Notice was also mailed to over 48,000 parties in interest.[108]  Additionally, was published in the national editions of the *Wall Street Journal* and *USA Today* on December 4, 2009 (more than 40 days prior to the Confirmation Hearing).[109]

86.     Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(2) of the Bankruptcy Code.

## C.     The Plan Was Proposed in Good Faith (§ 1129(a)(3)).

87.     Section 1129(a)(3) of the Bankruptcy Code compels courts to reject those plans not proposed in good faith or those forbidden by law.[110]  The Second Circuit has construed the good faith standard in the bankruptcy context as "requiring a showing that the plan was proposed with honesty and good intentions and with a basis for expecting that the reorganization can be effected."[111]  Good faith should be evaluated "in light of the totality of the circumstances

---

[108]   This figure does not include Holders of Class 6 Claims.  Including nominees, solicitation packages were mailed to over 400 entities in connection with solicitation of Class 6 votes.

[109]   *See* Affidavit of Publication of Notice of the Hearing to Consider Confirmation of the Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates in the USA Today [Docket No. 339]; Affidavit of Publication of Notice of the Hearing to Consider Confirmation of the Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates in The Wall Street Journal [Docket No. 340].

[110]   *See* 11 U.S.C. § 1129(a)(3); *see also In re Gaston & Snow*, Nos. 93-8517, 93 Civ. 8628, 1996 WL 694421, at *9 (JGK) (S.D.N.Y. Dec. 04, 1996).

[111]   *Kane v. Johns-Manville Corp.*, 843 F.3d 636, 649 (2d Cir.1988); *see also Manati Sugar Co. v. Mock*, 75 F.2d 284, 285 (2d Cir. 1935); *In re Texaco, Inc.*, 84 B.R. 893, 907 (Bankr. S.D.N.Y.), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988) (Generally, a plan is proposed in good faith "if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.")(internal citations omitted); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 759 (Bankr.S.D.N.Y.1992); *Gaston & Snow*, 1996 WL 694421, at *9 ("In this context, the failure to propose a plan in good faith occurs when the Plan is not proposed with honesty, good intentions, and to effectuate the reorganization of the enterprise, but rather for some other motive."); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 497-98 (S.D.N.Y.1994) (bankruptcy proceeding used as part of litigation strategy).

surrounding confirmation."[112] "[T]he bankruptcy judge is in the best position to assess the good faith of the parties' proposals."[113]

88.     Here, the Plan is most certainly proposed with honesty, good intentions and a desire to effectuate the reorganization of the enterprise while maximizing recoveries to all stakeholders.[114] Throughout these cases, the Debtors and their management teams have upheld their fiduciary duties to stakeholders and protected the interests of all constituents with an even hand. As the result of extensive arm's-length negotiations among the Debtors, the Prepetition Lenders, the Creditors' Committee and other parties in interest, the Plan allows all creditors to realize the highest possible recoveries under the circumstances. Importantly, the Plan is supported by the Creditors' Committee, a fiduciary for, and representative of, all unsecured creditors in these Chapter 11 Cases.

89.     Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(3) of the Bankruptcy Code.

### D.     Payments Under the Plan Are Subject to Court Approval (§ 1129(a)(4)).

90.     As required by section 1129(a)(4) of the Bankruptcy Code, all payments promised or received, made or to be made, by the Debtors in connection with services provided or for costs or expenses incurred in connection with these chapter 11 cases, including for professionals, are subject to the review by and approval of the Court.[115] Among other things, the Plan provides

---

[112] *In re Cellular Info Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (citing cases); *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984) (good faith has been found to be lacking where a plan is proposed for ulterior purposes) (quotations omitted).

[113] *See In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984)).

[114] *See* Williams Decl., at ¶ 36.

[115] *See* 11 U.S.C. § 1129(a)(4); *see also In re Johns-Manville Corp.*, 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986) (concluding that court must be permitted to review and approve reasonableness of professional fees made from estate assets), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom., Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

47

that all requests for professional compensation and claims for reimbursement will be allowed, after notice and a hearing, in accordance with and subject to the requirements of the Bankruptcy Code and prior orders of the Court, as applicable. Additionally, the Plan provides that the Court will retain jurisdiction to decide and resolve all matters relating to applications for the allowance of compensation or reimbursement of expenses to professionals authorized pursuant to the Bankruptcy Code or the Plan.

91.     Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(4) of the Bankruptcy Code.

**E.      The Plan Properly Discloses Post-Confirmation Management (§ 1129(a)(5))**

92.     Section 1129(a)(5) of the Bankruptcy Code requires certain disclosures regarding the identities and affiliations of post-confirmation officers and directors, that the appointment or continuance of such officers and directors is consistent with the interests of creditors and equity security holders and with public policy and any insiders to be employed or retained and the compensation proposed to be paid to such insiders. Courts have also found that, where post-confirmation officers or directors have not been selected and identified prior to confirmation, the disclosure of the identities of known officers and directors and the manner in which additional individuals will be selected, sufficient to satisfy the requirements of section 1129(a)(5) .

93.     **First**, the Plan satisfies section 1129(a)(5)(A)(i) because the Debtors will disclose the identities and affiliations of any known individuals by filing a notice with the Court prior to the Confirmation Hearing.[116]  The Plan provides for a new board of directors of Reorganized

---

[116]  *See In re Charter Commc'ns.*, 2009 WL 3841971, 52 Bankr.Ct.Dec. 114, at *n.30 (Bankr. S.D.N.Y.2009) ("To the extent the Plan's satisfaction of 11 U.S.C. § 1129(a)(5) remains at issue, the Court concludes that this confirmation standard is satisfied. It is undisputed that two out of the eleven seats on the Debtors' board of directors remain vacant. See JP Morgan Post-Trial Brief at pp. 57-61. Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the known directors.") (citing *In re Am. Solar King Corp.*, 90 B.R. 808, 815-17 (Bankr. W.D. Tex. 1988) ("debtor's inability to specifically identify future board members does not mean that the

Holdings that will consist of up to eleven (11) members to be identified through the use of an outside professional search firm.[117]  With respect to subsidiary Debtors, the board members will remain in such positions following confirmation (until replaced or removed in accordance with the applicable organizational documents).  Similarly, the Plan contemplates that the Debtors' existing officers will also remain in their current positions (subject to customary and ordinary removal or replacement rights of the board consistent with the relevant organizational documents and applicable employment agreements).[118]

94.    **Second**, the Plan satisfies section 1129(a)(5)(A)(ii)  because the individuals who will serve as directors and officers of the Reorganized Debtors, and the process by which they will be selected, ensures that the Debtors will be in "good hands" after emerging from these Chapter 11 Cases.[119] As described in the Disclosure Statement and demonstrated by the Debtors' recent financial performance (including during chapter 11 operations), the members of current

---

debtor has fallen short of the requirement imposed in subsection (a)(5)(A)(i)")); *In re AG Consultants Grain Div., Inc.*, 77 B.R. 665, 669 (Bankr. N.D. Ind. 1987) (debtor complied with section 1129(a)(5) despite fact that it did not specifically reveal identity and affiliation of any individuals who would serve after confirmation); *In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 599 (Bankr. S.D. Tex. 1991) (finding sufficient disclosure of officer and director identities "to the extent known as of the Hearing"), *aff'd*, 158 B.R. 42 (S.D. Tex. 1993).

[117] *See* Plan, Art. IV.N; s*ee also* Order Pursuant to Section 363 of the Bankruptcy Code Authorizing the Debtors to Pay Seiden Krieger Associates, Inc. as Executive Search Advisors [Docket No. 352].

[118] The Debtors have scheduled several management employment agreements to be rejected pursuant to the Plan to allow the New Board to determine the appropriate terms of such agreements.

[119] Section 1129(a)(5)(A)(ii) of the Bankruptcy Code asks the bankruptcy court to ensure that the post-confirmation governance of the reorganized debtors is in "good hands," which has been interpreted by courts to mean that, without limitation:  (a) the proposed directors and officers have experience in the debtor's business and industry and in financial and management matters; (b) control of the reorganized entity by the proposed individuals will be beneficial; and (c) the appointment of such persons does not "perpetuate incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor."  *See, e.g., In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992) (citations omitted); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (continuation of debtors' president and founder, who had many years of experience in the debtors' business, satisfied § 1129(a)(5), and enhanced feasibility of plan); *In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992); *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003); *see also* COLLIER ON BANKRUPTCY, 15th Rev. Ed. (2007), ¶ 1129.03[5][b] (This "public policy requirement" would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management").

management contemplated to remain in their respective positions post-emergence, are competent and have relevant, deep-rooted and recent industry experience, thus providing continuity and insights into running the reorganized businesses.[120]

95.   **Third**, the Plan satisfies section 1129(a)(5)(B) of the Bankruptcy Code because the Debtors have or will have disclosed the identities and affiliations of insiders, and the nature of their compensation, to be employed or retained by the Reorganized Debtors as directors or officers prior to the Confirmation Hearing on notice.[121]   On December 30, 2009, the Debtors filed the first supplement to the Contract/Lease Schedule, which included schedules of management employment agreements proposed to be assumed and rejected in connection with the Plan.[122]   On December 30, 2009, the Debtors also filed the first supplement to the Plan Supplement, which included forms of the Variable Compensation Plan and the Enterprise Value Maximization Plan (post-emergence management incentive plans set forth in Article V.B of the Plan) and the terms of a post-emergence interim severance plan applicable to certain executives as set forth therein.[123] Further, the Confirmation Order will provide that the employment agreements of the Chief Executive Officer and the Chief Financial Officer will be assumed as of the Effective Date on the terms of the letter agreements entered into in connection with the Restructuring Support Agreement.

---

[120]   *See In re Sherwood Square Assocs.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989) (a debtor has "first choice of its management, unless compelling cause to the contrary exists").

[121]   *See Texaco*, 84 B.R. at 908  (finding requirements of section 1129(a)(5)(B) satisfied where the plan discloses debtors' existing officers and directors who will continue to serve after plan confirmation).

[122]   *See* First Supplement to the Contract/Lease Schedule for the Proposed Joint Chapter 11 Plan of The Reader's Digest Association, Inc. and Its Debtor Affiliates [Docket No.424].

[123]   The Variable Compensation Plan and Enterprise Value Maximization Plan, along with other matters related to post-bankruptcy compensation and benefit schemes, are described in § IV.G of the Disclosure Statement.

K&E 16165851.3

96. Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(5) of the Bankruptcy Code.[124]

**F.      The Plan Does Not Require Regulatory Approval (§ 1129(a)(6)).**

97. Section 1129(a)(6) of the Bankruptcy Code requires, with respect to a debtor whose rates are subject to governmental regulation following confirmation, that appropriate governmental approval has been obtained for any rate change provided for in the plan, or that such rate change be expressly conditioned on such approval. Here, there is no governmental regulatory commission that has jurisdiction over the Debtors' or the Reorganized Debtors' rates. Accordingly, section 1129(a)(6) of the Bankruptcy Code does not apply; therefore, the Debtors submit that the Plan complies with section 1129(a)(6) of the Bankruptcy Code.

**G.      The Plan Satisfies the "Best Interests of Creditors" Test (§ 1129(a)(7)).**

98. The "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time.[125] The "best interests of creditors" test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a

---

[124]    *See* Williams Decl., at ¶ 37-38.

[125]    *See In re The Leslie Fay Cos.*, 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997) ("The [best interests of creditors test] requires that each holder of a claim or interest either accept the plan or receive or retain property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated in a hypothetical liquidation under chapter 7 of the Bankruptcy Code."); *see also In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 759 (Bankr.S.D.N.Y.1995) (same).

holder of an impaired claim or interest under the debtor's plan of reorganization that rejects the plan.[126]

99.      To determine the value that rejecting creditors and equity holders would receive in a hypothetical liquidation of the Debtors' estates chapter 7 of the Bankruptcy Code, first, the aggregate dollar amount estimated to be generated from a liquidation of the Debtors' assets by a chapter 7 trustee must be determined.  This "liquidation value" would consist of the net proceeds from the disposition of the Debtors' assets, plus cash on hand, reduced by the costs and expenses relating to, and claims arising in connection with, as applicable, (i) the compensation paid to the chapter 7 trustee, (ii) the asset disposition, (iii) taxes, (iv) litigation, (v) chapter 7 operations and (vi) any unpaid chapter 11 administrative claims, among other things.

100.      A chapter 7 liquidation could also trigger certain additional priority claims (*e.g.*, claims for severance pay) or accelerate the payment of certain priority claims (*e.g.*, tax claims), that would otherwise be payable in the ordinary course of business, but which, in a liquidation scenario, would instead be paid in from net proceeds (after paying secured claims to the extent of the value of the underlying collateral but before paying unsecured creditors or equity holders). Additionally, liquidation would likely increase, perhaps significantly, the aggregate amount of unsecured claims arising from additional lease rejections or litigation, among other things.[127]

101.      Here, all rejecting holders of impaired claims or interests will receive or retain property valued, as of the Effective Date, at an amount greater than the value of what they would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

---

[126]   *See 203 N. LaSalle St. P'ship*, 526 U.S. at 441 n.13 ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *Source Enters.*, 2007 WL 2903954, at *7; *In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (§ 1129(a)(7) is satisfied if the impaired holder would receive no less what would be received in a hypothetical liquidation").

[127]   *See generally* Liquidation Analysis, Discl. Stmt., Ex. E.

| Class Description | Estimated Aggregate Claims | Estimated Percent Recovery | |
|---|---|---|---|
| | | Plan | Liquidation |
| Class 1 Other Priority Claims | $0-1 million | 100% | 0-19% |
| Class 2 Other Secured Claims | $0 | 100% | 100% |
| Class 3 Prepetition Credit Agreement Claims | $1.645 billion | 53% - 63% | 18% - 23% |
| Class 4 Unsecured Claims Related to Operations | $20-25 million | 100% | 0% |
| Class 5 Other General Unsecured Claims | $110-120 million | 3.3% - 3.6% | 0% |
| Class 6 Senior Subordinated Note Claims | $628 million | <1% | 0% |
| Class 7 Section 510(b) Claims | $0 | 0% | 0% |
| Class 8 Equity Interests | $0 | 0% | 0% |
| Class 9 Intercompany Interests | $0 | N/A | N/A |
| Class 10 Intercompany Claims | $70 million | N/A | N/A |

102.     The Liquidation Analysis demonstrates that the estimated proceeds available for allocation (net required costs and expenses) from a hypothetical chapter 7 liquidation of the Debtors' assets would total between $357,475,000 and $437,481,000, subject to the estimations and assumptions set forth therein.  Thus, in a liquidation scenario, only chapter 7 administrative claims would be paid in full — all other claim holders would be impaired.  A disorderly liquidation of the Debtors' assets would create a class of administrative and priority claims of approximately $500-527 million, including customer subscription liabilities of approximately $400 million.  This class of claims would recover prior to any distribution to the class of General Unsecured Claims.[128]  This is in direct contrast to the Plan, which provides recoveries to general unsecured creditors in classes 4, 5 and 6 of approximately 100%, 3.6% and 1%, respectively.

103.     Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(7) of the Bankruptcy Code.

---

[128]   *See* Young Decl., at ¶ 23; Liquidation Analysis, Discl. Stmt., Ex. E..

K&E 16165851.3

### H. The Plan Has Been Accepted by the Requisite Classes (§ 1129(a)(8)).

104. Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan. Pursuant to section 1126(c) of the Bankruptcy Code, a class of impaired claims accepts a plan if holders of at least two thirds in dollar amount and more than one half in number of the claims in that class actually vote to accept the plan. Pursuant to section 1126(d), a class of interests accepts a plan if holders of at least two thirds in amount of the allowed interests in that class actually vote to accept the plan. A class that is not impaired under a plan, and each holder of a claim or interest in such a class, is conclusively presumed to have accepted the plan.[129] On the other hand, a class is deemed to have rejected a plan if the plan provides that the claims or interests of that class do not receive or retain any property under the plan on account of such claims or interests.

105. As evidenced by the Voting Reports, and summarized in the chart above, Classes 3, 4, 6 and 10 voted to accept the Plan. Class 5 was the only Voting Class that did not vote to accept the Plan (in dollar amount only). Although section 1129(a)(8) of the Bankruptcy Code has not been satisfied, however, as discussed in Part I, the Plan satisfies the requirements set forth in section 1129(b) of the Bankruptcy Code to "cram down" the rejecting classes.

106. Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(8) of the Bankruptcy Code.

---

[129] 11 U.S.C. § 1126(f); *see In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 290 (2d Cir. 1992) (an unimpaired class is presumed to have accepted the plan); *see also* S. Rep. No. 989, 95th Cong. 2d Sess. 123 (1978) (Section 1126(f) of the Bankruptcy Code "provides that no acceptances are required from any class whose claims or interests are unimpaired under the Plan or in the order confirming the Plan.").

K&E 16165851.3

### I. The Plan Provides for the Payment of Priority Claims (§ 1129(a)(9)).

107. Section 1129(a)(9) of the Bankruptcy Code requires that claims entitled to priority under section 507(a) must be paid in full in cash, unless the holder thereof agrees to a different treatment with respect to such claim. In accordance therewith, the Plan generally provides that:

- Allowed Administrative Claims will be paid in full in cash on or as soon as reasonably practicable after the Effective Date or, if not then due or Allowed, on or as soon as reasonably practicable after the date such Claim is due or becomes Allowed, consistent with section 1129(a)(9)(A);

- Allowed Other Priority Claims will be paid in full in cash on or as soon as reasonably practicable after the Effective Date or, if not then due or Allowed, on or as soon as reasonably practicable after the date such Claim is due or becomes Allowed, consistent with section 1129(a)(9)(B); and

- Allowed Priority Tax Claims will be paid in full in cash on or as soon as reasonably practicable after the Effective Date or paid in installments over a period of no more than five years, consistent with section 1129(a)(9)(C).

108. Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(9) of the Bankruptcy Code.

### J. The Plan Has Been Accepted by at Least One Impaired Class (§ 1129(a)(10)).

109. Section 1129(a)(10) of the Bankruptcy Code is an alternative to the requirement that each class of claims or interests must either accept a plan or be unimpaired under the plan set forth in section 1129(a)(8) of the Bankruptcy Code. Section 1129(a)(10) of the Bankruptcy Code provides that if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.[130] Excluding any insider votes, three Impaired Classes of Claims voted to accept the Plan – Class 3, Class 4 and Class 6 – thereby satisfying the requirements of section 1129(a)(10) of the Bankruptcy Code.[131]

---

[130] 11 U.S.C. § 1129(a)(10) .

[131] *See* Voting Certifications.

110.     Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.     The Plan Is Feasible (§ 1129(a)(11)).**

111.     Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine, in relevant part, that confirmation is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successor thereto).  This has been interpreted by courts in this district as requiring a determination that the Plan "has a reasonable likelihood of success."[132] While the feasibility inquiry "is peculiarly fact intensive and requires a case by case analysis," to demonstrate the Plan's feasibility requires "a relatively low threshold of proof."[133]

112.     In assessing feasibility, courts consider a number of probative factors, including: (a) the soundness and adequacy of the capital structure and working capital for the debtor's post-confirmation business; (b) the prospective availability of credit; (c) whether the reorganized debtor will have the ability to meet its requirements for capital expenditures; and (d) economic and market conditions.

113.     As set forth in the Williams Declaration, an analysis of these factors in the context of these Chapter 11 Cases leaves little doubt that the Plan is feasible and no parties in interest have challenged confirmation of the Plan based on lack of feasibility.  The Debtors sought

---

[132]  *See In re DBSD North America, Inc.*, 09-13061, 2009 WL 3491060, at *16 (REG) (Bankr. S.D.N.Y. Oct 26, 2009) ("In making determinations as to feasibility, ... a bankruptcy court does not need to know to a certainty or even a substantial probability, that the plan will succeed. All it needs to know is that the plan has a reasonable likelihood of success.") (internal citations omitted); *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 421-22 (S.D.N.Y.2003) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed.") (citing *Johns-Manville*, 843 F.2d 636, at 649 (2d Cir. 1988); *In re Texaco Inc.*, 84 B.R. 893, 910 (Bankr.S.D.N.Y.1988) (A plan is feasible if there is a "reasonable assurance of commercial viability"); *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986) ("Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11).").

[133]  *See DBSD North America, Inc.*, 2009 WL 3491060, at *16 ("[T]he feasibility inquiry is peculiarly fact intensive and requires a case by case analysis, using as a backdrop the relatively low parameters articulated in the statute.") (internal citations omitted).

chapter 11 protection primarily to effect the restructuring and substantial de-leveraging of the Debtors' capital structure to bring it into alignment with the Debtors' future operating prospects and to provide the Debtors with greater liquidity to fund operations. Thus, the Plan includes a balance sheet restructuring that substantially reduces leverage and interest expense. As set forth in more detail below, the Debtors have thoroughly analyzed their ability to meet their obligations under the Plan post-Confirmation and submit that Confirmation is not likely to be followed by liquidation or the need for further reorganization, unless such liquidation or reorganization is proposed in the Plan. As also further described below and in the Williams Declaration, the Debtors have reliable sources of liquidity and have secured valuable post-emergence financing commitments.[134] As such, the Debtors have a demonstrated ability to fund distributions required under the Plan, including to taxing authorities, administrative claimants and other unimpaired Classes of Claims. Moreover, the Debtors have successfully negotiated important concessions from some of their key suppliers that will support the Debtors' ability to execute against their exit business plan.

(i)    The Debtors Have Restructured Existing Debt.

114.    Turning first to the soundness and adequacy of the Debtors' capital structure upon emergence, consummation of the Plan assures that the Debtors emerge dramatically deleveraged, with modest overall indebtedness more appropriately aligned to their debt capacity. Specifically, the Debtors will reduce their current funded debt of approximately $2.2 billion down to $555 million — including an exit financing facility. With the exception of approximately $300 million in take-back paper and the reinstatement of the Euro Term Loan, the Debtors' $1.645

---

[134]    *See* Williams Decl., at ¶ 7.

billion obligations to the Prepetition Lenders under the Prepetition Credit Agreement is being exchanged for substantially all of the new common equity of the reorganized company.

115.     This substantial de-leveraging of the Debtors' balance sheet and reduction in interest obligations will better position the Debtors to compete in the extremely volatile and media and direct marketing sector.  With a restructured balance sheet, the Reorganized Debtors will be positioned to maintain market-rate credit and trade terms with critical suppliers domestically and abroad, and to raise any necessary additional capital to continue funding their businesses.[135]

116.     In light of current credit market conditions and the complexity of the Debtors' businesses and capital structure, the Plan is an impressive achievement.  In short, there can be no serious doubt that the Debtors will emerge far healthier financially than they were a mere six months ago or that the Plan maximizes value of the Debtors' estates while leaving their operations intact.  Therefore, this factor weighs in favor of feasibility.

> (ii)     The Debtors Have Sufficient Cash and
>          Have Secured Valuable Exit Financing

117.     As set forth in the Williams Declaration/Disclosure Statement, the Debtors project that they will have sufficient cash of between $170 - $200 million as of the Effective Date.  The Debtors' favorable liquidity position will assist the Debtors in their attempt to successfully transition out of chapter 11 by ensuring the availability of additional working capital for operational expenses and capital expenditures, thus demonstrating that the Plan is feasible.  Additionally, as further described herein, the Debtors' available liquidity will enable them to fund payments required under the Plan.

---

[135]    *See* Williams Decl., at ¶ 51.

K&E 16165851.3

118.    The Debtors also have sufficient liquidity and access to available working capital, and related financing commitments, for no less than the next three years, subject to the terms and conditions of the Exit Credit Agreement.  In light of current market improvements, the Debtors are also pursuing a bond issuance to refinance their exit debt and reduce their cost of capital, which reflects that the Debtors will have financing alternatives available post-emergence.[136]

(iii)    The Plan Has Been Scrutinized and Validated by Key Stakeholders.

119.    The Debtors' key stakeholders have scrutinized the Plan and its financial projections.  In fact, for months, these key stakeholders — the Committee and the Prepetition and DIP Lenders — have worked hand in hand with the Debtors to achieve both the financial and operational restructuring initiatives that will allow the Debtors to achieve success post-emergence.[137]  During this process, these stakeholders and their advisors reviewed the financial projections and multiple permutations of the Debtors' business plan and provided feedback that was in many cases incorporated into the Plan.  That these stakeholders agreed to support the Plan — is a testament to the feasibility of the Plan and to its likelihood of success.[138]

120.    Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(11) of the Bankruptcy Code.

**L.    The Plan Provides for the Payment of Certain Statutory Fees (§ 1129(a)(12)).**

121.    Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28 U.S.C. § 1930 must be paid or that provision be made for their payment under a chapter 11 plan.

---

[136]    *See* Williams Decl., at ¶ 51.

[137]    *See* Williams Decl., at ¶ 51.

[138]    *See, e.g., In re Journal Register Co.*, 2009 WL 1941624, at *16 (finding the plan was feasible in part because debtors "provided credible financial projections and testimony regarding the post-confirmation availability of funds to maintain their operations and obligations," including the testimony of an "experienced restructuring professional"); *In re Leslie Fay Co.*, 207 B.R. at 789 (holding that plan was feasible based on testimony of the debtors' management and financial advisors).

K&E 16165851.3

Here, Article II.D of the Plan provides that fees payable under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717, will be paid until the entry of a final order or dismissal or conversion of these chapter 11 cases. Indeed, such fees have been paid or will be paid on the Effective Date. Accordingly, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**M.    The Plan Provides for the Continuation of Retiree Benefits (§ 1129(a)(13)).**

122.    Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the continuation, after the plan's effective date, of all retiree benefits at the level established by agreement or by court order pursuant to section 1114 of the Bankruptcy Code at any time prior to confirmation of the plan, for the duration of the period to which the debtor has obligated itself. Pursuant to Article V.D of the Plan, the Debtors' obligations with respect to the payment of "retiree benefits" (as defined in section 1114(a) of the Bankruptcy Code) will continue for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, and subject to any contractual rights to terminate or modify such benefits.

123.    It is significant to note that, contrary to recent restructuring trends in a downturn economy, the Plan provides that "retiree benefits" within the meaning of section 1114(a) of the Bankruptcy Code (*e.g.*, medical and dental benefits for former employees and their spouses and dependants) will continue post-confirmation for the duration of the periods for which the Debtors have obligated themselves to provide such benefits, if any (subject to any rights to terminate or modify such benefits consistent with applicable non-bankruptcy law and the terms of the plan).[139]

---

[139]    *See* Plan, at Art. V.D; Discl. Stmt., at § IV.G.2 (the plan described here provides that former employees (and their spouses and dependents) who retired from participating Debtors on or after January 1, 1985 and have not attained age 65 are eligible for Debtor-subsidized retiree medical benefits through 2017 and Debtor-subsidized retiree dental benefits through 2009. For former employees (and their spouses and dependents) who retired from

124. Thus, notwithstanding that the Bankruptcy Code provides debtors reorganizing under chapter 11 with a mechanism to discontinue "retiree benefits" of the same nature as those here, the Reorganized Debtors are nevertheless going to continue to satisfy the minimum funding standards and otherwise administer this plan consistent with its terms and the relevant provisions of ERISA and the Internal Revenue Code post-confirmation (subject to statutory and contractual rights modify or terminate the plan).

125. Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(13) of the Bankruptcy Code.

**N.    The Plan Satisfies the Applicable "Cram Down" Requirements of § 1129(b).**

126. Section 1129(b) of the Bankruptcy Code allows for confirmation of a plan in cases where all requirements of section 1129(a) are met other than section 1129(a)(8) (*i.e.*, the plan has not been accepted by all impaired classes of claims), by allowing a court to "cram down" the plan notwithstanding objections as long as the court determines that the plan is "fair and equitable" and does not "discriminate unfairly" with respect to the dissenting classes.[140]

127. The "unfair discrimination" requirement of section 1129(b) of the Bankruptcy Code is discussed at length in Part I above. For all of the reasons set forth therein, and as will be further demonstrated at the Confirmation Hearing, the Debtors respectfully submit that the Plan

---

participating Debtors on and after January 1, 1985 and who have attained age 65 or older, the current plan provides for Debtor-subsidized retiree medical coverage through 2012 and Debtor-subsidized retiree dental coverage through 2009. With respect to former employees (and their spouses and dependents) who retired from participating Debtors prior to January 1, 1985, retiree medical and dental benefits continue to be 100% - subsidized by the Debtors, subject to all rights to amend, modify and terminate any retiree medical and dental plan to the extent consistent with applicable law and the applicable plans post-confirmation.").

[140]    11 U.S.C. § 1129(b)(1); *see In re Worldcom, Inc.*, No. 02-13533, 2003 WL 23861928, at *59-60 (AJG) (Bankr. S.D.N.Y. Oct 31, 2003) ("Section 1129 of the Bankruptcy Code provides, in relevant part: "Notwithstanding section 510(a) of [the Bankruptcy Code], if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.").

K&E 16165851.3

fully satisfies the "unfair discrimination" requirements of section 1129(b) of the Bankruptcy Code and, therefore, the objections of RDRG and Opera should be overruled on the merits.

128.    A plan is considered "fair and equitable" pursuant to sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy Code if, with respect to a class of impaired unsecured claims or interests, the plan provides that no holder of any junior claim or interest will receive or retain under the plan on account of such junior claim or interest any property. This central tenet of bankruptcy law—the "absolute priority rule"—requires that if the holders of claims in a particular class receive less than full value for their claims, no holders of claims or interests in a junior class may receive any property under the plan.[141]   The corollary of the absolute priority rule is that senior classes cannot receive more than a 100% recovery for their claims. The Plan satisfies the absolute priority rule with respect to all non-accepting Impaired Classes.

129.    Section 1129(b)(2)(B) provides that a class of unsecured claims satisfies the absolute priority rule where:  (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.[142]

130.    Here, there is no Class junior to Classes 5 and 6 that is receiving or retaining any property on account of a Claim or Interest under the Plan. Likewise, no Holders of Claims in senior Classes will receive more than 100% of their Allowed Claims.

---

[141]   See *203 N. LaSalle St. P'ship*, 526 U.S. at 441-42.

[142]   11 U.S.C. § 1129(b)(2)(B).

131.     Accordingly, the Debtors submit that the Plan fully complies with, and satisfies the "fair and equitable" requirements of, section 1129(b) of the Bankruptcy Code.

**O.     The Management Incentive Programs Are Appropriate and Permissible and Should Be Approved.**

132.     The Plan contemplates the adoption of two incentive compensation programs that will provide cash-based incentives for continuing employees eligible to participate in such plans: (a) the Variable Compensation Plan and (b) the Enterprise Value Maximization Plan.  The Plan also provides for the Management Equity Plan (together with the Variable Compensation Plan and the Enterprise Value Maximization Plan, the "***Management Incentive Programs***"), which will grant equity awards to certain continuing employees and directors of the Reorganized Debtors.[143]

133.     These plans – which are all post-emergence management incentive plans – were developed by the Debtors, in consultation with their advisors, and the terms, conditions and payment structures were extensively negotiated with the Prepetition Agent, on behalf of the future owners of the company, as part of the Restructuring Support Agreement, to protect enterprise value during these cases and going forward.[144]  Information related to the Management Incentive Programs (i) was disclosed on the Commencement Date, (ii) further described in the Disclosure Statement filed on October 10, 2009, (iii) included in the Plan solicited to and accepted by voting parties and (iv) is not the subject of any objection to confirmation filed with the Court.[145]

---

[143]     *See* Plan, at Art. V.A, V.B.

[144]     *See* Young Decl., at ¶ 10.

[145]     *See* (i) the Declaration of Thomas A. Williams, Chief Financial Officer and Senior Vice President of The Reader's Digest Association, Inc. in Support of First Day Pleadings [Docket No. 3], (ii) Exhibit F to the Disclosure Statement filed on October 9, 2009 [Docket No. 163] and (iii) First Supplement to the Plan Supplement [Docket No.423].

134.    Moreover, as set forth in the Friske Declaration, the Management Incentive Plans are reasonable, comparable to market and consistent with those approved by courts in this and other districts in connection with the confirmation process.[146]  Finally, given that these are post-Effective Date compensation and benefit plans, they are included in the Plan for purposes of disclosure more than because they require approval.[147]  Nevertheless, because the Plan provides for the adoption of the Management Incentive Programs as of the Effective Date, the Debtors believe it is appropriate to address the programs in connection with confirmation of the Plan.  If any legal standard applies to such programs, it must be found in section 1129 of the Bankruptcy Code —*i.e.*, if a plan of reorganization is confirmable after giving effect to the payments made under the compensation programs, then the plan should be confirmed.

(i)    Payments Under the Management Incentive Programs Do Not Implicate Section 503(c) but Would Be Permissible Even if They Did.

135.    Section 1129(a)(1) requires that a plan of reorganization must comply with all applicable provisions of the Bankruptcy Code.  Section 1129(a)(1) does not, however, implicate section 503(c) of the Bankruptcy Code — which addresses the allowance of retention incentives or severance to insiders, and bonuses granted to other employees, as administrative expenses of the bankruptcy estate.[148]  As one court in this district has noted, the legislative history of section

---

[146]   *See* Friske Decl., at ¶ 21.

[147]   Plan provisions that effectively implement post-bankruptcy programs or plans using non-estate resources, including post-Effective Date management incentive plans such as those included in the Plan, are considered more of a "technicality" (*i.e.*, a mechanism to implement rather than a term implementing), for example, by providing for the issuance of common stock in connection with a post-emergence equity plan.  As such, the presence of such provisions in 11 plan generally does not provide grounds for denial of confirmation of such plan.  *See In re Journal Register Comp.*, 407 B.R. 520, 533 (ALG) (Bankr. S.D.N.Y. 2009) ("the Second Circuit has cautioned that a plan should not be denied confirmation because of a "technicality" or "harmless error"); *Johns-Manville Corp.*, 843 F.2d at 648 (it is a "well established principle that relief under the bankruptcy laws is not to be withheld because of technicalities") (citing *Pepper v. Litton*, 308 U.S. 295 (1939)).

[148]   *Cf. JournalRegister*, 407 B.R. at 535 (noting that the legislative history of section 1129(a)(1) suggests that it is limited to sections 1122 and 1123 but nevertheless considering an incentive plan proposed in connection with a plan of reorganization under section 503(c)).

64

1129(a)(1) suggests that the term "applicable provisions" means "the applicable provisions of chapter 11, such as section 1122 and 1123, governing classification and contents of [a] plan."[149]

136.    Even if section 1129(a)(1) generally implicates section 503(c), however, the post-Effective Date Management Incentive Programs would be permissible because they do not contemplate payments as administrative expenses of the Debtors bankruptcy estates pursuant to section 503 of the Bankruptcy Code.    Instead, under the plans, subject to satisfaction of qualifying criteria, management would be "paid subsequent to confirmation of the Plan."[150]   In other words, section 503(c) would not even apply to payments made under the Management Incentive Programs.[151]

137.    In any event, the Management Incentive Programs do not violate any of the provisions of section 503(c).  Specifically, section 503(c)(1) provides that "there shall neither be allowed, nor paid . . . a transfer made to, or an obligation incurred to the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the business" unless specific conditions are satisfied.[152]   Not only will management bonuses be paid under the Management Incentive Programs only after the Effective Date, but such bonuses will only be paid if certain performance objectives are achieved.   The principal purpose of the Management Incentive Programs is **not** to induce participants to remain with the Debtors; it is to incent or incentivize

---

[149]   *In re JournalRegister Co.*, 407 B.R. 520, 535 (Bankr. S.D.N.Y. 2009) (quoting S. Rep. No. 989, 9th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.S.C.A.N. 5787; H.R. Rep. No. 595, 9th Cong., 2d Sess. 412 (1977), *reprinted in* 1978 U.S.S.C.A.N. 5787).  *See also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) ("It is doubtful that violations of the Code provisions unrelated to the form and content of a plan, such as voting procedures, implicate subsection 1129(a)(1) at all.").

[150]   *See id.*

[151]   *See id.* at 535 n.8 ("Like the rest of § 503, subsection 503(c) applies only when the proposed bonuses are to be paid as administrative expenses of the bankruptcy estate.").

[152]   *See* 11 U.S.C. § 503(c)(1).

performance by management to achieve results that will improve the value of the Reorganized Debtors and, therefore, the recoveries to the Prepetition Lenders.[153]

138.    Likewise, section 503(c)(2) does not apply to payments under the Management Incentive Programs because such payments are not severance payments or otherwise triggered by the termination of a recipients employment.[154]

139.    Finally, section 503(c)(3) only applies to limit the allowance as an administrative expense of "transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers or consultants hired after the date of filing the petition."[155]    Here, as the court held in *JournalRegister*, the facts and circumstances certainly justify approval of the Management Incentive Programs, even assuming section 503(c)(3) applies.

140.    Even though no payments will be made out of estate assets because all obligations are due post-Effective Date, "by including the Incentive Plans in their plan of reorganization, the Debtors have subjected the Incentive Plans to the heightened disclosure, notice and hearing requirements of the Plan confirmation process, and have given affected parties the opportunity to vote on it."[156]    In fact, no objections to the compensation plan have been received.  Moreover,

---

[153]    *See* Young Decl., at ¶ 10; *see also JournalRegister*, 407 B.R. at 536 (finding that where the principal purpose of a plan "is not to induce participating employees to remain with the Debtors" section 503(c)(1) does not apply); *In re Dana Corp.*, 358 B.R. 567, 571, 575-77 (Bankr. S.D.N.Y. 2006).

[154]    *See* 11 U.S.C. § 503(c)(2) (setting certain limitations on the allowance of "a severance payment to an insider" as an administrative expense); *see also Straus-Duparquet, Inc. v. Local Union No. 3, IBEW*, 386 F.2d 649, 651 (2d Cir. 1967), *cited in Journal Register*, 407 B.R. at 536 (holding that section 503(c)(2) did not apply to incentive plan payments not "triggered by a termination of employment event, as is normally the case with severance payments").

[155]    11 U.S.C. § 503(c)(3).

[156]    *JournalRegister*, 407 B.R. at 536-37.

K&E 16165851.3

like in *JournalRegister*, the senior secured lenders, who as the new owners "will bear the financial burden of the Incentive Plans, have overwhelmingly accepted the Debtor's Plan, and the recoveries of unsecured creditors . . . are ***not*** affected by the Incentive Plan."[157]

        (ii)    Payments Under the Management Incentive
                  Programs Satisfy the Requirements of Section 1129(a)(4).

141. The conclusion that the Management Incentive Programs are not subject to 503(c) is bolstered by the fact that there is a subsection of section 1129 that is directly applicable to payments made in connection with the Plan, such as the Management Incentive Programs.[158] Section 1129(a)(4) requires that "any payment made or to be made by the proponent, by the debtor . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to approval of, the court as reasonable."[159] "The requirements under section 1129(a)(4) are two-fold. First there must be disclosure. Second, the court must approve the reasonableness of the payment."[160]

142. The determination whether a payment is reasonable under section 1129(a)(4) requires an analysis of reasonableness based on the facts and circumstances of the payments. As one Court noted, the issue of reasonableness:

> will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives the typical case, payments that are not payable from, or reimbursable by, the bankruptcy estate should not engender

---

[157]   *JournalRegister*, 407 B.R. at 537 (emphasis added); *see also In re Airway Indus., Inc.*, 354 B.R. 82, 86 (finding section 503(c) inapplicable where, among other things, a bonus plan was funded with non-estate assets and had no effect on the objecting creditors' recoveries).

[158]   *See* 11 U.S.C. § 1129(a)(4).

[159] *See* 11 U.S.C. § 1129(a)(4).

[160]   *See* 7 Collier on Bankruptcy ¶ 1129.03[4].

K&E 16165851.3

anything like the judicial scrutiny devoted to those that are not payable out of the bankruptcy estate.[161]

143.    As set forth above, payments due under the Management Incentive Programs will be paid after the Effective Date from assets (*i.e.*, cash and equity value) that will be owned by the Prepetition Lenders. The Management Incentive Programs have been disclosed since the filing of the Restructuring Support Agreement and were described in the Disclosure Statement and are set forth in detail in the Plan Supplement, which gave holders of claims against these estates an opportunity to factor the payments into their decision whether to accept the Plan. Towers Watson has further opined that the proposed compensation is in line with the market for compensation of top executives of similar companies. Accordingly, the payments to be made under the Management Incentive Programs comply with section 1129(a)(4).

## III.    **The Debtors' Request for a Limited Waiver of Stay to Consummate the Plan Should be Approved.**

144.    The Debtors are seeking a limited waiver of the 14-day stay provided under Bankruptcy Rule 3020 so that they can close quickly after entry of the Confirmation Order. Bankruptcy Rule 3020(e)  provides that "[a]n order confirming a plan is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."

145.    The Committee, the Prepetition Lenders and the Debtors have worked cooperatively throughout this reorganization and are now prepared to confirm a Plan that is supported by the vast majority of the Debtors' stakeholders. The Debtors are poised to exit chapter 11 shortly after entry of the Confirmation Order, should the Court determine that the Plan is confirmable. The Debtors have been preparing for emergence at month end and have undertaken significant efforts in order to implement "fresh start" accounting on the first of

---

[161]    *Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 517 (5th Cir. 1998), cert. denied, 526 U.S. 1144 (1999).

February.   If the appeal period has not expired by the end of the month and the Debtors are not able to "go effective" with the Plan, the delay is expected to result in significant external accounting expenses.  Accordingly, the Debtors seek a limited waiver of the stay period only to the extent necessary to select an "Effective Date" prior to February 1, 2009.

146.    Accordingly, the Debtors request that a waiver of the 10-day stay pursuant to Rule 3020 be granted to that the Plan may be consummated quickly.

K&E 16165851.3

## **Conclusion**

For all of the reasons set forth herein and in the supporting declaration attached hereto, and as will be further shown at the Confirmation Hearing, the Debtors submit that the Plan fully satisfies all of the applicable requirements of the Bankruptcy Code.  Accordingly, the Debtors respectfully request that the Court enter the proposed Confirmation Order confirming the Plan, overrule any remaining objections and grant such other and further relief as is just and proper.

Dated:  January 11, 2009
          New York, New York

/s/  Nicole L. Greenblatt
James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

Counsel to the Debtors
and Debtors in Possession

K&E 16165851.3